```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF MINNESOTA
 2
          ------------------------------------------------------------
 3                                      )
          IN RE: GRANULATED SUGAR       )   File No. 24-md-3110
 4        ANTITRUST LITIGATION          )          (JWB/DTS)
                                        )
 5                                      )
                                        )   St. Paul, Minnesota
 6                                      )   August 20, 2024
                                        )   2:06 p.m.
 7                                      )
                                        )
 8                                      )
          ------------------------------------------------------------
 9

10

11

12

13

14             BEFORE THE HONORABLE JERRY W. BLACKWELL
                    UNITED STATES DISTRICT COURT JUDGE
15             AND THE HONORABLE DAVID T. SCHULTZ
               UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
16
                          (STATUS CONFERENCE)
17

18

19

20

21

22

23

24          Proceedings recorded by mechanical stenography;
          transcript produced by computer.
25
```

```
 1     APPEARANCES

 2     For Direct Purchaser        Gustafson Gluek, PLLC
       Plaintiff Northern          DANIEL C. HEDLUND, ESQ.
 3     Frozen Foods, Inc.,         Suite 2600
       d/b/a Northern Haserot:     120 South Sixth Street
 4                                 Minneapolis, Minnesota 55402

 5     For Consumer Class          Robbins Geller Rudman & Dowd LLP
       Plaintiffs Laura Fowler     ALEXANDRA S. BERNAY, ESQ.
 6     and Isabella Benmeleh:      655 West Broadway
                                   Suite 1900
 7                                 San Diego, California 92101

 8     For Commercial Class        Freed Kanner London & Millen LLC
       Plaintiffs WNT, LLC;        KIMBERLY A. JUSTICE, ESQ.
 9     WNT Farmington LLC; and     923 Fayette Street
       Morelos Bakery LLC:         Conshohocken, Pennsylvania 19428

10

11     For the Defendants          Latham & Watkins LLP
       United Sugar Producers      LAWRENCE E. BUTERMAN, ESQ.
12     & Refiners Cooperative:     1271 Avenue of the Americas
                                   New York, New York  10020
13

14     For the Defendants          A&O Shearman
       Domino Foods, Inc; ASR      TODD STENERSON, ESQ.
       Group International,        401 9th Street, NW
15     Inc.; and American          Suite 800
       Sugar Refining, Inc.:       Washington, DC  20004
16
       Court Reporter:             ERIN D. DROST RMR-CRR
17                                 Suite 146
                                   316 North Robert Street
18                                 St. Paul, Minnesota 55101

19

20

21

22

23

24

25
```

```
 1        Also present on behalf of Plaintiffs:
                     Shawn M. Raiter
 2                   Heidi Silton
                     Dave Cialkowski
 3                   Josh Rissman
                     Michael Flannery
 4                   Bobby Pouya
                     Peter Barile
 5                   Adam Zapala
                     Daniel Warshaw
 6                   Melissa Weiner
                     Abou Amara
 7                   Rita Wang
                     Michele Burkholder
 8                   Karen Halbert
                     Mike Roberts
 9                   Erich Schork
                     Garrett Blanchfield
10                   Elizabeth Fegan
                     Rachhana Srey
11                   Scott Martin
                     Joseph Kohn
12                   Christopher Le
                     Sisto Bediako
13                   Nicole Veno
                     Michelle Looby
14                   Andrew Wolinsky
                     Arthur Shingler
15                   Dayron Silverio
                     Peter Prieto
16                   Joseph Bourne
                     Jessica Servais
17                   Isreal David
                     Greg Asciolla
18                   Alexander Barnett
                     Brant Penney
19
          Also present on behalf of Defendants:
20                   Djordje Petkoski
                     Benjamin Waldin
21                   Moira Penza
                     Jessica Nelson
22                   Amelia Rasmussen
                     Gina Tonn
23                   Aaron Knoll
                     Andre Hanson
24                   Jill Radloff
                     Dan Mott
25
```

**P R O C E E D I N G S**

**IN OPEN COURT**

1
2
3
4       THE COURT:  Please be seated.  Would you please
5   call the case.
6       THE COURTROOM DEPUTY:  We are here for the matter
7   of Granulated Sugar Antitrust Litigation, Case Number
8   24-md-3110 JWB/DTS.
9       THE COURT:  Good afternoon to all of you.
10      ATTORNEYS:  Good afternoon.
11      THE COURT:  I was going to say, you can say that.
12  I am here with Judge Schultz who will be your Magistrate
13  Judge on this case, and we are honored to be your judges on
14  this case and we are pleased about it.  And we can tell you
15  that given your anticipated good conduct and
16  professionalism, that you will help us to remain pleased to
17  be your judges on this case.
18      Let me ask, I've got here the sign-in sheets from
19  everyone.  Is there anyone appearing today who has not
20  signed in already?
21      All right.  Then I won't go through the
22  appearances.  The appearances will be taken from the sign-in
23  sheets.
24      And so what we plan to do this afternoon is just
25  to get acquainted a little bit.  This is just the beginning

1    of our table setting in the case.  I've got some ideas and

2    thoughts about it, and there's some things I want to run

3    past you and then we want to hear from you also.

4           So with that said, have you sorted out who might

5    initially be speaking on behalf of the plaintiffs and/or the

6    defendants?  So who's going to come up initially and speak

7    for the plaintiffs?

8           MR. HEDLUND:  Good afternoon, Your Honor.  Dan

9    Hedlund, Gustafson Gluek, on behalf of Northern Frozen Foods

10   and direct purchaser plaintiffs and other plaintiffs at

11   times, although they appear for themselves also.

12          THE COURT:  So why don't you come on up initially

13   and -- because I want you to assume that Judge Schultz and I

14   don't know much about this other than we both eat sugar and

15   I eat more than he does.

16          And so if you would, just for starters, I

17   understand that there essentially are three tranches here

18   from -- the direct purchasers and then we have two

19   categories of indirects, the consumers and commercial.

20          MR. HEDLUND:  That is correct, Your Honor.

21          THE COURT:  Can you -- who is in each?  I can say

22   the names, but I don't know exactly what it means.  If -- if

23   I've got a grocery store, is that an indirect?  Can you help

24   to set the table for us a little bit?

25          MR. HEDLUND:  Yes, Your Honor.  And if my

1    colleagues from the other classes wish to correct me on how

2    they are defining themselves, I'll let them step up.

3            THE COURT:  Let me ask by the way, too, for the

4    defendant, is there a spokesperson for the defendant here?

5            MR. BUTERMAN:  Good afternoon, Your Honor.

6    Lawrence Buterman from Latham & Watkins.  I represent United

7    Sugar.  I'll be doing the bulk of the speaking today, but my

8    colleagues are representing some of the other defendants.

9            THE COURT:  All right.  Then why don't you come on

10   up and stand next to him at the podium.  That way if he's

11   wrong, you correct him right away.

12           So with that said, you were giving us just at

13   30,000 feet.

14           MR. HEDLUND:  Sure, Your Honor.  I'll just note

15   for the record that as the Court may be aware, there have

16   been several other cases around the country involving

17   protein, for example.  There's a *chicken* case in Chicago and

18   then there's a *turkey* case there and then there's a *beef*

19   case here in Minnesota in front of Judges Tunheim and Judge

20   Docherty and there's also a *pork* case, which I suspect, you

21   know, you're both aware of.

22           But in any event, these types of food commodity

23   cases have essentially broken out into three tracks, with

24   direct purchaser plaintiffs, who I'm here on behalf of.

25   Those consist mainly of large purchasers.  Some examples

1    might be like Sysco and U.S. Foods.  We don't represent

2    those -- those entities directly here, but those would be

3    examples.  There could be --

4            THE COURT:  So are these even potentially

5    resellers then?

6            MR. HEDLUND:  Yes.  That is what they do.  They

7    are distributors or resellers of sugar.

8            There's also grocery chains that are large enough

9    that it makes sense for them to purchase sugar directly and

10   then stock their stores and then sell to the consumers.

11           THE COURT:  Are there then manufacturers who are

12   also buying directly?

13           MR. HEDLUND:  Like soda manufacturers, that sort

14   of thing?

15           THE COURT:  Yeah, well, that's one good example of

16   the --

17           MR. HEDLUND:  Yes, yes.  We currently don't

18   represent a plaintiff like that, but I suspect, yes, if you

19   were to look at it, and perhaps Mr. Buterman could confirm,

20   but that Coca-Cola, for example, I would think would be a

21   direct purchaser.

22           THE COURT:  And what about governmental entities,

23   are any of those at play?

24           MR. HEDLUND:  They may -- they may be direct

25   purchasers, but typically in our class definitions, we

1    exclude them from the class, and so it remains to be seen,

2    but I think that probably some of them are direct

3    purchasers.

4              THE COURT:  All right.  So for the commercial

5    entities, we can have commercial direct and commercial

6    indirect?

7              MR. HEDLUND:  For the -- so in terms of the --

8    what I would describe as the consumer class, those would be

9    anybody who goes to the store and buys sugar.  That's

10   probably one of the more straightforward ones.

11             And then the commercial indirects are going to be

12   primarily -- and, again, folks from that class can speak up

13   if they -- if they disagree -- but I think mostly like

14   restaurants, bakeries, that sort of thing.  So people who

15   will buy the sugar and then convert it into a product or a

16   meal or a -- you know, a baked good that then they turn and

17   sell to consumers.

18             THE COURT:  All right.  Thank you for that.  Are

19   there any recent developments in the case?  This is just my

20   checking in on where are we.

21             MR. HEDLUND:  Yeah, so, I would say obviously as

22   the Court is aware, because we're all here, the panel, in

23   its wisdom, chose to send the cases here to Minnesota, which

24   one panel has described as the sugar beet capital, so I was

25   proud to hear that out at the hearing.

1          But we are here now.  All the cases I think are

2     organized.  I think there's now, last I checked, 55 cases.

3     I believe 54 cases have been reassigned to yourself and to

4     Judge Schultz.  There may be one that hasn't been, although

5     maybe that happened today.

6          There's been -- as the Court is aware, my class

7     submitted on July 3rd, a proposed leadership slate for the

8     direct purchaser plaintiff class.  Last Friday the

9     commercial indirect class submitted a proposed leadership

10    slate.  And the consumer class, as I understand it, proposes

11    to submit papers for what looks to be a contested motion I

12    think a week from today, on August 27th, with replies due

13    one week later -- or maybe eight days later, September 4th.

14         But, otherwise, the -- I think the latest would be

15    that we were pleased to see PTO Number 1 come out, and we

16    have been working, I believe, cooperatively with defense

17    counsel on the joint documents that we submitted for today's

18    conference.  But I think it's just been a lot of sort of

19    organization and sort of figuring out where things are.

20         But, Mr. Buterman, you can weigh in.

21         MR. BUTERMAN:  The only thing I would add,

22    Your Honor, is that there had been a issue.  One of the

23    defendants, Richard Wistisen, the plaintiffs I believe had

24    been trying to serve and had been unsuccessful.  We were

25    contacted by an individual who indicated that he's in the

1    process of working -- an attorney -- working with

2    Mr. Wistisen about potential representation.  So we provided

3    that information to the plaintiffs, and I think that they

4    are going to take it from there and deal with that issue.

5              THE COURT:  So that service issue might get worked

6    out then essentially?

7              MR. BUTERMAN:  I think that's what may happen,

8    probably.

9              MR. HEDLUND:  For the plaintiffs, we're hopeful

10   that now that we have potential lawyers representing

11   Mr. Wistisen and the commodity entity, that we'll be able to

12   work out some sort of service with them.

13             THE COURT:  In terms of the overall kind of

14   breakdown of number of cases in the different tranches, my

15   numbers aren't as current as of today, but at -- this was

16   some point at the end of I suppose last week where I had 5

17   direct purchaser actions, 33 commercial indirect, and 15

18   consumer indirect.  But for the addition of a couple of

19   others that you mentioned, is that the basic breakdown

20   though?

21             MR. HEDLUND:  Your Honor has numbers at the ready

22   better than me, but I believe the last I checked, it was

23   something very similar to that, yes.

24             THE COURT:  All right.  Do you have a different

25   understanding?

```
 1              MR. BUTERMAN:  No, Your Honor.

 2              THE COURT:  And I take it there's still no state

 3     litigation to speak of?

 4              MR. BUTERMAN:  There's no state litigation or

 5     other litigations.

 6              THE COURT:  All right.  So anybody have any kind

 7     of projection for what might be the total number of

 8     anticipated member cases?  What are you thinking?  I'm not

 9     holding you to it at all.  I'm just myself crystal gazing

10     so --

11              MR. HEDLUND:  Yeah, just from past experience in

12     cases, I think now that we are at the point where we're at

13     and we are having the initial conference with the Court,

14     that the -- the cases will trickle, if perhaps not stop.  I

15     wouldn't at this point anticipate on the plaintiffs -- you

16     know, the plaintiffs filing a lot more cases.

17              THE COURT:  All right.  Let me move on to a

18     different subject, which is tutorial day for the Court.

19     It's something I always found useful as a practitioner, was

20     always happy if a Court asked for one.  This Court is asking

21     for one, and I wanted to get your reactions to the idea.

22              MR. BUTERMAN:  Your Honor, on behalf of the

23     defendants, we think it's a great idea.  The sugar industry

24     is very complex.  I spent years representing one of the

25     companies involved in that DOJ litigation that took place in
```

1    Delaware several years ago, which is the impetus, I guess,

2    for the allegations here.

3            And so we would welcome the opportunity to be able

4    to explain to Your Honor the entire process because it's

5    very informative, not only how sugar is produced, but how

6    it's sold in this industry.  There's a very, very

7    significant regulatory overlay, which Judge Noreika found

8    particularly important in analyzing the merger litigation in

9    Delaware.  So we would welcome the opportunity to share that

10   with Your Honor.

11           And also we believe that some of the complexities

12   with respect to how sugar is sold in this country actually

13   play into the allegations here, including the fact that

14   95 percent of all sugar in the United States is sold through

15   long-term contracts.  And what -- what we will all learn at

16   some point is that the information that the plaintiffs are

17   alleging was shared here has nothing to do with long-term

18   contracts.  It has to do with the spot market, which is a

19   very distinct market of only about 5 percent.  And that's

20   information that's not competitively sensitive.  It's shared

21   with the USDA, which our tutorial will explain.

22           So we would very much welcome the opportunity to

23   get that information and get it out quickly also for the

24   plaintiffs because I think it might help them in their -- in

25   their understanding of some of the issues here.

1              THE COURT:  Well, Mr. Hedlund, you're probably

2       wondering what you are doing here then.

3              MR. HEDLUND:  Yes, Your Honor.  So our position on

4       this is we're -- we're not wholesale opposed to it,

5       especially if the Court believes it would be --

6              THE COURT:  Wait a minute.

7              MR. HEDLUND:  -- if the Court is interested.

8              THE COURT:  Wait.  Did you say you are not

9       wholesale opposed?

10             MR. HEDLUND:  I mean, we think that -- because

11      this has come up in some of the other cases.  For example,

12      in the *pork* MDL that Judge Tunheim has, the defendants

13      requested a similar type of day, and -- but it was later in

14      the case, around the time of class certification.  And at

15      that time, the -- Judge Tunheim decided that -- you know,

16      that it could be addressed at the class certification

17      hearing and that that would be sort of the appropriate place

18      to handle it.

19             I think on the plaintiffs' side, we feel a little

20      bit like the defendants -- well, certainly their clients,

21      you know, give them a lot of information about how the

22      industry works, but we get a little bit worried that if it

23      becomes a tutorial day, it becomes sort of also kind of a

24      advocacy day that could just sort of expand time on the

25      motion to dismiss.  So that would be our primary concern.

1    So not -- not opposed, but think it would be more

2    appropriate sort of later in the case.

3           THE COURT:  I hear you, and the only problem with

4    that is I want to know about it on the front of the case.

5    And there obviously are a number of wrong ways that one can

6    go about a tutorial day.  Nobody is going to win the case or

7    lose it from a tutorial day.  So this is just, to me,

8    setting the stage so that we have some better understanding

9    of what the industry is and frankly how it functions, what

10    the different parts are.

11           So I'm going to ask the two sides to come together

12    anyway in proposing what might be an approach to it so that

13    it isn't a free kick at the goal on some dispositive issue

14    in the case.  I'm not really interested in legal argument at

15    all, and I can probably hear what a legal argument is in

16    context.  For me, this is meant to be factual to understand

17    certain technical aspects of the case that I wouldn't

18    understand otherwise.  I presume out of it, I'll get

19    something that looks like a glossary, because though I don't

20    know this, I'm almost certain that there is a whole lexicon

21    that goes with this of things I'll need to understand.

22           So it's to get some basic understanding on the

23    front end.  There are different ways it can be done.  It

24    doesn't have to be necessarily in person.  It can be done by

25    submissions potentially.  I think I prefer in person.  There

1    wouldn't be -- it could be lawyer presentations.  It could

2    be you decide to put on a witness of some kind.  Nobody is

3    subject to cross-examination.  It's all for the Court's

4    education.

5              And I wouldn't intend to have it on the record at

6    all.  This is purely for the Court's information and

7    education.  If the parties felt differently about that, I

8    would certainly hear you out on it.

9              But I say that because the intent isn't to be, in

10   my mind, making a record that goes to any motion or issue.

11   I wouldn't have the expectation at any point in the case

12   that somebody refers back to something that was said at

13   tutorial day.  Just presume that your argument went to mute

14   when you said that, and I just didn't even hear it, because

15   that's not the point of it.  And it's just to get an

16   education on the front end so that, frankly, I better

17   understand your case.  And if you don't want me to

18   understand your case to class cert phase, I might wonder

19   about your case if you want me to wait that long.  I

20   wouldn't, but...

21             So in any event, I'll hear you out on it, and

22   ultimately, if it proves to be a bad idea, I won't do it.

23   And if there's no way to find any sort of common ground to

24   educate, I'll just learn in progress and by osmosis or

25   however the Courts do.  But I raise it as something that I

1    found helpful as a practitioner.  Granted I probably stood

2    at podiums to your left more often than not, but -- in fact,

3    I think I may have even done a science day back when in

4    front of you.  No, it was before your time.

5              MAGISTRATE JUDGE SCHULTZ:  I wasn't there yet.

6              THE COURT:  It was before your time.  I remember.

7              All right.  So stay tuned on that.  That even from

8    this hearing today, there will be a number of different

9    dates for things that will emerge and will come out of this,

10   and there will be reference to that in it too where I'll ask

11   for a joint submission from you all.

12             So can we move on now to talk about the points

13   that are set forth in the proposed joint agenda from the

14   parties?  And that is scheduling, discovery plan, and

15   proposed case management order.  Let me turn to it.

16             MR. HEDLUND:  Your Honor, I know one part of that

17   was the outlines of plaintiffs and defendants' respective

18   views of the primary facts, allegations, claims and defenses

19   involved in the litigation.  Is -- if -- one of my

20   colleagues was going to address that issue if that is what

21   you would like to move to next.

22             THE COURT:  Perfectly fine, and that's a fine

23   place to start.  Is it Buterman or Buterman?

24             MR. BUTERMAN:  Buterman, Your Honor.

25             THE COURT:  Buterman.

1              MR. BUTERMAN:  Yes.

2              THE COURT:  All right.  You can take your seat

3      while that occurs, and then I'll have you come up then

4      afterward.

5              MR. BUTERMAN:  Thank you, Your Honor.

6              MR. HEDLUND:  Thank you, Your Honor.

7              MS. BERNAY:  Good afternoon, Your Honor.

8      Alexandra Bernay from Robbins Geller Rudman & Dowd.  I'm

9      associated with the Fowler case, which is one of the

10     consumer indirect actions.

11             So I just thought that I would spend a little bit

12     of time talking about what our case -- just a sum-up of our

13     case and address some of the points that were in defendants'

14     briefs, but happy to take any questions you may have.

15             THE COURT:  No.  No.  So in brief, so no more than

16     a few minutes really.

17             MS. BERNAY:  Sure.  So at its highest level, this

18     is a case where in a market with numerous characteristics,

19     such as, a high barrier to entry market concentration and a

20     prior history of anticompetitive conduct, the exchange of

21     proprietary highly competitively sensitive nonpublic

22     internal information on pricing, future plans, spot pricing,

23     pricing strategies, crop yields, sold positions and the

24     like, plaintiffs allege that that allowed defendants to

25     raise, fix, maintain or stabilize granulated sugar prices in

1    the United States from January 1st, 2019, to present; and as

2    a result, plaintiffs paid artificially inflated prices in

3    excess of what they would have paid in a competitive market.

4             In the briefs that defendants cited, they refer to

5    this as a follow-on case.  That is just not the case.  It is

6    not a follow-on case.  Certain evidence that was --

7             THE COURT:  Follow-on to the DOJ action, you mean?

8             MS. BERNAY:  Yes, correct.  That case was a merger

9    case dealing with concentration in the southeast United

10   States, and it was a merger between U.S. Sugar and Imperial.

11   And the Court held there that the market was not properly

12   defined.  That was really the end of it.

13            Here, in this case, some of the evidence that

14   plaintiffs rely on was in the record of the DOJ case.  It

15   revealed a conspiracy using this conduit, Mr. Wistisen, and

16   commodity information.  Defendants claim that the -- in

17   their brief that the DOJ action implicitly found that the

18   allegation of an illegal conspiracy was without merit.

19   That's just not the case.  The DOJ never brought a Section 1

20   claim there.

21            THE COURT:  Well, that was a Clayton Act case and

22   this is a Sherman Act case, and I'm pretty sure I'm not

23   going to decide that kind of an issue *a priori* based on

24   frankly anything that might have been said from that other

25   action.

1          MS. BERNAY:  Sure.

2          THE COURT:  It will be addressed on its own

3     merits.

4          MS. BERNAY:  One of the interesting things that

5     did come up and you heard the defendants mention it just now

6     regarding the tutorial, however, was that certain USDA

7     regulations basically immunized their conduct.  And I just

8     wanted to point the Court to what the Third Circuit said

9     regarding that argument, which was, quote, No argument was

10    presented that any statutory provision immunizes the sugar

11    industry against antitrust challenges.  That's at 74 F.4th

12    197 at 208.  And also the Court there noticed that that line

13    of reasoning was improper, and also said that price supports

14    do not create immunity from antitrust.

15          Defendants also make a couple other arguments

16    claiming that here there was a failure to show direct

17    communications.  That's just not the law.  The test really

18    is, you know, were these communications shared.  That's a

19    well-expected -- accepted theory in antitrust laws.

20          We think we have a very strong case here.  Usually

21    cases have indirect proof and then you add on some economic

22    analysis.  Here, we actually have direct evidence of

23    widespread sharing among admitted competitors.  The sharing

24    was the most competitively sensitive information, as I

25    mentioned earlier, and that, coupled with the economic

1    evidence of rising prices without a change in supply, we

2    submit makes this a very strong case.

3          I'm happy to answer any other questions you might

4    have, Your Honor.

5          THE COURT:  No.  No.  Thank you.

6          MS. BERNAY:  Thank you.

7          THE COURT:  So let me hear from the defense.

8          MR. BUTERMAN:  A few points, Your Honor.  So just

9    so the -- the backdrop is clear here, in 2021, the Justice

10   Department sought to block the acquisition of a company

11   called Imperial Sugar by a company called U.S. Sugar.  That

12   was a Section 7 Clayton Act that followed after an

13   investigation.  And during the course of the litigation, the

14   Department of Justice introduced a theory of -- that the

15   transaction would lead to anticompetitive coordinated

16   effects.  And what they said was we're concerned that after

17   U.S. Sugar owns Imperial, there will be more coordination

18   amongst sugar producers in the United States.

19         And they sought to prove that by saying that there

20   was coordination already going forth in the industry.  And

21   they pointed to Mr. Wistisen.  Mr. Wistisen is an

22   individual.  He produces a analyst report, which contains

23   basic information in the industry.  That analyst report is

24   widely sold.  It's used not only by defendants, but it's

25   also used by sugar purchasers throughout the United States.

1    And it is used by the U.S. Department of Justice -- excuse

2    me, the USDA, the U.S. Department of Agriculture in putting

3    out the information that they put out.  And as I said

4    earlier, the USDA puts out a lot of robust information.

5         So I heard a lot of buzz words, "widespread,"

6    "most sensitive."  Your Honor, with respect, when one looks

7    at the information, that is far from the truth.  And on

8    that, I will say that while it is not dispositive, Judge

9    Noreika, in the District of Delaware, did get to see all

10   that evidence.  It was all presented to her.  And she looked

11   at it and she told the Department of Justice in closing

12   arguments, this just does not seem to be different from what

13   happens in every industry.  It is not price fixing in my

14   view.

15        Now, counsel is correct, there wasn't a Section 1

16   claim.  That would have been a much, much higher burden for

17   the Department of Justice.  And they never even sought to

18   make a Section 1 claim.  They said specifically to the

19   Court, we're not saying that this conduct rises to price

20   fixing.  We don't need to meet that burden.  They couldn't

21   even meet the lower burden that they had presented.

22        The reality is, Your Honor, as I said earlier,

23   that when it comes to -- it comes to how pricing is done in

24   this industry, it is very complicated, but one thing that

25   will become abundantly clear is that it has nothing to do

1    with the type of information that was produced through these

2    ordinary industry reports.

3              There's some other things that I think, though,

4    that are very important here.  Your Honor, it's -- that case

5    was decided in 2022.  The trial ended in April of 2022.

6    Judge Noreika's decision was in September of 2022.

7              As far as I know, no one of the defendants -- and,

8    again, you know, I can speak certainly on behalf of my

9    client and I've tried to figure this out, no one has spoken

10   to Mr. Wistisen in years.  So the idea that somehow pricing

11   in the industry is the product of the defendants sharing

12   information over the last years, doesn't even pass -- pass

13   muster.  There just haven't been communications with

14   Mr. Wistisen during that time.

15             Counsel made a point about immunization and

16   suggestions that we had argued that there was some sort of

17   immunization here because of the role of the USDA.  The

18   actual sentence that counsel read to you from the opinion

19   said specifically that no argument was presented on that.

20   We never made any sort of argument, and we never suggested

21   that there's any kind of blanket immunity with respect to

22   the USDA.

23             However, the role of the USDA in setting prices,

24   in regulating prices is critical here because what the USDA

25   does do is it manages price.  And so if the USDA -- the USDA

1    has -- there's a farm bill.  And as part of that farm bill,

2    the USDA ensures that there is a appropriate supply of sugar

3    in the United States and it has various levers, including

4    its ability to impose certain tariffs on imported sugar in

5    order to make sure that the price is where the USDA

6    determines it should best be.

7           And so those are, again, some of the complicated

8    things that we're going to talk about here.  But the notion

9    that the plaintiffs are trying to present here, which is,

10   this is a simple straightforward issue, Mr. Wistisen, this

11   one individual who publishes one of -- you know, one

12   newsletter somehow is sharing information and that's causing

13   prices throughout the United States to go up for sugar is,

14   with all due respect, a fallacy that's so devoid from the

15   realities of how this industry operates that we believe it's

16   not going to come close to meeting the plausibility standard

17   under *Twombly*.

18           THE COURT:  All right.  Thank you.

19           So, Mr. Hedlund, do you want to come back up?

20   Yeah, I think for the time being, I won't need to hear

21   anything about the status of discovery in the other cases

22   and so on.  We'll talk about ultimately a schedule here.

23           Why don't we move on and talk about ESI, if there

24   are any issues that the Court needs to understand about

25   electronic discovery.

```
 1              MR. HEDLUND:  Thank you, Your Honor.  Again, Dan

 2    Hedlund, Gustafson Gluek, for the plaintiffs.

 3              I'll tell you where I think things are at; and if

 4    there's more particular questions you have about ESI, I have

 5    someone who can -- who is extremely knowledgeable about

 6    that.  But I think both with regard to electronic discovery,

 7    and I know one of the other things on the agenda is the

 8    protective order, which if I can group those together --

 9              THE COURT:  You can put them together, yeah.

10              MR. HEDLUND:  Okay.  You know, we, on the

11    plaintiffs' side, and our colleagues on the defense side,

12    are all, you know, extremely experienced lawyers, also known

13    as old maybe in some cases.  But, in any event, we have been

14    through many cases like this where at the beginning, we --

15    you know, we go about negotiating, you know, a protective

16    order, ESI protocol.  Oftentimes, the parties and counsel

17    are able to agree and we don't need any assistance from the

18    Court, although from time to time there are certain things

19    that are not agreed upon and the -- and the input from the

20    Court is very helpful.

21              So I think that both of those would be items that,

22    you know -- in our schedule we put forth some dates by

23    which -- you know, deadlines for submissions of those.  The

24    defendants' view of when they should be completed is a

25    little bit different, but I think we -- I believe
```

1      Mr. Buterman would agree, that probably the first step with

2      those two items, once we agree upon the time to begin

3      negotiating them, would be to roll up our sleeves and try to

4      reach agreement on those, and, if not, then to reach out to

5      the Court for assistance.

6            THE COURT:  Right.  And you'll discuss that with

7      Judge Schultz when the time comes, but there are no issues

8      with respect to either protective order or e-discovery for

9      now?

10           MR. HEDLUND:  I don't believe so, Your Honor.

11     Your PTO Number 1 discussed preservation, and so I

12     understand the parties are all on the same page on that.

13           As we also referenced, you know, we believe that

14     it will be appropriate to set up document repositories for

15     documents on both sides, separate ones, and that, you know,

16     documents should be produced in a searchable format.  But at

17     this point, I don't think there's anything that needs to be

18     addressed by the Court.

19           THE COURT:  All right.  So just as a kind of

20     housekeeping matter, when I think about discovery issues in

21     hard-fought litigation, complex lit amongst experienced, you

22     know, practitioners, I just want to underscore how important

23     it is that you use rules of reason with respect to things.

24     It's probably -- I probably wouldn't be qualified, myself,

25     to be a Magistrate Judge like Judge Schultz until I was at

1   least five years away from private practice, just because I

2   think I still have my own after-effects of discovery

3   disputes as a litigator.  And any number of them I find not

4   to be legitimate disputes.  That either there's somebody

5   wanting something that they are not really entitled to or

6   withholding something that you know you ought to produce.

7          And so I -- I tend to veer toward, and I don't

8   start this way, but I get there pretty quickly in big

9   litigation, to a bring your checkbook rule.  And I don't

10  even intend that as a sanction.  So if there is a bring the

11  checkbook order, the order will be written in a way that

12  says, this is not a sanction.  It's just letting the

13  burden -- the economic burden fall where it should.

14         That if you decide to take a flier and it really

15  wasn't a close motion, God bless you for trying, but you

16  should probably pay for that flier and not the other side

17  and to think twice before you simply launch, you know,

18  various missiles that may not -- may not really be worth --

19  the stick may not be worth the candle.

20         And I have been myself in any number of the client

21  meetings where a certain idea starts off with everybody in

22  the room knowing that's not a great idea, you know.  Client

23  says it is, and before it's done, everybody is going, Good

24  answer, good answer.  And you get to Family Feud, survey

25  says, you know, (indicating), and the survey said that from

1    the beginning.

2          So I really do encourage there to be, you know,

3    rules of reason.  And that's not to discourage you from

4    being zealous advocates.  I think you should be on behalf of

5    your clients, but litigation is expensive, and I recognize

6    that, so for -- it may be that some of the forays that you

7    engage in, I'm not sanctioning you, it's simply shifting the

8    economic burdens to where I think they should lie on certain

9    issues, so I have got a middle ground that's not a sanction

10   but it will be shifting of the economics as a default rule.

11   And I discussed that with Judge Schultz, and we think it's a

12   respectable way to go.  So I wanted to make sure everybody

13   was aware of that.

14          Do you have anything then further, Mr. Hedlund?

15          MR. HEDLUND:  No.  We -- like always, we

16   appreciate the insight of Your Honor and Judge Schultz as we

17   go forward in this case, and, so nothing further on those

18   topics.

19          THE COURT:  And, Mr. Buterman, anything from you

20   on these subjects?

21          MR. BUTERMAN:  Nothing, Your Honor, except to just

22   re-emphasize that I fully expect that we're going to be able

23   to work cooperatively with the plaintiffs on these issues of

24   ESI and protective orders and the like, and we've, you know,

25   had the pleasure of working with many on the other side on

1    many cases and have had good relationships and see no reason

2    why we can't have that here as well.

3             THE COURT:  Right.  All right.  And I fully expect

4    there to be many different arguments on the relevance of the

5    DOJ opinion, and I expect even there may be times where the

6    same party is saying it is relevant and not relevant

7    depending on what the issue is.  In fact, I see some of that

8    already in what's been submitted.  Fine.  I mean, that's

9    fair game for what it's worth.

10            So while you are up there, why don't we talk about

11   the issue of the modification of the discovery stay, and

12   this is less for -- I'll give you a chance to respond or

13   react to it, but I intend to be very practical and pragmatic

14   in how we go about things.  I don't see an occasion where I

15   would agree, even if there were already consolidated

16   complaints in existence and even if we were past the motion

17   to dismiss, where I would just say, load up everything from

18   the DOJ action, just ship it over for starters.  That

19   probably won't be the way.

20            That the discovery rules and their requirements

21   are quite a bit more refined than that for what is going to

22   be discoverable, but the rules of reason, to me, would be

23   that we wait first until we get into place consolidated

24   complaints.  I have already heard from Mr. Buterman that

25   there will be motions to dismiss, and so let's get those

1    sorted out too and then get to discovery in earnest would be

2    the way that I would intend to approach it.

3                 Now having said it, I'll stop and hear from you,

4    Mr. Hedlund.

5                 MR. HEDLUND:  Your Honor, this is another one of

6    those where I've -- I would defer to one of my colleagues if

7    it's okay, Ms. Justice.

8                 MR. BUTERMAN:  And, Your Honor, is it okay if I --

9                 THE COURT:  It is, Mr. Buterman.  Yeah, sure.

10                 MR. BUTERMAN:  Thank you, Your Honor.

11                 MS. JUSTICE:  Good afternoon, Your Honor.

12    Kimberly Justice from Freed Kanner London & Millen.  I

13    represent Plaintiff WNT, LLC which was the first filed case

14    in this district, a commercial indirect plaintiff.

15                 I hate to get started from behind but that seems

16    like that's where I am right now.  But I did hear two --

17                 THE COURT:  It depends on how you define a win.

18                 MS. JUSTICE:  A win, the documents.  And now let

19    me explain why.  I heard two things today, and I had a bunch

20    of notes typed out and ready to present about the burden and

21    about it's already collected, about the timing, about other

22    cases that have allowed this type of discovery, some even

23    before a consolidated complaint.

24                 But I heard today about the tutorial, and a lot of

25    times plaintiffs come into these cases at a severe

1    informational disadvantage.  We hire experts.  We get as

2    much information about the market.  And in this case,

3    there's a docket.  And on that docket, we found e-mails.

4    And those e-mails show Mr. Wistisen collecting pricing

5    information from two different competitors on one day -- and

6    I can give you the cites for our complaint in WNT which has

7    that -- and then one day later sharing the competitor

8    information with the others.

9         As an antitrust lawyer, I look at that with

10   concern.  As a plaintiffs' lawyer, I think that's a great

11   piece of information to include in a complaint, but the

12   problem with that record is twofold.  And I understand and

13   respect Your Honor's point about all the documents that were

14   produced to the DOJ.  But part of our ask is a little more

15   discrete because that record is -- most of it is under seal,

16   a lot of it is redacted.  We were able to piece together

17   bits and pieces of e-mails for whatever reason weren't

18   subject to the seal.

19        THE COURT:  And, Ms. Justice, my comment doesn't

20   go to if you get access to relevant documents, but when you

21   get access to them is more what the thrust is of my comment.

22   Is that, you know, if we first get a consolidated complaint

23   and if there's a motion to dismiss, that's only going to be

24   assessing the sufficiency of the pleading, and we're not

25   even into anything that is factual beyond what's simply

1    averred in the pleading itself and there will be *Twiqbal*

2    challenges around it that I have heard already, but you

3    don't need the discovery yet for that.  So I'm simply trying

4    to do it in the most efficient way.

5            Having said that, I'll give you a chance to

6    respond, but it sounded to me as though you were concerned

7    that you're not going to get anything from the action.  I

8    don't know what you'll get.  I'm just talking about when

9    you'll get it.

10           MS. JUSTICE:  I think the defendants' papers are

11    already submitted in this case.  They are able to cherry

12    pick and choose what they cite from that record, and we

13    don't have equal access to that information.

14           Even -- set aside the complaint.  I think our

15    complaints are robust.  I think they will survive a motion

16    to dismiss.  We have e-mails along the lines that I've

17    described.  We don't have the full universe, but it's

18    something to get the process started, the efficiency started

19    because it's already a collected universe of documents and

20    it's very discrete.

21           The other point I would make is depending on the

22    timing of the tutorial, it's information that can help

23    inform plaintiffs so that we can help inform Your Honor.

24           THE COURT:  Uh-huh.

25           MS. JUSTICE:  And I think that's kind of also

1    important for us.

2              THE COURT:  Uh-huh.  No.  Understood.  And totally

3    open to the timing of the tutorial, probably sometime short

4    of the class certification hearing.  And I don't know in the

5    other case when the question of a tutorial came up, whether

6    it was at the beginning of the case or too close to the

7    class certification hearing.

8              But, no, that's understandable, and I certainly

9    don't read anything into the fact that there are facts yet

10   to be discovered by the plaintiffs in the case.  You're on

11   the front end of it -- in some ways in the front end of it,

12   so that I understand.

13             I was here mostly referring to the issue of

14   modifying the discovery stay.  The plaintiffs had asked to

15   have the stay lifted now; and then for starters, among other

16   things, just ship over the documents from the DOJ action and

17   then keep them cooking from there and we'll see what else we

18   need.

19             I'm not inclined to do that.  I'm inclined to

20   first get consolidated complaints in place and then hear

21   whatever the motions to dismiss are on that, and then we'll

22   get to the fact discovery in earnest, you know, after that.

23             And, again, the motion to dismiss is just looking

24   at the sufficiency of the pleading; and if something has

25   been inadequately pled, if it can be pled properly, then

1    there will be an opportunity to amend to address that.

2            So I'm not trying to pour out justiciable claims,

3    but the first thing is to address the pleading itself, and

4    before we can do that, we have to have a pleading itself

5    and -- before we get to discovery.  Otherwise, it's a mess

6    because it's impossible to order a preliminary disclosure of

7    documents or discovery without that leading to a profusion

8    of issues for Judge Schultz when we don't even have any

9    complaints in place yet to talk about what the particular

10   document is relevant to, and it just gets to be a very

11   inefficient process on the front end and I'd rather do it in

12   an orderly, sequential way.

13           MS. JUSTICE:  Understood, Your Honor.

14           THE COURT:  All right.  Is there anything further?

15           MS. JUSTICE:  Thank you.

16           THE COURT:  All right.  Thank you, Ms. Justice.

17           Mr. Buterman, I assume you're fine with that?

18           MR. BUTERMAN:  Yes, Your Honor.  We -- we are

19   certainly fine with that.  The only point, though, that I

20   would add, Your Honor, is that when we do get past the

21   filing of those motions to dismiss, one of the issues that

22   Courts in the -- in the circuit look at sometimes is the

23   sufficiency of the motion and whether there's a likelihood

24   of success with respect to the motion in determining whether

25   the stay should extend until the end of discovery.

1          THE COURT:  So I'm going to decide likelihood of

2     success before they've been able to decide whether they are

3     likely to be successful?

4          MR. BUTERMAN:  The case law provides a much lesser

5     burden for the defendants to meet with respect to that,

6     Your Honor, although you've raised a very good, logical

7     point with respect to that.

8          THE COURT:  Right.  No.  It's okay.  But we're not

9     here on an injunction, so...

10          MR. BUTERMAN:  They -- for whatever reason, the

11     Courts use likelihood of success as their standard when it

12     comes to this.  But, otherwise, we're fine, Your Honor,

13     proceeding --

14          THE COURT:  We'll cross that bridge when we get

15     there too, and I will read and consider whatever authorities

16     get submitted on it.

17          MR. BUTERMAN:  Thank you.

18          THE COURT:  But I expect this to look what I call

19     normal.

20          MR. BUTERMAN:  Yes, Your Honor.

21          THE COURT:  Right.  Okay.

22          Why don't we talk, Mr. Hedlund, if you'd come back

23     up again, just on the case schedule and the case

24     organization.  I've got something I'd like for you and

25     Mr. Buterman to respond to.  It's just something I'm

1    wondering about on this case unless --

2         MR. BUTERMAN:  Yes, Your Honor, my colleague

3    Mr. Stenerson is going to handle this.

4         THE COURT:  Mr. Stenerson, come on up, then.  Let

5    me tell you what I'm wondering about, and then you all can

6    jump into your respective views on the schedule.

7         I'm wondering whether it makes sense to do some

8    form of staging in this case.  And by way of "staging," it

9    seems to me that unless there's proof of collusion on the

10   front end, there's nothing else to talk about anywhere.

11   It's end of it.  So I'm looking at collusion plus

12   anticompetitive effect related to the collusion, which are

13   kind of two parts.  But on the front end of it, I've got to

14   find some kind of collusive misconduct and then we can argue

15   later by way of damages how it translates.

16        So this is just my thinking out loud.  I haven't

17   decided to stage anything.  But I'm wondering about your

18   reactions to that.  And it's not whether we get to all of

19   the aspects of the case because we're going to, but whether

20   we stage the discovery and perhaps even expedite getting at

21   the issue of whether there are facts or evidence to support

22   collusion first in the schedule.

23        So haven't had a chance to think about that, you

24   all, and so I have talked for about ten seconds more so that

25   you...

1    But just what your reactions are.  And I'll give

2    you a chance to respond in writing, but I'm just sort of

3    thinking about whether there are some ways to make this case

4    more efficient in how we approach the schedule and

5    discovery.  Mr. Hedlund.

6          MR. HEDLUND:  Thank you, Your Honor, Dan Hedlund.

7    My experience with how -- what you have referred to as

8    staging, I think sometimes also gets referred to as

9    bifurcation in terms of discovery, is that in the end, even

10   though it suggests some efficiencies, I think a lot of

11   the -- of the information that comes out in discovery is so

12   intertwined that we've found it's been more efficient to

13   just sort of do it all in one shot, and that is what I have

14   seen in all the cases I have been involved in recently.

15         So, you know, without consulting with my many

16   colleagues here and pre-leadership appointment, this is like

17   when the DOJ people speak, me speaking for myself here, but

18   that would be -- would be my view is that it's not something

19   I would favor, but we'd be, of course, happy to consult with

20   all the plaintiffs and submit something in writing as well.

21         THE COURT:  Yeah, no.  I'll give you a chance to

22   submit something in writing.  And I'm not convinced that my

23   own idea isn't a bad idea either.  But it occurs to me, as I

24   listen to Mr. Buterman who was just up saying there is no

25   there there to any of this, that we have here the primary

1    focal point for defendant, Mr. Wistisen -- what's his name

2    again?

3            MR. HEDLUND:  Wistisen.

4            THE COURT:  -- Mr. Wistisen -- that I hear nobody

5    has spoken to in years, and even at that, he just produced a

6    report they gave to everybody, and there's no there there

7    with respect to collusion, and that, to me, is a thing that

8    can be factually ferreted out as either likely to be true or

9    not provable to be likely to be true.

10           So let me hear from you, Mr. Stenerson.

11           MR. STENERSON:  Yes.  Good afternoon, Your Honor.

12   Todd Stenerson from A&O Shearman on behalf of the Domino

13   defendants.

14           Your Honor, we have had recent experience in

15   antitrust cases where bifurcation is helpful and important

16   in resolving issues.  I think it's like a lot of things,

17   it's the timing and scope of it, and so we would welcome the

18   opportunity to think about that further.  And, like I said,

19   I do have some recent experience where that does facilitate

20   resolution.

21           THE COURT:  Well, let me hear both sides out.

22   I'll give you a moment to do that in writing, to write back

23   to the Court.  And I'm not certain what will be the ultimate

24   decision.  If it proves to be a waste of time or something

25   that's tantamount to finger painting in the end, that who

1   can make any sense of it, then I won't do it.  But if it

2   actually looks like it might make aspects of this more

3   efficient, then I will.  Because if -- if we can't get

4   proofs on that fundamental issue, then there really won't be

5   much else to argue about.  And then once that's established,

6   then there will be all kinds of arguments, I'm sure, over

7   how we show industry-wide harm and there will be different

8   arguments from different tranches of the plaintiffs in that

9   regard too, I'm sure.

10          So stay tuned.  I just wanted to broach it.  So if

11  we just -- let me set that aside for a moment and then hear

12  from each of you on what your issues are with the

13  prospective schedules you propose.  I obviously have what

14  you submitted, and I will study it.  But if there are things

15  you wanted to point out for the Court, I'll give you an

16  opportunity to do it.

17          MR. HEDLUND:  Yes, Your Honor.  Thank you for that

18  opportunity.  We have submitted a proposed schedule and as

19  have defendants.  We -- you know, there are certain items

20  which we disagree on, but there's also several dates which

21  we have agreed upon.  I think two of the big ones that I see

22  currently in terms of differences, I mean, some of them are,

23  you know, sort of a difference of an amount of days and that

24  sort of thing, but in terms of more structural differences,

25  I think one is the negotiation of the ESI protocol, the

1    protective order, the 502(d) stipulation we think should

2    take place after lead counsel has been appointed because we

3    view that as a time, while, you know, the motions are being

4    briefed on Rule 12, to sort of move the ball forward as

5    we've discussed.

6         You know, we think that these are agreements that

7    we can reach agreement upon, and we don't want to have --

8    you know, assuming of course in plaintiffs' world we get

9    past the motion to dismiss and we commence with discovery,

10   then, you know, we want to be kind of ready to go and don't

11   want to have then spend additional time negotiating those

12   things.  The defendants suggest that that take place after

13   the ruling on the motion to dismiss, so that would be one

14   structural item.

15        The other is the issue of expert reports and

16   *Daubert* motions as they relate to that.  We have proposed

17   one report that covers both class certification and merits

18   issues to take place after discovery has closed when both of

19   those issues will be ripe.  We believe that in those two

20   types of reports, there tends to be a fair amount of

21   overlap, and we think it's more efficient to do them at one

22   time, have the *Daubert* motions, and just go from there.

23        The defendants, as Your Honors are aware, propose

24   one round of class certification, expert reports, *Daubert*

25   motions, et cetera, and then a separate round of merits

1    reports with *Daubert* motions, which, if you look at the

2    amount of days involved with, you know, the submission of

3    those things, I think it almost adds up to another year

4    of -- in the schedule and as -- so, in short, we think it

5    would be good to, you know, be more efficient, roll more

6    things into one, and hopefully get to -- again, in our hope,

7    get to trial sooner in front of this Court on behalf of our

8    plaintiffs.  So --

9            THE COURT:  Thank you, Mr. Hedlund.

10           Mr. Stenerson.

11           MR. STENERSON:  Your Honor.  If it would be

12   helpful, I put the schedules next to each other, and I can

13   hand it up.  I told Mr. Hedlund before the hearing that I

14   had done that.  It might help the Court follow.

15           THE COURT:  Sure.  If you think it would be

16   helpful.

17           MR. STENERSON:  If you think that will be of

18   assistance.  I'll give Mr. Hedlund one as well.  I'll

19   represent that I asked it to be exactly what is in the

20   submission, and I think we got it right.

21           THE COURT:  Right.  If you hand it to the deputy.

22           MR. STENERSON:  Any errors are mine.  For the

23   court reporter and then for both judges.

24           Largely I agree with Mr. Hedlund where the slight

25   areas of disagreement are.  I would just note, and I asked

1    plaintiffs to rethink this before, that right out of the

2    gate, there's a slight timing disagreement.  We'd like

3    60 days to respond to the motions to dismiss with 30 days to

4    reply.  They have 40 and 15.  As you might imagine, with

5    three tracks and consolidation, we would like that --

6          THE COURT:  You probably don't need to talk about

7    the timing elements in here.

8          MR. STENERSON:  Okay.

9          THE COURT:  I'll get with Judge Schultz, and we'll

10    decide on those.  And this will be helpful to see what each

11    side --

12          MR. STENERSON:  Okay.

13          THE COURT:  -- proposes.  And, as well, we'll

14    decide the issue of the timing for the assessments of the

15    ESI protocols, the 502(d) protective order, and whether that

16    makes sense to delay all of that until after the motion to

17    dismiss or do we get certain things ready.

18          MR. STENERSON:  Okay.  Well, then, hearing that,

19    Your Honor, let me just move on to flag three things for the

20    Court.

21          First is we think -- and as a matter of efficiency

22    and even in the bifurcation question that the Court raised,

23    you know, even if the parties don't agree now, it's not a

24    never.  And so our opening proposal is that the Court not

25    address any substantive schedule post motion to dismiss

1   opinion and order the parties that within 30 days of an

2   order not dismissing the case, that the parties submit as

3   much as possible a joint schedule going forward from there.

4   So that's our initial practical proposal, and we think that

5   that's a good place to start.

6        THE COURT:  And my leaning, again, will be a

7   pragmatic one.  That I don't see a reason to be jumping

8   headlong into substantive discovery if it's not even clear

9   what survives a motion to dismiss.  On the other hand, I

10   don't see a need to forestall all of the preparatory work

11   necessarily if things can be put into place and ready to go.

12        MR. STENERSON:  Sure.

13        THE COURT:  So there's kind of a rule of reason in

14   that.

15        MR. STENERSON:  Yeah.

16        THE COURT:  And so I will be looking at what each

17   side suggests with that in mind.

18        MR. STENERSON:  Thank you, Your Honor.  That makes

19   good sense.  And really I think the major place where the

20   parties diverge is whether or not to brief class

21   certification on top of summary judgment and have one set of

22   experts.  The defense thinks that that is quite inefficient

23   for one key reason, right.  If the plaintiffs win

24   everything, then you put it all up at the front.  If the

25   defendants win everything, you don't get there.

1              But from a practical standpoint, when you have

2       parties brief summary judgment before class cert is decided,

3       the issues are not framed as to what is up for summary

4       judgment.  And there's issues like one-way intervention of

5       whether or not we're moving against a named plaintiff.  Here

6       we have three tracks of classes that are going to have

7       presumably at least three different class definitions with

8       potential subclasses, and that just takes away from the

9       defendants and the Court the ability to make those decisions

10      on scoping, whether it's a full denial of class cert or some

11      minor grant of class cert, before you get to the merits of

12      those outcomes.

13              And as you also know, Your Honor, the expert

14      issues on class cert really focus on commonality versus

15      individual issues as opposed to the substantive elements of

16      antitrust law.  And that again is merits experts.  Often we

17      use different experts to do that.  And so just from an

18      efficiency standpoint and practically, it's really important

19      to the defendants to know what they are shooting at on

20      summary judgment if we ever get there.  And we actually

21      would submit that briefing summary judgment, and I think the

22      plaintiffs propose within 30 days of class cert briefing

23      being completed, you know, we're kind of shooting at a

24      ghost, and it really should await class cert decisions and

25      then have that next round.

1          THE COURT:  All right.  So I've heard you both out

2     on that, and so I won't decide anything on that this

3     afternoon other than I hear you and you'll see, you know, a

4     ruling sort of reflected in what we issue.  But I understand

5     the issues and the dynamics too.

6          If I can switch -- unless there's something

7     further, Mr. Stenerson, you'd like to say, I want to talk to

8     the plaintiffs about the plaintiffs' leadership.

9          MR. STENERSON:  No.  That's all, Your Honor.

10    Thank you for having us.

11         THE COURT:  Thank you.  Thank you.

12         So here's my question, Mr. Hedlund, about the

13    plaintiffs' leadership.  I see the proposal for the three

14    tranches, a direct and then two indirect groups.  What I

15    really am kind of thinking through is I like the idea of all

16    three of those tranches being represented in a plaintiffs'

17    steering committee, and I'll have consolidated complaints

18    for each tranche, but then I will put them all together

19    under one umbrella for the handling of the discovery and

20    then to have a leader for the plaintiffs' group for the

21    discovery consolidation.

22         And I wanted your reaction to that.  I think you

23    had in mind having three different groups, which I

24    understand why you would want that, but the whole point of

25    this MDL, from the Court's perspective, is to make this a

1   more efficient process for the Court.  And that doesn't make

2   it more efficient for the Court, let alone some of the

3   issues that will arise in discovery with third parties and

4   so on who may be getting multiple kinds of requests on

5   similar things from different groups of the plaintiffs and

6   the potential for inconsistent rulings or the lack of

7   coordination where things ought to be coordinated.

8          And so my leaning, at this point, is to appoint

9   leadership for each of the tranches, but they operate for

10  discovery purposes under one umbrella, the plaintiffs'

11  steering committee, with there being a liaison counsel.  I

12  mean, you all have been to a lot of these rodeos, so you

13  know what a plaintiffs' steering committee is and liaison

14  counsel.

15         And then to the extent there's discovery being

16  served where there are specific items that are specific to a

17  certain tranche, you just coordinate that so that it appears

18  in the discovery that gets served as opposed to having

19  multiple different sets, which strikes me as ultimately more

20  inefficient and likely to create more confusion out in the

21  public and for Judge Schultz.

22         So that is simply my thinking.  And I'm giving you

23  a chance to respond to the Judge's artist's conception of

24  the plaintiffs' leadership.

25         MR. HEDLUND:  Permission to ask a question of

1    clarification, Your Honor?

2         So the sort of plaintiff steering committee that

3    you are talking about, it would be limited to sort of joint

4    discovery requests?

5         THE COURT:  That's the idea.  And obviously you

6    would -- you don't -- you have different needs with respect

7    to certainly damages discovery and that sort of thing.  I

8    understand that.  That would be coordinated, though, through

9    the same plaintiffs' steering committee such that if

10   discovery is being served, then the defendants are getting

11   sets of discovery that in general will include the various

12   requests that the plaintiffs have.  There will be occasions

13   where there may be some things that only one tranche needs,

14   at which point that will get coordinated and get done, but

15   as an irregular verb.  That it won't be the normal

16   conjugation, and so there may be some of those that will

17   occur.

18        You would be in your own respective camps

19   obviously on the class cert motions and other aspects of the

20   case and certainly going toward trial even consolidated, so

21   this is just simply trying to make the discovery itself more

22   efficient and not have multiple rounds of discovery on

23   similar things going to either the defendants or the third

24   parties, and as well, I think to cut down on the confusion

25   that results in motion practice that percolates up to Judge

1    Schultz or to me.

2              MR. HEDLUND:  Thank you, Your Honor.  Again, with

3    the caveat that I'm just one person here speaking, I think,

4    in practice, what's happened in the other cases where there

5    are these three different tranches of cases -- my firm is

6    co-lead at different levels in the *beef*, *pork*, and *chicken*

7    case, as are many of the people who are in some of the

8    proposed leadership in the cases here -- there's been -- I

9    think everyone has worked very well together in terms of

10   coordinating discovery, not being inefficient, for example,

11   with deposition protocols.

12             There typically has been one person from a class

13   who's been designated to take the lead on that deposition.

14   The other classes will be there, and they'll ask, if

15   necessary, questions that are specific to their own class's

16   discovery, as Your Honor has sort of foreshadowed, but I

17   really feel like we -- we -- so far we've done that.  We've

18   worked very well together, but if there's sort of a proposal

19   -- well, not that you would propose necessarily, but if

20   there's some other --

21             THE COURT:  I'm not proposing to you yet, I'm just

22   saying.

23             MR. HEDLUND:  You know, I mean, look, I think all

24   the plaintiffs certainly agree that we want to do whatever

25   is, you know, efficient for the Court, and Your Honor

1    rightly points out that there are certain things that we do

2    need to be separated on in terms of discovery, in terms of

3    settlement, trial becomes a different issue.  The indirect

4    purchasers have pass through issues, the direct purchasers

5    don't, but certainly we do all share one thing in common,

6    which is to establish liability against the defendants.

7         So we've worked closely together on that, and I

8    believe it's worked well, but, you know, if there's another

9    way to sort of establish coordination, I believe the

10   plaintiffs would be, you know, happy to consider it.

11        THE COURT:  Well, so the thing I'll throw back to

12   the plaintiffs to think about is that if you are, all the

13   various tranches, to be coordinated under one umbrella, how

14   might it best work.  And if you wanted to make that approach

15   workable.

16        And I understand some of the things you've been

17   used to historically.  I mean, I hear that.  But it's not

18   what I'm talking about.  And so I'm talking about a

19   different approach; and then, you know, is it workable, and,

20   if so, how would you like to have it work if that were to be

21   the case.

22        And you ought to arrive at the same place,

23   frankly.  If you are all able to coordinate and work

24   together in other contexts that way, then this is simply a

25   formalized version of what you are already doing.  And it's

1    not precluding anybody asking the questions that are

2    specific to your interests at a deposition, for example.

3    It's not what it's meant to do.  It just means that there is

4    a deposition and not three of them with the same person who

5    has, you know, similar information to give.  So it bakes in

6    a kind of coordination, and that's the whole point of it.

7    So not to preclude anybody from developing their facts or

8    evidence but to coordinate it.

9            So I'll give that to you all to think about in

10   what gets pushed out from this hearing too, and we'll ask

11   for a response from the plaintiffs.

12           MR. HEDLUND:  Understood, Your Honor.

13           THE COURT:  All right.  So anything further?  You

14   might -- I know that I've got a motion pending for -- from

15   you, I think, Mr. Hedlund, at least from you or

16   Mr. Gustafson, appointment of lead counsel, and the others

17   are coming in.  I plan to address the schedule for those, at

18   least a ruling on those and will push that out, but I wanted

19   you to hear first that I'm thinking of having whoever those

20   leaders are to come together as part of a plaintiffs'

21   steering committee beyond, and that may, in some ways,

22   change what you submitted.  I don't know.  But I wanted to

23   broach it, and if it does, to give you a chance to edit or

24   modify what you have submitted.  All right?

25           MR. HEDLUND:  Appreciate that, Your Honor.

1          THE COURT:  So is there anything else,

2     Mr. Hedlund?

3          MR. HEDLUND:  The only other thing I had on here

4     was there was some discussion in the papers about regular

5     status conferences with the Court.  And just speaking,

6     again, from experience in both -- I keep coming back to *pork*

7     and *beef*.  If you don't leave this hearing hungry, there's

8     something wrong; right?  But in both those cases, we, at

9     least at some point, established regular status conferences

10    every 30 days.  And at one point they were with Judge

11    Bowbeer, and then --

12         THE COURT:  Mr. Hedlund, we will have them.

13         MR. HEDLUND:  Oh, excellent.  Very good.

14         THE COURT:  I know that -- I saw the defense

15    perspective that we -- what was the word -- to defer until

16    necessary was the defense perspective, and I'll find they

17    are necessary regularly and -- to do them on a monthly

18    basis.  And we'll decide -- I'll meet with Judge Schultz and

19    decide when we get our monthly process started.  It may not

20    be next month.  But we'll have regular monthly meetings, and

21    I will plan at this point to be there for most of them, but

22    some of them may be in front of Judge Schultz.  We'll just

23    see kind of how we proceed.

24         So with that, is there anything further from you

25    for this afternoon, Mr. Hedlund?

1          MR. HEDLUND:  No, other than my partner,

2     Mr. Gustafson, sends his regrets that he couldn't be here

3     today, and we look forward to, you know, pursuing this case

4     with both of Your Honors, but that covers the agenda.

5          THE COURT:  Well, thank you.  Thank you.  It's --

6     and, Mr. Buterman, anything further from you?

7          MR. BUTERMAN:  No, Your Honor.  Thank you very

8     much.

9          THE COURT:  All right.  Thank you both.  And it's

10    good to see a lot of familiar faces in the courtroom this

11    afternoon.  And Mr. Raiter, you know, I have been seeing

12    Mr. Raiter's face from back at a time when we both had hair,

13    so it's been a long time.  So thank you all, and the Court

14    will be in touch.  We'll start pushing some orders out.

15    Court will stand adjourned.

16          THE COURTROOM DEPUTY:  Thank you.  All rise.

17        (Court adjourned at 3:15 p.m.)

18                      *      *      *

19

20          I, Erin D. Drost, certify that the foregoing is a

21    correct transcript from the record of proceedings in the

22    above-entitled matter to the best of my ability.

23

24          Certified by:  *s/ Erin D. Drost*

25                         Erin D. Drost, RMR-CRR