# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| **IN RE: GRANULATED SUGAR ANTITRUST LITIGATION** | MDL No. 24-3110 (JWB/DTS) <br><br> **INDIRECT CONSUMER PURCHASER CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |
| This Document Relates to: <br><br> All Indirect Consumer Purchaser Actions | |

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION ................................................................................ 2

II.  PARTIES ........................................................................................................... 5

   A.  Plaintiffs ...................................................................................................... 5

   B.  Defendants ................................................................................................ 15

      1.  Producer Defendants ........................................................................... 15

         a.  ASR/Domino Defendants ............................................................ 15

         b.  United Sugar Defendants ............................................................. 16

         c.  Louis Dreyfus ............................................................................. 18

         d.  Michigan Sugar ........................................................................... 18

      2.  Commodity Defendants ....................................................................... 19

      3.  Agents and Co-conspirators ................................................................ 20

III. JURISDICTION, VENUE, AND COMMERCE ................................................ 20

IV.  FACTUAL ALLEGATIONS ............................................................................ 22

   A.  The Market for Granulated Sugar in the United States............................... 22

   B.  The Defendants Have Market Power .......................................................... 23

   C.  Defendants Unlawfully Raised, Fixed, Maintained, or Stabilized Prices of Granulated Sugar in the United States................................................................... 25

      1.  Defendants Unlawfully Shared Confidential Price and Sales Information With Each Other. ......................................................................................... 25

      2.  Defendants Relied Upon the Exchanged Competitively Sensitive Information... 42

      3.  Defendants Agreed to a Common Formula to Fix Prices ...................... 45

      4.  Defendants' Retail Granulated Sugar Prices Increased Dramatically and in Parallel Over the Class Period. .......................................................... 47

   D.  Additional Plus Factors Support the Existence of a Conspiracy ................. 51

      1.  The Market is Highly Concentrated and the Defendants Are the Dominant Firms. ................................................................................................ 51

      2.  Barriers to Entry Are High....................................................................... 52

      3.  Demand for Sugar is Inelastic................................................................. 52

      4.  Defendants Are Vertically Integrated. .................................................. 53

      5.  Defendants Had Numerous Opportunities to Collude. ......................... 53

      6.  Granulated Sugar is a Commodity........................................................... 55

      7.  There is a History of Anticompetitive Conduct in the Sugar Industry. ............... 57

   E.  Defendants' Information Exchange is an Independent Violation of Section 1 of the Sherman Act ............................................................................................ 59

F.  The USDA Sugar Program Does Not Render the Conspiracy Any Less Plausible .. 63

G.  The Inflated Price of Sugar Was Passed Through to Plaintiffs and the Classes ....... 66

H.  Defendants' Anticompetitive Conduct Proximately Caused Plaintiffs and Members of the Class to Suffer Antitrust Injury and Damages ................................................. 67

V.  CLASS ACTION ALLEGATIONS ................................................................... 68

VI. LIMITATIONS AND TOLLING .................................................................... 71

VII.  CLAIMS FOR RELIEF ............................................................................. 73

COUNT I: PRICE FIXING ............................................................................... 73

COUNT II: UNLAWFUL INFORMATION EXCHANGE .................................... 75

COUNT III: PRICE FIXING AND UNLAWFUL INFORMATION EXCHANGE IN VIOLATION OF STATE ANTITRUST STATUTES ..................................... 77

COUNT IV: STATE CONSUMER PROTECTION LAW VIOLATIONS ...................... 115

COUNT V: UNJUST ENRICHMENT ............................................................... 151

VIII. PRAYER FOR RELIEF ............................................................................ 176

IX. DEMAND FOR JURY TRIAL ..................................................................... 177

Plaintiffs Virginia Smith, Francisco Olivares, Robert E. Sunseri, Reynaldo Borge, Matthew Edlin, Mikhael Gershzon, Tammy Tacito, David Ulery, Michael Cervellino, Stacy Kurtz, Michael Santilli, Renee Newton, Mayelin Bernal, Claudette Palakiko, Matthew Marek, Mary Salazar, Debbie Hale, Daynna Mitchell, Laurie Marcello, Brooke Cutlip, Miranda Cofino, Victor Sathler, Liana Britt, Anthony Minicuci, Kim Rybarczyk, Raleigh Golden, Lauren Grouws, Bridget TenEyck, Sabra Turner, Lisa Clemenson, Erica Mitchell, Thomas Tombarello, Nancy Goodman, Claudine Williams, Amanda Boardman, Bruce Johnson, Kristin Jangula, Heidi Humphreys, Evan Annis, Stephen Reeves, John Luce, Cynthia Cornwell, Ernest Gambrell, Mary Reilly, James Veneziano, Jarred Cutlip, Donald Friedman, Richard Hammetter, Sandra Kluessendorf, Bradley Bennett, Robert Frasher, Roy Derhammer, Samantha Macaluso and Gina Gonzales ("Plaintiffs") on behalf of themselves and all others similarly situated (the "Classes" or "Class Members" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief based on investigation of counsel as to all other matters, bring suit against Defendants ASR Group International, Inc. ("ASR Group"), American Sugar Refining, Inc. ("ASR"), Domino Foods, Inc. ("Domino," together with ASR Group and ASR, "ASR/Domino"), Imperial Sugar Co. n/k/a United States Sugar Savannah Refinery, LLC ("Imperial" or "U.S. Sugar Savannah"), Michigan Sugar Company ("Michigan Sugar"), Louis Dreyfus Company LLC ("Louis Dreyfus"), United Sugar Producers & Refiners f/k/a United Sugars Corporation ("United," together with ASR/Domino, Imperial, Louis Dreyfus, and Michigan, the "Producer Defendants"), Commodity Information, Inc.

("Commodity"), and Richard Wistisen ("Wistisen," together with Commodity, "Commodity Defendants," and together with the Producer Defendants, "Defendants"), under Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Antitrust Act of 1914, 15 U.S.C. §§ 15, 26, state antitrust laws, state consumer protection laws, and state unjust enrichment laws, for redress of the injury and damages caused by Defendants' conspiracy to fix prices of Granulated Sugar in the United States from at least as early as January 1, 2019, through the date by which the anticompetitive effects of their violations of law shall have ceased, but in any case no earlier than the present (the "Class Period"). Plaintiffs demand a trial by jury.

## I.    NATURE OF THE ACTION

1.    Plaintiffs bring this civil antitrust action seeking an injunction under federal law, and damages and restitution under state laws arising out of Defendants' conspiracy to raise, fix, maintain, and/or stabilize the prices of Granulated Sugar sold in the United States during the Class Period. To implement their price-fixing conspiracy, Defendants exchanged detailed, competitively sensitive, non-public information about Granulated Sugar prices, capacity, sales volume, supply, and demand, in addition to other conduct alleged herein.

2.    An agreement to share, and the sharing of, competitively sensitive information among horizontal competitors is an independent violation of Section 1 of the Sherman Act, and separately supports an inference that an illegal price-fixing agreement exists. The Producer Defendants' agreement to share and sharing of confidential price, sales, supply, and demand data with their competitors is an unlawful information exchange

that demonstrates an effective enforcement mechanism of a price-fixing scheme.

3.    *First*, Commodity provided the Producer Defendants with access to a clearinghouse of nearly real-time information on current and forward-looking, non-anonymized Granulated Sugar data on competitors. The Producer Defendants agreed to use Commodity's clearinghouse to access the non-anonymized data to fix and maintain prices among them.

4.    *Second*, the Producer Defendants acted upon this agreement by sharing through Commodity specific information on the Producer Defendants' profits, prices, costs, production levels, and sold positions[1]—all of which are key metrics and highly competitively sensitive information in this market that competitors would not unilaterally share with each other in the absence of an agreement.

5.    *Third,* the information gathered and disseminated through Commodity was made available only to subscribing sugar producers and is completely unavailable to the public or other sugar suppliers. In other words, Commodity and the Producer Defendants that were its customers engaged in a "give to get" scheme, where they provided one another with mutual, reciprocal assurances that they would provide competitively sensitive information so long as their competitors also did so.

6.    Just as the antitrust laws do not allow competitors to exchange competitively sensitive information directly in an effort to stabilize or control industry pricing, they also

---

[1] A sold position is the percentage of a seller's supply of Granulated Sugar that has been sold. As a seller's sold position increases, that seller will generally raise prices. The sold position thus provides important information about the extent to which a supplier will or will not be aggressive on price going forward.

prohibit using an intermediary to facilitate the exchange of confidential business information.

7.    It was contrary to the Producer Defendants' self-interests to share such commercially sensitive information with horizontal competitors. The reciprocal and mutual agreement and sharing of such information facilitated and maintained a price-fixing conspiracy and reassured each Producer Defendant that its co-conspiring counterparts would adhere to the conspiracy. The ubiquitous sharing of such information, as in this case, served an important monitoring and enforcement mechanism for the cartel.

8.    In addition to sharing competitively sensitive information that would not be in their unilateral self-interests, additional plus factors support the existence of a price-fixing conspiracy: the structure of the Granulated Sugar industry is vertically integrated and highly concentrated, barriers to entry are high, sugar is a commodity product for which the demand is inelastic, and the Producer Defendants also had numerous opportunities to collude, including through meetings at trade organizations.

9.    Indeed, Defendants were able to successfully implement their conspiracy because the Granulated Sugar industry is structurally susceptible to collusion. In fact, for more than 80 years, the industry has been marked by repeated violations of the antitrust laws, including conduct remarkably similar to that alleged here.

10.    This information sharing also allowed Producer Defendants to coordinate their Granulated Sugar pricing strategies based on the prices of sugar futures contracts, as discussed below.

11.    As a result of the conspiracy, nominal retail prices of Granulated Sugar in

the U.S. rose 69% between January 2019 and October 2024.

12.    Among the victims of the conspiracy are U.S. consumers of Granulated Sugar, such as Plaintiffs and Class Members, who paid more for Granulated Sugar during the Class Period than they would have paid in a competitive market. Plaintiffs bring this action for redress of the injury and damages they and Class Members suffered and continue to suffer by reason of Defendants' violations of law.

## II.    PARTIES

### A.    Plaintiffs

13.    Plaintiff Virginia Smith is a resident of Alabama. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Alabama for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

14.    Plaintiff Francisco Olivares is a resident of Arizona. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Arizona for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

15.    Plaintiff Robert E. Sunseri is a resident of Arizona. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants in the state of Arizona for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

16.    Plaintiff Reynaldo Borge is a resident of California. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants,

including C&H brand, in the state of California for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

17.    Plaintiff Matthew Edlin is a resident of California. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including C&H brand, in the state of California for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

18.    Plaintiff Mikhael Gershzon is a resident of California. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including C&H brand, in the state of California for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

19.    Plaintiff Tammy Tacito is a resident of California. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including C&H brand, in the state of California for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

20.    Plaintiff David Ulery is a resident of Colorado. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including C&H brand, in the state of Colorado for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

21.    Plaintiff Michael Cervellino is a resident of Connecticut. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants in the state of Connecticut for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

22.    Plaintiff Stacy Kurtz is a resident of Connecticut. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Connecticut for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

23.    Plaintiff Michael Santilli is a resident of Connecticut. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Connecticut for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

24.    Plaintiff Renee Newton is a resident of Florida. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the states of Florida and New York for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

25.    Plaintiff Mayelin Bernal is a resident of Florida. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino and Crystal brands, in the state of Florida for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

26.    Plaintiff Claudette Palakiko is a resident of Hawaii. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Crystal and Domino brands, in the state of Hawaii for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

27.    Plaintiff Matthew Marek is a resident of Illinois. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including

C&H, Domino, and Crystal Sugar brands, in the state of Illinois for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

28.    Plaintiff Mary Salazar is a resident of Illinois. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Crystal Sugar and Domino brands, in the state of Illinois for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

29.    Plaintiff Debbie Hale is a resident of Iowa. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants in the state of Iowa for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

30.    Plaintiff Daynna Mitchell is a resident of Maine. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Maine for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

31.    Plaintiff Laurie Marcello is a resident of Maine. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Maine for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

32.    Plaintiff Brooke Cutlip is a resident of Maryland. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Maryland for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

33.     Plaintiff Miranda Cofino is a resident of Maryland. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Maryland for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

34.     Plaintiff Victor Sathler is a resident of Massachusetts. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Maryland for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

35.     Plaintiff Liana Britt is a resident of Michigan. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Michigan for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

36.     Plaintiff Anthony Minicuci is a resident of Michigan. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants in the state of Michigan for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

37.     Plaintiff Kim Rybarczyk is a resident of Michigan. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants in the state of Michigan for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

38.     Plaintiff Raleigh Golden is a resident of Minnesota. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants,

including C&H and Crystal Sugar brands, in the state of Minnesota for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

39.    Plaintiff Lauren Grouws is a resident of Minnesota. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Pioneer, Crystal Sugar and C&H brands, in the state of Minnesota for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

40.    Plaintiff Bridget TenEyck is a resident of Mississippi. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Mississippi for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

41.    Plaintiff Sabra Turner is a resident of Mississippi. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants in the state of Mississippi for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

42.    Plaintiff Lisa Clemenson is a resident of Missouri. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Missouri for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

43.    Plaintiff Erica Mitchell is a resident of Nevada. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including

Domino and C&H brands, in the state of Nevada for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

44.    Plaintiff Thomas Tombarello is a resident of New Hampshire. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of New Hampshire for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

45.    Plaintiff Nancy Goodman is a resident of New Jersey. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of New Jersey for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

46.    Plaintiff Claudine Williams was a resident of New York for most of the Class Period. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants in the state of New York, including Domino brand, for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

47.    Plaintiff Amanda Boardman is a resident of North Carolina. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of North Carolina for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

48.    Plaintiff Bruce Johnson is a resident of North Carolina. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants,

including Domino brand, in the state of North Carolina for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

49.    Plaintiff Kristin Jangula is a resident of North Dakota. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of North Dakota for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

50.    Plaintiff Heidi Humphreys is a resident of Pennsylvania. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Pennsylvania for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

51.    Plaintiff Evan Annis is a resident of Rhode Island. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Rhode Island for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

52.    Plaintiff Stephen Reeves is a resident of South Carolina. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants in the state of South Carolina for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

53.    Plaintiff John Luce is a resident of South Dakota. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of South Dakota for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

54.     Plaintiff Cynthia Cornwell is a resident of Tennessee. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants in the state of Tennessee for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

55.     Plaintiff Ernest Gambrell is a resident of Tennessee. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Tennessee for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

56.     Plaintiff Mary Reilly is a resident of Vermont. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Vermont for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

57.     Plaintiff James Veneziano is a resident of Vermont. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Vermont for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

58.     Plaintiff Jarred Cutlip is a resident of Virginia. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Virginia and the District of Columbia for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

59.     Plaintiff Donald Friedman is a resident of Wisconsin. During the Class

Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Wisconsin for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

60.     Plaintiff Richard Hammetter is a resident of Wisconsin. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including C&H and Domino brands, in the state of Wisconsin for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

61.     Plaintiff Sandra Kluessendorf is a resident of Wisconsin. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including C&H brand, in the state of Wisconsin for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

62.     Plaintiff Bradley Bennett is a resident of Texas. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Texas for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

63.     Plaintiff Robert Frasher is a resident of Kentucky. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the Commonwealth of Kentucky for his own personal use and not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

64.     Plaintiff Roy Derhammer is a resident of Georgia. During the Class Period, he purchased Granulated Sugar produced or sold by at least one of the Defendants, including Dixie and Domino brands, in the state of Georgia for his own personal use and

not for resale and he suffered injury as a result of the unlawful conduct alleged herein.

65.     Plaintiff Samantha Macaluso is a resident of Louisiana. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Dixie and Domino brands, in the state of Louisiana for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

66.     Plaintiff Gina Gonzales is a resident of Alaska. During the Class Period, she purchased Granulated Sugar produced or sold by at least one of the Defendants, including Domino brand, in the state of Alaska for her own personal use and not for resale and she suffered injury as a result of the unlawful conduct alleged herein.

### B.     Defendants

#### 1.     Producer Defendants

##### a.     ASR/Domino Defendants

67.     Defendant ASR Group is a privately held Florida corporation with its principal place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida 33401. It is a global producer and seller of Granulated Sugar. ASR Group owns six sugar refineries in North America, including four in the United States: Yonkers, New York; Baltimore, Maryland; Chalmette, Louisiana; and Crockett, California. ASR Group holds itself out as "the world's largest refiner and marketer of cane sugar with an annual production capacity of 6 million metric tons of sugar." It asserts that it sells its products to "customers in key channels, including grocery, industrial, foodservice and specialty." ASR Group is a subsidiary of the Florida Crystals Corporation and Sugar Cane Growers Cooperative of Florida, business enterprises of the global sugar empire Fanjul Corp. ASR

Group owns, as a subsidiary, Co-Defendant Domino. ASR Group is vertically integrated and owns sugar processing, marketing, and sales companies in Canada, the United Kingdom, Portugal, Mexico, and Belize.

68.    Defendant ASR is a privately held Florida corporation and global producer and seller of Granulated Sugar based in West Palm Beach, Florida.

69.    Defendant Domino is ASR Group and ASR's marketing and sales subsidiary for Granulated Sugar, with a current principal place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida.

70.    Defendants ASR Group, ASR, and Domino are collectively referred to herein as "ASR/Domino."

71.    ASR/Domino markets most of its Granulated Sugar under the Domino® and C&H brand names, but also sells sugar under the brand names Florida Crystals, Redpath, Tate & Lyle, Lyle's, and Sidul. It also sells sugar sold under various store brands.

**b.    United Sugar Defendants**

72.    Defendant United, a Minnesota corporation, is a marketing cooperative based in Edina, Minnesota. United has four member owners: (1) United States Sugar Corporation ("United States Sugar"), which owns and operates a cane mill and cane refinery in Clewiston, Florida; (2) American Crystal Sugar Company; (3) Minn-Dak Farmers Cooperative; and (4) Wyoming Sugar Company, LLC, all of which grow and process sugar beets at eight production facilities located in Minnesota, Montana, North Dakota, and Wyoming. United sells sugar under the United and Crystal Sugar brands, as well as the Imperial and Dixie Crystals brands, which were formerly Imperial brands before Imperial

was acquired by United. It also sells sugar sold under various store brands.

73.    United touts that "[b]ecause United has a unique, fully integrated business structure, we provide and transport sugar throughout the nation. We have 9 sugar producing plants, primarily in the Red River Valley along the border of North Dakota and Minnesota. We also produce beet sugar in Montana and Wyoming, as well as cane sugar in the Florida Everglades."

74.    United approaches the market as a unified competitor, marketing and selling all the Granulated Sugar produced by its member owners. United handles locating customers, negotiating sales contracts, and arranging all logistics. United also sets the prices for all the products it markets and sells on its members' behalf.

75.    Imperial Sugar Co. n/k/a United States Sugar Savannah Refinery, LLC ("Imperial" or "U.S. Sugar Savannah") is a Delaware company based in Georgia.  On November 30, 2022, U.S. Sugar Savannah completed its acquisition of Imperial from Louis Dreyfus. U.S. Sugar Savannah is wholly owned by United States Sugar. U.S. Sugar Savannah holds the trademarks to "Imperial Sugar," and "Imperial Sugar" customers are directed by the "Imperial Sugar" website to contact U.S. Sugar Savannah for customer service.

76.    U.S. Sugar Savannah, which is wholly-owned and controlled by U.S. Sugar, is a mere continuation of Imperial. Upon the purchase of Imperial Sugar Co. from Louis Dreyfus, all former Imperial Sugar employees continued as U.S. Sugar Savannah employees; all contractual obligations of Imperial were assumed; nothing changed ongoing execution of supply contracts with customers; and customer service representatives and

sales contacts remained the same. Payments were directed to the same bank account, with the name of the account changing to U.S. Sugar Savannah.

77.    Prior to its sale to U.S. Sugar Savannah and during the Class Period, Imperial's corporate offices were located in Sugar Land, Texas. Imperial produces Granulated Sugar in the United States. Imperial has a cane sugar refinery in Savannah, Georgia, and an intermediate sugar transfer and liquification facility in Ludlow, Kentucky.

78.    Defendants United and Imperial are sometimes collectively referred to herein as United on or after November 30, 2022.

### c.    Louis Dreyfus

79.    Defendant Louis Dreyfus is a Delaware corporation with its principal place of business in Wilton, Connecticut. It is a worldwide leader in sugar trading and merchandising. In 2012, Louis Dreyfus acquired Imperial Sugar Company ("Imperial"). Imperial, with headquarters in Sugar Land, Texas, produces Granulated Sugar in the United States and independently markets and sells its Granulated Sugar products. Imperial has a cane sugar refinery in Savannah, Georgia, and an intermediate sugar transfer and liquification facility in Ludlow, Kentucky. On November 30, 2022, Louis Dreyfus completed the sale of Imperial to U.S. Sugar Savannah.

80.    Louis Dreyfus and Imperial are sometimes collectively referred to herein as Louis Dreyfus on or before November 30, 2022.

### d.    Michigan Sugar

81.    Defendant Michigan Sugar is a Michigan corporation with its primary place of business at 122 Uptown Drive, Suite 300, Bay City, Michigan 48708. It is a cooperative

consisting of nine hundred sugar beet owners and a global producer and seller of Granulated Sugar under the brand names Pioneer Sugar and Big Chief Sugar. It also sells sugar sold under various store brands. Michigan Sugar owns and operates sugar beet processing facilities in Bay City, Caro, Croswell, and Sebewaing, Michigan. It owns a production facility in Toledo, Ohio, and an agricultural research center in Bay County Michigan. It also has warehouse facilities in Michigan and Ohio.

### 2. Commodity Defendants

82.    Defendant Commodity is a Delaware corporation with its principal place of business at 560 South State Street, Suite E-2, Orem, Utah 84058.

83.    Commodity appears currently defunct.  During the Class Period, Commodity was a strawman entity and tool for Defendants to exchange competitive sensitive information and otherwise conspire. Commodity has no public presence. It does not maintain a website on the internet. It does not advertise its services to the public. It does not publish publicly available reports on the sugar industry or offer to sell or provide any reports on or analysis of the sugar industry to other than a select few, as alleged herein.

84.    Defendant Wistisen is the principal of Commodity who, as part of Defendants' unlawful agreement, collected and shared confidential, proprietary, and competitively sensitive non-public information between the Producer Defendants.

85.    Defendants Commodity and Wistisen are alter egos and reference to one is a reference to both of them collectively.

86.    Throughout the Class Period, the Producer Defendants utilized Wistisen to facilitate the conspiracy and the exchange of confidential, proprietary, and competitively

sensitive non-public information, regarding, among other things, prices, capacity, demand, sales volume, and other key production and pricing metrics in furtherance of the conspiracy. Throughout the Class Period, the Producer Defendants utilized Wistisen to implement, monitor, and/or enforce the conspiracy and the exchange of confidential, proprietary, and competitively sensitive non-public information.

### 3.   Agents and Co-conspirators

87.   Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

88.   Whenever reference is made to any act of a corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

89.   Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers, acquisitions, asset purchase agreements, or other business combinations.

## III.   JURISDICTION, VENUE, AND COMMERCE

90.   This action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 & 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26, and the State laws cited herein.

91.   This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d),

and 1337.

92.    The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims.

93.    Venue is proper in this District under 15 U.S.C. §§ 15(a), 22, and 28 U.S.C. § 1391(b), (c), and (d) because, during the Class Period, Defendants resided, transacted business, were found, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

94.    During the Class Period, Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States and its territories.

95.    During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the United States Mail, to effectuate their illegal scheme.

96.    Defendants' conduct also had a substantial effect on the intrastate commerce of each State in the United States and the District of Columbia.

97.    This Court has personal jurisdiction over each Defendant because each Defendant transacted business, maintained substantial contacts, and is located and/or committed unlawful conduct in this District. Defendants' unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    The Market for Granulated Sugar in the United States

98.    "Granulated Sugar," also known as "white," or "table" sugar, refers to sugar that is extracted from sugar cane or sugar beets and ground to a uniform size. Granulated Sugar is considered the gold standard of sweeteners with a clean, pleasant sweetness and no secondary taste or aftertaste. Granulated Sugar is the most common sweetener used in home food preparation and cookbooks and consumers tend to dislike any sugar substitute that does not match its sweetness profile. In 2020, the average American consumed forty pounds of Granulated Sugar. Eighty percent of all sugar sold in the United States is Granulated Sugar.

99.    The relevant antitrust product market is the market for Granulated Sugar (the "Relevant Product Market"). The relevant antitrust geographic market is the United States (the "Relevant Geographic Market"). The relevant antitrust market is the market for Granulated Sugar in the United States (the "Relevant Market").

100.    The U.S. consumer sugar production process starts from beet and cane fields. About 56% of the sugar production is beet sugar and 44% is cane sugar. Although granulated sugar from beets and sugar cane is indistinguishable, the production process is slightly different. Sugar manufactured and refined through either process is reasonably interchangeable and is sold as Granulated Sugar.

101.    Granulated Sugar is a common ingredient found in many foods. Dry, granulated, white sugar is manufactured and sold to direct purchasers who resell, consume, or further refine it into various other types of sugar products. Granulated Sugar is the

predominant form of sugar sold in the United States.

102.    The sugar processing industry had an estimated revenue of $13.5 billion in 2024.

103.    Granulated Sugar producers, either directly or via their marketing affiliates, market and sell to customers, including food and beverage manufacturers, retailers, food service companies, and distributors.

104.    End user consumers, such as Plaintiffs and Class Members, often purchase Granulated Sugar from grocery stores, pharmacies, or convenience stores, or online.

105.    Granulated Sugar, regardless of whether it is made from sugar cane or sugar beets, is a commodity product with little or no differentiation based on the producer. Typically, competition for commodity products is based on price as opposed to other attributes such as product quality or customer service; as a result, a commodity such as Granulated Sugar is susceptible to cartel behavior.

106.    Due to the lack of product differentiation, the Producer Defendants are forced to compete on price such that the pricing decisions of each Granulated Sugar producer impact the market price for Granulated Sugar.

### B.    The Defendants Have Market Power

107.    During the Class Period, the Producer Defendants collectively controlled from 70% to 75% of the Relevant Market. The Producer Defendants have acknowledged their dominant position. For instance, upon hearing the announcement of Imperial's acquisition by United, ASR/Domino noted that "they view this as 1 less competitor and

now 3 companies account for 75% of the market."[2]

108.    The 2024 estimated market share[3] of each Producer Defendant by capacity

is shown in Figure 1 below:

| Marketing Entity | Refining Entity | Capacity (cwt) | % Share |
|---|---|---|---|
| Domino Foods, Inc. | American Sugar Refining, Inc. | | |
| | Chalmette, LA | 20,500,000 | |
| | Baltimore, MD | 16,500,000 | |
| | Crockett. CA | 17,000,000 | |
| | Yonkers, NY | 12,250,000 | |
| | **Florida Crystals Corp.** - South Bay, FL | 6,600,000 | |
| | Total | **72,850,000** | **30%** |
| United Sugar Cooperative | **American Crystal Sugar Co.** | 40,000,000 | |
| | **U.S. Sugar Corp.** – Clewiston, FL | 18,000,000 | |
| | **U.S. Sugar Savannah Refinery** - Savannah, GA | 18,600,000 | |
| | **Minn-Dak Farmers Co-op** – Wahpeton, ND | 9,600,000 | |
| | **Wyoming Sugar Co.** - Worland, WY | 1,100,000 | |
| | Total | **87,300,000** | **36%** |
| National Sugar Marketing LLC | **Amalgamated Sugar Co.** | | |
| | Snake River Sugar Co. | 23,500,000 | |
| | **Southern Minnesota Beet Sugar Cooperative** | | |
| | Renville, MN | 10,100,000 | |
| | Brawley, CA | 3,350,000 | |
| | Total | **36,950,000** | **15%** |
| Cargill, Inc. | **Louisiana Sugar Refining LLC** - Gramercy, LA | **20,000,000** | **8%** |
| Michigan Sugar Co. | **Michigan Sugar Co.** | **14,500,000** | **6%** |
| Western Sugar Cooperative | **Western Sugar Cooperative** | **12,000,000** | **5%** |
| Grand Total | | **243,600,000** | |

Figure 1.

109.    The total market share of the Producer Defendants is approximately 72%.

110.    The domestic market for Granulated Sugar has gone through significant

consolidation in recent years, helping to facilitate cartel conduct. For instance, in 2019,

United sought to acquire competitor Imperial Sugar from Louis Dreyfus. Subsequently,

---

[2] Attachment to Motion for Protective Order by American Sugar Refining, Inc. [Redacted], Email from ASR/Domino's Adam Whittaker dated 3/25/21, *United States v. U.S. Sugar Corp., et al.*, No. 21-cv-1644-MN (D. Del. April 18, 2022), ECF 207-24, at 2.

[3] https://iq.mckeany-flavell.com/wp-content/uploads/2024/01/projected-us-sugar industry-capacity-2024-01.pdf

United States Sugar, one of the four member-owners of United, entered into an asset purchase agreement whereby U.S. Sugar Savannah would acquire Imperial, and United would market and sell all of the Granulated Sugar produced by Imperial.

111.    In 2021, the Department of Justice ("DOJ") sued to block the proposed merger, arguing that the acquisition would leave the overwhelming majority of sales across the Southeast in the hands of only two producers and would create higher prices for businesses and consumers in the Southeast United States, which the district and appellate courts ruled was too narrow a geographic market. The merger was finalized on November 30, 2021.

### C.    Defendants Unlawfully Raised, Fixed, Maintained, or Stabilized Prices of Granulated Sugar in the United States.

#### 1.    Defendants Unlawfully Shared Confidential Price and Sales Information With Each Other.

"Genuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals . . . ."

*—American Column & Lumber Co. v. United States*, **257 U.S. 377, 410 (1921)**

112.    Defendants engaged in a systematic and deliberate scheme to exchange competitively sensitive, non-public information to suppress competition and maintain artificially high prices for Granulated Sugar in the United States. Through a network of coordinated exchanges facilitated primarily by Commodity, the Producer Defendants—United, Michigan Sugar, Louis Dreyfus, Imperial, and ASR/Domino—shared and received current pricing, sold positions, crop size and yields, and forward-looking price strategies. These exchanges were neither anonymized nor publicly accessible, serving only the agreed

conspiratorial purposes of the Producer Defendants.

113.    There is no economically rational reason for the Producer Defendants to share such information. This information was shared for the purpose of enabling Defendants to effectuate their agreement to artificially affect prices and avoid competing with one another. The information sharing scheme is a plus factor that supports the existence of a per se unlawful conspiracy to raise, fix, maintain, and/or stabilize prices of Granulated Sugar during the Relevant Time Period.

114.    Additionally, Defendants' information sharing scheme is, in and of itself, an independent violation of Section 1 of the Sherman Act, analyzed under the Rule of Reason.

115.    ***Mechanism of Information Exchange.*** Commodity acted as a clearinghouse, collecting detailed, sensitive information from the Producer Defendants, and rapidly redistributing it by agreement to other Producer Defendants within the cartel. The information exchanged allowed the Defendants to avoid price competition and coordinate their pricing strategies in near real-time. For example, "sold positions," which reflect the percentage of a seller's inventory already committed for sale, provided critical insights into each competitor's pricing flexibility. By knowing when a rival was nearing full capacity, the Producer Defendants could confidently raise prices without fear of undercutting.

116.    The role of Commodity in facilitating this scheme was crucial. Unlike legitimate industry analysts, Commodity lacked a public presence, did not market its services to the public, and did not publish anonymized market research based on the data it received. This exclusive and secretive arrangement underscored the Producer

26

Defendants' intent to limit access to critical market information and maintain their price-fixing conspiracy.

117.    Commodity did not gather information through voluntary surveys or periodic polling that it anonymized. Instead, the Producer Defendants regularly shared competitively sensitive information about their pricing and sold positions with Commodity, and Commodity in turn contemporaneously shared that competitively sensitive information with the other Producer Defendants.

118.    Commodity does not make its reports available to purchasers of Granulated Sugar and others in the sugar supply chain, thereby strengthening the advantage that the Producer Defendants gain by sharing information only with one another as producers.

119.    Commodity does not anonymize the competitively sensitive information it receives from the Producer Defendants when passing such information on. Furthermore, Commodity does not share or offer to share this competitively sensitive information with the customers of the Producer Defendants, nor does it publicly publish the competitively sensitive information it obtains from and shares with the Producer Defendants or otherwise make it available to consumers.

120.    The Producer Defendants understand the competitive sensitivity of the information that they provide to Commodity. Commodity understands that the competitively sensitive information that the Producer Defendants share would not ordinarily be disclosed to competitors. The purpose of their sharing was to enable United, Michigan Sugar, Louis Dreyfus, and ASR/Domino to raise, fix, maintain, stabilize, or coordinate prices of Granulated Sugar in the United States.

121. ***Impact on the Market.*** The consequences of the Defendants' coordinated efforts were profound. By maintaining a shared understanding of each other's pricing and market strategies, the Producer Defendants effectively eliminated meaningful competition. The USDA's restrictive production allotments and import limitations further amplified the anticompetitive effects, as Defendants could manipulate supply to exploit limited market alternatives. Retail sugar prices rose significantly during the Class Period, with no corresponding increase in production costs or supply constraints.

122. Due to United States Department of Agriculture ("USDA") production allotments linked to USDA loan programs and limitations on imports and tariffs, the Producer Defendants know that as they sell out of Granulated Sugar, they can charge higher prices because there will be little to no additional competitive product available in the market that could force them to reduce price. Thus, knowing one another's sold position allows them to calculate when and how much they can raise, fix, maintain, or stabilize prices due to the amount of supply.

123. Commodity provided this reciprocal information to the Producer Defendants rapidly, often within hours of having received it. The Producer Defendants then used the market intelligence they received from Commodity and other sources when deciding how much to charge for their products and to extract supra-competitive prices.

124. Using the non-anonymized competitively sensitive non-public information exchanged through Commodity, the Producer Defendants ensured that they would not undercut each other's prices and cause prices to decrease as they would in a competitive market. The Producer Defendants learned of each other's current pricing, crop size, crop

yields, future beliefs on pricing, and sold positions only because Commodity collects this competitively sensitive information from each of them and shares it with the other, pursuant to their unlawful agreement.

125.    In recent testimony, the Sourcing Business Leader for the Meals and Baking Operation System at General Mills explained that as a large customer of sugar it would negatively impact General Mills if sugar suppliers were sharing their sold information with one another.

126.    In particular, General Mills believes that "if [sugar suppliers] knew what other [suppliers] were potentially going to offer, how much they would offer or how aggressive someone else would be, [it] could potentially dictate what type [of] pricing they would submit to us."

127.    United does not publish the company's current Granulated Sugar prices or its sold position. United's sold position was confidential, and its employees were supposed to keep that information close to the vest. Nevertheless, United shared it with Mr. Wistisen, who United knew would pass it along to ASR/Domino and other competitors.

128.    Dirk Francis Swart, executive vice-president of sales at United States Sugar, testified that United Sugar shares information with Mr. Wistisen because United **know[s] he's going to share information and we want the information that gets shared to be accurate."**

129.    ASR/Domino has a written code of conduct with an ethics policy that prevents any ASR/Domino employee from directly talking about ASR/Domino's pricing with a representative of one of ASR/Domino's competitors. Nevertheless, ASR/Domino

employees shared non-public, confidential, commercially sensitive pricing, sold position, and other information with Mr. Wistisen knowing that he would provide the information to other competitors.

130.    The unlawful agreement to fix prices was implemented through information exchanged through Commodity, which included current pricing, future or forward pricing, pricing strategies, and sold positions. The conspiracy also included price signaling among Defendants, and upon information and belief, communications made through other conduits including persons and/or software platforms.

131.    Furthermore, as market leaders, the Producer Defendants account for the majority of Granulated Sugar production, sales, and capacity. As a result, smaller market participants are not an effective competitive constraint on Producer Defendants' dominance.

132.    ***Evidence of Coordinated Conduct.***  The conspiratorial exchanges between the Defendants were neither incidental nor benign. For example, on multiple occasions, senior executives at ASR/Domino and United explicitly sought to signal pricing intentions to their competitors. Internal communications reveal efforts to share updates on market "tightness," forward-looking price increases, and inventory conditions through Commodity, ensuring alignment among the Producer Defendants. These exchanges were instrumental in setting supra-competitive prices.

133.    The exchange of pricing, crop size and yield, and sold position information by the Producer Defendants was intended to ensure—and did ensure—higher prices for Granulated Sugar than would have existed in a competitive market unaffected by the

Defendants' anticompetitive agreement.

134.    The Producer Defendants knowingly and intentionally sought, shared, received, and used non-public, competitively sensitive information from Mr. Wistisen of Commodity pursuant to their anticompetitive agreement as alleged below, in order to raise, fix, maintain, or stabilize Granulated Sugar prices.

135.    In connection with the United/Imperial merger investigation, direct evidence of conspiratorial communications sharing competitively sensitive information was made public.  Excerpts of inculpatory communications follow:

136.    As an example, a September 16, 2019 email communication to Mr. Wistisen from ASR/Domino's Vice President of Industrial Sales, Alan Henderson, disclosed ASR/Domino's 2020 pricing and sold positions. Mr. Wistisen asked Mr. Henderson, "Wondering where you would put refined prices and coverage?" Mr. Henderson responded "Pricing for FY20: Northeast - $38.50 bulk basis Gulf - $36.50 bulk basis West - $39.00 bulk basis Cane refiners should be close to 70 to 75% covered for FY20. The open business that does remain will be at higher prices."

137.    ASR/Domino disclosed this confidential information knowing it would be shared with its competitors, and in return, that it would get its competitors' confidential information. Mr. Wistisen responded that he would send crop and pricing updates in the next day or two, and noted, "The price updates I did receive today didn't have nearly the level of cane price increases you reported . . . but I bet they're headed that way[.]"

138.    Commodity was not the only conduit of information between the Producer Defendants during this time period. On November 15, 2019, Gerald Kramer of Kramer

Brokerage Co. shared Domino price quotes with multiple Louis Dreyfus managers, and inventory details: "[a]lso told that Domino still has sugar to sell." In response Jim Evans, National Sales Manager at Louis Dreyfus, expressed his appreciation: "This is very helpful!" Jeana Hines, Vice President of Sales & Marketing at Imperial, in the same email chain, asked Gerald Kramer, "Have you heard anything on what Domino is doing with pricing for their grocery retail business?" Kramer responded, "Domino will not sell any 50# EFG below $24.00/50# fob refinery thru 2020 for end users and only thru 12/31/19 for distributors. If I get any info on retail business I will pass it on."

139.    On January 8, 2020, Robert Sproull, Senior VP of Sales Marketing and Product Development at ASR/Domino, emailed Mr. Henderson "it's really important we signal to the market that there's still going to be tightness," and "[w]e need to signal to the market that we're going to maintain price, especially for the Oct-Dec quarter. And there's not much to lose here. Pure price discovery."

140.    On March 3, 2020, Mr. Henderson sent an email regarding "Colloquium Recap" to Mr. Sproull, which contains a "summary of points from the International Sweetener Colloquium," including "Competitive Numbers" for fiscal year 2021 for certain competitors, including "Michigan firm at $38.50 for 2021," "United took prices up to $36.50 FOB RRV pre colloquium to the trade and heard it from specific customers," "Clewiston - $37.50 FOB bulk," "NSM – still offering sugar in FY20. Values close to 43.00/44.00 fob factory, 46.00/47.00 fob west coast transfer stations," "Imperial — 38.00/38.50 for CY 2021 on bulk EFG."

141.    The Producer Defendants provided accurate information to each other

through Mr. Wistisen. ASR/Domino was typically "upfront" with the information it provided to Mr. Wistisen. In one example of such "upfront" information, Mr. Henderson disclosed to Mr. Wistisen in an August 2020 email pricing updates for ASR/Domino Granulated Sugar. On August 17, 2020, Mr. Wistisen wrote to Mr. Henderson, providing him with sugar market updates and asked: "Where would you put cane prices and coverage?" The next day, August 18, Mr. Henderson responded:

[...]

Quick Update:

Pricing:

Northeast - $39.00 to $40.00 BULK FOB

South - $37.50 to $37.75 Bulk FOB - fighting Cargill mainly

West - $39.50 to $40.00 Bulk FOB - values staying strong…

  Cane gulf still fighting for share - but some talk of Cargill moving prices up to $37.50 gross fob.

Coverage:

Beets - 70 to 75%

Cane - 50 to 55%

[...]

142. Moreover, Mr. Wistisen told both United and ASR/Domino that he spoke with Michigan Sugar, and other sellers, and that the information he provided came directly from them. For example, Mr. Wistisen wrote to United that "ASR saying back up to $40.50 to $41," on one occasion, and on another, he wrote to Mr. Henderson that "the United

[pricing and sold position] info I provided was direct from them this morning. They held a big huddle yesterday (sounded like all sales reps/VP were present), and those numbers were the result." When discussing pricing, he stated that he did not have Michigan pricing yet, and "I hope to talk with them [Michigan] on Fri./Mon."

143.    Similarly, Mr. Wistisen shared Michigan Sugar's pricing and sold positions with United and ASR/Domino. In August 2020, he reported to Mr. Henderson at ASR/Domino, "My goodness, what a difference a month makes. Michigan 85+% booked[.]" The next month, Mr. Wistisen reported, "Michigan holding forecasts unchanged, sugars nearing 16%, factories running well, stockpiling on Oct. 19th." He added with regard to pricing that Michigan was at "$38.5+, selective selling."

144.    Mr. Wistisen provided information on pricing and sold position to the Producer Defendants rapidly, often soon after having received it. On September 21, 2020, Mr. Wistisen separately asked, within minutes, Mr. Henderson and Eric Speece, a Director of Strategic Accounts at United, if there was "[a]nything new of interest on the pricing front?" They each responded with their company's respective pricing and sold positions. Mr. Speece shared, "We are firm at $36.50 (no change) and now $38.50 on cane (an increase of $0.50/cwt) and yes you heard correctly we are 90+% sold." In response, Commodity thanked United "for keeping the communication lines open!"

145.    On September 22, 2020, Mr. Henderson responded:

"Pricing (Cane)

North and mid-Atlantic - $40.50 to 41.00 FOB - prices were lower past few weeks but have firmed up to these levels.  No discounting at this time.

34

Gulf - $38.50 fob

West - $40.50 to $41.00 fob firm

Note - higher levels for the Oct./Dec. 20 period as most cane and beet companies are well sold and/or filling past force majeure volume.

I'm hearing most cane guys 70 to 75% booked with the exception of Cargill at 90%??

Beet prices below seem accurate and coverage at 90% I believe is about right."

146.    On September 22, 2020, less than three hours after receiving Mr. Henderson's response, Mr. Wistisen provided United and ASR/Domino with the information from each other in emails less than a minute apart. Mr. Wistisen told ASR/Domino that "U.S. Sugar recently increased to $38.50, so looks like the range is $38.50 to $41, nice increase over last month. Beet not much change from earlier indications, prices are $36.50 to $38.75, very little sugar available at the low price, industry coverage 87%, all but NSM over 90+% booked." To United, Mr. Wistisen wrote, "ASR saying back up to $40.50 to $41. So now I have cane range at $38.50 to $41 Coverage . . . . ASR 5% below that, and the other southern refiners up 10-15% from the average. . . . Waiting for confirm from Michigan, but Midwest ranging from $36.50 to 38.75, very little available at low price (so I hear)."

147.    In yet another example, Mr. Wistisen emailed both Mr. Speece at United and Mr. Henderson at ASR/Domino within approximately 40 minutes of each other in mid-November 2020 asking "where would [they] put . . . prices?" Both responded later that day with pricing information.

148.    On November 16, 2020, Mr. Wistisen wrote to Henderson at ASR/Domino, asking: "Curious what you're hearing on domestic raw and refined pricing? I haven't heard back from United yet. Did they pullback from spot market? Where would you put prices and cane coverage?" Mr. Wistisen received his response from ASR/Domino later that day, which he conveyed to Domino, along with a note that he is "waiting to hear back from a number of contacts."



149.    On the same day, November 16, 2020, Mr. Henderson updated Mr. Wistisen on ASR Pricing and inventory: "Prices have firmed up again based on higher # 16 values, beets close to sold out and less imports, tier 2 sugar available at this time. Near-by values back up to $46.00 FOB all locations.  For calendar 2021: East/West - $42.00 fob[;] Gulf - $39.50  fob  [;]  Cane  Coverage  -  85-90%[.]"  On  November  17,  2020,  Mr.  Wistisen responded "So strange, I can't wrap my head around United's approach. They came up very short on production, and market has firmed, but they're still at $36.50 RRV and $38.50

Southeast?!?! But did say they'll probably be taking prices higher given strong sold position . . ."

150. On January 19, 2021, Mr. Wistisen wrote to United delivering several paragraphs of information on developments in the sugar industry. Near the end, he asked: "Has United put out a price range on FY22?" On January 20, Mr. Speece at United responded: "We have not yet set pricing for 2022, but we will soon."

151. Mr. Wistisen later emailed Domino/ASR asking for "[a]ny guidance [ASR/Domino] could give on how sub-30 cent No 16 prices makes sense?" Mr. Henderson at ASR/Domino and Mr. Wistisen exchanged messages regarding the "reason" Mr. Henderson had "heard," and Mr. Wistisen responded with real-time information from competitor United, "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50 based on demand, inventories, No. 16, and looking down the road and expecting another year of tight quotas in FY22. Selling FY21 firm, good activity, little to no competition from NSM or Western." Mr. Henderson passed this along to Adam Whittaker at ASR/Domino, adding, "United is usually pretty upfront with [Wistisen]." Whittaker replied "Good timing. Just off the phone with Ron…United telling him they're at $36.50 for 2022 but very little activity for now [...] Ron also asking about raw prices [...]" Upon information and belief, Ron refers to Ron Sterk from Sosland Publishing, the publisher of the Sosland Sweetener Report.

152. On February 15, 2021, Mr. Wistisen wrote to Mr. Speece at United: "Any action in FY22? Has United put a number on it yet? No word back from other processors/refiners, I'll send along indications." Mr. Speece quickly responded: "We are

still at the $36.50 and $38.50 with zero problems selling at those values. I do not anticipate any changes to our prices, but we have not formally decided. No action on 2022 just some small inquiries." Mr. Wistisen asked: "Just to clarify: United has not issued FY22 list prices, and at this point doesn't expect FY22 prices to change much from remainder FY21?" On February 16, 2021, Mr. Speece answered: "Give me a ring and we can discuss."

153.    The next day, February 17, 2021, Mr. Wistisen wrote to ASR/Domino: "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50[.]"

154.    On March 25, 2021, in response to the news that "[i]mperial's sugar will be marketed by United," Adam Whittaker, Director at Domino Foods, remarked that, "It's going to be more important than ever to stay close to United. To the point where we might want to start thinking about ways to work with them (*i.e.*, asking them for quotes [REDACTED]), on down the road. This is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry . . ."

155.    On April 29, 2021, Mr. Wistisen wrote to Mr. Henderson: "Where would you put price ranges and demand? I have spot $36.50 firm Midwest, $39.00 firm Michigan (but watching Baltimore progress, could creep higher), and east and west coasts now at $44.00. And forward I have quoting at $35.50-$36 Midwest, 37.50-38 Gulf, $42.00 Coasts," and provided pricing information.  In response to the inquiry, Henderson confirmed the accuracy of Wistisen's information: "I believe your pricing numbers below are very accurate," and provided additional pricing details: "Prices in FY21 are very firm with both coast at $43.50/$44.00 bulk FOB basis. We heard RRV folks are tight and holding at

$36.50 fob. For FY22, RRV at $35.50 big volume, $36.00 smaller volume fob. For us, closer to $39.00 gulf, $38.50 Florida and $41.50 both coasts. Close to 30% coverage for FY22."

156.    On May 11, 2021, Mr. Wistisen wrote to ASR/Domino: "Are those higher spot prices, $43.50-44.00 holding up?" On May 12, 2021, Mr. Henderson responded: "All is good in Baltimore. Melt rates close to 90% of pre-fire levels. With that being said near-by prices are selling at $44.00 fob bulk basis. The $31.50 #16 is also pushing white pricing up."

157.    On May 17, 2021, Wistisen emailed Henderson, requesting pricing and inventory information: "Have you bumped up FY22 prices yet on explosive gains in No. 16 prices… Where would you put refiner FY22 coverage?"

158.    Later that same day, Henderson responded with ASR/Domino FY21 pricing: "FY21 prices – now at $45.00 fob bulk basis east and west coast. Down in Florida and gulf $44.00 fob bulk basis. FY22 prices – $42.00 fob bulk basis, $40.50 fob bulk basis Florida and the gulf. FY22 coverage – approximately 35 to 40%."

159.    On May 18, 2021, Mr. Wistisen wrote again to ASR/Domino: "Just talked with United: prices unchanged, spot and forward Hello!? But their head honcho is on vacation, bad timing Only about 40% covered. But expect big action over the next month, 20+% add to bookings, and at that time expect to raise prices, and not by just a dollar...Western limping along, NSM picking off business...They're still $36 spot and forward, 45-50% booked. NSM: ...I believe they're $36 Renville and $38 west, 45-55?% booked."

160.    On May 26, 2021, Henderson circulated an internal email, relaying pricing information from his conversation with Wistisen, "Not surprised at the $37.75 fob rail for Cargill. In talking with Jenkins and Rich Wistisen they believe Cargill is offering $2.00 above RRV beets for FY22. United - 35.75 fob RRV for many decent size accounts. Cargill - 37.75 fob Gramercy for good rail volume."

161.    On June 17, 2021, Mr. Wistisen emailed Mr. Henderson an update on crops and asked, "What are you seeing on the price and demand side of things?" Mr. Wistisen then explained:

"I'm just getting going on pricing, but have heard a bit:

NSM: 35-36 net RRV, 37 net West. Claiming to be close to sold out at Brawley, 70% Renville, but only 40% booked Amalgamated.

United reportedly (I'll talk with them tomorrow) holding $36.50 gross, bigs are booking and getting discounts of about a buck or less, that's less than last season.

Western supposedly (I'll talk with them tomorrow) increased prices to $36.50 net, not getting many takers.

No talk on Michigan, yet. I hope to talk with them Fri/Mon.

Cane: I'm hearing Cargill is really chasing prices lower, a few deals under $37 gross.

And that Southeast has slipped below $38?

But that ASR is holding firm on the coasts."

162.    The next day, Mr. Henderson responded:

"[w]ord on the street [was] United moving up a $1.00 cwt since bookings now over 60%." He went on to share future prices for the 4th quarter of 2021:

"Cane prices firming up as #16 values rise.

Oct.- Dec. 21

East/West coasts ·- $44.00 gross fob bulk basis

Gulf - $42.00 gross fob bulk basis

Jan.- Dec. 22

East/West - $42.00 gross bulk basis

Gulf - $39. 75 gross fob bulk basis."

163.     On July 12, 2021, Mr. Wistisen reported to Henderson new pricing and inventory details: "Michigan and Western 80+% [booked], and rumors suggest United is also now around 80% booked and recently increased prices (I hope to have confirmation soon). Hearing NSM still a bit aggressive, at least into Texas." In the same email, Mr. Wistisen asked, "What's happening on the cane side of the fence? Sounds like you're now $48 spot, and Imperial $49. Where would you put forward pricing and coverage?"

164.     That same day, Mr. Henderson responded updating Mr. Wistisen on ASR/Domino's pricing details: "Our pricing for remainder of FY21 is $48.00 bulk basis all locations. With raws remaining high in the Oct./Dec. 21 period we are $46.00 fob bulk basis east/west and $44.00 gulf. For FY22 close to 65% booked and moving prices up. I haven't officially seen a United price increase but heard it's out there (+$2.00)." Additionally, on the same day, Henderson forwarded Wistisen's message to coworkers, saying, "FYI below………United price increase. Rich is thinking $2.00 increase but no official word yet. Let's see if we can hunt something down."

165.     On July 16, 2021, Mr. Wistisen wrote to ASR/Domino: "I don't understand

it, but this is the word from United: 80-85% sold, will be at 90 very soon. Beet holding at $36.50 firm, and cane increased to $39.50 firm… Any changes in ASR forward prices? I have you at $39.75 gulf and $42 coasts." Later, Mr. Wistisen adds: "Well at least one group, your group, has their finger on the pulse of this market. The United info I provided was direct from them this morning. They held a big huddle yesterday (sounded like all sales reps/VP were present), and those numbers were the result."

166.    Also on July 16, 2021, Henderson updated Wistisen on ASR's pricing: "We are now $40.50 gulf, $43.00 fob east and west coast."

### 2. Defendants Relied Upon the Exchanged Competitively Sensitive Information.

167.    The Producer Defendants used the sensitive information they exchanged through Mr. Wistisen in furtherance of their anticompetitive agreement and used it to send messages to competitors about desired price levels. For example, Robert Sproull, Senior Vice President of Sales & Marketing at ASR Group, forwarded pricing information from Mr. Wistisen to others at ASR/Domino with a recommendation of what price ASR/Domino would have to offer to win a specific customer's business. In another example, United's Mr. Speece thought a competitor was selling at too low a price, so he told his colleagues that United "may want to communicate pricing earlier than the colloquium to send a msg [message]." Knowing a competitor's sold position was used to justify higher prices.

168.    ASR/Domino's Mr. Henderson frequently forwarded the information obtained about other competitors from Mr. Wistisen to his sales team and his superior. In one such example, Mr. Henderson received, and forwarded to his subordinates, information

from Mr. Wistisen that United would likely be adding bookings and raising prices over the following month, and "not by just a dollar." In another example, Mr. Henderson sent to his boss, Mr. Sproull, information on competitors' inventory position that he received from Mr. Wistisen.

169.    United not only received information from Mr. Wistisen that it used in pricing decisions and to send messages about pricing to competitors, but also affirmatively used him to signal competitors. In one example, United's Executive Vice President, Dirk Swart, told United's Mr. Speece that he wanted Mr. Wistisen to "hear" that United's current beet sugar price was $36.50 and cane sugar price was $38, but United was contemplating increasing its prices given its sold position. They discussed what they wanted to "indicate" to Mr. Wistisen before deciding to continue the conversation by phone.

170.    United's Mr. Swart believes that the "better information about what [his] competitor's actual prices were, [United] could better avoid these destructive situations" of customers using pricing information to negotiate better prices. Customers believe that competitors sharing this information harms them.

* * *

171.    There is no plausible, non-conspiratorial justification for the Producer Defendants to use Commodity and/or other means to secretly share highly confidential and proprietary detailed information about their current and future prices and sold positions. In a competitive market, such proprietary, competitively sensitive information would be a closely guarded secret.

172.    Defendants knew and intended that their private exchanges of competitively

43

sensitive information about prices and sold positions would allow them to artificially raise, fix, maintain, or stabilize Granulated Sugar prices above the levels they would have been absent the anticompetitive conduct alleged herein.

173.    The Producer Defendants are interested in achieving higher prices for Granulated Sugar. In one instance, United raised prices in part to "send[] a message" to its competitors "that we were not interested in allowing the market to slip lower." United's CEO Matthew Wineinger testified that he was "confident" that "word got back" to United's competitors.

174.    In fact, in a March 2019 internal presentation, United explained that it launched a new "Competitive Sourcing Project" in 2019 to, among other things, "[o]btain real-time market data on which competitors are supplying the lanes / customers (by geography)".

175.    ASR/Domino similarly anticipated competitive reactions, used pricing to send signals to competitors, and considered how its actions may cause market prices to decline.

176.    ASR/Domino decided not to get "aggressive" on pricing because ASR/Domino "would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing." ASR/Domino also wanted to "signal to the market" that there would be tightness and ASR/Domino would "maintain price."

177.    ASR/Domino also observed that the proposed acquisition of Imperial by a member of the United cooperative was a "good thing" for ASR/Domino because it would help to align United's pricing strategy with ASR/Domino's. ASR/Domino believed that

after the acquisition of Imperial, "[i]t's going to be more important than ever to stay close to United" and "[t]his is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry."

178.    Michigan Sugar likewise participated in the sharing of sensitive information regarding pricing and sold positions with the intention of artificially raising, fixing, maintaining, or stabilizing Granulated Sugar prices above the price that would have prevailed in a competitive market.

### 3.    Defendants Agreed to a Common Formula to Fix Prices.

179.    In furtherance of their agreement to manipulate and fix the prices of Granulated Sugar, the Producer Defendants developed and agreed to standardized pricing formulas. For example, one of their formulas relied on publicly observed benchmarks, such as futures prices, to coordinate their pricing strategies and maintain artificially high price levels. This approach allowed the Defendants to obscure their collusion under the guise of market-driven practices while avoiding competitive pressures.

180.    The Producer Defendants routinely referenced Number 16 spot prices to set their Free on Board (FOB) pricing. For example, in February of 2021, Wistisen told Henderson that on the pricing side, sugar prices could increase thanks, *inter alia*, to the "history of excellent selling restraint/patience from ASR, [and] high no. 16 prices…." This communication highlights how shared adherence to such benchmarks reinforced collusion rather than competition.

181.    Similarly, in July 2021, Henderson referenced United's impending $2 price increase for beet sugar, emphasizing that it "makes sense if they follow the #16 market and

do the math." Henderson later acknowledged that ASR/Domino was actively "pricing off #16 market," and that United mirrored this strategy, raising its Gulf FOB price to precisely match ASR's price of $40.50. United's executives admitted that this increase followed a "big huddle" among their marketing team, a clear signal of coordinated decision-making.

182.    Even as Imperial Sugar operated outside the domestic production framework before its acquisition by United, it relied on similar pricing formulas tied to Number 16 prices. Notably, Imperial declared that "acting as a price-taker would put the whole business at risk," reinforcing its disinterest in genuine price competition. Such statements reveal a collective industry mindset aimed at maintaining profit margins through coordinated pricing rather than market-based competition.

183.    The Producer Defendants' reliance on shared pricing formulas constitutes a per se violation of the Sherman Act. The Department of Justice, in an amicus brief filed in *Gibson v. Cendyn Grp., LLC*, affirmed that any "formula underlying price policies," whether or not executed uniformly, qualifies as unlawful concerted action: in which it stated:

> In particular—and especially important here—the *per se* prohibition on price fixing applies with full force to concerted action by competitors on any "formula underlying price policies." [*United States v.*] *Socony-Vacuum* [*Oil Co.*], 310 U.S. [150] at 222, 226 n.59 [(1940)); *see also id.* at 223 ("an artificial stimulus applied to (or at times a brake on) market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone"). That includes any formula used to fix benchmark, component, recommended, or "starting point" prices—even if end prices ultimately vary….*see also, e.g.*, …*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 765, 771 (2d Cir. 2016)

> ("benchmark" or "component" used in contracts setting
> interest rates).
>
> Moreover, black-letter antitrust law prohibits horizontal price-
> fixing agreements without regard to whether the agreement is
> carried out at all. The agreement itself is the violation.

Amicus Brief dated Oct. 24, 2024, at 24-25, *Gibson v. Cendyn Grp.*, *LLC*, No. 24-cv-03576

(9th Cir.) (ECF No. 28.1).  Courts have consistently recognized that collusive reliance on

formulas to set prices distorts free-market dynamics and undermines competition.

184.   By agreeing to common pricing formulas based on Number 16 spot prices,

the Producer Defendants created an environment where price-fixing was not only feasible

but virtually guaranteed. This deliberate coordination eliminated the unpredictability

inherent in competitive markets, ensuring stable yet inflated prices that directly harmed

competition generally and consumers specifically. Such conduct underscores a blatant

disregard for antitrust principles, further illustrating the Defendants' conspiratorial

objectives that amount to a *per se* violation of the Sherman Act.

### 4.    Defendants' Retail Granulated Sugar Prices Increased Dramatically and in Parallel Over the Class Period.

185.   Granulated Sugar prices increased significantly during the Class Period as a

result of Defendants' conduct. As shown in Figure 2 below, nominal retail prices of

Granulated Sugar rose 69% from January 2019 through October 2024:



Figure 2.

186.    This increase was contrary to pricing patterns prior to the Class Period and is not explained by market forces, such as inflation (CPI)[4], as shown in Figure 3 below:

---

[4] Consumer Price Index ("CPI") is a price index of a basket of goods and services paid by urban consumers. Percent changes in the price index measure the inflation rate between any two time periods. CPI is a commonly recognized measure of inflation in the United States.



Figure 3.

187.    Moreover, Granulated Sugar prices increased dramatically during the Class Period without a decline in the supply of Granulated Sugar. U.S. beet and cane sugar production increased from 8,999,000 short tons in 2018/2019 to an estimated 9,368,000 short tons in 2023/2024.

188.    In the past 20 years, the price of Granulated Sugar has doubled on an indexed basis. There is no economic rationale for the rate of price increases during the Class Period.

189.    United relied upon Mr. Wistisen at least as early as the first half of 2019 to enable it to fix or coordinate prices with the other Producer Defendants. Cane sugar prices are now at their highest levels since November of 1974. Commencing on or about October of 2019, prices experienced one of the steepest climbs ever, which is ongoing. During that

period, the Producer Price Index ("PPI") calculated by the Federal Reserve Bank of St. Louis went from 87.6 to 97.4. After United's acquisition of Imperial in 2023, prices further increased, going from a PPI of 110.6 to 123.2 by the end of 2023.

190.    Since Defendants control more than 70% of the market, it is not surprising that Defendants increased the retail prices for Granulated Sugar by the same or nearly the same dramatic amount over the Class Period.

191.    For example, consider the price of Defendants' four-pound bags of sugar sold to consumers at supermarkets and other retailers. In 2020, a standard four-pound bag of Domino brand Granulated Sugar cost $2.49 at Target.  By 2022, the same four-pound bag of Granulated Sugar cost $3.49 at Target.  By 2024, the price for the same Domino four-pound bag of Granulated Sugar nearly doubled from its 2020 price to $4.89 at Target in 2024.

192.    Similarly, C&H brand Granulated Sugar, also priced at $2.49 for a four-pound bag at Target in 2020, is now $3.99—a 60% price hike.

193.    A four-pound bag of Michigan Sugar's Pioneer brand Granulated Sugar (at Kroger) and United's Crystal brand Granulated Sugar (at Target) each are both priced at these artificially high levels; each now costs $4.49.

194.    Meanwhile, there is no relief for consumers even when they turn to private label Granulated Sugar brands (many of which are manufactured by the Producer Defendants). Over the past four years, Target's Good & Gather private-label brand Granulated Sugar has increased 65% to $3.29 for a four-pound bag.  This means that big-box private-label brand Granulated Sugar is now 30% more expensive than what name-

brand Domino Granulated Sugar cost very early in the Class Period.

### D.    Additional Plus Factors Support the Existence of a Conspiracy

195.    In addition to the direct evidence of unprecedented price increases and extensive information sharing by the Producer Defendants commencing with the engagement of Commodity and Mr. Wistisen, as well as the dramatic price increases imposed by each of the Defendants during the Class Period, there are other economic factors, also known as "plus factors" in antitrust parlance, that are conducive to, and plausibly suggest collusion, including, but not limited to: (a) sugar industry consolidation and concentration, (b) high barriers to entry, (c) inelastic demand, (d) high vertical integration, (e) opportunities to collude, (f) the fungible, commodity nature of Granulated Sugar, and (g) a history of antitrust violations by sugar manufacturers, including a number of the Producer Defendants and/or their predecessors.

### 1.    The Market is Highly Concentrated and the Defendants Are the Dominant Firms.

196.    Prior to U.S. Sugar's acquisition of Imperial in 2022, the top three marketers of sugar in the United States accounted for 65% of the market.[5]

197.    While the Producer Defendants dominate the industry, none of the remaining producers of Granulated Sugar have had a market share that remotely approaches that of the Producer Defendants.

---

[5] American Crystal Sugar Company, "A Testament to the Limitless Potential of Growers," https://www.crystalsugar.com/our-company/cooperative-profile/#:~:text=Market%20and%20Competition,and%20The%20Western%20Sugar%20Cooperative.

198.    Furthermore, the industry recently became even more concentrated when United acquired Imperial in 2023, resulting in a substantial increase in dominance by ASR/Domino and United.

## 2. Barriers to Entry Are High.

199.    There are high barriers to becoming a manufacturer of Granulated Sugar. The start-up capital necessary to compete with today's Granulated Sugar manufacturers would be substantial. Granulated Sugar manufacturers have large economies of scale, utilizing large and expensive production facilities. Furthermore, Granulated Sugar manufacturers must be vertically integrated with growers of sugar beets or sugar cane to qualify for USDA loans and production allotments that enable growers to process raw sugar into Granulated Sugar without competition from imports.

## 3. Demand for Sugar is Inelastic.

200.    Economic theory recognizes that industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices.

201.    Demand for Granulated Sugar is inelastic, so a decrease in supply in the face of stable or rising demand will increase prices. Defendants recognize that Granulated Sugar demand is inelastic. The Producer Defendants knew that they could demand higher prices when less Granulated Sugar was available to sell. As a result, they routinely exchanged information about their sold position to maintain higher prices because they knew that there were no meaningful substitutes for Granulated Sugar.

202.    Furthermore, Defendants knew that the price support programs implemented

by the USDA limited the number of sources of raw sugar for refinement into Granulated Sugar and protected them from foreign competition.

### 4. Defendants Are Vertically Integrated.

203.   The Granulated Sugar industry is almost entirely vertically integrated. In the Granulated Sugar industry, "vertical integration" means the Granulated Sugar producer owns or controls each aspect of growing sugar cane or sugar beets, processing these crops into raw sugar using their own processing facilities, refining the raw sugar into Granulated Sugar in their own refining facilities, and selling their Granulated Sugar to direct purchasers. A consolidated market with vertically integrated participants is a structural characteristic that makes an industry conducive to collusion.

204.   The President and CEO of Imperial Sugar prior to its acquisition by United States Sugar testified that it was difficult for Imperial to compete with the other Granulated Sugar producers because it was not vertically integrated. Until Imperial was acquired by United States Sugar, it did not grow sugar cane or have direct access to domestic raw sugar cane in the U.S.  Imperial had to import raw cane sugar to manufacture Granulated Sugar. As a result, Imperial's costs were typically higher than the other Granulated Sugar producers.

### 5. Defendants Had Numerous Opportunities to Collude.

205.   In addition to sharing information through Wistisen and disseminating public statements to competitors, Defendants had opportunities to collude through annual meetings of the International Sweetener Colloquium ("ISC"), which is run by the International Dairy Foods Association ("IDFA") and is held in February of each year.

206.   The IDFA has characterized the purpose of the ISC as follows: "[t]he Colloquium draws hundreds of professionals and decision-makers from the sweetener industry and from companies that use sweeteners in the products they make. Buyers, processors, refiners, distributors, and food companies actively participate in the Colloquium, using it as a springboard to enhance their business and trading-partner networks."

207.   Due to the COVID-19 pandemic, the ISC meeting was not held in person in 2020-2021, but resumed in person in 2022 and the years that have followed. Representatives of Defendants attended each of the ISC's meetings held in 2019 and 2022-24. At the 2019 session, to offer one illustrative example, there were extensive presentations of the factors that would dictate future sugar prices during the upcoming year.

208.   Discussions on the sidelines of the ISC are a prime opportunity for collusion. During the past few years, the event has served to kick start sales for the following year. For example, in 2022, future contract prices for Number 16 sugar were discussed at the ISC and then finalized in the weeks following the event. These prices in turn were used to estimate Number 16 sugar futures, which in turn could be used to develop actual Number 16 spot prices during 2022 and 2023. Further discussion of pricing developments following ISC meetings is presented in Section IV(C)(2), above.

209.   In addition to participating in the ISC, the Producer Defendants each are members, either directly or through one of their affiliated companies, of various trade associations such as the Sugar Association and the American Sugar Alliance. The Producer Defendants, directly or through their affiliates, hold board positions on these trade

associations. For example, the Board of the Sugar Association includes Pepe Fanjul (ASR/Domino), Mike Greear (Wyoming Sugar Company, one of the member-owners of United), Matt Hoffman (Sugar Cane Growers Cooperative of Florida, parent company of ASR), Neil Juhnke (Michigan Sugar), Peter O'Malley (ASR/Domino), Parks Shackelford (Florida Crystals, parent company of ASR), Rob Sproull (ASR/Domino), and Kurt Wickstrom (Minn-Dak, one of the member-owners of United).[6] These memberships afford them opportunities to collude during the Class Period.

210.    Further, the crossover of employees among the Defendants provided additional opportunities to collude or exchange competitively sensitive information. For example, ASR/Domino's director of national accounts, Adam Whittaker, ASR/Domino's national accounts manager, Brian Dahlman, and United's director of strategic accounts, Eric Speece were each former employees of Cargill. Mr. Whittaker worked at Cargill for more than a decade before joining ASR/Domino, while Mr. Speece worked at Cargill for about nine years prior to joining United. Both Mr. Whittaker's and Mr. Speece's employment at Cargill overlapped for a five-year period. Mr. Whittaker, Mr. Speece, and Mr. Dahlman were all involved in the exchange of competitively sensitive information as described in the email exchanges detailed herein.

### 6.    Granulated Sugar is a Commodity.

211.    As detailed above, Granulated Sugar is a fungible commodity. Coordination is easier with a commodity product because firms wishing to form a cartel can more easily

---

[6] The Sugar Association, Board Members, https://www.sugar.org/about/board/ (last visited Nov. 12, 2024).

monitor and detect defections from a price-fixing agreement where observed differences in prices, other than those arising because of differences in product grade, for example, are more likely to reflect cheating on the conspiracy than some kind of custom arrangement.

212.    Futures contracts for domestic raw cane sugar and "White Sugar" (symbol "W") are traded on the Intercontinental Exchange ("ICE") alongside other commodity products such as wheat, crude oil, and gold.[7] Typically, when a product is characterized as a commodity, competition is based principally on price as opposed to other attributes such as product quality or customer service. The commodity nature of Granulated Sugar helps to facilitate cartel behavior.

213.    Due to the lack of product differentiation, the Producer Defendants are forced to compete on price such that the pricing decisions of each Granulated Sugar producer impact the market price for Granulated Sugar.

214.    In sum, the Granulated Sugar industry has characteristics that ensure the exchanges by Defendants of competitively sensitive, non-public, material internal information are highly anticompetitive. The exchanges allowed the Producer Defendants to raise, fix, maintain, or stabilize Granulated Sugar prices during the Class Period. As a result, Defendants' unlawful conduct caused Plaintiffs and members of the Classes to pay artificial prices for Granulated Sugar during the Class Period. These prices exceeded the amounts they would have paid if the prices for Granulated Sugar had been determined in a competitive market. Plaintiffs and members of the Classes have suffered antitrust injury

---

[7] ICE, *Products – Futures & Options*, https://www.ice.com/products/Futures-Options/Agriculture (last visited Nov. 12, 2024).

because of Defendants' conduct.

### 7.    There is a History of Anticompetitive Conduct in the Sugar Industry.

215.    The sugar industry in the United States has long been plagued by anticompetitive practices, with violations of antitrust laws dating back nearly a century. This historical pattern of misconduct serves as a backdrop to the present conspiracy, highlighting the industry's susceptibility to collusion and the Defendants' deliberate perpetuation of these unlawful practices.

216.    **1930s: The Sugar Institute Case.** For example, in the 1930s, the United States Supreme Court addressed the antitrust violations of the Sugar Institute, a trade association for sugar manufacturers.[8] The Court upheld findings that the Institute engaged in collusion by mandating advance price announcements and strict adherence to those announced prices and terms. These practices stifled competition and allowed manufacturers to control the market, setting a precedent for subsequent antitrust enforcement in the sugar industry.

217.    **1948: American Crystal Sugar and Uniform Pricing Agreements.** The anticompetitive tendencies of the sugar industry resurfaced in 1948 when the Supreme Court examined the activities of American Crystal Sugar, now part of Defendant United.[9] The case centered on agreements among California sugar refiners to pay uniform prices for sugar beets. The Court condemned this arrangement, noting its far-reaching monopolistic

---

[8] *United States v. Sugar Institute*, 297 U.S. 553, 582 (1936).

[9] *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 221 (1948).

effects. By eliminating price competition among refiners, the agreements deprived sugar beet growers of any competitive opportunity, increased market control over sugar sales, and entrenched a monopolistic structure. The Court's decision underscored the inherent dangers of collusion in the sugar industry and its devastating impact on competition.

218.    **1970s: Broker-Facilitated Price Fixing.** In the 1970s, the DOJ uncovered another collusion scheme involving sugar refiners, including California & Hawaiian Sugar Company (later acquired by Defendant ASR/Domino) and American Crystal Sugar Corporation (part of Defendant United). The sugar refiners were accused of using "brokers to act as go-betweens in carrying price information and exchanging assurances on price actions between and among refiners" to facilitate price-fixing.[10]

219.    This led to a 1978 consent decree prohibiting such conduct, including direct communications about future prices and the use of intermediaries to facilitate price discussions. Despite these prohibitions, the practices described in the decree bear striking similarities to the conduct alleged in this case.

220.    **Private Litigation and Settlements.** The DOJ's actions in the 1970s sparked multiple private class action lawsuits on both coasts of the United States, where courts certified classes of affected consumers. These cases ultimately settled, further illustrating the pervasiveness of anticompetitive practices in the sugar industry and the widespread

---

[10] *United States v. Great Western Sugar Co., et al.*, Case No. 74-2674-SW at ¶ 1415 (N.D. Cal. Dec. 19, 1974) (complaint brought by the United States in 1974 against Great Western Sugar Company, American Crystal Sugar Company (now part of United), Amalgamated Sugar Company, and other sugar refiners).

harm inflicted on consumers.[11]

221.    The history of antitrust violations in the sugar industry reveals a consistent pattern: sugar producers and refiners have repeatedly used information exchanges and pricing agreements to suppress competition. The Defendants' conduct in the present case is a continuation of this troubling legacy, exploiting structural vulnerabilities in the industry to agree upon and maintain artificially high prices for Granulated Sugar.

### E.    Defendants' Information Exchange is an Independent Violation of Section 1 of the Sherman Act

222.    Competition is harmed when, as here, competitors with market power in a concentrated market exchange confidential, strategic information about current and forward-looking plans for prices and supply. Price, capacity, supply, and costs are crucial aspects of competition. Information exchanges advance competitors' ability to collude.

223.    It is long held Supreme Court precedent that exchanges of competitive information among competitors may independently violate Section 1, even without an express agreement to fix prices.  "Exchanges of current price information . . . have the greatest potential for generating anti-competitive effects and . . . have consistently been held to violate the Sherman Act." *United States v. U.S. Gypsum Co*., 438 U.S. 422, 441 n.16 (1978); *see also Todd v. Exxon*, 275 F.3d 191, 211 (2d Cir. 2001) (same). "By the same reasoning, exchanges of future price information are considered especially anticompetitive." *Todd*, 275 F.3d at 211. "Genuine competitors do not make daily, weekly,

---

[11] *See In re Sugar Indus. Antitrust Litig*., 73 F.R.D. 322 (E.D. Pa. 1976); *In re Sugar Indus. Antitrust Litig*., MDL No. 2201, 1976 WL 1374 (N.D. Cal. May 12, 1976), *mandamus denied*, 559 F.2d 481 (9th Cir. 1977).

and monthly reports of the minutest details of their business to their rivals . . . ." *American Column & Lumber Co. v. United States*, 257 U.S. 377, 410 (1921); *see also United States v. Container Corp. of Am.*, 393 U.S. 333, 336–38 (1969) (information exchange of price data among competitors unlawful despite absence of agreement to adhere to a price schedule where the exchange had an anticompetitive effect in the industry).

224.    The Second Circuit has explained, "'[a] number of factors including most prominently the structure of the industry involved and the nature of the information exchanged are generally considered in divining the procompetitive or anticompetitive effects of this type of interseller communication.'" *Todd*, 275 F.3d at 199 (2d Cir. 2001) (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)). "[E]xchanges of current price information have the greatest potential of creating anticompetitive effects and have consistently been held to violate the Sherman Act."[12]

225.    The DOJ has stated that information exchanges with direct competitors raise serious antitrust concerns:

> [T]he sharing of information related to a market in which … the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of

---

[12] *In re SSA Bonds Antitrust Litig.*, No. 16 Civ. 3711 (ER), 2020 WL 1445783, at *4 (S.D.N.Y. Mar. 25, 2020) (citing *Gypsum*, 438 U.S. at 441 n.16).

information relating to less competitively sensitive information.[13]

226.    The DOJ has recently demonstrated a renewed focus on anticompetitive information sharing. On February 3, 2023, the DOJ withdrew antitrust policy statements that provided safe harbors for sharing pricing or cost information, concluding that the policy statements were "*overly permissive* on certain subjects, *such as information sharing*, and no longer serve[d] their intended purposes of providing encompassing guidance to the public on relevant healthcare competition issues in today's environment."

227.    The DOJ's most current analysis of information sharing and price-fixing is found in the *amicus* brief it filed on October 1, 2024 in *In re Pork Antitrust Litig.*, No. 0:18-cv-01776-JRT-GFD (D. Minn.) (ECF No. 2616). In that brief, the DOJ explained that information sharing by itself can violate the antitrust laws:

> As relevant here, competitors' exchange of competitively sensitive information is itself a form of concerted action that can violate the antitrust laws. As the Supreme Court explained in *United States v. Container Corp*., reciprocal information exchange among competitors is "concerted action [that] is of course sufficient to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act." 393 U.S. 333, 335 (1969) (emphasis added). This is so even when the participants have the "freedom to withdraw from the agreement" and when the exchanges are "infrequen[t] and irregular[]." Id.; see, e.g., *Todd [v. Exxon Corp.],* 275 F.3d [191] at 198 [(2d Cir. 2001)] (Sotomayor, J.)] (recognizing that an "information exchange itself" can form a claim under Section 1).

*Id*. at 5-6.

228.    With respect to a stand-alone information exchange, the DOJ went on to say:

---

[13]    https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf.

"Standalone information-sharing claims are evaluated under the rule of reason . . . If information sharing tends to harm competition based on the full factual circumstances, 'liability follow[s].'" *Id.* at 7-8 (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 446-47 n.22 (1978)).

229.    The DOJ also reiterated that information sharing can also support the inference of a price-fixing conspiracy, as Plaintiffs have also alleged here, explaining:

> Information exchanges can be relevant to concerted action in a second way: An information exchange among competitors can support an inference that a price-fixing or output-restriction agreement exists. Plaintiffs therefore regularly rely on information exchanges as evidence of a conspiracy to fix prices or restrict output. *See Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000) (en banc) (recognizing that information exchanges can serve as a "plus factor" suggestive of a price-fixing conspiracy); *Penne v. Greater Minneapolis Area Bd. of Realtors*, 604 F.2d 1143, 1151 (8th Cir. 1979).

*Id.* at 5-6. In such circumstances, the per se rule of antitrust liability applies.

230.    Indeed, the "[e]xchange of disaggregated data can harm competition even if the individual firms are not explicitly identified, and the United States has obtained consent decrees in recent years with firms that shared disaggregated information without directly identifying individual competitors." *Id.* at 12 n.9.

231.    Here, Defendants' information exchange existed for the purpose of increasing prices of Granulated Sugar above competitive levels and aiding the Producer Defendants in abusing their market power to suppress price competition.

232.    Defendants' information exchange took place in secret and involved the exchange of confidential, current, and forward-looking information.

233.    Further, as alleged above, Defendants' information exchange occurred in

markets with characteristics that make it particularly likely that such an exchange will have anticompetitive effects, including markets with inelastic demand, relatively few sellers, and a fungible product, for which competition is price-based.

234.    As a result, as alleged above, prices for Granulated Sugar rose significantly during the Relevant Period.

235.    There is no legitimate procompetitive justification for Defendants' conduct.

236.    Defendants' information sharing practices even violate a government policy—the Health Care Policy Statements—that the DOJ deemed "too permissive," demonstrating the particularly egregious nature of the conduct being challenged here.

237.    Defendants, through their use of Commodity and Wistisen to exchange non-public current and forward price and sales information, have caused direct anticompetitive effects across the nation in the form of higher prices to consumers such as Plaintiffs.

### F.    The USDA Sugar Program Does Not Render the Conspiracy Any Less Plausible

238.    Defendants' anticompetitive scheme was not constrained by the USDA sugar program. This government program, established under the Agriculture and Food Act of 1981, is said to stabilize sugar prices domestically. Over the years, Congress has reauthorized the program, most recently with a minor adjustment in 2018, which increased loan rates for raw cane and refined beet sugar by 5%.

239.    While the USDA sugar program sets certain parameters for the domestic sugar market, it neither dictates final pricing nor shields producers from domestic competition. Instead, it provides mechanisms like price support loans, marketing

allotments, and import quotas to maintain baseline sugar prices in the United States. However, these measures do not preclude the existence—or impact—of price-fixing conspiracies like the one alleged here.

240.    The price support loans offered by the USDA allow sugar processors to borrow against their inventory at predetermined rates. If market prices fall below these levels, processors can forfeit their sugar as loan repayment. Yet, during the Class Period, there were no forfeitures, indicating that market prices consistently exceeded the USDA's effective support levels.

241.    The Farm Service Agency (FSA) produces quarterly reports projecting whether the U.S. sugar stocks reported in the World Agricultural Supply and Demand Estimates report are likely to lead to forfeitures.[14] The FSA's projections have concluded that forfeitures are unlikely for every quarter since March 2019.[15] This is supported by the FSA's national level database of loan forfeitures for all commodities, which lists no forfeitures for beet sugar, cane sugar, or in-process sugars since at least 2019.[16]

242.    The lack of sugar loan forfeitures since 2019 suggests that market prices have

---

[14] "USDA Announces No Actions under Feedstock Flexibility Program," *Farm Service Agency* (March 29, 2019), available at https://www.fsa.usda.gov/news-events/news/03-29-2019/usda-announces-no-actions-feedstock-flexibility-program. ("USDA's March 8, 2019, World Agricultural Supply and Demand Estimates report (www.usda.gov/oce/commodity/wasde) projects that fiscal 2019 U.S. ending sugar stocks are unlikely to lead to forfeitures.").

[15] FSA reports are released quarterly, with the most recent dated August 30, 2024. For all news releases, *see* https://www.fsa.usda.gov/news-events/news.

[16] "Loan Forfeitures – National Level," *Farm Service Agency*, available at https://apps.fsa.usda.gov/sorspub/reports/web/public/loan-forfeiture-national.

been above the effective support level since 2019. As a result, the loan program did not serve as a binding constraint on sugar prices, leaving ample room for Defendants to manipulate the market upward.

243.    The USDA also administers annual marketing allotments to cap the amount of sugar that processors can sell domestically for human consumption. While this mechanism seeks to prevent overproduction from depressing prices, it explicitly excludes limits on agricultural production or processing.

244.    During the Class Period, the allotments were consistently below domestic demand, indicating that they did not act as a binding limitation on sales or pricing. This environment allowed the Defendants to coordinate price increases under the guise of supply constraints.

245.    The USDA enforces tariff-rate quotas (TRQs) on imported sugar under the World Trade Organization's Uruguay Round Agreement. While these quotas protect domestic producers by limiting the amount of foreign sugar entering the market duty-free, they set minimum, not maximum, levels for imports. Throughout the Class Period, TRQs were close to these minimum levels, providing limited external competitive pressure to counteract the Producer Defendants' collusive pricing strategies.

246.    The USDA sugar program does not actively regulate market prices for Granulated Sugar. Instead, it provides a framework that Defendants exploited to execute their conspiracy. By using information about supply limitations and production allotments, the Defendants created artificial scarcity and coordinated pricing in a manner that was neither compelled by nor consistent with the goals of the USDA program.

247.    While the USDA sugar program establishes a supportive baseline for domestic producers, it does not authorize, facilitate, or necessitate price-fixing. The conspiracy alleged in this case operated independently of the USDA's regulatory framework, leveraging market dynamics to harm competition, overcharge consumers, and violate antitrust laws.

### G.    The Inflated Price of Sugar Was Passed Through to Plaintiffs and the Classes

248.    Defendants' conspiracy to fix prices of Granulated Sugar injured Plaintiffs and the Classes because they paid higher prices for Granulated Sugar than they would have in the absence of Defendants' conspiracy.

249.    When a firm's costs increase due to an overcharge or increasing raw materials costs, the firm will tend to pass-through the cost increase by raising its price. Otherwise, it would lose money on each sale and be driven out of business. Similarly, when a firm's costs decrease, for example due to improved production efficiency or decreasing energy costs, the firm will tend to pass-through the cost decrease by lowering its price. Otherwise, competitors would be able to undercut its prices, taking market share.

250.    Economic theory predicts that pass-through occurs at each stage of the manufacturing and distribution process. When the manufacturer faces an industry-wide, nontransitory increase in the cost of inputs, it increases its prices. Similarly, when the distributor (and all its competitors) pays a higher price for the product, it also increases its prices. This process continues throughout the entire distribution chain.

251.    The purpose of Defendants' conspiratorial conduct was to increase, fix, or

maintain the price of Granulated Sugar in the United States, and, as a direct and foreseeable result of the conspiratorial conduct, Plaintiffs and the Classes purchased Granulated Sugar at artificially inflated prices during the Class Period.

252.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Classes have sustained injury, having purchased Granulated Sugar for higher prices during the Class Period than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy. As a result, Plaintiffs and the Classes have suffered damages.

253.    This is an injury of the type that the antitrust laws were meant to punish and prevent.

254.    The effects and injuries caused by Defendants' anticompetitive agreement commonly impacted all indirect consumer purchasers of Granulated Sugar in the United States.

**H.    Defendants' Anticompetitive Conduct Proximately Caused Plaintiffs and Members of the Class to Suffer Antitrust Injury and Damages**

255.    Because of the Defendants' anticompetitive conduct: (1) competition in the Granulated Sugar market has been reduced or eliminated, (2) prices for Granulated Sugar have been maintained at supra-competitive levels, and (3) United States purchasers of Granulated Sugar have been deprived of the benefit of price competition.

256.    As a result of the Defendants' anticompetitive conduct, Plaintiffs and Class members paid more for Granulated Sugar than they otherwise would have and thus suffered antitrust injury and damages. The overcharges paid by Plaintiffs and members of the Classes for Granulated Sugar constitutes antitrust injury and harm to competition under the

federal antitrust laws.

## V.    CLASS ACTION ALLEGATIONS

257.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a) and (b)(2), seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> **Nationwide Class**: All persons that indirectly purchased Granulated Sugar from a Defendant (or current or former subsidiary or affiliate thereof, or coconspirator thereof) for end use and not for resale during the Class Period.

258.    Plaintiffs also bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), seeking damages pursuant to antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following Class (the "Multistate Class"):

> **Multistate Class**: All persons that indirectly purchased Granulated Sugar from a Defendant (or current or former subsidiary or affiliate or co-conspirator thereof) for end use and not for resale during the Class Period and reside in one of the Consumer Indirect Purchaser States.[17]

259.    The Nationwide Class and Multistate Class are referred to collectively as the "Classes" and members of both Classes are collectively referred to as "Class Members" unless otherwise indicated. The following persons are excluded from the proposed Classes:

---

[17] The "Consumer Indirect Purchaser States" consist of: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, and the District of Columbia.

Any officers, directors, managers, or employees of Defendants, any current or former subsidiary of Defendants, or any co-conspirator of Defendants; the Court and any of its staff.

260.    The Classes' definitions provide clear, objective criteria understood by Class Members and Defendants, and allow the parties to identify the members of the Classes.

261.    Subject to additional information obtained through further investigation and discovery, the Classes' definitions may be expanded or narrowed.

262.     The Classes are so numerous and geographically dispersed that joinder is impracticable. Further, Class Members are readily identifiable from information and records in the possession of Defendants and/or third parties.

263.    Plaintiffs' claims are typical of the claims of the Class Members. Plaintiffs and the Class Members were damaged by the same conspiracy of Defendants.

264.    Plaintiffs will fairly and adequately protect and represent the interests of Class Members. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of Class Members.

265.    Plaintiffs are represented by counsel with substantial experience and success in the prosecution and leadership of antitrust class actions and other complex litigation, including class actions involving agricultural food staple products and other commodities, indirect purchaser cases, and consumer protection litigation.

266.    Defendants have acted and refused to act on grounds generally applicable to Class Members.

267.    Questions of law and fact common to the Class Members predominate over

questions, if any, that may affect only individual members.

268.    Questions of law and fact common to members of the Classes include, but are not limited to:

- Whether Defendants engaged in a combination or conspiracy among themselves to fix, raise, maintain, or stabilize the prices of Granulated Sugar in the United States and its territories;

- Whether Defendants agreed to unreasonably restrain trade in violation of federal antitrust laws;

- Whether Defendants engaged in an unlawful information exchange;

- The scope and duration of the alleged conspiracy;

- The effect of the alleged conspiracy on the price of Granulated Sugar during the Class Period;

- The type of injury suffered by Plaintiffs and Class Members;

- Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiffs and the Class Members;

- The extent to which Defendants were unjustly enriched;

- Aggregate damages suffered by Plaintiff and Class Members; and

- Whether Defendants acted or refused to act on grounds generally applicable to Class Members, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to Class Members as a whole.

269.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

270.    The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in management of this class action.

271.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

272.    Plaintiffs have defined Class Members based on currently available information and hereby reserve the right to amend the definition of members of the Classes, including, without limitation, the Class Period.

## VI.    LIMITATIONS AND TOLLING

273.    By equitable estoppel, Defendants' concealment of their unlawful conspiracy has tolled any applicable statutes of limitations for Plaintiffs and Class Members with respect to any claims and rights of action that Plaintiffs and Class Members have alleged in this Complaint.

274.    Plaintiffs and Class Members were not placed on actual or constructive notice of the conspiracy alleged herein until, at the earliest, the DOJ's Findings of Fact in support of its petition to stop the merger of United and Imperial was made public. The full

scope of the Defendants' unlawful conduct could not have been discovered until the appellate exhibit volumes from the DOJ matter were made public on or about November 1, 2022.

275.    In addition, throughout the Class Period, the Defendants actively, effectively, affirmatively, and fraudulently concealed their unlawful conspiracy from Plaintiffs and members of the Classes, and the conspiracy was inherently self-concealing.

276.    Defendants promised to obey the law and act with integrity. For example, ASR Group's Code of Ethics and Business Conduct states in part, "ASR Group has always been dedicated to conducting business in a lawful and ethical manner in all of its operations." It further states that it seeks success "only . . . while upholding the highest standards of ethical conduct and all of the laws, domestic and foreign, that apply to our work." Regarding antitrust and competition laws, the Code states that ASR Group is "prohibited" from engaging in "agreements with competitors to fix or control prices," and that it "may not engage in direct or indirect discussions or contacts with competitors regarding . . . [p]rices to be charged by ASR Group or others or regarding other terms and conditions of sales[;] [t]erritories or markets in which products will be sold[;] . . . [and] [b]usiness, marketing or strategic plans."

277.    United's Code of Business Conduct and Ethics states that "[o]beying the law, both in letter and in spirit, is the foundation on which our ethical standards are built. All our employees, officers, directors, agents, and other representatives must respect and obey the laws of the cities, states, and countries in which we operate." It further states that "[w]e seek to outperform our competition fairly and honestly," and that there is an "obligation to

protect [United's] assets [including United's] confidential information[.] Unauthorized use or distribution of United Sugars' confidential information is prohibited."

278.    Michigan Sugar's commitment to "Sustainability and Corporate Social Responsibility" states that the company "live[s] by our values – Excellence, Pride, Integrity, Compassion, and Trust. This is the foundation of a business environment that sets respect and dignity for coworkers, suppliers, customers, and partners as an absolute expectation."

279.    These promises to obey the law and behave with integrity prevented Plaintiffs and members of the Classes from discovering Defendants' conduct earlier.

## VII.  CLAIMS FOR RELIEF

### COUNT I: PRICE FIXING

**Section 16 of Clayton Act (15 U.S.C. § 26) for Violation of
Section 1 of the Sherman Act (15 U.S.C. § 1)**

**On Behalf of Plaintiffs and the Nationwide Class
for Injunctive and Equitable Relief**

280.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

281.    Defendants are direct competitors in the Granulated Sugar market throughout the United States.

282.    Defendants formed an unlawful contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, to raise, fix, maintain, or stabilize Granulated Sugar prices.

283.    Since at least 2019, Defendants agreed with each other to exchange

competitively sensitive non-public information regarding prices, output, and costs in order to raise, fix, maintain, or stabilize the prices of Granulated Sugar. The agreement was intended to and did unreasonably restrain trade and suppress competition. It has the purpose and effect of raising, fixing, maintaining, or stabilizing prices in the Granulated Sugar market in the United States.

284. Pursuant to the agreement, the Defendants agreed to and did share pricing and other information that distorted and suppressed competition in the relevant market knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Granulated Sugar sold to Plaintiffs and members of the Class.

285. This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

286. Plaintiffs and the Nationwide Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

287. Plaintiffs and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT II: UNLAWFUL INFORMATION EXCHANGE

### Section 16 of Clayton Act (15 U.S.C. § 26) for Violation of
### Section 1 of the Sherman Act (15 U.S.C. § 1)

### On Behalf of Plaintiffs and the Nationwide Class
### for Injunctive and Equitable Relief

288.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

289.    For purposes of this Count, which is based upon a claim subject to a Rule of Reason analysis, the relevant geographic market is the United States, and the relevant product market is Granulated Sugar. As noted above, the Producer Defendants now have a collective 72% of this market and thus possess market power within it.

290.    Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2019, and continuing through the present, Defendants agreed with each other to exchange competitively sensitive, non-public information regarding prices, output, supplies, and costs to raise, fix, maintain, or stabilize prices for Granulated Sugar in the United States to or at supra-competitive levels. The agreement was intended to and did unreasonably restrain trade and suppress competition, and it had the likely and actual effect of raising, fixing, maintaining, or stabilizing prices in the Granulated Sugar market in the United States to or at supra-competitive levels, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

291.    Pursuant to the agreement, Defendants agreed to and did share pricing and other internal, material competitive information that distorted and suppressed competition in the relevant market while knowing and intending that the information would be used to

raise, fix, maintain, or stabilize prices of Granulated Sugar sold in the United States to Plaintiffs and Class Members to or at supra-competitive levels.

292.    This conduct is unlawful under either a quick look or a full-fledged Rule of Reason analysis because the agreement is facially anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, the Producer Defendants' objectives could have been reasonably achieved through less restrictive means.

293.    The contract, combination, or conspiracy alleged herein has had the following effects, among others:

> a.  Price competition in the sale of Granulated Sugar has been restrained, suppressed, and/or eliminated in the United States;
>
> b.  Prices for Granulated Sugar sold by the Producer Defendants have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; and
>
> c.  Plaintiffs and the Nationwide Class have been deprived of the benefits of free and open competition.

294.    Plaintiffs and Nationwide Class Members have been injured and will continue to be injured in their businesses or property by paying more for Granulated Sugar purchased indirectly from the Producer Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

295.    Plaintiffs and the Nationwide Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the

Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

296.    Plaintiffs and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT III: PRICE FIXING AND UNLAWFUL INFORMATION EXCHANGE IN VIOLATION OF STATE ANTITRUST STATUTES

### On Behalf of Plaintiffs and the Multistate Class

297.    Plaintiffs repeat and reassert each of the preceding allegations as if fully set forth herein.

298.    During the Class Period, Defendants engaged in a continuing contract, combination, or conspiracy with respect to the sale of Granulated Sugar in unreasonable restraint of trade in commerce, in violation of various state antitrust and consumer protection statutes set forth below.

299.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Granulated Sugar.

300.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated Consumer Indirect Purchasers in the Multistate Class who purchased Granulated Sugar have been harmed by being forced to pay artificially inflated, supra-competitive prices for Granulated Sugar.

301.    By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws pleaded below.

302.    **Alabama:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Ala. Code § 6-5-60 with respect to purchases of Granulated Sugar in Alabama by Plaintiff Virginia Smith and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Alabama at the time of their purchase.

   a. Defendant ASR, Inc. is registered to do business in the State of Alabama and upon information and belief, did conduct business related to the production of Granulated Sugar in the State of Alabama during the Class Period.

   b. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Alabama; (2) Granulated Sugar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Alabama; (3) Plaintiff Virginia Smith and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiff Virginia Smith and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

   c. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Virginia Smith and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. Defendants entered into an agreement in restraint of trade in violation of Ala. Code § 6-5-60. Accordingly, Plaintiff Virginia Smith and members of the Multistate Class seek all forms of relief available under Ala. Code § 6-5-60.

303. **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1402, et seq. with respect to purchases of Granulated Sugar in Arizona by Plaintiffs Francisco Olivares and Robert E. Sunseri and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Arizona at the time of their purchase.

a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs Francisco Olivares and Robert E. Sunseri and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiffs Francisco Olivares and Robert E. Sunseri and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Francisco Olivares and Robert E. Sunseri and members of the Multistate Class have been

injured in their business and property and are threatened with further injury.

c. Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, et seq. Accordingly, Plaintiffs Francisco Olivares and Robert E. Sunseri and members of the Multistate Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1402, et seq.

d. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Arizona Attorney General in accordance with Ariz. Rev. Stat. Ann. § 44-1415. Plaintiffs will file proof of such service with the Court.

304.    **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code, §§ 16720, *et seq*. with respect to purchases of Granulated Sugar in California by Plaintiffs Reynaldo Borge, Mikhael Gershzon, and Tammy Tacito and members of the Multistate Class and/or purchases of Granulated by members of the Multistate Class who resided in California at the time of their purchases.

a. During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of Granulated Sugar at supra-competitive levels.

b. The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants, the substantial terms of which were to fix, raise, maintain, and stabilize the price of Granulated Sugar.

c. For the purpose of forming and effectuating the unlawful trust, the Defendants have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above including fixing, raising, stabilizing, and pegging the price of Granulated Sugar.

d. The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition in the sale of Granulated Sugar has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for Granulated Sugar sold by Defendants have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased Granulated Sugar have been deprived of the benefit of free and open competition; and (4) Plaintiffs Reynaldo Borge, Mikhael Gershzon, and Tammy Tacito and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

e. As a direct and proximate result of Defendants' unlawful conduct,

81

Plaintiffs Reynaldo Borge, Mikhael Gershzon, and Tammy Tacito and members of the Multistate Class have been injured in their business and property in that they paid more for Granulated Sugar than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Reynaldo Borge, Mikhael Gershzon, and Tammy Tacito and members of the Multistate Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

305. **Colorado:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Colo. Rev. Stat. Ann. §§6-4-104, *et seq*. with respect to purchases of Granulated Sugar in Colorado by Plaintiff David Ulery and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Colorado at the time of their purchase.

    a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Colorado; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) Plaintiff David Ulery and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiff David Ulery and members of the Multistate Class paid supra-

competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff David Ulery and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Colo. Rev. Stat. Ann. §§6-4-104, et seq. Accordingly, Plaintiff David Ulery and members of the Multistate Class seek all forms of relief available under Colo. Rev. Stat. Ann. §§6-4-104, et seq.

e. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Colorado Attorney General in accordance with Colo. Rev. Stat. §6-4-116. Plaintiffs will file proof of such service with the Court.

306. **Connecticut**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. Ann. §§ 35-26, *et seq.* with respect to purchases of Granulated Sugar in Connecticut by Plaintiffs Michael Cervellino, Michael Santilli, and Stacy Kurtz and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Connecticut at the time of their purchases.

a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Connecticut; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs Michael Cervellino, Michael Santilli, and Stacy Kurtz and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiffs Michael Cervellino, Michael Santilli, and Stacy Kurtz and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Michael Cervellino, Michael Santilli, and Stacy Kurtz and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Conn. Gen. Stat. Ann. §§ 35-26, et seq. Accordingly, Plaintiffs Michael Cervellino, Michael Santilli, and Stacy Kurtz and members of the Multistate Class seek all forms of relief available under Conn. Gen. Stat. Ann. §§ 35-26, et seq.

e. In conjunction with the filing of this Complaint, Plaintiffs have served

a copy of this Complaint on the Connecticut Attorney General in accordance with Conn. Gen. Stat. §35-37. Plaintiffs will file proof of such service with the Court.

307.    **Delaware**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Del. Code Ann. tit. 6, § 2101, *et seq.* with respect to purchases of Granulated Sugar in Delaware by members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Delaware at the time of their purchases.

    a.  Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Delaware; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware; (3) Members of the Multistate Class were deprived of free and open competition; and (4) Members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

    b.  During the Class Period, Defendants' illegal conduct substantially affected Delaware commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, Members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into an

agreement in restraint of trade in violation of Del. Code Ann. tit. 6, § 2101, *et seq.* Accordingly, Members of the Multistate Class seek all forms of relief available under Del. Code Ann. tit. 6, § 2108.

308. **District of Columbia**: Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code Ann. §§ 28-4502, *et seq.* with respect to purchases of Granulated Sugar in the District of Columbia by Plaintiff Jarred Cutlip and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in the District of Columbia at the time of their purchases.

  a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff Jarred Cutlip and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiff Jarred Cutlip and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

  b. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

  c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Jarred Cutlip and members of the Multistate Class have been injured in their business and property and are threatened with further

injury.

    d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4502, et seq. Accordingly, Plaintiff Jarred Cutlip and members of the Multistate Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4502 et seq.

309.    **Hawaii:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Haw. Rev. Stat. § 480-1, et seq. with respect to Granulated Sugar in Hawaii by Plaintiff Claudette Palakiko and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Hawaii at the time of their purchases.

    a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff Claudette Palakiko and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar; Plaintiff Claudette Palakiko and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar..

    b. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Claudette Palakiko and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Haw. Rev. Stat. § 480-1, et seq. Accordingly, Plaintiff Claudette Palakiko and members of the Multistate Class seek all forms of relief available under Haw. Rev. Stat. § 480-1, et seq.

310.  **Illinois**: Defendants have entered into an unlawful agreement in restraint of trade in violation of 740 Ill. Comp. Stat. Ann. 10/1, et seq. with respect to purchases of Granulated Sugar in Illinois by Plaintiffs Matthew Marek and Mary Salazar and members of the Multistate Class and/or purchasers of Granulated Sugar of the Multistate Class who resided in Illinois at the time of their purchases.

a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs Matthew Marek and Mary Salazar and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiffs Matthew Marek and Mary Salazar and members of the Multistate Class paid supra-competitive, artificially

inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Matthew Marek and Mary Salazar and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of 740 Ill. Comp. Stat. Ann. 10/1, et seq. Accordingly, Plaintiffs Matthew Marek and Mary Salazar and members of the Multistate Class seek all forms of relief available under 740 Ill. Comp. Stat. Ann. 10/1, et seq.

311. **Iowa**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.4, et seq. with respect to purchases of Granulated Sugar in Iowa by Plaintiff Debbie Hale and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Iowa at the time of their purchases.

a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiff Debbie Hale and members of the Multistate Class

were deprived of free and open competition; and (4) Plaintiff Debbie
Hale and members of the Multistate Class paid supra-competitive,
artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct substantially
affected Iowa commerce.

c. As a direct and proximate result of Defendants' unlawful conduct,
Plaintiff Debbie Hale and members of the Multistate Class have been
injured in their business and property and are threatened with further
injury.

d. By reason of the foregoing, Defendants have entered into an
agreement in restraint of trade in violation of Iowa Code §§ 553.4, et
seq. Accordingly, Plaintiff Debbie Hale and members of the
Multistate Class seek all forms of relief available under Iowa Code §§
553.4, et seq.

312. **Kansas**: Defendants have entered into an unlawful agreement in restraint of
trade in violation of Kan. Stat. Ann. §§ 50-101, et seq. with respect to purchases of
Granulated Sugar in Kansas by members of the Multistate Class and/or purchases of
Granulated Sugar by members of the Multistate Class who resided in Kansas at the time of
their purchases.

a. Defendants' combination or conspiracy had the following effects: (1)
Granulated Sugar price competition was restrained, suppressed, and
eliminated throughout Kansas; (2) Granulated Sugar prices were

raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) members of the Multistate Class were deprived of free and open competition; and (4) members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, et seq. Accordingly, members of the Multistate Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, et seq.

313.   **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. 10 §§ 1101, et seq. with respect to purchases of Granulated Sugar by Plaintiffs Daynna Mitchell and Laurie Marcello and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Maine at the time of their purchases.

a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Maine; (2) Granulated Sugar prices were

raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs Daynna Mitchell and Laurie Marcello and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiffs Daynna Mitchell and Laurie Marcello and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Daynna Mitchell and Laurie Marcello and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Me. Rev. Stat. Ann.10, §§ 1101, et seq. Accordingly, Plaintiffs Daynna Mitchell and Laurie Marcello and members of the Multistate Class seek all relief available under Me. Rev. Stat. Ann. 10, §§ 1101, et seq.

314. **Maryland**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Md. Com. Law Code Ann. § 11-201, *et seq.* with respect to purchases of Granulated Sugar in Maryland by Plaintiffs Miranda Cofino and Brooke Cutlip and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Maryland at the time of their purchases.

a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Maryland; (2) Granulated Sugar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs Miranda Cofino and Brooke Cutlip and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiffs Miranda Cofino and Brooke Cutlip and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

c. As a direct and proximate result of Defendants' conduct, Plaintiffs Miranda Cofino and Brooke Cutlip and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Md. Com. Law Code Ann. § 11-204. Accordingly, Plaintiffs Miranda Cofino and Brooke Cutlip and members of the Multistate Class seek all relief available under Md. Com. Law Code Ann. § 11-209.

315. **Michigan**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.772, et seq. with respect to

purchases of Granulated Sugar in Michigan by Plaintiffs Liana Britt, Anthony Minicuci and Kim Rybarczyk and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Michigan at the time of their purchases.

    a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Granulated Sugar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs Liana Britt, Anthony Minicuci and Kim Rybarczyk and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiffs Liana Britt, Anthony Minicuci and Kim Rybarczyk and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

    b. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

    c. As a direct and proximate result of Defendants' conduct, Plaintiffs Liana Britt, Anthony Minicuci and Kim Rybarczyk and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

    d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws

Ann. §§ 445.772, et seq. Accordingly, Plaintiffs Liana Britt, Anthony Minicuci and Kim Rybarczyk and members of the Multistate Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.772, et seq.

316. **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. §§ 325D.51, et seq. with respect to purchases of Granulated Sugar in Minnesota by Plaintiffs Raleigh Golden and Lauren Grouws and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Minnesota at the time of their purchases.

a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Granulated Sugar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs Raleigh Golden and Lauren Grouws and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiffs Raleigh Golden and Lauren Grouws and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Raleigh Golden and Lauren Grouws and members of the

Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minn. Stat. §§ 325D.51, et seq. Accordingly, Plaintiffs Raleigh Golden and Lauren Grouws and members of the Multistate Class seek all relief available under Minnesota Stat. §§ 325D.51, et seq.;

e. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Minnesota Attorney General in accordance with Minn. Stat. §325D.63.

317.    **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Code Ann. §§ 59-801, et seq. with respect to purchases of Granulated Sugar in Nebraska by members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Nebraska at the time of their purchases.

a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) members of the Multistate Class were deprived of free and open competition; and (4) members of the Multistate Class paid supra-competitive, artificially inflated prices for

Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, et seq. Accordingly, members of the Multistate Class seek all relief available under Nebraska Revised Statutes §§ 59-801, et seq.

318.    **Nevada**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A.060, et seq. with respect to purchases of Granulated Sugar in Nevada by Plaintiff Erica Mitchell and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Nevada at the time of their purchases.

a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated through Nevada; (2) Granulated Sugar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiff Erica Mitchell and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiff

Erica Mitchell and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Erica Mitchell and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A.060, et seq. Accordingly, Plaintiff and Erica Mitchell and members of the Multistate Class seek all relief available under Nev. Rev. Stat. Ann. §§ 598A.060, et seq.

e. In accordance with the requirements of Nev. Rev. Stat. Ann. §598A.210(3), Plaintiffs mailed notice of this action to the Nevada Attorney General.

319.   **New Hampshire**: Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. Rev. Stat. Ann. §§ 356.2, et seq., with respect to purchases of Granulated Sugar in New Hampshire by Plaintiff Thomas Tombarello and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in New Hampshire at the time of their purchases.

a. Defendants' combination or conspiracy had the following effects: (1)

Granulated Sugar price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire, (3) Plaintiff Thomas Tombarello and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiff Thomas Tombarello and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Thomas Tombarello and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes §§ 356.2, et seq. Accordingly, Plaintiff Thomas Tombarello and members of the Multistate Class seek all relief available under New Hampshire Revised Statutes §§ 356:2, et seq.

320.    **New Jersey**: Defendants have entered into an unlawful agreement in restraint of trade in violation of N.J. Stat. Ann. § 56:9-1, *et seq*., with respect to purchases of Granulated Sugar in New Jersey by Plaintiff Nancy Goodman and members of the

Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in New Jersey at the time of their purchases.

a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey, (3) Plaintiff Nancy Goodman and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiff Nancy Goodman and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct substantially affected New Jersey commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Nancy Goodman and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of N.J. Stat. Ann. § 56:9-1, et seq. Accordingly, Plaintiff Nancy Goodman and members of the Multistate Class seek all relief available under N.J. Stat. Ann. § 56:9-1.

321.    **New Mexico**: Defendants have entered into an unlawful agreement in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, et seq. with respect to purchases of Granulated Sugar in New Mexico by members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in New Mexico at the time of their purchases.

      a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) members of the Multistate Class were deprived of free and open competition; and (4) members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

      b. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

      c. As a direct and proximate result of Defendants' unlawful conduct, members of the Multistate Class have been injured in their business and property and are threatened with further injury.

      d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of N.M. Stat. Ann. S§ 57-1-1, et seq. Accordingly, members of the Multistate Class seek all relief available under N.M. Stat. Ann. §§ 57-1-1, *et seq*.

322.    **New York**: Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. Gen. Bus. L. §§ 340, et seq. with respect to purchases of Granulated Sugar in New York by Plaintiffs Renee Newton and Claudine Williams and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in New York at the time of their purchases.

   a. Defendants' combination or conspiracy or arrangement had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout New York; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs Renee Newton and Claudine Williams and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiffs Renee Newton and Claudine Williams and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar, or purchased products that were otherwise of lower quality than they would have been absent the conspirators illegal acts, or were unable to purchase products that they otherwise would have purchased absent the illegal conduct.

   b. During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

   c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Renee Newton and Claudine Williams and members of the

Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the New York Donnelly Act §§ 340, et seq. The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs Renee Newston and Claudine Williams and members of the Multistate Class seek all relief available under New York Gen. Bus. Law §§ 340, et seq.

e. Pursuant to New York General Business Law § 340(5), counsel for Plaintiffs has sent letters by certified mail, return receipt requested, to the Attorney General of New York, informing the Attorney General of the existence of this Class Action Complaint, identifying the relevant state antitrust provisions, and enclosing a copy of the original complaints filed by Plaintiffs.

323. **North Carolina**: Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, et seq. with respect to purchases of Granulated Sugar in North Carolina by Plaintiffs Amanda Boardman and Bruce Johnson and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in North Carolina at the time of their purchases.

a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Granulated Sugar prices

were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs Amanda Boardman and Bruce Johnson and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiffs Amanda Boardman and Bruce Johnson and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

c. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs Amanda Boardman and Bruce Johnson and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, et seq. Accordingly, Plaintiffs Amanda Boardman and Bruce Johnson and members of the Multistate Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq*.

324. **North Dakota**: Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq*. with respect to purchases of Granulated Sugar in North Dakota by Plaintiff Kristin Jangula and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in North Dakota at the time of their purchases.

a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiff Kristin Jangula and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiff Kristin Jangula and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce.

c. As a direct and proximate result of the Defendants' unlawful conduct, members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq*. Accordingly, Plaintiff Kristin Jangula and members of the Multistate Class seek all relief available under North Dakota Century Code §§ 51-08.1-01, *et seq*.

325. **Oregon**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases of Granulated Sugar in Oregon by members of the Multistate Class and/or purchases of

105

Granulated Sugar by members of the Multistate Class who resided in Oregon at the time of their purchases.

a. Defendants' combination and conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) members of the Multistate Class were deprived of free and open competition; and (4) members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, et seq. Accordingly, members of the Multistate Class seek all relief available under Oregon Revised Statutes §§ 646.705, et seq.

e. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Oregon Attorney General in accordance with Or. Rev. Stat. §646.780(5)(b). Plaintiffs will file

proof of such service with the Court.

326. **Rhode Island**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq*. with respect to Granulated Sugar in Rhode Island by Plaintiff Evan Annis and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Rhode Island at the time of their purchases.

   a. Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Granulated Sugar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff Evan Annis and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiff Evan Annis and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

   b. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce.

   c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Evan Annis and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

   d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island Antitrust

Act, R.I. Gen. Laws §§ 6-36-1, *et seq.* Accordingly, Plaintiff Evan Annis and members of the Multistate Class seek all relief available under Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq.*

    e.   In conjunction with the filing of this Complaint, Plaintiffs have mailed a copy of this Complaint to the Rhode Island Attorney General in accordance with R.I. Gen. Laws § 6-36-21. Plaintiffs will file proof of such service with the Court.

327.   **South Dakota**: Defendants have entered into an unlawful agreement in restraint of trade in violation of S.D. Codified Laws An. §§ 37-1, *et seq.* with respect to Granulated Sugar in South Dakota by Plaintiff John Luce and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in South Dakota at the time of their purchases.

    a.   Defendants' combination or conspiracy had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Granulated Sugar prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff John Luce and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiff John Luce and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

    b.   During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff John Luce and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws An. §§ 37-1, et seq. Accordingly, Plaintiff John Luce and members of the Multistate Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

328.  **Tennessee**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, et seq. with respect to purchases of Granulated Sugar in Tennessee by Plaintiffs Cynthia Cornwall and Ernest Gambrell and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Tennessee at the time of their purchases.

    a.  Defendants' combination or conspiracy had the following effects: Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs Cynthia Cornwall and Ernest Gambrell and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiffs Cynthia Cornwall and Ernest Gambrell and members of the Multistate Class paid supra-

competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

c. As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiffs Cynthia Cornwall and Ernest Gambrell and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiffs Cynthia Cornwall and Ernest Gambrell and members of the Multistate Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

329. **Utah**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Ann. §§ 76-10-3101, et seq. with respect to purchases of Granulated Sugar in Utah by members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Utah at the time of their purchases.

a. Defendants' combination or conspiracy had the following effects: Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Utah; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) members of the Multistate Class were deprived of free and

open competition; and (4) members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

c. As a direct and proximate cause of the Defendants' unlawful conduct, members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, et seq. Accordingly, members of the Multistate Class seek all relief available under Utah Code Ann. §§ 76-10-3101, et seq.

e. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Utah Attorney General in accordance with Utah Code Ann. §76-10-3109(9).

330. **Vermont**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. with respect to purchases of Granulated Sugar in Vermont by Plaintiffs Mary Reilly and James Veneziano and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Vermont at the time of their purchases.

a. Defendants' combination or conspiracy had the following effects: Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Granulated Sugar prices were

raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs Mary Reilly and James Veneziano and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiffs Mary Reilly and James Veneziano and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

c. As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiffs Mary Reilly and James Veneziano and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.* Accordingly, Plaintiffs Mary Reilly and James Veneziano and members of the Multistate Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

331. **West Virginia**: Defendants have entered into an unlawful agreement in restraint of trade in violation of W. Va. Code §§ 47-18-4, *et seq*. with respect to purchases of Granulated Sugar in West Virginia by members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in West Virginia at the time of their purchases.

a. Defendants' combination or conspiracy had the following effects: Granulated Sugar price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) members of the Multistate Class were deprived of free and open competition; and (4) members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c. As a direct and proximate cause of the Defendants' unlawful conduct, members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code §§ 47-18-1, et seq. Accordingly, members of the Multistate Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

332.    **Wisconsin**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. §§ 133.01, *et seq*. with respect to purchases of Granulated Sugar in Wisconsin by Plaintiffs Donald Friedman, Sandra Kluessendorf and Richard Hammetter and members of the Multistate Class and/or purchases of Granulated Sugar by members of the Multistate Class who resided in Wisconsin at the time of their purchases.

a. Defendants' combination or conspiracy had the following effects: Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs Donald Friedman, Sandra Kluessendorf and Richard Hammetter and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiffs Donald Friedman, Sandra Kluessendorf and Richard Hammetter and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

c. As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiffs Donald Friedman, Sandra Kluessendorf and Richard Hammetter and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. §§ 133.01, et seq. Accordingly, Plaintiffs Donald Friedman, Sandra Kluessendorf and Richard Hammetter and members of the Multistate Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

## COUNT IV: STATE CONSUMER PROTECTION LAW VIOLATIONS

### On Behalf of Plaintiffs and the Multistate Class

333.    Plaintiffs repeat and reassert each of the preceding allegations as if fully set forth herein.

334.    During the Class Period, Defendants engaged in unfair or deceptive acts or practices in violation of the state deceptive trade practices and consumer protection laws pleaded below.

335.    **Alaska**: Defendants have engaged in unfair or deceptive acts or practices in violation of Alaska Stat. Ann. § 45.50.471, *et al*.

    a.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, raising, controlling, maintaining, and/or stabilizing at non-competitive and artificially inflated levels, the prices at which Granulated Sugar was sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiff Gina Gonzales and members of the Multistate Class.

    b.  Defendants' conduct constituted an "unfair method of competition" and "unfair" or "deceptive" acts or practices in violation of Alaska Stat. Ann. § 45.50.471.

    c.  Defendants' unlawful conduct had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Alaska; (2) Granulated Sugar prices were

raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska; (3) Plaintiff Gina Gonzales and members of the Multistate Class were deprived of free and open competition; (4) members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

    d. During the Class Period, Defendants' illegal conduct had a substantial effect on Alaska commerce.

    e. As a direct and proximate cause of the Defendants' unlawful conduct Gina Gonzales and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

    f. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of Alaska Stat. Ann. § 45.50.471. Accordingly, Plaintiff Gina Gonzales and members of the Multistate Class seek all relief available under Alaska Stat. Ann. § 45.50.531.

336.   **Arkansas**: Defendants have engaged in unfair or deceptive acts or practices in violation of Ark. Code Ann. § 4-88-101, et seq.

    a. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, raising, controlling, maintaining, and/or stabilizing at non-competitive and artificially inflated levels, the prices at which Granulated Sugar was sold, distributed, or obtained in Arkansas and took efforts to conceal their

agreements from members of the Multistate Class.

b. Defendants' conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

c. Defendants' unlawful conduct had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) members of the Multistate Class were deprived of free and open competition; (4) members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

d. During the Class Period, Defendants' illegal conduct had a substantial effect on Arkansas commerce.

e. As a direct and proximate cause of the Defendants' unlawful conduct, members of the Multistate Class have been injured in their business and property and are threatened with further injury.

f. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of Ark. Code Ann. § 4-88-107(a)(10). Accordingly, members of the Multistate Class seek all relief available under Ark. Code Ann. § 4-88-107(a)(10).

337. **California**: Defendants have engaged in unfair or deceptive acts or practices

in violation of Cal. Bus. & Prof. Code § 17200, et seq.

    a.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, raising, controlling, maintaining, and/or stabilizing at non-competitive and artificially inflated levels, the price at which Granulated Sugar was sold, distributed, or obtained in California and exercised their collective control to suppress innovation and consumer choice.

    b.  Defendants took efforts to conceal their agreements from Plaintiffs Reynaldo Borge, Matthew Edlin, Mikhael Gershzon, and Tammy Tacito and members of the Multistate Class.

    c.  The claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution form these Defendants for acts as alleged herein that violated Section 17200 of the California Business and Professional Code, commonly known as the Unfair Competition Law (the "UCL").

    d.  Defendants' conduct as alleged herein violates the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of UCL, including, but not limited to, the following: the violations of Section 1 of the Sherman Act, as set forth above; (2) the

violations of Section 16720, et seq., of the California Business and Professions Code, set forth above.

e.  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, et seq., of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent.

f.  Defendants' acts or practices are unfair to consumers of Granulated Sugar in California within the meaning of Section 17200, California Business and Professions Code.

g.  Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

h.  During the Class Period, Defendants' illegal conduct had a substantial effect on California commerce.

i.  The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

j.  As a direct and proximate cause of the Defendants' unlawful and unfair business practices, Plaintiffs Reynaldo Borge, Mathew Edlin, Mikhael Gershzon, and Tammy Tacito and members of the Multistate Class have and continue to pay supra-competition and artificially

inflated prices for Granulated Sugar. Plaintiffs Reynaldo Borge, Matthew Edlin, Mikhael Gershzon, and Tammy Tacito and Members of the Multistate Class have been injured in their business and property and are threatened with further injury as a result of such unfair competition.

k.  As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct. Accordingly, Plaintiffs Reynaldo Borge, Matthew Edlin, Mikhael Gershzon, and Tammy Tacito and members of the Multistate class seek all relief available under Cal. Bus. & Prof. Code § 17200, et seq.

338.    **District of Columbia**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, et seq.

a.  Plaintiff Jarred Cutlip and members of the Multistate class purchased Granulated Sugar in the District Columbia or resided in the District of Columbia when they purchased Granulated Sugar for personal, family, or household purposes.

b.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Granulated Sugar were sold, distributed, or obtained in the District of Columbia.

c.  The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Members of the Multistate class were not aware of Defendants' price-fixing conspiracy and were therefore unaware of the unfair and illegal overcharges. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers and a gross disparity between the price paid and the value received for Granulated Sugar.

d.  Defendants' unlawful conduct had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff Jarred Cutlip and members of the Multistate class were deprived of free and open competition; and (4) Plaintiff Jarred Cutlip and members of the Multistate class paid supra-competitive, artificially inflated prices for Granulated Sugar.

e.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Jarred Cutlip and members of the Multistate class were injured and are threatened with further injury. Accordingly, members of the Multistate class seek all relief available under District of Columbia Code § 28-3901, et seq.

339.    **Florida**: Defendants have engaged in unfair, unconscionable, or deceptive acts or practices in violation of Fla. Stat. § 501.201(1).

    a.  Defendants agreed to and did in fact, act in restraint of trade or commerce by affecting, fixing, raising, maintaining, controlling, and /or stabilizing the price of Granulated Sugar and exercised their collective control to suppress innovation and consumer choice.

    b.  Defendants concealed, suppressed, and omitted to disclose material facts to members of the Multistate Class concerning Defendants' unlawful activities and artificially inflated prices for Granulated Sugar. The concealed, suppressed, and omitted facts would have been important to Plaintiffs Mayelin Bernal and Renee Newton and members of the Multistate class as they related to the Granulated Sugar that they purchased.

    c.  Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Granulated Sugar by making public statements that were not in accord with the facts.

    d.  Defendants' statement and conduct concerning the price of Granulated Sugar were deceptive as they had the tendency or capacity to mislead Plaintiffs Mayelin Bernal and Renee Newton and members of the Multistate Class to believe that they were purchasing Granulated Sugar with prices established by a free and fair market.

    e.  Defendants' unlawful conduct had the following effects: (1)

Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Florida; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs Mayelin Bernal and Renee Newton and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiffs Mayelin Bernal and Renee Newton and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

f.   During the Class Period, Defendants' illegal conduct had a substantial effect on Florida commerce and consumers.

g.   As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiffs Mayelin Bernal and Renee Newton and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

h.   By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of Fla. Stat. § 501.201(1), et seq. Accordingly, Plaintiffs Mayelin Bernal and Renee Newton and members of the Multistate Class seek all relief available under Fla. Stat. § 501.201(1), et seq.

340.   **Hawaii**: Defendants have engaged in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Hawaii Rev. Stat. § 480-2. Defendants agreed to, and did in fact, act in restraint

of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Granulated Sugar were sold, distributed, or obtained in Hawaii.

    a. Plaintiff Claudette Palakiko and members of the Multistate Class purchased Granulated Sugar in Hawaii and/or purchased Granulated Sugar while residing in Hawaii at the time of their purchases.

    b. Defendants' unlawful conduct had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff Claudette Palakiko and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiff Claudette Palakiko and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

    c. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

    d. As a direct and proximate result of Defendants' unlawful conduct, and Plaintiff Claudette Palakiko and members of the Multistate Class were injured and are threatened with further injury. Accordingly, Plaintiff Claudette Palakiko and members of the Multistate Class seek all relief available under the statute.

341.    **Illinois**: Defendants have engaged in unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. Ann. 505/10a, et seq.

a. Defendants worked together to fix, raise, maintain, and stabilize the price of Granulated Sugar and exercised their collective control to suppress innovation and consumer choice.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on Illinois commerce.

c. As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiffs Matthew Marek and Mary Salazar and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of 815 Ill. Comp. Stat. Ann. 505/10a, et seq. Accordingly, Plaintiffs Matthew Marek and Mary Salazar and members of the Multistate Class seek all relief available under 815 Ill. Comp. Stat. Ann. 505/10a, et seq.

342.    **Massachusetts:** Defendants have engaged in unfair or deceptive acts or practices in violation of 81 Massachusetts G.L. c. 93A, §2, *et seq*.

a. Defendants were engaged in trade or commerce as defined in G.L. c. 93A.

b. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting,

fixing, raising, maintaining, controlling and/or stabilizing the price of Granulated Sugar at artificial and non-competitive levels, the prices at which Granulated Sugar were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from members of the Multistate Class.

c. Defendants' unlawful conduct had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiff Victor Sathler and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiff Victor Sathler and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

d. During the Class Period, Defendants' illegal conduct had a substantial effect on Massachusetts commerce and consumers.

e. As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiff Victor Sathler and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

f. Certain of Defendants have or will be served with a demand letter in accordance with G.L. c. 93A, § 9, or, upon information and belief,

such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.

g. Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Plaintiff Victor Sathler and members of the Multistate Class to multiple damages.

343. **Minnesota:** Defendants have engaged in unfair, unconscionable, or deceptive acts or practices in violation of Minn. Stat. § 325F.68, *et seq*.

a. Defendants engaged in the conduct described in this Complaint in connection with the sale of Granulated Sugar in trade or commerce in a market that includes Minnesota.

b. Defendants agreed to, and did in fact, affect, fix, raise, maintain, control, maintain and/or stabilize the price of Granulated Sugar at artificial and non-competitive levels, and exercised their collective control to suppress innovation and consumer choice. Such conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive, and unscrupulous, and caused substantial injury to Plaintiffs Raleigh Golden and Lauren Grouws and members of the Multistate Class.

c. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Granulated Sugar by making public statements that were not in accord with the facts.

127

d. Defendants' statements and conduct concerning the price of Granulated Sugar were deceptive as they had the tendency or capacity to mislead Plaintiffs Raleigh Golden and Lauren Grouws and members of the Multistate Class to believe that they were purchasing Granulated Sugar at prices established by a free and fair market.

e. Defendants' unlawful conduct had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs Raleigh Golden and Lauren Grouws and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiffs Raleigh Golden and Lauren Grouws and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

f. During the Class Period, Defendants' illegal conduct had a substantial effect on Minnesota commerce.

g. As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiffs Raleigh Golden and Lauren Grouws and members of the Multistate Class suffered ascertainable loss of money or property.

h. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of Minn. Stat. § 325F.68, et seq. Accordingly, Plaintiffs Raleigh Golden and Lauren Grouws and

members of the Multistate Class seek all relief available under Minn. Stat. § 325F.68, *et seq*.

344.    **Missouri**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020, *et seq*.

  a.  Plaintiff Lisa Clemenson and members of the Multistate Class purchased Granulated Sugar in Missouri for personal, family, or household purposes, or resided in Missouri when they purchased Granulated Sugar in Missouri for personal, family or household purposes.

  b.  Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiff Lisa Clemenson and members of the Multistate Class concerning Defendants' unlawful activities and artificially inflated prices for Granulated Sugar. The concealed, suppressed, and omitted facts would have been important to Plaintiff Lisa Clemenson members of the Multistate class as they related to the Granulated Sugar that they purchased.

  c.  Defendants' unlawful conduct had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiff Lisa Clemenson and members of

the Multistate Class were deprived of free and open competition; and (4) Plaintiff Lisa Clemenson and members of the Damage Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

d. During the Class Period, Defendants' illegal conduct substantially affected Missouri commerce and consumers.

e. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Lisa Clemenson and members of the Multistate Class were injured and are threatened with further injury. Accordingly, Plaintiff Lisa Clemenson and members of the Multistate Class seek all relief available under the Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020, et seq.

345. **Montana**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Consumer Protection Act of 1973, Mont. Code, §§ 30-14-101, *et seq*.

a. Members of the Multistate Class purchased Granulated Sugar in Montana for personal, family, or household purposes, or resided in Montana when they purchased Granulated Sugar in Montana for personal, family, or household purposes.

b. Defendants' unlawful conduct had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Montana; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels

130

throughout Montana; (3) members of the Multistate Class were deprived of free and open competition; and (4) members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

c.  During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

d.  As a direct and proximate result of Defendants' unlawful conduct, members of the Multistate Class were injured and are threatened with further injury. Accordingly, members of the Multistate Class seek all relief available under the Montana Consumer Protection Act of 1973, Mont. Code, §§ 30-14-101, *et seq*.

e.  In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Montana Attorney General in accordance with Mont. Code §30-14-133(2). Plaintiffs will file proof of such service with the Court.

346.  **Nebraska:** Defendants have engaged in unfair methods competition and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602, *et seq*.

a.  Defendants' unlawful conduct had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels

throughout Nebraska; (3) members of the Multistate Class were deprived of free and open competition; and (4) members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

b.  During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Multistate Class were injured and are threatened with further injury. Accordingly, members of the Multistate Class seek all relief available under the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602, *et seq.*

347.  **Nevada**: Defendants have engaged in deceptive trade practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*

a.  Defendants engaged in the conduct described herein in connection with the sale of Granulated Sugar in trade or commerce in a market that includes Nevada.

b.  Defendants and their co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Granulated Sugar were sold, distributed or obtained in Nevada, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial

injury to members of the Multistate Class.

c.  Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiff Erica Mitchell and members of the Multistate Class concerning Defendants' unlawful activities and artificially inflated prices for Granulated Sugar. The concealed, suppressed, and omitted facts would have been important to Plaintiff Erica Mitchell and members of the Multistate Class as they related to the cost of Granulated Sugar that they purchased.

d.  Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Granulated Sugar by making public statements that were not in accord with the facts.

e.  Defendants' statements and conduct concerning the price of Granulated Sugar were deceptive as they had the tendency or capacity to mislead Plaintiff Erica Mitchell and members of the Multistate Class to believe that they were purchasing Granulated Sugar at prices established by a free and fair market.

f.  Defendants' unlawful conduct had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiff Erica Mitchell and members of the Multistate Class were deprived of free and open competition; and (4)

Plaintiff Erica Mitchell and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

g.  As a direct and proximate result of the above-described unlawful practices, Plaintiff Erica Mitchell and members of the Multistate Class suffered ascertainable loss of money or property. Accordingly, members of the Multistate Class seek all relief available under Nev. Rev. Stat. § 598.0993.

348.  **New Hampshire**: Defendants have engaged in unfair or deceptive acts or practices in violation of the New Hampshire Rev. Ann. tit. XXXI, § 358-A:1, *et seq*.

a.  Plaintiff Thomas Tombarello and members of the Multistate Class purchased Granulated Sugar in New Hampshire for personal, family, or household purposes, or resided in New Hampshire when they purchased Granulated Sugar in New Hampshire for personal, family or household purposes.

b.  Defendants concealed, suppressed, and omitted to disclose material facts to members of the Multistate Class concerning Defendants' unlawful activities and artificially raised prices for Granulated Sugar. The concealed, suppressed, and omitted facts would have been important to Plaintiff Thomas Tombarello and members of the Multistate class as they related to the Granulated Sugar that they purchased.

c.  Defendants' unlawful conduct had the following effects: (1)

134

Granulated Sugar price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff Thomas Tombarello and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiff Thomas Tombarello paid supra-competitive, artificially inflated prices for Granulated Sugar.

d. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire Commerce and consumers.

e. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Thomas Tombarello and members of the Multistate Class were injured and are threatened with further injury. Accordingly, Plaintiff Thomas Tombarello and members of the Multistate Class seek all available relief under the New Hampshire Rev. Ann. tit. XXXI, § 358-A:1, et seq.

f. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the New Hampshire Attorney General in accordance with New Hampshire Revised Statutes Annotated § 358-A:10(II). Plaintiffs will file proof of such service with the Court.

349. **New Jersey**: Defendants have engaged in unfair or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56.8-2, *et seq*.

a. Plaintiff Nancy Goodman and members of the Multistate Class purchased Granulated Sugar in New Jersey for personal, family, or household purposes, or resided in New Jersey when they purchased Granulated Sugar in New Jersey for personal, family or household purposes.

b. Defendants concealed, suppressed, and omitted to disclose material facts to members of the Multistate Class concerning Defendants' unlawful activities and artificially raised prices for Granulated Sugar. The concealed, suppressed, and omitted facts would have been important to Plaintiff Nancy Goodman and members of the Multistate class as they related to the Granulated Sugar that they purchased.

c. Defendants' unlawful conduct had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey; (3) Plaintiff Nancy Goodman and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiffs Nancy Goodman paid supra-competitive, artificially inflated prices for Granulated Sugar.

d. During the Class Period, Defendants' illegal conduct substantially affected New Jersey Commerce and consumers.

e. As a direct and proximate result of Defendants' unlawful conduct,

Plaintiff Nancy Goodman and members of the Multistate Class were injured and are threatened with further injury. Accordingly, Plaintiff Nancy Goodman and members of the Multistate Class seek all available relief under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56.8-2, et seq.

350.    **New Mexico**: Defendants have engaged in unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-3, et seq.

    a.   Defendants worked together to fix, raise, maintain, and stabilize the price of Granulated Sugar and exercised their collective control to suppress innovation and consumer choice.

    b.   During the Class Period, Defendants' illegal conduct had a substantial effect on New Mexico commerce.

    c.   As a direct and proximate cause of the Defendants' unlawful conduct, members of the Multistate Class have been injured in their business and property and are threatened with further injury.

    d.   By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of N.M. Stat. Ann. § 57-12- 3, et seq. Accordingly, members of the Multistate Class seek all relief available under N.M. Stat. Ann. § 57-12-3, et seq.

351.    **New York**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New York Gen. Bus. Law § 349, *et seq*.

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Granulated Sugar were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs Renee Newton and Claudine Williams and members of the Multistate Class.

b. Defendants and their co-conspirators made public statements about the prices of Granulated Sugar and Granulated Sugar that Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Granulated Sugar; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

c. Because of Defendants' unlawful trade practices in New York, Plaintiffs Renee Newton and Claudine Williams and members of the Multistate Class who purchased Granulated Sugar were misled to believe that they were paying a fair price for Granulated Sugar or the price increases for Granulated Sugar were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy.

d. Defendants knew that their unlawful trade practices with respect to

pricing Granulated Sugar would have an impact on New York consumers and not just Defendants' direct customers.

e.  Defendants knew that their unlawful trade practices with respect to pricing Granulated Sugar would have a broad impact, causing customers who purchased Granulated Sugar to be injured by paying more for Granulated Sugar than they would have paid in the absence of Defendants' unlawful trade acts and practices.

f.  The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

g.  Defendants' unlawful conduct had the following effects: (1) Granulated Sugar competition was restrained, suppressed, and eliminated throughout New York; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs Renee Newton and Claudine Williams and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiffs Renee Newton and Claudine Williams and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

h. During the Class Period, Defendants marketed, sold, or distributed Granulated Sugar in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

i. Plaintiffs Renee Newton and Claudine Williams and members of the Multistate Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

352.    **North Carolina**: Defendants have engaged in unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by fixing, raising, maintaining, and/or stabilizing the price of Granulated Sugar at artificial and non-competitive levels and took efforts to conceal their agreements from Plaintiffs Amanda Boardman and Bruce Johnson and members of the Multistate Class.

b. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation, and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs Amanda Boardman and Bruce Johnson and members of the Multistate Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases. Defendants' public

statements concerning the price of Granulated Sugar created the illusion of competitive pricing controlled by market forces rather than supra-competitive pricing driven by Defendants' illegal conspiracy.

c. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

d. Defendants' unlawful conduct had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs Amanda Boardman and Bruce Johnson and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiffs Amanda Boardman and Bruce Johnson and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

e. During the Class Period, Defendants' illegal conduct had a substantial effect on North Carolina commerce and consumers.

f. As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiffs Amanda Boardman and Bruce Johnson and members of the

Multistate Class have been injured in their business and property and are threatened with further injury.

g.  By reason of the foregoing, Defendants have engaged om unfair or deceptive acts of practices in violation of N.C. Gen. Stat. § 75-1.1, et seq. Accordingly, Plaintiffs Amanda Boardman and Bruce Johnson and members of the Multistate Class seek all relief available under N.C. Gen. Stat. § 75-1.1, *et seq*.

353.   **Oregon**: Defendants have engaged in unconscionable tactics and unfair and deceptive acts in violation of the Oregon Trade Practices Act, Or. Rev. Stat. §646.605, *et seq*.

a.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by fixing, raising, maintaining, and/or stabilizing the price of Granulated Sugar at artificial and non-competitive levels and exchanging commercial sensitive, non-public information and took efforts to conceal their agreements from members of the Multistate Class.

b.   Defendants' unlawful conduct had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) members of the Multistate Class were deprived of free and open competition; and (4) members of the

142

Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

c. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce and consumers.

d. As a direct and proximate cause of the Defendants' unlawful conduct, members of the Multistate Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have engaged om unfair or deceptive acts of practices in violation of the Oregon Trade Practices Act, Or. Rev. Stat. §646.605, et seq. Accordingly, Plaintiffs and members of the Multistate Class seek all relief available under the Oregon Trade Practices Act, Or. Rev. Stat. §646.605, et seq.

f. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Oregon Attorney General in accordance with Or. Rev. Stat. §646.638(2). Plaintiffs will file proof of such service with the Court.

354. **Pennsylvania**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1, *et seq*.

a. Plaintiff Heidi Humphreys and members of the Multistate Class purchased Granulated Sugar Products in Pennsylvania for personal, family, or household purposes, or resided in Pennsylvania when they

purchased Granulated Sugar in Pennsylvania for personal, family, or household purposes.

b. Defendants concealed, suppressed, and omitted to disclose material facts to members of the Multistate Class concerning Defendants' unlawful activities and artificially inflated prices for Granulated Sugar. The concealed, suppressed, and omitted facts would have been important to Plaintiff Heidi Humphreys and members of the Multistate class as they related to the Granulated Sugar that they purchased.

c. Defendants' unlawful conduct had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Pennsylvania; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Pennsylvania; (3) Plaintiff Heidi Humphreys and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiff Heidi Humphreys and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

d. During the Class Period, Defendants' illegal conduct substantially affected Pennsylvania commerce and consumers.

e. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Heidi Humphreys and members of the Multistate Class were

injured and are threatened with further injury. Accordingly, Plaintiff Heidi Humphreys and members of the Multistate Class seek all relief available under the Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1, et seq.

355.   **Rhode Island**: Defendants have engaged in unfair or deceptive acts or practices in violation of Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq*.

   a.  Defendants worked together to fix, raise, maintain, and stabilize the price of Granulated Sugar and exercised their collective control to suppress innovation and consumer choice.

   b.  Defendants' combinations or conspiracies had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiff Evan Annis and members of the Multistate Class were deprived of free and open competition; and (4) Plaintiff Evan Annis and members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

   c.  During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce.

   d.  As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiff Evan Annis and members of the Multistate Class have been

injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of R.I. Gen. Laws §§ 6-13.1-1, et seq. Accordingly, Plaintiff Evan Annis and members of the Multistate Class seek all relief available under R.I. Gen. Laws §§ 6-13.1-1, *et seq*.

f. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Rhode Island Attorney General in accordance with R.I. Gen. Laws §6-13.1-5.2(c). Plaintiffs will file proof of such service with the Court.

356. **South Carolina**: Defendants have engaged in unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*.

a. Defendants worked together to fix, raise, maintain, and stabilize the price of Granulated Sugar and exercised their collective control to suppress innovation and consumer choice.

b. Defendants' combinations or conspiracies had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiff Stephen Reeves and members of the Multistate Class were deprived of free and open

competition; and (4) Plaintiff Stephen Reeves members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

c. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

d. As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiff Stephen Reeves and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of S.C. Code Ann. § 39-5-10, et seq. Accordingly, Plaintiff Stephen Reeves and members of the Multistate Class seek all relief available under S.C. Code Ann. § 39-5-10, et seq.

f. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the South Carolina Attorney General in accordance with S.C. Code Ann. §39-5-140(b). Plaintiffs will file proof of such service with the Court.

357. **Utah**: Defendants have engaged in unfair or deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Utah Code Ann. §13-11-1, *et seq.*

a. Defendants worked together to fix, raise, maintain, and stabilize the price of Granulated Sugar at artificial and non-competitive levels and

exchanging commercial sensitive, non-public information and took efforts to conceal their agreements from members of the Multistate Class

b.   Defendants' combinations or conspiracies had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout Utah; (2) Granulated Sugar prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) members of the Multistate Class were deprived of free and open competition; and (4) members of the Multistate Class paid supra-competitive, artificially inflated prices for Granulated Sugar.

c.   During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

d.   As a direct and proximate cause of the Defendants' unlawful conduct, members of the Multistate Class have been injured in their business and property and are threatened with further injury.

e.   By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of Utah Code Ann. §13-11-1, et seq. Accordingly, Plaintiffs and members of the Multistate Class seek all relief available under Utah Code Ann. §13-11-1, *et seq.*

f.   In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Utah Attorney General in accordance

with Utah Code Ann. §13-11-21(2).  Plaintiffs will file proof of such

service with the Court.

358.    **Vermont**: Defendants have engaged in unfair or deceptive acts or practices

in violation of Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9 § 2451, *et. seq*.

    a.  Defendants worked together to fix, raise, maintain, and stabilize the

price of Granulated Sugar and exercised their collective control to

suppress innovation and consumer choice.

    b.  Defendants' combinations or conspiracies had the following effects:

(1) Granulated Sugar price competition was restrained, suppressed,

and eliminated throughout Vermont; (2) Granulated Sugar prices were

raised, fixed, maintained, and stabilized at artificially high levels

throughout Vermont; (3) Plaintiffs Mary Reilly and James Veneziano

and members of the Multistate Class were deprived of free and open

competition; and (4) Plaintiffs Mary Reilly and James Veneziano and

members of the Multistate Class paid supra-competitive, artificially

inflated prices for Granulated Sugar.

    c.  During the Class Period, Defendants' illegal conduct had a substantial

effect on Vermont commerce.

    d.  As a direct and proximate cause of the Defendants' unlawful conduct,

Plaintiffs Mary Reilly and James Veneziano and members of the

Multistate Class have been injured in their business and property and

are threatened with further injury.

e.  By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of Vt. Stat. Ann. tit. 9 § 2451, et. seq, et seq. Accordingly, Plaintiffs Mary Reilly and James Veneziano and members of the Multistate Class seek all relief available under Vt. Stat. Ann. tit. 9 § 2451, *et. seq*.

359.   **Wisconsin**: Defendants have engaged in unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*.

a.  Defendants worked together to fix, raise, maintain, and stabilize the price of Granulated Sugar and exercised their collective control to suppress innovation and consumer choice.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

c.  As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiffs Donald Friedman, Sandra Kluessendorf and Richard Hammetter and members of the Multistate Class have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have engaged om unfair or deceptive acts of practices in violation of Wisc. Stat. § 100.18, et seq. Accordingly, Plaintiffs Donald Friedman, Sandra Kluessendorf and Richard Hammetter and members of the Multistate Class seek all relief available Wisc. Stat. § 100.18, *et seq*.

## COUNT V: UNJUST ENRICHMENT

### On Behalf of Plaintiffs and the Multistate Class

360.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

361.    To the extent required, this Count V is pled in the alternative to other Counts in this Complaint to the extent they may have no remedy at law.

362.    Defendants have unlawfully benefited from their sales of Granulated Sugar because of the unlawful and inequitable acts alleged throughout this Complaint. Defendants unlawfully overcharged for Granulated Sugar during the Class Period, which caused Plaintiffs and the Multistate Class to make purchases of Granulated Sugar during the Class Period at prices that were higher than they would have been but for Defendants' unlawful and inequitable actions.

363.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and the Multistate Class during the Class Period.

364.    Plaintiffs and the Multistate Class have conferred upon Defendants an economic benefit, in the form of profits resulting from unlawful and ill-gotten overcharges during the Class Period to the economic detriment of the Plaintiffs and the Multistate Class.

365.    Defendants have been enriched by revenue resulting from unlawful overcharges for  Granulated Sugar during the Class Period while  Plaintiffs  and  the Multistate Class  have  been  detrimentally and adversely impacted  by  overcharges they paid for Granulated Sugar imposed through Defendants' unlawful conduct. Defendants'

enrichment, and the Plaintiffs' and the Multistate Class's economic detriment and economic losses, are connected.

366.    Defendants' inequitable and unlawful enrichment was at the expense, and to the economic detriment, of the Plaintiffs and the Multistate Class.

367.    There is no legitimate justification for Defendants' retention of, and enrichment from, the benefits they received, which caused economic detriment to Plaintiffs and the Multistate Class, because Plaintiffs and the Multistate Class paid supra-competitive prices during the Class Period that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

368.    Plaintiffs and the Multistate Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

369.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to artificially inflate the prices of Granulated Sugar.

370.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned during the Class Period due to their unlawful overcharges of Granulated Sugar are ascertainable by review of sales records and other discoverable financial data.

371.    It would be futile for Plaintiffs and the Multistate Class to seek to exhaust any remedy against any immediate intermediary in the chain of distribution from which they indirectly purchased Granulated Sugar, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Multistate Class for Defendants'

unlawful conduct.

372.    The economic benefit of overcharges and ill-gotten profits derived by Defendants through charging supra-competitive and artificially inflated prices for Granulated Sugar is a direct and proximate result of Defendants' unlawful and inequitable practices discussed throughout this Complaint.

373.    The financial benefits derived by Defendants rightfully belong to the Plaintiffs and the Multistate Class, because Plaintiffs and the Multistate Class paid supra-competitive prices during the Class Period, inuring to the benefit of Defendants.

374.    It would be inequitable under unjust enrichment principles under the laws of the Consumer Indirect Purchaser States, for Defendants to be permitted to retain any of the overcharges for Granulated Sugar derived from Defendants' unlawful, unfair, inequitable, and unconscionable methods, acts, and trade practices alleged throughout this Complaint.

375.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Multistate Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

376.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and the Multistate Class all unlawful, ill-gotten, and/or inequitable proceeds they received from their sales of Granulated Sugar.

377.    By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs and the Multistate Class of the opportunity to purchase lower-priced Granulated Sugar and forcing them to pay higher prices for Granulated Sugar during the Class Period, Defendants have been unjustly enriched.

378.    Unjust enrichment claims are alleged herein under the laws of all States (except Ohio and Indiana) as well as the District of Columbia, as follows:

379.    **Alabama**: Defendants unlawfully overcharged Plaintiffs and  the  Multistate Class, who made purchases of Granulated Sugar during the Class Period in Alabama at prices that were higher than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Multistate Class as a direct result of the unlawful overcharges, and Defendants have inequitably retained this money.  Defendants have benefitted at the expense of Plaintiffs and the Multistate Class from revenue resulting from unlawful and inequitable overcharges for Granulated Sugar.  It is inequitable and unjustifiable for Defendants to accept and retain the benefits received without compensating the Plaintiffs and the Multistate Class.

380.    **Alaska**: Defendants unlawfully overcharged Plaintiffs and  the  Multistate Class, who made purchases of Granulated Sugar during the Class Period in Alaska at prices that were higher than they would have been but for Defendants' actions.  Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Multistate Class.  Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Multistate Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

381.    **Arizona**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Arizona at prices that were higher than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Granulated Sugar. Plaintiffs and the Multistate Class have been detrimentally impacted and they have suffered economic losses by the overcharges for Granulated Sugar resulting from Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Multistate Class's economic detriment are connected. There is no legitimate justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Multistate Class's economic detriment because Plaintiffs and the Multistate Class paid supra-competitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Multistate Class have no adequate remedy at law.

382.    **Arkansas**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Arkansas at prices that were higher than they would have been but for Defendants' actions. Defendants received money from Plaintiffs and the Multistate Class as a direct result of the unlawful overcharges, and Defendants have improperly retained this money. Defendants have paid no consideration to any other person in exchange for this money. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

383.    **California**: Defendants    unlawfully    overcharged    Plaintiffs    and    the

Multistate Class, who made purchases of Granulated Sugar during the Class Period in California at prices that were higher than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Multistate Class as a direct result of the unlawful overcharges. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Multistate Class. Plaintiffs and the Multistate Class therefore seek restitution from Defendants under California law due to Defendants' unlawful and inequitable conduct.

384. **Colorado**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Colorado at prices that were higher than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Multistate Class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants have benefitted at the expense of Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

385. **Connecticut**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Connecticut at prices that were higher than they would have been but for Defendants' actions. Defendants benefitted in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants have paid no consideration to any other person in exchange for this benefit. Defendants retained the

benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Multistate Class.

386. **Delaware:** Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Delaware at prices that were higher than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Granulated Sugar. Plaintiffs and the Multistate Class have been detrimentally and adversely impacted by the overcharges for Granulated Sugar resulting from Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Multistate Class's economic losses are connected. There is no legitimate justification for Defendants' receipt of the benefits causing their enrichment because Plaintiffs and the Multistate Class paid supra-competitive prices that inured to Defendants' benefit, and it would be inequitable and unjust for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Multistate Class have no adequate remedy at law.

387. **District of Columbia**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in the District of Columbia at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Multistate Class. Under the circumstances, it

157

would be inequitable and unjust for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

388.    **Florida**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Florida at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

389.    **Georgia**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Georgia at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

390.    **Hawaii**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Hawaii at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of

revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

391. **Idaho:** Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Idaho at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants appreciated the benefit conferred upon them by Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

392. **Illinois**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Illinois at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Multistate Class. It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges without compensating Plaintiffs and the Multistate Class.

393. **Iowa**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Iowa at prices that were higher than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Granulated Sugar, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Multistate Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

394. **Kansas**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Kansas at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

395. **Kentucky**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Kentucky at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the

form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants appreciated the benefit conferred upon them by Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

396. **Louisiana**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Louisiana at prices that were higher than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Granulated Sugar. Plaintiffs and the Multistate Class have been detrimentally and adversely impacted by the overcharges for Granulated Sugar resulting from Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Multistate Class's economic losses are connected. There is no legitimate justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Multistate Class paid supra-competitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges without compensating Plaintiffs and the Multistate Class. Plaintiffs and the Multistate Class have no other adequate remedy at law.

397. **Maine**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Maine at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of

revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

398. **Maryland**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Maryland at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

399. **Massachusetts**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Massachusetts at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without

compensating Plaintiffs and the Multistate Class.

400. **Michigan:** Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Michigan at prices that were higher than they would have been but for Defendants' actions. Defendants received a benefit from Plaintiffs and the Multistate Class in the form of revenue resulting from unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants retained the benefits bestowed upon them by Plaintiffs and the Multistate Class under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

401. **Minnesota:** Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Minnesota at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

402. **Mississippi**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in

Mississippi at prices that were higher than they would have been but for Defendants' actions. Defendants received money from Plaintiffs and the Multistate Class as a direct result of the unlawful overcharges. Defendants retained the benefit of overcharges received on the sales of Granulated Sugar, which in equity and good conscience belong to Plaintiffs and the Multistate Class on account of Defendants' anticompetitive and inequitable conduct. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

403. **Missouri:** Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Missouri at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Multistate Class. Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain these ill-gotten benefits without compensating Plaintiffs and the Multistate Class.

404. **Montana**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Montana at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class conferred an economic benefit upon Defendants, in the form of

revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

405.    **Nebraska:** Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Nebraska at prices that were higher than they would have been but for Defendants' actions. Defendants received money from Plaintiffs and the Multistate Class as a direct result of the unlawful overcharges, and they have retained this money. Defendants have paid no consideration to any other person in exchange for this money. In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and the Multistate Class.

406.    **Nevada:** Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Nevada at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants in the form of revenue resulting from unlawful overcharges for Granulated Sugar. Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Multistate Class, for which Defendants have paid no consideration to any other person. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

407.    **New Hampshire**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in New

Hampshire at prices that were higher than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Multistate Class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Under the circumstances, it would be unconscionable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

408. **New Jersey:** Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in New Jersey at prices that were higher than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Multistate Class in the form of revenue resulting from unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from unlawful overcharges to Plaintiffs and the Multistate Class. Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiffs and the Multistate Class with respect to Defendants' sales of Granulated Sugar. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

409. **New Mexico:** Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in New Mexico at prices that were higher than they would have been but for Defendants' actions. Defendants have knowingly benefitted at the expense of Plaintiffs and the Multistate

Class from revenue resulting from unlawful overcharges for Granulated Sugar. To allow Defendants to retain these ill-gotten benefits would be unjust because the benefits resulted from anticompetitive and unlawful pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

410. **New York:** Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in New York at prices that were higher than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Granulated Sugar, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Multistate Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiffs and the Multistate Class. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges. Under the circumstances alleged throughout this Complaint, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

411. **North Carolina**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in North Carolina at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants in the form of revenue resulting from unlawful overcharges to the economic

167

detriment of Plaintiffs and the Multistate Class. Plaintiffs and the Multistate Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Multistate Class. The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records and other financial data. Defendants consciously accepted the benefits conferred upon them. Under the circumstances alleged throughout this Complaint, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

412. **North Dakota:** Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in North Dakota at prices that were higher than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Granulated Sugar. Plaintiffs and the Multistate Class have been adversely impacted by the overcharges for Granulated Sugar resulting from Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Multistate Class's economic losses and economic detriment are connected. There is no legitimate justification for Defendants' receipt of the benefits causing their enrichment because Plaintiffs and the Multistate Class paid supra-competitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Multistate Class have no adequate remedy at law. Under the

circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

413. **Oklahoma**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Oklahoma at prices that were higher than they would have been but for Defendants' actions. Defendants received money from Plaintiffs and the Multistate Class as a direct result of unlawful overcharges, and Defendants have retained this money. Defendants have paid no consideration to any other person in exchange for this money. Plaintiffs and the Multistate Class have no adequate remedy at law. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges. Under the circumstances alleged throughout this Complaint, it would be unjust and inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

414. **Oregon**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Oregon at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Multistate Class. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges. Under the circumstances, it would be unjust for Defendants to retain such benefits without

compensating Plaintiffs and the Multistate Class.

415. **Pennsylvania**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Pennsylvania at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class. Plaintiffs and the Multistate Class have no adequate remedy at law.

416. **Rhode Island:** Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Rhode Island at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

417. **South Carolina:** Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in

South Carolina at prices that were higher than they would have been but for Defendants' actions. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Multistate Class. Defendants realized value from the benefit bestowed upon them by Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

418. **South Dakota:** Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in South Dakota at prices that were higher than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Multistate Class in the form of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and the Multistate Class.

419. **Tennessee**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Tennessee at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants appreciated the benefit

bestowed upon them by Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Multistate Class with respect to Defendants' sales of Granulated Sugar. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and the Multistate Class.

420. **Texas**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Texas at prices that were higher than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Multistate Class in the form of revenue resulting from unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Multistate Class. The circumstances under which Defendants have retained the benefits bestowed upon them by Plaintiffs and the Multistate Class are inequitable in that they result from Defendants' unlawful overcharges for Granulated Sugar. Plaintiffs and the Multistate Class have no adequate remedy at law. Under the circumstances alleged throughout this Complaint, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and the Multistate Class.

421. **Utah**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Utah at prices

that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

422. **Vermont**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Vermont at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants accepted the benefit bestowed upon them by Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

423. **Virginia**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Virginia at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants were aware of the benefit bestowed upon

them by Plaintiffs and the Multistate Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Granulated Sugar. Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and the Multistate Class. Under the circumstances alleged throughout this Complaint, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

424. **Washington**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Washington at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

425. **West Virginia**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in West Virginia at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants were aware of or appreciated

the benefit bestowed upon them by Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

426. **Wisconsin**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Wisconsin at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Multistate Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

427. **Wyoming**: Defendants unlawfully overcharged Plaintiffs and the Multistate Class, who made purchases of Granulated Sugar during the Class Period in Wyoming at prices that were higher than they would have been but for Defendants' actions. Plaintiffs and the Multistate Class have conferred an economic benefit upon Defendants, in the form of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Multistate Class. Defendants accepted, used, and enjoyed the benefits bestowed upon them by Plaintiffs and the Multistate Class. Under the circumstances alleged throughout this Complaint, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Multistate Class.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Classes, respectfully pray that This Honorable Court:

A.    Determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.    Adjudge that Defendants violated federal antitrust laws, as set forth above;

C.    Adjudge that Defendants violated State antitrust and trade regulation laws, as set forth above;

D.    Award Plaintiffs and members of the Multistate Class actual, treble, punitive, exemplary and/or nominal damages; attorneys' fees and costs of suit, including costs of consulting and testifying experts; and pre- and post-judgment interest;

E.    Order disgorgement to a common fund from which Plaintiffs and the Multistate Class may obtain restitution;

F.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.    Grant such other, further, and different relief, including structural relief, as may be just and proper.

## IX.    DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a Trial by Jury as to all issues so triable.

Dated: December 9, 2024

By:  /s *Stacey P. Slaughter*
Stacey P. Slaughter
Caitlin E. Keiper
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
sslaughter@robinskaplan.com
ckeiper@robinskaplan.com

Ellen G. Jalkut
ROBINS KAPLAN LLP
1325 Avenue of the Americas, Suite 2601
New York, NY 10019
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
ejalkut@robinskaplan.com

By:  /s *Peter A. Barile III*
Peter A. Barile III
Sitso W. Bediako
Nicole A. Veno
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
pbarile@lowey.com
sbediako@lowey.com
nveno@lowey.com

By: _/s Elizabeth A. Fegan_____
Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100
beth@feganscott.com

Kyle A. Jacobsen
FEGAN SCOTT LLC
322 North Shore Drive
Building B1, Ste. 200
Pittsburgh, PA 15212
Ph: (412) 346-4104
kyle@feganscott.com

Ashali P. Chimata
FEGAN SCOTT LLC
1763 Columbia Road NW, Suite 100
Washington, D.C. 20009
Ph: (771) 244-6729
ashali@feganscott.com

***Interim Co-Lead Counsel for Indirect
Consumer Purchaser Class***

Robert J. Bonsignore
BONSIGNORE, LLC
3771 Meadowcrest Drive
Las Vegas, NV 89121
Telephone: (781) 354-1800
Facsimile: 702-983-8673
rbonsignore@classactions.us

Allison Watson Cross
BATHAEE DUNNE LLP
3420 Bristol Street, Suite 600
Costa Mesa, CA 92626
Telephone: 213-458-7075
across@bathaeedunne.com

Andrew Chan Wolinsky
Yavar Bathaee
BATHAEE DUNNE LLP
445 Park Avenue, 9th Floor
New York, NY 10022
Telephone: (332) 322-8835
awolinsky@bathaeedunne.com
yavar@bathaeedunne.com

Edward M. Grauman
Brian J. Dunne
BATHAEE DUNNE LLP
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Telephone: (213) 462-2772
egrauman@bathaeedunne.com
bdunne@bathaeedunne.com

Rachel Dapeer
DAPEER LAW, P.A.
20900 NE 30th Avenue, #417
Aventura, FL 33180
Telephone: (954) 799-5914
rachel@dapeer.com

Ronald A. Dardeno
LAW OFFICCES OF RONALD A.
DARDENO, PLLP
424 Broadway
Somerville, MA  02145
Telephone: (617) 666-2600 ext 12
Facsimile: (617) 666-2794
rdardeno@dardeno.com

Raphael Janove
JANOVE PLLC
1617 John F. Kennedy Blvd, 20th Fl.
Philadelphia, PA 19106
Telephone: (215) 267-0100
raphael@janove.law

Rachhana T. Srey
NICHOLS KASTER, PLLP
80 South 8th Street
4700 IDS Center,
Minneapolis, MN 55402
Telephone: (612) 256-3239
Facsimile: (612) 338-4878
Srey@nka.com

Daniel L. Warshaw
Bobby Pouya
PEARSON WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
dwarshaw@pwfirm.com
bpouya@pwfirm.com

Melissa Weiner (#387900)
Brian S. Pafundi (#0392405)
PEARSON WARSHAW, LLP
328 Barry Ave. South, Suite 200
Wayzata, MN 55391
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
mweiner@pwfirm.com
bpafundi@pwfirm.com

Peter Prieto
Matthew P. Weinshall
Dayron Silverio
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue, Suite 2300
Miami, FL 33131
Telephone: (305) 358-2800
pprieto@podhurst.com
mweinshall@podhurst.com
dsilverio@podhurst.com

Garrett D. Blanchfield
Brant D. Penney
REINHARDT WENDORF &
BLANCHFIELD
80 So. 8th Street, Suite 900
Minneapolis, MN 55402
Telephone: (651) 287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com

Ronen Sarraf
Joseph Gentile
SARRAF GENTILE LLP
Ronen Sarraf
Joseph Gentile
10 Bond Street, Suite 212
Great Neck, NY 11021
Telephone: 516-699-8890
ronen@sarrafgentile.com
joseph@sarrafgentile.com

Ian W. Sloss
John Seredynski
SILVER GOLUB & TEITELL, LLP
1 Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491
Facsimile: (203) 325-3769
isloss@sgtlaw.com
jseredynski@sgtlaw.com

Michelle C. Clerkin
SPIRO HARRISON & NELSON
1111 Lincoln Road, Suite 500
Miami Beach, FL 33139
Telephone: (786) 841-1181
Facsimile: (973) 232-0887
mclerkin@shnlegal.com

Robin F. Zwerling, Esq.
Jessica Hermes
ZWERLING, SCHACTER &
ZWERLING, LLP
41 Madison Avenue
New York, NY 10010
Telephone: 212-223-3900
rzwerling@zsz.com
jhermes@zsz.com

***Additional Counsel for Indirect Consumer
Purchaser Class***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 9, 2024, I caused a true and correct copy of the foregoing to be filed in this Court's CM/ECF system, which will send notification of such filing to all counsel of record, and have served the Notice hereof and a true and correct copy of the forgoing upon the following Attorney Generals via Certified Mail or by other means, as preferred by the Attorney General's Offices as follows:

Treg Taylor
Office of the Attorney General
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501

Kris Mayes
Office of the Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-2926

Philip J. Weiser
Colorado Attorney General
1300 Broadway
Denver, CO 80203

William Tong
Office of Attorney General
55 Elm St., P.O. Box 120
Hartford, CT 06141-0120

Anne E. Lopez
Department of the Attorney General
425 Queen Street
Honolulu, HI 96813

Kwame Raoul
Office of the Attorney General
115 S. LaSalle St.
Chicago, IL 60603

Keith Ellison
Minnesota Attorney General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2131

Andrew Bailey
Missouri Attorney General
207 W. High St. P.O. Box 899
Jefferson City, MO 65102

Austin Knudsen
Office of the Attorney General
215 North Sanders, Third Floor
PO Box 201401
Helena, MT 59620-1401

Aaron Ford
Office of the Attorney General
100 North Carson Street
Carson City, NV 89701-4717

John Formella
Office of the Attorney General
33 Capitol Street
Concord, NH 03301

Letitia James
Office of the Attorney General
1 Empire State Plaza
Albany, NY 12224

Ellen Rosenblum
Office of the Attorney General
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301

Peter Neronha
Office of the Attorney General
150 South Main Street
Providence, RI 02903

The Honorable Alan Wilson
Attorney General
PO Box 11549
Columbia, SC 29211

Sean Reyes
Office of the Attorney General
Utah State Capitol Complex
350 North State Street, Suite 230
Salt Lake City, UT 84114-2320

*/s Stacey P. Slaughter*