# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: GRANULATED SUGAR ANTITRUST LITIGATION | Case No. 24-md-03110 (JWB/DTS) |
| This Document Relates To:<br><br>ALL COMMERCIAL INDIRECT PURCHASER ACTIONS | |

## COMMERCIAL INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

## JURY TRIAL DEMANDED

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ................................................................................. 2

II.   JURISDICTION AND VENUE ........................................................................... 4

III.  PARTIES ............................................................................................................ 6

     A.    Plaintiffs .................................................................................................. 6

     B.    Defendants ............................................................................................. 10

          1.    ASR/Domino Corporate Family ................................................ 10

          2.    United Corporate Family ........................................................... 11

          3.    Louis Dreyfus ........................................................................... 13

          4.    Michigan Sugar Corporate Family ............................................ 14

          5.    Commodity ............................................................................... 14

          6.    Richard Wistisen ...................................................................... 15

     C.    Agents and Co-Conspirators ................................................................ 15

IV.  FACTUAL ALLEGATIONS ............................................................................. 16

     A.    The Domestic Granulated Sugar Market and Its Commercial
          Development ......................................................................................... 16

     B.    Summary Overview of Defendants' Agreement to Artificially Raise,
          Fix, Maintain, or Stabilize Prices of Domestic Granulated Sugar ............. 23

V.   THE ANTICOMPETITIVE CONDUCT AT ISSUE ........................................... 27

     A.    Detailed Analysis of How Information Was Shared Through
          Commodity and Wistisen .................................................................... 27

     B.    Exchanges of Competitive Sensitive Information ...................................... 28

          1.    Use of Exchanged Competitively Sensitive Information ................. 40

     C.    The Producer Defendants Used the ISC and Other Forums to
          Collude ................................................................................................. 43

     D.    Use of Formulas to Set Sugar Prices .................................................... 45

E.  Governmental Guidelines Prohibit Defendants' Conduct..........................45

    1.  Information Sharing as Evidence of a Conspiracy or as a Stand-Alone Antitrust Violation....................................................45

    2.  Joint Use of Formulas to Fix Prices. ................................53

F.  Sugar Prices Increased More Than They Would in a Competitive Market ...........................................................................53

G.  The Structure and Characteristics of the Production and Sale of Granulated Sugar, Together with Other Factors, Render the Conspiracy Economically Plausible............................................60

H.  The USDA Sugar Program Does Not Render the Alleged Conspiracy Implausible ......................................................................63

    1.  Price Support Loans. ........................................................64

    2.  Marketing Allotments. .....................................................65

    3.  Import Quotas on Raw Sugar. ...........................................66

    4.  Feedstock Flexibility Program ..........................................67

A.  There Is a Long History of Anticompetitive Conduct in the Sugar Industry..........................................................................67

VI.  ANTITRUST INJURY AND DAMAGES TO THE CLASS ..............................70

VII.  CLASS ALLEGATIONS.......................................................................72

VIII.  EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT...................76

IX.  CLAIMS FOR RELIEF.........................................................................79

X.  PRAYER FOR RELIEF.........................................................................97

XI.  DEMAND FOR JURY TRIAL.................................................................99

Plaintiffs Union LLC d/b/a Union Hospitality Group; Piala LLC; Pattibakes LLC; WNT, LLC; WNT Farmington, LLC; The Union Public House, LLC; Natile Inc. d/b/a Alpine View Family Restaurant; Portland Hunt-Alpine Club, LLC; Red Star Diner, Inc.; Morelos Bakery LLC; Up at 4, Inc. d/b/a Great Harvest Bread Co.; Gladys' Restaurant, LLC d/b/a Gladys'; SAM Restaurants, Inc. d/b/a Carolina's Diner; BW-SS Inc.; King Kullen Grocery Co.; PCA Too, LLC d/b/a Sugar Bakeshop; and The Coffee Bean LLC (collectively "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class," or "Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves, and upon information and belief as to all other matters, bring this consolidated class action for violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), state antitrust and consumer protection laws, and common law unjust enrichment, against Defendants ASR Group International, Inc. ("ASR Group"); American Sugar Refining, Inc. ("ASR"); Domino Foods, Inc. ("Domino," and, together with ASR Group and ASR, referred to herein as "ASR/Domino"); United Sugar Producers & Refiners f/k/a United Sugars Corporation ("United"); Michigan Sugar Company ("Michigan Sugar"); Imperial Sugar Co. n/k/a United States Sugar Savannah Refinery, LLC ("Imperial" or "U.S. Sugar Savannah"), and Louis Dreyfus Company LLC ("Louis Dreyfus") (collectively, "Producer Defendants"); Commodity Information, Inc. ("Commodity"); and Richard Wistisen ("Wistisen"), (collectively, along with the Producer Defendants, referred to herein as "Defendants"). Plaintiffs seek treble damages, injunctive relief, and other remedies pursuant to federal and state laws and demand a trial by jury on all matters so triable.

1

## I.    NATURE OF THE ACTION

1.      This lawsuit arises from Defendants' unlawful agreement to fix prices for "Granulated Sugar," as defined below, in the United States. The Producer Defendants are among the largest producers and sellers of Granulated Sugar in the United States and are direct competitors.

2.      At least as early as January 1, 2019, Defendants and their co-conspirators conspired to artificially inflate the price of Granulated Sugar in the United States and its territories in violation of applicable federal and state laws. Among the victims of the conspiracy are commercial indirect purchasers of Granulated Sugar produced and sold by the Producer Defendants, including restaurants, bakeries, coffee shops, and confectionaries.

3.      In order to implement the price-fixing conspiracy, the Producer Defendants purposefully exchanged competitively sensitive information with one another through Commodity and Wistisen, which knowingly acted as an intermediary. According to the United States Department of Justice ("DOJ"), the sharing of competitively sensitive information among horizontal competitors "support[s] an inference that a price-fixing or output-restriction agreement exists," and "is itself a form of concerted action that can violate the antitrust laws."[1] The way the Producer Defendants willfully exchanged competitively sensitive information bears all the hallmarks of a price-fixing scheme.

---

[1] *Amicus* Brief filed by the DOJ in *In re Pork Antitrust Litig.*, No. 0:18-cv-01776-JRT-GFD (D. Minn.) ("*Pork*"), ECF No. 2616 ("DOJ Pork Amicus") at 5-6.

4.      First, Commodity provided the Producer Defendants access to a clearinghouse of nearly real-time information, including current *and* forward-looking, non-anonymized competitor data.

5.      The information shared by Producer Defendants, through Commodity, included specific information about profits, prices, costs, production levels, and sold positions,[2]—all of which are key metrics for price-setting and monitoring and contain highly sensitive information that true competitors would be expected to carefully guard in the absence of an agreement.

6.      Furthermore, the information gathered and disseminated through Commodity was made available only to subscribing sugar producers, including Producer Defendants, and was unavailable to the public or sugar purchasers.

7.      In short, the Producer Defendants, through Commodity, engaged in a "give to get" scheme, whereby they provided one another with mutual information used to set their prices and reciprocal assurances that they would provide such competitively sensitive information so long as their competitors also did the same.

8.      Not only is it contrary to the Producer Defendants' economic self-interest to share commercially sensitive information with their horizontal competitors, but the ubiquitous nature of the information exchange serves as an important monitoring and enforcement mechanism for the price-fixing scheme alleged herein.

---

[2] A sold position is the percentage of a seller's supply of Granulated Sugar that has been sold. As a seller's sold position increases, that seller will generally raise prices. The sold position thus provides important information about the extent to which a supplier will or will not be aggressive on price going forward.

3

9.    The Producer Defendants also had opportunities to collude through annual meetings of the International Sweeteners Colloquium ("ISC"), which their representatives attended, and where contract prices with customers were negotiated.

10.    Defendants were able to successfully implement their conspiracy because the Granulated Sugar industry is structurally susceptible to collusion. In fact, for more than 80 years, the industry has been marked by repeated violations of the antitrust laws, including conduct remarkably similar to that alleged here.

11.    As a result of Defendants' conspiracy, Granulated Sugar prices reached all-time highs during the Class Period. In fact, shortly after United retained Commodity's services in 2019, Granulated Sugar prices experienced one of the steepest climbs ever.

12.    Defendants' actions resulted in Plaintiffs and members of the Class or Classes paying supracompetitive prices for Granulated Sugar in the United States and its territories. Defendants' anticompetitive conduct, described further herein, violates Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) as well as numerous state laws.[3]

## II.    JURISDICTION AND VENUE

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), as this action arises under Sections 1 and 3 of the Sherman

---

[3] As noted above, in its *amicus* brief filed in the *Pork* case, the DOJ explained that information sharing is "itself a form of concerted action that can violate the antitrust laws." Such conduct, standing alone, is subject to a Rule of Reason analysis. Accordingly, Plaintiffs include this alternative cause of action against all Defendants, as set forth below.

Act (15 U.S.C. §§ 1, 3), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26). This Court also has jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the Defendants.

14.    Venue is proper under Section 12 of the Clayton Act (15 U.S.C. § 22), and under 28 U.S.C. § 1391(b) and (c), because Defendants transacted business in this District during the relevant time period and a substantial part of the events giving rise to Plaintiffs' claims, including sales of Granulated Sugar, occurred in this District.

15.    Furthermore, a substantial portion of the growing and refining of sugar beets takes place in Minnesota.[4]

16.    This Court has personal jurisdiction over Defendants because, among other things, they either: (1) transact business throughout the United States, including this District; (2) have substantial contacts within the United States, including in this District, and/or (3) are engaged in an illegal anticompetitive scheme that was directed at, and had the intended effect of causing injury to, persons residing in, located in, and doing business in the United States, including in this District.

17.    During the Class Period, the Producer Defendants sold and shipped Granulated Sugar in a continuous and uninterrupted flow of interstate commerce, which included sales and shipments to or from this District. Defendants' conduct had a direct,

---

[4] *Where Does Sugar Come From*?  The Sugar Association (last visited December 5, 2024), available at: https://www.sugar.org/sugar/farm-to-table/.

substantial, and reasonably foreseeable effect on interstate commerce in the United States, including this District.

### III.    PARTIES

#### A.    **Plaintiffs**

18.    Plaintiff Union LLC d/b/a Union Hospitality Group ("Union LLC") is an Arizona limited liability company with its principal place of business located in Tucson, Arizona. Plaintiff Union LLC purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period.  Union LLC therefore suffered antitrust injury as a result of the unlawful conduct alleged in this Complaint.

19.    Plaintiff Piala LLC ("Piala") is a California limited liability company with its principal place of business located in Sebastopol, California. Piala operates a Georgian restaurant in Sebastopol, California. Plaintiff Piala purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period.  Piala therefore suffered antitrust injury as a result of the unlawful conduct alleged in this Complaint.

20.    Plaintiff Pattibakes LLC ("Pattibakes") is a California limited liability company with its principal place of business located in Solvang, California. Plaintiff Pattibakes purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period.  Pattibakes therefore suffered antitrust injury as a result of the unlawful conduct alleged in this Complaint.

21.     Plaintiff WNT, LLC ("WNT Hartford") is a Connecticut limited liability company with its principal place of business located in Hartford, Connecticut. Plaintiff WNT Hartford purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period.  WNT Hartford therefore suffered antitrust injury as a result of the unlawful conduct alleged in this Complaint.

22.     Plaintiff WNT Farmington, LLC ("WNT Farmington") is a Connecticut limited liability company with its principal place of business located in Farmington, Connecticut. Plaintiff WNT Farmington purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period.  WNT Farmington therefore suffered antitrust injury as a result of the unlawful conduct alleged in this Complaint.

23.     Plaintiff The Union Public House, LLC ("Union Public House") is a Florida limited liability company with its principal place of business located in Pensacola, Florida. Plaintiff Union Public House purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period.  Union Public House therefore suffered antitrust injury as a result of the unlawful conduct alleged in this Complaint.

24.     Plaintiff Natile Inc. d/b/a Alpine View Family Restaurant ("Natile") is an Illinois corporation with its principal place of business located in Rockford, Illinois. Plaintiff Natile purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period.  Natile therefore suffered antitrust injury as a result of the unlawful conduct alleged in this Complaint.

25.    Plaintiff Portland Hunt-Alpine Club, LLC ("Portland Hunt") is a Maine limited liability company with its principal place of business located in Portland, Maine. Plaintiff Portland Hunt purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period. Portland Hunt therefore suffered antitrust injury as a result of the unlawful conduct alleged in this Complaint.

26.    Plaintiff Red Star Diner, Inc. ("Red Star") is a Michigan corporation with its principal place of business located in Temperance, Michigan. Plaintiff Red Star purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period. Red Star therefore suffered antitrust injury as a result of the unlawful conduct alleged in this Complaint.

27.    Plaintiff Morelos Bakery LLC ("Morelos Bakery") is a Minnesota limited liability company with its principal place of business located in Saint Paul, Minnesota. Plaintiff Morelos Bakery purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period. Morelos Bakery therefore suffered antitrust injury as a result of the unlawful conduct alleged in this Complaint.

28.    Plaintiff Up at 4, Inc. d/b/a Great Harvest Bread Company ("Up at 4") is a Minnesota corporation with its principal place of business located in Duluth, Minnesota. Plaintiff Up at 4 purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period. Up at 4 therefore suffered antitrust injury as a result of the unlawful conduct alleged in this Complaint.

29.     Plaintiff Gladys' Restaurant, LLC d/b/a Gladys' ("Gladys'") is a Mississippi limited liability company with its principal place of business located in Lexington, Mississippi. Plaintiff Gladys' purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period.   Gladys' therefore suffered antitrust injury as a result of the unlawful conduct alleged in this Complaint.

30.     Plaintiff SAM Restaurants, Inc. d/b/a Carolina's Diner ("SAM Restaurants") is a North Carolina corporation with its principal place of business located in Greensboro, North Carolina. Plaintiff SAM Restaurants purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period. SAM Restaurants therefore suffered antitrust injury as a result of the unlawful conduct alleged in this Complaint.

31.     Plaintiff BW-SS, Inc. ("BW-SS") is a North Dakota corporation with its principal place of business located in Mandan, North Dakota. Plaintiff BW-SS purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period.   BW-SS therefore suffered antitrust injury as a result of the unlawful conduct alleged in this Complaint.

32.     Plaintiff King Kullen Grocery Co., Inc. ("King Kullen") is a New York domestic business corporation with its principal place of business located in Hauppauge, New York. Plaintiff King Kullen purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period.   King Kullen

9

therefore suffered antitrust injury as a result of the unlawful conduct alleged in this Complaint.

33.     Plaintiff PCA Too, LLC d/b/a Sugar Bakeshop ("PCA Too") is a South Carolina limited liability company with its principal place of business located in Charleston, South Carolina. Plaintiff PCA Too purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period. PCA Too therefore suffered antitrust injury as a result of the unlawful conduct alleged in this Complaint.

34.     Plaintiff The Coffee Bean LLC ("Coffee Bean") is a Wisconsin limited liability company with its principal place of business located in Milwaukee, Wisconsin. Plaintiff Coffee Bean purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period.  Coffee Bean therefore suffered antitrust injury as a result of the unlawful conduct alleged in this Complaint.

### B.    **Defendants**

#### 1.    **ASR/Domino Corporate Family**

35.     Defendant ASR Group is a privately held Florida corporation with its principal place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida 33401. ASR Group is a global producer and seller of Granulated Sugar. ASR Group owns six sugar refineries in North America, including four in the United States: Yonkers, New York; Baltimore, Maryland; Chalmette, Louisiana; and Crockett, California. ASR Group asserts that it is "the world's largest refiner and marketer of cane sugar[;] we sell our

branded products and service our customers in key channels, including grocery, industrial, food service and specialty."[5] ASR Group is a subsidiary of the Florida Crystals Corporation and Sugar Cane Growers Cooperative of Florida, business enterprises of the global sugar empire Fanjul Corp. ASR Group owns, as a subsidiary, Co-Defendant Domino as well as one of Domino's American competitors, C&H (Canadian & Hawaiian) Sugar. ASR Group is vertically integrated and owns sugar processing, marketing, and sales companies in Canada, the United Kingdom, Portugal, Mexico, and Belize.

36.     Defendant ASR is a privately held Florida corporation and global producer, and seller of Granulated Sugar based in West Palm Beach, Florida.

37.     Defendant Domino is a Florida corporation with its primary place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida 33401. Domino is a subsidiary of ASR's and ASR Group's Granulated Sugar business and is a global producer and seller of Granulated Sugar. Domino is ASR Group's and ASR's marketing and sales subsidiary for Granulated Sugar.

38.     ASR/Domino operates cane refineries in Crockett, California; Chalmette, Louisiana; Baltimore, Maryland; and Yonkers, New York.

### 2.    United Corporate Family

39.     Defendant United, a Minnesota corporation, is a marketing cooperative based in Edina, Minnesota. United has four member-owners: (1) United States Sugar Corporation

---

[5] ASR Group, *About Us*, https://asr-group.com/about-us (last visited Dec. 8, 2024) and ASR Group, *Sweetness is Our Main Ingredient*, https://asr-group.com/ (last visited Dec. 8, 2024).

("United States Sugar"), which owns and operates a cane mill and cane refinery in Clewiston, Florida; (2) American Crystal Sugar Company; (3) Minn-Dak Farmers Cooperative; and (4) Wyoming Sugar Company, LLC all of which grow and process sugar beets at eight production facilities located in Minnesota, Montana, North Dakota, and Wyoming. United sells sugar under the United and Crystal Sugar brands, as well as the Imperial and Dixie Crystals brands, which were formerly Imperial brands before Imperial was acquired by United. It also sells sugar sold under various store brands.

40.     United touts that "[b]ecause United has a unique, fully integrated business structure, we provide and transport sugar throughout the nation. We have 9 sugar producing plants, primarily in the Red River Valley along the border of North Dakota and Minnesota. We also produce beet sugar in Montana and Wyoming, as well as cane sugar in the Florida Everglades."[6]

41.     United approaches the market as a unified competitor, marketing and selling all the Granulated Sugar produced by its member-owners. United handles locating customers, negotiating sales contracts, and arranging all logistics. United also sets the prices for all the products it markets and sells on its members' behalf.

42.     Imperial Sugar Co. n/k/a United States Sugar Savannah Refinery, LLC ("Imperial" or "U.S. Sugar Savannah") is a Delaware company based in Georgia. On November 30, 2022, U.S. Sugar Savannah completed its acquisition of Imperial from Louis Dreyfus. U.S. Sugar Savannah is wholly owned by United States Sugar. U.S. Sugar

---

[6] United Sugar Producers and Refiners, *FAQS*, https://unitedsugarpr.com/faq/ (last visited Dec. 8, 2024).

Savannah holds the trademarks to "Imperial Sugar," and "Imperial Sugar" customers are directed by the "Imperial Sugar" website to contact U.S. Sugar Savannah for customer service.

43.    U.S. Sugar Savannah, which is wholly-owned and controlled by U.S. Sugar, is a mere continuation of Imperial. Upon the purchase of Imperial Sugar Co. from Louis Dreyfus, all former Imperial Sugar employees continued as U.S. Sugar Savannah employees; all contractual obligations of Imperial were assumed; nothing changed ongoing execution of supply contracts with customers; and customer service representatives and sales contacts remained the same. Payments were directed to the same bank account, with the name of the account changing to U.S. Sugar Savannah.

44.    Prior to its sale to U.S. Sugar Savannah and during the Class Period, Imperial's corporate offices were located in Sugar Land, Texas.  Imperial produces refined sugar in the United States.  Imperial has a cane sugar refinery in Savannah, Georgia, and an intermediate sugar transfer and liquification facility in Ludlow, Kentucky.

45.    Defendants United and Imperial are sometimes collectively referred to herein as United on or after November 30, 2022.

### 3.    Louis Dreyfus

46.    Defendant Louis Dreyfus is a Delaware corporation with its principal place of business in Wilton, Connecticut. It is a worldwide leader in sugar trading and merchandising. In 2012, Louis Dreyfus acquired Imperial Sugar Company ("Imperial"). Imperial, with headquarters in Sugar Land, Texas, produces refined sugar, including Granulated Sugar, in the United States and independently markets and sells its refined

sugar products. Imperial has a cane sugar refinery in Savannah, Georgia and an intermediate sugar transfer and liquification facility in Ludlow, Kentucky. On November 30, 2022, Louis Dreyfus completed the sale of Imperial to U.S. Sugar Savannah.

47.     Louis Dreyfus and Imperial are sometimes collectively referred to herein as Louis Dreyfus on or before November 30, 2022.

### 4.     Michigan Sugar Corporate Family

48.     Defendant Michigan Sugar is a Michigan corporation with its primary place of business at 122 Uptown Drive, Suite 300, Bay City, Michigan 48708. Michigan Sugar is a cooperative consisting of 900 sugar beet grower-owners, and is a global producer and seller of Granulated Sugar under the brand names Pioneer Sugar and Big Chief Sugar. Michigan Sugar owns and operates sugar beet processing facilities in Bay City, Caro, Croswell, and Sebewaing, Michigan. Additionally, Michigan Sugar owns a production facility in Toledo, Ohio, and an agricultural research center in Bay County, Michigan.

### 5.     Commodity

49.     Defendant Commodity is a Delaware corporation with its principal place of business at 560 South State Street, Suite E-2, Orem, Utah 84058. Commodity is believed to be inactive or defunct. Commodity has no public presence. It does not maintain a website on the internet. It does not advertise its services to the public. It does not and did not publish publicly available reports on the sugar industry or offer to sell or provide any reports on or analysis of the sugar industry to other than a select few, as alleged herein. During the Class Period, Commodity facilitated exchanges of commercially sensitive information among the Producer Defendants of detailed, non-public information regarding, among other

14

things, prices, capacity, demand, sales volume, and other key production and pricing metrics in furtherance of the conspiracy. During the Class Period, the Producer Defendants utilized Commodity to implement, monitor, and/or enforce the conspiracy and the exchange of confidential, proprietary, and competitively sensitive non-public information.

### 6.    Richard Wistisen

50.    Defendant Wistisen is the principal of Commodity who, as part of Defendants' unlawful agreement, collected and shared confidential, proprietary, and competitively sensitive non-public information between and among the Producer Defendants.

### C.    Agents and Co-Conspirators

51.    Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs, and for whom they are liable.

52.    The term "Defendants" as used in this Consolidated Complaint refers to and encompasses each Defendant and its successors, parent companies, subsidiaries, affiliates, employees, agents, officers, and directors.

53.    Various persons and entities that are not named as Defendants participated as co-conspirators in the violations alleged herein and performed acts in furtherance thereof. These other entities have facilitated, adhered to, participated in, aided and abetted, and otherwise acted in concert with Defendants in order to advance the objectives of the

scheme to benefit Defendants and themselves by artificially inflating the prices of Granulated Sugar. Plaintiffs reserve the right to name some or all of these entities as Defendants. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

### IV.    FACTUAL ALLEGATIONS

#### A.    The Domestic Granulated Sugar Market and Its Commercial Development

54.    "Granulated Sugar," also known as "white" or "table" sugar, refers to sugar that is extracted from sugar cane or sugar beets and ground to a uniform size.[7] Granulated Sugar is considered the gold standard of sweeteners with a clean, pleasant sweetness and no secondary taste or aftertaste. Granulated Sugar is the most common sweetener used in home food preparation and cookbooks and consumers tend to dislike any sugar substitute that does not match its sweetness profile. In 2020, the average American consumed 40 pounds of refined sugar.

55.    The sugar supply chain starts from the farmers that grow sugarcane or sugar beets, the two main sources of granulated sugar.

56.    After harvest, sugar beets are processed and refined at a single facility, while sugarcane is processed into raw cane sugar at one facility, and then further refined at another facility. Depending on the specific steps taken, different forms of refined sugar such as granulated sugar can be produced. Then, the refined sugar is packaged and

---

[7] Tracie Abram, *Sugars defined*, MICHIGAN STATE UNIVERSITY, https://www.canr.msu.edu/news/sugars_defined (April 30, 2014).

distributed to wholesalers, who sell the product to retailers or restaurants, and retailers sell the product to consumers.

57.     Granulated Sugar is made by extracting juice from the sugar cane or sugar beet, processing the juice to remove impurities and to concentrate it into a thick syrup, boiling it until sugar crystals form, separating the sugar crystals from the syrup in a centrifuge, drying the sugar crystals with hot air, and grinding them to uniform size.

58.     While Granulated Sugar derived from sugar cane is chemically indistinguishable from Granulated Sugar derived from sugar beets, their manufacturing processes are slightly different. Sugar cane is first processed into "raw sugar" and subsequently shipped to a refinery to be further processed into Granulated Sugar by washing and further removing remaining molasses and other non-sugar components. Sugar beets, on the other hand, are typically processed in a single facility where they are converted directly into Granulated Sugar. Sugar manufactured and refined through this process can be ground into powder or sold as liquid; however, Granulated Sugar accounts for approximately 80% of all refined sugar sold.

59.     Sugar cane and sugar beets are also grown in different climates. Sugar cane grows in semi-tropical or tropical climates. Thus, in the United States, sugar cane is produced in Florida and the Southern areas of Louisiana and Texas. Sugar beets are sturdier crops that are able to grow in rotation with other crops and are grown in four primary regions encompassing the Great Lakes (Michigan), Upper Midwest (Minnesota and North Dakota), Great Plains (Colorado, Montana, Nebraska, and Wyoming), and Far West (Northern California, Idaho, Oregon, and Washington).

60.    Granulated Sugar is manufactured and sold to direct purchasers that in turn resell, consume, or further refine it into other types of sugar products.

61.    Granulated Sugar is a staple food commonly used by commercial, industrial, and institutional users such as bakeries, restaurants, confectionaries, and food manufacturers, as well as consumers as an ingredient in baking, cooking, and sweetening foods and drinks. Commercial, industrial, and institutional users (*i.e.*, the proposed class of Commercial Indirect Purchasers) purchase the Producer Defendants' Granulated Sugar through direct purchaser intermediaries such as wholesalers, food service distributors, or grocery retailers. The Commercial Indirect Purchaser distribution channel is depicted in Figure 1 below.

**Figure 1**



62.    Granulated Sugar is used in some industrial processes, such as the production of medications (as a bulking agent and a binder in tablets like lozenges),[8] bioplastics,[9] biofuels (sugar-based ethanol), and co-generation of electricity (cane bagasse).[10] According to one global estimate, however, only 25% of refined sugar is used for such purposes, while 75% is used for food products.[11]

63.    Considering the ubiquity of its use in foods, beverages, and other applications, the global sugar industry is massive. In 2023, the global industrial sugar market was $39.59 billion and is projected to grow from $40.63 billion in 2024 to $50.76 billion by 2032.[12] A study conducted by Texas A&M University found that sugar

---

[8] Ben Eastick, *SUGARTalk Industrial Insight*, RAGUS, https://www.ragus.co.uk/how-is-sugar-used-in-the-pharmaceutical-industry/ (Nov. 23, 2023).

[9] John McKenna, *Scientists have made biodegradable plastic from sugar and carbon dioxide*, WORLD ECONOMIC FORUM, https://www.weforum.org/agenda/2017/10/scientists-have-made-biodegradable-plastic-from-sugar-and-carbon-dioxide/ (Oct. 4, 2017).

[10] Int'l Sugar Organization, *About Sugar*, https://www.isosugar.org/sugarsector/sugar (last visited Dec. 8, 2024).

[11] Ceres, *Sugarcane: An Investor Brief on Impacts that Drive Business Risks* (Mar. 22, 2017), https://www.ceres.org/resources/reports/sugarcane-an-investor-brief-on-impacts-that-drive-business-risks#:~:text=Producing%20sugarcane%20places%20significant%20pressure,countries%20present%20a%20business%20risk.

[12] Food Processing & Processed Food Research Report, *Industrial Sugar Market Size, Share & Industry Analysis, By Source (Cane Sugar and Beet Sugar), Type (White Sugar, Brown Sugar, and Liquid Sugar), End Use (Beverages, Confectionary, Bakery Products, Dairy Products and Other Food Applications), and Regional Forecast, 2024-2032*, FORTUNE BUSINESS INSIGHTS (Nov. 18, 2024), https://www.fortunebusinessinsights.com/industrial-sugar-market-102462.

production in the United States has an annual economic impact, including direct sales, indirect sales, and end user sales, of more than $23 billion.[13]

64.    Granulated Sugar is a commodity product with little or no product differentiation between producers.

65.    Options and futures for sugar products are traded as commodity futures contracts on the Chicago Mercantile Exchange ("CME") and the Intercontinental Exchange, Inc. ("ICE").

66.    Futures contracts for domestic sugar (known as Number 16 sugar) are traded on ICE as "White Sugar" under the symbol "W" alongside other commodity products such as wheat, crude oil, and gold.[14] It is used "as the global benchmark for the pricing of physical white sugar.  It is actively traded by the international sugar trade, sugar millers, refiners, and end-users (manufacturers) as well as by managed funds and both institutional and short-term investors."[15]

67.    Typically, when a product is characterized as a commodity, competition is based principally on price as opposed to other attributes, such as product quality or customer service. The commodity nature of Granulated Sugar helps to facilitate cartel behavior.

---

[13] Bart L. Fischer *et al.*, *Economic Impact of the U.S. Sugar Industry*, at 8, 9, AGRICULTURAL AND FOOD POLICY CENTER (June 2022), https://sugaralliance.org/wp-content/uploads/2022/06/Sugar-Report.pdf.

[14]ICE, *Products – Futures & Options*, https://www.ice.com/products/Futures-Options/Agriculture (last visited Nov. 12, 2024).

[15]  Product Spec, *White Sugar Futures*, ICE (last visited May 20, 2024), available at: https://www.ice.com/products/37089080/White-Sugar-Futures.

68.    Due to the lack of product differentiation, the Producer Defendants are forced to compete on price such that the pricing decisions of each Granulated Sugar producer impact the market price for Granulated Sugar.

69.    The domestic market for Granulated Sugar saw significant consolidation in recent years, further helping to facilitate cartel conduct. For instance, in 2019, United sought to acquire competitor Imperial Sugar. Subsequently, U.S. Sugar, one of the four member-owners of United, entered into an asset purchase agreement whereby U.S. Sugar would acquire Imperial, and United would market and sell all of the refined sugar produced by Imperial. In 2021, the DOJ sued to block the proposed merger, arguing that the acquisition would leave the "overwhelming majority of refined sugar sales across the Southeast in the hands of only two producers leading to higher prices for purchasers." The merger was nonetheless finalized later that year. United now boasts that it currently supplies approximately one quarter of total United States sugar demand.[16]

70.    Similarly, ASR, along with the Sugar Cane Growers Cooperative of Florida, acquired Defendant Domino in 2001.[17] In 2005, ASR Group purchased domestic competitor C&H Sugar Company, and in 2007, it acquired Jack Frost (National Sugar Company), and Redpath Sugar (part of Tate & Lyle's Canadian sugar business).[18] In 2010,

---

[16]  United Sugar Producers & Refiners, *Who We Are*, https://unitedsugarpr.com/whowe-are/our-members/ (last visited Dec. 8, 2024).

[17]  ASR Group, *History Timeline*, https://prd.asr-group.com/history-timeline (last visited Dec. 8, 2024).

[18]  *Id. See also* PR Newswire, *American Sugar Refining Completes Purchase of Tate & Lyle Sugars* (Sep. 30, 2010), https://www.prnewswire.com/news-releases/american-sugar-refining-completes-purchase-of-tate--lyle-sugars-104075823.html.

ASR completed its takeover of Tate & Lyle's sugar business by acquiring their refineries in London and Lisbon.[19]

71.    Michigan Sugar also is a product of consolidation in the industry. In 2004, Michigan Sugar Company purchased Monitor Sugar Company.[20] Later, in 2016, Michigan Sugar purchased Michigan-based cane sugar refiner and manufacturer AmCane Sugar LLC, an acquisition that Michigan Sugar stated would increase its sugar sales volumes by nearly 15%.[21]

72.    During the Class Period, the Producer Defendants and their co-conspirators collectively controlled a large majority of the domestic market for Granulated Sugar. As of 2021, just three of the Producer Defendants (United, ASR/Domino, and Michigan Sugar) accounted for nearly 70% of the domestic Granulated Sugar market. Domino and United alone accounted for 50% of total Granulated Sugar sales in the United States in 2021. The Producer Defendants acknowledge their dominant position. For instance, upon hearing the announcement of Imperial Sugar's acquisition by United, one Producer Defendant noted that "they view this as 1 less competitor and now 3 companies account for 75% of the market."

---

[19]  PR Newswire, *American Sugar Refining Completes Purchase of Tate & Lyle Sugars* (Sep. 30, 2010), https://www.prnewswire.com/news-releases/american-sugar-refining-completes-purchase-of-tate--lyle-sugars-104075823.html.

[20]  Michigan Sugar Company, *History*, https://www.michigansugar.com/about-us/history/ (last visited Dec. 8, 2024).

[21] Farm Progress, *Michigan Farmer, Michigan Sugar Company acquires assets of AmCane Sugar LLC*, https://www.farmprogress.com/farm-business/michigan-sugar-company-acquires-assets-of-amcane-sugar-llc (last visited Dec. 8, 2024).

73.    The 2024 estimated market share of each Producer Defendant by capacity is shown in Figure 2 below[22]:

**Figure 2**

| Marketing Entity | Refining Entity | Capacity (cwt) | % Share |
|---|---|---|---|
| Domino Foods, Inc. | American Sugar Refining, Inc. | | |
| | Chalmette, LA | 20,500,000 | |
| | Baltimore, MD | 16,500,000 | |
| | Crockett. CA | 17,000,000 | |
| | Yonkers, NY | 12,250,000 | |
| | Florida Crystals Corp. - South Bay, FL | 6,600,000 | |
| | Total | 72,850,000 | 30% |
| United Sugar Cooperative | American Crystal Sugar Co. | 40,000,000 | |
| | U.S. Sugar Corp. – Clewiston, FL | 18,000,000 | |
| | U.S. Sugar Savannah Refinery - Savannah, GA | 18,600,000 | |
| | Minn-Dak Farmers Co-op – Wahpeton, ND | 9,600,000 | |
| | Wyoming Sugar Co. - Worland, WY | 1,100,000 | |
| | Total | 87,300,000 | 36% |
| National Sugar Marketing LLC | Amalgamated Sugar Co. | | |
| | Snake River Sugar Co. | 23,500,000 | |
| | Southern Minnesota Beet Sugar Cooperative | | |
| | Renville, MN | 10,100,000 | |
| | Brawley, CA | 3,350,000 | |
| | Total | 36,950,000 | 15% |
| Cargill, Inc. | Louisiana Sugar Refining LLC - Gramercy, LA | 20,000,000 | 8% |
| Michigan Sugar Co. | Michigan Sugar Co. | 14,500,000 | 6% |
| Western Sugar Cooperative | Western Sugar Cooperative | 12,000,000 | 5% |
| Grand Total | | 243,600,000 | |

74.    The total market share of the Producer Defendants is approximately 72%.

**B.    Summary Overview of Defendants' Agreement to Artificially Raise, Fix, Maintain, or Stabilize Prices of Domestic Granulated Sugar**

75.    Since at least January 1, 2019, the Producer Defendants agreed, combined, or conspired to artificially raise, fix, maintain, or stabilize prices of domestic Granulated Sugar in the United States. To facilitate their unlawful contract, combination, or conspiracy, Producer Defendants knowingly engaged in the mutual and reciprocal sharing of accurate, competitively sensitive, non-public information regarding current pricing, crop size, crop yields, future beliefs on pricing, and recently-sold positions with each other, including through Commodity. This regular reciprocal information exchange has occurred

---

[22] https://iq.mckeany-flavell.com/wp-content/uploads/2024/01/projected-us-sugar-industry-capacity-2024-01.pdf (last visited Dec. 8, 2024).

for years. There is no economically rational reason for the Producer Defendants to share such information. In the absence of an agreement or understanding, sharing such information would pose a competitive risk to any individual Defendant. Instead, the information was shared for the purpose of enabling Defendants to artificially set prices and avoid competing with one another.

76.    The Producer Defendants used Commodity to facilitate the price-fixing conspiracy. During the Class Period Commodity purported to analyze the sugar industry but had no public presence. It did not maintain a website on the internet, advertise its services to the public, publish publicly available reports on the sugar industry, or offer to sell or provide any sugar industry reports or analyses to other than a select few, as alleged herein.  Moreover, Commodity did not gather information through voluntary surveys or periodic polling. Rather, the Producer Defendants regularly shared competitively sensitive information about their pricing and recently sold positions with Commodity, and Commodity in turn contemporaneously shared that competitively sensitive information with the other Producer Defendants. Importantly, Commodity did not aggregate or anonymize the competitively sensitive information it received from the Producer Defendants before circulating.

77.    Furthermore, Commodity did not share or offer to share this competitively sensitive information with the customers of the Producer Defendants or others in the Granulated Sugar supply chain, nor did it publicly publish the competitively sensitive information it obtained from and shared with the Producer Defendants or otherwise make

it available to consumers, thereby strengthening the advantage that the Producer Defendants gained by sharing information only with one another.

78.    The Producer Defendants understood that the information they provided to Commodity was competitively sensitive information that would not have been ordinarily disclosed to competitors. Sharing such competitively sensitive information would have been detrimental to their business interests were it not for the existence of a price-fixing conspiracy. The purpose of their sharing was to enable United, Michigan Sugar, and ASR/Domino to raise, fix, maintain, stabilize, or coordinate prices of Granulated Sugar in the United States and to destroy the independent centers of decision making the antitrust laws were designed to safeguard.

79.    Using the information exchanged through Commodity, the Producer Defendants ensured that they could enforce the conspiracy and not undercut each other's prices or cause prices to decrease as they would in a competitive market. The Producer Defendants learned of each other's current pricing, crop size, crop yields, future beliefs on pricing, and recently sold positions only because Commodity collected this competitively sensitive information from each of them and shared it collectively in furtherance of the conspiracy.

80.    The information voluntarily given to Commodity by each of the Producer Defendants included the companies' current pricing, future or forward pricing, pricing strategies, sold positions, spot prices, contract prices, crop yields, and crop size.

81.    Commodity provided this competitively sensitive information to all the Producer Defendants rapidly, often within hours of having received it. The Producer

Defendants then used the information received from Commodity when determining how to price their products.

82.    Commodity often shared inter-competitor, competitively sensitive information regarding the pricing and supply of Granulated Sugar sold to customers on the spot market (the market for immediate delivery or delivery within a short period). Sharing this competitively sensitive information had and has a direct effect on future Granulated Sugar pricing agreements with customers because a futures contract price is commonly determined using the spot price of the commodity as a baseline.

83.    The sharing of competitively sensitive information between the Producer Defendants thus enabled them to artificially raise, fix, maintain, or stabilize the prices at which Granulated Sugar was sold to their customers pursuant to their anticompetitive agreement. Knowing each other's sold positions allowed the Producer Defendants to be more aggressive with pricing.

84.    Due to United States Department of Agriculture ("USDA") production allotments linked to USDA loan programs and limitations on imports and tariffs, the Producer Defendants know that as they sell less Granulated Sugar, they can charge higher prices because there will be little to no additional competitive product available in the market to place downward pressure on price. Thus, knowing their horizontal competitor's sold positions allows a given Producer Defendant to manipulate the available supply in the market, thereby permitting it to raise, fix, maintain, or stabilize prices.

85.     As market leaders, the Producer Defendants account for the majority of Granulated Sugar production and sales. As a result, smaller market participants are not an effective competitive constraint on Producing Defendants' dominance.

86.     The mutual, reciprocal exchange of pricing, crop size and yield, and sold position information by the Producer Defendants was intended to and did ensure higher prices for Granulated Sugar than would have existed in a competitive market unaffected by the Defendants' anticompetitive agreement.

87.     In addition to sharing competitively sensitive information through Commodity and Wistisen, Defendants participated in trade association meetings that provided opportunities to collude and agree to set price ranges based on the commodity spot prices for Number 16 sugar, as discussed further below.

88.     As also explained in further detail below, the anticompetitive conduct alleged here is consistent with past governmental lawsuits alleging violations of the antitrust laws by sugar producers.

## V.     THE ANTICOMPETITIVE CONDUCT AT ISSUE

### A.     Detailed Analysis of How Information Was Shared Through Commodity and Wistisen

89.     The Producer Defendants knowingly and intentionally sought, shared, received, and used non-public, competitively sensitive information collected and shared by Commodity through the direction of Wistisen pursuant to the alleged anticompetitive understanding alleged herein in order to raise, fix, maintain, or stabilize Granulated Sugar prices.

90.     United does not publish the company's current Granulated Sugar prices or its sold position, *i.e.,* the percentage of its crop that is booked for the current fiscal year.

91.     United's sold position was confidential, and its employees were to keep that information non-public. Nevertheless, United shared it with Commodity, knowing Commodity would pass the information along to ASR/Domino and Michigan Sugar.

92.     ASR/Domino has a written code of conduct, discussed further below, that includes an ethics policy preventing any ASR/Domino employee from talking about ASR/Domino's pricing with any representative of ASR/Domino's competitors. Despite this prohibition, ASR/Domino employees shared non-public, confidential, commercially sensitive pricing, sold position, and other information with Commodity knowing that Commodity would provide the information to other competitors.

93.     Commodity distributed information among all the Producer Defendants rapidly, often within hours of having received it. High-level executives at the Producer Defendants, who had direct involvement in pricing, shared their company's sensitive information with Wistisen.

94.     The pricing shared among United, Michigan Sugar, ASR/Domino, and Commodity included spot prices, contract prices, and sold positions. Current spot prices can also be turned into contract prices.

### B.     Exchanges of Competitive Sensitive Information

#### 2019

95.     As an example, a September 16, 2019 email communication to Mr. Wistisen from ASR/Domino's Vice President of Industrial Sales, Alan Henderson, disclosed

ASR/Domino's 2020 pricing and sold positions. Mr. Wistisen asked Mr. Henderson, "Wondering where you would put refined price and coverage?" Mr. Henderson responded "Pricing for FY20: Northeast - $38.50 bulk basis Gulf - $36.50 bulk basis West - $39.00 bulk basis Cane refiners should be close to 70 to 75% covered for FY20. The open business that does remain will be at higher prices."

96.     ASR/Domino disclosed this confidential information knowing it would be shared with its competitors, and in return, that it would get its competitors' confidential information. Mr. Wistisen responded that he would send crop and pricing updates in the next day or two, and noted, "The price updates I did receive today didn't have nearly the level of cane price increases you reported ... but I bet they're headed that way."

97.     Commodity was not the only conduit of information between the Producer Defendants during this time period. On November 15, 2019, Gerald Kramer of Kramer Brokerage Co. shared Domino Price Quotes with multiple Louis Dreyfus managers, and the inventory details: "[a]lso told that Domino still has sugar to sell." Jim Evans, National Sales Manager at Louis Dreyfus, expressed his appreciation: "This is very helpful!" Jeana Hines, Vice President Sales & Marketing at Imperial, in the same email chain, asked Gerald Kramer, "Have you heard anything on what Domino is doing with pricing for their grocery retail business?" Kramer responded, "Domino will not sell any 50# EFG below $24.00/50# fob refinery thru 2020 for end users and only thru 12/31/19 for distributors. If I get any info on retail business I will pass it on."

**2020**

98.     On January 8, 2020, Robert Sproull, Senior VP of Sales Marketing and Product Development at ASR/Domino, emailed Mr. Henderson ""it's really important we signal to the market that there's still going to be tightness," and "[w]e need to signal to the market that we're going to maintain price, especially for the Oct-Dec quarter. And there's not much to lose here. Pure price discovery."

99.     On March 3, 2020, Mr. Henderson sent an email regarding "Colloquium Recap" to Mr. Sproull, which contains a "summary of points from the International Sweetener Colloquium," including (i) "Belief is that LSR/Cargill will be short on raws in Aug/Sep." (ii) "Competitive Numbers" for fiscal year 2021 for certain competitors, including Cargill's future pricing of $37.50 gross FOB, "Michigan firm at $38.50 for 2021," "United took prices up from $36.50 FOB RRV pre colloquium to the trade and heard it from specific customers," Clewiston - $37.50 FOB bulk, "NSM — still offering sugar in FY20. Values close to 43.00/44.00 fob factory, 46.00/47.00 fob west coast transfer stations," "Imperial — 38.00/38.50 for CY 2021 on bulk EFG."

100.    The Producer Defendants provided accurate information to each other through Mr. Wistisen. ASR/Domino was typically "upfront" with the information it provided to Mr. Wistisen. In one example of such "upfront" information, Mr. Henderson disclosed to Mr. Wistisen in an August 2020 email pricing updates for ASR/Domino Granulated Sugar. On August 17, 2020, Mr. Wistisen wrote to Mr. Henderson, providing him with sugar market updates and asked: "Where would you put cane prices and coverage?" The next day, August 18, Mr. Henderson responded:

[...]
Quick Update:
Pricing:
Northeast - $39.00 to $40.00 BULK FOB
South - $37.50 to $37.75 Bulk FOB - fighting Cargill mainly
West - $39.50 to $40.00 Bulk FOB - values staying strong…
Cane gulf still fighting for share - but some talk of Cargill moving prices up to $37.50 gross FOB.
Coverage:
Beets - 70 to 75%
Cane - 50 to 55%

101.    Moreover, Mr. Wistisen told both United and ASR/Domino that he spoke with Michigan Sugar, and other sellers, and that the information he provided came directly from them. For example, Mr. Wistisen wrote to United that "Domino saying back up to $40.50 to $41," on one occasion, and on another, he wrote to Mr. Henderson that "the United [pricing and sold position] info I provided was direct from them this morning. They held a huddle yesterday (sounded like all sales reps/VP were present), and those numbers were the result." When discussing pricing, he stated that he did not have Michigan pricing yet, and "I hope to talk with them [Michigan] on Fri./Mon."

102.    Similarly, Mr. Wistisen shared Michigan Sugar's pricing and sold positions with United and ASR/Domino. In August 2020, he reported to Mr. Henderson at ASR/Domino, "My goodness, what a difference a month makes. Michigan 85+% booked." The next month, Mr. Wistisen reported, "Michigan holding forecasts unchanged, sugars nearing 16%, factories running well, stockpiling on Oct. 19th." He added with regard to pricing that Michigan was at "$38.5+, selective selling."

103.    Mr. Wistisen provided information on pricing and sold position to the Producer Defendants rapidly, often soon after having received it. On September 21, 2020,

Mr. Wistisen separately asked, within minutes, Mr. Henderson and Eric Speece, a Director of Strategic Accounts at United, if there was "anything new of interest on the pricing front?" They each responded with their company's respective pricing and sold positions. Mr. Speece shared, "We are firm at $36.50 (no change) and now $38.50 on cane (an increase of $0.50/cwt) and yes you heard correctly we are 90+% sold." In response, Commodity thanked United "for keeping the communication lines open!"

104.    On September 22, 2020, Mr. Henderson responded:

> Pricing (Cane)
> North and mid-Atlantic - $40.50 to 41.00 FOB - prices were
> lower past few weeks but have firmed up to these
> levels. No discounting at this time.
> Gulf - $38.50 fob
> West - $40.50 to $41.00 fob firm
> Note - higher levels for the Oct./Dec. 20 period as most cane
> and beet companies are well sold and/or filling
> past force majeure volume.
> I'm hearing most cane guys 70 to 75% booked with the
> exception of Cargill at 90% ??
> Beet prices below seem accurate and coverage at 90% I
> believe is about right.

105.    On September 22, 2020, less than three hours after receiving Mr. Henderson's response, Mr. Wistisen provided United and ASR/Domino with the information from each other in emails less than a minute apart. Mr. Wistisen told ASR/Domino that "U.S. Sugar recently increased to $38.50, so looks like range is $38.50 to $41, nice increase over last month.    Beet not much change from earlier indications, prices are $36.50 to $38.75, very little sugar available at low price, industry coverage 87%, all but NSM over 90+% booked." To United, Mr. Wistisen wrote, "ASR saying back up to $40.50 to $41. So now I have cane range at $38.50 to $41 Coverage . . . . ASR 5% below

32

that, and the other southern refiners up 10-15% from the average. . . . Waiting confirm from Michigan, but Midwest ranging from $36.50 to 38.75, very little available at low price (so I hear)."

106.    In yet another example, Mr. Wistisen emailed both Mr. Speece at United and Mr. Henderson at ASR/Domino within approximately 40 minutes of each other in mid-November 2020 asking "where would [they] put . . . . prices?" Both responded later that day with pricing information.

107.    The communications between Mr. Wistisen and United, Michigan Sugar, and ASR/Domino were candid and specific about pricing.  In a November 2020 email, ASR/Domino's Mr. Henderson emailed Mr. Wistisen, "Prices have firmed up again based on higher #16 values, beets close to sold out and less imports, tier 2 sugar available at this time. Near-by values back up to $46.00 FOB all locations. For calendar 2021: East/West - $42.00 fob[;] Gulf - $39.50 fob[;] Cane Coverage – 85-90%[.]" Mr. Wistisen responded by providing United's pricing to ASR/Domino.

108.    That same month, Mr. Wistisen emailed Domino/ASR asking for "[a]ny guidance [ASR/Domino] could give on how sub-30 cent No 16 prices makes sense?" Mr. Henderson at ASR/Domino and Mr. Wistisen exchanged messages regarding the "reason" Mr. Henderson had "heard," and Mr. Wistisen responded with real-time information from competitor United, "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50 based on demand, inventories, No. 16, and looking down the road and expecting another year of tight quotas in FY22. Selling FY21 firm, good activity, little to no competition from NSM or Western." Mr.

33

Henderson passed this along to Adam Whittaker at ASR/Domino, adding, "United is usually pretty upfront with [Wistisen]." Whittaker replied "Good timing. Just off the phone with Ron…United telling him they're at $36.50 for 2022 but very little activity for now [...] Ron also asking about raw prices [...]" Upon information and belief, Ron refers to Ron Sterk from Sosland Publishing, the publisher of the Sosland Sweetener Report.

109.    On November 16, 2020, Mr. Wistisen wrote to Henderson at ASR/Domino, asking: "Curious what you're hearing on domestic raw and Granulated pricing. I haven't heard back from United yet. Did they pullback from spot market? Where would you put prices and cane coverage?" Mr. Wistisen received his response from ASR/Domino later that day, which he conveyed to Domino, along with a note that he is "waiting to hear back from another of contacts."   This exchange is depicted in Figure 3 below, which was submitted by the DOJ as evidence in its suit to enjoin the United/Imperial merger.

**Figure 3**

110.    On the same day, November 16, 2020, Mr. Anderson updated Mr. Wistisen on ASR Pricing and inventory: "Prices have firmed up again based on higher # 16 values, beets close to sold out and less imports, tier 2 sugar available at this time. Near-by values back up to $46.00 FOB all locations.  For calendar 2021: East/West - $42.00 fob[;] Gulf - $39.50 fob [;] Cane Coverage - 85-90%[.]" On November 17, 2020, Mr. Wistisen responded ""So strange, I can't wrap my head around United's approach. They came up very short on production, and market has firmed, but they're still at $36.50 RRV and $38.50 Southeast?!?! But did say they'll probably be taking prices higher given strong sold position..."

**2021**

111.    On January 19, 2021, Mr. Wistisen wrote to United delivering several paragraphs of information on developments in the sugar industry. Near the end, he asked: "Has United put out a price range on FY22?" On January 20, Mr. Speece at United responded: "We have not yet set pricing for 2022, but we will soon."

112.    On February 15, 2021, Mr. Wistisen wrote to Mr. Speece at United: "Any action in FY22? Has United put a number on it yet? No word back from other processors/Refiners, I'll send along indications." Mr. Speece quickly responded: "We are still at the $36.50 and $38.50 with zero problems selling at those values. I do not anticipate any changes to our prices, but we have not formally decided. No action on 2022 just some small inquiries." Mr. Wistisen asked: "Just to clarify: United has not issued FY22 list prices, and at this point doesn't expect FY22 prices to change much from remainder

FY21?" On February 16, 2021, Mr. Speece answered: "Give me a ring and we can discuss."

113.    The next day, February 17, 2021, Mr. Wistisen wrote to ASR/Domino: "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50[.]"

114.    On March 25, 2021, in response to the news that "[i]mperial's sugar will be marketed by United," Adam Whittaker, Director at Domino Foods, remarked that, "It's going to be more important than ever to stay close to United. To the point where we might want to start thinking about ways to work with them (i.e., asking them for quotes [REDACTED]), on down the road. This is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry..."

115.    On April 29, 2021, Mr. Wistisen wrote to Mr. Henderson: "Where would you put price ranges and demand? I have spot $36.50 firm Midwest, $39.00 firm Michigan (but watching Baltimore progress, could creep higher), and east and west coasts now at $44.00. And forward I have quoting at $35.50-$36 Midwest, 37.50-38 Gulf, $42.00 Coasts," and provided pricing information.  In response to the inquiry, Henderson confirmed the accuracy of Wistisen's information: "I believe your pricing numbers below are very accurate," and provided additional pricing details: "FY21 are very firm with both coast at $43.50/$44.00 bulk FOB basis. We heard RRV folks are tight and holding at $36.50 fob. For FY22, RRV at $35.50 big volume, $36.00 smaller volume fob. For us, closer to $39.00 gulf, $38.50 Florida and $41.50 both coasts. Close to 30% coverage for FY22."

116.    On May 11, 2021, Mr. Wistisen wrote to ASR/Domino: "Are those higher spot prices, $43.50-44.00 holding up?" On May 12, 2021, Mr. Henderson responded: "All is good in Baltimore. Melt rates close to 90% of pre-fire levels. With that being said near-by prices are selling at $44.00 fob bulk basis. The $31.50 #16 is also pushing white pricing up."

117.    On May 17, 2021, Wistisen emailed to Anderson, requesting pricing and inventory information: "Have you bumped up FY22 prices yet on explosive gains in No. 16 prices… Where would you put refiner FY22 coverage?"

118.    Later on the same day, Henderson responded with ASR/Domino FY21 pricing: "FY21 prices – now at $45.00 FOB bulk basis east and west coast. Down in Florida and Gulf $44.00 FOB bulk basis. FY22 prices – $42.00 FOB bulk basis, $40.50 FOB bulk basis Florida and the Gulf. FY22 coverage – approximately 35 to 40%"

119.    On May 18, 2021, Mr. Wistisen wrote again to ASR/Domino: "Just talked with United: prices unchanged, spot and forward Hello!? But their head honcho is on vacation, bad timing Only about 40% covered. But expect big action over the next month, 20+% add to bookings, and at that time expect to raise prices, and not by just a dollar...Western limping along, NSM picking off business...They're still $36 spot and forward, 45-50% booked. NSM: ...I believe they're $36 Renville and $38 west, 45-55?% booked."

120.    On May 26, 2021, Henderson circulated an internal email, relaying pricing information from his conversation with Wistisen, "Not surprised at the $37.75 fob rail for Cargill. In talking with Jenkins and Rich Wistisen they believe Cargill is offering $2.00

above RRV beets for FY22. United - 35.75 fob RRV for many decent size accounts. Cargill

- 37.75 fob Gramercy for good rail volume."

121.    On June 17, 2021, Mr. Wistisen emailed Mr. Henderson an update on crops

and asked "What are you seeing on the price and demand side of things?" Mr. Wistisen

then explained:

> I'm just getting going on pricing, but have heard a bit:
> NSM: 35-36 net RRV, 37 net West. Claiming to be close to
> sold out at Brawley, 70%   Renville, but only 40% booked
> Amalgamated.
> United reportedly (I'll talk with them tomorrow) holding
> $36.50 gross, bigs are booking and getting discounts of about
> a   buck   or   less,   that's   less   than   last   season.
> Western supposedly (I'll talk with them tomorrow) increased
> prices   to   $36.50   net,   not   getting   many   takers.
> No talk on Michigan, yet. I hope to talk with them Fri/Mon.
> Cane: I'm hearing Cargill is really chasing prices lower, a few
> deals under $37 gross. And that Southeast has slipped below
> $38?
> But that ASR is holding firm on the coasts.")

122.    The next day, Mr. Henderson responded:

> [w]ord on the street [was] United moving up a $1.00 cwt since
> bookings now over 60%

He went on to share future prices for the 4th quarter of 2021:

> Cane prices firming up as #16 values rise.
> Oct.- Dec. 21
> East/West coasts ·- $44.00 gross fob bulk basis
> Gulf - $42.00 gross fob bulk basis
> Jan.- Dec. 22
> East/West - $42.00 gross bulk basis
> Gulf - $39. 75 gross fob bulk basis.

123.    On July 12, 2021, Mr. Wistisen reported to Henderson new pricing and

inventory details: "Michigan and Western 80+% [booked], and rumors suggest United is

also now around 80% booked and recently increased prices (I hope to have confirmation soon. Hearing NSM still a bit aggressive, at least into Texas.)" In the same email, Mr. Wistisen asked, "What's happening on the cane side of the fence? Sounds like you're now $48 spot, and Imperial $49. Where would you put forward pricing and coverage?"

124.    That same day, Mr. Henderson responded updating Mr. Wistisen on ASR/Domino's pricing details: "Our pricing for remainder of FY21 is $48.00 bulk basis all locations. With raws remaining high in the Oct./Dec. 21 period we are $46.00 fob bulk basis east/west and $44.00 gulf. For FY22 close to 65% booked and moving prices up. I haven't officially seen a United price increase but heard it's out there (+$2.00)." Additionally, on the same day, Henderson forwarded Wistisen's message to coworkers, saying, "FYI below…United price increase. Rich is thinking $2.00 increase but no official word yet. Let's see if we can hunt something down."

125.    On July 16, 2021, Mr. Wistisen wrote to ASR/Domino: "I don't understand it, but this is the word from United: 80-85% sold, will be at 90 very soon. Beet holding at $36.50 firm, and cane increased to $39.50 firm.  Any changes in ASR/Domino forward prices? I have you at $39.75 (gulf) and $42 (coasts)."  Later, Mr. Wistisen adds: "Well at least one group, your group, has their finger on the pulse of this market. The United info I provided was direct from them this morning. They held a big huddle yesterday (sounded like all sales reps/VP were present, and those numbers were the result."

126.    Later on July 16, 2021 Henderson updated Wistisen on ASR's pricing: "We are now $40.50 gulf, $43.00 fob east and west coast.

### 1.    Use of Exchanged Competitively Sensitive Information

127.    The Producer Defendants used the sensitive information they exchanged through Mr. Wistisen in furtherance of their anticompetitive agreement and used it to send messages to competitors about desired price levels. For example, Robert Sproull, Senior Vice President of Sales & Marketing at ASR Group, forwarded pricing information from Mr. Wistisen to others at ASR/Domino with a recommendation of what price ASR/Domino would have to offer to win a specific customer's business. In another example, United's Mr. Speece thought a competitor was selling at too low a price, so he told his colleagues that United "may want to communicate pricing earlier than the colloquium to send a message." Knowing a competitor's sold position was used to justify higher prices.

128.    ASR/Domino's Mr. Henderson frequently forwarded the information obtained about other competitors from Mr. Wistisen to his sales team and his superior. In one such example, Mr. Henderson received, and forward to his subordinates, information from Mr. Wistisen that United would likely be adding bookings and raising prices over the following month, and "not by just a dollar." In another example, Mr. Henderson sent to his boss, Mr. Sproull, information on competitors' inventory position that he received from Mr. Wistisen.

129.    United not only received information from Mr. Wistisen that it used in pricing decisions and to send messages about pricing to competitors, but also affirmatively used him to signal competitors. In one example, United's Executive Vice President, Dirk Swart, told United's Mr. Speece that he wanted Mr. Wistisen to "hear" that United's current beet sugar price was $36.50 and cane sugar price was $38, but United was

contemplating increasing its prices given its sold position. They discussed what they wanted to "indicate" to Mr. Wistisen before deciding to continue the conversation by phone.

130.    United's Mr. Swart believes that the "better information about what [his] competitor's actual prices were, [United] could better avoid these destructive situations" of customers using pricing information to negotiate better prices. Customers believe that competitors sharing this information harms them.

131.    There is no plausible, non-conspiratorial justification for the Producer Defendants to use Commodity and/or other means to secretly share highly confidential and proprietary detailed information about their current and future prices and sold positions. In a competitive market, such proprietary, competitively sensitive information would be a closely guarded secret.

132.    Defendants knew and intended that their private exchanges of competitively sensitive information about prices and sold positions would allow them to artificially raise, fix, maintain, or stabilize Granulated Sugar prices above the levels they would have been absent the anticompetitive conduct alleged herein.

133.    The Producer Defendants are interested in achieving higher prices for Granulated Sugar. In one instance, United raised prices in part to "send[] a message" to its competitors "that we were not interested in allowing the market to slip lower." United's CEO Matthew Wineinger testified that he was "confident" that "word got back" to United's competitors.

134.    Similarly, United at times pulled its competitive punches for fear of prices dropping. ("As with all plans of this nature where we are looking at taking share from competitors, we need to factor in competitive responses. In our minds the key is stay balanced, thoughtful where the moves will initiate relatively smaller reactions.").

135.    In fact, in a March 2019 internal presentation, United explained that it launched a new "Competitive Sourcing Project" in 2019 to, among other things, "[o]btain real-time market data on which competitors are supplying the lanes / customers (by geography)"

136.    ASR/Domino similarly anticipated competitive reactions, used pricing to send signals to competitors, and considered how its actions may cause market prices to decline.

137.    ASR/Domino decided not to get "aggressive" on pricing because ASR/Domino "would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing." ASR/Domino also wanted to "signal to the market" that there would be tightness and ASR/Domino would "maintain price."

138.    ASR/Domino also observed that the proposed acquisition of Imperial by a member of the United cooperative was a "good thing" for ASR/Domino because it would help to align United's pricing strategy with ASR/Domino's. ASR/Domino believed that after the acquisition of Imperial, "[i]t's going to be more important than ever to stay close to United" and "[t]his is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry."

42

139.    Michigan Sugar likewise, as described above, participated in the sharing of sensitive information regarding pricing and sold positions with the intention of artificially raising, fixing, maintaining, or stabilizing Granulated Sugar prices above the price that would have prevailed in a competitive market.

C.    **The Producer Defendants Used the ISC and Other Forums to Collude**

140.    In addition to sharing information through Wistisen and disseminating public statements to competitors, Producer Defendants had opportunities to collude through annual meetings of the ISC, which are run by the International Dairy Foods Association ("IDFA") and held in February of each year.

141.    The IDFA characterizes the purpose of the ISC as follows: "The Colloquium draws hundreds of professionals and decision-makers from the sweetener industry and from companies that use sweeteners in the products they make. Buyers, processors, refiners, distributors and food companies actively participate in the Colloquium, using it as a *springboard to enhance their business and trading-partner networks*."[23]

142.    On March 3, 2020, at 3:47 PM, ASR/Domino circulated an internal "Colloquium Recap," with a "a summary of points from the International Sweetener Colloquium," including (i) "Belief is that LSR/Cargill will be short on raws in Aug/Sep."; (ii) "Competitive Numbers" for fiscal year 2021 for certain competitors, including Cargill's future pricing of "$37.50 gross FOB," "Michigan firm at $38.50 for 2021, and

---

[23] https://www.idfa.org/wordpress/wp-content/uploads/2024/08/ISC-2025-Sponsorship-Prospectus.pdf (emphasis added) (last visited Dec. 8, 2024).

United took prices up from $36.50 FOB"; and (iii) "Reports have United Sugars telling customers that their 2020 slicing campaign will begin on August 10."

143.    Due to the COVID-19 pandemic, the ISC meeting was not held in person in 2020-2021, but resumed in 2022 and the years that followed. Representatives of Defendants attended each of the ISC's meetings held in 2019 and 2022-24.

144.    Discussions on the sidelines of the ISC are a prime opportunity for collusion. During the past few years, the event has served to kick start sales for the following year. For example, at the 2019 session, there were extensive presentations of the factors that would dictate future sugar prices during the upcoming year. In 2022, future contract prices for Number 16 sugar were discussed at the ISC and then finalized in the weeks following the event. These prices in turn were used to estimate Number 16 sugar futures, which in turn could be used to develop actual Number 16 spot prices during 2022 and 2023.

145.    In addition to participating in the ISC, the Producer Defendants each are members, either directly or through one of their affiliated companies, of various trade associations such as the Sugar Association and the American Sugar Alliance. The Producer Defendants, directly or through their affiliates, hold board positions on these trade associations. For example, the Board of the Sugar Association includes Pepe Fanjul (ASR/Domino), Mike Greear (Wyoming Sugar Company, one of the member-owners of United), Matt Hoffman (Sugar Cane Growers Cooperative of Florida, parent company of ASR), Neil Juhnke (Michigan Sugar), Peter O'Malley (ASR/Domino), Parks Shackelford (Florida Crystals, parent company of ASR), Rob Sproull (ASR/Domino), and Kurt

Wickstrom (Minn-Dak, one of the member-owners of United).[24] These memberships afford them opportunities to collude during the Class Period.

### D.    Use of Formulas to Set Sugar Prices

146.    The Producer Defendants also developed formulas to set pricing levels. One approach among Defendants was to set current prices within ranges based on the Number 16 spot prices that were in turn used to set FOB prices.

147.    For example, in February 17, 2021, at 8:44 AM, Wistisen told Henderson that on the pricing side, sugar prices could increase thanks, *inter alia*, to the "history of excellent selling restraint/patience from ASR, [and] high no. 16 prices…."

148.    Imperial Sugar (now part of United), which sold foreign imported sugar rather than domestically grown sugar, also used a formula based off of Number 16 sugar prices. It advocated a "clear view of market structure. Acting as a price-taker would put the whole business at risk." In short, it was not interested in competing on price.

### E.    Governmental Guidelines Prohibit Defendants' Conduct

#### 1.    Information Sharing as Evidence of a Conspiracy or as a Stand-Alone Antitrust Violation.

149.    In 2000, the DOJ and the Federal Trade Commission ("FTC") issued their joint "Guidelines for Collaborations Among Competitors" ("FTC/DOJ Guidelines").[25]

---

[24]  The Sugar Association, *Board Members*, https://www.sugar.org/about/board/ (last visited Dec. 8, 2024).

[25]  *See* U.S. Federal Trade Commission and the U.S. Department of Justice, *Antitrust Guidelines for Collaborations Among Competitors* (April 2000), https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf.

150.    The FTC/DOJ Guidelines state that:

Agreements that facilitate collusion sometimes involve the exchange or disclosure of information. . . . [I]n some cases, the sharing of information related to a market in which the collaboration operates or in which the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive variables. Similarly, other things being equal, the sharing of information on current operating and future business plans is more likely to raise concerns than the sharing of historical information. Finally, other things being equal, the sharing of individual company data is more likely to raise concern than the sharing of aggregated data that does not permit recipients to identify individual firm data.[26]

151.    A decade later, in 2010, the United States submitted the following comments to the Organization for Economic Cooperation and Development on the legal approach to information sharing among competitors. In those comments, it stated that:

[C]ertain information exchanges among competitors may violate Section 1 of the Sherman Act, which prohibits a 'contract, combination…or conspiracy' that unreasonably restrains trade. The antitrust concern is that information exchanges may facilitate anticompetitive harm by advancing competing sellers' ability either to collude or to tacitly coordinate in a manner that lessens competition. Thus, for

---

[26] U.S. Federal Trade Commission and the U.S. Department of Justice, *Roundtable on Joint Ventures*, 15–16 (Oct. 9, 2000), https://www.ftc.gov/system/files/attachments/us-submissions-oecd-other-international-competition-fora-2000-2009/2000-rdtble_on_joint_ventures_ftc_doj.pdf.

example, exchanges on price may lead to illegal price coordination.[27]

152.    It went on to say that "[i]nformation exchanges can be treated as circumstantial evidence of an unlawful price fixing or market allocation agreement among competitors, and in such a case are analyzed under the per se rule as a violation of the antitrust laws."[28] Factors that inform the analysis include the nature and quantity of the information, the currentness of the exchanged data, the parties' intent in sharing data, the concentrated nature of the industry, and the frequency of the exchanges.[29]

153.    Similarly, the FTC issued general guidance in 2014 entitled "Information exchange: be reasonable," confirming that "competing companies seek market intelligence by exchanging price or other commercially sensitive information, that may facilitate collusion or otherwise harm competition and consumers in violation of the antitrust laws."[30]

154.    Since these position papers were written, the DOJ has expressed even greater concerns about information sharing among competitors. In February 2023, the DOJ

---

[27]  Organization for Economic Co-operation and Development, *Roundtable on Information Exchanges Between Competitors Under Competition Law*, *Note by the Delegation of the United States*, at 2 (Oct. 21, 2010), https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/1010informationexchanges.pdf.

[28]  *Id*. at 3.

[29]  *Id*. at 4.

[30]  Michael Bloom, *Information exchange: be reasonable*, FEDERAL TRADE COMMISSION (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable.

withdrew three policy statements regarding the healthcare industry, stating that "the statements are overly permissive on certain subjects, such as information sharing."[31]

155.    The withdrawal of the policy statements was preceded by remarks made by principal Deputy Assistant Attorney General Doha Mekki on February 2, 2023, in which she said that "throughout its enforcement and policy work, the DOJ has had 'serious concerns' about whether the factors set out in the safety zones are appropriate for the industry as it exists today." Ms. Mekki noted that "[e]xchanges facilitated by [third-party] intermediaries can have the same anticompetitive effect as direct exchange among competitors." Additionally, she said that "the suggestion that data that's at least three months old is unlikely to be competitively sensitive or valuable is underpinned by the rise of pricing algorithms that can increase the competitive value of historical data."

156.    Following the withdrawal of the policy statements, at a conference in March 2023, Deputy Assistant Attorney General Michael Kades ("Kades") commented on the DOJ's new position related to information sharing. Responding to questions on what proper information sharing looks like without safe harbors, Kades said that "top-of-mind questions should be what information is being shared, how it is being used, and what the impacts are of that sharing. Any time information sharing appears to be suppressing price competition or eliminating other forms of competition, 'that should send red sirens off.'"

---

[31]  U.S. Department of Justice, *Justice Department Withdraws Outdated Enforcement Policy Statements*, (Feb. 3, 2023) https://www.justice.gov/opa/pr/justice-department-withdraws-outdated-enforcement-policy-statements.

157.   The DOJ's most current analysis of information sharing and price-fixing is found in the *amicus* brief it filed on October 1, 2024 in the *Pork* case. In that brief, the DOJ explained that information sharing *by itself* can violate the antitrust laws:

> As relevant here, competitors' exchange of competitively sensitive information is itself a form of concerted action that can violate the antitrust laws. As the Supreme Court explained in *United States v. Container Corp.*, reciprocal information exchange among competitors is "concerted action [that] is of course sufficient to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act." 393 U.S. 333, 335 (1969) (emphasis added). This is so even when the participants have the "freedom to withdraw from the agreement" and when the exchanges are "infrequen[t] and irregular[]." *Id.; see, e.g., Todd [v. Exxon Corp.]*, 275 F.3d [191] at 198 [(2d Cir. 2001)] (Sotomayor, J.)] (recognizing that an "information exchange itself" can form a claim under Section 1).[32]

158.   With respect to a stand-alone information exchange, the DOJ went on to say: "Standalone information-sharing claims are evaluated under the rule of reason . . . If information sharing tends to harm competition based on the full factual circumstances, 'liability follow[s].'" *Id.* at 7-8 (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 446-47 n.22 (1978)).

159.   The DOJ also reconfirmed at length that there was a second, independent manner in which information exchanges can violate the antitrust laws:

> Information exchanges can be relevant to concerted action in a second way: An information exchange among competitors can

---

[32]  DOJ Pork Amicus at 5. Indeed, the DOJ stated that "[e]xchange of disaggregated data can harm competition even if the individual firms are not explicitly identified, and the United States has obtained consent decrees in recent years with firms that shared disaggregated information without directly identifying individual competitors." *Id*. at 15 n.11.

> support an inference that a price-fixing or output-restriction agreement exists. Plaintiffs therefore regularly rely on information exchanges as evidence of a conspiracy to fix prices or restrict output. *See Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000) (en banc) (recognizing that information exchanges can serve as a "plus factor" suggestive of a price-fixing conspiracy); *Penne v. Greater Minneapolis Area Bd. of Realtors*, 604 F.2d 1143, 1151 (8th Cir. 1979).

*Id.* at 5-6. In such circumstances, the *per se* rule of antitrust liability applies.

160.    The DOJ also emphasizes that structural market factors can be important in detecting conspiratorial conduct in violation of the antitrust laws. In a 2016 primer on price-fixing, the DOJ noted that while collusion can occur in almost any industry, it is more likely and may be more meaningful when industry conditions are already favorable to such conduct. Specifically:

- Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories. Collusion may also occur when the number of firms is fairly large, but there is a small group of major sellers and the rest are "fringe" sellers who control only a small fraction of the market. The probability of collusion increases if other products cannot easily be substituted for the product in question or if there are restrictive specifications for the product being procured.

- The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to

agree on other forms of competition, such as design, features, quality,

or service.

161.    Additionally, "[r]epetitive purchases may increase the chance of collusion, as the vendors may become familiar with other bidders and future contracts may provide the opportunity for competitors to share the work. Collusion is more likely if the competitors know each other well through social connections, trade associations, legitimate business contacts, or shifting employment from one company to another."[33]

162.    As explained above, all of these factors are present in the domestic Granulated Sugar market.

163.    Defendants' scheme described herein is far outside the scope of permissible information sharing among competitors. For example:

164.    The FTC/DOJ Guidelines note the high risk of antitrust issues for information sharing programs in industries with a history of collusion. As explained below, sugar refiners have a long history of price-fixing (*see infra* Section V.E.).

165.    The more competitively sensitive the information being shared, the higher the antitrust concern for such information sharing. The detailed and granular pricing, and sold position information, shared by Defendants are considered to be trade secrets in a competitive industry. Therefore, the competitive sensitivity of the information shared by

---

[33] U.S. Department of Justice, *Price Fixing, Bid Rigging, And Market Allocation Schemes: What They Are And What to Look For, An Antitrust Primer*, at 5-6 (Feb. 2021) https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf.

United, ASR/Domino, and Michigan Sugar warrants a particularly high level of antitrust concern.

166.    The older or more historical the information being shared, the less concern the FTC and DOJ have with information collaborations by competitors. "Genuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals . . . ." *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 410 (1921). However, here, Defendants shared current and future price information, including their current pricing, future or forward pricing, pricing strategies, and sold positions. Commodity through Wistisen exchanged accurate and current pricing and sold position information with Producer Defendants within hours of receiving it, and Producer Defendants would then consider and use that competitively sensitive information contemporaneously. This is the sort of current, competitively sensitive information that supports heightened antitrust concerns under the FTC/DOJ Guidelines.

167.    The pricing and sold positions provided by Producer Defendants to Commodity and Wistisen were not aggregated or anonymized. Producer Defendants knew *exactly* from which of their competitors the information came. Commodity functioned as an information exchange among ASR/Domino, Michigan Sugar, and United. Commodity did not prepare or publish any public reports. Further, Wistisen explicitly stated that the pricing and sold positions he was conveying came straight from ASR/Domino, Michigan Sugar, or United. Producer Defendants could at all times identify whose pricing and sold positions they received.

168.    As explained above, all these factors are present in the domestic Granulated

Sugar market.

### 2.    Joint Use of Formulas to Fix Prices.

169.    The DOJ addressed this topic most recently in another *amicus* brief filed on

October 24, 2024 in *Gibson v. Cendyn Grp.*, *LLC*, No. 24-cv-03576 (9th Cir.) (ECF No.

28.1), in which it stated:

> In particular—and especially important here—the *per se*
> prohibition on price fixing applies with full force to concerted
> action by competitors on any "formula underlying price
> policies." [*United States v.*] *Socony-Vacuum* [*Oil Co.*], 310
> U.S. [150] at 222, 226 n.59 [(1940)]; *see also id.* at 223 ("an
> artificial stimulus applied to (or at times a brake on) market
> prices, a force which distorts those prices, a factor which
> prevents the determination of those prices by free competition
> alone"). That includes any formula used to fix benchmark,
> component, recommended, or "starting point" prices—even if
> end prices ultimately vary….*see also, e.g.,* …*Gelboim v. Bank
> of Am. Corp.*, 823 F.3d 759, 765, 771 (2d Cir. 2016)
> ("benchmark" or "component" used in contracts setting
> interest rates).
>
> Moreover, black-letter antitrust law prohibits horizontal price-
> fixing agreements without regard to whether the agreement is
> carried out at all. The agreement itself is the violation.

*Id.* at 24-25. Thus, the Defendants' use of agreed-upon pricing ranges based on Number

16 spot prices also is conduct that is a *per se* violation of the Sherman Act, even if it is not

carried out.

### F.    Sugar Prices Increased More Than They Would in a Competitive Market

170.    Although the FTC/DOJ Guidelines also provide a "safety zone" (i.e.,

presumptively permissible conduct) for collaborations among competitors if they impact

no more than twenty percent of a market, the Producer Defendants as of 2021 accounted for nearly 70% or more of the Granulated Sugar market, far above the threshold set forth in the FTC/DOJ Guidelines, which shows heightened antitrust risks.

171.    Granulated Sugar prices became significantly elevated during the Class Period as a result of Defendants' conduct. This was contrary to pricing patterns prior to the Class Period.

172.    Moreover, sugar prices increased dramatically during the Class Period without shortages in the supply of sugar.

173.    Moreover, the temporal proximity of the price increases to meetings of the executives of Defendants is further evidence of their illicit understanding. Many of the price increases at issue in this market occurred after ISC meetings, when participants had an opportunity to coordinate with one another. As discussed above, the ISC provided a perfect opportunity for such collusion.

174.    For example, as reported in April of 2019, soon after the ISC meeting held that year, buyers who had paid beet sugar prices in the low 30 cents extending back to 2017 were shocked at a $0.02 to $0.03 a pound increase.

175.    In 2020, spot prices for cane sugar reached seven-year highs in some instances and in the fourth quarter of 2020, they exceeded the high spot prices for 2019-2020.

176.    In late 2021, cane sugar prices got as high as $0.51 a pound FOB in all regions, a figure that had not been seen since April of 2012.

177.    Soon after the 2022 ISC ended, prices rose by 25% in many instances from the prices for which sugar was contracted for in 2022-23. Parallel price increases for both cane and beet sugar for the 2024 calendar year also occurred. Cane sugar was offered at $0.62 a pound. FOB Northeast and West Coast went up $0.01 from its prior list price, which had been steady for weeks. Prices ranged from $0.57 to $0.60 a pound. FOB Gulf and Southeast also went up $0.01 higher. Beet sugar was offered at $0.56 to $0.59 a pound FOB Midwest, firm to $0.01 higher.

178.    Defendants' communications with Wistisen further evidenced their parallel pricing. Defendants held similar prices "firm" in parallel, which is another way of saying they would not be discounting to take market share. For example, on September 21, 2020, United was "**firm** at $36.50 (no change) and now $38.50 on cane." (Emphasis added). On February 17, 2021, Wistisen conveyed the following to Henderson at ASR/Domino: "Long conversation with United: won't set FY22 price list until March, but the plan remains to **hold steady** at $36.50 and $38.50 …" (Emphasis added). Michigan's prices remained between $38.50 and $39 from at least September 2020 to April 2021 during the same time period that United "held steady" with cane price at $38.50. ASR/Domino also quoted prices between $38.50 and $39.50 in the Gulf from September 2020 to April 2021.

179.    In addition to holding prices firm in parallel, Defendants increased their prices in parallel. Although United initially communicated it was holding prices firmly at $36.50 and $38.50, it also conveyed its plan to increase prices when the time came. On May 18, 2021, Wistisen told Henderson that he had just talked with United, and to "expect big action over the next month, … and at that time expect to raise prices, and not by just a

dollar …." A little over a month later, in July 2021, ASR increased its gulf FOB price to $40.50. That same month, United raised its prices to $40.50.

180.    The DOJ Findings of Fact concluded that Defendants were "interdependent," meaning that if one Defendant raised prices, the others would similarly raise in parallel. The DOJ further concluded that "Competitors closely monitor one another's pricing and sold positions" and that "[t]here is ample evidence that United and others recognize their strategic interdependence, accounting for price signals they send as well as receive. United sends messages or signals to competitors about pricing and consider how its own actions may cause market-wide prices to decline [or increase]. For example, United's CEO, Mr. Wineinger, explained a strategic decision whereby United "pull[ed] some older offers while sending a message to NSM and other competitors that we were not interested in allowing the market to slip lower. And United at times pulls its competitive punches for fear of prices dropping."

181.    The DOJ Statement of Facts further concluded that just like United, "Imperial and Domino similarly anticipate competitive reactions, use pricing to send signals to competitors, and consider how their actions may cause market prices to decline. The DOJ Statement of Facts cited to Imperial's Henneberry expressing concern that lowering pricing "would be snatching something from United just as they are starting to show some upside price movement'; and Domino's Henderson explaining a decision not to get "aggressive" on pricing because Domino "would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing"). "Domino's Robert

Sproull instructed Henderson to "signal to the market" that there would be tightness and Domino would maintain price."

182.    As further evidence of parallel conduct, Domino bluntly stated that after the Imperial/United merger "[i]t's going to be more important than ever to stay close to United" and "[t]his is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry..." Further, "[a]fter speaking with his 'trusted friend,' the Imperial's CEO, Domino's Mark Olson wrote that following the transaction, United/U.S. Sugar would be more likely to follow Imperial's 'cane price approach,' which likely is a good thing for [Domino]."

183.    The parallel pricing resulted in dramatic overall increases to the sugar market. Pricing had reached a low point in February of 2014. Prices then started trending upward for the most part, but at modest levels of progression. United employed Wistisen/Commodity at least as early as the first half of 2019 to enable it to fix or coordinate prices with ASR/Domino and Michigan. Then, commencing on or about October of 2019, prices experienced one of the steepest climbs ever, which is ongoing, and by late 2023, cane sugar prices were at their highest levels since November of 1974. During that period, the Producer Price Index ("PPI") calculated by the Federal Reserve Bank of St. Louis went from 87.6 to 97.4. After United's acquisition of Imperial in 2023, prices further increased, going from a PPI of 110.6 to 123.2 by the end of 2023.

184.    In April 2019, prices for the ICE No. 11 Sugar futures contract reached its highest point in 11 years. By October 2019, the contract was trading 37% higher year to date.

185.    All of the foregoing must be examined in conjunction with the activity of Commodity. Granulated Sugar prices reached a low point in February 2014. Prices then started trending upward for the most part, but at modest levels of progression. Then, beginning in 2019, United employed Wistisen/Commodity to enable it to fix or coordinate prices with ASR/Domino and Michigan. Commencing on or about October 2019, prices experienced one of the steepest climbs ever, and by late 2023, cane sugar prices were at their highest levels since November of 1974. During that period, the Producer Price Index ("PPI") calculated by the Federal Reserve Bank of St. Louis went from 87.6 to 97.4. After United's acquisition of Imperial in 2023, prices further increased, going from a PPI of 110.6 to 123.2 by the end of 2023.

186.    Figure 4 illustrates the dramatic sugar PPI increase before and after the start of the Class Period.[34]  Figure 5 shows the rolling front month ICE futures price for January 2019 to March 2024.[35]

---

[34]  Producer Price Index by Industry: Sugar Manufacturing, St. Louis Fed Economic Research (last visited Dec. 8, 2024), https://fred.stlouisfed.org/series/PCU3113131131.

[35]  Report Center, ICE (last visited May 20, 2024), https://www.ice.com/marketdata/reports.

**Figure 4**



Click and drag in the plot area to zoom in. Hover over chart to view data.
Source: U.S. Bureau of Labor Statistics.

**Figure 5**



59

G. **The Structure and Characteristics of the Production and Sale of Granulated Sugar, Together with Other Factors, Render the Conspiracy Economically Plausible**

187.    As alleged *supra*, Granulated Sugar is a commodity product and competitors' pricing and sold positions are competitively sensitive information. The sugar industry is also vulnerable to coordinated interaction because of its structural dynamics.

188.    United and ASR/Domino have connected ownership interests that further raise the risks of unlawful coordination. United States Sugar has an ownership interest in the Sugar Cane Growers' Cooperative of Florida ("SCGC") through United States Sugar's wholly owned subsidiary South Bay Growers. SCGC, in turn, is one of the two owners of ASR/Domino.

189.    In addition to the extensive information sharing by the Producer Defendants and the structural characteristics of the industry, there are other "plus factors" that plausibly suggest the likelihood of collusion, including, but not limited to: (1) high vertical integration, (2) high barriers to entry, (3) sugar industry consolidation and concentration, (4) inelastic supply and demand, (5) a lack of significant substitutes for Granulated Sugar, and (6) a history of antitrust violations by sugar manufacturers.

190.    The Granulated Sugar industry is almost entirely vertically integrated. In the Granulated Sugar industry, "vertical integration" means the Granulated Sugar producer owns or controls each aspect of growing sugar cane or sugar beets, processing these crops into raw sugar using their own processing facilities, refining the raw sugar into Granulated Sugar in their own refining facilities, and selling their Granulated Sugar to direct purchasers.

191.    There are high barriers to becoming a manufacturer of Granulated Sugar. The start-up capital necessary to compete with today's Granulated Sugar manufacturers would be substantial (including constructing processing plants, refiners, and transportation infrastructure, hiring skilled labor, creating sugarcane/sugar beet farms or obtaining contracts with sugarcane/sugar beet farmers, and obtaining regulatory approvals). Granulated Sugar manufacturers have large economies of scale, utilizing large and expensive production facilities. Furthermore, Granulated Sugar manufacturers must be vertically integrated with growers of sugar beets or sugar cane to qualify for USDA loans and production allotments that enable growers to process raw sugar into Granulated Sugar without competition from imports.

192.    Due to the high barriers to entry, the Granulated Sugar industry is highly concentrated. As explained above, the Producer Defendants dominate the industry, such that none of the remaining producers of Granulated Sugar have had a market share that remotely approaches that of the Producer Defendants.

193.    Furthermore, the industry became even more concentrated when United acquired Imperial in 2023, resulting in a substantial increase in dominance by ASR/Domino and United.

194.    Demand for Granulated Sugar is inelastic, so a decrease in supply in the face of stable or rising demand will increase prices. Defendants recognize that Granulated Sugar demand is inelastic. The Producer Defendants knew that they could demand higher prices when less Granulated Sugar was available to sell. As a result, they routinely exchanged

information about their sold position to maintain higher prices because they knew that there were no meaningful substitutes for Granulated Sugar.

195.    Defendants also knew that the price support programs implemented by the USDA, like the USDA Sugar Program, limited the number of sources of raw sugar for refinement into Granulated Sugar and protected them from foreign competition.

196.    The crossover of employees among the Defendants provided additional opportunities to collude or exchange competitively sensitive information. For example, ASR/Domino's director of national accounts, Adam Whittaker, ASR/Domino's national accounts manager, Brian Dahlman, and United's director of strategic accounts, Eric Speece were each former employees of Cargill. Both Mr. Whittaker's and Mr. Speece's employment at Cargill overlapped for a five-year period. Mr. Whittaker, Mr. Speece, and Mr. Dahlman were all involved in the exchange of competitively sensitive information as described in the email exchanges detailed herein.

197.    In sum, the Granulated Sugar industry has a number of characteristics that make the exchanges by Defendants of competitively sensitive, non-public information highly anticompetitive and allowed the Producer Defendants to raise, fix, maintain, or stabilize Granulated Sugar prices during the Class Period. As a result, Defendants' unlawful conduct caused Plaintiffs and the Class members to pay artificially inflated prices for Granulated Sugar during the Class Period. These prices exceeded the amounts they would have paid if the prices for Granulated Sugar had been determined in a competitive market. Plaintiffs and Class members have suffered antitrust injury because of Defendants' conduct.

### H.    The USDA Sugar Program Does Not Render the Alleged Conspiracy Implausible

198.    The current USDA sugar program structure originates from the Agriculture and Food Act of 1981 ("1981 Farm Bill") and has been reauthorized since with some modifications.

199.    The sugar program was most recently reauthorized by Congress in 2018 with minor changes from the preceding 2014 and 2008 bills. "The only change to the sugar program under the 2018 farm bill was a 5% increase in the [loan] rate for raw cane and refined beet sugar."[36] The 2014 Farm Bill left the objective and structure of the sugar program unchanged from the 2008 Farm Bill and maintained the FY2012 loan rate which was enacted in the previous bill. On November 19, 2023, Congress enacted a one year extension of the farm bill which expired on September 30, 2024.

200.    The objective of the sugar program is "to *support* domestic sugar prices without incurring budgetary costs to the federal government while also ensuring that adequate supplies of beet and cane sugar are available to sugar users."

201.    In the USDA's discussion of the sugar program, producers refer to those who produce sugarcane or sugar beet crops. Sugar processors are those who are involved in the processing and refining steps of the supply chain. That is, sugar processors use sugarcane, sugar beets, and raw sugar as input to produce refined sugar such as granulated sugar. Among processors, USDA differentiates between beet processors, cane processors, and

---

[36]  As discussed in Section V.H.1. below, this increase in loan rate did not make the price support loans a binding constraint that elevates sugar prices, and therefore has no influence on the effect of the alleged conspiracy.

cane refiners. USDA classifies Defendants as processors and refiners of sugar. The sugar program is administered by the USDA and has four main mechanisms to keep sugar prices above guaranteed levels: price support loans, marketing allotments, import quotas, and a sugar-to-ethanol backstop (also known as the Feedstock Flexibility Program).

## 1. **Price Support Loans.**

202. USDA offers price support loans to processors of domestically grown sugarcane and sugar beets. The loans are specifically offered to processors and not producers of the crops since sugarcane and sugar beets are bulky and perishable, so they must be processed before they can be traded and stored.

203. "The price levels at which processors can take out loans are referred to as 'loan rates.'" The current national average loan rates since FY2020 are set in the 2018 Farm Bill as 19.75 cents per pound for raw sugar and 25.38 cents per pound for refined beet sugar. That is, the national average loan rates are fixed even though sugar supply and prices would change year over year. The national average loan rates "are adjusted regionally to reflect marketing cost differentials."

204. The maximum term of the loan is nine months. The loans are nonrecourse, meaning that when the loan is due, the processor can either repay the loan with interest or forfeit the sugar to USDA, "if the market price is below the effective support level."

205. There have been no loan forfeitures of sugar in the Class Period. The Farm Service Agency ("FSA") produces quarterly reports projecting whether the U.S. sugar stocks reported in the World Agricultural Supply and Demand Estimates report are likely to lead to forfeitures. The FSA's projections have concluded that forfeitures are unlikely

for every quarter since March 2019. This is supported by the FSA's national level database of loan forfeitures for all commodities, which lists no forfeitures for beet sugar, cane sugar, or in-process sugars since at least 2019.

206.    The lack of sugar loan forfeitures since 2019 suggests that market prices are above the effective support level since 2019. Therefore, the price support loans do not constitute a binding constraint for U.S. sugar prices in the Class Period.

### 2.    **Marketing Allotments.**

207.    USDA establishes annual marketing allotments "that limit the quantity of sugar that U.S. processors can sell for domestic human use." There is an overall allotment quantity ("OAQ") that is "not less than 85% of estimated U.S. human consumption of sugar." The allotment is divided between beet and cane sugar and is allocated to processors based on their sales and capacity.

208.    This allotment explicitly does not limit "how much beet and cane farmers can produce" nor "how much sugar beets and sugarcane that beet refiners and raw sugar mills can process." "The OAQ is intended to ensure that permitted sales of domestic sugar, when added to imports under U.S. trade commitments, do not depress market prices below loan forfeiture levels for refined beet sugar and raw cane sugar. Sugar production that is in excess of a processors' marketing allotment may not be sold for human consumption except to allow another processor to meet its allocation or for export."

209.    There has been a shortfall between the OAQ and the supply from processors since at least FY2013. This suggests that the allotment is not binding on aggregate production.

### 3. **Import Quotas on Raw Sugar.**

210.  "The United States negotiated sugar [tariff-rate quotas ("TRQs")] as part of the Uruguay Round Agreement on Agriculture (AoA). These are also called World Trade Organization (WTO) TRQs." Each fiscal year, the Secretary of Agriculture sets a TRQ that limits how much sugar can be imported duty-free or at a low duty.

211.  Different import quotas apply to raw sugars and to refined sugar. Defendants import raw sugars while refined sugars are primarily imported into the U.S. by distributors.

212.  The AoA sets a *minimum*, as opposed to a maximum, of the TRQs on raw and refined sugars that can be imported into the U.S.

213.  Empirical evidence shows that the TRQs for raw and refined sugars were set at levels close to the AoA minimum for most of the Class Period. According to the USDA, the raw sugar TRQ is at the AoA minimum level in 2019, and close to it in 2021 through 2023, and the refined sugar TRQ is at the AoA minimum level in every year in the Class Period except for 2020. According to USDA, the increases in TRQ in 2020 were driven by non-conspiratorial factors such as uncertainty in imports from Mexico and the effect of coronavirus. USDA did not identify any suspicious cartel activities as the reason to increase the TRQs.[37]

---

[37] According to USDA, the increase in TRQ in 2020 was intended to offset low domestic supply, which at least was partially driven by "poor weather and harvesting conditions in Louisiana [having] reduced the outlook for cane sugar production."

### 4.    Feedstock Flexibility Program

214.    The Feedstock Flexibility Program (FFP) requires the USDA to purchase surplus sugar from processors if there is the likelihood of loan forfeitures. Specifically, if the market price falls below forfeiture levels, the USDA would be required to buy domestically processed sugar and sell it to ethanol producers, hence why this program is also called a "sugar-to-ethanol backstop."

215.    Since at least 2014, the USDA has announced no action under the FFP. The annual domestic delivery of sugar for use in ethanol has been zero since at least FY2019, according to Yearly Sweetener Market Reports produced by the Dairy and Sweeteners Analysis branch of the FSA. Thus, this program does not have a limiting or binding effect on domestic processor supply of sugar in the Class Period.

216.    The USDA Sugar Program does not set prices for sugar nor does it prevent the conspiracy from charging anticompetitive prices during the Class Period.

### A.    There Is a Long History of Anticompetitive Conduct in the Sugar Industry

217.    The sugar industry has been marked by repeated violations of the antitrust laws going back nearly 90 years.

218.    The United States Supreme Court in the 1930s upheld a lower court ruling that the Sugar Institute, an industry trade association, violated the antitrust laws by, among other things, requiring advance pricing announcements by manufacturers with "a

requirement of adherence, without deviation, to the prices and terms publicly announced."[38]

219.    In 1948, the United States Supreme Court reversed the dismissal of a complaint raising the issue of whether "California sugar refiners who sell sugar in interstate commerce may agree among themselves to pay a uniform price for sugar beets grown in California without incurring liability to the local beet growers under the [Sherman] Act."[39] The Court stated:

> In sum, the restraint and its monopolistic effects were reflected throughout each stage of the industry, permeating its entire structure. This was the necessary and inevitable effect of the agreement among the refiners to pay uniform prices for beets, in the circumstances of this case. Those monopolistic effects not only deprived the beet growers of any competitive opportunity for disposing of their crops by the immediate operation of the uniform price provision; they also tended to increase control over the quantity of sugar sold interstate; and finally by the tie-in provision they interlaced those interstate effects with the price paid for the beets.

> These restrictive and monopolistic effects, resulting necessarily from the practices allegedly intended to produce them, fall squarely within the Sherman Act's prohibitions, creating the very injuries they were designed to prevent, both to the public and to private individuals.[40]

220.    In the 1970s, the DOJ accused sugar refiners of using "brokers to act as go-betweens in carrying price information and exchanging assurances on price actions

---

[38]  *United States v. Sugar Institute*, 297 U.S. 553, 582 (1936).

[39]  *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 221 (1948).

[40]  *Id.* at 242.

between and among refiners" to facilitate price-fixing.[41] The defendants in that case entered into a consent decree with the DOJ in 1978, which prohibited the same types of conduct engaged in here:

> Each refiner defendant is enjoined and restrained from:
>
> (A)  Directly communicating to any other refiner information concerning Future Prices.
>
> (B)  Requesting, requiring or coercing any third person, including but not limited to brokers and sugar beet grower representatives, to communicate to any other refiner, information concerning Future Prices.
>
> (C)  For a period of ten (10) years from the date of entry of this Final Judgment,
>
>> (1)  Directly communicating to any other refiner information concerning:
>>
>>> (a) the prices at which, or terms or conditions upon which, refined sugar is then being sold or offered for sale; or
>>>
>>> (b) the prices at which, or terms or conditions upon which, other than prices or terms or conditions described in subsection (1)(a) of this paragraph (C), refined sugar has been sold or offered for sale within the one (1) year period ending on the date of the communications;
>>>
>>> (c) Requesting, requiring or coercing any third person, including but not limited to brokers and sugar beet growers representatives, to communicate to any

---

[41] *United States v. Great Western Sugar Co., et al.*, Case No. 74-2674-SW at ¶ 1415 (N.D. Cal. Dec. 19, 1974) (complaint brought by the United States in 1974 against Great Western Sugar Company, American Crystal Sugar Company (now part of United), Amalgamated Sugar Company, and other sugar refiners).

other refiner, information concerning the
prices at which, or terms or conditions
upon which, refined sugar is then being
sold or offered for sale.[42]

221.    The DOJ action spawned multiple private class actions on both the East and

West Coasts. Classes were certified in each group of actions.[43] The cases were ultimately

settled.

## VI.    ANTITRUST INJURY AND DAMAGES TO THE CLASS

222.    Defendants' anticompetitive conduct has had the following effects, among

others:

a)    Price competition in the Granulated Sugar Market has been restrained
or eliminated;

b)    Prices for Granulated Sugar sold by Producer Defendants and their
divisions, subsidiaries, affiliates, or co-conspirators, in turn, have
been raised, fixed, maintained, or stabilized at artificially high,
noncompetitive levels throughout the United States;

c)    Commercial Indirect Purchasers of Granulated Sugar have been
deprived of free and open competition; and

d)    Commercial Indirect Purchasers of Granulated Sugar have paid

---

[42]  *United States v. Great Western Sugar Co.*, No. 74-2674-SW, 1978 WL 1399 at *2
(N.D. Cal. Sept. 13, 1978); *also available at*
https://www.justice.gov/atr/page/file/1138841/dl?inline.

[43]  *See In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322 (E.D. Pa. 1976); *In re Sugar
Indus. Antitrust Litig.*, MDL No. 2201, 1976 WL 1374 (N.D. Cal. May 12, 1976),
*mandamus denied*, 559 F.2d 481 (9th Cir. 1977).

artificially inflated prices.

223. The purpose of Defendants' and their co-conspirators' conduct is to raise, fix, maintain, or stabilize the price of Granulated Sugar and, as a direct and foreseeable result, Plaintiffs and the Class have paid supra-competitive prices for Granulated Sugar during the Class Period.

224. Granulated Sugar is widely used in commercial and institutional settings like Plaintiffs' business and other restaurants, bakeries, caterers, food service, food and beverage manufacturers, and other commercial product producers. Most commercial and institutional users purchase Granulated Sugar from food service distributors while some purchase Granulated Sugar through wholesalers or retailers.

225. As described in Sections III and VII, during the Class Period, Plaintiffs indirectly purchased Granulated Sugar from Producer Defendants for commercial use in their restaurant businesses.

226. The chain of distribution of Granulated Sugar is easily tracked and the overcharges associated with Defendants' illegal conduct can be followed through the distribution. Commercial Indirect Purchasers like Plaintiffs and the Class members necessarily absorb at least some, and in some cases all, of the price increases caused by the illegal conduct described in this Complaint.

227. Plaintiffs' counsel and their experts have shown in other commercial indirect purchaser litigation that economic analyses can be used to assess and quantify the amount of damage commercial indirect purchasers like Plaintiffs and the Class members sustained

because of conduct that violates federal and state antitrust and consumer protection, and unjust enrichment laws.

228.    As a result of Defendants' anticompetitive conduct, Plaintiff and Class members paid more for Granulated Sugar than they otherwise would have and thus suffered antitrust injury and damages. The overcharges paid by Plaintiff and members of the Classes for Granulated Sugar constitutes antitrust injury and harm to competition under the federal antitrust laws.

229.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.   CLASS ALLEGATIONS

230.    Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rule of Civil Procedure 23(a) and (b)(2), seeking treble damages, injunctive relief, and other relief pursuant to federal antitrust laws on behalf of the members of the following class (the "Nationwide Class"):

> All persons and entities who indirectly purchased Granulated Sugar from any of the Producer Defendants or any of their co-conspirators for use in their commercial food preparation or other business in the United States and its territories at any time from January 1, 2019, until the present (the "Class Period").

231.    Plaintiffs also bring this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure, Rule 23(a) and (b)(3) seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following Class (the "Damages Class"):

All persons and entities who indirectly purchased Granulated Sugar from any of the Producer Defendants or any of their co-conspirators for use in their commercial food preparation or other business in an Indirect Purchaser State[44] during the Class Period.

232.    The Nationwide Class and Damages Class are referred to collectively as the "Classes" unless otherwise indicated. Specifically excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, co-conspirators, federal government entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, the Court, and persons who purchased Granulated Sugar directly from Defendants.

233.    Plaintiffs reserve the right to amend these Class definitions, including, without limitation, the Class Period.

234.    **Class Identity**. The above-defined Class Members are readily identifiable from information and records in the possession of United, ASR/Domino, Michigan Sugar, Louis Dreyfus, and direct purchaser intermediaries.

235.    **Numerosity**. Plaintiffs do not know the exact number of Class Members because such information is presently under exclusive control of the Producer Defendants. Plaintiffs believe that due to the nature of the trade and commerce involved, there are

---

[44] The "Indirect Purchaser States" as listed below in Counts III, IV, and Five are: Alabama, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

hundreds of class members geographically dispersed throughout the United States, such that joinder of all class members would be impracticable.

236. **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs purchased Granulated Sugar indirectly from one or more of the Producer Defendants and were damaged by the same common course of wrongful conduct.

237. **Predominance of Common Questions**. There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including, but not limited to:

    a)     Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to raise, fix, maintain, or stabilize prices of Granulated Sugar sold in interstate commerce in the United States in violation of federal antitrust laws;

    b)     Whether Defendants agreed to unreasonably restrain trade in violation of federal antitrust laws;

    c)     The identity of the participants of the alleged conspiracy;

    d)     The scope and duration of the alleged conspiracy;

    e)     The acts performed by Defendants and their co-conspirators in furtherance of the alleged conspiracy;

    f)     The effect of Defendants' alleged conspiracy on the prices of Granulated Sugar sold in the United States during the Class Period;

g)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and other members of the Class;

h)    Whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;

i)    The appropriate class-wide measure of damages; and

j)    Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiffs and the Class.

238.    **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of other members of the Class and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

239.    **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impractical and class members do not have interests in individually controlling the prosecution of separate actions. Prosecution as a class action will eliminate the possibility of duplicative litigation. The damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Furthermore, individual

litigation presents the potential for inconsistent or contradictory judgments and the establishment of incompatible standards of conduct for Defendants and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

240.    **Injunctive Relief**. Defendants have acted on grounds generally applicable to Plaintiffs and members of the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VIII.  EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

241.    Defendants' concealment of their unlawful conspiracy has tolled any applicable statute of limitations for Plaintiffs and the Class with respect to any claims and rights of action that Plaintiffs and the Class have alleged in this Complaint under equitable estoppel.

242.    Plaintiffs and the Class were not placed on actual or constructive notice of the conspiracy alleged herein until, at the earliest, the DOJ's Findings of Fact in support of its petition to stop the merger of United and Imperial was made public. The full scope of the Defendants' unlawful conduct could not be discovered until the appellate exhibit volumes from the DOJ matter were made public.

243.    In addition, throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful conspiracy from Plaintiffs and the Class, and the conspiracy was inherently self-concealing.

244.    Plaintiffs and Class members relied on Defendants' promises to obey the law and act with integrity, and those promises prevented Plaintiff from discovering Defendants' conduct earlier. For example:

245.    The letter introducing ASR Group's Code of Ethics and Business Conduct states: "Throughout our long history, ASR Group has always been dedicated to conducting business in a lawful and ethical manner in all of its operations.… We seek success in all of our business endeavors. However, we may only do so while upholding the highest standards of ethical conduct and all of the laws, domestic and foreign, that apply to our work."[45] The Code contains a section devoted to "Following Antitrust and Competition Laws," which, among other things, prohibits ASR Group and its employees, officers, and directors from entering into "[p]rohibited agreements and activities," including "[a]greements with competitors to fix or control prices," and directs that, "[t]o ensure that [they] avoid these illegal agreements, [they] may not engage in direct or indirect discussions or other contacts with competitors regarding … [p]rices to be charged by ASR Group or others or regarding other terms and conditions of sales."[46]

246.    Michigan Sugar's "Sustainability & Corporate Social Responsibility" webpage states: "At Michigan Sugar Company, we live by our values – Excellence, Pride, Integrity, Compassion and Trust. This is the foundation of a business environment that sets

---

[45]  ASR Group, *Code of Ethics and Business Conduct*, at 1, (Sep. 27, 2023) https://www.asr-group.com/sites/asr_group_com/files/2023-01/ASR%20Group%20-20Code%20of%20Ethics%20and%20Business%20Conduct%20%282020-01-20%29%20English%20-%20Final%20-%20Website%20%281%29.pdf.

[46]  *Id.* at 8–9.

respect and dignity for co-workers, suppliers, customers, and partners as an absolute expectation."[47] It further states: "[W]e are committed to creating a responsible business model that serves and builds value for our grower-owners, employees, customers, suppliers, and other stakeholders now and in the future."[48]

247.    United's Code of Business Conduct and Ethics states: "Obeying the law, both in letter and in spirit, is the foundation on which our ethical standards are built. All our employees, officers, directors, agents and other representatives must respect and obey the laws of the cities, states and countries in which we operate."[49] It further states: "Our employees, officers, directors, agents and other representatives must maintain the confidentiality of confidential information entrusted to them by us or our customers, except when disclosure is authorized in writing by a supervisor or required by laws or regulations. Confidential information includes, without limitation, any information that derives independent value because it is not known by third parties, including United Sugar's competitors or the general public, whether or not expressly identified as confidential."[50]

---

[47]  Michigan Sugar Company, *Sustainability & Corporate Social Responsibility*, (June 25, 2020) https://www.michigansugar.com/about-us/sustainability-corporate-social-responsibility/.

[48]  *Id.*

[49]  Code of Business Conduct and Ethics, United Sugars Corporation, Adopted by the Board of Directors 1 (Mar. 16, 2020), https://unitedsugarpr.com/wp-content/uploads/2021/04/United-Sugars_-Code-of-Conduct-and-Ethics-Updated-March-2020.pdf.

[50]  *Id.* at 6.

## IX.    CLAIMS FOR RELIEF

### COUNT I
**Violation of Sections 1 and 3 of the Sherman Act—Unlawful Price-Fixing**
**(15 U.S.C. §§ 1, 3,)**
(On Behalf of Plaintiffs and the Nationwide Class)

248.    Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint, as though fully set forth herein.

249.    Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2019, and continuing through the present Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Granulated Sugar in the United States to or at supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

250.    Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2019, and continuing through the Defendants effectuated the foregoing conspiracy through the means described herein, including through the exchange of competitively sensitive, non-public information regarding prices, output, supplies, and costs to raise, fix, maintain, or stabilize prices for Granulated Sugar in the United States.

251.    Their conduct had the intended, likely, and actual effect of raising, fixing, maintaining, or stabilizing prices in the Granulated Sugar market in the United States to or at supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

252.    This conduct is unlawful *per se* as a violation of the antitrust laws.

253.    The contract, combination, or conspiracy alleged herein has had the following effects, among others:

    a)    Price competition in the sale of Granulated Sugar has been restrained, suppressed, and/or eliminated in the United States;

    b)    Prices for Granulated Sugar sold by the Producer Defendants have been raised, fixed, maintained, or stabilized to or at artificially high, non-competitive levels throughout the United States; and

    c)    Those who purchased Granulated Sugar indirectly from the Producer Defendants or their co-conspirators have been deprived of the benefits of free and open competition.

    d)    Plaintiffs and the Class Members paid supra-competitive, artificially inflated prices for Granulated Sugar.

254.    Plaintiffs and Class Members have been injured and will continue to be injured in their businesses and property by paying more for Granulated Sugar purchased indirectly from the Producer Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

255.    Plaintiffs and Class Members are entitled to injunctive relief against Defendants, preventing and restraining the violations alleged herein.

## COUNT II
**Violation of Sections 1 and 3 of the Sherman—Unlawful Information Exchanges
(15 U.S.C. §§ 1, 3)**
(On Behalf of Plaintiffs and the Nationwide Class)

256.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

257.    For purposes of this Count, which is based upon a claim subject to a Rule of Reason analysis, the relevant geographic market is the United States and its territories, and the relevant product market consists of Granulated Sugar made from either sugar beets or sugar cane, both of which are treated by the industry as indistinguishable from each other. As noted above, the Producer Defendants now have a collective 75% of this market and thus possess market power within it.

258.    Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2019, and continuing through the present Defendants agreed with each other to exchange competitively sensitive, non-public information regarding their prices, output, supplies, and production costs. The agreement was intended to and did unreasonably restrain trade and suppress competition, and it had the likely and actual effect of raising, maintaining, or stabilizing prices in the Granulated Sugar market in the United States at supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

259.    Pursuant to the agreement, Defendants agreed to and did share pricing and other internal, material, competitive information that distorted and suppressed competition in the relevant market. Producer Defendants' regular information exchanges through

Commodity and Wistisen reflected concerted action between horizontal competitors in the Granulated Sugar market. Each Producer Defendant furnished competitively sensitive information with the understanding it would be reciprocated.

260.    When defendants that are competing for the same customers exchange competitive information, it reduces incentives to compete on price. Producer Defendants used the data obtained through Commodity and Wistisen to reduce the uncertainty that they should have individually faced from not knowing what their competitors were offering and providing in terms of supply and price in the market for Granulated Sugar. This strategic information was a material factor in the decisions to inflate prices that Plaintiffs and Class Members paid for Granulated Sugar during the Class Period.

261.    This conduct is unlawful under either a quick look or a full-fledged Rule of Reason analysis because the agreement is facially anticompetitive with no valid procompetitive justification. The information exchanged between Producer Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them. Moreover, even if there were valid procompetitive justifications, the Producer Defendants' objectives could have been reasonably achieved through less restrictive means.

262.    The contract, combination, or conspiracy alleged herein has had the following effects, among others:

> a)    Price competition in the sale of Granulated Sugar has been restrained, suppressed, and/or eliminated in the United States;

    b)     Prices for Granulated Sugar sold by the Producer Defendants have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; and

    c)     Those who purchased Granulated Sugar indirectly from the Producer Defendants or their co-conspirators have been deprived of the benefits of free and open competition.

    d)     Plaintiffs and the Class Members paid supra-competitive, artificially inflated prices for Granulated Sugar.

263.   Plaintiffs and Class Members have been injured and will continue to be injured in their businesses or property by paying more for Granulated Sugar purchased indirectly from the Producer Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

264.   Plaintiffs and Class Members are entitled to injunctive relief against Defendants, preventing and restraining the violations alleged herein.

**COUNT III**
**Violation of State Antitrust Statutes—Unlawful Price Fixing[51]**
(On Behalf of Plaintiffs and the Damages Class)

265.   Plaintiffs incorporate and re-allege each allegation in the preceding paragraphs, as though fully set forth in this Count.

---

[51] The following states permit indirect purchasers, like Plaintiffs, to bring antitrust claims for damages, either by statute or judicial decision: Alabama, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota,

266.    During the Class Period, Defendants engaged in a continuing contract, combination, or conspiracy with respect to the sale of Granulated Sugar in unreasonable restraint of trade and commerce and in violation of the state antitrust statutes set forth in this Count.

267.    The contract, combination, or conspiracy consisted of an agreement among Defendants to fix, raise, inflate, stabilize, maintain, or a combination of these actions, at artificially supracompetitive prices for Granulated Sugar, including in the United States and its territories.

268.    In formulating and effectuating this conspiracy, Defendants performed acts in furtherance of the combination and conspiracy, including agreeing to fix, increase, inflate, maintain, or stabilize effective prices of Granulated Sugar purchased by Plaintiffs and members of the Damages Class.

269.    Defendants engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of Granulated Sugar. Defendants' conspiracies had the following effects: (1) Price competition in the sale of Granulated Sugar has been restrained, suppressed, and/or eliminated in the states included in this Count; (2) Prices for Granulated Sugar sold by the Producer Defendants have been raised, fixed, maintained, or stabilized to or at artificially high, non-competitive levels throughout the states included in this Count; and (3) Those who purchased Granulated Sugar indirectly from the Producer Defendants or their co-

Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

conspirators have been deprived of the benefits of free and open competition; and (4) Plaintiffs and the Class Members paid supra-competitive, artificially inflated prices for Granulated Sugar.

270.    As a direct and proximate result, Plaintiffs and members of the Damages Class were deprived of free and open competition and paid more for Granulated Sugar than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the states included in this Count were designed to prevent, and this injury flows from that which makes Defendants' conduct unlawful.

271.    During the Class Period, a substantial part of Defendants' unlawful conduct occurred in the states included in this Count or substantially affected the commerce of the states included in this Count.

272.    Defendants' anticompetitive acts described above were knowing, willful, and constitute violations of the following state antitrust statutes:

a)    Ala. Code § 6-5-60, *et seq*., with respect to purchases of Granulated Sugar by Class Members in Alabama.

b)    Ariz. Rev. Stat. Ann. § 44-1401, *et seq*., with respect to purchases of Granulated Sugar by Class Members in Arizona.

c)    Cal. Bus. & Prof. Code, § 16720, *et seq*. with respect to purchases of Granulated Sugar by Class Members in California.

d)    Colo. Rev. Stat. § 6-4-101, *et seq*., with respect to purchases of Granulated Sugar by Class Members in Colorado.

e)   Conn. Gen. Stat. § 35-26, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Connecticut.

f)   Del. Code Ann. tit. 6, § 2101, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Delaware.

g)   D.C. Code § 28-4501, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in the District of Columbia.

h)   Haw. Rev. Stat. Ann. § 480-1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Hawaii.

i)   740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Illinois.

j)   Iowa Code § 553.1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Iowa.

k)   Kan. Stat. Ann. § 50-101, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Kansas.

l)   Me. Rev. Stat. Tit. 10, § 1101, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Maine.

m)   Md. Code, Com. Law § 11-201, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Maryland.

n)   Mich. Comp. Laws Ann. § 445.772, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Michigan.

o)   Minn. Stat. § 325D.49, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Minnesota.

p)      Miss. Code Ann. § 75-21-3, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Mississippi.

q)      Neb. Rev. Stat. Ann. § 59-801, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Nebraska.

r)      Nev. Rev. Stat. Ann. § 598A.060, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Nevada.

s)      N.H. Rev. Stat. Ann. § 356:2, *et seq.* with respect to purchases of Granulated Sugar by Class Members in New Hampshire.

t)      N.J. Stat. Ann. § 56:9-1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in New Jersey.

u)      N.M. Stat. Ann. § 57-12-1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in New Mexico.

v)      N.Y. Gen. Bus. Law § 349, *et seq.* with respect to purchases of Granulated Sugar by Class Members in New York.

w)      N.C. Gen. Stat. § 75-1.1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in North Carolina.

x)      N.D. Cent. Code § 51-08.1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in North Dakota.

y)      Or. Rev. Stat. § 646.705, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Oregon.

z)      R.I. Gen. Laws § 6-36-1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Rhode Island.

aa)     S.D. Codified Laws § 37-1-3.1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in South Dakota.

bb)     Tenn. Code, § 47-25-101, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Tennessee.

cc)     Utah Code Ann. § 76-10-911, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Utah.

dd)     Vt. Stat. Ann. Tit. 9, § 2453, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Vermont.

ee)     W. Va. Code § 46A-6-101, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in West Virginia.

ff)     Wis. Stat. Ann. § 133.01(1), *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Wisconsin.

273.    Accordingly, Plaintiffs and the members of the Damages Class in each of the foregoing jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the foregoing state laws.

## COUNT IV
### Violation of State Antitrust Statutes—Unlawful Information Exchanges
(On Behalf of Plaintiffs and the Damages Class)

274.    Plaintiffs incorporate and re-allege each allegation in the preceding paragraphs, as though fully set forth in this Count.

275.    During the Class Period, Defendants engaged in a continuing contract, combination, or conspiracy with respect to the sale of Granulated Sugar in unreasonable restraint of trade and commerce and in violation of the state antitrust statutes set forth in this Count.

276.    The contract, combination, or conspiracy consisted of an agreement among Defendants to exchange competitively sensitive, non-public information about their operations. The agreement was intended to and did unreasonably restrain trade and suppress competition.

277.    Pursuant to the agreement, Defendants agreed to and did share pricing and other internal, material, competitive information that distorted and suppressed competition in the relevant market. Producer Defendants' regular information exchanges through Commodity and Wistisen reflected concerted action between horizontal competitors in the Granulated Sugar market. Each Producer Defendant furnished competitively sensitive information with the understanding it would be reciprocated. This strategic information was a material factor in the decisions to inflate prices that Plaintiffs and Class Members paid for Granulated Sugar during the Class Period.

278.    This conduct is unlawful under either a quick look or a full-fledged Rule of Reason analysis because the agreement is facially anticompetitive with no valid procompetitive justification. The information exchanged between Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them. Moreover, even if there were valid procompetitive

justifications, the Producer Defendants' objectives could have been reasonably achieved through less restrictive means.

279. Defendants' information exchange had the following effects, among others: (1) Price competition in the sale of Granulated Sugar has been restrained, suppressed, and/or eliminated in the states included in this Count; (2) Prices for Granulated Sugar sold by the Producer Defendants have been raised, fixed, maintained, or stabilized to or at artificially high, non-competitive levels throughout the states included in this Count; and (3) Those who purchased Granulated Sugar indirectly from the Producer Defendants or their co-conspirators have been deprived of the benefits of free and open competition; and (4) Plaintiffs and the Class Members paid supra-competitive, artificially inflated prices for Granulated Sugar.

280. As a direct and proximate result, Plaintiffs and members of the Damages Class were deprived of free and open competition and paid more for Granulated Sugar than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the states included in this Count were designed to prevent, and this injury flows from that which makes Defendants' conduct unlawful.

281. During the Class Period, a substantial part of Defendants' unlawful conduct occurred in the states included in this Count or substantially affected the commerce of the states included in this Count.

282. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations of the following state antitrust statutes:

a)      Ala. Code § 6-5-60, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Alabama.

b)      Ariz. Rev. Stat. Ann. § 44-1401, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Arizona.

c)      Cal. Bus. & Prof. Code, § 16720, *et seq.* with respect to purchases of Granulated Sugar by Class Members in California.

d)      Colo. Rev. Stat. § 6-4-101, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Colorado.

e)      Conn. Gen. Stat. § 35-26, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Connecticut.

f)      Del. Code Ann. tit. 6, § 2101, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Delaware.

g)      D.C. Code § 28-4501, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in the District of Columbia.

h)      Haw. Rev. Stat. Ann. § 480-1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Hawaii.

i)      740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Illinois.

j)      Iowa Code § 553.1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Iowa.

k)      Kan. Stat. Ann. § 50-101, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Kansas.

l) Me. Rev. Stat. Tit. 10, § 1101, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Maine.

m) Md. Code, Com. Law § 11-201, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Maryland.

n) Mich. Comp. Laws Ann. § 445.772, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Michigan.

o) Minn. Stat. § 325D.49, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Minnesota.

p) Miss. Code Ann. § 75-21-3, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Mississippi.

q) Neb. Rev. Stat. Ann. § 59-801, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Nebraska.

r) Nev. Rev. Stat. Ann. § 598A.060, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Nevada.

s) N.H. Rev. Stat. Ann. § 356:2, *et seq.* with respect to purchases of Granulated Sugar by Class Members in New Hampshire.

t) N.J. Stat. Ann. § 56:9-1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in New Jersey.

u) N.M. Stat. Ann. § 57-12-1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in New Mexico.

v) N.Y. Gen. Bus. Law § 349, *et seq.* with respect to purchases of Granulated Sugar by Class Members in New York.

w) N.C. Gen. Stat. § 75-1.1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in North Carolina.

x) N.D. Cent. Code § 51-08.1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in North Dakota.

y) Or. Rev. Stat. § 646.705, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Oregon.

z) R.I. Gen. Laws § 6-36-1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Rhode Island.

aa) S.D. Codified Laws § 37-1-3.1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in South Dakota.

bb) Tenn. Code, § 47-25-101, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Tennessee.

cc) Utah Code Ann. § 76-10-911, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Utah.

dd) Vt. Stat. Ann. Tit. 9, § 2453, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Vermont.

ee) W. Va. Code § 46A-6-101, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in West Virginia.

ff) Wis. Stat. Ann. § 133.01(1), *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Wisconsin.

283. Accordingly, Plaintiffs and the members of the Damages Class in each of the foregoing jurisdictions seek damages (including statutory damages where applicable), to

be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the foregoing state laws.

## COUNT V
## Violation of State Consumer Protection Laws[52]
### (On Behalf of the Damages Class)

284.    Plaintiffs incorporate and re-allege each allegation in the preceding paragraphs, as though fully set forth in this Count.

285.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes included in this Count by engaging in the acts and practices specified above.

286.    Defendants' unlawful conduct had the following effects: (1) Granulated Sugar price competition was restrained, suppressed, and eliminated throughout the states included in this Count; (2) Granulated Sugar prices were, fixed, maintained, or stabilized at artificially high levels throughout the states listed below; (3) Plaintiffs and the Class Members were deprived of free and open competition; and (4) Plaintiffs and the Class Members paid supra-competitive, artificially inflated prices for Granulated Sugar.

287.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured and are threatened with further injury.

---

[52] Courts have interpreted the consumer protection statutes of the following states to permit indirect purchasers, like Plaintiffs, to bring antitrust claims for damages: Arkansas, California, Florida, Illinois, Minnesota, Montana, Nebraska, Nevada, New Mexico, North Carolina, South Carolina, and Vermont.

288.    During the Class Period, a substantial part of Defendants' unlawful conduct occurred in the states included in this Count or substantially affected the commerce of the states included in this Count.

289.    Defendants' anticompetitive acts described above constitute violations of the following state consumer protection laws:

a)    Ark. Code Ann. § 4-88-101, *et seq*., with respect to purchases of Granulated Sugar by Class Members in Arkansas.

b)    Cal. Bus. & Prof. Code § 17200, *et seq*., with respect to purchases of Granulated Sugar by Class Members in California.

c)    Fla. Stat. § 501.201 *et seq*., with respect to purchases of Granulated Sugar by Class Members in Florida.

d)    815 Ill. Comp. Stat. Ann. 505/10a, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Illinois.

e)    Minn. Stat. § 325D.43, *et seq*., with respect to purchases of Granulated Sugar by Class Members in Minnesota.

f)    Mont. Code Ann. § 30-14-103, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Montana.

g)    Neb. Rev. Stat. § 59-1601, *et seq*., with respect to purchases of Granulated Sugar by Class Members in Nebraska.

h)    Nev. Rev. Stat. § 598.0903, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Nevada.

i)     N.M. Stat. § 57-12-1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in New Mexico.

j)     N.C. Gen. Stat. §75-1.1, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in North Carolina.

k)     S.C. Code Ann. § 39-5-10, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in South Carolina.

l)     Vt. Stat. Ann. tit. 9, § 2453, *et seq.*, with respect to purchases of Granulated Sugar by Class Members in Vermont.

290.    Accordingly, Plaintiffs and members of the Damages Class seek all relief available under the foregoing state consumer protection laws.

**COUNT VI**
**Unjust Enrichment[53]**
(On Behalf of Plaintiffs and Damages Class)

291.    Plaintiffs incorporate and reallege, as though fully set forth herein, each allegation set forth in the preceding paragraphs.

292.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

293.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the

---

[53] Unjust enrichment claims are alleged under the laws of the following states: Alabama, Arkansas, Arizona, California, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

receipt of, at a minimum, unlawfully inflated prices, and unlawful profits on sales of Granulated Sugar.

294.    Defendants have benefitted from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the Class Members for Granulated Sugar.

295.    Plaintiffs and the Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the Class Members are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Class may make claims on a pro rata basis.

296.    Pursuit of any remedies against the firms from whom Plaintiffs and the Class purchased Granulated Sugar subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully request judgment against Defendants, as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.      That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed in violation of Sections 1 and 3 of the Sherman Act;

C.      That Plaintiffs and the Class recover damages to the maximum extent allowed under federal law, and that a joint and several judgment in their favor be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.      That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of a company's information;

F.      That Plaintiffs and the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.    That Plaintiffs and the Class recover their costs of suit, including reasonable attorneys' fees, expenses, and costs as provided by law; and

H.    That Plaintiffs and the Class have such other and further relief as the case may require and the Court may deem just and proper.

## XI.    DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all others similarly situated, hereby request a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), on any and all claims so triable.

Dated: December 9, 2024                Respectfully submitted,

                                       LOCKRIDGE GRINDAL NAUEN PLLP

                                       */s/Heidi M. Silton*
                                       Heidi M. Silton (MN #025759X)
                                       Jessica N. Servais (MN #0326744)
                                       Joseph C. Bourne (MN #0389922)
                                       Antonia M. Konkoly (MN #0504377)
                                       100 Washington Avenue South, Suite 2200
                                       Minneapolis, MN 55401
                                       (612) 339-6900
                                       hmsilton@locklaw.com
                                       jnservais@locklaw.com
                                       jcbourne@locklaw.com
                                       amkonkoly@locklaw.com

                                       */s/Kimberly A. Justice*
                                       Kimberly A. Justice
                                       FREED KANNER LONDON & MILLEN LLC
                                       923 Fayette Street
                                       Conshohocken, PA 19428
                                       (484) 234-6335
                                       kjustice@fklmlaw.com

                                       Matthew W. Ruan
                                       Douglas A. Millen
                                       Robert J. Wozniak, Jr.
                                       FREED KANNER LONDON& MILLEN LLC
                                       100 Tri-State International, Suite 128
                                       Lincolnshire, IL 60069
                                       (224) 632-4500
                                       mruan@fklmlaw.com
                                       dmillen@fklmlaw.com
                                       rwozniak@fklmlaw.com

                                       ***PSC Co-Lead Counsel for the Commercial
                                       Indirect Purchaser Plaintiffs***

Shawn M. Raiter
LARSON · KING LLP
30 East Seventh Street, Suite 2800
St. Paul, MN 55101
(651) 312-6518
sraiter@larsonking.com

Michael J. Flannery
CUNEO GILBERT & LADUCA, LLP
Two City Place Drive
Second Floor
St. Louis, MO 63141
(314) 226-1015
mflannery@cuneolaw.com

David M. Cialkowski
ZIMMERMAN REED, LLP
1100 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
(612) 341-0400
david.cialkowski@zimmreed.com

Jon A. Tostrud
Anthony M. Carter
TOSTRUD LAW GROUP, P.C.
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
(310) 278-2600
jtostrud@tostrudlaw.com
acarter@tostrudlaw.com

***Counsel for the Commercial Indirect
Purchaser Plaintiffs***