## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: GRANULATED SUGAR ANTITRUST LITIGATION | Case No. 24-md-03110(JWB/DTS) |
| This Document Relates To:<br><br>ALL DIRECT PURCHASER ACTIONS | **DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................. 1

II.     JURISDICTION AND VENUE ........................................................................... 5

III.    PARTIES ............................................................................................................. 6

  A.    Plaintiffs ............................................................................................................. 6

  B.    Defendants .......................................................................................................... 7

        1.    ASR Corporate Family ............................................................................. 7

        2.    United Corporate Family ........................................................................... 8

        3.    Michigan Sugar Corporate Family ........................................................... 9

        4.    Louis Dreyfus ......................................................................................... 10

        5.    Imperial ................................................................................................... 10

        6.    Commodity .............................................................................................. 11

        7.    Individual Defendant .............................................................................. 12

  C.    Agents and Co-Conspirators ............................................................................ 12

IV.     FACTUAL ALLEGATIONS ............................................................................. 12

  A.    The Domestic Refined Sugar Market and Its Commercial Development ......... 12

  B.    Summary Overview of Defendants' Agreement to Artificially Raise, Fix, Maintain, or
        Stabilize Prices of Domestic Refined Sugar .................................................... 16

V.      THE ANTICOMPETITIVE CONDUCT AT ISSUE ......................................... 20

  A.    Detailed Analysis of How Information was Shared Through Commodity, Wistisen and
        Other Conduits ................................................................................................. 20

  B.    The Producer Defendants Used the ISC and Other Forums to Collude............. 32

  C.    Use of Formulas to Set Sugar Prices ................................................................ 34

  D.    Governmental Guidelines Prohibit Defendants' Conduct ................................. 34

  E.    Sugar Prices Have Risen in Parallel and More Than They Would in a Competitive Market
        During the Class Period ..................................................................................... 43

  F.    The Structure and Characteristics of the Production and Sale of Refined Sugar, Together
        with Other Factors, Render the Conspiracy Economically Plausible ................ 48

  G.    There Is a Long History of Anticompetitive Conduct in the Sugar Industry .................... 51

  H.    The USDA Sugar Program Does Not Render The Alleged Conspiracy As Being
        Implausible. ....................................................................................................... 53

VI.     ANTITRUST INJURY AND DAMAGES TO THE CLASS ............................. 57

VII.    CLASS ALLEGATIONS ................................................................................... 58

VIII.   EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT ................. 61

IX.     CLAIMS FOR RELIEF ..................................................................................... 64

X.    PRAYER FOR RELIEF ................................................................................................... 68

XI.    DEMAND FOR JURY TRIAL ........................................................................................ 69

Plaintiffs KPH Healthcare Services, Inc. ("KPH"), Northern Frozen Foods, Inc. d/b/a Northern Haserot ("Northern"), Wakefern Food Corp. ("Wakefern"), Redner's Markets, Inc. ("Redner's"), and C.A. Curtze Co. ("Curtze") (collectively "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to themselves, and upon information and belief as to all other matters, bring this consolidated class action for violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) against ASR Group International, Inc. ("ASR Group"), American Sugar Refining, Inc. ("ASR"), Domino Foods, Inc. ("Domino," and, together with ASR Group and ASR, referred to herein as "ASR/Domino"), United Sugar Producers & Refiners f/k/a United Sugars Corporation ("United"), Michigan Sugar Company ("Michigan Sugar), Louis Dreyfus Company LLC ("Louis Dreyfus"), and Imperial Sugar Company n/k/a U.S. Sugar Savannah Refinery, LLC ("Imperial") (collectively, "Producer Defendants"), Commodity Information, Inc. ("Commodity"), and Richard Wistisen ("Wistisen"), (collectively, along with the Producer Defendants, referred to as "Defendants"). Plaintiffs seek treble damages, injunctive relief, and other relief pursuant to the federal antitrust laws and demand a trial by jury on all matters so triable.

## I.    NATURE OF THE ACTION

1.      This lawsuit arises from Defendants' unlawful agreement to fix prices for "Refined Sugar," as defined below, in the United States. The Producer Defendants are among the largest producers and sellers of Refined Sugar in the United States and are direct competitors.

1

2.      Pursuant to Section 1 of the Sherman Act (15 U.S.C. §§ 1), "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." At least as early as January 1, 2019, and continuing to the date upon which any class is certified by the Court ("Class Period"), Defendants and their co-conspirators conspired to artificially inflate the price of Refined Sugar in the United States and its territories. Among the victims of the conspiracy are entities that directly purchased Refined Sugar from the Producer Defendants, including food and beverage manufacturers, retailers, food service companies, and distributors. As the United Stares Supreme Court said decades ago, "the machinery employed by a combination for price-fixing is immaterial. Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." *United States v. Socony-Vacuum Oil Co*., 310 U.S. 150, 223 (1940).

3.      In order to implement the price-fixing conspiracy, and in addition to other conduct alleged herein, the Producer Defendants shared and received non-public, competitively sensitive information from one another through Commodity and others. The United States Department of Justice ("DOJ") has stated that the sharing of competitively sensitive information among horizontal competitors "support[s] an inference that a price-fixing or out-put restriction agreement exists" but also "is itself a form of concerted action

that can violate the antitrust laws."[1] The Producer Defendants' sharing of competitively sensitive information bears all the hallmarks of concerted information sharing and demonstrates an effective enforcement mechanism of a price-fixing scheme.

4.      *First*, Commodity provided the Producer Defendants with a clearinghouse of access to nearly real-time information on current and forward-looking, non-anonymized data on competitors. *Second*, the information shared by Commodity included specific information on the Producer Defendants' profits, prices, costs, production levels, and sold positions[2]—all of which are key metrics and highly competitively sensitive information in this market that competitors would not unilaterally share with each other in the absence of an agreement. *Finally*, the information gathered and disseminated through Commodity was made available only to subscribing sugar producers and is completely unavailable to the public or other sugar suppliers. In other words, Commodity and the horizontal competitor Defendants that were its customers engaged in a "give to get" scheme, where they provided one another with mutual, reciprocal assurances that they would provide competitively sensitive information so long as their competitors also did so.

5.      It was contrary to the Producer Defendants' self-interest to share such commercially sensitive information with horizontal competitors. The reciprocal and mutual

---

[1] Amicus Brief filed by the DOJ in *In re Pork Antitrust Litig.*, No. 0:18-cv-01776-JRT-GFD (D. Minn.) ("*Pork*") (ECF No. 2616), at 5-6.

[2] A sold position is the percentage of a seller's supply of Refined Sugar that has been sold. As a seller's sold position increases, that seller will generally raise prices. The sold position thus provides important information about the extent to which a supplier will or will not be aggressive on price going forward.

sharing of such information facilitated and maintained a price-fixing conspiracy and reassured each Producer Defendant its co-conspiring counterparts would adhere to the conspiracy. The ubiquitous sharing of such information, as in this case, also serves an important monitoring and enforcement mechanism for the cartel.

6.      In addition to sharing competitively sensitive information that would not be in their unilateral self-interest, the Producer Defendants also had opportunities to collude with each other through annual meetings of the International Sweeteners Colloquium ("ISC"), which their representatives attended, and at which, contract prices with customers were negotiated.

7.      Furthermore, the Producer Defendants also used No. 16 (domestic sugar future contracts) prices to coordinate their pricing efforts, as discussed below.

8.      In its amicus brief in Pork, the DOJ also said that information sharing is "itself a form of concerted action that can violate the antitrust laws."[3] Such conduct would be tested under the Rule of Reason. Plaintiffs here have pled this alternative cause of action against all Defendants.

9.      Defendants' actions resulted in Plaintiffs and members of the Class paying supracompetitive prices for Refined Sugar in the United States and its territories. Defendants' anticompetitive conduct, described further herein, violates Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

---

[3] *Id.*

## II.    JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), as this action arises under Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26). This court further has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the Defendants.

11.    Venue is proper under Section 12 of the Clayton Act (15 U.S.C. § 22), and under 28 U.S.C. § 1391(b) and (c), because Defendants transact business in this District and a substantial part of the events giving rise to Plaintiffs' claims, including sales of Refined Sugar, occurred in this District.

12.    This Court has personal jurisdiction over Defendants because, among other things, they either: (1) transact business throughout the United States, including this District; (2) have substantial contacts within the United States, including in this District, and/or (3) are engaged in an illegal anticompetitive scheme that was directed at, and had the intended effect of causing injury to, persons residing in, located in, and doing business in the United States, including in this District.

13.    During the Class Period, the Producer Defendants sold and shipped Refined Sugar in a continuous and uninterrupted flow of interstate commerce, which included sales and shipments to or from this District. Defendants' conduct had a direct, substantial, and

reasonably foreseeable effect on interstate commerce in the United States, including this District.

### III.    PARTIES

#### A.    Plaintiffs

14.    Plaintiff KPH is a New York corporation with its principal place of business located in Gouverneur, New York. KPH purchased Refined Sugar directly from one or more of the Producer Defendants that was sold at prices artificially inflated by one or more of the Producer Defendants or their co-conspirators during the Class Period. KPH has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

15.    Plaintiff Northern is a privately owned Ohio corporation with its principal place of business located in Cleveland, Ohio. Northern purchased Refined Sugar directly from one or more of the Producer Defendants that was sold at prices artificially inflated by one or more of the Producer Defendants or their co-conspirators during the Class Period. Northern has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

16.    Plaintiff Wakefern is the largest retailer-owned cooperative in the United States, comprising member companies that independently own and operate more than 350 retail supermarkets that operate under, among other trademarks owned by Wakefern, the ShopRite® trademark, and has its principal place of business in Keasbey, New Jersey. Wakefern purchased Refined Sugar directly from one or more of the Producer Defendants that was sold at prices artificially inflated by one or more of the Producer Defendants or

their co-conspirators during the Class Period. Wakefern has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

17.    Plaintiff Redner's is a Pennsylvania corporation with its principal place of business located in Reading, Pennsylvania. Redner's purchased Refined Sugar directly from one or more of the Producer Defendants that was sold at prices artificially inflated by one or more of the Producer Defendants or their co-conspirators during the Class Period. Redner's has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

18.    Plaintiff Curtze is a Pennsylvania corporation with its principal place of business located in Erie, Pennsylvania. Curtze purchased Refined Sugar directly from one or more of the Producer Defendants that was sold at prices artificially inflated by one or more of the Producer Defendants or their co-conspirators during the Class Period. Curtze has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

**B.    Defendants**

**1.    ASR Corporate Family**

19.    Defendant ASR Group is a privately held Florida corporation with its principal place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida 33401. ASR Group is a global producer and seller of Refined Sugar. ASR Group owns six sugar refineries in North America, including four in the United States: Yonkers, New York; Baltimore, Maryland; Chalmette, Louisiana; and Crockett, California. ASR Group asserts that it is "the world's largest refiner and marketer of cane sugar[;] we sell our branded

7

products and service our customers in key channels, including grocery, industrial, food service and specialty." ASR Group is a subsidiary of the Florida Crystals Corporation and Sugar Cane Growers Cooperative of Florida, business enterprises of the global sugar empire Fanjul Corp. ASR Group owns, as a subsidiary, Co-Defendant Domino as well as one of Domino's American competitors, C&H Sugar. ASR Group is vertically integrated and owns sugar processing, marketing, and sales companies in Canada, the United Kingdom, Portugal, Mexico, and Belize.

20.    Defendant ASR is a privately held Florida corporation and global producer and seller of Refined Sugar based in West Palm Beach, Florida.

21.    Defendant Domino is a Florida corporation with its primary place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida 33401. Domino is a subsidiary of ASR's and ASR Group's Refined Sugar business and is a global producer and seller of Refined Sugar. Domino is ASR Group's and ASR's marketing and sales subsidiary for Refined Sugar.

22.    ASR/Domino operates cane refineries in Crockett, California; Chalmette, Louisiana; Baltimore, Maryland; and Yonkers, New York.

23.    ASR and Domino are sometimes collectively referred to herein as ASR/Domino.

### 2.    United Corporate Family

24.    Defendant United, a Minnesota corporation, is a marketing cooperative based in Edina, Minnesota. United has four member-owners: (1) U.S. Sugar Corporation, which owns and operates a cane mill and cane refinery in Clewiston, Florida; (2) American Crystal

Sugar Company, headquartered in Moorhead, Minnesota; (3) Minn-Dak Farmers Cooperative, headquartered in Wahpeton, North Dakota; and (4) Wyoming Sugar Company, LLC, based in Worland, Wyoming, the last three of which grow and process sugar beets at eight production facilities located in Minnesota, Montana, North Dakota, and Wyoming.

25.    United touts that "[b]ecause United has a unique, fully integrated business structure, we provide and transport sugar throughout the nation. We have 9 sugar producing plants, primarily in the Red River Valley along the border of North Dakota and Minnesota. We also produce beet sugar in the State of Wyoming, as well as cane sugar in the [States of] Florida and Georgia."

26.    United participates in the market as a unified competitor, marketing and selling all the Refined Sugar produced by its member-owners. United handles locating customers, negotiating sales contracts, and arranging all logistics. United also sets the prices for all the products it markets and sells on its members' behalf.

### 3.    Michigan Sugar Corporate Family

27.    Defendant Michigan Sugar is a Michigan corporation with its primary place of business at 122 Uptown Drive, Suite 300, Bay City, Michigan 48708. Michigan Sugar is a cooperative consisting of 900 sugar beet grower-owners, and it is a global producer and seller of Refined Sugar under the brand names Pioneer Sugar and Big Chief Sugar. Michigan Sugar owns and operates sugar beet processing facilities in Bay City, Caro, Croswell, and Sebewaing, Michigan. Additionally, Michigan Sugar owns a production facility in Toledo, Ohio and an agricultural research center in Bay County, Michigan.

### 4. Louis Dreyfus

28.     Defendant Louis Dreyfus is a Delaware corporation with its principal place of business in Wilton, Connecticut. It is a worldwide leader in sugar trading and merchandising. In 2012, Louis Dreyfus acquired Imperial Sugar Company ("Imperial"). Imperial, with headquarters in Sugar Land, Texas, produces Sugar in the United States and independently markets and sells its Refined Sugar products. Imperial has a cane sugar refinery in Savannah, Georgia and an intermediate sugar transfer and liquification facility in Ludlow, Kentucky. On November 30, 2022, Louis Dreyfus completed the sale of Imperial to U.S. Sugar.

### 5. Imperial

29.     Defendant Imperial Sugar Company n/k/a United States Sugar Savannah Refinery, LL ("Imperial" or "U.S. Sugar Savannah") is a Delaware company based in Georgia. On November 30, 2022, U.S. Sugar Savannah completed its acquisition of Imperial from Louis Dreyfus. U.S. Sugar Savannah is wholly owned by U.S. Sugar. U.S. Sugar Savannah holds the trademarks to "Imperial Sugar," and "Imperial Sugar" customers are directed by the "Imperial Sugar website to contact U.S. Sugar Savannah for customer service."

30.     U.S. Sugar Savannah, which is wholly-owned and controlled by U.S. Sugar, is a mere continuation of Imperial. Upon the purchase of Imperial Sugar Co. from Louis Dreyfus, all former Imperial Sugar employees continued as U.S. Sugar Savannah employees; all contractual obligations of Imperial were assumed; nothing changed ongoing execution of supply contracts with customers; and customer service representatives and

10

sales contacts remained the same. Payments were directed to the same bank account, with the name of the account changing to U.S. Sugar Savannah.

31.     Prior to its sale to U.S. Sugar Savannah and during the Class Period, Imperial's corporate offices were located in Sugar Land, Texas.  Imperial produces Refined Sugar in the United States.  Imperial has a cane sugar refinery in Savannah, Georgia, and an intermediate sugar transfer and liquification facility in Ludlow, Kentucky.

32.     Defendants United and Imperial are sometimes collectively referred to herein as United on or after November 30, 2022.

### 6.     Commodity

33.     Defendant Commodity is a Delaware corporation with its principal place of business at 560 South State Street, Suite E-2, Orem, Utah 84058. Commodity is currently inactive or defunct. Commodity has no public presence. It does not maintain a website on the internet. It does not advertise its services to the public. It does not publish publicly available reports on the sugar industry or offer to sell or provide any reports on or analysis of the sugar industry to other than a select few, as alleged herein. Throughout the Class Period, Commodity facilitated exchanges of commercially sensitive information among the Producer Defendants of detailed, non-public information regarding, among other things, prices, capacity, demand, sales volume, and other key production and pricing metrics in furtherance of the conspiracy. Throughout the Class Period, the Producer Defendants utilized Commodity to implement, monitor, and/or enforce the conspiracy and the exchange of confidential, proprietary, and competitively sensitive non-public information.

### 7.    Individual Defendant

34.    Defendant Wistisen is the principal of Commodity who, as part of Defendants' unlawful agreement, collected and shared confidential, proprietary, and competitively sensitive non-public information between and among the Producer Defendants.

### C.    Agents and Co-Conspirators

35.    Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs, and for whom they are liable.

36.    Various persons and entities that are not named as Defendants participated as co-conspirators in the violations alleged herein and have performed acts in furtherance thereof. These other entities have facilitated, adhered to, participated in, aided and abetted, and otherwise acted in concert with Defendants in order to advance the objectives of the scheme to benefit Defendants and themselves by artificially inflating the prices of Refined Sugar. Plaintiffs reserve the right to name some or all of these entities as Defendants. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

## IV.    FACTUAL ALLEGATIONS

### A.    The Domestic Refined Sugar Market and Its Commercial Development

37.     "Refined Sugar," as that term is used herein, refers to sugar that is extracted from sugar cane or sugar beets and processed to yield granulated white sugar, granulated brown sugar, powdered sugar, and liquid sugar. Refined Sugar is considered the gold standard of sweeteners with a clean, pleasant sweetness and no secondary taste or aftertaste. Refined Sugar is the most common sweetener used in home food preparation and cookbooks and consumers tend to dislike any sugar substitute that does not match its sweetness profile. In 2020, the average American consumed 40 pounds of Refined Sugar.

38.     Refined Sugar is made by extracting juice from the sugar cane or sugar beet, processing the juice to remove impurities and to concentrate it into a thick syrup, boiling it until sugar crystals form, separating the sugar crystals from the syrup in a centrifuge, drying the sugar crystals with hot air, and grinding them to uniform size.

39.     While Refined Sugar derived from sugar cane is chemically indistinguishable from Refined Sugar derived from sugar beets, their manufacturing processes are slightly different. Sugar cane is first processed into "raw sugar" and subsequently shipped to a refinery to be further processed into Refined Sugar by washing and further removing remaining molasses and other non-sugar components. Sugar beets, on the other hand, are typically processed in a single facility where they are converted directly into Refined Sugar. Sugar manufactured and refined through this process can be ground into powder or sold as liquid; however, granulated Refined Sugar accounts for approximately 80 percent of all refined sugar sold.

40.     Sugar cane and sugar beets are also grown in different climates. Sugar cane grows in semitropical or tropical climates. Thus, in the United States, sugar cane is

13

produced in Florida and the Southern areas of Louisiana and Texas. Sugar beets are sturdier crops that are able to grow in rotation with other crops and are grown in four primary regions encompassing the Great Lakes (Michigan), Upper Midwest (Minnesota and North Dakota), Great Plains (Colorado, Montana, Nebraska, and Wyoming), and Far West (Northern California, Idaho, Oregon, and Washington).

41.    Refined Sugar is manufactured and sold to direct purchasers who resell, consume, or further refine it into other types of sugar products.

42.    Refined Sugar is a staple food commonly used by commercial/industrial/institutional users such as bakeries, restaurants, confectionaries, and food manufacturers, as well as end users as an ingredient in baking, cooking, and sweetening foods and drinks. Many commercial, industrial, and institutional users purchase Refined Sugar directly from the Producer Defendants or from intermediaries such as wholesalers, food service distributors, or grocery retailers. End user consumers typically purchase Refined Sugar as an ingredient in prepared foods or in its whole form from grocery stores.

43.    Refined Sugar is used in some industrial processes, such as the production of medications (as a bulking agent and a binder in tablets, such as lozenges), bioplastics, biofuels (sugar-based ethanol), and co-generation of electricity (cane bagasse). However, according to one global estimate, only 25% of Refined Sugar is used for biofuels and other industrial applications, while 75% is used for food products.

44.    Considering the ubiquity of its use in foods, beverages, and other applications, the global sugar industry is massive. In 2023, the global industrial sugar

14

market was $39.59 billion, and it is projected to grow from $40.63 billion in 2024 to $50.76 billion by 2032. According to one study conducted by Texas A&M University, sugar production in the United States has an annual economic impact, including direct sales, indirect sales, and end user sales, of more than $23 billion.

45.    Refined Sugar is a commodity product with little or no product differentiation between producers. For example, futures contracts for domestic sugar are traded on the Intercontinental Exchange ("ICE") as "White Sugar" under the symbol "W", alongside other commodity products such as wheat, crude oil, and gold. Typically, when a product is characterized as a commodity, competition is based principally on price as opposed to other attributes such as product quality or customer service. The commodity nature of Refined Sugar helps to facilitate cartel behavior.

46.    Due to the lack of product differentiation, the Producer Defendants are forced to compete on price such that the pricing decisions of each Refined Sugar producer impact the market price for Refined Sugar.

47.    The domestic market for Refined Sugar has gone through significant consolidation in recent years, helping to facilitate cartel conduct. For instance, in 2019, United sought to acquire competitor Imperial Sugar. Subsequently, U.S. Sugar, one of the four member-owners of United, entered into an asset purchase agreement whereby U.S. Sugar would acquire Imperial, and United would market and sell all of the Refined Sugar produced by Imperial. In 2021, the DOJ sued to block the proposed merger, arguing that the acquisition would leave the overwhelming majority of Refined Sugar sales across the Southeast in the hands of only two producers and would create higher prices for businesses

15

and consumers. The merger was finalized later that year. United now boasts that it currently supplies approximately one quarter of the total United States sugar demand.

48.     Similarly, ASR, along with the Sugar Cane Growers Cooperative of Florida, acquired Defendant Domino in 2001. In 2005, ASR Group purchased domestic competitor California and Hawaiian Sugar Company ("C&H Sugar"), and in 2007, it acquired Jack Frost ("National Sugar Company"), and Redpath Sugar ("Tate & Lyle's Canadian sugar refining operations"). In 2010, ASR completed its takeover of Tate & Lyle's sugar business by acquiring their refineries in London and Lisbon.

49.     Michigan Sugar also is a product of consolidation in the industry. In 2004, Michigan Sugar Company purchased Monitor Sugar Company. Later, in 2016, Michigan Sugar purchased Michigan-based cane sugar refiner and manufacturer AmCane Sugar LLC, an acquisition that Michigan Sugar stated would increase its sugar sales volumes by nearly 15%.

50.     During the Class Period, the Producer Defendants collectively controlled a large majority of the domestic market for Refined Sugar. As of 2021, just three of the Producer Defendants (United, ASR/Domino, and Michigan Sugar) accounted for nearly 70% of the domestic Refined Sugar market. The Producer Defendants have even acknowledged their dominant position. For instance, upon hearing the announcement of Imperial Sugar's acquisition by United, one Producing Defendant noted that "they view this as 1 less competitor and now 3 companies account for 75% of the market."

**B.      Summary Overview of Defendants' Agreement to Artificially Raise, Fix, Maintain, or Stabilize Prices of Domestic Refined Sugar**

16

51.     Since at least January 1, 2019, the Producer Defendants agreed, combined, or conspired to artificially raise, fix, maintain, or stabilize prices of domestic Refined Sugar in the United States. To facilitate their unlawful contract, combination, or conspiracy, Producer Defendants knowingly engaged in the mutual and reciprocal sharing of accurate, competitively sensitive, non-public information with each other, including through Commodity. This regular reciprocal information exchange has taken place for years. There is no unilateral economically rational reason for the Producer Defendants to share such information. In the absence of an agreement or understanding, sharing such information would pose a competitive risk to any individual Defendant. This information was shared, however, for the purpose of enabling Defendants to effectuate their agreement to artificially affect prices and avoid competing with one another.

52.     The Producer Defendants used Commodity and others to facilitate the price-fixing conspiracy. Commodity purports to analyze the sugar industry. However, Commodity has no public presence. It does not maintain a website on the internet. It does not advertise its services to the public. It does not publish publicly available reports on the sugar industry or offer to sell or provide any reports on or analysis of the sugar industry to other than a select few, as alleged herein. Moreover, Commodity does not gather information through voluntary surveys or periodic polling that it anonymizes. Instead, the Producer Defendants regularly share competitively sensitive information about their pricing and recently sold positions with Commodity, and Commodity in turn contemporaneously shares that competitively sensitive information with the other Producer Defendants.

17

Importantly, Commodity does not aggregate or anonymize the competitively sensitive information it receives from the Producer Defendants when passing along such information.

53.     Furthermore, Commodity does not share or offer to share this competitively sensitive information with the customers of the Producer Defendants or others in the Refined Sugar supply chain, nor does it publicly publish the competitively sensitive information it obtains from and shares with the Producer Defendants or otherwise make it available to consumers, thereby strengthening the advantage that the Producer Defendants gain by sharing information only with one another as producers.

54.     The Producer Defendants understand that the information they provide to Commodity is competitively sensitive information that would not ordinarily be disclosed to competitors. Sharing such competitively sensitive information would be detrimental to their business interests were it not for the existence of a price-fixing conspiracy. The purpose of their sharing was to enable United, Michigan Sugar, and ASR/Domino to raise, fix, maintain, stabilize, or coordinate prices of Refined Sugar in the United States and to destroy the independent centers of decision making the antitrust laws were designed to protect.

55.     Using the non-anonymized competitively sensitive non-public information exchanged through Commodity, the Producer Defendants ensured that they could enforce the conspiracy and not undercut each other's prices or cause prices to decrease as they would in a competitive market. The Producer Defendants learned of each other's current pricing, crop size, crop yields, future beliefs on pricing, and recently sold positions only because Commodity collects this competitively sensitive information from each of them and shares it with the others pursuant to their unlawful agreement.

18

56.     The information voluntarily given to Commodity by each of the Producer Defendants includes the companies' current pricing, future or forward pricing, pricing strategies, sold positions, spot prices, contract prices, crop yields, and crop size.

57.     Commodity then gives this competitively sensitive information to all the Producer Defendants rapidly, often within hours of having received it. The Producer Defendants then used the information they received from Commodity when deciding how much to set the price for their products.

58.     Commodity was often sharing inter-competitor competitively sensitive information regarding the pricing and supply of Refined Sugar sold to customers on the spot market (the market for immediate delivery or delivery within a short period). Sharing this competitively sensitive information has a direct effect on future Refined Sugar pricing agreements with customers because a futures contract price is commonly determined using the spot price of the commodity as a baseline.

59.     The sharing of competitively sensitive information between the Producer Defendants thus enabled them to artificially raise, fix, maintain, or stabilize the prices at which Refined Sugar was sold to their customers pursuant to their anticompetitive agreement. Knowing each other's sold positions allowed the Producer Defendants to be more aggressive with pricing.

60.     As noted below, similar conduct by earlier producers of Refined Sugar led to a consent decree in 1978 that forbade such information exchanges by competitors.

61.     Due to United States Department of Agriculture ("USDA") production allotments linked to USDA loan programs and limitations on imports and tariffs, the

19

Producer Defendants know that as they sell out of Refined Sugar, they can charge higher prices because there will be little to no additional competitive product available in the market that could force them to reduce price. Thus, knowing their horizontal competitor's sold position allows a competitor to manipulate the availability of supply in the market, thereby permitting them to raise, fix, maintain, or stabilize prices.

62.    Furthermore, as market leaders, the Producer Defendants account for the majority of Refined Sugar production and sales. As a result, smaller market participants are not an effective competitive constraint on Producing Defendants' dominance.

63.    The mutual, reciprocal exchange of pricing, crop size and yield, and sold position information by the Producer Defendants was intended to ensure—and did ensure—higher prices for Refined Sugar than would have existed in a competitive market unaffected by the Defendants' anticompetitive agreement.

64.    In addition to sharing of competitively sensitive information through Commodity and Wistisen and others, the Defendants participated in trade association meetings that provided them with opportunities to collude and agreed to set price ranges based on the commodity spot prices for Number 16 sugar, as also discussed below.

65.    As will be explained in further detail below, the agreement at issue here is consistent with some of the past governmental lawsuits challenging sugar producers for violations of the antitrust laws.

## V.    THE ANTICOMPETITIVE CONDUCT AT ISSUE

### A.    Detailed Analysis of How Information was Shared Through Commodity, Wistisen and Other Conduits

20

66.    The Producer Defendants knowingly and intentionally sought, shared, received, and used non-public, competitively sensitive information from Wistisen of Commodity and other conduits pursuant to the alleged anticompetitive understanding as alleged herein in order to raise, fix, maintain, or stabilize Refined Sugar prices.

67.    United does not publish the company's current Refined Sugar prices or its sold position, *i.e.* the percentage of its crop that is booked for the current fiscal year.

68.    United's sold position was confidential, and its employees were supposed to keep that information non-public. Nevertheless, United shared it with Commodity, who they knew and understood would pass it along to ASR/Domino and other competitors.

69.    As explained below, ASR/Domino has a written code of conduct with an ethics policy that prevents any ASR/Domino employee from talking about ASR/Domino's pricing with a representative of one of ASR/Domino's competitors. Despite this prohibition, ASR/Domino employees shared non-public, confidential, commercially sensitive pricing, sold position, and other information with Commodity knowing that Commodity would provide the information to other competitors.

70.    Despite having internal policies against the sharing of non-public information, the Producer Defendants shared competitively sensitive information with one another through Commodity during the Class Period pursuant to their agreement. The information exchanged includes the companies' current pricing, future or forward pricing, pricing strategies, sold positions, spot prices, and contract prices. The Producer Defendants used the information they received from Commodity when deciding how much to charge for their products pursuant to their price-fixing agreement.

21

71.    Commodity distributed this reciprocal information exchange among all the Producer Defendants rapidly, often within hours of having received it. High-level executives at the Producer Defendants, who had direct involvement in pricing, shared the sensitive information with Wistisen. The sharing of information between the Producer Defendants thus allowed them to raise, fix, maintain, or stabilize Refined Sugar prices pursuant to the unlawful agreement.

72.    The pricing shared among United, Michigan Sugar, ASR/Domino, and Commodity included spot prices, contract prices, and sold positions. Current spot prices can also be turned into contract prices.

73.    Commodity was not the only conduit of information between the Producer Defendants. On November 15, 2019, Gerald Kramer of Kramer Brokerage Co. shared Domino price quotes with multiple Louis Dreyfus managers, and the inventory details: "[a]lso told that Domino still has sugar to sell." Jim Evans, National Sales Manager at Louis Dreyfus, expressed his appreciation: "This is very helpful!" Jeana Hines, Vice President Sales & Marketing at Imperial, in the same email chain, asked Gerald Kramer, "Have you heard anything on what Domino is doing with pricing for their grocery retail business?" Kramer responded, "Domino will not sell any 50# EFG below $24.00/50# fob refinery thru 2020 for end users and only thru 12/31/19 for distributors. If I get any info on retail business I will pass it on."

74.    Returning to Commodity's role, in an email communication to Wistisen, ASR/Domino's Vice President of Industrial Sales, Alan Henderson ("Henderson"), disclosed ASR/Domino's pricing and sold positions. ASR/Domino disclosed this non-

public information knowing it would be shared with its competitors, and in return, that it would receive its competitors' non-public information. Wistisen responded that he would send crop and pricing updates in the next day or two.

75.     The Producer Defendants provided accurate information to each other through Wistisen. ASR/Domino was typically "upfront" with the information it provided to Wistisen. In one example of such "upfront" information, Henderson disclosed pricing updates for ASR/Domino Granulated Sugar to Wistisen in an August 2020 email.

76.     Moreover, Wistisen told both United and ASR/Domino that he had spoken with the other company, Michigan Sugar, and other sellers, and that the information he provided had come directly from them. For example, on one occasion, Wistisen wrote to United that "Domino saying back up to $40.50 to $41." On another occasion, Wistisen wrote to Henderson that "the United [pricing and sold position] info I provided was direct from them this morning. They held a huddle yesterday (sounded like all sales reps/VP were present), and those numbers were the result." When discussing pricing, Wistisen stated that he did not have Michigan pricing yet, and "I hope to talk with them [Michigan] on Fri./Mon."

77.     Wistisen provided information on pricing and sold positions to the Producer Defendants rapidly, often soon after having received it. On September 21, 2020, Wistisen separately asked, within minutes, Henderson and Eric Speece ("Speece"), a Director of Strategic Accounts at United, if there was "anything new of interest on the pricing front?" They each responded with their company's respective pricing and sold positions. Speece shared, "[w]e are firm at $36.50 (no change) and now $38.50 on cane (an increase of

$0.50/cwt) and yes you heard correctly we are 90+% sold." In response, Commodity thanked United "for keeping the communication lines open!"

78.    On August 17, 2020, Wistisen wrote to Henderson, providing him with sugar market updates and asked: "Where would you put cane prices and coverage?" The next day, August 18, Henderson responded: "Quick update: Pricing: [next three lines redacted]."

79.    On September 21, 2020, Wistisen wrote to Henderson yet again, providing several paragraphs of sugar industry news, after which he asked: "Anything new of interest on the pricing front? . . . Where would you put ASR/Domino prices . . . ?" One day later, on September 22, 2020, Henderson responded with "Pricing (Cane)." Wistisen quickly answered back: "U.S. Sugar recently increased to $38.50, so looks like the range is $38.50 to $41, nice increase over last month."

80.    At the same time, Wistisen emailed Henderson, relaying, "United also 90+% (including cane) not sure on price, last indication was early Sep, were still in market and mostly firm at $36.50 and $38. Just getting started on cane side. Early read suggests $38-40, so down on the coasts and up in south." Henderson responded, "Lots of meeting[s] this week so I'll keep it short. Pricing (Cane)[:] North and mid-Atlantic - $40.50 to 41.00 FOB – prices were lower past few weeks but have firmed up to these levels. No discounting at this time. Gulf - $38.50 fob[.] West - $40.50 to $41.00 fob firm[.]" They also discussed other topics of interest, such as sold positions of ASR/Domino's competitors.

81.    On September 22, 2020, less than three hours after receiving Henderson's response, Wistisen provided United and ASR/Domino with the information from each other in emails less than a minute apart. Wistisen told ASR/Domino that "U.S. Sugar recently

24

increased to $38.50, so looks like range is $38.50 to $41, nice increase over last month. . . . Beet not much change from earlier indications, prices are $36.50 to $38.75, very little sugar available at low price, industry coverage 87%, all but NSM over 90+% booked." To United, Wistisen wrote, "ASR saying back up to $40.50 to $41. So now I have cane range at $38.50 to $41 Coverage . . . . ASR 5% below that, and other southern refiners up 10-15% from the average. . . . Waiting to confirm from Michigan, but Midwest ranging from $36.50 to 38.75, very little available at low price (so I hear)."

82.    Similarly, Wistisen shared Michigan Sugar's pricing and sold positions with United and ASR/Domino. In August of 2020, he reported to Henderson at ASR/Domino, "My goodness, what a difference a month makes. Michigan 85+% booked." The next month, Wistisen reported, "Michigan holding forecasts unchanged, sugars nearing 16%, factories running well, stockpiling on Oct. 19th." He added with regard to pricing that Michigan was at "$38.5+, selective selling."

83.    In yet another example, Wistisen emailed both Speece at United and Henderson at ASR/Domino within approximately 40 minutes of each other in mid-November of 2020, asking "where [they] would put . . . prices?" Both responded later that day with the requested pricing information.

84.    The communications between Wistisen and United, Michigan Sugar, and ASR/Domino were candid and specific about pricing. In a November 2020 email, ASR/Domino's Henderson emailed Wistisen, "Prices have firmed up again based on higher #16 values, beets close to sold out and less imports, tier 2 sugar available at this time. Near-by values back up to $46.00 FOB all locations. For calendar 2021: East/West - $42.00 fob[;]

25

Gulf - $39.50 fob[;] Cane Coverage – 85-90%[.]" Wistisen responded by providing United's pricing to ASR/Domino.

85.    That same month, Wistisen emailed Domino/ASR asking for "[a]ny guidance [ASR/Domino] could give on how sub-30 cent No 16 prices makes sense?" Henderson at ASR/Domino and Wistisen exchanged messages regarding the "reason" Henderson had "heard," and Wistisen responded with real-time information from competitor United: "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50 based on demand, inventories, No. 16, and looking down the road and expecting another year of tight quotas in FY22. . . . Selling FY21 firm, good activity, little to no competition from NSM or Western." Henderson passed this along to others in ASR/Domino, adding, "United is usually pretty upfront with [Wistisen]."

86.    On January 19, 2021, Wistisen wrote to United delivering several paragraphs of information on developments in the sugar industry. Wistisen also asked: "Has United put out a price range on FY22?" On January 20, United responded: "We have not yet set pricing for 2022, but we will soon."

87.    On February 15, 2021, Wistisen wrote to United: "Any action in FY22? Has United put a number on it yet? No word back from other processors/Refiners, I'll send along indications." United quickly responded: "We are still at the $36.50 and $38.50 with zero problems selling at those values. I do not anticipate any changes to our prices, but we have not formally decided. No action on 2022 just some small inquiries." Wistisen asked: "Just to clarify: United has not issued FY22 list prices, and at this point doesn't expect FY22

prices to change much from remainder FY21?" On February 16, 2021, United answered: "Give me a ring and we can discuss."

88.     The next day, February 17, 2021, Wistisen wrote to ASR/Domino: "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50 . . . ."

89.     On April 29, 2021, Wistisen wrote to ASR/Domino: "Where would you put price ranges and demand? I have spot $36.50 firm Midwest, $39.00 firm Michigan (but watching Baltimore progress, could creep higher), and east and west coasts now at $44.00. And forward I have quoting at $35.50-$36 Midwest, 37.50-38 Gulf, $42.00 Coasts," and provided pricing information. ASR/Domino responded: "I believe your pricing numbers below are very accurate."

90.     In another message in April of 2021, Wistisen wrote to ASR/Domino regarding pricing. ASR/Domino responded with specific prices and told Wistisen, "I believe your price predictions below are very accurate. Prices in FY21 are very firm."

91.     In May of 2021, ASR/Domino informed Wistisen of FY21 pricing. Wistisen responded that United's "prices [were] unchanged."

92.     In June of 2021, Wistisen sent an email to ASR/Domino sharing that he had "heard . . . United reportedly (I'll talk with them tomorrow) holding $36.50 gross . . . [a]nd that ASR is holding firm on the coasts." ASR/Domino responded that "[w]ord on the street [was] United moving up a $1.00 cwt since bookings now over 60%." ASR/Domino then went on to share future prices for the fourth quarter of 2021. In July, Wistisen responded, among other things, that "Michigan . . . 80+% [booked,] and rumors suggest United is also

27

now around 80% booked and recently increased prices (I hope to have confirmation soon)."
ASR/Domino forwarded Wistisen's message to coworkers saying, "no official word yet.
Let's see if we can hunt something down."

93.    Also in July of 2021, Wistisen emailed ASR/Domino saying, "the United info
I provided was direct from them this morning. . . . They are a hair shy of 90% sold."

94.    In another example, United provided its current pricing to Wistisen and
informed him that United did not "anticipate any changes to our prices" as they had "zero
problems selling at those values." Wistisen responded, "Just to clarify: United has not
issued FY22 list prices, and at this point doesn't expect FY22 prices to change much from
remainder FY21?" to which United responded, "Give me a ring and we can discuss." After
confirming the information with United by phone, Wistisen wrote to ASR/Domino a few
hours later providing the information that he had a "[l]ong conversation with United" and
that United "won't set FY22 price list until March, but the plan remains to hold steady at
$36.50 and $38.50."

95.    The Producer Defendants used the sensitive information they exchanged
through Wistisen in furtherance of their anticompetitive agreement and used it to send
messages to competitors about desired price levels. For example, ASR/Domino forwarded
pricing information from Wistisen to others at ASR/Domino with a recommendation of
what price ASR/Domino would have to offer to win a specific customer's business. In
another example, an executive at United thought a competitor was selling at too low a price,
so he told his colleagues that United "may want to communicate pricing earlier than the
colloquium to send a message."

96.    ASR/Domino frequently forwarded the information obtained about other competitors from Wistisen to their sales team and senior executives. In one such example, ASR/Domino received, and forwarded internally, information from Wistisen that United would likely be adding bookings and raising prices over the following month, and "not by just a dollar." In another example, ASR/Domino executives exchanged information on competitors' inventory position that ASR/Domino received from Wistisen.

97.    United not only received information from Wistisen that it used in pricing decisions and sent messages about pricing to competitors through Wistisen, but also affirmatively used him to signal other important information to competitors. In one example, United's Executive Vice President, Dirk Swart ("Swart"), told United that he wanted Wistisen to "hear" that United's current beet sugar price was $36.50 and cane sugar price was $38, but United was contemplating increasing its prices given its sold position. They discussed what they wanted to "indicate" to Wistisen before deciding to continue the conversation by phone.

98.    United believed that the "better information about what [his] competitor's actual prices were, [United] could better avoid these destructive situations" of customers using pricing information to negotiate better prices.

99.    Wistisen also wrote to ASR/Domino and asked: "Wondering where you would put Granulated prices and coverage?" An hour and fifteen minutes later, ASR/Domino provided "[p]ricing for FY20."

100.    On November 16, 2020, Wistisen wrote to ASR/Domino, asking: "Curious what you're hearing on domestic raw and Granulated pricing. I haven't heard back from

29

United yet. Did they pullback from spot market? Where would you put prices and cane coverage?" Wistisen received his response from ASR/Domino later that day.

101.    On May 11, 2021, Wistisen wrote to ASR/Domino: "Are those higher spot prices, [redacted] holding up?" On May 12, 2021, ASR/Domino responded: "All is good in Baltimore. Melt rates close to 90% of pre-fire levels. With that being said near-by prices are selling at [redacted]."

102.    On May 18, 2021, Wistisen wrote again to ASR/Domino: "Just talked with United: prices unchanged, spot and forward."

103.    On June 16, 2021, Wistisen wrote to ASR/Domino: "The word from United: 80-85% sold, will be at 90 very soon. Beet holding at $36.50 firm, and cane increased to $39.50 firm. . . .  Any changes in ASR/Domino forward prices? I have you at [redacted] and [redacted]." Later, Wistisen added: "The United info I provided was direct from them this morning."

104.    On July 12, 2021, Wistisen wrote to ASR/Domino, asking, "What's happening on the cane side of the fence? Sounds like you're now [redacted], and Imperial $49. Where would you put forward pricing and coverage?" ASR/Domino responded: "United price increase. Rich is thinking $2.00 increase but no official word yet."

105.    There is no plausible, non-conspiratorial justification for the Producer Defendants to use Commodity to secretly share highly confidential and proprietary detailed information about their pricing and sold position. In a competitive market, such proprietary, competitively sensitive information would be a closely guarded secret. Economic theory suggests that the routine exchange among competitors of such sensitive internal company

information reduces the intensity of competition and destroys independent centers of business decision making.

106.    Defendants knew and intended that their private exchanges of competitively sensitive information about prices and sold positions would allow them to artificially raise, fix, maintain, or stabilize Refined Sugar prices above the levels they would have been absent the anticompetitive conduct alleged herein.

107.    During the class period, documentary evidence demonstrates that the Producer Defendants were interested in achieving higher prices for Refined Sugar. In one instance, United raised prices in part to "send[] a message" to its competitors "that we were not interested in allowing the market to slip lower." United's CEO Matthew Wineinger testified that he was "confident" that "word got back" to United's competitors.

108.    Similarly, United at times pulled its competitive punches for fear of prices dropping. ("As with all plans of this nature where we are looking at taking share from competitors, we need to factor in competitive responses . . . . In our minds the key is stay balanced, thoughtful where the moves will initiate relatively smaller reactions.").

109.    ASR/Domino similarly anticipated competitive reactions, used pricing to send signals to competitors, and considered how its actions may cause market prices to decline.

110.    ASR/Domino decided not to get "aggressive" on pricing because ASR/Domino "would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing." ASR/Domino also wanted to "signal to the market" that there would be tightness and ASR/Domino would "maintain price."

31

111.   ASR/Domino also observed that the proposed acquisition of Imperial by a member of the United cooperative was a "good thing" because it would help to align United's pricing strategy with ASR/Domino's. ASR/Domino believed that after the acquisition of Imperial, "[i]t's going to be more important than ever to stay close to United" and "[t]his is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry . . . ."

112.   Upon information and belief, Michigan Sugar likewise participated in the sharing of sensitive information regarding pricing and sold positions with the intention of artificially raising, fixing, maintaining, or stabilizing Refined Sugar prices above the levels they would have been absent the anticompetitive conduct alleged herein.

**B.    The Producer Defendants Used the ISC and Other Forums to Collude**

113.   In addition to sharing information through Wistisen and disseminating public statements to competitors, Defendants had opportunities to collude through annual meetings of the ISC, which is run by the International Dairy Foods Association ("IDFA") and is held in February of each year.

114.   The IDFA has characterized the purpose of the ISC as follows: "[t]he Colloquium draws hundreds of professionals and decision-makers from the sweetener industry and from companies that use sweeteners in the products they make. Buyers, processors, refiners, distributors and food companies actively participate in the Colloquium, using it as a springboard to enhance their business and trading-partner networks."

115.   Due to the COVID-19 pandemic, the ISC meeting was not held in person in 2021, but resumed in person in 2022 and the years that have followed. Representatives of

32

Defendants attended each of the ISC's meetings held in 2019-20 and 2022-24. At the 2019 session, to offer one illustrative example, there were extensive presentations of the factors that would dictate future sugar prices during the upcoming year.

116.    Discussions on the sidelines of the ISC are a prime opportunity for collusion. During the past few years, the event has served to kick start sales for the following year. For example, in 2022, future contract prices for Number 16 sugar were discussed at the ISC and then finalized in the weeks following the event.

117.    Further discussion of pricing developments following ISC meetings is presented in Section VIII below.

118.    In addition to participating in the ISC, the Producer Defendants each are members, either directly or through one of their affiliated companies, of various trade associations such as the Sugar Association and the American Sugar Alliance. The Producer Defendants, directly or through their affiliates, hold board positions on these trade associations. For example, the Board of the Sugar Association includes Pepe Fanjul (ASR/Domino), Mike Greear (Wyoming Sugar Company, one of the member-owners of United), Matt Hoffman (Sugar Cane Growers Cooperative of Florida, parent company of ASR), Neil Juhnke (Michigan Sugar), Peter O'Malley (ASR/Domino), Parks Shackelford (Florida Crystals, parent company of ASR), Rob Sproull (ASR/Domino), and Kurt Wickstrom (Minn-Dak, one of the member-owners of United). These memberships afford them opportunities to collude during the Class Period.

### C.    Use of Formulas to Set Sugar Prices

119.    The Producer Defendants also developed formulas to set pricing levels. One approach among Defendants was to set current prices within ranges based on the Number 16 spot prices that were in turn used to set FOB prices.

120.    For example, in February of 2021, Wistisen told Henderson that on the pricing side, sugar prices could increase thanks, inter alia, to the "history of excellent selling restraint/patience from ASR, [and] high no. 16 prices…."

121.    In July of 2021, Henderson told Wistisen that he understood that United would soon be announcing a $2 price increase for beet sugar because pricing for the 2022 fiscal year was moving up and it "makes sense if they follow the #16 market and do the math."

122.    In a subsequent July 2021 e-mail, Henderson told Wistisen that ASR was using "pricing off #16 market." Henderson noted that United had indeed also raised its price to $40.50, which matched to the penny ASR's gulf FOB price. Wistisen said that the price increase was arrived at after a "big huddle" among United's marketing personnel.

123.    Imperial Sugar (now part of United), which sold foreign imported sugar rather than domestically grown sugar, also used a formula based off of Number 16 sugar prices. It advocated a "clear view of market structure. Acting as a price-taker would put the whole business at risk.".

### D.    Governmental Guidelines Prohibit Defendants' Conduct

#### 1.    Information Sharing as Evidence of a Conspiracy or as a Stand-Alone Antitrust Violation.

34

124.     In 2000, the DOJ and the Federal Trade Commission ("FTC") issued their joint "Guidelines for Collaborations Among Competitors" ("FTC/DOJ Guidelines").[4]

125.     The FTC/DOJ Guidelines state that:

> Agreements that facilitate collusion sometimes involve the exchange or disclosure of information. . . . [I]n some cases, the sharing of information related to a market in which the collaboration operates or in which the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive variables. Similarly, other things being equal, the sharing of information on current operating and future business plans is more likely to raise concerns than the sharing of historical information. Finally, other things being equal, the sharing of individual company data is more likely to raise concern than the sharing of aggregated data that does not permit recipients to identify individual firm data.[5]

126.     A decade later, in 2010, the United States submitted the following comments to the Organization for Economic Cooperation and Development on the legal approach to information sharing among competitors. In those comments, it stated that:

---

[4] *See Antitrust Guidelines for Collaborations Among Competitors*, U.S. FED. TRADE COMM'N & U.S. DEP'T OF JUST. (Apr. 2000), https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf.

[5] U.S. Federal Trade Commission & U.S. Department of Justice, *Guidelines for Collaborations Among Competitors*, Organisation for Economic Co-operation & Development, 15–16 (Oct. 9, 2000), https://www.ftc.gov/system/files/attachments/us-submissions-oecd-other-international-competition-fora-2000-2009/2000-rdtble_on_joint_ventures_ftc_doj.pdf.

> [C]ertain information exchanges among competitors may violate Section 1 of the Sherman Act, which prohibits a 'contract, combination…or conspiracy' that unreasonably restrains trade. The antitrust concern is that information exchanges may facilitate anticompetitive harm by advancing competing sellers' ability either to collude or to tacitly coordinate in a manner that lessens competition. Thus, for example, exchanges on price may lead to illegal price coordination.[6]

127.    It went on to say that "[i]nformation exchanges can be treated as circumstantial evidence of an unlawful price fixing or market allocation agreement among competitors, and in such a case are analyzed under the per se rule as a violation of the antitrust laws."[7] Factors that inform the analysis include the nature and quantity of the information, the currentness of the exchanged data, the parties' intent in sharing data, the concentrated nature of the industry, and the frequency of the exchanges.[8]

128.    Similarly, the FTC issued general guidance in 2014 entitled "Information exchange: be reasonable," confirming that "competing companies seek market intelligence

---

[6] Delegation of the United States, *Roundtable on Information Exchanges Between Competitors Under Competition Law*, Organisation for Economic Co-operation and Development, 2 (Oct. 21, 2010), https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/1010informationexchanges.pdf.

[7] *Id*. at 3.

[8] *Id*. at 4.

by exchanging price or other commercially sensitive information, that may facilitate collusion or otherwise harm competition and consumers in violation of the antitrust laws."[9]

129.    Since these position papers were written, the DOJ has expressed even greater concerns about information sharing among competitors. In February of 2023, it withdrew three policy statements regarding the healthcare industry, stating that "the statements are overly permissive on certain subjects, such as information sharing."[10]

130.    The withdrawal of the policy statements was preceded by remarks made by principal Deputy Assistant Attorney General Doha Mekki on February 2, 2023, in which she said that "throughout its enforcement and policy work, the DOJ has had 'serious concerns' about whether the factors set out in the safety zones are appropriate for the industry as it exists today." Mekki noted that "[e]xchanges facilitated by [third-party] intermediaries can have the same anticompetitive effect as direct exchange among competitors." Additionally, she said that "the suggestion that data that's at least three months old is unlikely to be competitively sensitive or valuable is underpinned by the rise of pricing algorithms that can increase the competitive value of historical data."

131.    Following the withdrawal of the policy statements, at a conference in March of 2023, Deputy Assistant Attorney General Michael Kades ("Kades") commented

---

[9] Michael Bloom, *Information exchange: be reasonable*, U.S. FED. TRADE COMM'N (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable.

[10] *Justice Department Withdraws Outdated Enforcement Policy Statements*, U.S. DEP'T OF JUST. (Feb. 3, 2023), https://www.justice.gov/opa/pr/justice-department-withdraws-outdated-enforcement-policy-statements.

on the DOJ's new position related to information sharing. Responding to questions on what proper information sharing looks like without safe harbors, Kades said that "top-of-mind questions should be what information is being shared, how it is being used, and what the impacts are of that sharing. Any time information sharing appears to be suppressing price competition or eliminating other forms of competition, 'that should send red sirens off.'"

132.    The DOJ's most current analysis of information sharing and price-fixing is found in an amicus brief it filed on October 1, 2024 in its amicus brief in Pork. In that brief, the DOJ explained that information sharing by itself can violate the antitrust laws:

> As relevant here, competitors' exchange of competitively sensitive information is itself a form of concerted action that can violate the antitrust laws. As the Supreme Court explained in *United States v. Container Corp.*, reciprocal information exchange among competitors is "concerted action [that] is of course sufficient to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act." 393 U.S. 333, 335 (1969) (emphasis added). This is so even when the participants have the "freedom to withdraw from the agreement" and when the exchanges are "infrequen[t] and irregular[]." *Id.; see, e.g., Todd [v. Exxon Corp.]*, 275 F.3d [191] at 198 [(2d Cir. 2001)] (Sotomayor, J.)] (recognizing that an "information exchange itself" can form a claim under Section 1).[11]

133.    With respect to a stand-alone information exchange, the DOJ went on to say: "Standalone information-sharing claims are evaluated under the rule of reason . . . If information sharing tends to harm competition based on the full factual circumstances,

---

[11] *Pork*, at 5-6. Indeed, the DOJ stated that "[e]xchange of disaggregated data can harm competition even if the individual firms are not explicitly identified, and the United States has obtained consent decrees in recent years with firms that shared disaggregated information without directly identifying individual competitors." *Id.* at 15 n.11.

'liability follow[s].'" Id. at 7-8 (quoting United States v. Gypsum Co., 438 U.S. 422, 446-47 n.22 (1978)).

134.    The DOJ also reconfirmed at length that there was a second, independent manner in which information exchanges can violate the antitrust laws:

> Information exchanges can be relevant to concerted action in a second way: An information exchange among competitors can support an inference that a price-fixing or output-restriction agreement exists. Plaintiffs therefore regularly rely on information exchanges as evidence of a conspiracy to fix prices or restrict output. *See Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000) (en banc) (recognizing that information exchanges can serve as a "plus factor" suggestive of a price-fixing conspiracy); *Penne v. Greater Minneapolis Area Bd. of Realtors*, 604 F.2d 1143, 1151 (8th Cir. 1979).

*Id.* at 5-6. In such circumstances, the *per se* rule of antitrust liability applies.

135.    The DOJ has also emphasized that structural market factors can be important in assessing whether conspiratorial conduct in violation of the antitrust laws has occurred. In 2016, the DOJ issued a primer on price-fixing where it said that while collusion can occur in almost any industry, it is more likely to occur in some industries than in others. An indicator of collusion may be more meaningful when industry conditions are already favorable to collusion. It further stated:

- Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories. Collusion may also occur when the number of firms is fairly large, but there is a small group of major sellers and the rest are

39

"fringe" sellers who control only a small fraction of the market. The probability of collusion increases if other products cannot easily be substituted for the product in question or if there are restrictive specifications for the product being procured.

- The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.

136.    Repetitive purchases may increase the chance of collusion, as the vendors may become familiar with other bidders and future contracts may provide the opportunity for competitors to share the work. Collusion is more likely if the competitors know each other well through social connections, trade associations, legitimate business contacts, or shifting employment from one company to another.[12]

137.    As explained above, all of these factors are present in the domestic Refined Sugar market.

138.    Defendants' scheme described herein is far outside the scope of permissible information sharing among competitors. For example:

(a)    The FTC/DOJ Guidelines note the high risk of antitrust issues for information sharing programs in industries with a history of collusion.

---

[12] *Price Fixing, Bid Rigging, And Market Allocation Schemes: What They Are And What to Look For: An Antitrust Primer,* U.S. DEP'T OF JUST. (Feb. 2021) https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf.

As explained below, sugar refiners have a long history of price-fixing (*see infra* Section XI).

139. The more competitively sensitive the information being shared, the higher the antitrust concern for such information sharing. The detailed and granular pricing and sold position information, shared by Defendants, would be considered to be trade secrets in a competitive industry. Therefore, the competitive sensitivity of the information shared by United, ASR/Domino, and Michigan Sugar warrants a particularly high level of antitrust concern.

(b)    The older or more historical the information being shared, the less concern the FTC and DOJ have with information collaborations by competitors. However, here, the Defendants shared current and future price information, including their current pricing, future or forward pricing, pricing strategies, and sold positions. Commodity normally exchanged accurate and current pricing and sold position information within hours of receiving it, and the Producer Defendants would then consider and use that competitively sensitive information contemporaneously. This is the sort of current competitively sensitive information which clearly supports heightened antitrust concerns under the FTC/DOJ Guidelines.

(c)    The pricing and sold positions were not aggregated or anonymized. Defendants knew exactly from where the information came.

41

> Commodity functioned as an information exchange among ASR/Domino, Michigan Sugar, and United. Commodity did not prepare or publish any public reports. Furthermore, Wistisen explicitly stated when the pricing and sold positions he was conveying were coming straight from ASR/Domino, Michigan Sugar, or United. Defendants could at all times identify whose pricing and sold positions they received.

140.    As explained above, all these factors are present in the domestic Refined Sugar market.

141.    **Joint Use of Formulas to Fix Prices**. As noted above, Defendants agreed to charge spot prices for Refined Sugar within a range based on reported No. 16 sugar spot prices.

142.    The DOJ dealt with this topic most recently in an amicus brief filed on October 24, 2024 in Gibson v. Cendyn Grp., LLC, No. 24-cv-03576 (9th Cir.) (ECF No. 28.1). It said:

> In particular—and especially important here—the *per se* prohibition on price fixing applies with full force to concerted action by competitors on any 'formula underlying price policies.' [*United States v.*] *Socony-Vacuum* [*Oil Co.*], 310 U.S. [150] at 222, 226 n.59 [(1940)]; *see also id.* at 223 ('an artificial stimulus applied to (or at times a brake on) market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone'). That includes any formula used to fix benchmark, component, recommended, or "starting point" prices—even if end prices ultimately vary….*see also, e.g.*, …*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 765, 771 (2d Cir. 2016) ('benchmark' or 'component' used in contracts setting interest rates).

42

> Moreover, black-letter antitrust law prohibits horizontal price-fixing agreements without regard to whether the agreement is carried out at all. The agreement itself is the violation.

*Id.* at 24-25. Thus, the Defendants' use of agreed-upon pricing ranges based on No. 16 spot prices also is conduct that can be a *per se* violation of the Sherman Act, even if it is not carried out.

### E.    Sugar Prices Have Risen in Parallel and More Than They Would in a Competitive Market During the Class Period

143.    As noted above, 80 percent of all Refined Sugar sold in the United States is Granulated Sugar.

144.    Although the FTC/DOJ Guidelines also provide a "safety zone" (*i.e.*, presumptively permissible) for collaborations among competitors if they impact no more than twenty percent of a market, the Producer Defendants as of 2021 accounted for nearly 70% or more of the Refined Sugar market, far above the threshold set forth in the FTC/DOJ Guidelines, which shows heightened antitrust risks.

145.    Refined Sugar prices became significantly elevated during the Class Period as a result of Defendants' conduct. This was contrary to pricing patterns prior to the Class Period.

146.    Moreover, sugar prices increased dramatically during the Class Period without shortages in the supply of sugar.

147.    In the past 20 years, the price of Refined Sugar has doubled on an indexed basis. There is no economic rationale for this rate of price increases.

148.     Moreover, the temporal proximity of the price increases to meetings of the executives of Defendants is further evidence of their illicit understanding. Many of the price increases at issue in this market occurred after ISC meetings, when participants had an opportunity to coordinate with one another. As discussed above, the ISC provided a perfect opportunity for such collusion.

149.     For example, as reported in April of 2019, soon after the ISC meeting held that year, buyers who had paid beet sugar prices in the low 30 cents extending back to 2017 were shocked at a $0.02 to $0.03 a pound increase.

150.     In 2020, spot prices for cane sugar reached seven-year highs in some instances and in the fourth quarter of 2020, they exceeded the high spot prices for 2019-2020.

151.     In late 2021, cane sugar prices got as high as $0.51 a pound FOB in all regions, a figure that had not been seen since April of 2012.

152.     Soon after the 2022 ISC ended, prices rose by 25% in many instances from the prices for which sugar was contracted for in 2022-23. Parallel price increases for both cane and beet sugar for the 2024 calendar year also occurred. Cane sugar was offered at $0.62 a pound. FOB Northeast and West Coast went up $0.01 from its prior list price, which had been steady for weeks. Prices ranged from $0.57 to $0.60 a pound. FOB Gulf and Southeast also went up $0.01 higher. Beet sugar was offered at $0.56 to $0.59 a pound FOB Midwest, firm to $0.01 higher.

153.     As evidenced throughout Section IV.A, Defendants' communications with Wistisen further evidenced their parallel pricing. For example, Defendants held similar

44

prices "firm" in parallel, which is another way of saying they would not be discounting to take market share. For example, on September 21, 2020, United was "**firm** at $36.50 (no change) and now $38.50 on cane." (Emphasis added). On February 17, 2021, Wistisen conveyed the following to Henderson at ASR/Domino: "Long conversation with United: won't set FY22 price list until March, but the plan remains to **hold steady** at $36.50 and $38.50 . . . ." (Emphasis added). Michigan's prices remained between $38.50 and $39 from at least September 2020 to April 2021 during the same time period that United "held steady" with cane price at $38.50. ASR/Domino also quoted prices between $38.50 and $39.50 in the Gulf from September 2020 to April 2021.

154.    In addition to holding prices firm in parallel, Defendants increased their prices in parallel. For example, although United initially communicated it was holding prices firmly at $36.50 and $38.50, it also conveyed its plan to increase prices when the time came. On May 18, 2021, Wistisen told Henderson that he had just talked with United, and to "expect big action over the next month, … and at that time expect to raise prices, and not by just a dollar …." A little over a month later, in July 2021, ASR/Domino increased its gulf FOB price to $40.50. That same month, United raised its prices to $40.50.

155.    The DOJ Findings of fact in the merger case concluded that Defendants were "interdependent," meaning that if one Defendant raised prices, the others would similarly raise in parallel. The DOJ further concluded that "Competitors closely monitor one another's pricing and sold positions" and that "[t]here is ample evidence that United and others recognize their strategic interdependence, accounting for price signals they send as well as receive. United sends messages or signals to competitors about pricing and

consider how its own actions may cause market-wide prices to decline [or increase]. For example, United's CEO, Mr. Wineinger, explained a strategic decision whereby United "pull[ed] some older offers while sending a message to NSM and other competitors that we were not interested in allowing the market to slip lower. And United at times pulls its competitive punches for fear of prices dropping."

156.    The DOJ Statement of Facts further concluded that just like United, "Imperial and Domino similarly anticipate competitive reactions, use pricing to send signals to competitors, and consider how their actions may cause market prices to decline. The DOJ Statement of Facts cited to Imperial's Henneberry expressing concern that lowering pricing "would be snatching something from United just as they are starting to show some upside price movement"; and Domino's Henderson explaining a decision not to get "aggressive" on pricing because Domino "would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing." Domino's Robert Sproull instructed Henderson to "signal to the market" that there would be tightness and Domino would maintain price.

157.    As further evidence of parallel conduct, Domino bluntly stated that after the Imperial/United merger "[i]t's going to be more important than ever to stay close to United"  and "[t]his is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry..." Further, "[a]fter speaking with his 'trusted friend,' the Imperial's CEO, Domino's Mark Olson wrote that following the transaction, United/U.S. Sugar would be more likely to follow Imperial's 'cane price approach,' which likely is a good thing for [Domino]."

46

158.    The parallel pricing resulted in dramatic overall increases to the sugar market. Pricing had reached a low point in February of 2014. Prices then started trending upward for the most part, but at modest levels of progression. United employed Wistisen/Commodity at least as early as the first half of 2019 to enable it to fix or coordinate prices with ASR/Domino and Michigan. Then, commencing on or about October of 2019, prices experienced one of the steepest climbs ever, which is ongoing, and by late 2023, cane sugar prices were at their highest levels since November of 1974. During that period, the Producer Price Index ("PPI") calculated by the Federal Reserve Bank of St. Louis went from 87.6 to 97.4. After United's acquisition of Imperial in 2023, prices further increased, going from a PPI of 110.6 to 123.2 by the end of 2023.

159.    The following chart depicts the PPI for the Granulated Sugar Manufacturing sector during the Class Period and the five years preceding it:



PPI industry data for Sugar mfg, not seasonally adjusted

Click and drag in the plot area to zoom in. Hover over chart to view data.
Source: U.S. Bureau of Labor Statistics.

### F. The Structure and Characteristics of the Production and Sale of Refined Sugar, Together with Other Factors, Render the Conspiracy Economically Plausible

160.    As alleged previously, Refined Sugar is a commodity product and competitors' pricing and sold positions are competitively sensitive information.

161.    The sugar industry is also vulnerable to coordinated interaction because of its structural dynamics.

162.    United and ASR/Domino have connected ownership interests that further raise the risks of unlawful coordination. U.S. Sugar has an ownership interest in the Sugar Cane Growers' Cooperative of Florida ("SCGC") through U.S. Sugar's wholly owned subsidiary South Bay Growers. SCGC, in turn, is one of the two owners of ASR/Domino.

163.    As also alleged previously, the Producer Defendants strategically used price signals (messages) they send and receive. For example, United sent signals (messages) to competitors about pricing and considered how its own actions may cause market-wide prices to decline and what to do to avoid that situation.

164.    In addition to the extensive information sharing by the Producer Defendants and the structural characteristics of the industry, there are other "plus factors" that plausibly suggest the likelihood of collusion, including, but not limited to: (1) high vertical integration, (2) high barriers to entry, (3) sugar industry consolidation and concentration, (4) inelastic supply and demand, (5) a lack of significant substitutes for Refined Sugar, and (6) a history of antitrust violations by sugar manufacturers.

165.    The Refined Sugar industry is almost entirely vertically integrated. In the Refined Sugar industry, "vertical integration" means the Refined Sugar producer owns or controls each aspect of growing sugar cane or sugar beets, processing these crops into raw sugar using its own processing facilities, refining the raw sugar into Refined Sugar in its own refining facilities, and selling its Refined Sugar to direct purchasers.

166.    There are high barriers to becoming a manufacturer of Refined Sugar. The start-up capital necessary to compete with today's Refined Sugar manufacturers would be substantial. Refined Sugar manufacturers have large economies of scale, utilizing large and expensive production facilities. Furthermore, Refined Sugar manufacturers must be vertically integrated with growers of sugar beets or sugar cane to qualify for USDA loans and production allotments that enable growers to process raw sugar into Refined Sugar without competition from imports.

49

167.    Due to high barriers to entry, the Refined Sugar industry is highly concentrated. As explained above, the Producer Defendants dominate the industry, such that none of the remaining producers of Refined Sugar have had a market share that remotely approaches that of the Producer Defendants.

168.    Furthermore, the industry has recently become even more concentrated when United acquired Imperial in 2023, resulting in a substantial increase in dominance by ASR/Domino and United.

169.    Demand for Refined Sugar is inelastic, so a decrease in supply in the face of stable or rising demand will increase prices. Defendants recognize that Refined Sugar demand is inelastic. The Producer Defendants knew that they could demand higher prices when less Refined Sugar was available to sell. As a result, they routinely exchanged information about their sold position to maintain higher prices because they knew that there were no meaningful substitutes for Refined Sugar.

170.    Furthermore, Defendants knew that the price support programs implemented by the USDA limited the number of sources of raw sugar for refinement into Refined Sugar and protected them from foreign competition.

171.    In sum, the Refined Sugar industry has a number of characteristics that make the exchanges by Defendants of competitively sensitive, non-public information highly anticompetitive and allowed the Producer Defendants to raise, fix, maintain, or stabilize Refined Sugar prices during the Class Period. As a result, Defendants' unlawful conduct caused Plaintiffs and the Class members to pay artificially inflated prices for Refined Sugar during the Class Period. These prices exceeded the amounts they would have

50

paid if the prices for Refined Sugar had been determined in a competitive market. Plaintiffs

and Class members have suffered antitrust injury because of Defendants' conduct.

### G.    There Is a Long History of Anticompetitive Conduct in the Sugar Industry

172.    The sugar industry has been marked by repeated violations of the antitrust

laws going back nearly 90 years.

173.    For example, the United States Supreme Court in the 1930s upheld a lower

court ruling that the Sugar Institute, an industry trade association, violated the antitrust laws

by, among other things, requiring advance pricing announcements by manufacturers with

"a requirement of adherence, without deviation, to the prices and terms publicly

announced."[13]

174.    In 1948, the United States Supreme Court reversed the dismissal of a

complaint raising the issue of whether "California sugar refiners who sell sugar in interstate

commerce may agree among themselves to pay a uniform price for sugar beets grown in

California without incurring liability to the local beet growers under the [Sherman] Act."[14]

The Court stated:

> In sum, the restraint and its monopolistic effects were reflected
> throughout each stage of the industry, permeating its entire
> structure. This was the necessary and inevitable effect of the
> agreement among the refiners to pay uniform prices for beets,
> in the circumstances of this case. Those monopolistic effects
> not only deprived the beet growers of any competitive
> opportunity for disposing of their crops by the immediate

---

[13] *United States v. Sugar Institute*, 297 U.S. 553, 582 (1936).

[14] *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 221 (1948).

operation of the uniform price provision; they also tended to increase control over the quantity of sugar sold interstate; and finally by the tie-in provision they interlaced those interstate effects with the price paid for the beets.

These restrictive and monopolistic effects, resulting necessarily from the practices allegedly intended to produce them, fall squarely within the Sherman Act's prohibitions, creating the very injuries they were designed to prevent, both to the public and to private individuals.[15]

175.    In the 1970s, the DOJ accused sugar refiners of using "brokers to act as go-betweens in carrying price information and exchanging assurances on price actions between and among refiners" to facilitate price-fixing.[16] The defendants in that case entered into a consent decree with the DOJ in 1978, which prohibited the same types of conduct engaged in here:

Each refiner defendant is enjoined and restrained from:
(A)  Directly communicating to any other refiner information concerning Future Prices.
(B)  Requesting, requiring or coercing any third person, including but not limited to brokers and sugarbeet grower representatives, to communicate to any other refiner, information concerning Future Prices.
(C)  For a period of ten (10) years from the date of entry of this Final Judgment,
(1)  Directly communicating to any other refiner information concerning:
(a) the prices at which, or terms or conditions upon which, refined sugar is then being sold or offered for sale; or

---

[15] *Id*. at 242.

[16] *United States v. Great Western Sugar Co., et al.,* Case No. 74-2674-SW at ¶ 1415 (N.D. Cal. Dec. 19, 1974) (complaint brought by the United States in 1974 against Great Western Sugar Company, American Crystal Sugar Company (now part of United), Amalgamated Sugar Company, and other sugar refiners).

(b) the prices at which, or terms or conditions upon which, other than prices or terms or conditions described in subsection (1)(a) of this paragraph (C), refined sugar has been sold or offered for sale within the one (1) year period ending on the date of the communications;

176.    Requesting, requiring or coercing any third person, including but not limited to brokers and sugarbeet growers representatives, to communicate to any other refiner, information concerning the prices at which, or terms or conditions upon which, refined sugar is then being sold or offered for sale.[17]

177.    The DOJ action spawned multiple private class actions on both the East and West Coasts. Classes were certified in each group of actions.[18] The cases were ultimately settled.

**H.    The USDA Sugar Program Does Not Render The Alleged Conspiracy As Being Implausible.**

178.    The current USDA sugar program structure originates from the Agriculture and Food Act of 1981 (1981 Farm Bill) and has been reauthorized since with some modifications.

---

[17] *United States v. Great Western Sugar Co*., No. 74-2674-SW, 1978 WL 1399 at *2 (N.D. Cal. Sept. 13, 1978); also available at https://www.justice.gov/atr/page/file/1138841/dl?inline.

[18] *See In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322 (E.D. Pa. 1976); *In re Sugar Indus. Antitrust Litig*., MDL No. 2201, 1976 WL 1374 (N.D. Cal. May 12, 1976), *mandamus denied*, 559 F.2d 481 (9th Cir. 1977).

179.    The sugar program was most recently reauthorized by Congress in 2018 with minor changes from the preceding 2014 and 2008 bills. "The only change to the sugar program under the 2018 farm bill was a 5% increase in the [loan] rate for raw cane and refined beet sugar." The 2014 Farm Bill left the objective and structure of the sugar program unchanged from the 2008 Farm Bill and maintained the FY2012 loan rate which was enacted in the previous bill. On November 19, 2023, Congress enacted a one year extension of the farm bill which expired on September 30, 2024.

180.    The objective of the sugar program is "to support domestic sugar prices without incurring budgetary costs to the federal government while also ensuring that adequate supplies of beet and cane sugar are available to sugar users."

181.    In the USDA's discussion of the sugar program, producers refer to those who produce sugarcane or sugar beet crops. Sugar processors are those who are involved in the processing and refining steps of the supply chain. That is, sugar processors use sugarcane, sugar beets, and raw sugar as input to produce Refined Sugar. Among processors, USDA differentiates between beet processors, cane processors, and cane refiners. USDA classifies Defendants as processors and refiners of sugar.

182.    The sugar program is administered by the USDA and has four main mechanisms to keep sugar prices above guaranteed levels: price support loans, marketing allotments, import quotas, and a sugar-to-ethanol backstop (also known as the Feedstock Flexibility Program).

183.    **Price Support Loans**. The USDA offers price support loans to processors of domestically grown sugarcane and sugar beets. The loans are specifically offered to

processors and not producers of the crops since sugarcane and sugar beets are bulky and perishable, so they must be processed before they can be traded and stored.

184.    "The price levels at which processors can take out loans are referred to as 'loan rates.'" The current national average loan rates since FY2020 are set in the 2018 Farm Bill as 19.75 cents per pound for raw sugar and 25.38 cents per pound for refined beet sugar. That is, the national average loan rates are fixed even though sugar supply and prices would change year over year. The national average loan rates "are adjusted regionally to reflect marketing cost differentials."

185.    The maximum term of the loan is nine months. The loans are nonrecourse, meaning that when the loan is due, the processor can either repay the loan with interest or forfeit the sugar to USDA, "if the market price is below the effective support level."

186.    There have been no loan forfeitures of sugar in the Class Period. The Farm Service Agency ("FSA") produces quarterly reports projecting whether the U.S. sugar stocks reported in the World Agricultural Supply and Demand Estimates report are likely to lead to forfeitures. The FSA's projections have concluded that forfeitures are unlikely for every quarter since March 2019. This is supported by the FSA's national level database of loan forfeitures for all commodities, which lists no forfeitures for beet sugar, cane sugar, or in-process sugars since at least 2019.

187.    The lack of sugar loan forfeitures since 2019 suggests that market prices are above the effective support level since 2019. Therefore, the price support loans do not constitute a binding constraint for United States sugar prices in the Class Period.

188.    **Marketing Allotments**. USDA establishes annual marketing allotments "that limit the quantity of sugar that U.S. processors can sell for domestic human use." There is an overall allotment quantity ("OAQ") that is "not less than 85% of estimated U.S. human consumption of sugar." The allotment is divided between beet and cane sugar and is allocated to processors based on their sales and capacity.

189.    This allotment explicitly does not limit "how much beet and cane farmers can produce" nor "how much sugar beets and sugarcane that beet refiners and raw sugar mills can process." "The OAQ is intended to ensure that permitted sales of domestic sugar, when added to imports under U.S. trade commitments, do not depress market prices below loan forfeiture levels for refined beet sugar and raw cane sugar. Sugar production that is in excess of a processors' marketing allotment may not be sold for human consumption except to allow another processor to meet its allocation or for export."

190.    There has been a shortfall between the OAQ and the supply from processors since at least FY2013. This suggests that the allotment is not binding on aggregate production.

191.    **Import Quotas on Raw Sugar**. "The United States negotiated sugar [tariff-rate quotas ("TRQs")] as part of the Uruguay Round Agreement on Agriculture (AoA). These are also called World Trade Organization (WTO) TRQs." Each fiscal year, the Secretary of Agriculture sets a TRQ that limits how much sugar can be imported duty-free or at a low duty.

192.    Different import quotas apply to raw sugars and to Refined Sugar. Defendants import raw sugars while Refined Sugar are primarily imported into the U.S. by distributors.

193.    Import quotas on raw sugar set a minimum, as opposed to a maximum, of raw sugar that can be imported into the United States, according to the AoA.

194.    Empirical evidence shows that the TRQ for raw sugar was set at levels close to the minimum for most of the Class Period. According to the AoA, the raw sugar TRQ is at the minimum level in 2019, and close to it in 2021 through 2023.

195.    The USDA Sugar Program does not set prices for sugar nor does it prevent the conspiracy from charging anticompetitive prices during the Class Period.

## VI.    ANTITRUST INJURY AND DAMAGES TO THE CLASS

196.    Defendants' anticompetitive conduct has had the following effects, among others:

a)    Price competition in the domestic Refined Sugar Market has been restrained or eliminated;

b)    Prices for Refined Sugar sold by the Producer Defendants and their divisions, subsidiaries, affiliates, or co-conspirators, in turn, have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States;

c)    Direct purchasers of Refined Sugar have been deprived of free and open competition; and

d)    Direct purchasers of Refined Sugar have paid artificially inflated

57

prices.

197.    The purpose of Defendants' and their co-conspirators' conduct is to raise, fix, maintain, or stabilize the price of Refined Sugar and, as a direct and foreseeable result, Plaintiffs and the Class have paid supra-competitive prices for Refined Sugar during the Class Period.

198.    By reason of the alleged violations of the antitrust laws, Plaintiffs and Class Members have sustained injury to their businesses or property, having paid higher prices for Refined Sugar than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they have suffered damages.

199.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

200.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.    <u>CLASS ALLEGATIONS</u>

201.    Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), seeking treble damages, injunctive relief, and other relief pursuant to federal antitrust laws on behalf of the members of the following class:

> All persons and entities who purchased Refined Sugar directly from any of the Producer Defendants or any of their co-conspirators in the United States and its territories at any time from January 1, 2019, until the present (the "Class Period").

> Specifically excluded from this Class are Defendants; their officers, directors, or employees; any entity in which a

58

Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of a Defendant; any federal, state, or local governmental entities; any judicial officers presiding over this action and members of their immediate family and staff; and any juror assigned to this action.

202.    Plaintiffs reserve the right to amend this Class definition, including, without limitation, the Class Period.

203.    **Class Identity**. The above-defined Class members are readily identifiable from information and records in the possession of United, ASR/Domino, Michigan Sugar, Louis Dreyfus, and/or Imperial.

204.    **Numerosity**. Plaintiffs do not know the exact number of Class Members because such information is presently under exclusive control of the Producer Defendants. Plaintiffs believe that due to the nature of the trade and commerce involved, there are hundreds of class members geographically dispersed throughout the United States, such that joinder of all class members would be impracticable.

205.    **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs purchased Refined Sugar directly from one or more of the Producer Defendants and were damaged by the same common course of wrongful conduct.

206.    **Predominance of Common Questions**. There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including, but not limited to:

a)    Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to raise, fix, maintain, or stabilize prices

59

of Refined Sugar sold in interstate commerce in the United States in violation of federal antitrust laws;

b) Whether Defendants agreed to unreasonably restrain trade in violation of federal antitrust laws;

c) The identity of the participants of the alleged conspiracy;

d) The scope and duration of the alleged conspiracy;

e) The acts performed by Defendants and their co-conspirators in furtherance of the alleged conspiracy;

f) The effect of Defendants' alleged conspiracy on the prices of Refined Sugar sold in the United States during the Class Period;

g) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and other members of the Class;

h) Whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;

i) The appropriate class-wide measure of damages; and

j) Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiffs and the Class.

207. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of other

members of the Class and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

208.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impractical and class members do not have interests in individually controlling the prosecution of separate actions. Prosecution as a class action will eliminate the possibility of duplicative litigation. The damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Furthermore, individual litigation presents the potential for inconsistent or contradictory judgments and the establishment of incompatible standards of conduct for Defendants and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

209.    **Injunctive Relief**. Defendants have acted on grounds generally applicable to Plaintiffs and members of the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VIII.  EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

210.    Defendants' concealment of their unlawful conspiracy has tolled any applicable statute of limitations for Plaintiffs and the Class with respect to any claims and

rights of action that Plaintiffs and the Class have alleged in this Complaint under equitable estoppel.

211.    Plaintiffs and the Class were not placed on actual or constructive notice of the conspiracy alleged herein until, at the earliest, the DOJ's Findings of Fact in support of its petition to stop the merger of United and Imperial was made public. The full scope of the Defendants' unlawful conduct could not be discovered until the appellate exhibit volumes from the DOJ matter were made public.

212.    In addition, throughout the Class Period, the Defendants effectively, affirmatively, and fraudulently concealed their unlawful conspiracy from Plaintiffs and the Class, and the conspiracy was inherently self-concealing.

213.    Plaintiffs and Class members relied on Defendants' promises to obey the law and act with integrity, and those promises prevented Plaintiff from discovering Defendants' conduct earlier. For example:

a)    The letter introducing ASR Group's Code of Ethics and Business Conduct states: "Throughout our long history, ASR Group has always been dedicated to conducting business in a lawful and ethical manner in all of its operations.… We seek success in all of our business endeavors. However, we may only do so while upholding the highest standards of ethical conduct and all of the laws, domestic and foreign, that apply to our work." The Code contains a section devoted to "Following Antitrust and Competition Laws," which, among other things, prohibits ASR Group and its employees, officers, and directors

62

from entering into "[p]rohibited agreements and activities," including "[a]greements with competitors to fix or control prices," and directs that, "[t]o ensure that [they] avoid these illegal agreements, [they] may not engage in direct or indirect discussions or other contacts with competitors regarding … [p]rices to be charged by ASR Group or others or regarding other terms and conditions of sales."

b)    Michigan Sugar's "Sustainability & Corporate Social Responsibility" webpage states: "At Michigan Sugar Company, we live by our values – Excellence, Pride, Integrity, Compassion and Trust. This is the foundation of a business environment that sets respect and dignity for co-workers, suppliers, customers, and partners as an absolute expectation." It further states: "[W]e are committed to creating a responsible business model that serves and builds value for our grower-owners, employees, customers, suppliers, and other stakeholders now and in the future."

c)    United's Code of Business Conduct and Ethics states: "Obeying the law, both in letter and in spirit, is the foundation on which our ethical standards are built. All our employees, officers, directors, agents and other representatives must respect and obey the laws of the cities, states and countries in which we operate." It further states: "Our employees, officers, directors, agents and other representatives must maintain the confidentiality of confidential information entrusted to

63

them by us or our customers, except when disclosure is authorized in writing by a supervisor or required by laws or regulations. Confidential information includes, without limitation, any information that derives independent value because it is not known by third parties, including United Sugar's competitors or the general public, whether or not expressly identified as confidential."

## IX.    CLAIMS FOR RELIEF

### COUNT I
### Violation of Sections 1 and 3 of the Sherman Act and
### Section 4 and 16 of the Clayton Act—Unlawful Price-Fixing
### (15 U.S.C. §§ 1, 3, 15(a), 26)

214.    Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint, as though fully set forth herein.

215.    Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2019, and continuing through the present Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Refined Sugar in the United States to or at supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

216.    Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2019, and continuing through, the Defendants effectuated the foregoing conspiracy through the means described herein, including through the exchange of

competitively sensitive, non-public information regarding prices, output, supplies, and costs to raise, fix, maintain, or stabilize prices for Refined Sugar in the United States.

217.    Their conduct had the intended, likely, and actual effect of raising, fixing, maintaining, or stabilizing prices in the Refined Sugar market in the United States to or at supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

218.    This conduct is unlawful per se as a violation of the antitrust laws.

219.    The contract, combination, or conspiracy alleged herein has had the following effects, among others:

    a)    Price competition in the sale of Refined Sugar has been restrained, suppressed, and/or eliminated in the United States;

    b)    Prices for Refined Sugar sold by the Producer Defendants have been raised, fixed, maintained, or stabilized to or at artificially high, non-competitive levels throughout the United States; and

    c)    Those who purchased Refined Sugar directly from the Producer Defendants or their co-conspirators have been deprived of the benefits of free and open competition.

220.    Plaintiffs and Class Members have been injured and will continue to be injured in their businesses and property by paying more for Refined Sugar purchased directly from the Producer Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

221.     Plaintiffs and Class Members are entitled to damages, treble damages, and injunctive relief against Defendants, preventing and restraining the violations alleged herein.

## COUNT II
### Violation of Sections 1 and 3 of the Sherman Act and Sections 4 and 16 of the Clayton Act—Unlawful Information Exchanges (15 U.S.C. §§ 1, 3, 15(a), 26)

222.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

223.     For purposes of this Count, which is based upon a claim subject to a Rule of Reason analysis, the relevant geographic market is the United States and its territories and the relevant product market consists of Refined Sugar made from either sugar beets or sugar cane, both of which are treated by the industry as indistinguishable from each other. As noted above, the Producer Defendants now have a collective 75% of this market and thus possess market power within it.  Defendants United agreed in the merger litigation that the relevant product market was refined sugar, in all of its forms.

224.     Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2019, and continuing through the present, Defendants agreed with each other to exchange competitively sensitive, non-public information regarding prices, output, supplies, and costs to raise, fix, maintain, or stabilize prices for Refined Sugar in the United States to or at supracompetitive levels. The agreement was intended to and did unreasonably restrain trade and suppress competition, and it had the likely and actual effect of raising, fixing, maintaining, or stabilizing prices in the Refined Sugar market in the United States

to or at supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

225.    Pursuant to the agreement, Defendants agreed to and did share pricing and other internal, material competitive information that distorted and suppressed competition in the relevant market while knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Refined Sugar sold in the United States to Plaintiffs and members of the Class to or at supracompetitive levels.

226.    This conduct is unlawful under either a quick look or a full-fledged Rule of Reason analysis because the agreement is facially anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, the Producer Defendants' objectives could have been reasonably achieved through less restrictive means.

227.    The contract, combination, or conspiracy alleged herein has had the following effects, among others:

a)    Price competition in the sale of Refined Sugar has been restrained, suppressed, and/or eliminated in the United States;

b)    Prices for Refined Sugar sold by the Producer Defendants have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; and

c)    Those who purchased Refined Sugar directly from the Producer Defendants or their co-conspirators have been deprived of the benefits of free and open competition.

67

228.    Plaintiffs and Class Members have been injured and will continue to be injured in their businesses or property by paying more for Refined Sugar purchased directly from the Producer Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

229.    Plaintiffs and Class Members are entitled to damages, treble damages, and injunctive relief against Defendants, preventing and restraining the violations alleged herein.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully request judgment against Defendants, as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed in violation of Sections 1 and 3 of the Sherman Act;

C.    That Plaintiffs and the Class recover damages to the maximum extent allowed under federal law, and that a joint and several judgment in their favor be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.    That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or

claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.    That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of a company's information;

F.    That Plaintiffs and the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.    That Plaintiffs and the Class recover their costs of suit, including reasonable attorneys' fees, expenses, and costs as provided by law; and

H.    That Plaintiffs and the Class have such other and further relief as the case may require and the Court may deem just and proper.

## XI.    <u>DEMAND FOR JURY TRIAL</u>

The Plaintiffs, on behalf of themselves and all others similarly situated, hereby request a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), on any and all claims so triable.

Dated:   December 9, 2024                Respectfully submitted,

*/s/ Daniel E. Gustafson*
Daniel E. Gustafson (#202241)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 So. Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com

Michael L. Roberts (admitted *pro hac vice*)
**ROBERTS LAW FIRM US, PC**
1920 McKinney Ave, Suite 700
Dallas, Texas 75201
Tel: (501) 821-5575
Fax: (501) 821-4474
mikeroberts@robertslawfirm.us

***Appointed PSC Liaison, Interim PSC Members, and Co-Lead Counsel for the Direct Purchaser Plaintiffs' Subgroup***


Daniel C. Hedlund (#258337)
Joshua J. Rissman (#0391500)
Abou B. Amara, Jr. (#0401146)
Gabrielle M. Kolb (#0504386)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 So. Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dhedlund@gustafsongluek.com
jrissman@gustafsongluek.com
aamara@gustafsongluek.com
gkolb@gustafsongluek.com

70

Erich P. Schork (admitted *pro hac vice*)
Sarah E. DeLoach
Karen Halbert
Morgan Hunt
**ROBERTS LAW FIRM US, PC**
1920 McKinney Ave, Suite 700
Dallas, Texas 75201
Tel: (501) 821-5575
Fax: (501) 821-4474
erichschork@robertslawfirm.us
sarahdeloach@robertslawfirm.us
karenhalbert@robertslawfirm.us
morganhunt@robertslawfirm.us

Scott Martin (admitted *pro hac vice*)
Erika Inwald (admitted *pro hac vice*)
**HAUSFELD LLP**
33 Whitehall Street
New York, NY 10004
Tel.: (646) 357-1100
Fax: (212) 202-4322
smartin@hausfeld.com
einwald@hausfeld.com

Michael Hausfeld (admitted *pro hac vice*)
**HAUSFELD LLP**
888 16th St. N.W.
Suite 300
Washington, D.C. 20006
Tel: (202)-540-7200
Fax: (202)-540-7201
mhausfeld@hausfeld.com

Michael Lehmann (admitted *pro hac vice*)
**HAUSFELD LLP**
600 Montgomery St.
Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980
mlehmann@hausfeld.com

71

Joseph C. Kohn (admitted *pro hac vice*)
William E. Hoese (admitted *pro hac vice*)
Douglas A. Abrahams
**KOHN, SWIFT & GRAF, P.C.**
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

Greg Asciolla
Alexander E. Barnett (admitted *pro hac vice*)
Charles F. Dender
Jonathan S. Crevier
Noah L. Cozad
**DICELLO LEVITT**
485 Lexington Ave, Suite 1001
New York, NY 10017
Telephone: (646) 933-1000
gasciolla@dicellolevitt.com
abarnett@dicellolevitt.com
cdender@dicellolevitt.com
jcrevier@dicellolevitt.com
ncozad@dicellolevitt.com

Linda P. Nussbaum (admitted *pro hac vice*)
**NUSSBAUM LAW GROUP, P.C.**
1133 Avenue of the Americas, 31st Floor
New York, NY 10036
Tel.: (917) 438-9189
lnussbaum@nussbaumpc.com

Arthur N. Bailey
**RUPP PFALZGRAF, LLC**
111 West Second St., Suite 1100
Jamestown, NY 14701
Tele: (716) 664-2967
bailey@RuppPfalzgraf.com

Joshua H. Grabar
**GRABAR LAW OFFICE**
One Liberty Place

72

1650 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(267) 507-6085
jgrabar@grabarlaw.com

Marc H. Edelson
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N300
Newtown, Pennsylvania 18940
(215) 867-2399
medelson@edelson-law.com

Ira N. Glauber (ING-8383)
**DILWORTH PAXSON LLP**
99 Park Avenue, Suite 320
New York, NY 10016
Tel.: (917) 675-4252
iglauber@dilworthlaw.com

Catherine Pratsinakis
Ira Neil Richards
Lisa J. Rodriguez
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
(215) 575-7000
cpratsinakis@dilworthlaw.com
irichards@dilworthlaw.com
lrodriguez@dilworthlaw.com

Dianne M. Nast (admitted *pro hac vice*)
Daniel N. Gallucci (admitted *pro hac vice*)
Joseph N. Roda
Michele S. Burkholder (admitted *pro hac vice*)
Michael S. Tarringer (admitted *pro hac vice*)
**NASTLAW LLC**
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
Tel: (215) 923-9300
Fax: (215) 923-9302
dnast@nastlaw.com
dgallucci@nastlaw.com
jnroda@nastlaw.com

73

mburkholder@nastlaw.com
mtarringer@nastlaw.com

Christopher V. Le (admitted *pro hac vice*)
Brian P. Drockton
**BOIESBATTIN LLP**
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel: (703) 764-8700
Fax: (703) 764-8704
cle@boiesbattin.com
bdrockton@boiesbattin.com

Kenneth A. Wexler
Justin N. Boley
**WEXLER BOLEY & ELGERSMA LLP**
311 S. Wacker Dr., Suite 5450
Chicago, IL 60606
Telephone: (312) 346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com

Adam J. Zapala
Elizabeth Castillo
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel: (650) 697-6000
azapala@cpmlegal.com
ecastillo@cpmlegal.com

***Additional Counsel for the Direct Purchaser
Plaintiffs Class***