**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| IN RE: GRANULATED SUGAR ANTITRUST LITIGATION | Case No. 24-md-03110 (JWB/DTS) |
| | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' MASTER CONSOLIDATED AND SHORT FORM COMPLAINTS** |
| This Document Relates To: ALL ACTIONS | |

# TABLE OF CONTENTS

<u>**Page**</u>

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 4

    A.    Defendants And The U.S. Sugar Industry .................................... 4
    B.    The Alleged Conspiracy ................................................................ 8
    C.    Plaintiffs ..................................................................................... 10

LEGAL STANDARD ...................................................................................... 11

ARGUMENT .................................................................................................. 11

I.      PLAINTIFFS DO NOT PLAUSIBLY ALLEGE ANY AGREEMENT ............... 11

    A.    The Complaints Do Not Plausibly Allege An Agreement ........................ 12
    B.    Plaintiffs Have Not Pled Direct Evidence Of A Conspiracy ..................... 16
    C.    Plaintiffs Have Pled No Circumstantial Evidence From Which The
        Court Could Infer A Conspiracy ................................................................ 18

        1.    Plaintiffs Have Not Alleged Any Parallel Conduct ........................ 18
        2.    Plaintiffs Have Not Alleged "Plus Factors" That Support An
            Inference Of Any Conspiracy .......................................................... 21

II.    PLAINTIFFS HAVE NOT ALLEGED THAT THE NAMED
       PLAINTIFFS SUFFERED ANY INJURY FROM THE PURPORTED
       CONSPIRACY ....................................................................................... 33

III.   PLAINTIFFS' INFORMATION EXCHANGE CLAIM FAILS FOR THE
       INDEPENDENT REASON THAT PLAINTIFFS HAVE NOT
       PLAUSIBLY ALLEGED ANY ANTICOMPETITIVE EFFECTS .................... 34

    A.    Plaintiffs Do Not Plead Direct Evidence Of Anticompetitive Effects ........ 35
    B.    Plaintiffs Also Have Not Adequately Alleged Indirect Evidence Of
        Anticompetitive Effects ............................................................................. 36

IV.   PLAINTIFFS ALLEGE NO PLAUSIBLE ONGOING CONSPIRACY ............. 37

V.    THERE ARE MULTIPLE, INDEPENDENT GROUNDS TO DISMISS
       PLAINTIFFS' STATE LAW CLAIMS ....................................................... 38

    A.    The Indirect Plaintiffs Lack Standing To Bring Claims Under The
        Laws Of States Where No Named Plaintiff Resides .................................. 39

B.      The Indirect Plaintiffs Fail To Adequately Plead An Effect On
        *Intrastate* Commerce For Their State Antitrust Claims ............................. 40

C.      The Indirect Plaintiffs' Consumer Protection Claims Are Deficient .......... 41

        1.      Plaintiffs Have Not Alleged Any Proscribed Conduct In New
                Hampshire ...................................................................................... 41

        2.      The Indirect Plaintiffs Cannot Bring Claims Under
                Connecticut Or Vermont Law .......................................................... 42

        3.      Plaintiffs Do Not Adequately Plead Fraud, Misrepresentation,
                or Unconscionability ....................................................................... 42

D.      Indirect Plaintiffs Fail To Adequately Allege Their Unjust
        Enrichment Claims ................................................................................... 43

        1.      Indirect Plaintiffs Have Not Plausibly Alleged Unjust
                Enrichment ...................................................................................... 43

        2.      Indirect Plaintiffs Cannot Bring Standalone Unjust
                Enrichment Claims ........................................................................... 44

VI.     CONCLUSION ................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*1-800 Contacts, Inc. v. FTC*,
  1 F.4th 102 (2d Cir. 2021) (per curiam)......................................................... 35

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................. 15

*Bauer v. Tacey Goss, P.S.*,
  2012 WL 2838834 (N.D. Cal. July 10, 2012)................................................. 30

*BCBSM, Inc. v. GS Labs, LLC*,
  2023 WL 2044329 (D. Minn. Jan. 30, 2023)........................................... 22, 33

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .......................................................................................*passim*

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask., Inc.*,
  203 F.3d 1028 (8th Cir. 2000) ...................................................................23, 24

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011).......................................................................*passim*

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Secs. Corp.*,
  92 F.4th 381 (2d Cir. 2024) ............................................................................. 24

*Cole v. Chevron USA, Inc.*,
  554 F. Supp. 2d 655 (S.D. Miss. 2007)......................................................... 45

*D'Augusta v. Am. Petroleum Inst.*,
  117 F.4th 1094 (9th Cir. 2024) ....................................................................... 33

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n*,
  788 F. Supp. 1042 (D. Minn. 1992)............................................................... 35

*Frost v. LG Elecs. Inc.*,
  801 F. App'x 496 (9th Cir. 2020) .................................................................. 17

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (2019).......................................................................................... 36

*Gibson v. Cendyn Grp., LLC*,
    2024 WL 2060260 (D. Nev. May 8, 2024) ................................................................ 21

*Gibson v. MGM Resorts Int'l*,
    2023 WL 7025996 (D. Nev. Oct. 24, 2023) .............................................................. 14

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic*
    *Equip.*,
    48 F.4th 656 (6th Cir. 2022) ................................................................................... 26

*In re Aftermarket Filters Antitrust Litig.*,
    2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ............................................................ 43

*In re Aggrenox Antitrust Litig.*,
    94 F. Supp. 3d 224 (D. Conn. 2015) ....................................................................... 44

*In re Cal. Gasoline Spot Mkt. Antitrust Litig.*,
    2021 WL 1176645 (N.D. Cal. Mar. 29, 2021) ........................................................ 38

*In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*,
    2015 WL 5166014 (E.D. Tenn. June 24, 2015) ...................................................... 41

*In re Cattle & Beef Antitrust Litig.*,
    687 F. Supp. 3d 828 (D. Minn. 2023) ..................................................................... 33

*In re Cattle Antitrust Litig.*,
    2020 WL 5884676 (D. Minn. Sept. 29, 2020) ........................................................ 20

*In re Cattle Antitrust Litig.*,
    2021 WL 7757881 (D. Minn. Sept. 14, 2021) .................................................. 43, 44

*In re Chocolate Confectionary Antitrust Litig.*,
    801 F.3d 383 (3d Cir. 2015) ................................................................................... 28

*In re Crop Inputs Antitrust Litig.*,
    749 F. Supp. 3d 992 (E.D. Mo. 2024) ............................................................... 11, 13

*In re Crude Oil Commodity Futures Litig.*,
    913 F. Supp. 2d 41 (S.D.N.Y. 2012) ...................................................................... 32

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    362 F. Supp. 3d 510 (N.D. Ill. 2019) ..................................................................... 40

*In re DRAM Indirect Purchaser Antitrust Litig.*,
    28 F.4th 42 (9th Cir. 2022) .................................................................................... 27

*In re DRAM Indirect Purchaser Litig.*,
2020 WL 8459279 (N.D. Cal. Nov. 24, 2020), *aff'd*, 28 F.4th 42 (9th
Cir. 2022) ........................................................................................................ 27

*In re Mexican Gov't Bonds Antitrust Litig.*,
412 F. Supp. 3d 380 (S.D.N.Y. 2019) ........................................................... 13

*In re Milk Prods. Antitrust Litig.*,
84 F. Supp. 2d 1016 (D. Minn. 1997), *aff'd*, 195 F. 3d 430 (8th Cir.
1999) ............................................................................................................... 13

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ....................................................................... 20

*In re Nexium (Esomeprazole) Antitrust Litig.*,
845 F.3d 470 (1st Cir. 2017) ......................................................................... 38

*In re Niaspan Antitrust Litig.*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) .............................................................. 42

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
997 F. Supp. 2d 526 (N.D. Tex. 2014) .......................................................... 26

*In re Opana ER Antitrust Litig.*,
162 F. Supp. 3d 704 (N.D. Ill. 2016) ............................................................ 44

*In re Optical Disk Drive Antitrust Litig.*,
2011 WL 3894376 (N.D. Cal. 2011) ............................................................. 29

*In re Packaged Seafood Prods. Antitrust Litig.*,
242 F. Supp. 3d 1033 (S.D. Cal. 2017) ......................................................... 40

*In re Pork Antitrust Litig.*,
2019 WL 3752497 (D. Minn. Aug. 8, 2019) ................................... 12, 20, 22

*In re Pork Antitrust Litig.*,
495 F. Supp. 3d 753 (D. Minn. 2020) ....................................................*passim*

*In re Pre-Filled Propane Tank Antitrust Litig.*,
893 F.3d 1047 (8th Cir. 2018) ................................................................. 15, 38

*In re RealPage, Inc. Rental Software Antitrust Litig. (II)*,
709 F. Supp. 3d 478 (M.D. Tenn. 2023) ....................................................... 36

*In re Resideo Techs., Inc., Secs. Litig.*,
2021 WL 1195740 (D. Minn. Mar. 30, 2021) ............................................... 26

*In re SSA Bonds Antitrust Litig.*,
   2018 WL 4118979 (S.D.N.Y. Aug. 28, 2018) ............................................................ 34

*In re Travel Agent Comm'n Antitrust Litig.*,
   2007 WL 3171675 (N.D. Ohio Oct. 29, 2007), *aff'd*, 583 F.3d 896 (6th
   Cir. 2009) .............................................................................................................. 21

*In re: Passenger Vehicle Replacement Tires Antitrust Litig.*,
   2025 WL 606533 (N.D. Ohio Feb. 25, 2025) .................................................... *passim*

*Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*,
   2006 WL 1851137 (D. Minn. June 30, 2006) ..................................................... 35, 36

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
   2014 WL 943224 (D. Minn. Mar. 11, 2014), *aff'd*, 797 F.3d 538 (8th
   Cir. 2015) .......................................................................................................... 39, 40

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
   797 F.3d 538 (8th Cir. 2015) ......................................................................... *passim*

*Kelsey K. v. NFL Enters., LLC*,
   254 F. Supp. 3d 1140 (N.D. Cal. 2017), *aff'd*, 757 F. App'x 524 (9th
   Cir. 2018) .............................................................................................................. 19

*Lynch Display Corp. v. Nat'l Souvenir Ctr., Inc.*,
   640 S.W.2d 837 (Tenn. Ct. App. 1982) ................................................................. 41

*Maple Flooring Mfrs.' Ass'n v. United States*,
   268 U.S. 563 (1925) ............................................................................................... 23

*Mayor & Council of Balt. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) .................................................................................. 24

*McAteer v. Target Corp.*,
   2018 WL 3597675 (D. Minn. July 26, 2018) ......................................................... 39

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018) ......................................................................................... 35, 36

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
   310 F. Supp. 3d 1002 (E.D. Mo. 2018), *aff'd*, 911 F.3d 505 (8th Cir.
   2018) ..................................................................................................................... 22

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
   911 F.3d 505 (8th Cir. 2018) ................................................................ 18, 19, 21, 22

*Porter v. Cape Girardeau Cnty.*,
   2022 WL 990676 (E.D. Mo. Mar. 31, 2022) ............................................. 7

*Process Controls Int'l, Inc. v. Emerson Process Mgmt.*,
   753 F. Supp. 2d 912 (E.D. Mo. 2010) ...................................................... 28

*Robertson v. Univ. of Akron Sch. of Law*,
   2021 WL 3709915 (N.D. Ohio Aug. 20, 2021), *aff'd*, 2022 WL
   1836922 (6th Cir. June 3, 2022) ............................................................. 13

*Rosen v. Tenn. Comm'r of Fin. & Admin.*,
   288 F.3d 918 (6th Cir. 2002) .................................................................... 39

*RSD Leasing, Inc. v. Navistar Int'l Corp.*,
   319 A.3d 734 (Vt. 2024) ........................................................................... 42

*Ryan v. Ryan*,
   889 F.3d 499 (8th Cir. 2018) ............................................................. 25, 32

*Serrano v. Campbell Soup Co.*,
   2025 WL 926394 (D.N.J. Mar. 27, 2025) .................................................. 40

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline,
   PLC*,
   737 F. Supp. 2d 380 (E.D. Pa. 2010) ................................................ 44, 45

*Stahl v. USDA*,
   327 F.3d 697 (8th Cir. 2003) ...................................................................... 7

*State ex rel. Fitch v. Yazaki N. Am., Inc.*,
   294 So. 3d 1178 (Miss. 2020) ................................................................... 41

*U.S. Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*,
   390 F. Supp. 3d 892 (N.D. Ill. 2019) ...................................................... 13

*United States v. Citizens & So. Nat'l Bank*,
   422 U.S. 86 (1975) ............................................................................. 23, 34

*United States v. U.S. Sugar Corp.*,
   2022 WL 4544025 (D. Del. Sept. 28, 2022), *aff'd*, 73 F.4th 197 (3d Cir.
   2023) ......................................................................................... 4, 8, 9

*Vacco v. Microsoft Corp.*,
   793 A.2d 10418 (Conn. 2002) .................................................................. 42

*Yong Ki Hong v. KBS Am., Inc.*,
   951 F. Supp. 2d 402 (E.D.N.Y. 2013) .......................................................................... 42

## STATUTES

15 U.S.C. § 26 ..................................................................................................................... 38

Minn. Stat. § 325F.69 .......................................................................................................... 43

N.H. Rev. Stat. Ann. § 358-A:2 ........................................................................................... 41

N.Y. Gen. Bus. Law § 349 ................................................................................................... 42

Or. Rev. Stat. § 646.607(1) .................................................................................................. 43

Sherman Act, 15 U.S.C. § 1 ...........................................................................................*passim*

Vt. Stat. Ann. Title 9, § 2451a ............................................................................................. 42

## TABLE OF ABBREVIATIONS

| The Parties | |
|---|---|
| **DPPs** | Direct Purchaser Plaintiffs |
| **CIPPs** | Commercial Indirect Purchaser Plaintiffs |
| **IIPPs** | Consumer Indirect Purchaser Plaintiffs |
| **Indirect Plaintiffs** | The CIPPs and IIPPs |
| **Plaintiffs** | DPPs, CIPPs, and IIPPs |
| **ASR Group International** | ASR Group International, Inc. |
| **ASR** | American Sugar Refining, Inc. |
| **Domino** | Domino Foods, Inc. |
| **MSC** | Michigan Sugar Company |
| **United** | United Sugar Producers & Refiners Cooperative |
| **LDC** | Louis Dreyfus Company |
| **U.S. Sugar Savannah** | U.S. Sugar Savannah Refinery, LLC |
| **Commodity** | Commodity Information, Inc. |

| Non-Parties | |
|---|---|
| **U.S. Sugar** | U.S. Sugar Corporation |
| **Imperial** | Imperial Sugar Company |
| **USDA** | United States Department of Agriculture |

| Pleadings And Other Filings | |
|---|---|
| **MCC or Complaint** | Plaintiffs' Master Consolidated Complaint, ECF No. 332 |
| **DPP SFC** | Direct Purchaser Plaintiffs' Short Form Consolidated Class Action Complaint, ECF No. 341 |
| **CIPP SFC** | Commercial Indirect Purchaser Plaintiffs' Short Form Consolidated Class Action Complaint, ECF No. 342 |
| **IIPP SFC** | Consumer Indirect Purchaser Plaintiffs' Short Form Complaint, ECF No. 343 |
| **Complaints** | The MCC, DPP SFC, CIPP SFC, and IIPP SFC |
| **CIPP AC** | Commercial Indirect Purchaser Plaintiffs' Amended Complaint, ECF No. 293 |
| **Decl.** | Declaration of Lawrence Buterman in Support of Defendants' Joint Motion to Dismiss Plaintiffs' Master Consolidated and Short Form Complaints |
| **Ex. __** | Exhibit __ to the Declaration of Lawrence Buterman in Support of Defendants' Joint Motion to Dismiss Plaintiffs' Master Consolidated and Short Form Complaints |

## INTRODUCTION

Plaintiffs allege that from September 2019 to July 2021, a sugar industry analyst—Richard Wistisen—emailed separately with one employee at Domino and one employee at United about a dozen times, gathering general information for his publication regarding sugar prices, estimated sold positions, crop sizes, and yields. From that, Plaintiffs allege a sprawling six-plus-year conspiracy among at least five sugar companies, including three who Plaintiffs never allege ever communicated with Mr. Wistisen, to fix all granulated sugar prices in this country. According to Plaintiffs, this supposed conspiracy is still ongoing today—even while this lawsuit is pending, and nearly four years after anyone at Domino or United is even alleged to have spoken with Mr. Wistisen. Plaintiffs' Complaints, which include charts showing that, for the bulk of the period when Mr. Wistisen was alleged to have communicated with the two employees at Domino and United sugar prices barely moved, demonstrates the implausibility of their claims. And that implausibility is also demonstrated by what is absent from Plaintiffs' Complaints, including *any* allegation that *any* sugar price offered by *any* defendant at *any* time was ever adjusted as a result of *any* alleged communication with Mr. Wistisen. Plaintiffs fail to satisfy the most basic requirements for pleading a violation under Section 1 of the Sherman Act, and their Complaints should be dismissed.

To begin, there is not a single, well-pled *factual* allegation to support Plaintiffs' far-fetched conspiracy among Defendants to fix prices or to participate in a "give to get," "reciprocal" exchange of information through Mr. Wistisen. Plaintiffs do not allege when, where, or how any agreement was reached among any two Defendants, let alone each of

them.  Instead, Plaintiffs just lump all Defendants together and make the vague assertion that at some "unknown" time, Defendants, in some unexplained way, agreed to fix prices for granulated sugar by exchanging supposedly sensitive information through Mr. Wistisen.  Such naked assertions of conspiracy do not suffice.

Under Section 1, Plaintiffs must plausibly allege that Defendants entered into an *agreement*, which Plaintiffs must do either through direct evidence of an *agreement* or through circumstantial evidence of an *agreement*.  Here, Plaintiffs do not even attempt to allege direct evidence.  None of the handful of communications with Mr. Wistisen shows that Defendants agreed on any price and, indeed, the majority of Defendants did not even participate in the alleged communications.   That means Plaintiffs have to plead an agreement through circumstantial evidence, which requires allegations of both parallel conduct *and* "plus factors," *i.e.*, facts that show the parallel conduct was the product of a preceding agreement, not independent action.  Plaintiffs do not plausibly allege either.

As to parallel conduct, Plaintiffs do not allege that the Sugar Defendants[1] charged the same or even similar prices for granulated sugar or that the Sugar Defendants' prices changed or increased in parallel.  In fact, the few specific allegations Plaintiffs make about Defendants' prices show their prices were different and moved differently.

Without any alleged parallel conduct, the Court need not even address Plaintiffs' purported plus factors.  But, even if considered, the plus factors Plaintiffs attempt to rely

---

[1] The "Sugar Defendants" include all Defendants other than Richard Wistisen and Commodity.  Plaintiffs refer to the same companies as the "Producer Defendants," *see* MCC at 2, but many of those Defendants do not produce refined sugar.

on, such as sporadic supposedly interfirm communications among some Defendants, attendance at random trade association meetings by some Defendants, and certain characteristics of the sugar industry are insufficient. Even collectively, they cannot create a plausible inference of a conspiracy.

Moreover, Plaintiffs ignore obvious, alternative explanations for rising sugar prices, *such as the rising cost of the primary input for granulated cane sugar, i.e., raw sugar*. Plaintiffs do not purport to allege any conspiracy to fix prices for raw sugar, nor do they explain why the increase in raw sugar prices is not a more (or at least as) likely explanation for rising sugar prices than the purported conspiracy. Plaintiffs also gloss over the fact that the alleged increases in prices correspond with a time when worldwide sugar prices (for raw sugar, granulated sugar, liquid sugar, and all other types of sugar) were rising as industries throughout the world saw supply chain disruptions following the outbreak of the COVID-19 pandemic. Again, all this undermines the plausibility of Plaintiffs' baseless theory that sugar prices across the country increased because of a few sporadic communications with Mr. Wistisen.

Throughout their Complaint, Plaintiffs rely extensively (indeed, almost exclusively) on allegations made by the Department of Justice ("DOJ") as part of its attempt to block U.S. Sugar from acquiring Imperial. In that case, DOJ *argued* that Domino and United Sugars Corporation—the cooperative through which U.S. Sugar marketed its refined sugar at the time, and a predecessor to Defendant United—were sharing allegedly competitively sensitive information through Mr. Wistisen, resulting in "coordinated effects" that would

be exacerbated by the merger.[2]  However, Plaintiffs ignore that DOJ specifically eschewed alleging that the Wistisen communications amounted to an *agreement* to fix prices.[3]  More importantly, after a bench trial, the Delaware Court implicitly found that the allegations of an anticompetitive information exchange were without merit, and rejected DOJ's attempt to block the transaction.  *See United States v. U.S. Sugar Corp.*, 2022 WL 4544025, at *25-27 (D. Del. Sept. 28, 2022), *aff'd*, 73 F.4th 197 (3d Cir. 2023).[4]  While the Delaware Court's findings are, of course, not binding, this Court should nonetheless follow the Eighth Circuit's instruction to be "reasonably aggressive in weeding out meritless antitrust claims at the pleading stage," and dismiss Plaintiffs' claims.  *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015).

## BACKGROUND[5]

### A.    Defendants And The U.S. Sugar Industry

Refined sugar is a food-grade sugar that is produced by refining sugar cane or processing sugar beets, and includes a variety of different types of sugar including

---

[2] *See* Pl.'s Post-Trial Br. at 30-34, *United States v. U.S. Sugar Corp.*, No. 21-1644 (D. Del. May 16, 2022), ECF No. 218.

[3] *See* Ex. 1, Trial Tr. at 1167:14-16, *United States v. U.S. Sugar Corp.*, No. 21-1644 (D. Del. Apr. 21, 2022), ECF No. 229 ("We don't need to prove that there has been a Section 1 violation … that's not what we're proving.").

[4] *See also* Ex. 1 at 1212:17-25 (after considering all of the evidence, the Court stated during DOJ's closing argument, "I was a litigator for twenty years and this just doesn't seem like that much of a difference from what everybody in every industry does which is not price fixing ….").

[5] Defendants accept the facts as alleged in Plaintiffs' Complaints for the purposes of this Motion only and do not admit the truth of any allegations, including but not limited to those pertaining to market definition.

-4-

granulated sugar, brown sugar, powdered sugar, and liquid sugar.  MCC ¶ 51 n.4. Granulated sugar refers to "white" or "table" sugar.  *Id.* ¶ 51.

Defendants in this case include the following companies, or parents thereof, that processed, refined, and/or marketed refined sugar:  ASR Group International, ASR, Domino, MSC, United, LDC, and U.S. Sugar Savannah.  *Id.* at 2 & ¶¶ 17-34.

**The ASR/Domino Defendants**.  Domino is ASR Group International's and ASR's "marketing and sales subsidiary for Granulated Sugar."  *Id.* ¶ 19.  Domino sells refined cane sugar produced at refineries in Louisiana, Florida, Maryland, New York, and California. *Id.* ¶ 17.

**MSC**.  MSC, an agricultural cooperative located in Bay City, Michigan, is owned by 900 sugar beet farmers.  *Id.* ¶ 32.  MSC processes its farmer owners' sugar beets into refined sugar and then markets that sugar on behalf of those farmers.  *See id.*

**LDC**.  In 2012, LDC acquired Imperial.  *Id.* ¶ 30.  Imperial owned and operated a sugar cane refinery in Savannah, Georgia, and marketed the refined sugar that it produced. *Id.*  In November 2022, U.S. Sugar Savannah acquired the business and assets of Imperial, including the Savannah refinery, from LDC.  *Id.* ¶¶ 26-28, 30.  Plaintiffs do not allege that LDC owned any other entity or asset that refined, processed, or marketed granulated sugar during the putative class period.

**United**.  United is a cooperative based in Edina, Minnesota.  *Id.* ¶ 22.  United does not produce any sugar.  *See id.*  Instead, it markets the refined sugar produced by its four member owners:  U.S. Sugar, American Crystal Sugar Company, Minn-Dak Farmers Cooperative, and Wyoming Sugar Company.  *Id.* ¶¶ 22, 25.  U.S. Sugar owns and operates

a sugar cane refinery in Clewiston, Florida. *Id.* ¶ 22. United's other members grow and process sugar beets in Minnesota, North Dakota, and Wyoming. *Id.* United markets the refined sugar cane produced by U.S. Sugar Savannah. *Id.* ¶¶ 22, 25-27.

**U.S. Sugar Savannah**. U.S. Sugar Savannah, a wholly owned subsidiary of U.S. Sugar, acquired assets associated with Imperial from LDC in November 2022. *Id.* ¶¶ 26-28, 30. Plaintiffs do not allege that U.S. Sugar Savannah was engaged in refining, processing, or marketing granulated sugar before November 2022. Plaintiffs incorrectly assert at various points that United, as opposed to U.S. Sugar Savannah, acquired Imperial. *See id.* ¶¶ 165, 172.

Domino, MSC, Imperial (prior to U.S. Sugar Savannah acquiring its assets), and United sell granulated sugar to a diverse set of customers, including retail, food service, and industrial customers, as well as sugar distributors, in a variety of different sizes (*e.g.*, bulk, super sacks, 50-pound bags, retail size bags, *etc.*). *See id.* ¶¶ 24, 28, 34, 54.

**Commodity/Richard Wistisen**. Commodity is owned by Richard Wistisen, a sugar industry analyst and commentator. *See id.* ¶¶ 35-38. Commodity provides monthly reports regarding the sugar industry to its subscribers, as do a number of other sugar industry publications. *See id.* ¶¶ 36, 69, 102.

**USDA Regulates The Sugar Industry**. The USDA heavily regulates the sale of raw and refined sugar in the United States. *See id.* ¶¶ 72, 173, 211-18. The USDA manages the supply of sugar to balance the competing interests of sugar farmers and sugar purchasers, and ensure that U.S. sugar prices remain "reasonable." *See id.* ¶¶ 211-213,

216.[6]  To accomplish that objective, the USDA actively monitors the sugar industry, including sugar supply, demand, and prices, and publishes extensive information on these topics.  *See, e.g.*, *id.* ¶ 214 & n.21.  Indeed, USDA regularly reviews and reports on "spot" pricing information in its monthly Sugar and Sweeteners Outlook reports, its Sugar and Sweetener Yearbook Tables, and other publications, which are publicly available on USDA's website.[7]

The USDA also has a variety of tools at its disposal to control the amount of sugar available for sale in the United States, which, as a matter of basic economics, will impact

---

[6] *See also* Ex. 2, Harmonized Tariff Schedule of the U.S. Revision 9, § IV ch. 17, ¶ 5(a)(ii) USITC Pub. 5614 (Apr. 11, 2025) ("Whenever the Secretary [of the USDA] believes that domestic supplies of sugars may be inadequate to meet domestic demand at reasonable prices, the Secretary may modify any quantitative limitations which have previously been established ….").  The Court may take judicial notice of the Harmonized Tariff Schedule, which is a public record.  *See Stahl v. USDA*, 327 F.3d 697, 700 (8th Cir. 2003).

[7] *See, e.g.*, Ex. 3, Vidalina Abadam, *Sugar and Sweeteners Outlook: February 2025* at 11 (USDA Feb. 18, 2025) (reporting that "Midwest refined beet sugar price" had dropped to 43 cents, and that "Northeast refined cane price (calendar year) was reduced … to 54 cents—the lowest since May 2022"); Ex. 4, Vidalina Abadam, *Sugar and Sweeteners Outlook: February 2022* at 13 (USDA Feb. 15, 2022) (reporting that "Northeast cane sugar is 52 cents per pound and 41-42 cents per pound for refined Midwestern beet sugar, compared with 42 and 36.5 cents a year ago" and "while spot prices are high, the bulk of the sugar sold is usually priced through longer-term contracts"); *see also World, U.S., and Mexican Sugar and Corn Sweetener Prices*, Sugar and Sweeteners Yearbook Tables (May 2, 2025), https://www.ers.usda.gov/data-products/sugar-and-sweeteners-yearbook-tables (providing monthly world and U.S. sugar prices).  The Court may take judicial notice of these reports, which are publicly available on the USDA's website.  *See Porter v. Cape Girardeau Cnty.*, 2022 WL 990676, at *2 n.5 (E.D. Mo. Mar. 31, 2022) (taking judicial notice of information published on a USDA website).

the price of sugar. *See id.* ¶¶ 211-216, 218.[8]  For example, "market allotments" allow the USDA to restrict or increase the amount of sugar that U.S. processors are permitted to sell, and the USDA controls the amount of foreign sugar that can be imported into the United States at low or no duty under the tariff-rate quota system. *See id.* ¶¶ 73, 173, 216, 218.

**Sugar Futures Are Publicly Traded**.  Options and futures for sugar products are traded as commodity futures contracts on the Chicago Mercantile Exchange and the Intercontinental Exchange ("ICE").  CIPP AC ¶ 65.  Futures contracts for U.S. raw cane sugar, known as the "Number 16," are traded on ICE, as are futures contracts for global raw cane sugar, known as the "Number 11," and global refined sugar, known as the "W." *Id.* ¶¶ 65-66; *see also* MCC ¶ 185.  As raw sugar cane is a key cost driver for refined cane sugar, the price of raw sugar influences the price of granulated sugar in the United States.

**B.    The Alleged Conspiracy**

**Mr. Wistisen's Communications with United and Domino**.  Plaintiffs allege that on around a dozen occasions between September 2019 and July 2021, Mr. Wistisen communicated with one employee at United (Eric Speece) and one employee at Domino (Alan Henderson).  MCC ¶¶ 87-117.  In those communications, Mr. Wistisen solicited feedback from Mr. Speece and Mr. Henderson regarding United's and Domino's general "spot" and "forward" pricing and sold positions (*i.e.*, the percentage of sugar that the company had sold), and shared market information with Mr. Speece and Mr. Henderson,

---

[8] *See also U.S. Sugar*, 2022 WL 4544025, at *8 ("[T]he Federal Sugar Program gives the USDA tools to control the supply of raw and refined sugar that is available for sale, which ultimately controls price.").

including general "spot" and "forward" pricing for sugar in various geographic areas (*e.g.*, sugar from the "Midwest" or "Gulf," *id.* ¶ 106) or "coverage" from other domestic sugar sellers. *See id.* ¶¶ 87-117.[9]

Plaintiffs do not explain how, or when, any Sugar Defendants, let alone all of them, and Mr. Wistisen entered into an agreement to fix prices or reciprocally exchange information. All Plaintiffs allege (albeit incorrectly) is that United "retained Commodity's services in 2019." *Id.* ¶ 12. Nor do Plaintiffs allege a single direct communication between any of the Sugar Defendants or any communications between any Sugar Defendant and Mr. Wistisen after July 2021.[10]

Plaintiffs contend that the alleged conspiracy is supported by the following additional allegations:

**Increasing Retail Prices for Granulated Sugar**. Plaintiffs' main "evidence" of the alleged conspiracy is that "nominal retail prices" for granulated sugar purportedly "experienced one of the steepest climbs ever" starting in January 2019, which supposedly cannot be explained by "market forces," including inflation. *See id.* ¶¶ 12, 136-37 & fig. 2.

---

[9] "Spot" prices refer to the "list" price for sugar that is sold on an as needed basis and not pursuant to a contract. "Spot" prices are generally higher than contracted prices; however, most granulated sugar is sold pursuant to annual contracts. *See* MCC ¶¶ 149, 154, 157-58, 161 (discussing the negotiation or pricing for annual contracts); *supra* n.7; *see also* Pl.'s Proposed Finding of Fact ¶ 28, *United States v. U.S. Sugar Corp.*, No. 21-1644 (D. Del. May 16, 2022), ECF No. 219 (recognizing that most retail and industrial customers purchase refined sugar pursuant to annual contracts).

[10] As Defendants have previously represented to the Court, it has been years since any Sugar Defendant has spoken to Mr. Wistisen. *See* Tr. at 22:7-14, Aug. 20, 2024, ECF No. 156.

**Supposed Opportunities to Collude**.  Plaintiffs allege that the Sugar Defendants "had opportunities to collude" through participation in various trade associations and sugar industry events, including the annual International Sweetener Colloquium ("ISC"), which is attended by "[b]uyers, processors, refiners, distributors, and food companies."  *Id.* ¶¶ 142, 178-81.

**Characteristics of the Sugar Industry**.  Plaintiffs allege that the sugar industry is "highly concentrated," there are "high barriers" to entry, the Sugar Defendants are vertically integrated, and granulated sugar is a commodity with "inelastic" demand.  *See id.* ¶¶ 170-77, 184-87.  Plaintiffs also allege that the Sugar Defendants "control[ ] 70% to 75% of the market" for granulated sugar in the United States, *see id.* ¶ 58, relying on data regarding United, Domino, and MSC's estimated production ***capacity***.  *See id.* ¶ 59 & fig. 1.

**Historical Antitrust Violations**.  Plaintiffs allege that there is a "pattern of misconduct" in the sugar industry, relying on antitrust cases that are at least 55 (and, in one case, nearly 100) years old, and involved different defendants and different allegations of wrongdoing.  *See id.* ¶¶ 188-94.

## C.  Plaintiffs

Plaintiffs are direct and indirect commercial and consumer purchasers of granulated sugar.  *See id.* ¶¶ 14-16.  No Plaintiffs, however, allege that they bought sugar in the "spot" market, or anything about the prices that they paid for granulated sugar.  They bring claims on behalf of all individuals or entities that purchased granulated sugar directly or indirectly from the Sugar Defendants from January 1, 2019 to the "present."  *See* DPP SFC ¶ 12; CIPP SFC ¶ 37; IIPP SFC ¶ 28.  The DPPs bring federal antitrust claims under Section 1

-10-

of the Sherman Act, DPP SFC ¶ 12, and the Indirect Plaintiffs seek injunctive relief under Section 1 of the Sherman Act and bring antitrust and other claims under various state laws. CIPP SFC ¶¶ 37, 46; IIPP SFC ¶¶ 8, 22, 43.

## LEGAL STANDARD

To plead a Section 1 claim, Plaintiffs must allege facts plausibly demonstrating that "the defendants shared a unity of purpose or a common design and understanding, or a meeting of the minds" to restrain trade.  *Insulate*, 797 F.3d at 543 (quotations omitted). This requires "more than labels and conclusions," and conduct that is "merely consistent with [an] agreement" will not suffice.  *Id.* (alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)).

The Eighth Circuit has also instructed that "[g]iven 'the unusually high cost of discovery in antitrust cases,'" "the limited 'success of judicial supervision in checking discovery abuse[,]' and 'the threat that discovery expense will push cost-conscious defendants to settle even anemic cases,'" district courts should be "reasonably aggressive in weeding out meritless antitrust claims at the pleading stage."  *Insulate*, 797 F.3d at 543; *In re Crop Inputs Antitrust Litig.*, 749 F. Supp. 3d 992, 1003 (E.D. Mo. 2024) (same).

## ARGUMENT

## I.    PLAINTIFFS DO NOT PLAUSIBLY ALLEGE ANY AGREEMENT

All Plaintiffs' federal claims under Section 1 of the Sherman Act fail because they do not plausibly allege any agreement—the "crucial" element of a Section 1 claim, regardless of whether their claims are analyzed under the *per se* standard or rule of reason. *Twombly*, 550 U.S. at 553 (citation omitted); *Burch v. Milberg Factors, Inc.*, 662 F.3d

212, 225 (3d Cir. 2011) ("Claims subject to both the *per se* analysis and the rule of reason require alleging the existence of a conspiracy."). This pleading failure is also fatal to all of the Indirect Plaintiffs' state law claims. *See, e.g.*, *In re: Passenger Vehicle Replacement Tires Antitrust Litig.*, 2025 WL 606533, at \*44 (N.D. Ohio Feb. 25, 2025) ("*Replacement Tires*") (dismissing state law claims where plaintiffs failed to plead a conspiracy); *In re Pork Antitrust Litig.*, 2019 WL 3752497, at \*10 (D. Minn. Aug. 8, 2019) ("*Pork*") (same).

To adequately plead a Section 1 claim, a plaintiff must allege either direct evidence of an agreement or circumstantial evidence from which the existence of an agreement can be plausibly inferred. *See Burtch*, 662 F.3d at 225; *Insulate*, 797 F.3d at 544-45. Direct evidence is "explicit and requires no inferences." *Burtch*, 662 F.3d at 225 (citation omitted). To plead an agreement through circumstantial evidence, Plaintiffs must allege sufficient facts from which a plausible inference of an unlawful agreement is warranted. *See Twombly*, 550 U.S. at 556-57. This requires that Plaintiffs allege parallel business conduct among the alleged co-conspirators ***and*** additional facts—known as "plus factors"—that put the parallel conduct "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557.

Plaintiffs' conspiracy claims should be dismissed because they have not plausibly alleged any agreement among Defendants—whether to fix prices for granulated sugar or to exchange information—through either direct or circumstantial evidence.

## A.    The Complaints Do Not Plausibly Allege An Agreement

Plaintiffs fail to satisfy the most basic of pleading requirements because they have

not alleged how "each individual defendant joined the conspiracy and played some role in it," which is necessary, because "at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *U.S. Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 904-05 (N.D. Ill. 2019) (citation omitted). "[E]ach defendant is entitled to know how it is alleged to have conspired, with whom, and for what purpose." *Crop Inputs*, 749 F. Supp. 3d at 1007; *see also In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019) (A "complaint that 'fail[s] to connect each or any individual entity to the overarching conspiracy'" is insufficient. (alteration in original) (citation omitted)).

Plaintiffs refer vaguely and generically to "Defendants" and do not explain how, when, or where any of the Defendants joined the purported conspiracy. *See Robertson v. Univ. of Akron Sch. of Law*, 2021 WL 3709915, at *8 n.9 (N.D. Ohio Aug. 20, 2021) ("[G]roup pleading … does [not] satisfy the degree of specificity required for pleading a federal conspiracy."), *aff'd*, 2022 WL 1836922 (6th Cir. June 3, 2022); *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1020 (D. Minn. 1997) (dismissal required where defendant was simply "lump[ed]" together with other defendants without any well-pled allegations), *aff'd*, 195 F. 3d 430 (8th Cir. 1999). Instead, Plaintiffs allege only that United "employed" Mr. Wistisen "at least as early as the first half of 2019," MCC ¶ 166, and that "Defendants" supposedly relied on Mr. Wistisen to fix or coordinate prices with one another "at least as early" as that date, *see id.* ¶ 140. But Plaintiffs never explain when, or how, any agreement among the Defendants, let alone all of them, was reached, or even when any other Defendants began "employ[ing]" Mr. Wistisen, or even that all the Sugar

-13-

Defendants *did* employ Mr. Wistisen. *See Twombly*, 550 U.S. at 565 n.10 (bare allegation of a conspiracy that started "at least as early" as a given date and continued to the present was deficient); *Insulate*, 797 F.3d at 546 (dismissing conspiracy allegations where "[t]he complaint [did] not allege when the agreements occurred"); *see also Gibson v. MGM Resorts Int'l*, 2023 WL 7025996, at *4 (D. Nev. Oct. 24, 2023) (dismissing conspiracy claim where plaintiffs alleged one defendant began using software in 2012 but did not allege when any other defendants allegedly began using the same software).

Plaintiffs also attempt to allege that the Sugar Defendants agreed to use a "common formula" to set prices for granulated sugar based on the price of the "Number 16." *See* MCC ¶¶ 130-35. But Plaintiffs do not allege when any such agreement was reached, by whom, or even what "common formula" was supposedly used. *See id.* Plaintiffs allege that the Sugar Defendants "routinely referenced Number 16 spot prices" in deciding their pricing, *id.* ¶ 131, but relying on publicly available and publicly traded information regarding the price of raw sugar (the main input for granulated cane sugar) does not remotely show an illicit agreement to use a "common formula" to fix prices. *See Replacement Tires*, 2025 WL 606533, at *19 ("There is nothing unreasonable about consulting public sources to determine how to price your product." (citation omitted)). Indeed, it would be nonsensical for sellers to ignore the cost of a key input in setting their prices, as Plaintiffs seem to suggest they would have done in the absence of the alleged conspiracy.

Nor do Plaintiffs allege any facts supporting the inference that each of the Sugar Defendants agreed to share competitively sensitive information through Mr. Wistisen (*i.e.*,

-14-

the "give to get"). There are no allegations that Mr. Wistisen ever conditioned the provision of any allegedly sensitive information to any Sugar Defendant on the receipt of any particular information, nor that any Sugar Defendant demanded any information from Mr. Wistisen before providing any information to Mr. Wistisen. And Plaintiffs only allege that two Sugar Defendants (United and Domino) communicated with Mr. Wistisen at all. Plaintiffs' allegations of a conspiracy are nothing but "naked assertion[s]" that are insufficient to state a claim. *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1057 (8th Cir. 2018) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Plaintiffs' vague allegations of conspiracy are particularly lacking with respect to LDC, U.S. Sugar Savannah, and MSC.

*LDC.* Plaintiffs do not allege that anyone at LDC or Imperial, the business and assets of which LDC sold in November 2022, MCC ¶ 30, ever communicated with Mr. Wistisen (or any other Sugar Defendant), or explain how or when either entity joined or participated in any conspiracy. Plaintiffs allege a single communication in November 2019 where a sugar broker, Gerald Kramer, told individuals at Imperial information about Domino. *See id.* ¶ 89. There are no factual allegations to suggest that Mr. Kramer was connected to Plaintiffs' alleged conspiracy, nor any allegations that suggest that the information that Mr. Kramer provided was non-public or that it was ever acted upon. Plaintiffs fail to explain how this single communication with a sugar broker is at all related to the alleged conspiracy among the Sugar Defendants and Mr. Wistisen, or how it shows any agreement involving LDC or Imperial to share non-public information or fix prices.

-15-

*U.S. Sugar Savannah*.  U.S. Sugar Savannah's connection to the alleged conspiracy is likewise without basis.  Plaintiffs do not allege that U.S. Sugar Savannah ever communicated with Mr. Wistisen or anyone else regarding prices or sold positions.  Nor would it have any reason to do so, as U.S. Sugar Savannah does not market its own sugar— United does so on its behalf.  *See id.* ¶¶ 22, 25.  Indeed, U.S. Sugar Savannah did not exist until November 2022, *see id.* ¶ 26, and Plaintiffs do not allege a single communication between Mr. Wistisen and any Sugar Defendant after July 2021.

*MSC*.  Plaintiffs do not allege when or how, or who at MSC reached any agreement with any other Sugar Defendant or Mr. Wistisen, and Plaintiffs do not allege a single communication between Mr. Wistisen and anyone at MSC.  Plaintiffs allege that on three occasions, Mr. Wistisen shared with United and/or Domino MSC's spot price or estimated sold percentage, *see id.* ¶¶ 94, 106, 114, but there are no factual allegations that Mr. Wistisen obtained the information from MSC, *see id.*  On three other occasions, Mr. Wistisen said he "hope[d]" to talk to MSC, yet there are no allegations demonstrating that Mr. Wistisen ever did talk with anyone at MSC.  *See id.* ¶¶ 93, 97, 112.

## B.    Plaintiffs Have Not Pled Direct Evidence Of A Conspiracy

Plaintiffs essentially concede that they do not plead any direct evidence of an agreement to fix prices for granulated sugar.  *See id.* ¶ 64 (arguing that Defendants' alleged information sharing is a "plus factor" that supports an inference of a price-fixing agreement); *see also Burtch*, 662 F.3d at 225 (no direct evidence of an agreement where plaintiffs failed to "specify a time or place that any actual agreement … occurred").

-16-

Plaintiffs also fail to plead any direct evidence of an agreement among Defendants to exchange information through Mr. Wistisen or otherwise. Plaintiffs allege that the exchange of information through Mr. Wistisen was "reciprocal" and a "give to get," meaning that the Sugar Defendants only provided their own supposedly sensitive information to Mr. Wistisen because they commonly understood that their competitors would do the same. *See* MCC ¶¶ 6, 8. However, there are no allegations that reflect evidence of any such agreement.

All that Plaintiffs allege is that on about a dozen occasions between September 2019 and July 2021, Mr. Henderson responded to individual emails from Mr. Wistisen requesting information regarding Domino's prices or sold positions, and Mr. Speece separately responded to individual emails from Mr. Wistisen requesting the same information regarding United. *Id.* ¶¶ 86-117. Despite Plaintiffs' labels, none of the alleged communications is evidence, let alone direct evidence, of a "give to get" agreement among the Sugar Defendants or with Mr. Wistisen to exchange any information. *See Burtch*, 662 F.3d at 223, 226 ("[T]he exchange of price information still requires showing that the defendants had an agreement."); *see also Frost v. LG Elecs. Inc.*, 801 F. App'x 496, 498 (9th Cir. 2020) (allegations that "require[ ] inferences in order to support the existence of a conspiracy" are "not direct evidence" of an agreement).

### C.    Plaintiffs Have Pled No Circumstantial Evidence From Which The Court Could Infer A Conspiracy

In the absence of any direct factual allegations of an agreement, Plaintiffs must plead facts that raise a plausible ***inference*** of a conspiracy. *Twombly*, 550 U.S. at 556. Plaintiffs failed to do so.

### 1.    Plaintiffs Have Not Alleged Any Parallel Conduct

Plaintiffs' conspiracy claims fail because they have not plausibly alleged any parallel conduct. *See, e.g.*, *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516-17 (8th Cir. 2018) (affirming dismissal of Section 1 claim for failure to plead "parallel conduct"); *Insulate*, 797 F.3d at 543 ("Pleading only 'parallel conduct' … is not sufficient …." (citation omitted)).

### a.    Plaintiffs Have Not Alleged Parallel Pricing

Plaintiffs allege that United and Domino's communications with Mr. Wistisen "evidence[ ]" parallel pricing, MCC ¶ 150, but those communications do not show parallel pricing, and in fact, show the opposite.

None of the excerpted communications between United or Domino and Mr. Wistisen demonstrates that the Sugar Defendants charged the same amounts for granulated sugar, or that the Sugar Defendants' prices moved in parallel, and certainly not for the entirety of the time from January 2019 to the "present." *See id.* ¶¶ 86-117. In fact, it is impossible to glean from the handful of emails Plaintiffs excerpt how any Sugar Defendant's prices changed over time, let alone all of them.

Even where there are prices for particular Sugar Defendants alleged, as reflected in

the communications with Mr. Wistisen or collected from other (presumably publicly available) sources, they show that the Sugar Defendants' prices differed and changed at different times. For example, in September 2020, United's spot price for beet sugar was $0.365/lb and its spot price for cane sugar was $0.385/lb, while Domino's spot price was $0.385/lb from the "Gulf" and $0.405/lb to $0.41/lb from its other refineries, and MSC's spot price was $0.385/lb for beet sugar; there are no allegations regarding Imperial's price. *See id.* ¶¶ 94-96. A few months later, in November 2020, Domino's spot prices for cane sugar had increased to $0.46/lb, while United was still charging $0.365/lb for beet and $0.385/lb for cane sugar, and there are no allegations regarding MSC or Imperial's pricing. *Id.* ¶ 100. In July 2021, United was supposedly charging $0.365/lb for beet sugar and $0.395/lb for cane sugar, *see id.* ¶ 116, Domino was allegedly charging $0.43/lb on the "east and west coast" and $0.405/lb from the "gulf," *id.* ¶ 117, and again, there are no allegations regarding MSC or Imperial's pricing. Plaintiffs' allegations thus do not reflect any parallel pricing. *Park Irmat Drug Corp.*, 911 F.3d at 517 (actions "executed under dissimilar circumstances and separated by six months, d[o] not constitute parallel conduct"); *Burtch*, 662 F.3d at 228-29 (no parallel conduct where Defendants acted differently, and at different times); *Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1146 (N.D. Cal. 2017) (no parallel conduct where "four examples" showed "difference[s] in price[s]"), *aff'd*, 757 F. App'x 524 (9th Cir. 2018).

Plaintiffs allege that "many" price increases supposedly occurred after annual ISC meetings, including after the 2019 and 2022 meetings, MCC ¶¶ 142, 146, 157, but Plaintiffs only allege that Domino's price increased to $0.37/lb at some undetermined time

and geography after the 2019 meeting and say nothing about how any other Sugar Defendants' prices changed, *see id.* Plaintiffs' conclusory allegations are insufficient to plead that the Sugar Defendants' prices moved in parallel. *See Pork*, 2019 WL 3752497, at *8-9 (rejecting allegations of parallel conduct that did not allow the court to analyze "which, how many, or when any of the individual Defendants may have affirmatively acted").

Plaintiffs rely on their allegations that "nominal retail" prices for granulated sugar industry-wide have increased since 2019, *see* MCC ¶¶ 12, 136, 166, but that does not show that the Sugar Defendants' prices moved in parallel. Such aggregated, industry-wide data—that includes sugar sold by non-defendants—does not reflect how any particular Sugar Defendant's price changed or compared to any other Sugar Defendant's or non-defendant's price. *Pork*, 2019 WL 3752497, at *8 ("industry-wide data" did "nothing to indicate how any of the individual Defendants acted" and did "not suffice to plausibly plead parallel conduct"); *In re Cattle Antitrust Litig.*, 2020 WL 5884676, at *6 (D. Minn. Sept. 29, 2020) (finding no parallel conduct where plaintiffs "resort[ed] to group pleading, arguing that the market did this or that"); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195, 1197 (9th Cir. 2015) (rejecting statistics "alleg[ing] an increase in the average retail price of *all* guitars and guitar amplifiers sold"). Plaintiffs' industry-wide data is all the more irrelevant because it reflects ***retail*** prices for granulated sugar, which are not prices that any Sugar Defendant charged; ***retail*** prices reflect prices charged by some of the ***Plaintiffs*** (*e.g.*, grocery stores like Named Plaintiffs, Wakefern and Redners).

**b.      Plaintiffs Have Not Alleged Any Other Parallel Conduct**

Plaintiffs also have not alleged that Defendants engaged in any other parallel conduct that could support a plausible inference of a conspiracy.  Plaintiffs lump together the Sugar Defendants and allege that they all entered into a "reciprocal" agreement to share sensitive information through Mr. Wistisen, MCC ¶¶ 6, 8, but Plaintiffs do not allege that LDC, U.S. Sugar Savannah, or MSC ever even communicated, much less shared, any information with Mr. Wistisen.  Nor do Plaintiffs allege that the Sugar Defendants began using Mr. Wistisen's services around the same time or in the same way (or for some Sugar Defendants, that they used Mr. Wistisen's services at all).  *See also Gibson v. Cendyn Grp., LLC*, 2024 WL 2060260, at *3-4 (D. Nev. May 8, 2024) (finding allegations of a "tacit agreement" among hotels was "implausible" where hotels began using software "at different times" over a 10-year period).  Plaintiffs' allegations of communications between Mr. Wistisen and a single employee at each of United and Domino is not sufficient to allege that ***all of*** the Sugar Defendants engaged in parallel conduct with respect to sharing information.  *See In re Travel Agent Comm'n Antitrust Litig.*, 2007 WL 3171675, at *4 (N.D. Ohio Oct. 29, 2007) (dismissing some defendants because the complaint provided insufficient facts to conclude that they engaged in the alleged parallel conduct), *aff'd*, 583 F.3d 896 (6th Cir. 2009).

**2.      Plaintiffs Have Not Alleged "Plus Factors" That Support An Inference Of Any Conspiracy**

Plaintiffs' alleged plus factors are irrelevant and need not be considered given Plaintiffs' failure to plead parallel conduct.  *See, e.g.*, *Park Irmat Drug Corp.*, 911 F.3d

-21-

at 517 ("[N]o discussion of any 'plus factors' is necessary," where plaintiffs have not plausibly alleged parallel conduct.); *Pork*, 2019 WL 3752497, at *7 ("without plausible allegations of parallel conduct," plus factors "are insufficient").

But even if Plaintiffs had plausibly alleged parallel conduct, it would not be enough because "parallel conduct" alone "does not suggest a conspiracy" as it is consistent "with a wide swath of rational and competitive business strategy." *Twombly*, 550 U.S. at 554, 557. Only when parallel conduct is accompanied by "plus factors" showing that such conduct is likely the product of a preceding agreement, can it support the inference of a conspiracy. *See id.* at 557. "Plus factors" are "economic actions and outcomes that are largely inconsistent with unilateral conduct" or "largely consistent with explicitly coordinated conduct." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 310 F. Supp. 3d 1002, 1013 (E.D. Mo. 2018) (citation omitted), *aff'd*, 911 F.3d 505 (8th Cir. 2018); *see also Twombly*, 550 U.S. at 556 n.4 ("plus factors" must suggest that parallel conduct "would probably not result from chance" (citation omitted)).

In considering whether alleged "plus factors" support the inference of an agreement, the Court must also consider "obvious alternative explanation[s]" that are equally capable of explaining the alleged parallel conduct. *Twombly*, 550 U.S. at 567; *see also Replacement Tires*, 2025 WL 606533, at *37, 39, 43 (finding plaintiffs' alleged plus factors were insufficient to render their price-fixing claims plausible because plaintiffs failed to meaningfully grapple with the "obvious alternative explanation" for the alleged price increases); *BCBSM, Inc. v. GS Labs, LLC*, 2023 WL 2044329, at *16 (D. Minn. Jan. 30,

2023) (dismissing Section 1 claim where plaintiffs failed to address an "obvious alternative explanation" for parallel conduct).

> **a.    Plaintiffs' Purported "Plus Factors" Do Not Support An Inference Of A Conspiracy**

*The Alleged Communications With Mr. Wistisen*.  There is nothing unusual or nefarious about providing market information to an industry analyst.  Indeed, courts, including the Supreme Court, have acknowledged that businesses have a legitimate motivation to conduct their operations with market data and even the direct exchange of pricing data is consistent with a competitive market.  *See, e.g.*, *Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 582-83 (1925) (noting that "gathering and dissemination" of market-level data leads to efficiency and transparency); *Burch*, 662 F.3d at 223 ("[T]he dissemination of price information is not itself a *per se* violation of the Sherman Act." (quoting *United States v. Citizens & So. Nat'l Bank*, 422 U.S. 86, 113 (1975))).  Indeed, "information-seeking [about competitors]," including their pricing, "is common" and "such behavior is consistent with conscious parallelism rather than collusion." *Replacement Tires*, 2025 WL 606533, at *19 (alteration in original) (citation omitted).  While a "high level of [interfirm] communications among competitors can constitute a plus factor," *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask., Inc.*, 203 F.3d 1028, 1033 (8th Cir. 2000), that is not what Plaintiffs have alleged.

Specifically, Plaintiffs have not alleged a single interfirm communication between any Sugar Defendants.  And, even if the communications between United and Domino, on the one hand, and Mr. Wistisen, on the other hand, could be considered "interfirm"

communications, their infrequent nature (around a dozen during a two-year period) and discussion of general prices and estimated sold positions would not rise to a "high level" of "interfirm communications" permitting a plausible inference of a conspiracy involving United and Domino, let alone all of the Defendants. *See Blomkest*, 203 F.3d at 1033-34 (finding that roughly three dozen interfirm communications verifying prices charged over the course of seven years were insufficient to support the existence of a price-fixing conspiracy); *Mayor & Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 139-40 (2d Cir. 2013) (holding that rare interfirm communications among three of more than a dozen defendants did not amount to a "'high level' of interfirm communications").

Indeed, Plaintiffs have not plausibly alleged how United or Domino, the two Sugar Defendants who allegedly communicated with Mr. Wistisen, could even use the exchanged information (even if it was "confidential" and "commercially sensitive," MCC ¶ 80) to fix or otherwise move market-wide prices, where the alleged correspondence took place less than once a month, did not include customer-specific prices, and related to a market Plaintiffs allege has $13.5 billion in annual sales with millions of purchasers across multiple channels. *See id.* ¶¶ 53, 86-117; *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Secs. Corp.*, 92 F.4th 381, 390, 397 (2d Cir. 2024) (affirming dismissal of plaintiffs' claims where alleged information exchange was "market color" that was "far from the sort of actionable information that traders could use to game Treasury auctions.").

***No Actions Against Self-Interest***.  Plaintiffs also allege that no Sugar Defendant would provide Mr. Wistisen with its supposedly sensitive information unless it was assured that it would receive other competitors' sensitive information in return.  MCC ¶¶ 6, 8, 122.

-24-

To start, Plaintiffs do not allege that all Sugar Defendants even communicated with Mr. Wistisen. *See supra* at Section I.A. As to the two that allegedly did—United and Domino—Plaintiffs selectively quote trial testimony from a United Vice President to imply that United provided information to Mr. Wistisen because it "know[s] [Mr. Wistisen is] going to share information and [United] want[s] the information that gets shared to be accurate." MCC ¶ 79 (first alteration in original). But far from supporting Plaintiffs' allegations, the testimony from United's witness only undermines Plaintiffs' theory:

> Q. Why did United or why does United share information about itself with Mr. Wistisen?
>
> A. Well, we know he's going to share information and we want the information that gets shared to be accurate. It's the same thing that we're telling our customers every time the phone rings or every time there is an e-mail that needs to be responded to, but we see a value in having the information that he publishes be accurate.
>
> Q. You mean the information in his monthly report?
>
> A. That's correct.
>
> Q. That's an industry wide report?
>
> A. It is.
>
> Q. Why does United care whether the information in Mr. Wistisen's monthly report is accurate?
>
> A. Well, it's widely read by customers. We also think that the USDA reads that. Reads other periodicals that write on the industry, like Sosland Milling & Baking News report, Jenkins, Frank Jenkins, JSG Commodities I think it is writes virtually a daily report tracking the industry. And it's read by all of the industry analysts and by USDA. We want what's in there to be accurate.[11]

---

[11] Ex. 1, Trial Tr. at 180:16-181:11. The Court can and should consider the trial transcript, which is quoted and relied upon by Plaintiffs and thus incorporated by reference. *Ryan v. Ryan*, 889 F.3d 499, 505 (8th Cir. 2018) (court may consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not

This testimony demonstrates that United provided information to Mr. Wistisen because it expected that the information would be read by its customers, the USDA, and industry analysts, among others.   Far from being an action against self-interest, communicating with Mr. Wistisen was a rational business decision, irrespective of whether United was assured access to competitors' information through the same source. *See In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 539 (N.D. Tex. 2014) ("Just because Defendants' rational business interests can be recast in a suspicious light does not mean the allegations actually suggest a conspiracy was formed.").

Plaintiffs' other supposed "plus factors" are all generic allegations that courts routinely hold are insufficient to render conspiracy allegations plausible.

*Characteristics of the Sugar Industry*.  Plaintiffs allege that the sugar industry is ripe for collusion because the industry is "highly concentrated," there are purportedly high barriers to entry, there is "inelastic demand," and the Sugar Defendants are "vertically integrated."  MCC ¶¶ 9, 169-77.  But each of those allegations could apply to many different industries and does not even apply to each Sugar Defendant, and "[b]eing ripe for collusion, or having a market where collusion is simply possible" due to the market structure "is not evidence of collusion."  *Replacement Tires*, 2025 WL 606533, at *22 (alteration in original) (quoting *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on*

_____

physically attached to the pleading" (citation omitted)); *In re Resideo Techs., Inc., Secs. Litig.*, 2021 WL 1195740, at *3 (D. Minn. Mar. 30, 2021) (incorporation by reference "seeks to prevent plaintiffs from selectively excerpting documents in a manner that supports their claim, while omitting those portions that weaken or defeat their claims").

*Standards for Athletic Equip.*, 48 F.4th 656, 668 (6th Cir. 2022)); *see also In re DRAM Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 52 (9th Cir. 2022) (plaintiffs must do more than allege that the structure of the "market makes it conducive to conspiracy").

    ***Supposed Opportunities to Collude***.  Plaintiffs also allege that the "Defendants had opportunities to collude" through their participation in certain sugar industry trade associations and attendance at industry events, as well as through the "crossover of employees" among certain Sugar Defendants.  MCC ¶¶ 178-83.  However, Plaintiffs do not allege that any Defendant entered into any *agreement* (or even exchanged any competitively sensitive information) with any other Defendant at any trade association event.  *See id.*  Plaintiffs allege only that at the February 2022 ISC meeting, "future contract prices for Number 16 sugar [*i.e.*, raw sugar] were discussed" "and then finalized in the weeks following the event."  *Id.* ¶ 181.  Not only does that allegation fail to identify which, if any, Sugar Defendants participated in the purported discussions, but "Number 16" sugar is raw sugar, not granulated sugar, which none of the Sugar Defendants produce or sell.  Moreover, as Plaintiffs recognize, sugar purchasers attend the ISC meeting, and there is nothing nefarious about the Sugar Defendants meeting with, or discussing, contracts with their customers.  *Id.* ¶¶ 91, 179; *see also Replacement Tires*, 2025 WL 606533, at *16-17 ("[M]ere attendance at [ ] trade association meetings contributes little, if anything, to the plausibility of an alleged conspiracy."); *In re DRAM Indirect Purchaser Litig.*, 2020 WL 8459279, at *10 (N.D. Cal. Nov. 24, 2020) ("Simply because Defendants *could* talk to competitors does not mean that they *did*."), *aff'd*, 28 F.4th 42 (9th Cir. 2022).

Plaintiffs' allegation regarding the supposed "crossover of employees among Defendants," *see* MCC ¶ 183, is equally irrelevant. Plaintiffs allege that two Domino and one United employee previously worked at Cargill, the large agricultural conglomerate. *See id.* However, Plaintiffs do not allege that those employees even knew each other at Cargill, or that they communicated with each other after moving to United and Domino. *See Process Controls Int'l, Inc. v. Emerson Process Mgmt.*, 753 F. Supp. 2d 912, 922 (E.D. Mo. 2010) (disregarding allegation that "several [of one defendant's] directors and board members" were "also members of the [other] defendants' boards").

**Historical Antitrust Violations**. Plaintiffs also allege that there is a "history of anticompetitive conduct" in the sugar industry, pointing to antitrust lawsuits from at least half a century ago. *See* MCC ¶¶ 188-94. But none of those dated lawsuits makes Plaintiffs' conspiracy allegations plausible. "To use former antitrust violations as evidence of a current Section 1 conspiracy, a plaintiff must establish a "'direct, logical relationship" between the collateral conspirac[ies] and the instant conspiracy.'" *Replacement Tires*, 2025 WL 606533, at *40 (alteration in original). "Meaningful overlap" would include that "the prior and current conspiracies involve the same executives, the same conspiratorial method, or the same third-party intermediaries facilitating the conspiracy." *Id.* Plaintiffs allege no such overlap. None of the prior litigations involves the same executives, the same conspiratorial method, or the same third-party intermediary as Plaintiffs' alleged conspiracy here. *See* MCC ¶¶ 188-94. Indeed, Mr. Wistisen and many of the Sugar Defendants' employees were not even alive at the time of many of the prior antitrust litigations. *See In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 402 (3d Cir.

-28-

2015) ("Illegal behavior elsewhere in time or place does not generally allow the inference of an immediate conspiracy." (citation omitted)); *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *9 (N.D. Cal. 2011) (finding other instances in which defendants were found to have engaged in price-fixing not "probative").

### b. Plaintiffs Ignore Obvious, Alternative Non-Conspiratorial Explanations For Increases In Granulated Sugar Prices

Plaintiffs' "plus factors" also do not make Plaintiffs' conspiracy allegations plausible because Plaintiffs fail to address the "obvious alternative explanation" for industry-wide increases in retail prices for granulated sugar:  increasing prices for raw sugar in the United States and across the world.  *See Twombly*, 550 U.S. at 557, 567.

Plaintiffs blame industry-wide increases in retail prices for granulated sugar from 2019 to the "present" entirely on the approximately dozen alleged communications two employees of Domino and United had with Mr. Wistisen from September 2019 to July 2021.  But Plaintiffs' own charts show that the most significant increases in granulated sugar prices—which took place between mid-2022 and mid-2024—occurred a year ***after*** the last alleged communication with Mr. Wistisen, which supposedly took place in July 2021.  *See* MCC ¶¶ 114-17, 136-37.  Plaintiffs have no theory as to why, or how, retail granulated sugar prices would increase most significantly when there are no alleged communications between any Sugar Defendant and Mr. Wistisen.

The reality is that prices for raw sugar have increased both in the United States and globally since 2019 due to macroeconomic forces (*e.g.*, post-COVID-19 supply chain issues, inflation, and global weather events impacting sugar production).  Figure 1 below,

-29-

which the CIPPs included in their Amended Complaint (but was deleted when Plaintiffs filed their operative pleadings[12]), shows that prices for No. 11 sugar futures, which reflect global prices for raw sugar, increased between January 2019 and March 2024 in the same fashion as "nominal retail prices" for granulated sugar in the United States. *See* CIPP AC ¶¶ 184, 186; MCC ¶ 136.



**Figure 1[13]**

---

[12] *See Bauer v. Tacey Goss, P.S.*, 2012 WL 2838834, at *3 (N.D. Cal. July 10, 2012) (plaintiffs cannot "seek to avoid the implications of the[ir] factual allegation[s] by omitting them" in an amended complaint).

[13] *See* CIPP AC ¶¶ 184, 186 & fig. 5.



**Figure 2[14]**

Publicly traded futures contracts for raw cane sugar in the United States (the "Number 16"), also increased in a similar fashion between 2019 and 2024. Figure 3 below shows prices for the Number 16 between January 2019 and June 2024:

---

[14] Plaintiffs' alleged nominal retail prices for granulated sugar in the United States. *See* MCC ¶ 136 & fig. 2.

-31-



**Figure 3**[15]

As granulated sugar is refined or processed from raw sugar cane or beets, *see* MCC ¶¶ 50-51, it is not at all surprising—and certainly not evidence of a conspiracy—that prices for granulated sugar would increase in tandem with price increases for raw sugar cane.

The fact that the price of granulated sugar has increased with the price of raw sugar both in the United States (Number 16) and globally (Number 11) dispels Plaintiffs' claim of a conspiracy, given the more likely explanation that prices for granulated sugar have increased due to macroeconomic forces impacting the price of raw sugar. Plaintiffs' failure

---

[15] Federal Reserve Economic Data, *Global price of Sugar, No. 16, US* (Apr. 10, 2025), https://fred.stlouisfed.org/series/PSUGAUSAUSDM (last accessed May 13, 2025); *see also* Decl. ¶ 8. Plaintiffs' allegations rely on and incorporate by reference the publicly traded price of the Number 16, *see* MCC ¶¶ 131, 133, 135, 181, and thus the Court can consider this information. *See Ryan*, 889 F.3d at 505 (court may consider "documents 'necessarily embraced by the complaint'" (citation omitted)). The Court may also take judicial notice of prices regarding publicly traded commodities, like the Number 11 and Number 16. *See In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 52 (S.D.N.Y. 2012) (court "can take judicial notice of publicized commodities prices").

to address this "obvious alternative explanation" for the alleged industry-wide increases in granulated sugar pricing is fatal to their conspiracy allegations.  *See D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1104 (9th Cir. 2024) (dismissing conspiracy allegations where plaintiffs failed to address an "obvious alternative explanation," *i.e.*, the COVID-19 pandemic); *Replacement Tires*, 2025 WL 606533, at *16 (dismissing conspiracy allegations where plaintiffs did "not offer[ ] any compelling reason why the COVID-19 pandemic should not be considered … and treated as an obvious alternative and lawful explanation" for the alleged parallel prices); *BCBSM, Inc.*, 2023 WL 2044329, at *15 ("Conspiracy allegations are implausible when there exists an 'obvious alternative explanation' for the defendant's conduct that the complaint does not plausibly undermine." (citation omitted)).

## II.     PLAINTIFFS HAVE NOT ALLEGED THAT THE NAMED PLAINTIFFS SUFFERED ANY INJURY FROM THE PURPORTED CONSPIRACY

Plaintiffs' claims also fail because the named Plaintiffs have not alleged any injury-in-fact as a result of the alleged antitrust violation or any antitrust standing.  In a putative class action alleging a price-fixing conspiracy like this one, the named Plaintiffs must plausibly allege that they paid inflated prices as a direct result of the allegedly anticompetitive conduct.  *See, e.g.*, *In re Cattle & Beef Antitrust Litig.*, 687 F. Supp. 3d 828, 838 (D. Minn. 2023) (finding no standing where plaintiffs failed to allege the impact of defendants' conduct on the price of the product defendants sold to plaintiffs).  Here, Plaintiffs make no effort to connect their purchases of granulated sugar and the prices they paid with the conduct they claim constitutes the antitrust violation, *i.e.*, the alleged

-33-

agreement to exchange information through Mr. Wistisen.

There are no allegations in the Complaints regarding how, when, where, or at what price any of the Named Plaintiffs purchased sugar, even though this information is within Plaintiffs' possession. The Complaints make generalized claims that the Named Plaintiffs purchased sugar "from one or more" or "at least one" of the Defendants during the Class Period. MCC ¶¶ 14-16; *see also* CIPP SFC ¶¶ 4-19, 42, IIPP SFC ¶ 53. That is not enough to infer that any of the Named Plaintiffs was overcharged for the granulated sugar that they purchased, or that any purported overcharge was the result of any communications with Mr. Wistisen. *See, e.g.*, *In re SSA Bonds Antitrust Litig*., 2018 WL 4118979, at *6 (S.D.N.Y. Aug. 28, 2018) ("[A]bsent other allegations showing injury, courts have found no injury where the plaintiffs failed to allege any specific transactions that they entered into that harmed them through the defendants' misconduct.").

## III.   PLAINTIFFS' INFORMATION EXCHANGE CLAIM FAILS FOR THE INDEPENDENT REASON THAT PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED ANY ANTICOMPETITIVE EFFECTS

Plaintiffs' Section 1 claim predicated on Defendants' alleged sharing of information with Mr. Wistisen should be dismissed for the independent reason that Plaintiffs have not adequately alleged that any information exchange has caused anticompetitive effects in any relevant market.

Purported agreements among competitors to exchange information, including pricing information, are analyzed under the rule of reason. *Citizens & So. Nat'l Bank*, 422 U.S. at 113 ("[T]he dissemination of price information is not itself a per se violation of the Sherman Act."). That is because, "absent some agreement between competitors to restrain

price, the exchange of price and other market information is generally benign conduct that facilitates efficient economic activity." *Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1052-53 (D. Minn. 1992) (footnote omitted). To adequately plead an information exchange claim under Section 1, a plaintiff thus must allege facts demonstrating that the purported exchange of information has resulted in anticompetitive effects in a relevant market through either direct or indirect evidence. *See Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 2006 WL 1851137, at *5 (D. Minn. June 30, 2006). Plaintiffs have done neither.

### A.    Plaintiffs Do Not Plead Direct Evidence Of Anticompetitive Effects

Plaintiffs do not allege any direct evidence of anticompetitive effects. Direct evidence of anticompetitive effects would include factual allegations showing an "'actual detrimental effect [on competition],' such as reduced output, increased prices, or decreased quality in the relevant market" *resulting from* the alleged restraint. *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) ("*Amex*") (alteration in original) (citation omitted); *Insignia Sys., Inc.*, 2006 WL 1851137, at *5. When a plaintiff relies on increased prices as direct evidence of anticompetitive effects, it must demonstrate that the increased prices were caused by the allegedly unlawful conduct. *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021) (per curiam) ("[T]he question is whether [the plaintiff] can show an actual anticompetitive change in prices after the restraint was implemented."). A plaintiff typically makes this showing with an analysis of the "effect on price," yet Plaintiffs here have not made any non-conclusory allegations about the supposed effect on price. Instead, all Plaintiffs have alleged is that "nominal retail" prices for granulated sugar industry-wide

-35-

increased between 2019 and 2024, MCC ¶ 136, but that is not "direct evidence" of anticompetitive effects caused by any purported exchange of information among the Sugar Defendants and Mr. Wistisen. *See In re RealPage, Inc. Rental Software Antitrust Litig. (II)*, 709 F. Supp. 3d 478, 531-32 (M.D. Tenn. 2023) (finding plaintiffs had not alleged direct evidence of price increases caused by a purported information exchange); *Insignia Sys., Inc.*, 2006 WL 1851137, at *5 (holding that conclusory allegations of price increases are not "direct evidence" of anticompetitive effects").

### B. Plaintiffs Also Have Not Adequately Alleged Indirect Evidence Of Anticompetitive Effects

To plead that an information exchange resulted in anticompetitive effects through indirect evidence, a plaintiff must allege that Defendants "have a dominant market share in a well-defined relevant market," along with evidence that the challenged restraint harms competition. *Insignia Sys., Inc.*, 2006 WL 1851137, at *5; *Amex*, 585 U.S. at 542 ("Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition.").[16]  That is because, without market power, any exchange of pricing or other market information—even if competitively sensitive—is unlikely to result in anticompetitive effects. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (2019) ("[M]arket power is … but a 'surrogate for detrimental effects.'" (citation omitted)).

Plaintiffs' allegations of Defendants' supposed "dominant share" rest on two

---

[16]  For the purposes of this Motion, Defendants do not challenge Plaintiffs' allegations regarding the relevant product or geographic markets; Defendants, however, do not concede that Plaintiffs have properly pled either.

allegations:  (1) an email in which a Domino employee purportedly wrote that three unnamed companies account for "75% of" an unspecified market, *see* MCC ¶ 58; and (2) the estimated "capacity" of each Sugar Defendant, *see id.* ¶¶ 59-60 & fig. 1.  Neither allegation is sufficient.

*First*, an undated email from a Domino employee stating that three unnamed companies supposedly account for 75% of some unspecified market, *see id.* ¶ 58, is not sufficient to plausibly allege that the *Sugar Defendants* collectively have a "dominant share" of the market for granulated sugar.

*Second*, while Plaintiffs allege that Figure 1 of their Complaint shows United, Domino, and MSC's "estimated market share," *id.* ¶ 59, that is incorrect.  The chart that Plaintiffs excerpt, which is incorporated by reference into their Complaint, reflects "[p]rojected U.S. sugar industry *capacity*" from McKeany-Flavell, an agricultural commodities brokerage and analyst.  *See* Ex. 5 (emphasis added); *see also* CIPP AC ¶ 73 n.22.  The "estimated" "projected capacity" reflected in Plaintiffs' chart represents the volume of refined sugar that each Sugar Defendant could theoretically produce, not the volume of refined (or granulated) sugar that any Sugar Defendant actually produced, and the chart wholly ignores other sellers of granulated sugar and imported sugar.  Plaintiffs' chart thus provides no meaningful information regarding any Sugar Defendant's supposed market share, and is insufficient to plausibly allege that the Sugar Defendants possess a "dominant share" in any relevant market.

## IV.    PLAINTIFFS ALLEGE NO PLAUSIBLE ONGOING CONSPIRACY

Plaintiffs' request for injunctive relief under the Sherman Act must also be

dismissed because Plaintiffs have not pled facts plausibly suggesting a continued risk of any threatened injury, which is a predicate for such relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.  To be entitled to injunctive relief, Plaintiffs must "demonstrate that they face a threat of injury that is both real and immediate, not conjectural or hypothetical." *In re Nexium (Esomeprazole) Antitrust Litig.*, 845 F.3d 470, 474-75 (1st Cir. 2017) (quotations omitted).  "Past exposure" to allegedly unlawful conduct is insufficient to warrant injunctive relief absent any "continuing, present adverse effects."  *Propane Tank*, 893 F.3d at 1054 (citation omitted).  While Plaintiffs label the purported conspiracy ongoing, *see, e.g.*, MCC ¶ 239, Plaintiffs have not alleged a single communication with Mr. Wistisen that took place after July 2021, and in fact, Plaintiffs allege that Mr. Wistisen's company is now "defunct."  *Id.* ¶ 36.  Their allegations of a continuing conspiracy are thus only "naked assertions" that are not sufficient to warrant injunctive relief.  *See Propane Tank*, 893 F.3d at 1057 (citation omitted) (rejecting request for injunctive relief because plaintiffs had not plausibly alleged ongoing conspiracy); *see also In re Cal. Gasoline Spot Mkt. Antitrust Litig.*, 2021 WL 1176645, at *6-7 (N.D. Cal. Mar. 29, 2021) (striking claims for injunctive relief).

## V.    THERE ARE MULTIPLE, INDEPENDENT GROUNDS TO DISMISS PLAINTIFFS' STATE LAW CLAIMS

The Indirect Plaintiffs' state law claims fail for the same reasons as Plaintiffs' federal antitrust claims, *i.e.*, because Plaintiffs have not plausibly alleged any conspiracy,

*see supra* at Section I, but also for a number of other, independent reasons.[17]

### A. The Indirect Plaintiffs Lack Standing To Bring Claims Under The Laws Of States Where No Named Plaintiff Resides

Plaintiffs bear the burden of demonstrating Article III standing "for each claim set forth in a class action." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 2014 WL 943224, at *11 (D. Minn. Mar. 11, 2014), *aff'd*, 797 F.3d 538 (8th Cir. 2015); *accord Rosen v. Tenn. Comm'r of Fin. & Admin.*, 288 F.3d 918, 928 (6th Cir. 2002). And, it is well-settled that "named plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury." *Insulate*, 2014 WL 943224, at *11 (citation omitted); *see also McAteer v. Target Corp.*, 2018 WL 3597675, at *3 (D. Minn. July 26, 2018) ("Without a named Plaintiff who has purchased a product within the relevant state, there can be no determination that an interest was harmed that was legally protected."). As the *Insulate* court explained, "[w]ere a named plaintiff not required to establish Article III standing" for each claim at the outset of a litigation, plaintiffs in a putative class action could "embark on lengthy class discovery with respect to injuries in potentially every state in the Union." 2014 WL 943224, at *11 (citation omitted).

Defendants recognize that some courts in this District and elsewhere have deferred addressing Article III standing until class certification. *See, e.g.*, *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 776 (D. Minn. 2020) ("*Pork II*"). However, as other courts have recognized, there is "no practical benefit to waiting to decide standing until after a decision

---

[17] Defendants reserve all rights to challenge Plaintiffs' claims, including their state law claims, on additional grounds not set forth in this Motion.

on class certification," and neither Defendants, nor the Court, should be "dragged into protracted nationwide discovery" for alleged injuries that are speculative. *See Serrano v. Campbell Soup. Co.*, 2025 WL 926394, at *10 (D.N.J. Mar. 27, 2025) (citation omitted). This Court should follow the majority of courts, like *Insulate*, that "require a named plaintiff to establish standing for each claim" and dismiss claims brought under the laws of states where no named plaintiff resides or purchased granulated sugar. *See Insulate*, 2014 WL 943224, at *11; *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1095-96 (S.D. Cal. 2017).[18]

### B. The Indirect Plaintiffs Fail To Adequately Plead An Effect On *Intrastate* Commerce For Their State Antitrust Claims

The Indirect Plaintiffs' claims under **Alabama**, **Mississippi**, **North Carolina**, **Tennessee**, and **West Virginia's** antitrust laws should be dismissed because they do not adequately plead that the alleged conspiracy substantially affected or is connected to *intrastate* commerce, as is required under the laws of each of those states. *See, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 549-50 (N.D. Ill. 2019) (Alabama's antitrust law "regulates conduct occurring intrastate" and requires a showing of "purely intrastate" conduct, and North Carolina's antitrust statute "reaches only conduct

---

[18] The states where no named CIPP Plaintiff resides or purchased sugar include: Alabama, Arkansas, Delaware, D.C., Hawaii, Iowa, Kansas, Massachusetts, Michigan, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, and West Virginia. *See* CIPP SFC ¶¶ 3-19, 38 & n.1. The IIPPs bring claims under the laws of New Mexico and Utah, where no named IIPP resides or purchased granulated sugar. *See* IIPP SFC ¶¶ 24-26; *see generally* ECF No. 343-1.

causing a '"substantial" in-state injury,' not merely an '"incidental one"' (citations omitted)); *State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178, 1188 (Miss. 2020) (The Mississippi Antitrust Act only applies to conduct that is "accomplished in part … by transactions lying wholly within the state." (citation omitted)); *Lynch Display Corp. v. Nat'l Souvenir Ctr., Inc.*, 640 S.W.2d 837, 840 (Tenn. Ct. App. 1982) (Tennessee's antitrust law only "applies to transactions which are predominantly intrastate in character."); *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, 2015 WL 5166014, at *25 (E.D. Tenn. June 24, 2015) (West Virginia's antitrust statute requires that "a plaintiff must show that the wrongful conduct occurred in West Virginia or was felt in West Virigina."). The Indirect Plaintiffs have not made any non-conclusory allegations regarding the intrastate effects in, or connection to, Alabama, Mississippi, North Carolina, Tennessee, or West Virginia, and their claims under those states' antitrust laws should be dismissed.

**C.    The Indirect Plaintiffs' Consumer Protection Claims Are Deficient**

**1.    Plaintiffs Have Not Alleged Any Proscribed Conduct In New Hampshire**

The **New Hampshire** Consumer Protection Act ("NHCPA") bars the use of "any unfair method of competition … in the conduct of any trade or commerce ***within this state***." N.H. Rev. Stat. Ann. § 358-A:2 (emphasis added). "[N]umerous federal district courts … have acknowledged that the [NHCPA] requires the proscribed conduct to occur within the state" and that "merely selling a good in New Hampshire is not enough." *Pork II*, 495 F. Supp. 3d at 789 (alteration in original) (citation omitted). The Indirect Plaintiffs do not allege that any "proscribed conduct" occurred within New Hampshire, and their

-41-

allegations are thus insufficient.  *Id*.

### 2.    The Indirect Plaintiffs Cannot Bring Claims Under Connecticut Or Vermont Law

**Connecticut** bars indirect purchasers from suing under its consumer protection statute.  *See Vacco v. Microsoft Corp.*, 793 A.2d 10418, 1066-67 (Conn. 2002) (holding that indirect purchasers lack standing to sue for alleged overcharges under Connecticut's Unfair Trade Practices Act); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 764 (E.D. Pa. 2014) (same).

The CIPPs allege they purchased granulated sugar "for commercial use in making food or other products for business purposes."  CIPP SFC ¶ 31.  Their purchases were thus not for household, personal, or family purposes, as is required under **Vermont's** consumer protection statute.  *See* Vt. Stat. Ann. tit. 9, § 2451a; *see also RSD Leasing, Inc. v. Navistar Int'l Corp.*, 319 A.3d 734, 737 (Vt. 2024) (claims under Vermont law are limited to "consumers," which excludes resellers).

### 3.    Plaintiffs Do Not Adequately Plead Fraud, Misrepresentation, or Unconscionability

The **New York** Deceptive Practice Act ("NYDPA"), N.Y. Gen. Bus. Law § 349, does not prohibit unfair competition or unfair business practices, and "anticompetitive conduct that is not premised on consumer deception is not within the ambit of the statute." *Pork II*, 495 F. Supp. 3d at 782 (quoting *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 420 (E.D.N.Y. 2013)).  To satisfy the "narrow parameters" of the NYDPA, Plaintiffs must allege that Defendants "materially misled" them by their price-fixing, which requires "a degree of subterfuge." *Id.* at 782-83 (citation omitted).  Plaintiffs have alleged no such

"subterfuge." *See id.* at 783.

The **Minnesota** Consumer Fraud Act ("MCFA"), Minn. Stat. § 325F.69, prohibits "fraud, unfair or unconscionable practice, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise." Plaintiffs' allegations fail because they do not allege any misrepresentations by Defendants, let alone any made to "a broad group of consumers." *Pork II*, 495 F. Supp. 3d at 786 (citation omitted) ; *In re Cattle Antitrust Litig.*, 2021 WL 7757881, at *13 (D. Minn. Sept. 14, 2021) (dismissing MCFA claim because plaintiffs did not "plead allegations involving misrepresentations by defendants that affected the market").

**Oregon's** Unlawful Trade Practices Act prohibits "any unconscionable tactic in connection with selling … goods or services." Or. Rev. Stat. § 646.607(1). Courts have found that "unconscionable tactic[s]" require false and misleading representations made by defendants to plaintiffs. *Cattle*, 2021 WL 7757881, at *14 (citation omitted). The IIPPs' claim fails because they have not alleged that Defendants made any false or misleading representations to them. *Id.*

### D. Indirect Plaintiffs Fail To Adequately Allege Their Unjust Enrichment Claims

#### 1. Indirect Plaintiffs Have Not Plausibly Alleged Unjust Enrichment

The elements of an unjust enrichment claim vary—often substantially—by state, and as a result, unjust enrichment claims "must be brought under the specific laws of each state." *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *11 (N.D. Ill. Nov.

5, 2009).  The IIPPs' claims fail because they do not even attempt to plead the elements of an unjust enrichment claim for any specific state, let alone all of them.  *See* IIPP SFC ¶¶ 75-98; *see also In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 726 (N.D. Ill. 2016) (dismissing unjust enrichment claims where plaintiffs failed "to set forth the elements of the claims under each state's laws").  The CIPPs' claims fare no better.  While the CIPPs purport to allege state specific allegations, they have simply cut-and-paste the same identical, conclusory allegations for each state, which is insufficient.  *See* ECF No. 342-1 at 94-114; *see also Opana*, 162 F. Supp. 3d at 726 (dismissing inadequately pled unjust enrichment claims); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 255 (D. Conn. 2015) (finding that cut-and-paste allegations of unjust enrichment are insufficient).[19]

### 2. Indirect Plaintiffs Cannot Bring Standalone Unjust Enrichment Claims

The Indirect Plaintiffs cannot bring standalone unjust enrichment claims under the laws of **Georgia**, **Idaho**, **Kentucky**, **Louisiana**, **Oklahoma**, **Texas**, **Viriginia**, **Washington**, and **Wyoming** because those states follow *Illinois Brick* and do not allow claims by indirect purchasers.  *See Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 424-48 (E.D. Pa. 2010) (dismissing unjust enrichment claims in states that "disallow indirect purchasers from pursuing antitrust or

---

[19] Defendants recognize that the Court in *Pork* and *Cattle* reached a different conclusion in addressing the indirect plaintiffs' unjust enrichment claims.  *See Pork II*, 495 F. Supp. 3d at 791; *Cattle*, 2021 WL 7757881, at *15.  However, Defendants maintain that Federal Rule of Civil Procedure 8 requires that Plaintiffs plausibly allege each of their claims, and that Plaintiffs cannot dispense with that requirement.

consumer protection claims" because allowing recovery in those circumstances would "circumvent[ ]" "the policies expressed by state legislatures").  Plaintiffs also cannot bring unjust enrichment claims under **Alabama, Mississippi**, and **Tennessee** law because they have not plausibly alleged antitrust claims under those state's laws, *see supra* at Section V.B.1, and cannot maintain a standalone claim for unjust enrichment.  *See Sheet Metal Workers*, 737 F. Supp. 2d at 429, 445; *Cole v. Chevron USA, Inc.*, 554 F. Supp. 2d 655, 671 (S.D. Miss. 2007).

## VI.    CONCLUSION

For all of the foregoing reasons, Defendants respectfully request dismissal of Plaintiffs' Complaints with prejudice, as Plaintiffs have now had multiple opportunities to plead their claims.

Dated:  May 13, 2025                    Respectfully submitted,

                                        By: */s/ Lawrence E. Buterman*
                                        Lawrence E. Buterman (*pro hac vice*)
                                        Latham & Watkins LLP
                                        1271 Avenue of the Americas
                                        New York, New York, 10020
                                        Telephone: (212) 906-1200
                                        Facsimile: (212) 751-4864
                                        lawrence.buterman@lw.com

Elyse M. Greenwald (*pro hac vice*)
Latham & Watkins LLP
10250 Constellation Boulevard, Suite 1100
Los Angeles, CA 90067
Telephone: (424) 653-5500
Facsimile: (424) 653-5501
elyse.greenwald@lw.com

Matthew J. Piehl (#0395942)
David L. Johnson (*pro hac vice*)
Christopher J. Brown (*pro hac vice*)
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
matthew.piehl@lw.com
david.johnson@lw.com
chris.brown@lw.com

***Counsel for Defendant United Sugar
Producers & Refiners Cooperative, and
Defendants' Lead Counsel and Liaison
Counsel***

*/s/ Vanessa G. Jacobsen*
Vanessa G. Jacobsen
Benjamin E. Waldin
EIMER STAHL LLP
224 S Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7604

Facsimile: (312) 692-1718
vjacobsen@eimerstahl.com
bwaldin@eimerstahl.com

Isaac J. Weitzhandler
Eimer Stahl LLP
1999 S. Bascom Ave., Suite 1025
Campbell, CA 95008
408-889-1670
iweitzhandler@eimerstahl.com

Ariel K. Lierz (#397355)
Luke J. Wolf (#399986)
SPENCER FANE LLP
100 South Fifth Street, Suite 2500
Minneapolis, MN 55402
Telephone: (612) 268-7000
Facsimile: (612) 268-7001
alierz@spencerfane.com
lwolf@spencerfane.com

***Counsel for Defendant Michigan Sugar
Company, and Defendants' Steering
Committee Member***

*/s/ Djordje Petkoski*
Djordje Petkoski (*pro hac vice*)
Todd Stenerson (*pro hac vice*)
Amelia Rasmussen (*pro hac vice*)
ALLEN OVERY SHEARMAN STERLING US
LLP
101 New York Ave NW
Washington, DC 20005
Telephone: (202) 683-3800
djordje.petkostki@aoshearman.com
todd.stenerson@aoshearman.com
memmi.rasmussen@aoshearman.com

Andre Hanson (#0258234)
ALLEN OVERY SHEARMAN STERLING US
LLP
300 W 6th Street
Austin, TX 78701

-47-

Telephone: +1.512.647.1900
andre.hanson@aoshearman.com

***Counsel for Defendants ASR Group International, Inc., American Sugar Refining, Inc., and Domino Foods, Inc., and Defendants' Steering Committee Member***

*/s/ Christopher D. Plumlee*
Christopher D. Plumlee
Wendy Johnson
RMP LLP
5519 Hackett Street, Suite 300
Springdale, AR 72762
(479) 443-2705
cplumlee@rmp.law
wjohnson@rmp.law

***Counsel for Defendants Commodity Information, Inc. and Richard Wistisen, and Defendants' Steering Committee Member***

*/s/ Timothy G. Cameron*
Timothy G. Cameron
Michael P. Addis
Jesse M. Weiss
CRAVATH, SWAINE & MOORE LLP
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
tcameron@cravath.com
maddis@cravath.com
jweiss@cravath.com

Tara C. Norgard (#0307683)
CARLSON CASPERS VANDENBURGH & LINDQUIST, PA
225 So. Sixth Street, Suite 4200
Minneapolis, MN 55402
Telephone:  (612) 436-9600
Facsimile:  (612) 436-9605
tnorgard@carlsoncaspers.com

*Counsel for Defendant Louis Dreyfus Company
LLC, and Defendants' Steering Committee
Member*

*/s/ David C. Kully*
David C. Kully
HOLLAND & KNIGHT LLP
800 17th St., NW; Suite 1100
Washington, DC 20006
Phone: 202-469-5415
Fax: 202-955-5564
david.kully@hklaw.com

Caitlin F. Saladrigas, Esq
HOLLAND & KNIGHT LLP
777 S. Flagler Drive
Suite 1900, West Tower
West Palm Beach, FL 33401
Tel: 561-833-2000
Fax: 561-650-8399
Email: caitlin.saladrigas@hklaw.com

*Counsel for United States Sugar Savannah
Refinery, LLC, and Defendants' Steering
Committee Member*