# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: GRANULATED SUGAR ANTITRUST LITIGATION | Case No. 24-md-03110 (JWB/DTS) |
| This Document Relates To:<br><br>All Actions | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' MASTER CONSOLIDATED AND SHORT FORM COMPLAINTS** |

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................... 1

II.    SUMMARY OF PLAINTIFFS' WELL-PLEADED FACTS ............................... 3

    A.    Defendants Agreed on Standardized Pricing Formulas ............................... 3

    B.    Defendants Agreed to Exchange Competitively Sensitive, Non-Public Information ............................................................................................ 4

    C.    Defendants' Conspiracy Artificially Inflated Granulated Sugar Prices ........ 8

    D.    Defendants' Conspiracy Harmed Competition and, as a Result, Each Set of Plaintiffs Has Alleged Injury ...................................................................... 9

III.    LEGAL STANDARD ................................................................................. 9

IV.    ARGUMENT ........................................................................................ 11

    A.    Plaintiffs Plausibly Allege Defendants' Participation in a Price-Fixing Conspiracy ........................................................................................... 11

        1.    Direct Evidence Supports Defendants' Participation in a Price-Fixing Agreement ............................................................................. 13

        2.    Circumstantial Evidence Also Supports Defendants' Participation in a Price-Fixing Agreement ............................................................ 18

    B.    Plaintiffs Plausibly Allege an Unlawful Information Exchange ................ 43

        1.    Plaintiffs Allege an Agreement to Exchange Information ............... 44

        2.    Plaintiffs Allege Direct Evidence of Anticompetitive Effects ......... 45

        3.    Plaintiffs Allege Indirect Evidence of Anticompetitive Effects ...... 46

    C.    Plaintiffs Plausibly Allege Antitrust Injury as a Result of Paying Supracompetitive Prices for Granulated Sugar ............................................ 49

    D.    Plaintiffs Plausibly Allege an Ongoing Conspiracy.................................... 53

    E.    Indirect Purchaser Plaintiffs Plausibly Allege State Law Claims for Relief Under State Statutory Antitrust and Consumer Protection Law and for Unjust Enrichment. ................................................................................. 55

        1.    Indirect Purchaser Plaintiffs' State Law Claims Do Not Rise or Fall on Their Federal Claims............................................................. 55

        2.    Indirect Purchaser Plaintiffs Plausibly Plead Consumer Protection Claims .................................................................................. 58

        3.    Indirect Purchaser Plaintiffs Plausibly Plead State Law Claims for Unjust Enrichment ...................................................................... 63

      4.    Defendants' Remaining Arguments Against Indirect Purchaser Plaintiffs' State Law Claims Do Not Warrant Dismissal ................ 66

  F.    Defendants Rely on Materials Inappropriate for Consideration at the Pleadings Stage ........................................................................................ 69

V.    SHOULD THE COURT DISMISS, PLAINTIFFS REQUEST LEAVE TO AMEND ................................................................................................... 71

VI.   CONCLUSION ..................................................................................... 71

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*,
  727 F.3d 502 (6th Cir. 2013) ........................................................ 41

*Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*,
  463 F. Supp. 3d 409 (S.D.N.Y. 2020) ........................................ 52

*Alsbrook v. Concorde Career Colleges, Inc.*,
  469 F. Supp. 3d 805 (W.D. Tenn. 2020) ..................................... 41

*Am. Achievement Corp. v. Jostens, Inc.*,
  622 F. Supp. 3d 749 (D. Minn. 2022) ......................................... 10

*Am. Column & Lumber Co. v. United States*,
  257 U.S. 377 (1921) ............................................................... 26, 27

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) ....................................................... 40

*Ariz. v. Maricopa Cnty. Med. Soc'y*,
  457 U.S. 332 (1982) ................................................................... 40

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ................................................................... 50

*Barclay v. ICON Health & Fitness, Inc.*,
  No. 19-CV-2970, 2020 WL 6083704 (D. Minn. Oct. 15, 2020) .................................. 69

*BCBSM, Inc. v. GS Labs, LLC*,
  No. 22-CV-513 (ECT/DJF), 2023 WL 2044329 (D. Minn. Jan. 30, 2023) ................. 42

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................. 3, 10, 18, 40

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*,
  203 F.3d 1028 (8th Cir. 2000) ................................................... 13

*Blue Cross & Blue Shield of Vermont v. Teva Pharm. Indus., Ltd.*,
   712 F. Supp. 3d 499 (D. Vt. 2024) ............................................................... 67

*Blue Shield of Va. v. McCready*,
   457 U.S. 465 (1982) ..................................................................................... 50

*Bougopoulos v. Altria Grp., Inc.*,
   954 F. Supp. 2d 54 (D.N.H. 2013) ................................................................ 58

*Boyd v. Target Corp.*,
   750 F. Supp. 3d 999 (D. Minn. 2024) ............................................................ 69

*Braden v. Wal-Mart Stores, Inc.*,
   588 F.3d 585 (8th Cir. 2009) ............................................................. 29, 39, 40

*Brown v. JBS USA Food Co.*,
   No. 22-CV-02946, 2025 WL 918804 (D. Colo. Mar. 26, 2025) ................... 24

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
   429 U.S. 477 (1977) ..................................................................................... 50

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011) .................................................................. 17, 25

*California v. ARC America Corp.*,
   490 U.S. 93 (1989) ....................................................................................... 65

*Chen v. Target Corp.*,
   No. 21-CV-1247, 2022 WL 1597417 (D. Minn. May 19, 2022) ................... 69

*City of Kennett v. EPA*,
   887 F.3d 424 (8th Cir. 2018) ....................................................................... 53

*City of Moundridge v. Exxon Mobil Corp.*,
   No. 04-CV-0940, 2009 WL 5385975 (D.D.C. Sept. 30, 2009) ..................... 22

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ..................................................................................... 11

*E. Mountain Platform Tennis, Inc. v. Sherwin-Williams Co.*,
   40 F.3d 492 (1st Cir. 1994) .......................................................................... 58

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) ......................................................... 56

*Exch. Benchmark Rates Antitrust Litig.*,
   74 F. Supp. 3d 581 (S.D.N.Y. 2015) ........................................ 16, 19

*Farmers Edge Inc. v. Farmobile, LLC*,
   No. 16-CV-191, 2018 WL 2869005 (D. Neb. May 3, 2018) ....................... 56

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n*,
   788 F. Supp. 1042 (D. Minn. 1992) ................................................ 43

*Frost v. LG Elecs., Inc.*,
   801 Fed. App'x 496 (9th Cir. 2020) ............................................... 17

*FTC v. Accusearch Inc.*,
   570 F.3d 1187 (10th Cir. 2009) ................................................... 53

*FTC v. Sperry & Hutchinson Co.*,
   405 U.S. 233 (1972) ............................................................... 56

*Fusco v. Xerox Corp.*,
   676 F.2d 332 (8th Cir. 1982) ..................................................... 11

*Gelboim v. Bank of Am. Corp.*,
   823 F.3d 759 (2d Cir. 2016) ................................................... 10, 38

*Gisairo v. Lenovo (United States) Inc.*,
   516 F. Supp. 3d 880 (D. Minn. 2021) .............................................. 68

*Goshen v. Mut. Life Ins. Co. of N.Y.*,
   774 N.E.2d 1190 (N.Y. 2002) ...................................................... 59

*Grasso Enters., LLC v. Express Scripts, Inc.*,
   No. 14-CV-1932, 2017 WL 365434 (E.D. Mo. Jan. 25, 2017) ........................ 38

*Grisham v. Covidien, Inc.*,
   No. 21-CV-00656, 2022 WL 402215 (W.D. Mo. Feb. 9, 2022) ........................ 39

*Grp. Health Plan, Inc. v. Philip Morris, Inc.*,
   621 N.W.2d 2 (Minn. 2001) ........................................................ 62

*Hannah's Boutique, Inc. v. Surdej*,
  No. 13-CV-2564, 2015 WL 3856551 (N.D. Ill. June 19, 2015)....................................48

*Hosp. Bldg. Co. v. Trustees of Rex Hosp.*,
  425 U.S. 738 (1976)....................................................................................................11

*Hudock v. LG Elecs. U.S.A., Inc.*,
  No. 16-CV-1220, 2017 WL 1157098 (D. Minn. Mar. 27, 2017)..................................69

*In re Aggrenox Antitrust Litig.*,
  94 F. Supp. 3d 224 (D. Conn. 2015).............................................................................67

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018)..........................................................................................68

*In re Auto. Parts Antitrust Litig.*,
  29 F. Supp. 3d 982 (E.D. Mich. 2014)..........................................................................67

*In re Auto. Parts Antitrust Litig.*,
  No. 12-CV-00201, 2014 WL 1746579 (E.D. Mich. Apr. 30, 2014) .............................55

*In re Auto. Parts Antitrust Litig.*,
  No. 12-MD-02311, 2014 WL 4272784 (E.D. Mich. Aug. 29, 2014)............................35

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999) .........................................................................................13

*In re Blood Reagents Antitrust Litig.*,
  266 F. Supp. 3d 750 (E.D. Pa. 2017)............................................................................22

*In re Blood Reagents Antitrust Litig.*,
  756 F. Supp. 2d 623 (E.D. Pa. 2010)..............................................................22, 30, 31

*In re Broiler Chicken Antitrust Litig.*,
  290 F. Supp. 3d 772 (N.D. Ill. 2017)......................................................................*passim*

*In re Broiler Chicken Antitrust Litig.*,
  No. 16 C 8637, 2020 WL 4032932 (N.D. Ill. July 15, 2020).......................................52

*In re California Gasoline Spot Market Antitrust Litig.*,
  No. 20-CV-03131-JSC, 2021 WL 1176645 (N.D. Cal. Mar. 29, 2021) ................54, 55

*In re Cardizem CD Antitrust Litig.*,
    105 F. Supp. 2d 618 (E.D. Mich. 2000)...................................................57, 64

*In re Cattle & Beef Antitrust Litig.*,
    687 F. Supp. 3d 828 (D. Minn. 2023).....................................................50, 51

*In re Cattle Antitrust Litig.*,
    No. 19-CV-1129 (JRT/HB), 2020 WL 5884676 (D. Minn. Sept. 29, 2020)...........10, 23

*In re Cattle Antitrust Litig.*,
    No. 19-CV-1129 (JRT/HB), 2021 WL 7757881 (D. Minn. Sept. 14, 2021)..........*passim*

*In re Chocolate Confectionary Antitrust Litig.*,
    749 F. Supp. 2d 224 (M.D. Pa. 2010).............................................................58

*In re Cipro Cases I & II*,
    348 P.3d 845 (Cal. 2015)...............................................................................56

*In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*,
    No. 23-MD-3062, 2025 WL 315835 (M.D.N.C. Jan. 28, 2025).................................58

*In re Domestic Airline Travel Antitrust Litig.*,
    221 F. Supp. 3d 46 (D.D.C. 2016)..................................................................69

*In re Domestic Airlines Travel Antitrust Litig.*,
    691 F. Supp. 3d 175 (D.D.C. Sept. 12, 2023)................................................36

*In re DRAM Indirect Purchaser Antitrust Litig.*,
    28 F.4th 42 (9th Cir. 2022) ...........................................................................31

*In re Elec. Books Antitrust Litig.*,
    859 F. Supp. 2d 671 (S.D.N.Y. 2012) ...........................................................10

*In re EpiPen Direct Purchaser Litig.*,
    No. 20-CV-0827 (ECT/TNL), 2021 WL 147166 (D. Minn. Jan. 15, 2021) ...............49

*In re Euro. Gov't Bonds Antitrust Litig.*,
    No. 19-CV-2601, 2020 WL 4273811 (S.D.N.Y. July 23, 2020)...............................51

*In re Flash Memory Antitrust Litig.*,
    643 F. Supp. 2d 1133 (N.D. Cal. 2009) .........................................................33

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
No. 13-CV-7789, 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ................................ 24

*In re Fragrance Direct Purchaser Antitrust Litig.*,
No. 23-CV-02174, 2025 WL 579639 (D.N.J. Feb. 21, 2025) ................................ 19, 60

*In re Generic Pharms. Pricing Antitrust Litig.*,
338 F. Supp. 3d 404 (E.D. Pa. 2018) .................................................... 19, 22

*In re Generic Pharms. Pricing Antitrust Litig.*,
368 F. Supp. 3d 814 (E.D. Pa. 2019) ............................................... *passim*

*In re Generic Pharms. Pricing Antitrust Litig.*,
No. 16-MD-2724, 2022 WL 1470272 (E.D. Pa. May 10, 2022).................................. 64

*In re Grp. Health Plan Litig.*,
709 F. Supp. 3d 707 (D. Minn. 2023)................................................ 10, 63

*In re GSE Bonds Antitrust Litig.*,
396 F. Supp. 3d 354 (S.D.N.Y. 2019) ................................................... 17

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) ................................................ 16, 29, 30

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) .......................................................... 25

*In re Loc. TV Advert. Antitrust Litig.*,
2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) .................................... 23, 43, 46

*In re Loestrin 24 FE Antitrust Litig.*,
410 F. Supp. 3d 352 (D.R.I. 2019) ............................................... 59, 67

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
332 F. Supp. 3d 885 (S.D.N.Y. 2018) ................................................. 16

*In re Mercedes-Benz Antitrust Litig.*,
No. 99-CV-4311 (WHW), 2006 WL 2129100 (D.N.J. July 26, 2006) ........................ 53

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) .......................................................... 23

*In re Packaged Ice Antitrust Litig.*,
 723 F. Supp. 2d 987 (E.D. Mich. 2010)..........................................................35

*In re Packaged Seafood Prods. Antitrust Litig.*,
 242 F. Supp. 3d 1033 (S.D. Cal. 2017)......................................................61, 68

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
 No. 24-MD-3107, 2025 WL 606533 (N.D. Ohio Feb. 25, 2025)...................31, 42

*In re Polyurethane Foam Antitrust Litig.*,
 799 F. Supp. 2d 777 (N.D. Ohio 2011)...........................................................29

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
 158 F. Supp. 3d 544 (E.D. La. 2016)..............................................................21

*In re Pork Antitrust Litig.*,
 665 F. Supp. 3d 967 (D. Minn. 2023)........................................................64, 68

*In re Pork Antitrust Litig.*,
 495 F. Supp. 3d 753 (D. Minn. 2020)........................................................*passim*

*In re Pork Antitrust Litig.*,
 No. 18-CV-1776 (JRT/LIB), 2019 WL 3752497 (D. Minn. Aug. 8, 2019).................23

*In re Pork Antitrust Litig.*,
 No. 18-CV-1776, 2025 WL 964545 (D. Minn. Mar. 31, 2025) ....................................71

*In re Pork Antitrust Litig.*,
 No. 18-CV-1776, 2025 WL 1224694 (D. Minn. April 28, 2025) ........................*passim*

*In re Pre-Filled Propane Tank Antitrust Litig.*,
 860 F.3d 1059 (8th Cir. 2017) ......................................................................10

*In re Pre-Filled Propane Tank Antitrust Litig.*,
 893 F.3d 1047 (8th Cir. 2018) ......................................................................54

*In re Publ'n Paper Antitrust Litig.*,
 690 F.3d 51 (2d Cir. 2012) ...........................................................................17

*In re Qualcomm Antitrust Litig.*,
 No. 17-MD-02773-JSC, 2023 WL 121983 (N.D. Cal. Jan. 6, 2023)............................55

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
709 F. Supp. 3d 478 (M.D. Tenn. 2023)..............................................................38, 46, 52

*In re Resideo Techs., Inc., Secs. Litig.*,
No. 19-CV-2863 (WMW/KMM), 2021 WL 1195740 (D. Minn. Mar. 30, 2021) ........69

*In re SoClean, Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.*,
No., 22-mc-152, 2023 WL 8006602, (W.D. Pa. Nov. 17, 2023) ..................................58

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
No. 14-MD-02503, 2015 WL 5458570 (D. Mass. Sept. 16, 2015)...............................67

*In re SSA Bonds Antitrust Litig.*,
No. 16-CV-3711 (ER), 2018 WL 4118979 (S.D.N.Y. Aug. 28, 2018)........................51

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
580 F. Supp. 2d 896 (N.D. Cal. 2008) ....................................................................35, 44

*In re Target Corp. Data Sec. Breach Litig.*,
66 F. Supp. 3d 1154 (D. Minn. 2014)..........................................................................69

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) .......................................................................................19

*In re Text Messaging Antitrust Litig.*,
No. 08-CV-7082, 2009 WL 5066652 (N.D. Ill. Dec. 10, 2009)...................................21

*In re Thalomid & Revlimid Antitrust Litig.*,
No. 14-CV-6997, 2015 WL 9589217 (D.N.J. Oct. 29, 2015) ......................................64

*In re Turkey Antitrust Litig.*,
642 F. Supp. 3d 711 (N.D. Ill. 2022) ...........................................................................29

*In re Vascepa Antitrust Litig. Indirect Purchaser Plaintiffs*,
No. 21-CV-12061, 2023 WL 2182046 (D.N.J. Feb. 23, 2023) ......................59, 60, 61

*Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*,
No. 04-4213 (JRT/AJB), 2006 WL 1851137 (D. Minn. June 30, 2006)......................46

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
797 F.3d 538 (8th Cir. 2015) .................................................................................50, 71

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
   No. 13-CV-2664, 2014 WL 943224 (D. Minn. Mar. 11, 2014) ................................... 68

*Interstate Cir. v. United States*,
   306 U.S. 208 (1939) ............................................................................................... 18

*Jensen v. Minn. Bd. of Med. Prac*.,
   No. 23-CV-1689, 2025 WL 965091 (D. Minn. Mar. 31, 2025) ................................. 10

*Johannessohn v. Polaris Indus., Inc*.,
   No. 16-CV-3348, 2017 WL 2787609 (D. Minn. June 27, 2017) ................................. 69

*Kelsey K. v. NFL Enters., LLC*,
   254 F. Supp. 3d 1140 (N.D. Cal. 2017) ................................................................... 25

*King Drug Co. of Florence v. Cephalon, Inc*.,
   702 F. Supp. 2d 514 (E.D. Pa. 2010) ...................................................................... 64

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
   910 F.3d 927 (7th Cir. 2018) .................................................................................. 30

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
   775 F. Supp. 2d 1071 (N.D. Ill. 2011) ................................................................ 29, 32

*Kushner v. Beverly Enters., Inc.*,
   317 F.3d 820 (8th Cir. 2003) .................................................................................. 71

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ............................................................................................... 12

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co*.,
   334 U.S. 219 (1948) ............................................................................................... 12

*Markson v. CRST Int'l, Inc.*,
   No. 15-CV-1261, 2021 WL 1156863 (C.D. Cal. Feb. 10, 2021) ................................. 17

*Mayor & City Council of Baltimore v. Merck Sharp & Dohme Corp.*,
   No. 23-CV-828, 2023 WL 8018980 (E.D. Pa. Nov. 20, 2023) ................................... 58

*McIvor v. Credit Control Servs., Inc.*,
   773 F.3d 909 (8th Cir. 2014) .................................................................................. 70

*Miami Prods. & Chem. Co. v. Olin Corp.*,
    546 F. Supp. 3d 223 (W.D.N.Y. 2021) ........................................................ 55

*Mississippi River Corp. v. FTC*,
    454 F.2d 1083 (8th Cir. 1972) .................................................................... 30

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) .......................................................................... 44, 46

*Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*,
    No. 19 C 8318, 2020 WL 6134982 (N.D. Ill. Oct. 19, 2020) ................. 45, 47

*Othart Dairy Farms, LLC v. Dairy Farmers of Am., Inc.*,
    720 F. Supp. 3d 1087 (D.N.M. 2024) .......................................................... 31

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
    911 F.3d 505 (8th Cir. 2018) ...................................................................... 25

*Park v. Forest Serv. of U.S.*,
    205 F.3d 1034 (8th Cir. 2000) .................................................................... 53

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharm.*,
    530 F. Supp. 3d 301 (S.D.N.Y. 2021) .......................................................... 22

*Phyllis Schlafly Revocable Tr. v. Cori*,
    512 F. Supp. 3d 916 (E.D. Mo. 2021) .......................................................... 39

*Porous Media Corp. v. Pall Corp.*,
    186 F.3d 1077 (8th Cir. 1999) ................................................................. 2, 11

*Pro-Life Action Ministries v. City of Minneapolis*,
    700 F. Supp. 3d 687 (D. Minn. 2023) .......................................................... 70

*Qualley v. Clo–Tex Int'l Inc.*,
    212 F.3d 1123 (8th Cir. 2000) .................................................................... 41

*Roth v. Life Time Fitness, Inc.*,
    No. 15-CV-3270, 2016 WL 3911875 (D. Minn. July 14, 2016) ................. 69

*Rouse v. H.B. Fuller Co.*,
    694 F. Supp. 3d 1149 (D. Minn. 2023) ........................................................ 69

*Ryan v. Ryan*,
    889 F.3d 499 (8th Cir. 2018) ................................................................ 10, 69

*Seutter v. Mead Johnson Nutrition Co.*,
    763 F. Supp. 3d 783 (D. Minn. 2025) ........................................................ 69

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010) ..................................................................... 35

*Sullivan v. Barclays PLC*,
    No. 13-CV-2811, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ................... 16

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ................................................................................. 53

*Sylvester v. SOS Children's Vills. Ill., Inc.*,
    453 F.3d 900 (7th Cir. 2006) .................................................................... 17

*Taxi Tours Inc. v. Go New York Tours, Inc.*,
    236 N.E.3d 159 (N.Y. Ct. App. 2024) ....................................................... 56

*Tivoli LLC v. Targetti Sankey S.P.A.*,
    No. 14-CV-1285, 2015 WL 12683801 (C.D. Cal. Feb. 3, 2015) ................. 39

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ............................................................ *passim*

*United HealthCare Servs., Inc. v. Merck & Co., Inc.*,
    No. 20-1909 (DSD/DTS), 2025 WL 607110 .............................................. 50

*United States v. Agri Stats, Inc.*,
    No. 23-CV-3009 (JRT/JFD), 2024 WL 2728450 (D. Minn. May 28, 2024) ... 53

*United States v. Container Corp. of Am.*,
    393 U.S. 333 (1969) ...................................................................... 43, 47, 49

*United States v. Falstaff Brewing Corp.*,
    410 U.S. 526 (1973) ................................................................................. 19

*United States v. Great W. Sugar Co.*,
    No. 74-CV-2674, 1978 WL 1399 (N.D. Cal. Sept. 13, 1978) ................ 34, 35

*United States v. Socony–Vacuum Oil Co.*,
   310 U.S. 150 (1940) .................................................................... 12, 22, 38

*United States v. Sugar Inst.*,
   15 F. Supp. 817 (S.D.N.Y. 1934) ........................................................ 18

*United States v. Texas*,
   507 U.S. 529 (1993) ........................................................................ 65

*United States v. United States Gypsum Co.*,
   438 U.S. 422 (1978) ................................................................ 26, 47, 49

*United States v. United States Sugar Corp.*,
   No. 21-CV-1644, 2022 WL 4544025 (D. Del. Sept. 28, 2022) ................ 36

*United States v. W.T. Grant Co.*,
   345 U.S. 629 (1953) ........................................................................ 54

*Vacco v. Microsoft Corp.*,
   793 A.2d 1048 (Conn. 2002) ............................................................ 59

*W. Penn Allegheny Health Sys. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010) ........................................................... 14, 18

## **Statutes**

15 U.S.C. § 1 ..................................................................................... 12, 13

P.A. 18-22, Conn. Gen. Stat. § 35-35 ........................................................ 59

Minn. Stat. § 325F.69 ..................................................................... 61, 62

Or. Rev. Stat. § 646.607(1) ...................................................................... 61

## **Rules**

Fed. R. Civ. P. 8 ................................................................................... 48

Fed. R. Civ. P. 8(a) .............................................................................. 57

Fed. R. Civ. P. 8(d)(2) ......................................................................... 64

Fed. R. Civ. P. 9(b) ........................................................................ 60, 61

Fed. R. Civ. P. 12(b)(6) .................................................................. *passim*

Fed. R. Civ. P. 12(d) ............................................................................ 69

Fed. R. Civ. P. 15(a)(2) ......................................................................... 71

Fed. R. Civ. P. 23 ................................................................................ 68

Fed. R. Evid. 201(b)(2) ................................................................. 71

Fed. R. Evid. 201 ................................................................. 70, 71

**<u>Other Authorities</u>**

3A Encyclopedia of Mississippi Law § 21:72 (3d ed.) ...................................... 64

Amicus Brief, *Gibson v. Cendyn Grp., LLC*,
   No. 24-CV-03576 (9th Cir. 2024) (ECF No. 28.1) ....................................... 38

Fed. Prac. & Proc. Civ. § 1363 (3d ed.) ............................................ 9

Restatement (Third) of Restitution and Unjust Enrichment § 44 (2011) ........................ 57

Tilley's Alabama Equity § 19:1 ............................................ 64

Direct Purchaser Plaintiffs, Commercial Indirect Purchaser Plaintiffs, and Consumer Indirect Purchaser Plaintiffs (collectively, "Plaintiffs") respectfully submit this Memorandum of Law in Opposition to Defendants' Joint Motion to Dismiss Plaintiffs' Master Consolidated Complaint and Short Form Complaints.[1]

## I.    INTRODUCTION

The Granulated Sugar industry in the United States has been plagued by anticompetitive behavior for nearly a century. This case is about an old-fashioned agreement between the nation's largest sugar producers and intermediaries to artificially inflate Granulated Sugar prices by using standardized pricing formulas and covertly exchanging competitively sensitive, non-public information. The conspiracy, detailed in Defendants' own words, emails, and internal communications, resulted in an

---

[1] The term "Producer Defendants" refers collectively to ASR Group International, Inc. ("ASR Group"), American Sugar Refining, Inc. ("ASR"), Domino Foods, Inc. ("Domino," together with ASR Group and ASR, "ASR/Domino"), Imperial Sugar Co. n/k/a United States Sugar Savannah Refinery, LLC ("Imperial" or "U.S. Sugar Savannah"), Louis Dreyfus Company LLC ("Louis Dreyfus"), Michigan Sugar Company ("Michigan Sugar"), and United Sugar Producers & Refiners f/k/a United Sugars Corporation. The term "Wistisen" refers collectively to Richard Wistisen and Commodity Information, Inc. ("Commodity"). The term "Defendants" refers to Producer Defendants and Wistisen.

The term "Master Complaint" refers to the Master Consolidated Complaint (ECF 332), and "MC ¶_" refers to paragraphs therein; "DPP Complaint" refers to the Direct Purchaser Plaintiffs' Short Form Complaint (ECF 341); "Comm. Complaint" refers to the Commercial Indirect Purchaser Plaintiffs' Short Form Consolidated Class Action Complaint (ECF 342); and "Cons. Complaint" refers to the Consumer Indirect Purchaser Plaintiffs' Short Form Complaint (ECF 343). "Complaints" collectively refers to the Master Complaint, DPP Complaint, Comm. Complaint, and Cons. Complaint. Capitalized terms not otherwise defined herein shall have the meanings ascribed in the Complaints.

unprecedented 69% increase in retail Granulated Sugar prices between January 2019 and October 2024, untethered to inflation, production costs, or market supply.

Defendants' joint motion to dismiss contains two core defects. *First*, Defendants ignore the well-pleaded allegations in the Complaints—including their executives' direct quotes and contemporaneous emails describing how the information exchange was intended to, and did, allow competitors to coordinate and maintain inflated prices, as well as monitor pricing across competitors. Plaintiffs allege facts revealing an agreement to use standardized pricing formulas and exchange contemporaneous information regarding current pricing and sold positions and *forward-looking* pricing strategies, and Defendants' admissions that the purpose of their information exchanges was to maintain pricing discipline and avoid competitive discounting. Plaintiffs also allege facts supporting an industry structure that rendered the conspiracy not only plausible, but profitable and sustainable, as evidenced by extraordinary and unprecedented increases in Granulated Sugar prices that cannot be explained by inflation or other natural market forces. Plaintiffs' allegations easily satisfy the plausibility standard.

*Second*, Defendants improperly urge the Court to draw inferences in their favor, consider their supposed version of events, and improperly consider extraneous materials at the pleading stage. *See, e.g.*, *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (On a Rule 12(b)(6) dismissal motion, the court can consider the pleadings and materials that are "necessarily embraced" by the pleadings, but "must ignore materials outside of the pleadings" and materials that "contradict" the pleadings). Evaluating Plaintiffs' allegations as a whole, their Complaints "raise a reasonable expectation that

discovery will reveal evidence of illegal agreement," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), which is all that is required at the pleading stage. Accordingly, Defendants' motion to dismiss should be denied in its entirety.

## II.    SUMMARY OF PLAINTIFFS' WELL-PLEADED FACTS

Beginning in January 2019, Defendants conspired to artificially inflate Granulated Sugar prices in the United States through: (1) the use of agreed upon standardized pricing formulas; and (2) the exchange of detailed, competitively sensitive non-public information about Granulated Sugar prices, capacity, sales volume, supply, and demand, with the purpose and effect of increasing Granulated Sugar prices paid by Plaintiffs and members of the Classes.

### A.    Defendants Agreed on Standardized Pricing Formulas

As the first lever in their price-fixing conspiracy, the Producer Defendants developed and agreed to standardized pricing formulas to coordinate their pricing strategies and maintain artificially high price levels. MC ¶ 130.

The Producer Defendants jointly referenced Intercontinental Exchange "Number 16" futures prices for domestic sugar to which they pegged their FOB pricing.[2] *Id.* ¶ 131. For example, in February 2021, Richard Wistisen ("Wistisen")—who acted as a conduit for the Producer Defendants to exchange information—told Defendant ASR/Domino's Vice President of Industrial Sales, Alan Henderson, that on the pricing side, sugar prices

---

[2] "FOB" or "fob" is an abbreviation for Free on Board. Free on Board is an industry term that means the buyer takes the goods free of freight charges at the seller's location; in other words, any transportation related costs are not included.

could increase thanks, *inter alia*, to the "history of excellent selling restraint/patience from ASR, [and] high no. 16 prices." *Id.* Similarly, in July 2021, Henderson referenced his knowledge of Defendant United's impending $2.00 price increase for beet sugar, emphasizing that it "makes sense if they follow the #16 market and do the math." *Id.* ¶ 132. Henderson later admitted that ASR/Domino was actively "pricing off #16 market," and that United also pegged its prices to Number 16, raising its Gulf FOB price to match ASR/Domino's price of $40.50. *Id.* Imperial, likewise, relied on similar pricing formulas tied to Number 16 prices. *Id.* ¶ 133. These statements reveal a collective industry mindset aimed at maintaining profit margins through coordinated pricing rather than market-based competition.

By agreeing to common pricing formulas, the Producer Defendants created an environment where price-fixing was not only feasible but virtually guaranteed. *Id.* ¶ 135. This deliberate coordination among competitors eliminated the unpredictability inherent in competitive markets and ensured stable yet inflated prices that directly harmed competition generally and consumers specifically. *Id.*

### B.    Defendants Agreed to Exchange Competitively Sensitive, Non-Public Information

As the second lever, through a network of coordinated exchanges facilitated by Wistisen and other conduits, the Producer Defendants engaged in a systematic and deliberate "give to get" scheme through which they exchanged real-time, competitively

sensitive, non-public information regarding current sugar pricing, sold positions,[3] crop size and yields, and forward-looking pricing strategies in furtherance of the conspiracy. *Id*. ¶¶ 63-71.

Wistisen acted as a clearinghouse for the Producer Defendants' exchanges, collecting detailed, sensitive non-public information from each of the individual Producer Defendants and rapidly redistributing that information by agreement to the other Producer Defendants within the cartel to facilitate and monitor the conspiracy. *Id*. ¶ 66. The information exchanged through Wistisen (among others) allowed the Producer Defendants to coordinate their pricing strategies in real-time to avoid price competition. *Id*. For example, sold positions provided critical insights into each competitor's price flexibility and supply. By knowing when a rival was selling out of its supply, the Producer Defendants could confidently raise prices without fear of their prices being undercut by their ostensible rivals. *Id.*

Wistisen's "Commodity Information, Inc." was captive to the Producer Defendants, who used it as a "fig leaf" to facilitate and conceal their conspiracy. Tellingly, unlike legitimate industry analysts, Wistisen did not want the public to know his services existed. *See id*. ¶ 67. Wistisen lacked a public presence, did not market his services to the public, and did not publish anonymized market research based on the data he received. *Id*. Wistisen

---

[3] A sold position, as applied here, is the percentage of a seller's supply of Granulated Sugar that is no longer available to purchase. As a seller's sold position increases, that seller will generally raise prices. The sold position thus provides important information about the extent to which a supplier will or will not be aggressive on price going forward. MC ¶ n.3.

also did not gather information through anonymized voluntary surveys or periodic polling. *Id.* ¶ 68. Instead, the Producer Defendants regularly shared contemporaneous competitively sensitive, non-public information about their pricing and sold positions directly to Wistisen, with the understanding and expectation that Wistisen would contemporaneously share that competitively sensitive information with other Producer Defendants. *Id.; see also id.* ¶ 79 (Dirk Francis Swart, executive vice-president of sales at United States Sugar, testified that United Sugar shared information with Wistisen because United "know[s] he's going to share information and we want the information that gets shared to be accurate").

For example, on September 21, 2020, Wistisen separately emailed Henderson (ASR/Domino) and Eric Speece, Director of Strategic Accounts at Defendant United, asking "anything new of interest on the pricing front?" Speece (United) responded "we are firm at $36.50 (no change) and now $38.50 on cane (an increase of $0.50/cwt) and yes you heard correctly we are 90+% sold," and Henderson (ASR/Domino) responded: "Pricing (Cane)": "North and mid-Atlantic -  $40.50 to 41.00 FOB - prices were lower past few weeks but have firmed up to these levels. No discounting at this time"; "Gulf - $38.50 fob"; "West - $40.50 to $41.00 fob firm"; "Note - higher levels for the Oct./Dec. 20 period as most cane and beet companies are well sold and/or filling past force majeure volume." *Id*. ¶¶ 95-96. Less than three hours after receiving Henderson's email, Wistisen emailed the information Henderson provided to Speece at United, while separately emailing the information Speece provided to Henderson at ASR/Domino. *Id*. ¶ 97. The Master Complaint contains numerous additional instances where the Producer Defendants used Wistisen as a conduit to exchange information regarding their current pricing, sold

6

positions, crop size and yields, and forward-looking price strategies. *See*, *e.g.*, *id*. ¶¶ 87-88, 92-117.

On multiple occasions, the Producer Defendants' senior executives explicitly sought to signal pricing intentions to their competitors. Internal communications reveal efforts to share updates on market "tightness," forward-looking price increases, and inventory conditions through Wistisen, ensuring alignment among the Producer Defendants. *Id.* ¶ 83. On January 8, 2020, Robert Sproull, Senior VP of Sales Marketing and Product Development at ASR/Domino, emailed Henderson that "it's really important we signal to the market that there's still going to be tightness," and "[w]e need to signal to the market that we're going to maintain price, especially for the Oct-Dec quarter. And there's not much to lose here. Pure price discovery." *Id.* ¶ 90.

The consequences of Defendants' coordinated efforts were profound. By maintaining a shared understanding of one another's pricing and market strategies, the Producer Defendants effectively eliminated meaningful competition and were instrumental in setting supra-competitive prices. *Id.* ¶ 72.

There is no plausible, non-conspiratorial justification for the Producer Defendants' use of Wistisen and others as conduits to secretly exchange highly confidential and detailed proprietary information about their current and future prices and sold positions. *Id.* ¶ 122. In a competitive market, such proprietary, competitively sensitive information would be a closely guarded secret and sharing such information would not be in Defendants' economic self-interest. *Id.* Defendants knew and intended that their exchange of competitively sensitive information about prices (current and future) and sold positions would allow them

to artificially raise, fix, maintain, or stabilize Granulated Sugar prices above competitive levels to benefit their bottom lines at the expense of their customers and consumers. *Id.* ¶ 123.

### C.  Defendants' Conspiracy Artificially Inflated Granulated Sugar Prices

The price of Granulated Sugar skyrocketed as a direct result of Defendants' conspiracy. As the following chart illustrates, the nominal retail prices of Granulated Sugar in the United States increased by 69 percent between January 2019 and October 2024. *Id*. ¶ 136.



These increases were contrary to recent historical Granulated Sugar pricing patterns and not explainable by normal market forces, such as inflation. *Id*. ¶¶ 137, 139. The price spikes are also not attributable to decline in the supply of Granulated Sugar—U.S. beet and cane sugar production increased marginally from 8,999,999 short tons in 2018/2019 to an

estimated 9,368,000 short tons in 2023/2024. *Id*. ¶ 138. Between October 2019 and the end

of 2023, the Producer Price Index ("PPI")[4] for cane sugar calculated by the Federal Reserve

Bank of St. Louis went from 87.6 to 123.2—its highest level since 1974. *Id*. ¶ 140.

### D. Defendants' Conspiracy Harmed Competition and, as a Result, Each Set of Plaintiffs Has Alleged Injury

Competition in the Granulated Sugar industry was harmed when the Producer

Defendants agreed to use standardized pricing formulas and exchanged confidential, non-

public, strategic information about current and forward-looking plans for prices and supply.

*Id*. ¶ 195. Defendants' "coordination eliminated the unpredictability inherent in

competitive markets, ensuring stable yet inflated prices that directly harmed competition

generally and consumers specifically." *Id*. ¶ 135. By their anticompetitive conduct,

Defendants were enriched at the expense of Plaintiffs and Class members, who paid more

for Granulated Sugar than they otherwise would have paid in a competitive market and

suffered antitrust injury and damages as a result. *Id*. ¶ 222; *see also, e.g.,* DPP Compl. ¶ 9

(incorporating by reference MC ¶ 222); Cons. Compl. ¶¶ 53, 70, 81, App. B-C; Comm.

Compl. ¶¶ 32-33, 52-53, 58-59.

## III. LEGAL STANDARD

"A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes

to the sufficiency of the pleading under Rule 8(a)(2)." 5C Wright & Miller, Fed. Prac. &

Proc. Civ. § 1363 (3d ed.). Under Rule 8(a)(2), a complaint must contain a "short and plain

---

[4] PPI measures the average change over time in the selling prices received by domestic producers for their output.

statement of the claim showing that the pleader is entitled to relief." *Am. Achievement Corp. v. Jostens, Inc.*, 622 F. Supp. 3d 749, 759 (D. Minn. 2022). Rule 8(a)(2) "is fashioned in the interest of fair and reasonable notice, not technicality, and therefore is not meant to impose a great burden upon a plaintiff." *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 680 (S.D.N.Y. 2012). On a Rule 12(b)(6) motion, therefore, the allegations are taken "as true and in the light most favorable" to Plaintiffs. *In re Grp. Health Plan Litig.*, 709 F. Supp. 3d 707, 712 (D. Minn. 2023).

"To survive a motion to dismiss, a complaint must contain enough factual content to state a claim that is plausible on its face." *Jensen v. Minn. Bd. of Med. Prac.*, No. 23-CV-1689, 2025 WL 965091, at *1 (D. Minn. Mar. 31, 2025) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ryan v. Ryan*, 889 F.3d 499, 505 (8th Cir. 2018) (citation omitted). "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (citation omitted).

There is no heightened pleading standard in antitrust cases. *In re Cattle Antitrust Litig.*, No. 19-CV-1129 (JRT/HB), 2020 WL 5884676, *5 (D. Minn. Sept. 29, 2020) ("*Cattle I*"). Plaintiffs "need not provide *specific facts* in support of their allegations." *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1070 (8th Cir. 2017) (citation omitted). This standard "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.

"Moreover, in antitrust cases, where the proof is largely in the control of the defendant, 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" *Fusco v. Xerox Corp.*, 676 F.2d 332, 337 n. 7 (8th Cir. 1982) (quoting *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976)) (internal citation omitted). Importantly, under longstanding precedent, the "character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

At the pleading stage, the Court is generally limited to an examination of Plaintiffs' allegations and materials embraced by the complaint and, as such, cannot consider any extraneous or contradictory evidence. *See, e.g.*, *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (On a Rule 12(b)(6) dismissal motion, the court can consider the pleadings and materials that are "necessarily embraced" by the pleadings, but "must ignore materials outside of the pleadings" and materials that "contradict" the pleadings). Accordingly, in considering Defendants' joint motion to dismiss, the Court must disregard any attempt by Defendants to introduce facts and exhibits not contained in, or embraced by, Plaintiffs' complaints.

## IV.   ARGUMENT

### A.   Plaintiffs Plausibly Allege Defendants' Participation in a Price-Fixing Conspiracy

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade . . . is declared to be illegal."

15 U.S.C. § 1. "To establish a claim under § 1, a plaintiff must demonstrate (1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce." *In re Cattle Antitrust Litig.*, No. 19-CV-1129 (JRT/HB), 2021 WL 7757881, at *3 (D. Minn. Sept. 14, 2021) ("*Cattle II*") (citation and internal quotation omitted). The Sherman Act "is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co*., 334 U.S. 219, 236 (1948).

Agreements among horizontal competitors to fix, stabilize, or control prices are *per se* unreasonable and therefore illegal without further inquiry. *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 224 n. 59 (1940) ("Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy."); *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 886 (2007) ("Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices").

For a horizontal price fixing claim, "the only thing that must be alleged at the motion to dismiss stage is that the defendants acted in concert." *Cattle II*, 2021 WL 7757881, at *3. Concerted action may be demonstrated through the presentation of direct evidence or circumstantial evidence. *In re Pork Antitrust Litig.*, No. 18-CV-1776, 2025 WL 1224694, at *12 (D. Minn. April 28, 2025) ("*Pork II*") (citation omitted).

"Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Id.* (quoting *In re Baby Food Antitrust Litig*., 166 F.3d 112, 118 (3d Cir. 1999)). Establishing a conspiracy via circumstantial evidence requires evidence of parallel conduct and circumstances suggesting concerted action (often referred to as "plus factors"). *Pork II*, 2025 WL 1224694, at *12 (citing *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask*., 203 F.3d 1028, 1033 (8th Cir. 2000)). "Plus factors may include both economic evidence, such as economic analyses depicting that the industry is susceptible to collusion or that the alleged conspirators share a common motive to conspire, and non-economic evidence, such as actions against self-interest or frequent meetings and communications among competitors regarding competitively sensitive information." *Pork II,* 2025 WL 1224694, at *12 (collecting cases). The *Pork II* court described such allegations as those that could plausibly suggest that "defendants' similar behavior would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Id.* at *12 (citations omitted).

1.   **Direct Evidence Supports Defendants' Participation in a Price-Fixing Agreement**

Plaintiffs plead direct evidence of Defendants' conspiracy in the form of statements from Defendants' executives regarding the exchange of competitively sensitive information to fix prices of Granulated Sugar. *See, e.g.*, MC ¶¶ 79, 89-91, 95-96, 102, 104, 116, 121, 132. Because the Complaints include "non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement

13

has been adequately pled." *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010).

The Complaints include direct quotes taken from emails, testimony, and other statements by Defendants' executives describing the purpose of the exchange of competitively sensitive information. Defendants acknowledge that "Plaintiffs allege that the exchange of information through Wistisen was 'reciprocal' and a 'give to get,' meaning that the Sugar Producers only provided their own sensitive information to Wistisen because they commonly understood that their competitors would do the same," Defs.' Mem. of Law in Support of Defs.' Mot. to Dismiss (ECF 398) ("Mem.") 17 (citing MC ¶¶ 6, 8). The following statements from Defendants' executives are direct evidence of their price-fixing agreement:

- On November 15, 2019, Jim Evans, the National Sales Manager at Louis Dreyfus, and Jeana Hines, the Vice President of Sales & Marketing at Imperial, obtained pricing and inventory information regarding Domino from Gerald Kramer at Kramer Brokerage Co. MC ¶ 89. Kramer also passed along ASR/Domino's future retail pricing and negotiation strategy for selling Granulated Sugar at retail, writing to Evans and Hines that "Domino will not sell 50# EFG below $24.00/50# fob refinery thru 2020 for end users." *Id.*

- On January 8, 2020, Sproull of ASR/Domino emailed Henderson regarding sharing information and stated, "[I]t's really important we signal to the market that there's still going to be tightness," and "**[w]e need to signal to the market that we're going to maintain price**, especially for the Oct-Dec. quarter. And there's not much to lose here. Pure price discovery." *Id.* ¶ 90. (emphasis added).

- On March 3, 2020, Henderson of ASR/Domino reported the future pricing strategies for certain competitors that he obtained while at the International Sweetener Colloquium, including the "Michigan firm at $38.50 for 2021" and "Imperial – 38.00/38.50 for CY 2021 on bulk EFG." *Id.* ¶ 91.

14

- In February 2021, Wistisen told Henderson that sugar prices could increase thanks, inter alia, to the "history of excellent selling restraint/patience from ASR, [and] high no. 16 prices." *Id.* ¶ 131.

- In July 2021, Henderson referenced United's impending $2 price increase for beet sugar, emphasizing that it "makes sense if they **follow the #16 market and do the math**." *Id.* ¶ 132 (emphasis added). Henderson later acknowledged that ASR/Domino was actively "pricing off #16 market," and that United mirrored this strategy, raising its Gulf FOB price to precisely match ASR's price of $40.50. *Id.*

- Swart of United testified that United shared information with Wistisen because it knew he was going to share the information and "United wanted the information that gets shared to be accurate." *Id.* ¶ 79.

- On January 20, 2021, Wistisen passed information about United onto Henderson at ARS/Domino, discussing United's "plan to hold steady at $36.50 and $38.50" and telling him that United was "[s]elling FY21 firm." *Id.* ¶ 102. When passing that information on to his colleagues at ASR/Domino, Henderson commented that "United is usually pretty upfront with [Wistisen]." *Id.*

- On July 16, 2021, Wistisen conveyed United pricing to ASR/Domino, explaining that it "is the word from United," "direct from them this morning," which included the notes that United had "Beet holding at $36.50 firm, and cane increased to $39.50 firm." *Id.* ¶ 116.

- United's Swart stated that with information about competitors' actual prices, United could avoid "destructive situations" of customers negotiating better prices. *Id.* ¶ 121.

These detailed factual allegations demonstrate that the Defendants (a) intentionally shared pricing information and (b) did so to fix the price of Granulated Sugar. *See Cattle II*, 2021 WL 7757881 at *4 (concluding plaintiffs presented sufficiently detailed direct evidence regarding the conspiracy by alleging Defendants intentionally shared pricing information and did so to price-fix).

15

These exchanges depict Defendants' practice of providing and receiving each other's competitively sensitive Granulated Sugar prices along with signals not to depart from those prices. Courts have consistently found exchanges that effectuate the conspiracy constitute direct evidence of an anticompetitive agreement. *See, e.g., In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 901 (S.D.N.Y. 2018) (finding chat messages among defendants are "direct evidence of an anticompetitive agreement to manipulate the silver markets"); *Sullivan v. Barclays PLC*, No. 13-CV-2811, 2017 WL 685570, at *23-24 (S.D.N.Y. Feb. 21, 2017) (finding direct evidence of an agreement to fix Euribor from allegations of twelve chats among defendants); *In re For. Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 591 (S.D.N.Y. 2015) (holding that plaintiffs alleged direct evidence of an agreement by quoting communications from electronic chats, where defendants shared nonpublic information and collusive trading strategies).

Direct evidence of agreement should be viewed holistically. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661-62 (7th Cir. 2002) (reversing district court that incorrectly disregarded direct evidence because it thought it pertinent only if a single piece of evidence was "sufficient in itself to prove a price-fixing conspiracy"). These exchanges directly show the mechanism by which the conspiracy was implemented, effectuated, and enforced, bolstering the direct evidence of an anticompetitive agreement.

Defendants' attempt to find ambiguities in Plaintiffs' direct evidence of an agreement should be rejected. Mem. 17.[5] "All evidence, including direct evidence, can sometimes require a factfinder to draw inferences to reach a particular conclusion. . . .'" *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 64 (2d Cir. 2012) (quoting *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900 (7th Cir. 2006) (Posner, J.))*; In re GSE Bonds Antitrust Litig.,* 396 F. Supp. 3d 354, 363 (S.D.N.Y. 2019) (noting that it is "not permissible" at the dismissal stage for a court to "pick-and-choose between plausible inferences") (citation omitted).

Likewise, Defendants' reliance on *Burch v. Milberg Factors, Inc.*, 662 F.3d 212 (3d Cir. 2011) is misplaced. *Burch* involved the exchange of future creditworthiness information, which the district court held was distinct from pricing information: "Exchanges regarding price typically serve no other purpose than to suppress competition and violate the Sherman Act; conversely, information concerning the creditworthiness of customers can protect competitors from insolvent customers." *Id.* at 223. Moreover, the *dicta* in *Burch* that price-exchange evidence *alone* is insufficient to establish an agreement is inapposite because here, Plaintiffs also plead direct evidence of actual statements from

---

[5] Defendants cite *Frost v. LG Elecs., Inc.*, 801 Fed. App'x 496 (9th Cir. 2020), for the proposition that allegations requiring inference are not direct evidence of an agreement. Mem. 17. But *Frost* held that the plaintiffs' allegations of direct evidence did "not establish who, did what, to whom (or with whom), where, and when?" *Id.* at 498 (citations omitted); *cf. Markson v. CRST Int'l, Inc.*, No. 15-CV-1261, 2021 WL 1156863, *3 (C.D. Cal. Feb. 10, 2021) ("*Frost* did not purport to break new legal ground in its unpublished memorandum disposition. In six paragraphs, the Ninth Circuit summarily concluded that the allegations in the challenged complaint failed to plausibly allege direct or indirect evidence of a conspiracy."). Here, in contrast, Plaintiffs allege many examples that include the who, what, where, and when.

Defendants' executives regarding the exchange of non-public, competitively sensitive information. *See*, *e.g*., MC ¶¶ 89–91, 102, 121, 132.

Defendants' statements convey an understanding of each other's pricing strategies and an intention for each to share accurate information, via signals and otherwise, that would allow each to maintain their desired market prices. Plaintiffs thus allege sufficient facts to plausibly allege an antitrust conspiracy and establish that discovery will reveal further evidence of Defendants' agreement. *See Interstate Cir. v. United States*, 306 U.S. 208, 226-27 (1939) ("*Interstate*") ("It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it.") (citations omitted); *see also Twombly,* 550 U.S. at 556 (holding antitrust conspiracy is plausible where the complaint alleges "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement").

Because Plaintiffs' Complaints include "non-conclusory allegations of direct evidence of an agreement," this Court "need go no further on the question whether an agreement has been adequately pled." *W. Penn Allegheny Health Sys.*, 627 F.3d at 99. But even if this Court determines that direct evidence alone fails to establish Defendants' participation in a price-fixing agreement, Plaintiffs' well-pleaded circumstantial evidence is also sufficient to survive the motion to dismiss.

### 2. Circumstantial Evidence Also Supports Defendants' Participation in a Price-Fixing Agreement

Antitrust "conspiracies are seldom capable of proof by direct testimony, and may be inferred from the things actually done." *United States v. Sugar Inst.*, 15 F. Supp. 817,

851 (S.D.N.Y. 1934). A "smoking gun can be hard to come by, especially at the pleading stage." *In re Foreign Exch. Antitrust Litig.*, 74 F. Supp. 3d at 591. Thus, "[c]ircumstantial evidence is the lifeblood of antitrust law," *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 534 n. 13 (1973), and it is well-settled that even absent direct evidence, "[c]ircumstantial evidence can establish an antitrust conspiracy." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010).

Plaintiffs allege circumstantial evidence—parallel conduct and plus factors—to support an inference that Defendants engaged in a price-fixing conspiracy.

### a)      Defendants Engaged in Parallel Pricing and Other Parallel Conduct

A "showing of parallel pricing requires only evidence that defendants acted similarly, not evidence that they charged the same prices or engaged in identical conduct." *In re Fragrance Direct Purchaser Antitrust Litig.* ("*Fragrance*"), No. 23-CV-02174, 2025 WL 579639, at *8 (D.N.J. Feb. 21, 2025) (citation and internal quotations omitted); *see also In re Generic Pharms. Pricing Antitrust Litig.* ("*Generics I*"), 338 F. Supp. 3d 404, 441 (E.D. Pa. 2018) ("Plaintiffs are not required to plead simultaneous price increases—or that the price increases were identical—in order to demonstrate parallel conduct."); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 792 (N.D. Ill. 2017) (parallel conduct does not require uniformity in methods or amounts).

In addition to allegations regarding the joint exchange of pricing information through Wistisen and others, Plaintiffs allege numerous instances of parallel price increases implemented by Defendants in close temporal proximity coinciding with notable upward

19

pricing trends in excess of general inflation rates. Taken together, these allegations are sufficient to show that Defendants "acted similarly," particularly at this stage of the litigation. *See, e.g.*, *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 771 (D. Minn. 2020) ("*Pork I*") ("Given the inherent difficulty of obtaining solid information of an antitrust conspiracy—especially one involving sophisticated commercial entities—the evidence that Plaintiffs have marshalled is sufficient to survive the relatively low bar of the pleading stage.").

The Complaints show that Defendants increased prices in similar amounts at similar time periods throughout the Class Period. Leading up to the Class Period, Granulated Sugar prices remained essentially flat, fluctuating within a narrow band. MC ¶¶ 136-37. This period of stability was followed by parallel price increases starting in 2019 that shocked buyers, who continued to face similar lock-step increases each year of the Class Period:

| | |
|---|---|
| **2019** | In January 2019, beet processors announced that they would hold prices firm in the Midwest at $0.35 per pound f.o.b. up from $0.34 a year earlier. *Id.* ¶ 145. |
| | Soon after the International Sweetener Convention ("ISC") meeting in April 2019, buyers were shocked by the $0.35 price from beet sugar producers, including United, and the $0.37 a pound for Granulated Sugar from ASR/Domino's Northeast refineries, which was also up one cent from a year earlier. *Id.* ¶ 146. |
| | In September 2019, ASR/Domino increased its prices for the fiscal year 2020 contracts, charging $0.385 from its Northeast refineries, $0.365 from its Gulf refinery, and $0.39 in the West. *Id.* ¶ 87. |
| **2020** | In early 2020, Michigan increased to $0.385, United increased to $0.365 in the Midwest's Russian River Valley and $0.375 from its cane sugar refinery in Florida, while Imperial charged $0.38-$0.385. *Id.* ¶ 91. |

| | |
|---|---|
| | Later that year, United and ASR/Domino reported increased cane sugar prices with United moving to $0.385 and ASR/Domino increasing its prices to $0.405-$0.41 for the North, Mid-Atlantic and West and $0.385 in the Gulf. *Id.* ¶¶ 95-96. |
| **2021** | In May 2021, Domino increased its East and West Coast prices to $0.42. *Id.* ¶ 109. |
| | In June 2021, Michigan increased its price to $0.39 from $0.38. *Id.* ¶ 153. |
| | The next month, United increased its cane sugar price from $0.385 to $0.395. *Id.* ¶ 116. |
| | By late August, ASR/Domino increased its price for its Northeast and West Coast refineries to $0.45 and Michigan increased to $0.41. *Id.* ¶ 154. |
| **2022** | As contracting season kicked off in 2022, prices rose by 25% from a year earlier. *Id.* ¶ 157. |
| **2023** | The starting prices for Granulated Sugar from beet producers, including United, was $0.54 to $0.58 per pound f.o.b. in the Midwest for the 2023-24 contracting year, a 35% increase from the previous year. Likewise, ASR/Domino started out offering $0.59 from its Northeast and West Coast refineries. *Id.* ¶ 158. |
| **2024** | Even with record-setting sugar supplies, Granulated Sugar prices from the Midwest, where United dominates, started at $0.53 to $0.55 and ASR/Domino offered Granulated Sugar at $0.60 from its Northeast and West Coast refineries. *Id.* ¶¶ 161-62. |

Plaintiffs' allegations of coinciding price increases establish parallel conduct and would be sufficient even if the price increases were not so close in time. *See In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 158 F. Supp. 3d 544, 559 (E.D. La. 2016) (the fact that the defendants' "announcements and effective price increases took place over the course of several months does not disprove that the[y] engaged in parallel behavior"); *In re Text Messaging Antitrust Litig.*, No. 08-CV-7082, 2009 WL 5066652, at *5 (N.D. Ill.

Dec. 10, 2009) (holding price increases occurring ten months apart sufficient to allege parallel conduct). Conduct is not required to be simultaneous for it to be considered parallel. *See*, *e.g.*, *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharm.*, 530 F. Supp. 3d 301, 334 (S.D.N.Y. 2021) (noting simultaneous action is not a requirement to demonstrate parallel conduct); *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010) ("Plaintiffs are not required to plead simultaneous price increases—or that the price increases were identical—in order to demonstrate parallel conduct.") (citation omitted). Plaintiffs are only required to allege price increases that are "reasonably proximate in time and value." *Generics I*, 338 F. Supp. 3d 404, 441 (E.D. Pa. 2018) (collecting authorities).

Similarly, Defendants' argument that the prices were not identical raises the bar for parallel conduct far beyond what the law requires. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 791-92. Courts have found price increases to be sufficiently parallel even when the amounts varied substantially. *See*, *e.g.*, *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 769-72 (E.D. Pa. 2017) (finding evidence that one competitor raised prices by 125% while others raised them by between only 58% and 90% sufficient to create a genuine dispute of material fact concerning parallel behavior); *City of Moundridge v. Exxon Mobil Corp.,* No. 04-CV-0940, 2009 WL 5385975, at *5 (D.D.C. Sept. 30, 2009) ("Price-fixing can occur even though the price increases are not identical in absolute or relative terms."). Price increases need not be identical because unlawful price fixing is not confined to agreements to charge uniform prices. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222-23 (1940).

Defendants also criticize Plaintiffs for their use of aggregate pricing data. Defendants' pricing information is non-public and confidential. *See, e.g.*, MC ¶¶ 2, 63, 78, 88, 122. Courts permit antitrust plaintiffs at the pleading stage (who do not yet have the benefit of discovery) to "connect the aggregate data to the presence of a potential conspiracy." *In re Loc. TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *8 (N.D. Ill. Nov. 6, 2020).[6]

As the *TV Ads* court aptly noted, courts dismissing cases due to reliance on aggregate data generally do so only where, unlike here, the plaintiff fails to connect the aggregated data to the presence of a potential conspiracy. *Id.* Plaintiffs' aggregate pricing data, including: (a) the nominal retail prices for Granulated Sugar (MC ¶ 136); (b) the PPI for Granulated Sugar manufacturing (MC ¶ 167); and (c) the average cost for Granulated Sugar in U.S. Cities (Cons. Compl. ¶¶ 5, 58). The aggregate price data alleged shows an unprecedented spike in the price of Granulated Sugar during the Class Period, implicating Defendants as the dominant market players that control in excess of 70% of the market.

---

[6] Defendants' cases are inapposite given Plaintiffs' allegations of specific forward and spot prices being shared by the Producer Defendants through information exchanges. *See, e.g.*, MC ¶¶ 144-61; *Cattle I*, 2020 WL 5884676, at *6 (finding plaintiffs, unlike here, relied almost exclusively on aggregate data, which was unable to provide a basis for the court to determine which defendants affirmatively acted); *In re Pork Antitrust Litig.*, No. 18-CV-1776 (JRT/LIB), 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019)("Without specific information regarding each [d]efendant, the [c]ourt has no basis to analyze which, how many, or when any of the individual [d]efendants may have affirmatively acted to reduce the supply of pork. And that type of information is vital to pleading parallel conduct."); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1197 (9th Cir. 2015) (plaintiffs did not allege defendant-specific price increases, and failed to allege any facts "connecting the purported price increase to an illegal agreement among competitors.").

MC ¶¶ 58-60. Defendants' individual granular pricing information is confidential. *See, e.g.*, *id.* ¶ 63. The publicly available pricing information in the Master Complaint gives rise to the reasonable expectation that discovery will reveal further evidence of parallel pricing and conspiracy.

Despite Plaintiffs' allegations of Defendants' parallel price increases within temporal proximity, Defendants nevertheless declare that Plaintiffs' allegations do not demonstrate parallel pricing. Mem. 19. Defendants' argument that Plaintiffs must plead the specifics of "which, how many, or when" prices increased in minute detail throughout the Class Period (Mem. 20)—which would ordinarily be proven through expert analysis of structured transactional data *after* discovery—has been soundly rejected.[7]

Also contrary to the weight of authority, Defendants dismember and isolate Plaintiffs' allegations to distract from the overall allegations showing parallel pricing. *See supra* at III ("Courts must consider the allegations in the complaint as a whole."). Defendants highlight just four pricing allegations in the Complaints and cite several cases

---

[7] *See In re Broiler Chicken Antitrust Litig.,* 290 F. Supp. 3d at 791-92 (rejecting defendants' argument that plaintiffs' parallel conduct was insufficient because they alleged that some defendants engaged in production decreases by various amounts and methods). Plaintiffs' allegations of Defendants' parallel pricing are sufficient at this early stage to allege parallel conduct. While certain pricing allegations are more general, these allegations may not be dismissed as conclusory but considered in context with the more detailed allegations. *See Brown v. JBS USA Food Co.*, No. 22-CV-02946, 2025 WL 918804, at *14 (D. Colo. Mar. 26, 2025) ("Defendants provide no support for the proposition that the Court must ignore the general allegations on the grounds that plaintiffs provide more detailed allegations about certain years."); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-CV-7789, 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016) ("Questions as to each Defendant's participation in the conspiracy and the conspiracy's scope may be raised later in litigation, but do not merit dismissal at this phase").

that have no bearing on Plaintiffs' allegations. Mem. 19. The cases Defendants rely on do not even attempt to allege parallel price increases.[8] Here, in contrast, Plaintiffs specifically allege parallel price increases facilitated by Wistisen and others.

> **b)    Plus Factors Support that Defendants Engaged in a Price-Fixing Conspiracy**

The parallel pricing and related misconduct detailed in the Complaints was undertaken against the backdrop of numerous antitrust "plus factors," compelling the plausible inference that Defendants conspired to fix prices during the Class Period. Plus factors are "other facts that serve to transform parallelism into conspiracy (or allow a jury to do so)." Phillip Areeda, *Antitrust Analysis* 372-73 (3d ed. 1981). Although only "one plus factor" need be established, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010), Plaintiffs adequately allege five plus factors from which a plausible inference of conspiracy may be drawn: Defendants' (1) information exchange, (2) actions contrary to unilateral interest, (3) industry structure and motive, (4) opportunity to collude, and (5) recidivism.

---

[8] *Park Irmat Drug Corp. v. Express Scripts Holding Co*., 911 F.3d 505, 516-17 (8th Cir. 2018) (holding a single instance of supposedly parallel conduct—the termination of plaintiff from PBM networks operated by Express Scripts and CVS—six months apart, did not establish parallel conduct); *Burtch*, 662 F.3d at 228 (dismissing the complaint where defendants exchanged customer credit information and "chos[e] to decline, decrease, and even increase credit to [a garment retailer] at different time periods"); *Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1146 (N.D. Cal. 2017) (holding no allegations of parallel pricing where allegations described vastly different cheerleader pay structures).

### (1)   Defendants Agreed to Exchange Competitively Sensitive Information

"The Supreme Court has recognized that '[g]enuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals.'" *Pork II*, 2025 WL 1224694, at *28 (quoting *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 410 (1921)). "The sharing of confidential information with competitors, especially pricing information, can support an inference of agreement." *Id.* (citing *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).

The Producer Defendants conspired by utilizing conduits to exchange real-time, competitively sensitive, non-public information regarding current pricing, sold positions, crop size and yields, and forward-looking pricing strategies in furtherance of this conspiracy. MC ¶¶ 63-71, 87-117; *see also id* ¶ 79 (Swart of United admitting that United shared information with Wistisen because United "know[s] he's going to share information and we want the information that gets shared to be accurate"). This information exchange supports the inference of a price-fixing agreement. *See, e.g., Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) ("Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement").

### (2)   Defendants Acted Contrary to Their Unilateral Self-Interests in the Absence of an Agreement to Fix Prices

Defendants mischaracterize both the factual allegations in the Master Complaint and the economic realities of the sugar market. Plaintiffs do not simply label rational business conduct as suspicious. Rather, Plaintiffs allege that Defendants utilized conduits, such as

Wistisen, to exchange highly sensitive, non-anonymized, real-time information on current pricing, sold positions, crop size and yields, and forward-looking pricing strategies. MC ¶¶ 2–8, 63–75, 85–117.

Sharing such proprietary and competitively sensitive information is against each Defendant's unilateral economic self-interest in the absence of an agreement. A firm disclosing its forward-looking pricing or sold position risks ceding strategic advantage to competitors. Such conduct is logical only where firms have certainty that there will be no detrimental impacts: when they expect reciprocal disclosures or other coordinated benefits in return. This type of conduct—actions taken against independent self-interest—constitute a well-recognized "plus factor" supporting the inference of collusion. *See Pork II*, 2025 WL 1224694, at *12.

Defendants' claim that their conduct was a "rational business decision" motivated by a desire for accurate industry reporting has no merit. Mem. 26. As mentioned above, "[g]enuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals." *Am. Column & Lumber Co.*, 257 U.S. at 410; *see also Todd*, 275 F.3d at 211 (recognizing that "exchanges of future price information are considered especially anticompetitive") (citing *Am. Column & Lumber Co.*, 257 U.S. at 398–99).

Plaintiffs plausibly allege that the Producer Defendants disclosed this information to facilitate mutual coordination. MC ¶¶ 6, 8, 68, 71. A company sharing its internal pricing strategy, sold position, or forward-looking plans would ordinarily place itself at a competitive disadvantage by allowing rivals to anticipate and respond to its market

behavior. In a competitive market, such disclosures would be closely guarded as proprietary. *Id.* ¶ 122. The only plausible reason to share them openly and consistently is the existence of an advanced understanding that the information would be used for the mutual benefit of the disclosing and receiving firms. *Id.* ¶¶ 6, 8. The fact that the Producer Defendants made such disclosures—knowing they would be reciprocated—supports the inference of a shared understanding to restrain competition and align pricing. *Id.* ¶¶ 72, 83, 85, 128.

Indeed, as the Master Complaint details, the exchanged information was used by Defendants to communicate price increases, time their own pricing decisions based on competitor positions, and maintain discipline across the cartel. *Id.* ¶¶ 83–117. This is not limited to parallel conduct or public signaling; it is contemporaneous, coordinated, and mutually reinforcing anticompetitive behavior employed to facilitate and monitor the conspiracy. *Id.* ¶¶ 118–120. Such exchanges are a classic "plus factor" supporting the inference of conspiracy, especially where—as here—the market is concentrated, the product is commoditized, and firms interact repeatedly.

The trial testimony cited in the Master Complaint does not undercut Plaintiffs' claims. Mem. 26-27. A United executive admitted the company provided information to Wistisen with the understanding that it would be disseminated—and that United wanted to control the message being shared. MC ¶ 79. That disclosure was not incidental—it was strategic. Defendants now attempt to justify this conduct by asserting that they shared similar pricing information through public channels. But that misses the point (in addition to being outside the Complaint). The substance of Plaintiffs' allegations is that Defendants

engaged in non-public, reciprocal information exchanges through Wistisen and others.

At the pleading stage, Plaintiffs are not required to eliminate all lawful explanations. *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 597 (8th Cir. 2009). They must allege a plausible unlawful one. *See In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 799 (N.D. Ohio 2011) ("Because the latter, unlawful explanation is a plausible one, Plaintiffs need not foreclose alternative, lawful explanations for such conduct."). Plaintiffs have done so in detail.

### (3) The Granulated Sugar Industry Is Conducive to Collusion and thus Provided Motive

The structural characteristics of the Granulated Sugar industry support the plausibility of the alleged conspiracy. *See Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1081 (N.D. Ill. 2011) (finding industry characteristics provided "contextual support for the plausibility of a conspiracy"). The Granulated Sugar industry is highly concentrated, protected by substantial barriers to entry, marked by inelastic demand, dominated by vertically integrated producers, and involves a commodity product. MC ¶ 169. Courts routinely recognize these structural features as well-established "plus factors" that render a market conducive to collusion. *See In re Turkey Antitrust Litig.,* 642 F. Supp. 3d 711, 727 (N.D. Ill. 2022) ("industry structure that facilitates collusion constitutes supporting evidence of collusion"). Defendants have a motive to fix prices where, as here, the "structure of the market is such as to make secret price fixing feasible." *In re High Fructose Corn Syrup Antitrust Litig*., 295 F.3d at 655.

**High Market Concentration.** The Granulated Sugar industry is highly concentrated, in part due to consolidation through acquisitions, with three Producer Defendants controlling in excess of 70% of the market. MC ¶¶ 58-60. Courts have held that concentrated markets are more vulnerable to collusion. *See Pork II*, 2025 WL 1224694, at *31 (citing *In re High Fructose,* 295 F.3d at 656-57).

**High Barriers to Entry.** There are high barriers to becoming a manufacturer of Granulated Sugar, including expensive physical infrastructure costs and meeting United States Department of Agriculture ("USDA") imposed requirements. MC ¶ 173. In addition, USDA imposed tariffs and import restrictions limit foreign competitors' entry to the U.S. market. *Id.* Such barriers protect the incumbent domestic Producer Defendants and increase the feasibility of collusion. *See Mississippi River Corp. v. FTC*, 454 F.2d 1083, 1092 (8th Cir. 1972) ("barriers to entry in a market strengthen the market power of existing firms allowing the use of oligopolistic power with relative safety from new competition").

**Inelastic Demand.** Demand for Granulated Sugar is inelastic, as it is a staple food product with no meaningful substitutes. MC ¶¶ 174-75. Inelastic demand is conducive to collusion because customers cannot easily reduce consumption and are therefore willing to pay supracompetitive prices. *See, e.g., In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 631 (E.D. Pa. 2010); *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927 (7th Cir. 2018) (recognizing "inelastic demand" as a "structural feature" that makes a market "conducive to collusion").

**Vertical Integration.** The Granulated Sugar industry is "almost entirely vertically integrated," with major producers owning both refining operations and upstream sources

such as raw cane or beet processing facilities. MC ¶¶ 173, 176. Courts have acknowledged that vertical integration, while not inherently unlawful, can "support an inference of conspiracy." *Othart Dairy Farms, LLC v. Dairy Farmers of Am., Inc.,* 720 F. Supp. 3d 1087, 1108 (D.N.M. 2024) (vertical integration considered a plus factor where it disadvantaged other producers).

**Commodity Nature of Sugar.** Granulated Sugar is a fungible commodity with standardized grades and pricing benchmarks, rendering products interchangeable across producers. MC ¶ 184. Homogeneous or commodity products also promote collusion, as pricing is the dominant competitive variable. *See In re Titanium Dioxide Antitrust Litig.,* 959 F. Supp. 3d 799, 826 (D. Md. 2013).

Defendants cite *In re Passenger Vehicle Replacement Tires Antitrust Litigation*, No. 24-MD-3107, 2025 WL 606533 (N.D. Ohio Feb. 25, 2025), and *In re DRAM Indirect Purchaser Antitrust Litig.*, 28 F.4th 42 (9th Cir. 2022) to downplay the relevance of market structure. *See* Mem. 26. Both decisions, however, merely held that structural "plus factors" *alone* were insufficient to establish collusion. Here, Plaintiffs allege both a structurally cartel-prone market and a detailed course of coordinated conduct, including the exchange of non-public competitively sensitive information through a shared intermediary. Together, these allegations plausibly support the inference of an unlawful agreement.

**USDA Sugar Program.** The USDA sugar program increases foreign barriers to entry and makes collusion more plausible—not less, as Defendants wrongly assert. MC ¶ 211. The sugar program—established by the Agriculture and Food Act of 1981—sets certain parameters for the domestic sugar market, but does not dictate final pricing or shield

producers from domestic competition. *Id*. ¶ 212. Rather, through its production allotments, which are linked to USDA loan programs and limitations on imports and tariffs, the USDA sugar program limits foreign competitors from entering the U.S. market who could otherwise serve as a competitive restraint on the Producer Defendants. *Id*. ¶ 173. The program's purpose is to protect domestic sugar producers against competition from lower-priced imports and subsidized foreign sugar. *See id*. Because of the USDA's sugar program, the Producer Defendants knew that they could charge higher prices as they sold out of Granulated Sugar because there would be little to no additional supply from foreign sources available in the domestic market that could force them to reduce price. *Id*. ¶ 73. Thus, knowing one another's sold position allows the Producer Defendants to calculate when and how much they can raise, fix, maintain, or stabilize prices due to the amount of supply. *Id*.

### (4)    Defendants Had Ample Opportunities to Collude

"[E]vidence of frequent communication among firms on competitively sensitive topics may support an inference of conspiracy when coupled with parallel behavior." American Bar Ass'n, Section of Antitrust, *Proof of Conspiracy Under the Antitrust Laws* 39 (2010). Thus, "belonging to a trade association or attending industry events and exchanging price information . . . facilitates price fixing.'" *Kleen Prods.*, 775 F. Supp. 2d at 1080. Attendance at trade association meetings and other opportunities to collude support the inference of a conspiracy when they are connected to alleged conspiratorial acts. *See id*.

Defendants had opportunities to collude through the International Sweetener Colloquium ("ISC"), a trade show run annually by the International Dairy Foods Association that "draws hundreds of professionals and decision-makers from the sweetener industry and from companies that use sweeteners in the products they make." MC ¶¶ 178-79. The ISC was a prime opportunity for collusion each year because negotiations of future contract prices commenced there, and extensive presentations on sugar pricing were made there. *Id.* ¶ 181. Indeed, in March 2020, ASR/Domino's Henderson emailed his colleague Robert Sproull at ASR/Domino, "a summary of points from the [ISC]" including "Competitive Numbers" for 2021 for certain competitors, including  "Michigan firm at $38.50 for 2021," "United took prices up to $36.50 FOB RRV pre colloquium to the trade and heard it from specific customers," and "Imperial — 38.00/38.50 for CY 2021 on bulk EFG." *Id*. ¶ 91. Additionally, soon after the 2022 ISC ended, prices rose by 25% in many instances from the prices for which sugar was contracted for in 2022-23. *Id.* ¶ 157.

In addition to participating in the ISC, the Producer Defendants each are members, either directly or through one of their affiliated companies, of various trade associations such as the Sugar Association and the American Sugar Alliance. *Id*. ¶ 182. Producer Defendants, directly or through their affiliates, hold board positions on these trade associations. *Id.* These memberships afford Defendants opportunities to orchestrate their price-fixing conspiracy. *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1148 (N.D. Cal. 2009) ("courts have recognized that trade association affiliations and attendance at industry events may be alleged to show that putative conspirators had the opportunity and means to develop and/or further their alleged collusive scheme").

33

### (5)    Defendants Are Recidivist Antitrust Violators

Courts recognize that involvement in a prior conspiracy may support an inference of a conspiracy, especially if there is "significant overlap in identity of interest of the alleged co-conspirators in both markets and the claims are based upon the same anticompetitive conduct." *Pork II*, 2025 WL 1224694, at *40 (internal citation and quotations omitted).

Defendants' tactics reflect a repeat of anticompetitive conduct in the sugar industry involving third party conduits. In 1974, the Department of Justice sued various sugar refiners—including California & Hawaiian Sugar Company (later acquired by ASR/Domino) and American Crystal Sugar Co. (now part of United)—accusing the refiners of using "brokers to act as go-betweens in carrying price information and exchanging assurances on price actions between and among refiners" to facilitate price-fixing. *See* MC ¶ 191 (citation omitted). This led to the entry of a Consent Decree in 1978 prohibiting the refiners, for a ten-year period, from: (a) "[r]equesting, requiring or coercing any third person, including but not limited to brokers and sugarbeet grower representatives, to communicate to any other refiner, information concerning Future Prices" and (b) "[r]equesting, requiring or coercing any third person, including but not limited to brokers and sugarbeet grower representatives, to communicate to any other refiner, information concerning the prices at which, or terms and conditions upon which, refined sugar is then being sold or offered for sale." *United States v. Great W. Sugar Co.*, No. 74-CV-2674, 1978 WL 1399, at *2 (N.D. Cal. Sept. 13, 1978).

The conduct at issue in *Great Western* is the same type of conduct alleged here, within the same industry, and involving certain Defendants' predecessors. Such conduct violated antitrust law then and does so today. Sugar producers' prior use of third-party conduits for anticompetitive purposes further supports an inference of conspiracy here. *See In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (holding various defendants' prior guilty pleas to conspiracy regarding another product supported an inference of a conspiracy in the SRAM industry); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1011 (E.D. Mich. 2010) (finding "guilty pleas in one market [were] suggestive of the plausibility of a conspiracy to commit the same illegal acts in another market" where "the corporate actors [were] the same" and the claims were "based upon the same anticompetitive conduct").

### c) Horizontal Price Fixing Allegations Are Not Subject to Heightened Pleading Requirements

Plaintiffs are not required to specifically allege how, when, and where each Defendant joined the conspiracy, as Defendants wrongly assert. Courts recognize that there "is no heightened pleadings requirement for stating an antitrust claim [and] [a]llegations of who, what, when and where are not the litmus test for determining whether a defendant is on notice of the claims." *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2014 WL 4272784, at *6 (E.D. Mich. Aug. 29, 2014); *see also Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 325 (2d Cir. 2010) (rejecting contention that plaintiff was required to identify specifically the time, place, or person related to each allegation of conspiracy).

35

The Complaints spell out in detail the specific acts of United, ASR/Domino, Michigan Sugar, Louis Dreyfus, and Wistisen. Plaintiffs' allegations are consistent with the body of cases recognizing that conspiracies can operate by utilizing third parties as "conduits" who share rivals' confidential information to align on prices or other forms of competition. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 800 (Agri Stats "facilitated the conspiracy" because it was "a tool [that the producers] used to help implement their conspiracy."); *In re Domestic Airlines Travel Antitrust Litig.*, 691 F. Supp. 3d 175, 208-09 (D.D.C. Sept. 12, 2023) (United Airlines used the investment community to act as conduits of messages between defendants and to facilitate monitoring and enforcement of defendants' agreement to limit capacity expansion). Because the Complaints sufficiently allege the involvement of each Defendant and put each on notice of the claims against it, Plaintiffs have met their pleading burden.

Defendants mischaracterize what they call Judge Noreika's "implicit" determination that Wistisen did nothing wrong in the case brought by the Department of Justice challenging United's acquisition of Imperial. Mem. 4. The court there stated that "[b]ecause the Government has failed to identify the relevant market for analyzing any proposed competitive injury resulting from U.S. Sugar's acquisition of Imperial, the Government cannot establish its *prima facie* case. The Court need not and does not reach the second prong of the *prima facie* case—i.e., whether the Government has shown that the effects of the acquisition are likely to be anticompetitive." *United States v. United States Sugar Corp.*, No. 21-CV-1644, 2022 WL 4544025, at *25-26 (D. Del. Sept. 28, 2022), *aff'd*, 73 F.4th 197 (3d Cir. 2023).

36

Moreover, price fixing and merger cases are litigated by different attorneys in entirely different sections of the DOJ Antitrust Division. Defendants' reliance on the lack of a price-fixing claim in a merger case to establish a back-door argument to claim preclusion improperly seeks for the Court to construe materials outside the pleadings in Defendants' favor, ignore the reality of federal antitrust enforcement, and apply claim preclusion principles where none of the elements have been met.

Defendants' attacks on Plaintiffs' formulaic pricing allegations likewise fail. Plaintiffs allege that the Producer Defendants developed and agreed to standardized pricing formulas, such as using Number 16 (domestic sugar) futures prices, to set their FOB pricing. MC ¶¶ 130-31. For example, in July 2021, ASR/Domino's Henderson referenced United's impending $2 price increase for beet sugar, emphasizing that it "makes sense if they follow the #16 market and do the math." MC ¶ 132. Henderson later acknowledged ASR/Domino was actively "pricing off #16 market" and that United mirrored this strategy, raising its Gulf FOB price to precisely match ASR/Domino's price of $40.50. *Id*. Even Imperial, which imported part of its sugar from outside the United States before being acquired by United, used No. 16 pricing to set its sales. *Id.* ¶ 133. "Imperial declared that 'acting as a price-taker would put the whole business at risk,' reinforcing its disinterest in genuine price competition." *Id*.

The Producer Defendants contend that there is nothing wrong with relying on public data to set prices. Mem. 14. But there certainly is a wrong committed when a *joint agreement* to do so stymies price competition. On this point, the DOJ stated:

In particular—and especially important here—the *per se* prohibition on price fixing applies with full force to concerted action by competitors on any "formula underlying price policies." [*United States v.*] *Socony-Vacuum* [*Oil Co.*], 310 U.S. [150] at 222, 226 n.59 [(1940)]; *see also id.* at 223 ("an artificial stimulus applied to (or at times a brake on) market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone"). That includes any formula used to fix benchmark, component, recommended, or "starting point" prices—even if end prices ultimately vary… *see also, e.g.,* …*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 765, 771 (2d Cir. 2016) ("benchmark" or "component" used in contracts setting interest rates).

Moreover, black-letter antitrust law prohibits horizontal price-fixing agreements without regard to whether the agreement is carried out at all. The agreement itself is the violation.

MC ¶ 134 (citing Amicus Brief, *Gibson v. Cendyn Grp., LLC*, No. 24-CV-03576 (9th Cir. 2024) (ECF No. 28.1)). Defendants' argument fails.

Defendants' contention that Plaintiffs "engaged in group pleading" has no merit. Each Defendant's actions are spelled out in detail in the Complaints. Further, numerous decisions hold that minute defendant-by-defendant factual allegations are not required to adequately plead a plausible cause of action, including a conspiracy.[9] Additionally, courts

---

[9] *See, e.g., Grasso Enters., LLC v. Express Scripts, Inc.*, No. 14-CV-1932, 2017 WL 365434, at **5-6 (E.D. Mo. Jan. 25, 2017) (denying motion to dismiss antitrust claims with allegations against the "Defendants and their co-conspirators," reiterating that plaintiffs are only required to put forth "sufficient factual matter to plausibly suggest an inference of conspiracy, *even if* the facts are susceptible to an equally likely interpretation," and emphasizing that "in antitrust cases, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly") (italics in original) (internal citations and quotations omitted); *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 498-500 (M.D. Tenn. 2023).

recognize that "[g]roup pleading is not fatal to a complaint if the complaint still gives defendants fair notice of the claims against them." *Tivoli LLC v. Targetti Sankey S.P.A.*, No. 14-CV-1285, 2015 WL 12683801, at *3 (C.D. Cal. Feb. 3, 2015); *Grisham v. Covidien*, *Inc.*, No. 21-CV-00656, 2022 WL 402215, at *6 (W.D. Mo. Feb. 9, 2022) (rejecting the defendants' argument that the plaintiffs' complaint "impermissibly lumps all defendants together," and holding that the plaintiffs' allegations were "sufficient to put each Defendant on fair notice of the claims against it"); *see also Phyllis Schlafly Revocable Tr. v. Cori*, 512 F. Supp. 3d 916, 924-25 (E.D. Mo. 2021) (rejecting the defendants' argument that the plaintiffs' complaint was an impermissible "kitchen sink" or "shotgun" pleading, and finding the plaintiffs' complaint "more than sufficient to put Defendants on notice of the allegations against them").

Here, Plaintiffs sufficiently allege the involvement of each Defendant and put Defendants on notice of the claims against them.

### d)   Defendants' Assertions of Non-Conspiratorial Explanations for Price Increases Are Inappropriate at the Pleading Stage

Having failed to demonstrate that Plaintiffs' allegations do not support a plausible price-fixing conspiracy, Defendants argue that there is an "obvious alternative explanation" for the industry-wide price increase of Granulated Sugar: increased raw sugar prices due to non-actionable macroeconomic forces. Mem. 29. The Court should reject Defendants' attempt to convert this pleading motion into one for summary judgment and disregard this purported "obvious" non-conspiratorial explanation for increased Granulated Sugar pricing. *See Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 597 (8th Cir. 2009).

Plausibility "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. Indeed, "[t]he question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible." *Anderson News, L.L.C. v. Am. Media, Inc*., 680 F.3d 162, 189 (2d Cir. 2012). As repeatedly emphasized by the Eighth Circuit, "[r]equiring a plaintiff to rule out every possible lawful explanation" for a defendant's challenged conduct "would invert the principle that the complaint is construed most favorably to the nonmoving party, and would impose the sort of probability requirement at the pleading stage which *Iqbal* and *Twombly* explicitly reject." *Braden*, 588 F.3d at 597 (citation and internal quotations omitted). It follows, therefore, that to state a Section 1 claim under the Sherman Act and survive a Rule 12(b)(6) motion to dismiss, a plaintiff "need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages[.]"*Anderson News, L.L.C*., 680 F.3d at 184.

Plaintiffs allege a plausible conspiracy by pleading specific facts regarding Defendants' agreement, implementation, and operation of a conspiracy to fix Granulated Sugar prices. Because Plaintiffs allegations describe a price-fixing conspiracy—a *per se* antitrust violation—it matters not that Defendants claim that the price of raw sugar (along with Granulated Sugar) was purportedly affected by macro-economic forces. Mem. 29. *See Ariz. v. Maricopa Cnty. Med. Soc'y,* 457 U.S. 332, 351 (1982) ("The anticompetitive

40

potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some.").

Defendants ask this Court to take judicial notice of a single chart of Federal Reserve economic data concerning global sugar prices. Mem. 32. Defendants rely on these external materials in an effort to substantiate their version of contested facts and improperly invite the Court to draw inferences in their favor. The Court should decline that invitation. Defendants' purported exculpatory evidence is completely irrelevant; global economic data has no bearing on allegations limited to the U.S. Granulated Sugar market, which operates under unique USDA supply constraints. MC ¶¶ 212, 216, 220. Thus, they are not properly judicially noticeable adjudicative facts. *See Qualley v. Clo–Tex Int'l Inc.,* 212 F.3d 1123, 1128 (8th Cir. 2000).

Defendants' argument is further undermined by the fact that Producer Defendants are each vertically integrated—meaning that they grow sugar beets and sugar cane before processing, refining, marketing, and selling the sugar—so they do not need to buy sugar from other producers. *Id*. ¶ 176. The argument also ignores Plaintiffs' well-pleaded allegations, *id.* ¶¶ 137-42, demonstrating the lack of economic rationale for the dramatic increase in Granulated Sugar prices during the proposed Class Period, which suggests a plausible inference of conspiratorial conduct. *See, e.g.*, *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.,* 727 F.3d 502, 505 (6th Cir. 2013) ("[I]f a plaintiff's claim is plausible, the availability of other explanations—even more likely explanations—does not bar the door to discovery."); *Alsbrook v. Concorde Career Colleges, Inc.,* 469 F. Supp. 3d

805, 848 (W.D. Tenn. 2020) ("A plaintiff's explanation for a defendant's conduct need only be <u>among</u> the set of plausible interpretations.").

Bolstering the plausible inference of anticompetitive conduct, Plaintiffs allege that Granulated Sugar price increases during the Class Period outpaced inflation as measured by the Consumer Price Index. MC ¶¶ 137, 139. Plaintiffs further allege that according to the PPI for cane sugar, as calculated by the Federal Reserve Bank of St. Louis, cane sugar prices increased from 87.6 in 2019 to 123.2 by the end of 2023. *Id*. ¶ 140.

Plaintiffs additionally allege that the dramatic increase in Granulated Sugar prices during the 2019-2024 time period occurred absent a decline in the supply of Granulated Sugar, as demonstrated by the significant increase of U.S. beet and cane sugar production during that period. *Id*. ¶ 138. Moreover, Defendants control more than seventy percent of the Granulated Sugar market and precipitous price increases for Granulated Sugar during the Class Period occurred soon after meetings of Defendants' executives at ISC meetings, where participants had an opportunity to collude with one another. These facts create a strong plausible inference that increases in Granulated Sugar prices since 2019 were the result of unlawful collusion and not macroeconomic forces.[10] *Id.* ¶¶ 141-42.

---

[10] Defendants rely on cases where courts found that the plaintiffs' allegations themselves identified "obvious alternative explanations," which is not present here. *See In re Passenger Veh. Replacement Tires*, 767 F. Supp. 3d at 709 (stating that where the complaint included allegations regarding Defendants' use of the "inflationary environment" to raise prices, "the pleadings themselves provide[d] an 'obvious alternative explanation'" for price increases); *BCBSM, Inc. v. GS Labs, LLC*, No. 22-CV-513 (ECT/DJF), 2023 WL 2044329 (D. Minn. Jan. 30, 2023) (stating that the complaint identified an "obvious alternative explanation" to the group boycott with allegations regarding the plaintiff's price gouging).

### B.    Plaintiffs Plausibly Allege an Unlawful Information Exchange

The Supreme Court has long held that exchanges of competitively sensitive information among competitors can independently violate Section 1 of the Sherman Act, even without an express agreement to fix prices. *See United States v. Container Corp. of Am.,* 393 U.S. 333, 334-38 (1969) (information exchange of price data among competitors unlawful despite absence of formal agreements to adhere to a price schedule where the exchange had an anticompetitive effect).

Defendants' exchange of non-public, firm-specific, current and forward-looking pricing and output information provides the basis for Plaintiffs' stand-alone claim of unlawful information exchange in violation of Section 1 of the Sherman Act. MC ¶¶ 200–202, 237–245. Although not *per se* illegal, information exchanges can be found unlawful under a "rule of reason" analysis, which considers "a number of factors including most prominently the structure of the industry involved and the nature of the information exchanged." *In re Local TV Advert. Antitrust Litig.*, No. 18-CV-6785, 2020 WL 6557665, at *11 (N.D. Ill. Nov. 6, 2020) (citing *Todd*, 275 F.3d at 199).

At the motion to dismiss stage, the rule of reason inquiry requires that the plaintiff allege "concerted action that is intended to harm or unreasonably restrain competition" and a relevant market "that has been adversely affected by the challenged restraint."[11] *Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1051 (D. Minn. 1992). In assessing adverse impact, courts may consider direct or indirect evidence of

---

[11] Defendants do not challenge Plaintiffs' definition of the market for purposes of their motion to dismiss. Mem. 4 n. 5.

anticompetitive effects. "Direct evidence" includes "proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) (citation and internal quotations omitted). "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Id.* Here, Plaintiffs allege facts establishing both and therefore state a plausible claim of unlawful information exchange.

### 1.    Plaintiffs Allege an Agreement to Exchange Information

For information exchange claims, the exchange *itself* proves the agreement. *See, e.g.*, Areeda & Hovenkamp, *Antitrust Law* ¶ 1436b2 ("The [] information exchange *itself* embodies a conspiracy to [] exchange[.]"); *Todd*, 275 F.3d at 198 ("the violation lies in the information exchange *itself*"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 902 (N.D. Cal. 2008) ("the exchange of price information *alone . . .* [can show] the initial ingredient of a violation") (citation and internal quotations omitted) (emphasis added). Here, as explained in detail above, Defendants' own words depict their agreement, describing the intentional reciprocal exchange of competitively sensitive information by the participants. *See, e.g.,* MC ¶¶ 79, 90, 102.

In addition to the direct statements describing the nature of the information exchange, Plaintiffs allege specific examples of the Producer Defendants regularly exchanging real-time, firm-specific, non-public current and forward-looking data on prices, sold positions (output), and other competitively sensitive metrics through intermediaries, such as Wistisen and others, who then contemporaneously distributed that information to horizontal competitors. *See, e.g.,* MC ¶¶ 66-71, 75, 87-117.

Courts consistently find that allegations involving the exchange of "detailed, timely, competitively sensitive and non-public information" plausibly allege the existence of an unlawful information exchange claim. *See Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, No. 19 C 8318, 2020 WL 6134982, at \*6 (N.D. Ill. Oct. 19, 2020) (citation and internal quotations omitted). In *Olean*, by way of example, the court sustained the plaintiffs' information sharing claim, holding that the plaintiffs' allegations that "[e]ach Turkey Defendant contributed data to Agri Stats with the understanding that it would be reciprocated by other Turkey Defendants" were sufficient to allege an unlawful information sharing agreement under § 1 of the Sherman Act. *Id*. (citation omitted).

### 2.    Plaintiffs Allege Direct Evidence of Anticompetitive Effects

Plaintiffs adequately allege that the information exchange resulted in anticompetitive effects—specifically, that the "exchange of pricing, crop size and yield, and sold position information by the Producer Defendants was intended to ensure—and did ensure—higher prices for Granulated Sugar than would have existed in a competitive market unaffected by the Defendants' anticompetitive agreement." MC ¶ 84.

The economic impact of Defendants' information sharing scheme on the Granulated Sugar market in the United States was swift and substantial. Shortly after United began using Wistisen's services, "nominal retail prices of Granulated Sugar rose 69% from January 2019 through October 2024." *Id*. ¶ 136. Plaintiffs' allegations describe how this industry-wide surge diverged from historic trends and could not be explained by inflation, cost increases, or changes in beet and cane sugar production alone. *Id*. ¶¶ 137-38. Plaintiffs further assert that once Defendants began their information exchanges, cane sugar prices

experienced one of the steepest climbs ever, with the PPI rising from 87.6 in 2019 to 123.2 by the end of 2023. *Id.* ¶ 140. Ultimately, as Plaintiffs allege, there is no "economic rationale" for the price increases observed during the Class Period, absent the alleged scheme. *Id*. ¶ 139. This is direct evidence of an actual detrimental effect on competition in the form of increased prices. *See, e.g.*, *In re Local TV Advertising.*, 2020 WL 6557665, at *13 ("Plaintiffs allege that Defendants' information exchange resulted in higher prices, which is an anticompetitive effect.").

The cases Defendants cite are inapposite. In *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, the plaintiffs offered "no indication of the amount or type of output decline, the ways in which quality of advertising has decreased, or a single price increase." No. 04-4213 (JRT/AJB), 2006 WL 1851137, at *5 (D. Minn. June 30, 2006); *see also In re RealPage, Inc., Rental Software Antitrust Litig. (No. II),* 709 F. Supp. 3d 478, 525 (M.D. Tenn. 2023) (holding that the complaint did not show rent increases that could not be explained by normal market forces). In contrast, Plaintiffs allege direct evidence of anticompetitive effects through allegations of price increases in Granulated Sugar outside of historical norms that cannot be explained by normal market factors such as inflation, input cost increases, or supply constraints.

### 3.    Plaintiffs Allege Indirect Evidence of Anticompetitive Effects

Plaintiffs' allegations also independently satisfy the standard for indirect evidence under the rule of reason, which requires showing "proof of market power plus some evidence that the challenged restraint harms competition." *Am. Express Co*., 585 U.S. at 541. In evaluating whether an information exchange is likely to generate anticompetitive

effects, courts look "most prominently" to the "structure of the industry involved and the nature of the information exchanged." *United States Gypsum Co*, 438 U.S. at 443 n. 16. Here, both factors strongly support the plausibility of anticompetitive effects.

### a. The Structure of the Industry Involved

The exchange of pricing information among competitors is likely to harm competition in a market, like the Granulated Sugar market, that has the following features: few sellers, a fungible product, price-based competition, inelastic demand, and a tendency toward price uniformity. *See Container Corp. of Am*., 393 U.S. at 337. Plaintiffs allege that demand for Granulated Sugar is inelastic, MC ¶ 175, and that the market is dominated by a small number of producers competing primarily on price. *Id*. ¶ 206; *see also id*. ¶ 170 ("Prior to U.S. Sugar's acquisition of Imperial in 2022 [which further concentrated the market] the top three marketers of sugar accounted for 65% of the market."); *id*. ¶ 238 (stating that Producer Defendants have a collective 72% of the Granulated Sugar market); *see, e.g.*, *Olean Wholesale Grocery Coop.*, 2020 WL 6134982, at *6 (finding allegations of anticompetitive effects plausible in a market with "(1) fungible products, for which competition is price-based, (2) inelastic demand, and (3) relatively few sellers.") (citation omitted).

Defendants only challenge Plaintiffs' allegations that the market is dominated by a small number of producers. Plaintiffs allege that during the Class Period the Producer Defendants collectively controlled 70% to 75% of the market for Granulated Sugar in the United States. MC ¶¶ 58-62. Defendants argue that such allegations are insufficient and based on inadequate source material. Mem. 37. Defendants cite no case law to support this

argument. Indeed, Rule 8 does not require *any* citations to support a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Nonetheless, Defendants challenge an "undated" email, Mem. 37, (ignoring the footnote that provides a date) in which an ASR/Domino employee discussing U.S. Sugar's acquisition of Imperial remarked that "now 3 companies account for 75% of the market." MC ¶ 58. This is far from a speculative claim from an uncredited source, but rather an industry participant's candid reaction to events occurring during the Class Period.

Defendants' second argument, that Plaintiffs' market share allegations improperly rely on "projected capacity," is similarly flawed. Mem. 37. Plaintiffs support their allegations of market power with a figure depicting 2024 estimated market share projections of each Producer Defendant by capacity, which shows a combined market share of approximately 72%. MC ¶¶ 59-60. *See Hannah's Boutique, Inc. v. Surdej*, No. 13-CV-2564, 2015 WL 3856551, at *8 (N.D. Ill. June 19, 2015) (crediting expert's testimony that "the use of capacity to calculate market share is supported by the economic literature, including the Horizontal Merger Guidelines of the United States Department of Justice and Federal Trade Commission").

### b. The Nature of Information Exchanged

When analyzing the nature of information exchanged, courts consider "the sensitivity of the data, its granularity, whether the data is publicly available, and the contemporariness of the information that is exchanged." *Pork II*, 2025 WL 1224694, at *74 (citations omitted). "'[E]xchanges of current price information, of course, have the greatest potential for generating anti-competitive effects and although not *per se* unlawful have

consistently been held to violate the Sherman Act.'" *Todd*, 275 F.3d at 211 (quoting *United States Gypsum Co.,* 438 U.S. at 441 n. 16).

Here, the Producer Defendants exchanged real-time, non-public, non-aggregated information regarding current sugar pricing, sold positions, crop size and yields, and forward-looking pricing strategies. MC ¶¶ 63-71, 87-117. Courts have consistently recognized that the exchange of such information is likely to give rise to anticompetitive effects. In *United States v. Container Corp. of Am.*, 393 U.S. 333 (1969), for example, the Supreme Court held that an information exchange was unlawful where competitors knowingly exchanged current price information, despite not agreeing to adhere to a specific price schedule. *See id.* at 335. The Court was clear that the violation was premised on the exchange of information itself because "[e]ach defendant on receiving that request [for price information] usually furnished the data with the expectation that it would be furnished reciprocal information when it wanted it. That concerted action is of course sufficient to establish the combination or conspiracy." *Id*. Here, the nature of information at issue further supports the exchanges were likely to have anticompetitive effects.

### C.    Plaintiffs Plausibly Allege Antitrust Injury as a Result of Paying Supracompetitive Prices for Granulated Sugar

Defendants further assert that Plaintiffs have not alleged that they suffered any injury as a consequence of Defendants' violations of the law.  Memo. 33. This argument ignores pages of allegations in the Complaints and should be rejected.

To properly plead an antitrust claim, Plaintiffs must allege an injury "'attributable to an anti-competitive aspect of the practice under scrutiny.'" *In re EpiPen Direct*

*Purchaser Litig.*, No. 20-CV-0827 (ECT/TNL), 2021 WL 147166, at *23 (D. Minn. Jan. 15, 2021) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)); *see Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 542 (8th Cir. 2015) ("a private plaintiff must demonstrate that he has suffered an antitrust injury because of the alleged conduct of the defendants") (citations and internal quotations omitted). "An antitrust injury is an 'injury of the type the antitrust laws were intended to prevent . . . that flows from that which makes defendants' acts unlawful.'" *United HealthCare Servs., Inc. v. Merck & Co., Inc.*, No. 20-1909 (DSD/DTS), 2025 WL 607110, at *3 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)); *see Blue Shield of Va. v. McCready*, 457 U.S. 465, 482 (1982) ("an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury").

Here, Plaintiffs more than sufficiently allege that Defendants agreed to standardized pricing formulas and exchanged detailed, non-public, and competitively sensitive information about Granulated Sugar pricing, sold positions, and crop size and yields, thereby enabling them to coordinate pricing strategies, suppress competition, and charge Plaintiffs artificially inflated prices. *See generally* MC ¶¶ 1-13, 63-167, 221-222. Defendants ignore these detailed allegations.

Defendants also improperly rely on *In re Cattle & Beef Antitrust Litigation*, 687 F. Supp. 3d 828 (D. Minn. 2023) (Tunheim, J.), where the court found that the plaintiffs failed to allege how a conspiracy to depress the prices of one product caused a price depression in another product. *Id.* 838. The court also found that the plaintiffs had not sufficiently alleged how the defendants' anticompetitive conduct caused the purported price

depression, but, instead, "rel[ied] on inferences about the market generally, which is insufficient." *Id.* Here, Plaintiffs do not allege effects on different products or rely on broad market inferences. Instead, the Complaints explain in detail how the alleged price-fixing conspiracy directly increased the price of the very product at issue—Granulated Sugar. *See* MC ¶¶ 1-13, 63-167, 221-222.

Defendants also fail to acknowledge Judge Tunheim's related decision in *Cattle II* recognizing that indirect purchasers of beef alleged "an appropriate injury" by asserting that "horizontal price fixing restrained or eliminated beef price competition and deprived everyone down the supply chain in the relevant market of the benefit of price competition." *Cattle II*, 2021 WL 7757881, at *11. Plaintiffs here are far more like those harmed in *Cattle II*, having alleged in detail an anticompetitive horizontal price-fixing conspiracy that artificially inflated the price of Granulated Sugar to the detriment of both direct and indirect purchasers.

Defendants further argue that Plaintiffs fail to allege the "how, when, where, or at what price" Plaintiffs purchased Granulated Sugar. Mem. 34. But that misconstrues what is required at the pleading stage. In fact, Defendants' cited authority for this premise—*In re SSA Bonds Antitrust Litig.*, No. 16-CV-3711 (ER), 2018 WL 4118979 (S.D.N.Y. Aug. 28, 2018) ("*SSA Bonds*")—is both non-controlling and undermined by cases that directly reject its misstatement of the pleading standard. *See, e.g.*, *In re Euro. Gov't Bonds Antitrust Litig.*, No. 19-CV-2601, 2020 WL 4273811, at *13 (S.D.N.Y. July 23, 2020) (distinguishing *SSA Bonds* and holding that "the Court is not persuaded that Plaintiffs must plead facts regarding specific transactions to allege antitrust standing in this case . . .

Because Plaintiffs allege they were directly injured by the quintessentially anticompetitive act of price fixing, pleading the details of particular purchases will not impact whether they have pled a 'special kind of antitrust injury'") (citation omitted); *Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*, 463 F. Supp. 3d 409, 418, n.5 (S.D.N.Y. 2020) ("*Allianz Global*") (distinguishing *SSA Bonds* as a case where "the plaintiffs had not sufficiently pleaded antitrust injury because they had not alleged any specific transactions that had an artificially unfavorable price that injured them nor had they provided any other basis, such as statistical analysis, from which injury could be plausibly inferred") (citation omitted).

Moreover, the court in *Allianz Global* emphasized that pleading an antitrust injury does not require specifics of the "actual transactions" that harmed Plaintiffs. *Id.* at 417-18. "Rather the Second Circuit has made clear that there are other avenues by which a plaintiff can plead antitrust injury, such as alleging that a trade was made based on a contract price that the defendant plausibly manipulated." *Id.* (citation omitted).

Other courts have similarly rejected Defendants' argument. *See, e.g., In re RealPage, Inc.,* 709 F. Supp. 3d at 534 (rejecting defendants' argument that "Plaintiffs continue to make only vague, conclusory allegations that they paid 'higher' rental prices' but 'do not allege specific facts causally connecting any of those 'higher' prices to the purported critical mechanism of the alleged conspiracy" as unavailing "at such an early stage of litigation"); *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2020 WL 4032932, at *2 (N.D. Ill. July 15, 2020) ("Most of the direct-action plaintiffs in this case do not allege which specific defendants they made purchases from, let alone any details

about those purchases. This is not surprising because such details are unnecessary for Defendants to be on notice of the claims against them.").

### D.    Plaintiffs Plausibly Allege an Ongoing Conspiracy

Plaintiffs allege one count of price-fixing and one count of unlawful information exchange, in violation of Sections 1 and 3 of the Sherman Act. *See* MC ¶¶ 230-245. Accordingly, pursuant to Section 16 of the Clayton Act, Plaintiffs seek injunctive relief against Defendants to prevent and restrain the violations alleged in the Master Complaint. *Id.* ¶¶ 235-36, 244-45.

A complaint seeking injunctive relief should describe a "threat of ongoing or future harm." *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation and internal quotations omitted); *City of Kennett v. EPA*, 887 F.3d 424, 431 (8th Cir. 2018) (same). And "it is elementary that a conspiracy is presumed to continue unless there is affirmative evidence that the defendant abandoned, withdrew from, or disavowed the conspiracy or defeated its purpose." *In re Mercedes-Benz Antitrust Litig.*, No. 99-CV-4311 (WHW), 2006 WL 2129100, at *21 (D.N.J. July 26, 2006) (citation and internal quotations omitted). Further, "the Court may still consider claims for injunctive relief on challenged conduct that terminated before litigation commenced." *United States v. Agri Stats, Inc.*, No. 23-CV-3009 (JRT/JFD), 2024 WL 2728450, at *4 (D. Minn. May 28, 2024) (citing *FTC v. Accusearch Inc.,* 570 F.3d 1187, 1201 (10th Cir. 2009) ("A

53

'court's power to grant injunctive relief survives the discontinuance of the illegal conduct.'") (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 633 (1953)).

Plaintiffs plausibly allege that the Producer Defendants' unlawful price-fixing and information sharing conduct has been continuous since at least January 1, 2019. MC ¶¶ 1, 239, 243. While Defendants contend that Plaintiffs have not plausibly alleged a continued risk given that Wistisen appears "defunct," Mem. 38 (citing MC ¶ 36), Defendants neglect Plaintiffs' allegations of a continuing anticompetitive conspiracy among Defendants and that Wistisen was *but one* alleged means of information exchanges and conspiratorial communications. MC ¶ 89 ("Commodity was not the only conduit of information between the Producer Defendants," and mentioning Gerald Kramer's communications about Domino pricing with Louis Dreyfus managers). Plaintiffs further allege that because of Defendants' conduct, Granulated Sugar "prices experienced one of the steepest climbs ever, *which is ongoing*."[12] *Id.* ¶¶ 140, 166 (emphasis added).

Plaintiffs' injunctive relief claims are more than sufficiently supported at the pleading stage by concrete allegations of ongoing conduct and resulting continued price increases, the Granulated Sugar industry's history of collusion (*id.* ¶¶ 188-94), numerous opportunities for Producer Defendants to collude (*id.* ¶¶ 178-83), and high barriers to entry to the Granulated Sugar market (*id.* ¶ 173). *See, e.g., Cattle II*, 2021 WL 7757881, at *13

---

[12] Plaintiffs' continuing conspiracy allegations are far more detailed than those at issue in cases cited by Defendants. Mem. 38. For example, in *In re Pre-Filled Propane Tank Antitrust Litigation,* 893 F.3d 1047, 1057 (8th Cir. 2018), indirect purchaser plaintiffs did not plead that the defendants were currently charging supracompetitive prices. *Id.* Nor did the indirect purchaser plaintiffs in *In re California Gasoline Spot Market Antitrust Litig.*, No. 20-CV-03131-JSC, 2021 WL 1176645, at *6-7 (N.D. Cal. Mar. 29, 2021).

(denying defendants' motions to dismiss where plaintiff sought "injunctive relief, as a continuing conspiracy has been alleged and, thus, a plausible likelihood of future harm."); *Miami Prods. & Chem. Co. v. Olin Corp.*, 546 F. Supp. 3d 223, 248 (W.D.N.Y. 2021) ("[T]he Indirect Purchaser Plaintiffs have alleged that Defendants are engaged in an ongoing anticompetitive conspiracy that continues to result in artificially inflated prices for caustic soda. This is sufficient to allow the Indirect Purchaser Plaintiffs to proceed on their request for injunctive relief under § 16."); *In re Auto. Parts Antitrust Litig.*, No. 12-CV-00201, 2014 WL 1746579, at *12 (E.D. Mich. Apr. 30, 2014) (denying motion to dismiss injunctive relief claim where plaintiffs alleged "a decade-long global conspiracy in a market with high barriers to entry" where those market conditions persisted). Accordingly, Plaintiffs have plausibly alleged an ongoing conspiracy, and the Court should deny Defendants' request to dismiss their injunctive relief claims.

### E. Indirect Purchaser Plaintiffs Plausibly Allege State Law Claims for Relief Under State Statutory Antitrust and Consumer Protection Law and for Unjust Enrichment.

#### 1. Indirect Purchaser Plaintiffs' State Law Claims Do Not Rise or Fall on Their Federal Claims

Contrary to Defendants' *ipse dixit*, whether Plaintiffs state a plausible federal price fixing or information exchange claim under the federal Sherman Act does not control whether Indirect Purchaser Plaintiffs state plausible antitrust, consumer protection, or unjust enrichment claims under state law. The state laws under which Indirect Purchaser Plaintiffs seek relief are broader in scope as a general matter than the Sherman Act. *See In re Qualcomm Antitrust Litig.*, No. 17-MD-02773-JSC, 2023 WL 121983, at *15 (N.D. Cal.

Jan. 6, 2023), *aff'd sub nom.*, *Key v. Qualcomm Inc*., 129 F.4th 1129 (9th Cir. 2025) (stating state law is "broader and deeper than the Sherman Act") (citation and internal quotations omitted); *see also Farmers Edge Inc. v. Farmobile, LLC*, No. 16-CV-191, 2018 WL 2869005, at *8 (D. Neb. May 3, 2018), *aff'd*, 970 F.3d 1027 (8th Cir. 2020).

This is true for both Indirect Purchaser Plaintiffs' statutory antitrust and state consumer protection claims. For instance, the New York Donnelly Antitrust Act outlaws "arrangements" in restraint of trade in addition to combinations or conspiracies. *See Taxi Tours Inc. v. Go New York Tours, Inc*., 236 N.E.3d 159, 160-61 (N.Y. Ct. App. 2024). Likewise, the California Cartwright Act "is broader in range and deeper in reach than the Sherman Act." *In re Cipro Cases I & II*, 348 P.3d 845, 871-72 (Cal. 2015) (citation and internal quotations omitted).

State consumer protection laws, like the FTC Act, upon which such laws are modeled, overlap and extend beyond federal and state antitrust laws in scope. State consumer protection laws thus reach anticompetitive conduct that violates the letter and spirit of antitrust laws and beyond. *See FTC v. Sperry & Hutchinson Co*., 405 U.S. 233, 244 (1972) (cited in *Pork I*, 495 F. Supp. 3d at 784). Courts have applied state consumer protection laws in cases that were factually similar to traditional Sherman Act cases but did not legally fall precisely within the bounds of the Sherman Act, as unfair acts or practices or unfair methods of competition. *See, e.g*., *Epic Games, Inc. v. Apple, Inc*., 67 F.4th 946, 999 (9th Cir. 2023) (holding conduct that did not violate the Sherman Act did violate of California Unfair Competition Law).

It also is well-settled that unjust enrichment claims are not categorically delimited by federal antitrust law, even where the underlying conduct is antitrust-related. *See, e.g.*, *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 669 (E.D. Mich. 2000) ("[C]ourts often award equitable remedies under common law claims for unjust enrichment in circumstances where claims based upon contract or other state law violations prove unsuccessful."); *accord* Restatement (Third) of Restitution and Unjust Enrichment § 44 (2011) (explaining that obtaining restitution for unjust enrichment does not turn on whether the alleged conduct "violates another legal duty or prohibition"). In addition, as a general matter, unjust enrichment claims provide an alternative means to equitable recovery in the absence of a viable legal claim. *See* Fed. R. Civ. P. 8(a). Finally, "[u]njust-enrichment claims often turn on individualized facts," *Pork I*, 495 F. Supp. 3d at 791, making it inappropriate to dismiss Indirect Purchaser Plaintiffs' unjust enrichment claims as a matter of law.

Defendants' unsupported assumption that federal law controls all Indirect Purchaser Plaintiffs' state law statutory and common law claims should be rejected. Other than on this basis, Indirect Purchaser Plaintiffs' claims under the laws of Alaska, Arizona, California, Florida, Illinois, Maine, Maryland, North Dakota, Pennsylvania, South Carolina, Wisconsin, and (for Consumers) Arkansas, Delaware, D.C., Hawaii, Iowa, Kansas, Massachusetts, Michigan, Missouri, Montana, Nebraska, Nevada, New Jersey, Rhode Island, South Dakota, Tennessee, and Vermont stand unopposed and should proceed to discovery. Having failed to put forth any meaningful or accurate argument regarding whether federal law is or is not controlling, Defendants should not be heard to argue

57

otherwise on reply.[13] Because so many claims thus survive regardless of Defendants' other

arguments, the Court need not analyze this issue further.

> **2.    Indirect Purchaser Plaintiffs Plausibly Plead Consumer Protection Claims**

*New Hampshire.* Consumers' New Hampshire Consumer Protection Act (NHCPA)

claim is viable against out-of-state Defendants for sales that caused an impact or injury in

New Hampshire. *See, e.g.*, *E. Mountain Platform Tennis, Inc. v. Sherwin-Williams Co*., 40

F.3d 492, 496-500 (1st Cir. 1994) (affirming in-state plaintiff's verdict against national

out-of-state paint manufacturer based on sales to New Hampshire resident for use in New

Hampshire); *Bougopoulos v. Altria Grp., Inc*., 954 F. Supp. 2d 54, 64-65 (D.N.H. 2013)

(denying motion to dismiss NHCPA claim by out-of-state cigarette manufacturers on injury

claim by New Hampshire resident who purchased and used product in New Hampshire).[14]

---

[13] Defendants' reservation of rights to make any other arguments that they did not make in their moving brief (Mem. 39 n.17) should not be permitted. Defendants are not entitled to raise new arguments on reply under Local Rule 7.1(c)(3)(B) or to later raise arguments they waived by not timely raising them here. To the extent such argument is not barred, Plaintiffs reserve the right to oppose.

[14] *See also, e.g.*, *In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*, No. 23-MD-3062, 2025 WL 315835, at *17 (M.D.N.C. Jan. 28, 2025) (denying motion to dismiss NHCPA claims in antitrust MDL where "Plaintiffs here realleged all preceding allegations in the complaint and alleged that (1) class members purchased [relevant products indirectly] in New Hampshire" against out-of-state defendants); *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 234–35 (M.D. Pa. 2010) (denying motion to dismiss where New Hampshire allegations related only to product sale); *Mayor & City Council of Baltimore v. Merck Sharp & Dohme Corp.*, No. 23-CV-828, 2023 WL 8018980, at *15 (E.D. Pa. Nov. 20, 2023) ("allegations of a nationwide anticompetitive scheme that raises prices for pharmaceutical products are sufficient to satisfy the intrastate pleading requirements of the [NHCPA]"); *In re SoClean, Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 22-mc-152, 2023 WL 8006602, at *54, (W.D. Pa. Nov. 17, 2023) ("allegations [that defendants engaged in a nationwide campaign to disparage plaintiff's

Defendants' reliance on *Pork I* is misplaced. There, the court limited its analysis to whether the "mere sale of a product the price of which has been illicitly inflated by an alleged price-fixing scheme" is sufficient to satisfy the NHCPA. *Pork I*, 495 F. Supp. 3d at 789. Here, in contrast, the proscribed conduct is not simply the sale of a product in the state, but Defendants' nationwide efforts to create supra-competitive Granulated Sugar prices, "the impact of which was felt within each state." *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 377 (D.R.I. 2019) ("*Loestrin*"). Because Plaintiffs allege that Defendants' price-fixing scheme impacted prices in New Hampshire, the motion to dismiss the NHCPA claim should be denied.

**Connecticut.** Effective October 1, 2018, Connecticut enacted an *Illinois Brick* repealer statute, allowing all indirect purchasers standing to sue for damages. *See* P.A. 18-22, Conn. Gen. Stat. § 35-35. Defendants rely solely on a 2002 pre-repealer case and, therefore, their argument should be rejected as superseded by current Connecticut law.[15]

**New York.** Consumer Plaintiffs have sufficiently pleaded that Defendants are "engaging in an act or practice that is deceptive or misleading in a material way," as required by the New York Deceptive Practice Act ("NYPDA"). *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1995 (N.Y. 2002). Allegations of unfair competition or unfair practices premised on consumer deception are sufficient under the NYPDA. *See In re Vascepa Antitrust Litig. Indirect Purchaser Plaintiffs* ("*Vascepa*"), No. 21-CV-12061,

---

products] are sufficient to show plausibly the "within the state" requirement of the NHCPA is satisfied.").

[15] Mem. 42 (citing *Vacco v. Microsoft Corp*., 793 A.2d 1048, 1061 (Conn. 2002)).

2023 WL 2182046, at *9 (D.N.J. Feb. 23, 2023) (stating that NYPDA requires "deception over and above anticompetitive conduct"). Consumer Plaintiffs adequately plead consumer deception here, including that Defendants pretextually blamed increased Granulated Sugar prices on COVID-related cost increases.[16]

COVID-based excuses to cover up a price-fixing conspiracy constitute deception under the NYPDA. *See, e.g.*, *Fragrance*, 2025 WL 579639, at *21 (holding that plaintiffs "plausibly alleged deception (including, for example, that Defendants misrepresented the true cause of price increases for the products they produced")) (citing *Vascepa*, 2023 WL 2182046, at *9);[17] *see also In re Generic Pharms. Pricing Antitrust Litig.* ("*Generics II*"), 368 F. Supp. 3d 814, 846 (E.D. Pa. 2019) (holding plaintiffs' allegations sufficient where claims rest on defendants' alleged unconscionable or deceptive conduct, not fraud).

Defendants' reliance on the Court's decision in *Pork I* is misplaced. There, the Court held that plaintiffs failed to plead fraudulent concealment under Fed. R. Civ. P. 9(b). *Pork I*, 495 F. Supp. 3d at 782-83. Here, Consumers did not allege fraudulent concealment, and claims based on alleged unconscionable or deceptive conduct (and not fraud) "do not require application of the heightened pleading standard of Rule 9(b)." *Generics II*, 368 F. Supp. 3d at 846; *see also Pork I*, 495 F. Supp. 3d at 780 (determining that plaintiffs'

---

[16] *See* Cons. Compl. ¶ 71, App. C at 17-18.

[17] In *Fragrance*, the plaintiffs similarly alleged that the defendants' justifications for their price increases, including COVID, were "pretextual." End-User Plaintiffs' Complaint ¶ 161, *In re Fragrance End-User Plaintiff Antitrust Litigation*, No. 23-CV-16127 (D.N.J. Feb. 5, 2024), ECF No. 38; Indirect Purchaser Plaintiffs' Complaint ¶ 137, *In re Fragrance Indirect Purchaser Antitrust Litig.*, No. 23-CV-3249 (D.N.J. Feb. 6, 2024), ECF No. 43.

consumer-protection claims did not sound in fraud and therefore were not subject to Rule 9(b)).

*Oregon*. Similarly, Consumers plausibly allege a claim under Oregon's Unlawful Trade Practices Act ("OUTPA"), Or. Rev. Stat. § 646.607(1). Like the NYPDA, the OUTPA requires a pleading of deception, not just a well-pleaded antitrust violation. *See Vascepa*, 2023 WL 2182046, at *9. OUTPA claims are sufficient where plaintiffs allege that defendants deceived consumers "by withholding material information." *Id.* (citation omitted). Here, Plaintiffs allege not only that Defendants "concealed" material facts from consumers, but that they also "misled consumers to believe that they were paying a fair price for Granulated Sugar or the price increases . . . were for valid business reasons." Cons. Compl. App. C at 21 & ¶ 71 (alleging that one or more Defendants blamed price increases on post-COVID cost increases).[18] Because Plaintiffs have made "allegations involving false and misleading representations by defendants," the motion to dismiss the OUTPA claim should be denied. *See Cattle II*, 2021 WL 7757881, at *14; *In re Packaged Seafood Prods. Antitrust Litig.* ("*Packaged Seafood*"), 242 F. Supp. 3d 1033, 1084 (S.D. Cal. 2017) ("OUTPA is to be liberally construed to protect consumers").

*Minnesota.* Indirect Purchaser Plaintiffs also plead plausible claims under Minnesota's Consumer Fraud Act ("MCFA"), Minn. Stat. § 325F.69. Following a 2023 amendment, the MCFA prohibits any "unfair or unconscionable practice." *Id.* at subd. 1.

---

[18] Indirect Purchaser Plaintiffs in *Vascepa* alleged that defendants had "withheld material facts and information." Compl. ¶ 245, *Uniformed Fire Officers Assoc. Family Prot. Local 854 v. Amarin Pharma, Inc.*, No. 21-CV-12061 (D.N.J. Sept. 9, 2021), ECF No. 53.

The statute defines such practice as "any method of competition, act, or practice that: (1) offends public policy as established by the statutes, rules, or common law of Minnesota; (2) is unethical, oppressive, or unscrupulous; or (3) is substantially injurious to consumers." *Id*. at subd. 8. Both decisions relied on by Defendants—*Pork II* and *Cattle II*—were decided prior to the amendment, and thus their MCFA interpretations have been superseded by statute.

The courts' interpretations of state statutes akin to the 2023 MCFA amendment, however, are on point. For example, in *Pork I*, the court concluded that "unconscionable acts," as prohibited by the Arkansas Deceptive Trade Practices Act, "include" anticompetitive behavior like "price-fixing schemes." 495 F. Supp. 3d at 785. And in *Cattle II*, the Court construed Utah's Consumer Sales Practice Act prohibiting "unconscionable acts" to include antitrust violations. 2021 WL 7757881, at *14. Here, the MCFA explicitly includes "unfair method of competition" in its discussion of "unfair or unconscionable acts or practices" proscribed by the statute. Minn. Stat. § 325.69F, subd. 8. Thus, under the plain language of the statue, it follows that anticompetitive conduct, in violation of public policy and injurious to consumers, is prohibited. *See* Cons. Compl., Add. at 83-85; Comm. Compl., App. C at 9-11 (alleging that Defendants engaged in unfair methods of competition or unfair or unconscionable practices).

Finally, Plaintiffs need not plead individual reliance where an activity is prohibited under the statute. *See Grp. Health Plan, Inc. v. Philip Morris, Inc.*, 621 N.W.2d 2, 11 (Minn. 2001). Rather, they need only allege a causal nexus between the conduct alleged and the damages claimed. *Id*. at 4. Plaintiffs have done so here. *See* Comm. Compl.

Addendum at 83-85; Cons. Compl. App. C at 9-11 (alleging that Defendants' unlawful price-fixing practices caused injury to consumers).[19]

### 3. Indirect Purchaser Plaintiffs Plausibly Plead State Law Claims for Unjust Enrichment

Defendants do not discuss the elements of unjust enrichment under any particular state's laws, nor identify any specific element that is missing. Guided by *Generics II*, 368 F. Supp. 3d at 850, another major pending Multidistrict Litigation, Consumers plead unjust enrichment under the laws of 48 states (excluding Ohio and Indiana) and the District of Columbia; Commercials plead the unjust enrichment claim under the subset of *Illinois Brick* repealer jurisdictions. All Indirect Purchaser Plaintiffs allege that it would be inequitable for Defendants to retain their ill-gotten gains owing to artificially increased prices for Granulated Sugar paid by Plaintiffs resulting from Defendants' illicit acts and practices.[20] Such allegations invariably "are sufficient factual allegations to make a plausible case for relief." *Pork I*, 495 F. Supp. 3d at 791; *accord In re Grp. Health Plan*, 709 F. Supp. 3d at 715. Moreover, "unjust enrichment claims are nearly identical in the antitrust context," and any minor discrepancies between states' unjust enrichment laws are

---

[19] Defendants further seek dismissal of Commercial IPPs' claim under Vermont's consumer protection statute. Commercial IPPs hereby withdraw their Vermont consumer protection claim.

[20] Indirect Purchaser Plaintiffs include more than 175 paragraphs of factual allegations across the Master Complaint and their respective Short Form Complaints in support of their causes of action, including the elements of their unjust enrichment claims. *See*, *e.g.*, Comm. Compl. ¶¶ 23-35, 51-75; Cons. Compl. ¶¶ 42-59, 75-98.

simply "not material." *In re Pork Antitrust Litig.* ("*Pork III*"), 665 F. Supp. 3d 967, 1010 (D. Minn. 2023).

Defendants concede that *Pork I* and *Cattle II* expressly rejected the exact same arguments they make here. *See* Mem. 44 n.19. However, *Pork* and *Cattle* are not outliers, and it is entirely proper for Plaintiffs to plead an unjust enrichment claim in parallel with, or in the alternative to, federal and state statutory claims in antitrust cases. *See* Fed. R. Civ. P. 8(d)(2); *Cattle II*, 2021 WL 7757881 at *15 ("it is unnecessary to dismiss unjust-enrichment claims because they are pleaded in the alternative") (quoting *Pork I*, 495 F. Supp. at 799).[21]

Other than invoking some immaterial peculiarities of a very small handful of certain states' laws,[22] Defendants' other primary argument is that Consumers may not assert unjust enrichment claims under the laws of non-repealer states (Georgia, Idaho, Kentucky,

---

[21] *See*, *e.g.*, *Generics II*, 368 F. Supp. 3d at 851 (denying motion to dismiss unjust enrichment claims); *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-MD-2724, 2022 WL 1470272, at *8–9 (E.D. Pa. May 10, 2022) (denying renewed request for dismissal of unjust enrichment claims); *In re Thalomid & Revlimid Antitrust Litig.*, No. 14-CV-6997, 2015 WL 9589217, at *21 (D.N.J. Oct. 29, 2015) (denying motion to dismiss unjust enrichment claims, holding that it would be premature to decide the merits of plaintiffs' unjust enrichment claims prior to discovery); *King Drug Co. of Florence v. Cephalon, Inc.*, 702 F. Supp. 2d 514, 540 (E.D. Pa. 2010) (denying motion to dismiss unjust enrichment claims which are "viable regardless of the applicable state antitrust laws"); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 669-71 (E.D. Mich. 2000) (denying motions to dismiss unjust enrichment claims).

[22] As for the immaterialities, Defendants argue that Plaintiffs cannot maintain "standalone" claims for unjust enrichment under the laws of Alabama, Mississippi, and Tennessee. Not so. *See generally* Tilley's Alabama Equity § 19:1; 3A Encyclopedia of Mississippi Law § 21:72 (3d ed.); 21 Tennessee Contract Law and Practice § 1:12; *accord Pork I*, 495 F. Supp. 3d at 792 ("Unjust enrichment has also been found to be an independent cause of action in Mississippi.").

Louisiana, Oklahoma, Texas, Virginia, and Washington).  However, Plaintiffs are aware of no law or policy in those states to suggest that non-repealer states bar unjust enrichment claims based on conduct that is competition-related. In the absence of statutory prohibitions or other binding state authority (such as under Ohio or Indiana law), the policy argument that enforcement of state principles of equity could be barred by *Illinois Brick* finds no support in federal or state law. *See United States v. Texas*, 507 U.S. 529, 534 (1993) ("In order to abrogate a common-law principle, the statute must 'speak directly' to the question.").[23]

Duplicative recovery, complexity in apportioning recovery, and pass-on issues that motivated *Illinois Brick* are not at issue with unjust enrichment claims because "the very nature of such claims requires a focus on the gains of the defendants, not the losses of the plaintiffs." *Generics II*, 368 F. Supp. 3d at 850. Defendants' only authority to the contrary is a case called into question most recently by *Generics II*. That other plaintiffs have exercised the prosecutorial discretion to limit unjust enrichment claims to repealer states' common law, as a matter of law, should have no bearing on whether Consumers' claims here survive.

---

[23] *Compare California v. ARC America Corp.*, 490 U.S. 93, 103 (1989) (seminal case confining indirect purchaser rule to the statutory interpretation of federal antitrust law; holding that federal antitrust law supplements and does not preempt state law); *Generics II*, 368 F. Supp. 3d at 850 ("No reason or logic supports a conclusion that a state's adherence to the rule of *Illinois Brick* dispossesses a person not only of a statutory legal remedy for an antitrust violation, but also dispossesses the same person of his right to pursue a common law equitable remedy. Therefore, *Illinois Brick* does not require dismissal of the unjust enrichment claims at this time.").

Finally, Defendants can point to no incremental benefit to dismissing some or all of Consumers' unjust enrichment claims at this stage. *Cattle II*, 2021 WL 7757881 at *15 ("Additionally, 'when it is still unclear whether [plaintiffs'] other legal remedies will prevail, it is unnecessary to dismiss unjust-enrichment claims because they are pleaded in the alternative,'" (quoting *Pork I*, 495 F. Supp. 3d at 799)); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 818 ("The Court will not address Defendants' arguments with respect to the consumer protection statutes and unjust enrichment laws of the states for which antitrust claims are proceeding, because the fact that the antitrust claims are going forward in those jurisdictions is sufficient for the parties to proceed with discovery relevant to those jurisdictions").

### 4. Defendants' Remaining Arguments Against Indirect Purchaser Plaintiffs' State Law Claims Do Not Warrant Dismissal

#### a) Indirect Purchaser Plaintiffs Sufficiently Plead the Requisite Effect on Intrastate Commerce

Defendants contend that Plaintiffs fail to make sufficient allegations under Alabama, Mississippi, North Carolina, Tennessee, and West Virginia antitrust laws. To the contrary, Plaintiffs detail a pervasive antitrust conspiracy that affected the U.S. market for Granulated Sugar and impacted intrastate commerce in all states under which Plaintiffs bring state antitrust claims. The "majority" view of federal courts is that where, as here,

plaintiffs bring state antitrust claims based on a nationwide conspiracy in interstate commerce, any purported intrastate commerce requirement is satisfied.[24]

Plaintiffs allege that a "substantial part of Defendants' unlawful conduct occurred in the states" included in Indirect Purchaser Plaintiffs' Counts III and IV or substantially affected the commerce in those states. Cons. Compl. ¶¶ 45-74; Comm. Compl. ¶¶ 51-60. Plaintiffs also allege that Defendants' conduct suppressed and/or eliminated price competition, fixed and/or maintained prices at artificially high levels, and artificially inflated prices paid by Class members for Granulated Sugar in all States and the District of Columbia. *Id.* Drawing all reasonable inferences in Plaintiffs' favor, these allegations are sufficient to satisfy the state antitrust statutes under which Plaintiffs plead under the state laws at issue. *See, e.g.*, *Pork I*, 495 F. Supp. 3d at 790; *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1006-07, 1027 (E.D. Mich. 2014); *Generics II*, 368 F. Supp. 3d at 837.[25]

---

[24] *See, e.g., Blue Cross & Blue Shield of Vermont v. Teva Pharm. Indus., Ltd*., 712 F. Supp. 3d 499, 548 (D. Vt. 2024) ("[I]t is not obvious why the intra state effect of anticompetitive conduct would not be reached by the cited statutes merely because interstate conduct predominates.") (quoting *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 253 (D. Conn. 2015); *see also Loestrin*, 410 F. Supp. 3d at 377 (holding indirect purchasers sufficiently pleaded intrastate activity "where they allege[d] overcharge damages for purchases at supracompetitive prices, the impact of which was felt within each state") (citing cases); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig*., No. 14-MD-02503, 2015 WL 5458570, at *16 (D. Mass. Sept. 16, 2015) (same).

[25] Commercial Plaintiffs withdraw their Alabama state law claim on this basis. Consumer Plaintiffs specifically allege that Defendants sold and delivered sugar directly into Alabama. Cons. Compl. App. B. at 1.

> b)    **Indirect Purchaser Plaintiffs Have Article III Standing to Bring Claims Under the Law of the States in Which They Reside and Have Fed. R. Civ. P. 23 Representative Capacity to Represent Class Members in Other States**

Defendants "recognize that some courts in this District and elsewhere have deferred addressing Article III standing until class certification." Mem. 39 (citing *Pork I*, 495 F. Supp. 3d at 775-776).[26] Nevertheless, Defendants contend that Indirect Purchaser Plaintiffs lack standing to bring claims under the laws of states in which the current named plaintiffs do not reside or did not purchase Granulated Sugar. Mem. 39-40. [27]

There is no good reason to depart from *Pork* on this issue, which explained that at the motion to dismiss stage "there is no issue of standing because the named plaintiffs have each alleged that they suffered an injury in fact sufficient to confer standing and '[r]equiring that the claims of the class representative be in all respects identical to those in each class member in order to establish standing would 'confuse[] the requirements of Article III and Rule 23.'" *Pork III*, 665 F. Supp. 3d at 1000 (quoting *In re Asacol Antitrust*

---

[26] The single case Defendants cite for the proposition that a "majority" of courts follow their proposed approach to addressing Article III standing is *Packaged Seafood*, 242 F. Supp. 3d 1033. But that case was referring to the majority of federal courts in California, *id.* at 1095, which are not binding on this Court. Contrary to Defendants' suggestion, since *Insulate SB, Inc. v. Advanced Finishing Sys., Inc*., No. 13-CV-2664, 2014 WL 943224, at *10-11 (D. Minn. Mar. 11, 2014), courts within this district, such as those cited *supra*, have declined Defendants' invitation to buck "the weight of authority hold[ing] that in general class certification should come first." *Gisairo v. Lenovo (United States) Inc.*, 516 F. Supp. 3d 880, 887 (D. Minn. 2021).

[27] Consumer Plaintiffs include residents of every state except New Mexico and Utah *See* Consumer Compl., Ex. A.

*Litig.*, 907 F.3d 42, 49 (1st Cir. 2018)). Accordingly, this issue should be deferred until the class certification stage.[28]

### F.   Defendants Rely on Materials Inappropriate for Consideration at the Pleadings Stage

Defendants attach five exhibits to Lawrence E. Buterman's Declaration in Support of their Joint Motion to Dismiss, none of which are appropriate for consideration in the context of a motion to dismiss. *See* Fed. R. Civ. P. 12(d).

When ruling on a 12(b)(6) motion, a court may only consider documents incorporated by reference if the contents form the basis of a claim. *See, e.g., Ryan v. Ryan*, 889 F.3d 499, 505 (8th Cir. 2018) (affirming decision to consider stock valuation document where "it was through that document that [plaintiff] determined her stock's purchase price"); *In re Resideo Techs., Inc., Secs. Litig.*, No. 19-CV-2863 (WMW/KMM), 2021 WL 1195740, at *3 (D. Minn. Mar. 30, 2021) (to consider documents incorporated by reference "the complaint must *necessarily* embrace the document such that it forms the basis of the plaintiff's claim"); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 71

---

[28] *See, e.g.*, *In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1159-60 (D. Minn. 2014); *Roth v. Life Time Fitness, Inc.*, No. 15-CV-3270, 2016 WL 3911875, at *4-5 (D. Minn. July 14, 2016); *Hudock v. LG Elecs. U.S.A., Inc.*, No. 16-CV-1220, 2017 WL 1157098, at *2 (D. Minn. Mar. 27, 2017); *Johannessohn v. Polaris Indus., Inc.*, No. 16-CV-3348, 2017 WL 2787609, at *5 (D. Minn. June 27, 2017); *Barclay v. ICON Health & Fitness, Inc.*, No. 19-CV-2970, 2020 WL 6083704, at *6 (D. Minn. Oct. 15, 2020); *Chen v. Target Corp.*, No. 21-CV-1247, 2022 WL 1597417, at *4 (D. Minn. May 19, 2022) (Frank, J.); *Rouse v. H.B. Fuller Co.*, 694 F. Supp. 3d 1149, 1156 (D. Minn. 2023); *Boyd v. Target Corp.*, 750 F. Supp. 3d 999, 1026-27 (D. Minn. 2024); *Seutter v. Mead Johnson Nutrition Co.*, 763 F. Supp. 3d 783, 791-92 (D. Minn. 2025).

(D.D.C. 2016) (holding incorporation-by-reference inapplicable where the documents are not "integral" to Plaintiffs' claims).

Defendants offer Exhibits 1 (trial transcript) and 5 (chart) under a theory that Plaintiffs incorporated those exhibits by reference in their Complaints. But neither the trial transcript nor the chart forms the basis of Plaintiffs' claims. Rather, the quotes from Exhibit 1 and the chart in Exhibit 5 are merely two of dozens of factual allegations in the Master Complaint supporting Plaintiffs' claims of price fixing and information exchange. In other words, Plaintiffs' claims would still stand even without the information found in the trial transcript or the chart. To the extent Defendants alternatively claim these are matters of public record, "the court may merely take notice of the existence of the transcript and hearing; it may not evaluate testimonial statements recorded in the transcript that contradict the pleadings." *Pro-Life Action Ministries v. City of Minneapolis*, 700 F. Supp. 3d 687, 696 (D. Minn. 2023) (citation and internal quotations omitted); *see also McIvor v. Credit Control Servs., Inc.,* 773 F.3d 909, 914 (8th Cir. 2014) ("Judicial notice of another court's opinion takes notice of the existence of the opinion, which is not subject to reasonable dispute over its authenticity, but not of the facts summarized in the opinion.").

Likewise, the Court should not take judicial notice of Exhibits 2-4 or the USDA report cited in footnote 7 of Defendants' Memorandum in Support of their Joint Motion to Dismiss to the extent that the Defendants are requesting that this Court accept the truth of facts within these documents and any inferences that can be drawn within them. Federal Rule of Evidence 201 ("Rule 201") limits judicial notice to facts that that are "not subject to reasonable dispute." The impact of the USDA's sugar program on Plaintiffs' claims and

the price of sugar during the Class Period are central to this litigation and any related facts are in dispute. Rule 201 considers facts beyond reasonable dispute if they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Defendants push the boundaries of this rule by contending that any public record may be judicially noticed. *See* Mem. 7 n. 6-7. The Eighth Circuit has been very clear that "judicial notice is inappropriate" when the documents are offered for "truth of the matters within them and inferences to be drawn from them" for matters in dispute. *Insulate SB*, 797 F.3d at 543 n.4; *see also Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 832 (8th Cir. 2003) (refusing to take judicial notice of matters of public record where the facts and inferences within the documents were in dispute).

## V.    SHOULD THE COURT DISMISS, PLAINTIFFS REQUEST LEAVE TO AMEND

Defendants' request for dismissal with prejudice is inappropriate at this stage. Granting leave to amend is the appropriate disposition if the Court chooses to dismiss Plaintiffs' claims. *See* Fed. R. Civ. P. 15(a)(2) (the court "should freely give leave when justice so requires"); *In re Pork Antitrust Litig.*, No. 18-cv-1776, 2025 WL 964545, at *7 (D. Minn. Mar. 31, 2025) (dismissing claims *without* prejudice to grant Plaintiffs leave to amend the complaint).

## VI.    CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request that the Court **DENY** Defendants' joint motion to dismiss Plaintiffs' Master Consolidated and Short Form Complaints.

Dated:  June 12, 2025               Respectfully Submitted,

*/s/ Daniel E. Gustafson*
**GUSTAFSON GLUEK PLLC**
DANIEL E. GUSTAFSON (#0202241)
DANIEL C. HEDLUND (#0258337)
JOSHUA J. RISSMAN (#0391500)
ABOU B. AMARA, JR. (#0401146)
GABRIELLE M. KOLB (#0504386)
Canadian Pacific Plaza
120 So. Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
jrissman@gustafsongluek.com
aamara@gustafsongluek.com
gkolb@gustafsongluek.com

*/s/ Michael L. Roberts*
**ROBERTS LAW FIRM US, PC**
MICHAEL L. ROBERTS
ERICH P. SCHORK
SARAH E. DELOACH
1920 McKinney Ave, Suite 700
Dallas, TX  75201
Telephone: (501) 821-5575
Fax: (501) 821-4474
mikeroberts@robertslawfirm.us
erichschork@robertslawfirm.us
sarahdeloach@robertslawfirm.us

***Appointed Interim Plaintiffs Steering Committee Members and Co-Leads for the Direct Purchaser Plaintiff Subgroup***

*/s/ Heidi M. Silton*
**LOCKRIDGE GRINDAL NAUEN PLLP**
HEIDI M. SILTON (#025759X)
JESSICA N. SERVAIS (#0326744)
JOSEPH C. BOURNE (#0389922)
ANTONIA M. KONKOLY (#0504377)
MICHAEL J.K.M. KINANE (#0504621)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone:  612/339-6900
hmsilton@locklaw.com
jnservais@locklaw.com
jcbourne@locklaw.com
amkonkoly@locklaw.com
mjkmkinane@locklaw.com

*/s/ Kimberly A. Justice*
**FREED KANNER LONDON
& MILLEN LLC**
KIMBERLY A. JUSTICE
JONATHAN M. JAGHER
923 Fayette Street
Conshohocken, PA  19428
Telephone:  610/234-6486
kjustice@fklmlaw.com
jjagher@fklmlaw.com

**FREED KANNER LONDON
& MILLEN LLC**
MATTHEW W. RUAN (#033909X)
DOUGLAS A. MILLEN
ROBERT J. WOZNIAK
100 Tri-State International, Suite 128
Lincolnshire, IL  60069
Telephone: (224) 632-4500
mruan@fklmlaw.com
dmillen@fklmlaw.com
rwozniak@fklmlaw.com

***Appointed Interim Plaintiffs' Steering
Committee Member and Co-Lead Counsel for
the Commercial Indirect Purchaser Plaintiffs
Subgroup***

73

*/s/ Stacey P. Slaughter*
**ROBINS KAPLAN LLP**
STACEY P. SLAUGHTER (#0296971)
CAITLIN E. KEIPER (#0504799)
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: 612-349-8500
Facsimile: 612-339-4181
sslaughter@robinskaplan.com
ckeiper@robinskaplan.com

**ROBINS KAPLAN LLP**
ELLEN G. JALKUT
1325 Avenue of the Americas, Suite 2601
New York, NY 10019
Telephone: 212-980-7400
Facsimile: 212-980-7499
ejalkut@robinskaplan.com

*/s/ Elizabeth A. Fegan*
**FEGAN SCOTT LLC**
ELIZABETH A. FEGAN
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Fax: (312) 264-0100
beth@feganscott.com

**FEGAN SCOTT LLC**
KYLE A. JACOBSEN
709 N 2nd St., Suite 400 #1280
Philadelphia, PA 19123
Telephone: (484) 352-2318
Fax: (312) 264-0100
kyle@feganscott.com

*/s/ Peter A. Barile III*
**LOWEY DANNENBERG, P.C.**
VINCENT BRIGANTI
PETER ST. PHILLIP, JR.
PETER A. BARILE III
SITSO BEDIAKO (#0389073)

74

NICOLE A. VENO
44 South Broadway, Suite 1100
White Plains, NY  10601
Telephone: (914) 997-0500
Fax: (914) 997-0035
vbriganti@lowey.com
pstphillip@lowey.com
pbarile@lowey.com
sbediako@lowey.com
nveno@lowey.com

***Appointed Interim Plaintiffs' Steering Committee Members and Co-Lead Counsel for the Consumer Indirect Purchaser Plaintiffs Subgroup***