**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| IN RE: GRANULATED SUGAR ANTITRUST LITIGATION | MDL No. 24-3110 (JWB/DTS) |
| This Document Relates To:<br><br>ALL ACTIONS | |

**STATEMENT OF INTEREST OF**
**THE UNITED STATES OF AMERICA**

JOSEPH H. THOMPSON
Acting United States Attorney

LILES H. REPP
Attorney ID No. 0400692
Assistant United States Attorney
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
Phone: (612) 664-5600
Fax: (612) 664-5788
Email: Liles.Repp@usdoj.gov

ABIGAIL A. SLATER
*Assistant Attorney General*

ROGER P. ALFORD
*Principal Deputy Assistant Attorney General*

MARK H. HAMER
*Deputy Assistant Attorney General*

DAVID B. LAWRENCE
*Policy Director*

DANIEL E. HAAR
NICKOLAI G. LEVIN
PETER M. BOZZO
*Attorneys*

*United States Department of Justice*
*Antitrust Division*
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
Phone: (202) 803-1196
Email: peter.bozzo@usdoj.gov

# TABLE OF CONTENTS

INTEREST OF THE UNITED STATES..........................................................................1

STATEMENT OF FACTS ........................................................................................2

ARGUMENT......................................................................................................5

    THE COMPLAINT PLEADS CONCERTED ACTION FOR THE
    STANDALONE INFORMATION-SHARING CLAIM..............................................7

CONCLUSION ................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Column & Lumber Co. v. United States*,
   257 U.S. 377 (1921)................................................................1, 6, 14, 15, 16, 17

*American Needle, Inc. v. National Football League*,
   560 U.S. 183 (2010)..............................................................................7, 8, 14, 15

*American Tobacco Co. v. United States*,
   328 U.S. 781 (1946).............................................................................................9

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................9, 12, 13, 14

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*,
   203 F.3d 1028 (8th Cir. 2000) (en banc) ..........................................................10

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993).............................................................................................9

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984).............................................................................................8

*Duffy v. Yardi Systems, Inc.*,
   758 F. Supp. 3d 1283 (W.D. Wash. 2024) .......................................................11

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961).............................................................................................9

*ES Development, Inc. v. RWM Enterprises, Inc.*,
   939 F.2d 547 (8th Cir. 1991) ..............................................................................7

*FTC v. Cement Institute*,
   333 U.S. 683 (1948)...........................................................................................11

*Impro Products, Inc. v. Herrick*,
   715 F.2d 1267 (8th Cir. 1983) ..........................................................................11

*In re Lipitor Antitrust Litigation*,
   868 F.3d 231 (3d Cir. 2017) ........................................................................ 8

*In re Multiplan Health Insurance Provider Litigation*,
   No. 1:24-cv-06795, 2025 WL 1567835 (N.D. Ill. June 3, 2025) ................... 11

*In re Pork Antitrust Litigation*,
   No. 18-1776, 2025 WL 1224694 (D. Minn. Apr. 28, 2025) ......................... 11

*In re Pre-Filled Propane Tank Antitrust Litigation*,
   860 F.3d 1059 (8th Cir. 2017) ................................................................... 16

*In re RealPage, Inc., Rental Software Antitrust Litigation (No. II)*,
   709 F. Supp. 3d 478 (M.D. Tenn. 2023)...................................................... 11

*In re Wholesale Grocery Products Antitrust Litigation*,
   752 F.3d 728 (8th Cir. 2014) ..................................................................... 10

*Interstate Circuit v. United States*,
   306 U.S. 208 (1939).......................................................... 10, 11, 12, 13, 14, 15

*Kleen Products LLC v. Georgia-Pacific LLC*,
   910 F.3d 927 (7th Cir. 2018) ....................................................................... 9

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) ...................................................................... 15

*Northern Securities Co. v. United States*,
   193 U.S. 197 (1904)...................................................................................... 9

*Ohio v. American Express Co.*,
   585 U.S. 529 (2018)...................................................................................... 7

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
   911 F.3d 505 (8th Cir. 2018) ................................................................. 9, 10

*PLS.Com, LLC v. National Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) ...................................................................... 11

*Robertson v. Sea Pines Real Estate Cos.*,
   679 F.3d 278 (4th Cir. 2012) ..................................................................... 12

*Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n*,
    666 F.2d 1130 (8th Cir. 1981) ................................................................. 11, 12

*Standard Oil Co. v. United States*,
    221 U.S. 1 (1911) ..................................................................................... 7

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ........................................................... 6, 7, 8, 16

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ................................................................. 11

*United States v. American Linseed Oil Co.*,
    262 U.S. 371 (1923) ........................................................................ 5, 6, 14, 15

*United States v. American Tobacco Co.*,
    221 U.S. 106 (1911) ............................................................................... 9

*United States v. Container Corp. of America*,
    393 U.S. 333 (1969) ...................................................... 6, 9, 13, 14, 16

*United States v. Foley*,
    598 F.2d 1323 (4th Cir. 1979) ............................................................. 11

*United States v. Masonite Corp.*,
    316 U.S. 265 (1942) ........................................................................ 11, 15, 16

*United States v. Misle Bus & Equipment Co.*,
    967 F.2d 1227 (8th Cir. 1992) ........................................................... 9, 10

*United States v. Paramount Pictures, Inc.*,
    334 U.S. 131 (1948) ............................................................................... 11

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ........................................................................... 6, 9

*United States v. United States Gypsum Co.*,
    333 U.S. 364 (1948) ............................................................................... 11

*United States v. United States Sugar Corp.*,
    73 F.4th 197 (3d Cir. 2023) ................................................................ 8

*United States v. United States Sugar Corp.*,
No. 21-1644, 2022 WL 4544025 (D. Del. Sept. 28, 2022) ............................................8

*White v. R.M. Packer Co.*,
635 F.3d 571 (1st Cir. 2011)..............................................................................9

## <u>Statutes</u>

15 U.S.C. § 1 ...........................................................................................1, 7, 9

28 U.S.C. § 517 .............................................................................................1

## INTEREST OF THE UNITED STATES

The United States submits this Statement of Interest under the authority of 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice to attend to the interests of the United States in any case pending in a federal or state court.

The United States enforces the federal antitrust laws and has a strong interest in their correct application.  In this case, Plaintiffs allege that competing sugar producers and cooperatives violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by agreeing to share competitively sensitive information with each other.  As the Supreme Court has recognized for over a century, information exchanges can distort the competitive process. *E.g.*, *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 409-10 (1921).  They can, for example, encourage collusion among firms that should be rivals.  They can insulate prices from market forces, causing those prices to stabilize at uniform levels. And they can exacerbate informational advantages held by firms over their suppliers, customers, or competitors.

These anticompetitive effects can come to fruition regardless of whether the parties share information directly with one another, through third parties, or both. Accordingly, the United States has brought challenges to information exchanges facilitated by intermediaries.  *See* Am. Compl. ¶¶ 260-69, *United States v. RealPage, Inc.*, No. 1:24-cv-00710 (M.D.N.C. Jan. 7, 2024), ECF No. 47; Second Am. Compl. ¶¶ 163, 165, 167, *United States v. Agri Stats, Inc.*, No. 0:23-cv-3009 (D. Minn. Nov. 15, 2023), ECF No. 50.  The United States has also filed amicus briefs and statements of

interest in cases involving intermediary-coordinated information exchanges that were alleged to be either standalone Section 1 violations or tools to facilitate price-fixing agreements.  *E.g.*, Br. for the United States as Amicus Curiae in Supp. of Pls.-Appellants, *Gibson v. Cendyn Grp., LLC*, No. 24-3576 (9th Cir. Oct. 24, 2024); Statement of Interest, *In re Pork Antitrust Litig.*, No. 0:18-cv-01776 (D. Minn. Oct. 1, 2024), Dkt. 28.1; Mem. of Law in Supp. of Statement of Interest of the United States, *In re: RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, No. 3:23-md-03071 (M.D. Tenn. Nov. 15, 2023), ECF No. 628.

The United States files this Statement because Defendants' motion to dismiss could be read to heighten the pleading bar for Section 1 information-exchange claims when the exchanges occur through or are orchestrated by go-betweens instead of directly between competitors.  We ask the Court to reject such a heightened pleading standard to avoid creating a Section 1 loophole for information exchanges conducted through intermediaries, potentially permitting such exchanges to evade Section 1 scrutiny despite their potential for significant anticompetitive effects.  We take no position on Defendants' other arguments.

## STATEMENT OF FACTS

Plaintiffs, direct and indirect purchasers of granulated sugar, allege that sugar producers and sellers ("Producer Defendants") agreed to share competitively sensitive information with one another.  Master Consolidated Compl. ("Compl.") ¶¶ 3, 14-16, Doc. 332.  Plaintiffs claim that this agreement was both an independent violation of

Section 1 and a mechanism for implementing a separate violation of Section 1—an agreement to fix granulated sugar prices. *Id.* ¶¶ 3, 232-33, 239-41.

Plaintiffs allege that the information-sharing arrangement took the form of "a 'give to get' scheme," in which the Producer Defendants "gave one another mutual, reciprocal assurances that they would provide competitively sensitive information" to a third party (Commodity Information, Inc.) "so long as their competitors also did so." Compl. ¶ 6. Specifically, Plaintiffs claim that Commodity "acted as a clearinghouse, collecting detailed, sensitive non-public information from the Producer Defendants[] and rapidly redistributing it"—in non-anonymized form—"to other Producer Defendants." *Id.* ¶ 66; *see id.* ¶ 70. This was allegedly Commodity's sole function: The firm purportedly was not a "legitimate industry analyst[,]" "did not gather information through voluntary surveys or periodic polling that it anonymized," "did not advertise its services to the public," "did not maintain a website," "did not publish publicly available reports," and did not otherwise make "reports available to purchasers of [g]ranulated [s]ugar." *Id.* ¶¶ 36, 67-69.

The complaint provides examples of specific exchanges, including multiple instances in which Commodity (acting through its principal, Richard Wistisen, *see* Compl. ¶ 37) allegedly sent confidential information from one sugar company to another:

- In September 2020, Wistisen "asked, within minutes," employees of two competing Producer Defendants (United and ASR/Domino) for "pricing" information. *Id.* ¶ 95; *see id.* ¶¶ 1, 231. After both firms sent their prices,

"Wistisen provided United and ASR/Domino with the information from each other in emails less than a minute apart." *Id.* ¶ 97.

- A few months later, Wistisen again asked both firms, within an hour, for pricing information. *Id.* ¶ 99. United provided its current pricing but said that it would "probably go higher given [its] strong sold position" (i.e., the amount of sugar no longer available for purchase, *see id.* ¶ 5 n.3); ASR/Domino also provided information about its pricing and inventory. *Id.* ¶¶ 99-100. The next day, Wistisen sent United's information to ASR/Domino and vice versa. *Id.*

- In still other cases, Wistisen told ASR/Domino, based on a "[l]ong conversation with United," that United's pricing "plan" was "to hold steady at $36.50 and $38.50," *id.* ¶ 102; *see id.* ¶ 104; told ASR/Domino that he had "[j]ust talked with United: prices unchanged," *id.* ¶ 110; and informed ASR/Domino, based on "the word from United"—"direct from them this morning"—of the latter's sold position and pricing, *id.* ¶ 116.

The complaint alleges that United and ASR/Domino knew that, once their information was provided to Wistisen, it would be shared with competitors. *Id.* ¶¶ 78, 80, 88.

Plaintiffs also claim that these information exchanges had anticompetitive effects. With inside knowledge of their rivals' prices, the Producer Defendants allegedly were able "to hold[] prices firm in parallel" at certain times and to "increase[] their prices in parallel" at others—rather than competing on price. Compl. ¶ 153; *see id.* ¶¶ 150, 154-56, 159. For example, according to Plaintiffs, United executives "affirmatively used

4

[Wistisen] to signal competitors" that the firm "was contemplating increasing its prices," *id.* ¶ 120—a means of assuring other sugar companies that they could keep prices elevated, too, *see id.* ¶¶ 163-64.  Moreover, obtaining information about sold positions enabled the Producer Defendants to learn when their competitors were "nearing full capacity"—at which point the Producer Defendants "could confidently raise prices without fear of being undercut by their ostensible rivals." *Id.* ¶ 66.

Defendants have moved to dismiss, arguing that Plaintiffs' Section 1 claims fail because, among other reasons, the complaint purportedly does not plead concerted action.  Joint Mot. to Dismiss ("Mot.") at 11-33, Doc. 398.  In support of this contention, Defendants claim that the complaint lacks allegations of "parallel conduct" and "plus factors," which Defendants define as "'economic actions and outcomes that are largely inconsistent with unilateral conduct' or 'largely consistent with explicitly coordinated conduct.'" *Id.* at 18-22 (citation omitted).  Defendants point to, among other things, the absence of allegations about any "interfirm communication[s]" between the Producer Defendants.  *Id.* at 23.

## ARGUMENT

"The Sherman Act was intended to secure equality of opportunity[] and to protect the public against . . . those abnormal contracts and combinations which tend directly to suppress the conflict for advantage called competition." *United States v. Am. Linseed Oil Co.*, 262 U.S. 371, 388 (1923).  Information exchanges violate the statute when they "destroy the kind of competition to which the public has long looked for protection." *Id.* at 390.  As the Supreme Court has recognized, information exchanges—even absent a

5

"specific agreement" to "fix prices"—can promote a "tacit understanding" among rivals. *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 411 (1921). For example, if firms use their "[k]nowledge of a competitor's price" to "match[] that price," the result will be "price uniformity," *United States v. Container Corp. of Am.*, 393 U.S. 333, 336-37 (1969), or "market stabilization," *Todd v. Exxon Corp.*, 275 F.3d 191, 214 (2d Cir. 2001) (Sotomayor, J.)—rather than prices set by "the play of the contending forces" of market competition, *Am. Linseed*, 262 U.S. at 388. And, by equipping firms "[w]ith intimate knowledge" of their rivals' "affairs," information exchanges may enable businesses to exploit "widely separate and unorganized customers necessarily ignorant" of the data that the firms have exchanged. *Id.* at 389-90.

Just as price fixing among competitors is inherently anticompetitive regardless of the precise "machinery employed" to set prices, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940), information exchanges may pose anticompetitive risks regardless of the form of the exchange. The Supreme Court has condemned agreements to share information directly between firms, *see Container Corp.*, 393 U.S. at 335-38, just as it has condemned information-sharing agreements facilitated by intermediaries, *see Am. Linseed*, 262 U.S. at 380-86, 389-90; *Am. Column*, 257 U.S. at 391, 394-97, 409-12. Indeed, the Court has warned of the special dangers posed by the joint use of intermediaries, which permits a "single" centralized entity "to insistently recommend harmony of action," *Am. Column*, 257 U.S. at 411, and to "insure" the information exchangers' "obedience" to the scheme, *Am. Linseed*, 262 U.S. at 389. It is thus important that courts apply the same scrutiny under Section 1 to information exchanges

6

conducted through an intermediary as to information exchanges directly among competitors.

## THE COMPLAINT PLEADS CONCERTED ACTION FOR THE STANDALONE INFORMATION-SHARING CLAIM

Section 1 bars every "contract," "combination," or "conspiracy[]" in restraint of trade." 15 U.S.C. § 1. There are two primary elements for a Section 1 claim: (1) "concerted action" (i.e., a contract, combination, or conspiracy) that (2) unreasonably "restrains trade." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010); *see ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 553, 556 (8th Cir. 1991). "Restraints can be unreasonable in one of two ways." *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018). Some restraints are "unreasonable *per se*," *id.*, based on their inherently anticompetitive "nature and character," *Standard Oil Co. v. United States*, 221 U.S. 1, 64-65 (1911). Other restraints are unreasonable under the rule of reason, "a fact-specific assessment" of "'the restraint's actual effect' on competition." *Am. Express*, 585 U.S. at 541 (cleaned up).

Plaintiffs here bring two Section 1 claims—one based on Defendants' alleged information-sharing agreement, one asserting that the information sharing can be used to infer a price-fixing agreement that itself violated Section 1. Compl. ¶¶ 64-65, 232-34, 239-42. An agreement to share information, on its own, "is not illegal *per se*, but can be found unlawful under a rule of reason analysis," *Todd*, 275 F.3d at 198; accordingly, Plaintiffs challenge the information-sharing agreement under the rule of reason, Compl. ¶¶ 239-42. Plaintiffs challenge the price-fixing agreement under the per se rule or,

7

alternatively, the rule of reason. *Id.* ¶¶ 232-34. Although Defendants' motion makes the same arguments as to why both claims purportedly fail to plead concerted action, *see* Mot. at 11-33, the claims are "analytically distinct," *Todd*, 275 F.3d at 198, and thus require separate consideration. And, as relevant to this Statement, Defendants provide an incomplete picture of the legal framework applicable to the concerted-action element of Plaintiffs' standalone information-sharing claim.[1]

1. Congress defined concerted action broadly because it "deprives the marketplace of . . . independent centers of decisionmaking" and thus "inherently is fraught with anticompetitive risk." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768-69 (1984). "The key," therefore, is whether the challenged conduct "joins together separate decisionmakers"—that is, "separate economic actors pursuing separate economic interests." *Am. Needle*, 560 U.S. at 195 (citation omitted).

---

[1] Defendants assert that, in separate litigation challenging a merger between two sugar refiners (U.S. Sugar and Imperial), "DOJ specifically eschewed alleging that the Wistisen communications amounted to an *agreement* to fix prices." Mot. at 4. But the government simply said that, to prove that the merger violated Section 7 of the Clayton Act, it "d[id]n't need to prove that there has been a Section 1 violation." *Id.* at 4 n.3. And it would be "erroneous to conclude" that the government's declining to bring a Section 1 claim "equate[d] to a determination" that the conduct "d[id] not run afoul of the Sherman Act." *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 263 (3d Cir. 2017). Defendants also assert that the district court in the merger case "implicitly found that the allegations of an anticompetitive information exchange were without merit." Mot. at 4 (citing *United States v. U.S. Sugar Corp.*, No. 21-1644, 2022 WL 4544025, at *25-27 (D. Del. Sept. 28, 2022)). But the Third Circuit *overturned* the portion of the opinion on which Defendants rely. *See United States v. U.S. Sugar Corp.*, 73 F.4th 197, 207-08 (3d Cir. 2023). In any event, the district court said nothing, implicitly or otherwise, about information exchanges—and, in fact, explained that it was "not reach[ing]" the question "whether the Government has shown that the effects of the acquisition are likely to be anticompetitive." *U.S. Sugar*, 2022 WL 4544025, at *25.

Concerted action comes in an array of shapes and sizes. Section 1 applies not only to easily recognizable agreements such as "contract[s]" and "trust[s]," but also to "conspirac[ies]" and "combination[s]." 15 U.S.C. § 1. In particular, courts have applied the latter term capaciously to encompass, among other things, "express *or implied* agreement[s] or understanding[s] that the participants will jointly give up their trade freedom." *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961) (emphasis added); *see United States v. Am. Tobacco Co.*, 221 U.S. 106, 187 (1911); *N. Sec. Co. v. United States*, 193 U.S. 197, 326-27 (1904).

As this definition of "combination" confirms, "[n]o formal agreement" is necessary to establish concerted action. *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946); *see Container Corp.*, 393 U.S. at 337 (condemning a "somewhat casual" agreement). Tacit agreements—that is, agreements established "only" by "the conspirators' actions," *White v. R.M. Packer Co.*, 635 F.3d 571, 576 (1st Cir. 2011)— qualify.[2] *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007); *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516 (8th Cir. 2018). These agreements may take the form of a "wink and a nod," *Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 936 (7th Cir. 2018), or a "gentlemen's agreement or understanding," *Socony-Vacuum*, 310 U.S. at 179, 252; *see United States v. Misle Bus & Equip. Co.*, 967 F.2d 1227, 1231 (8th Cir. 1992) (upholding Section 1 convictions based on "mutual

---

[2] Tacit agreements are distinct from conscious parallelism (sometimes called "tacit collusion"), a type of interdependent action in oligopolistic markets that does not qualify as concerted action. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993).

understandings" among conspirators); *cf. In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 734 (8th Cir. 2014) ("[M]ost would-be monopolists probably can be expected to . . . seal[] their true anticompetitive agreement with a knowing nod and wink.").

2.  Just as concerted action can take on many forms, plaintiffs can follow a number of paths to establish concerted action.  While the Eighth Circuit has, on occasion, assessed whether plaintiffs satisfied the concerted-action requirement by identifying parallel conduct and so-called "plus factors," *see Park Irmat*, 911 F.3d at 516-17; *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1032-33 (8th Cir. 2000) (en banc), that is not the only way to show concerted action.

Another way is to identify an invitation proposing collective action followed by conduct manifesting acceptance of the invitation.  *See Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939).  In *Interstate Circuit*, a manager of movie-theater companies sent identical letters to eight film distributors; each letter identified all the distributors as addressees and asked them to impose restrictions on secondary runs of films (which, in large part, they did).  *Id.* at 215-18.  Although the Supreme Court first inferred an agreement among the distributors based on what today might be labeled plus factors, this conclusion "was not a prerequisite to an unlawful conspiracy."  *Id.* at 226.  Even "without [a] previous agreement," the Court explained, "[i]t was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to

10

the scheme and participated in it." *Id.* at 226-27; *see FTC v. Cement Inst.*, 333 U.S. 683, 716 n.17 (1948); *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 393-94 (1948).[3]

The Supreme Court applied the same approach in *United States v. Masonite Corp.*, 316 U.S. 265 (1942). There, the Court found a "combination" where multiple competitors entered "identical agreements" with a manufacturer and "became aware" of each other's agreements. *Id.* at 269, 275. Under these cases, "[i]t is enough that a concert of action is contemplated and that the defendants conformed to the arrangement." *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 142 (1948).[4]

---

[3] *See also Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n*, 666 F.2d 1130, 1140 (8th Cir. 1981) ("When the circumstantial evidence leads to the conclusion that concerted or collaborative action has been contemplated and undertaken by competitors with the purpose and effect of eliminating competition among themselves or from others, a Sherman Act violation has been committed." (citing, *e.g.*, *Interstate Circuit*, 306 U.S. at 227)); *cf. Impro Prods., Inc. v. Herrick*, 715 F.2d 1267, 1279-80 (8th Cir. 1983) (applying a test that infers concerted action where "there is an *overall*-unlawful plan or 'common design,'" "knowledge that others must be involved is inferable to each member," and "each alleged member[] participat[ed]" in the plan (citation omitted)).

[4] Other circuit and district courts, too, have held that parties alleged or proved concerted action where firms engaged in conduct manifesting acceptance of an invitation to act collectively. *See PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 843 (9th Cir. 2022); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935-36 (7th Cir. 2000); *United States v. Foley*, 598 F.2d 1323, 1331-32 (4th Cir. 1979); *In re Multiplan Health Ins. Provider Litig.*, No. 1:24-cv-06795, 2025 WL 1567835, at *18-19 (N.D. Ill. June 3, 2025); *Duffy v. Yardi Sys., Inc.*, 758 F. Supp. 3d 1283, 1291-92 (W.D. Wash. 2024). A court in this district recently held that evidence of "invitation and acceptance of an anticompetitive plan" was not sufficient to establish concerted action absent "corresponding evidence of parallel conduct"; however, the court acknowledged that "[t]he Eighth Circuit seems to have given some credence" to the invitation-and-acceptance theory and recognized that "[d]eveloping caselaw also support[ed]" the theory. *In re Pork Antitrust Litig.*, No. 18-1776, 2025 WL 1224694, at *14-16 (D. Minn. Apr. 28, 2025) (citing *Impro Prods.*, 715 F.2d at 1279; *Duffy*, 758 F. Supp. 3d at 1288-93; *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 507-08 (M.D. Tenn. 2023)); *see supra* at 11 n.3.

3. Plaintiffs' information-sharing claim pleads concerted action. Plaintiffs may allege an agreement directly, through "circumstantial" facts from which an agreement can be "infer[red]," or both. *Twombly*, 550 U.S. at 553 (citation omitted); *see Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 289 (4th Cir. 2012); *Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n*, 666 F.2d 1130, 1139-40 (8th Cir. 1981). Without excluding the possibility that Plaintiffs have satisfied the concerted-action requirement in multiple ways, they have, at least, pleaded an agreement for their information-sharing claim under the theory approved in *Interstate Circuit*.[5] *See* Pls.' Mem. of Law in Opp. to Defs.' Joint Mot. to Dismiss Pls.' Master Consolidated and Short Form Compls. at 44, Doc. 403 (arguing that information-exchange claim pleads concerted action because it alleges "the intentional reciprocal exchange of competitively sensitive information").

According to the complaint, Wistisen requested information about pricing and output from sugar producers/sellers and provided them with similar information about their competitors. *E.g.*, Compl. ¶¶ 87-88, 92, 95-97, 99-103, 106, 112, 114, 116. The alleged information exchangers thus mutually understood that, once they provided their information, Wistisen "would in turn share it" with their rivals, *id.* ¶ 78; *see id.* ¶¶ 80, 88—that is, they "kn[e]w[] that concerted action was contemplated and invited," *Interstate Circuit*, 306 U.S. at 226. By nonetheless submitting the requested data and accepting corresponding data about competitors, *e.g.*, Compl. ¶¶ 87, 92-104, 106-07, 109-10, 112-17, the producers/sellers allegedly "gave their adherence to" the information-

---

[5] This Statement does not address whether Plaintiffs have pleaded concerted action under any alternative theories.

sharing "scheme and participated in it," *Interstate Circuit*, 306 U.S. at 226. That is

"enough," *id.*, to plead concerted action. Put differently, when a party "furnishe[s]"

requested data to competitors "with the expectation that it would be furnished reciprocal

information when it wanted it," that "is of course sufficient to establish [a] combination

or conspiracy" under Section 1. *Container Corp.*, 393 U.S. at 335.

4. Defendants' motion to dismiss appears to proceed from the premise that the

only way to prove concerted action through circumstantial evidence is by alleging

parallel conduct and plus factors, *see* Mot. at 11-33, though it is unclear whether

Defendants (1) are arguing this approach is required as a matter of law or (2) are simply

responding to the complaint's allegations of parallel conduct and plus factors. To the

extent they are arguing the former, they are incorrect. *Interstate Circuit* makes clear that,

regardless of whether an agreement can be inferred under a plus-factors-style analysis, a

distinct theory of concerted action is available when parties manifest acceptance of an

invitation for collective action. 306 U.S. at 226; *see supra* at 10-11.

In particular, Defendants appear to put significant weight on the complaint's

purported failure "to allege that ***all of*** the [Producer] Defendants engaged in parallel

conduct with respect to sharing information" with Wistisen. Mot. at 21 (emphasis in

original). But that is just one approach to pleading concerted action: Plaintiffs *may* do so

by identifying "parallel conduct" supplemented by a factual "context" suggesting that the

conduct resulted from "a preceding agreement," rather than from "independent" decision-

making. *Twombly*, 550 U.S. at 557. But in some circumstances, this approach makes

little or no sense because plaintiffs rely not on distinct, parallel acts by each conspirator,

13

but instead on collective actions that the conspirators undertook together, such as participating in a joint association or exchanging information with each other. *See Am. Needle*, 560 U.S. at 196-97; *Container Corp.*, 393 U.S. at 335; *Am. Linseed*, 262 U.S. at 380-86; *Am. Column*, 257 U.S. at 391-95.

Here, for example, the complaint identifies reciprocal information exchanges between competitors. *See supra* at 3-4. Plaintiffs thus had no need to allege "parallel conduct" that resulted from "a preceding agreement," *Twombly*, 550 U.S. at 557, because the alleged reciprocal exchanges themselves reflect an agreement. *See Container Corp.*, 393 U.S. at 335 (Requesting information and "furnish[ing]" it "with the expectation" of receiving "reciprocal information" was "concerted action."); *see also Interstate Circuit*, 306 U.S. at 227 ("Acceptance" of "an invitation" is "sufficient" even "without [a] previous agreement[.]").[6]

Moreover, Defendants state that "Plaintiffs have not alleged a single interfirm communication between any [Producer] Defendants." Mot. at 23. But *Interstate Circuit* contains no requirement that, to engage in concerted action by accepting an invitation for collective action, the invitation's recipients must directly communicate with one another.

---

[6] Defendants' argument about the purported lack of allegations as to "***all***" Producer Defendants, Mot. at 21, fails for an additional reason. It conflates two distinct inquiries: (1) whether the complaint alleges concerted action (which depends on whether the conduct "joins together separate decisionmakers," *Am. Needle*, 560 U.S. at 195), and (2) whether the complaint alleges that each of the named defendants is liable for that concerted action. Even if the complaint fails to show that some of the Defendants participated in the information exchange, that would not mean that the information-exchange claim lacks allegations of concerted action—and thus would not justify wholesale dismissal of that claim.

306 U.S. at 214-19, 226-27. *Masonite* likewise found concerted action even though each recipient "had no discussions with any of the others." 316 U.S. at 275. Instead, the conspirators' "aware[ness]" that the same invitation had been extended to others, coupled with "[a]cceptance" of that invitation, was sufficient. *Id.*; *Interstate Circuit*, 306 U.S. at 227.

Defendants' argument thus is incorrect to the extent it suggests that only direct "interfirm communications" can support a plausible inference of concerted action (Mot. at 23). Such a conclusion would be at odds with foundational Supreme Court information-sharing decisions, which held intermediary-facilitated exchanges unlawful. *See Am. Linseed*, 262 U.S. at 380-86, 389-90; *Am. Column*, 257 U.S. at 391, 394-97, 409-12. It would be equally at odds with the black-letter principle that "competitors cannot simply get around antitrust liability by acting through a third-party intermediary or joint venture." *Am. Needle*, 560 U.S. at 202 (internal quotation marks omitted) (quoting *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 335 (2d Cir. 2008) (Sotomayor, J., concurring in the judgment)).

Defendants' arguments also appear to go too far in another respect. Defendants fault Plaintiffs for failing to "allege that the [Producer] Defendants began using Mr. Wistisen's services around the same time or in the same way." Mot. at 21. But "[i]t is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Circuit*, 306 U.S. at 227. In *Masonite*, for example, the manufacturer entered into agreements with its

co-conspirators "on various dates" between October 1933 and June 1934.  316 U.S. at 268-70.

Finally, Defendants point to the exchanges' purportedly "infrequent nature" and suggest that the information shared was not sufficiently specific or sensitive to justify "a plausible inference of conspiracy."  Mot. at 24.  But the alleged infrequency is not dispositive of the concerted-action inquiry.[7]  In *Container Corp.*, the Supreme Court found an agreement "to furnish price information whenever requested" despite the "infrequency and irregularity of [the] price exchanges."  393 U.S. at 335.  Nor did the "sometimes fragmentary" nature of the information exchanged—or the information's "availab[ility]" through sources other than the exchange—undermine the Court's finding of "concerted action."  *Id.* at 335-36.

Indeed, although Defendants assert that the Department of Agriculture publicly reports sugar spot prices, *see* Mot. at 7 & n.7, the Supreme Court long ago found an intermediary-facilitated information exchange unlawful despite the defendants' objection that the shared information was "the equivalent" of material already available in "government publications."  *Am. Column*, 257 U.S. at 411.  The Court explained that,

---

[7] The purported infrequency may be relevant to whether Plaintiffs pleaded anticompetitive effects of the alleged information-exchange agreement (the second element of their standalone information-exchange claim, *see supra* at 7).  *See Todd*, 275 F.3d at 213 (considering "frequency" of meetings among information exchangers in assessing exchanges' competitive effects).  The purported infrequency may also bear on whether the alleged information exchanges can be used to infer a price-fixing agreement. *See In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1069 (8th Cir. 2017) (complaint pleaded "price-fixing conspiracy" based on, *inter alia*, "dozens of calls, emails, and in-person meetings" among defendants).  This Statement takes no position on these issues.

despite "the published reports," the private data exchanges posed special risks because customers were not privy to those exchanges and because the intermediary was able to promote "harmony of action." *Id.* Plaintiffs allege that the information sharing in this case presented similar risks: Commodity purportedly did not make the information available to sugar purchasers, and the conspirators allegedly used their exchanges to "ensur[e] alignment" by "signal[ing] pricing intentions to their competitors." Compl. ¶¶ 69-70, 83.

## CONCLUSION

This Court should not create a heightened pleading bar for information exchanges conducted through intermediaries.

17

June 24, 2025

Respectfully submitted,

*/s/ Peter M. Bozzo*

ABIGAIL A. SLATER
*Assistant Attorney General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
PETER M. BOZZO
*Attorneys*

ROGER P. ALFORD
*Principal Deputy Assistant Attorney General*

MARK H. HAMER
*Deputy Assistant Attorney General*

*United States Department of Justice Antitrust Division*
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
Phone: (202) 803-1196
Email: peter.bozzo@usdoj.gov

DAVID B. LAWRENCE
*Policy Director*

*/s/ Joseph H. Thompson*
JOSEPH H. THOMPSON
Acting United States Attorney

*/s/ Liles H. Repp*
LILES H. REPP
Attorney ID No. 0400692
Assistant United States Attorney
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
Phone: (612) 664-5600
Fax: (612) 664-5788
Email: Liles.Repp@usdoj.gov

18