**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| IN RE: GRANULATED SUGAR ANTITRUST LITIGATION | Civil No. 0:24-md-3110 (JWB/ECW) |
| This Document Relates To:<br><br>All Class Actions | **AMENDED MASTER CONSOLIDATED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**PUBLIC REDACTED VERSION**

## TABLE OF CONTENTS


I. NATURE OF THE ACTION .......... 2

II. PARTIES .......... 5

A. Plaintiffs .......... 5

1. Direct Purchaser Plaintiffs .......... 5

2. Commercial Indirect Purchaser Plaintiffs .......... 6

3. Consumer Indirect Purchaser Plaintiffs .......... 6

B. Defendants .......... 7

1. Producer Defendants .......... 7

2. Commodity Defendants .......... 17

3. Agents and Co-conspirators .......... 19

III. JURISDICTION, VENUE, AND COMMERCE .......... 20

IV. FACTUAL ALLEGATIONS .......... 21

A. The Market for Granulated Sugar in the United States .......... 21

B. The Defendants Have Market Power .......... 23

C. Defendants Unlawfully Raised, Fixed, Maintained, or Stabilized Prices of Granulated Sugar in the United States. .......... 26

1. Defendants Unlawfully Shared Confidential Price and Sales Information Through Commodity. .......... 26

2. Mechanism of Information Exchange. .......... 27

3. Defendants Communicated Directly and Worked Together to Maintain High Prices .......... 65

4. Defendants Relied Upon the Exchanged Competitively Sensitive Information. .......... 67

5. Defendants Agreed to a Common Formula to Fix Prices. .......... 69

6. As a Result of Defendants' Misconduct, the Producer Defendants' Sugar Prices Increased Dramatically During the Class Period .......... 71

D. Additional Plus Factors Support the Existence of a Conspiracy .......... 75

1. The Market is Highly Concentrated, and the Defendants Are the Dominant Firms .......... 76

2. Barriers to Entry Are High .......... 76

3. Demand for Sugar is Inelastic .......... 77

4. Defendants Are Vertically Integrated .......... 77

5. Defendants Had Numerous Opportunities to Collude ..................... 78

6. Granulated Sugar is a Commodity ................................................ 84

7. There is a History of Anticompetitive Conduct in the Sugar Industry ........................................................................................ 85

E. Defendants' Information Exchange Is an Independent Violation of Section 1 of the Sherman Act ........................................................................ 88

F. The USDA Sugar Program Does Not Render the Conspiracy Less Plausible ........................................................................................ 89

G. Defendants' Anticompetitive Conduct Proximately Caused Plaintiffs and Members of the Classes to Suffer Antitrust Injury and Damages ............... 91

V. LIMITATIONS AND TOLLING ........................................................ 92

VI. CLAIMS FOR RELIEF ...................................................................... 94

VII. Prayer for relief ................................................................................ 98

## GLOSSARY

| **Term/Abbreviation** | **Definition** |
|---|---|
| Bulk basis | Refers to product sold loose and in large quantities, rather than packaged in individual bags, containers, or retail units. |
| Bulk FOB gross | Gross price or sales value of a product sold in bulk on FOB terms. |
| CWT | Refers to hundredweight, or 100 pounds; a quoted price of $10.00/cwt means $10.00 per 100 pounds. |
| FOB | An abbreviation for "free on board," where the buyer takes goods free of freight charges at the seller's location. |
| Futures contracts | An agreement to buy or sell a specified quantity at a predetermined price for delivery at a future time. |
| Gross | The total value prior to applying any deductions. |
| Rail volume | The quantity of product shipped by railroad. |
| RRV | An abbreviation for the "Red River Valley" region, where the majority of sugar beet production occurs in the United States. |
| Slicing time-tables | The schedule for when a factory will slice and process sugar beets into sugar. |
| Tonnage | The quantity or volume of the product measured in tons. |
| TPA | An abbreviation for "tons per acre." |

1. Plaintiffs[1], on behalf of themselves and the three classes they seek to represent under Rule 23 of the Federal Rules of Civil Procedure, respectively (collectively the "Classes" or "Class Members"),[2] upon personal knowledge as to the facts pertaining to themselves and upon information and belief and investigation by counsel as to all other matters, bring suit against Defendants ASR Group International, Inc. ("ASR Group"), American Sugar Refining, Inc. ("ASR"), Domino Foods, Inc. ("Domino," together with ASR Group and ASR, "ASR/Domino"); Florida Crystals Corporation ("Florida Crystals"); Michigan Sugar Company ("Michigan Sugar"); National Sugar Marketing ("NSM") and its two sugar producing member owners Amalgamated Sugar Company ("Amalgamated") and Southern Minnesota Beet Sugar Cooperative ("So-Minn"); Western Sugar Cooperative ("Western"); United Sugar Producers & Refiners f/k/a United Sugars Corporation ("United") and its four sugar producing member owners United States Sugar Corporation ("U.S. Sugar"), American Crystal Sugar Company ("American Crystal"), Minn-Dak Farmers Cooperative ("Minn-Dak"), and Wyoming Sugar Company LLC ("Wyoming") (together, the "Producer Defendants"); Commodity Information, Inc. ("Commodity"), and Richard Wistisen ("Wistisen," together with Commodity, "Commodity Defendants," and together with the Producer Defendants, "Defendants"), for violations of Sections 1 and 3

[1] "Plaintiffs" herein refers to the Direct Purchaser Plaintiffs, Commercial Indirect Purchaser Plaintiffs, and Consumer Indirect Purchaser Plaintiffs.

[2] Direct Purchaser Plaintiffs, Commercial Indirect Purchaser Plaintiffs, and Consumer Indirect Purchaser Plaintiffs seek to represent different Classes, as defined in their respective Amended Short-Form Complaints.

of the Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1, 3.[3] Beginning at least as early as January 1, 2019, and continuing through the date upon which any Class is certified by the Court ("Class Period").

## I. NATURE OF THE ACTION

2. During the Class Period, the leading sugar producers in the United States conspired to fix prices and exchange competitively sensitive information about pricing and production with the purpose and effect of increasing prices of Granulated Sugar to artificially high levels. As a result of and in furtherance of the conspiracy, Producer Defendants charged, and Plaintiffs and Class Members paid, artificially high prices for Granulated Sugar.

3. To implement their price-fixing conspiracy, Defendants exchanged detailed, competitively sensitive, non-public information about Granulated Sugar prices, capacity, sales volume, supply, and demand, in addition to other conduct alleged herein.

4. An agreement to share, and the sharing of, competitively sensitive, non-public information among horizontal competitors is itself an unlawful information exchange that is an independent violation of Section 1 of the Sherman Act. The Producer Defendants' agreement to share and the sharing of confidential price, sales, supply, volume and production levels (*e.g.*, harvest and planting data), and demand data with their competitors also served as an effective enforcement mechanism for a price-fixing scheme.

[3] The Commercial Indirect Purchaser Plaintiffs and the Consumer Indirect Purchaser Plaintiffs also bring claims for violations of state law, as set forth in their respective Amended Short-Form Complaints.

5. The Producer Defendants effectuated the conspiracy in three ways: through the Commodity Defendants, through other conduits, such as Ron Sterk, an editor of Sosland Publishing, and working directly together to prop up the price of sugar, including by use of a common formula to peg prices to certain sugar futures prices.

6. The Producer Defendants acted upon this agreement by sharing specific information through Wistisen and Commodity regarding the Producer Defendants' prices, production levels, and sold positions[4]—all of which are key metrics and highly competitively sensitive information in this market that rivals would not share with each other in the absence of an agreement. Wistisen and Commodity actively facilitated the conspiracy as a key conduit through which Producer Defendants exchanged competitively sensitive information and otherwise conspired to fix and artificially increase prices paid by Plaintiffs and members of the Classes.

7. The information gathered and disseminated through Wistisen and Commodity was made available on a confidential basis to certain sugar producers, including each Producer Defendant and their top executives, and cannot be accessed by the public or other sugar suppliers.

8. The Producer Defendants also shared competitively sensitive information through Ron Sterk, a senior editor at Sosland Publishing. [redacted]

[4] A sold position, as applied here, is the percentage of a seller's supply of Granulated Sugar that is no longer available to purchase. As a seller's sold position increases, that seller will generally raise prices. The sold position thus provides important information about the extent to which a supplier will or will not be aggressive on price going forward.

[redacted]

9. The Producer Defendants were engaged in a give-to-get scheme through intermediaries—including Commodity and Sterk—whereby they gave one another mutual, reciprocal assurances that each would provide competitively sensitive information.

10. Just as the antitrust laws do not allow competitors to exchange competitively sensitive information directly to stabilize or control industry pricing, they also prohibit the use of an intermediary to do the same. Simply put, the Producer Defendants cannot use an intermediary to shield their information exchange from antitrust liability.

11. It was contrary to each Producer Defendant's individual self-interest to share such competitively sensitive information with horizontal competitors. The reciprocal and mutual agreement, and sharing of such information, facilitated and maintained a price-fixing conspiracy and reassured each Producer Defendant that its co-conspiring competitors would adhere to the conspiracy. The Producer Defendants also purchased Granulated Sugar from one another to stabilize supply and maintain high prices.

12. The ubiquitous sharing of such information by the Producer Defendants served as an important monitoring and enforcement mechanism for their cartel.

13. In addition to sharing competitively sensitive information contrary to their unilateral self-interests, additional plus factors support the existence of a price-fixing conspiracy: the structure of the Granulated Sugar industry is vertically integrated and highly concentrated, barriers to entry are high, sugar is a commodity product for which demand is inelastic, and the Producer Defendants had numerous opportunities to collude,

including through meetings at trade organizations and industry events, such as the International Sweetener Colloquium, where the Producer Defendants would meet and directly exchange pricing information.

14. Indeed, Defendants were able to successfully implement their conspiracy because the sugar industry is structurally susceptible to collusion. In fact, for more than 80 years, the industry has been marked by repeated violations of the antitrust laws, including conduct remarkably similar to that alleged here.

15. Producer Defendants also colluded by pegging their prices to the prices of certain sugar futures contracts, as discussed below.

16. As a result of Defendants' conspiracy, Granulated Sugar prices reached all-time highs during the Class Period, with nominal retail prices of Granulated Sugar in the U.S. rising 69% between January 2019 and October 2024, far outpacing inflation.

17. Among the victims of the conspiracy are Consumer Indirect Purchasers (*e.g.*, retail purchasers), Commercial Indirect Purchasers—including restaurants, bakeries, coffee shops, and confectionaries—and Direct Purchasers, all of whom paid more for Granulated Sugar during the Class Period than they would have paid in a competitive market but for the unlawful conspiracy and acts in furtherance alleged herein.

## II. PARTIES

### A. Plaintiffs

#### 1. Direct Purchaser Plaintiffs

18. Plaintiffs KPH Healthcare Services, Inc. ("KPH"), Northern Frozen Foods, Inc. d/b/a Northern Haserot ("Northern"), Wakefern Food Corp. ("Wakefern"), Redner's

Markets, Inc. ("Redner's"), and C.A. Curtze Co. ("Curtze") purchased Granulated Sugar directly from one or more of the Producer Defendants that was sold at prices artificially inflated by one or more of the Producer Defendants or their co-conspirators during the Class Period.

**2. Commercial Indirect Purchaser Plaintiffs**

19. Commercial Indirect Purchaser Plaintiffs Union LLC d/b/a Union Hospitality Group, Pattibakes LLC, WNT, LLC, WNT Farmington, LLC, The Union Public House, LLC, Natile Inc. d/b/a Alpine View Family Restaurant, Portland Hunt-Alpine Club, LLC, Morelos Bakery LLC, Up at 4, Inc. d/b/a Great Harvest Bread Co., Gladys' Restaurant, LLC d/b/a Gladys', SAM Restaurants, Inc. d/b/a Carolina's Diner, King Kullen Grocery Co., Inc., PCA Too, LLC d/b/a Sugar Bakeshop, The Coffee Bean LLC, Bambu Las Vegas LLC, Madison's Closet and Farm L.L.C., Snaadt Ventures LLC d/b/a/ Helen Bernhard Bakery, Strange Donuts, LLC, and Bake Dance, LLC (collectively "Commercial Indirect Purchaser Plaintiffs") purchased Granulated Sugar indirectly from one or more of the Producer Defendants or their co-conspirators during the Class Period.

**3. Consumer Indirect Purchaser Plaintiffs**

20. Consumer Indirect Purchaser Plaintiffs ("Consumer Plaintiffs") are persons that indirectly purchased Granulated Sugar at retail for end use and not for resale in the United States during the Class Period. The identity of each Consumer Plaintiff is set forth in the Amended Consumer Short Form Complaint filed herewith.

### B. Defendants

#### 1. Producer Defendants

##### a) ASR/Domino Defendants

21. Defendant ASR Group is a privately held Florida corporation with its principal place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida 33401. It is a global producer and seller of Granulated Sugar. ASR Group owns five sugar refineries in North America, including three in the United States: Baltimore, Maryland; Chalmette, Louisiana; and Crockett, California. ASR Group operates the only sugar refineries in Maryland and California. Until December 31, 2025, ASR Group also owned and operated a cane sugar refinery in New York, which was the only refinery in the Northeast until November 2022.

22. ASR Group holds itself out as "the world's largest refiner and marketer of cane sugar with an annual production capacity of 6 million metric tons of sugar." It asserts that it sells its products to "customers in key channels, including grocery, industrial, foodservice and specialty." ASR Group is a subsidiary of the Florida Crystals Corporation and Sugar Cane Growers Cooperative of Florida, business enterprises of the global sugar empire Fanjul Corp. ASR Group owns, as a subsidiary, Co-Defendant Domino. ASR Group is vertically integrated and owns sugar processing, marketing, and sales companies in Canada, the United Kingdom, Portugal, Mexico, and Belize.

23. Defendant ASR is a privately held Florida corporation and global producer and seller of Granulated Sugar based in West Palm Beach, Florida.

24. Defendant Domino is ASR Group and ASR's marketing and sales subsidiary for Granulated Sugar, with a current principal place of business at 1 North Clematis Street, Suite 200, West Palm Beach, Florida.

25. Defendants ASR Group, ASR, and Domino are collectively referred to herein as "ASR/Domino."

26. ASR/Domino markets most of its Granulated Sugar under the Domino® and C&H brand names but also sells sugar under the brand names Florida Crystals, Redpath, Tate & Lyle, Lyle's, and Sidul. It also sells sugar under numerous private label brands.

27. Florida Crystals is a privately held Delaware corporation with its principal place of business at One North Clematis Street, Suite 200, West Palm Beach, FL 33401. Florida Crystals is valued at an estimated $8.2 billion and is the third largest private company in Florida.

28. In addition to owning ASR/Domino, Florida Crystals produces raw cane sugar and various sugar products. These products include organic light brown sugar, organic powdered sugar and turbinado cane sugar. Florida Crystals is the largest certified regenerative organic sugar farm in the United States and recorded a revenue of $5.75 billion in 2024. Florida Crystals brand Granulated Sugar was sold during the Class Period.

29. There is significant overlap between the employees of ASR/Domino and Florida Crystals. Both companies share high level executives and employees. For example, Florida Crystals Co-President, Luis Fernandez is a Director, Chairman of the Board, and President of ASR Group International, Inc. Similarly, Alejandro Londono, Florida

Crystal's VP, CEO and Treasurer, and Jose "Pepe" Fanjul, Jr., Florida Crystals' Co-President are Directors of ASR, ASRGI, and Domino.

30. Florida Crystals also shares its General Counsel with ASR/Domino. Florida Crystals' VP, General Counsel, and Secretary, Armando Tabernilla, is the Director, VP and General Counsel and Secretary of Domino Foods, Inc., a VP, Director, General Counsel and Secretary of ASR Group, International Inc., and the VP, General Counsel and Secretary of American Sugar Refining, Inc.

31. [redacted].

32. [redacted]

33. [redacted]

34. [redacted]

[redacted].

35. Pepe Fanjul, Jr., Shackelford, and Sproull all held board positions in the Sugar Association. [redacted]

36. As a sugar manufacturer, Florida Crystals not only benefitted directly from participating in the conspiracy - but also benefitted as a parent company of ASR/Domino. Florida Crystals wholly owns ASR/Domino—given the ownership structure, reporting structure, and the overlap between high level executives and other personnel, Florida Crystals directly or indirectly controlled ASR/Domino's finances, policy, and business decisions with respect to the alleged conduct.

37. Given the extraordinary degree of corporate overlap between Florida Crystals and ASR/Domino, including that Jose "Pepe" Fanjul, Jr. holds high-level positions at both ASR/Domino and Florida Crystals, information necessarily flowed from one entity to another. Both entities engaged in the conspiracy and conduct alleged herein.

38. Florida Crystals benefitted as an owner of ASR/Domino. Benefits that ASR/Domino derived as a result of the conspiracy and conduct alleged herein flowed to and were conferred upon Florida Crystals.

**b) United Sugar Defendants**

39. Defendant United, a Minnesota corporation, is a marketing cooperative based in Edina, Minnesota. United has four member owners: (1) United States Sugar Corporation ("U.S. Sugar"); (2) American Crystal Sugar Company ("American Crystal"); (3) Minn-Dak Farmers Cooperative ("Minn-Dak"); and (4) Wyoming Sugar Company, LLC, ("Wyoming"). The latter three grow and process sugar beets at eight production facilities located in Minnesota, Montana, North Dakota, and Wyoming, while U.S. Sugar grows and processes sugar cane in Florida. United sells sugar under the United, Crystal Sugar, Imperial, and Dixie Crystals brands—the latter two of which were Imperial brands before Imperial was acquired by U.S. Sugar in 2022. United also sells beet and cane sugar sold under numerous private label brands.

40. United touts that "[b]ecause United has a unique, fully integrated business structure, we provide and transport sugar throughout the nation. We have 9 sugar producing plants, primarily in the Red River Valley along the border of North Dakota and Minnesota. We also produce beet sugar in Montana and Wyoming, as well as cane sugar in the Florida Everglades."

41. United sells Granulated Sugar in bulk via truck and rail car. It also sells Granulated Sugar in various size packaging, including retail-size bags, 25-pound bags, 50-pound bags, and super sacks of 2,000 pounds.

42. United functions as the sole authorized marketer and seller of Granulated Sugar produced by its member owners U.S. Sugar, American Crystal, Minn-Dak, and Wyoming. United's Uniform Member Marketing Agreement expressly designates United

as the "sole worldwide agent in the sale and marketing" of its member owners' Granulated Sugar. United is responsible for locating customers, negotiating sales contracts, managing logistics, and setting the prices of sugar products (including Granulated Sugar) produced by its member owners.

43. United is owned and controlled by its member owners U.S. Sugar, American Crystal, Minn-Dak, and Wyoming and operates solely for their commercial benefit. United's four-member Executive Management Committee is comprised of the Chief Executive Officers of its member owners. [redacted]

44. United acted as an agent for its member owners U.S. Sugar, American Crystal, Minn-Dak, and Wyoming in pricing, marketing, and selling their Granulated Sugar. The process worked as follows: (1) each member owner was responsible for informing United of the volume of Granulated Sugar it would be producing and when for the next fiscal year; (2) all Granulated Sugar produced by the member owners for each fiscal year were pooled together; (3) United—who was authorized to sell in the name of the member owners and pass title on their behalf—sold the pooled Granulated Sugar at the highest net selling price possible; and (4) after accounting for certain authorized expenses, United paid each member owner their pro rata share of the proceeds from all Granulated Sugar sold by United. United and its four member owners compete in the U.S. Granulated Sugar market as one entity.

45. Defendant U.S. Sugar grows and processes sugar cane, citrus and sweet corn. It accounts for 13% of all refined sugar produced in the United States. U.S. Sugar grows,

harvests and processes sugar cane into Granulated Sugar that is sold for use by food manufacturers and packaged into small bags for retail. It farms sugar cane on over 245,000 acres. Since 1931, it has owned and operated a cane mill in Clewiston, Florida where it built a refinery in 1998. In 2008, the Clewiston facility became the world's largest vertically integrated cane sugar mill and refinery, processing up to 42,000 tons of cane per day. As a member owner of United, U.S. Sugar sells all of the sugar it produces through United.

46. On March 24, 2021, U.S. Sugar announced an agreement with Louis Dreyfus Company to acquire the business and assets of Imperial Sugar Co. The various facilities, consumer brands, and raw/refined sugar inventories were included in the purchase.

47. On November 30, 2022, U.S. Sugar Savannah completed its acquisition of Imperial from Louis Dreyfus. U.S. Sugar Savannah is wholly owned by U.S. Sugar. U.S. Sugar Savannah holds the trademarks to "Imperial Sugar," and "Imperial Sugar" customers are directed by the "Imperial Sugar" website to contact U.S. Sugar Savannah for customer service.

48. U.S. Sugar Savannah, which is wholly owned and controlled by U.S. Sugar, is a mere continuation of Imperial. Upon the purchase of Imperial Sugar Co. from Louis Dreyfus, all former Imperial Sugar employees continued as U.S. Sugar Savannah employees, all contractual obligations of Imperial were assumed, nothing changed ongoing execution of supply contracts with customers, and customer service representatives and sales contacts remained the same. Payments were directed to the same bank account, with

the name of the account changing to U.S. Sugar Savannah. Since the acquisition, all Imperial Granulated Sugar is sold through United.

49. Defendant American Crystal is a beet sugar cooperative located in Moorhead, Minnesota. American Crystal is the largest beet sugar manufacturer in the United States. Its namesake brand Crystal Sugar is available for retail sales in 4-, 5- and 10-pound bags. As a member owner of United, American Crystal sells all of the sugar it produces through United.

50. Defendant Minn-Dak was formed in 1972 as the first sugar beet cooperative in the United States. Minn-Dak is located in Wahpeton, North Dakota, within the Red River Valley. It has a sugar beet processing plant located in Wahpeton. As a member owner of United, Minn-Dak sells all of the sugar it produces through United.

51. Defendant Wyoming joined United as a member owner in 2018. It owns and operates a sugar beet factory in Worland, Wyoming, where it produces approximately 1 million cwt of sugar annually. As a member owner of United, Wyoming sells all the sugar it produces through United.

52. Benefits that United derived as a result of the conspiracy and conduct alleged herein flowed to and were conferred upon its member owners U.S. Sugar, American Crystal, Minn-Dak, and Wyoming.

53. Defendants United, U.S. Sugar, U.S. Sugar Savannah, American Crystal, Minn-Dak, and Wyoming and Imperial are sometimes collectively referred to herein as "United."

**c) Michigan Sugar**

54. Defendant Michigan Sugar is a Michigan corporation with its principal place of business at 122 Uptown Drive, Suite 300, Bay City, Michigan 48708. It is a cooperative consisting of nine hundred sugar beet owners and a global producer and seller of Granulated Sugar under the brand names Pioneer Sugar and Big Chief Sugar. It also sells Granulated Sugar under various store brands. Michigan Sugar owns and operates sugar beet processing facilities in Bay City, Caro, Croswell, and Sebewaing, Michigan. It owns a production facility in Toledo, Ohio, and an agricultural research center in Bay County, Michigan. It also has warehouse facilities in Michigan and Ohio. Michigan Sugar is the only producer of Granulated Sugar in the state of Michigan.

55. Michigan Sugar sells Granulated Sugar in bulk and various sizes of packaging, including retail-size packages, 25-, 50-, and 100-pound bags, and super sacks of 2,000 to 2,500 pounds.

**d) National Sugar Marketing Defendants**

56. Defendant National Sugar Marketing ("NSM") is a cooperative of sugar producers and the exclusive marketer and seller of refined sugar produced by its member owners (1) Southern Minnesota Beet Sugar Cooperative, (2) Amalgamated Sugar Company, and starting in 2025, (3) Western Sugar Cooperative. It sells Granulated Sugar in bulk, railcars, and supersacks up to 2,500 pounds, and 50 pound bags. It also sells Granulated Sugar in retail packaging of 1-, 2-, 4- and 10-pound bags or 25-pound industrial bags.

57. NSM is owned and controlled by its member owners and operates solely for their commercial benefit. NSM acted as an agent for its member owners in the pricing, marketing, and selling of Granulated Sugar. Upon information and belief, NSM's process for pricing, marketing, and selling Granulated Sugar for its member owners is similar to the process between United and its member owners. NSM, So-Minn, Amalgamated, and Western compete as one entity in the U.S. Granulated Sugar market. Benefits that NSM derived as a result of the conspiracy and conduct alleged herein flowed to and were conferred upon NSM's member owners.

58. Defendant Amalgamated Sugar Company ("Amalgamated") is a sugar-beet cooperative based in Boise, Idaho. It is the founding member of NSM and all sugar it produces is marketed and sold by NSM. Amalgamated has three sugar production facilities in Idaho. It also has sugar warehouses in Colorado, Oregon, and Utah.

59. NSM markets Amalgamated's sugar under the White Satin Brand name and approximately thirty different private brands and labels.

60. Defendant Southern Minnesota Beet ("So-Minn") is a beet sugar cooperative located in Renville, Minnesota. It also owned the only sugar beet factory in California, until that factory closed in 2025. It sells its Granulated Sugar in bulk, 50 pound bags, and super sacks weighing up to 2,000 pounds. Since 2016, So-Minn has been a member of NSM, which markets and sells all of So-Minn's sugar.

61. Defendant Western Sugar Cooperative ("Western") is a beet sugar cooperative that owns and operates four sugar-beet plants located in Colorado, Montana, Nebraska, and Wyoming. Until it joined NSM in 2025, it marketed and sold its own sugar

under the GW brand in 2-, 4-, 10-, and 25-pound bags. It also sells bulk rail, bulk truck, bulk totes and 25- and 50-pound bags for food processing and food service.

### 2. Commodity Defendants

62. Defendant Commodity is a Delaware corporation with a principal place of business at 3115 East Lion Lane, Suite 160, Salt Lake City, Utah, 84121 and, more recently, an address of 401 E. Main Street, Montrose, Colorado, 81401.

63. [redacted]

64. [redacted] During the Class Period, Commodity has been a strawman entity and tool for Defendants to exchange competitively sensitive information and otherwise conspire.

65. Commodity otherwise has no public presence. It does not maintain a website on the internet. It does not advertise its services to the public. It does not publish publicly available reports on the sugar industry or offer to sell or provide any reports on or analysis of the sugar industry to other than a select few, largely current or former Defendants and their members or affiliated entities or associations, as alleged herein.

66. Defendant Richard Wistisen is the sole owner and operator of Commodity who, as part of Defendants' unlawful conspiracy, collects and shares confidential, proprietary, and competitively sensitive non-public information between the Producer Defendants. For Producer Defendants to receive the information from Wistisen, they needed to "give to get." In short, they needed to supply their competitively sensitive information to receive similar information from their competitors through Commodity and Wistisen.

67. Defendants Commodity and Wistisen are alter egos, and reference to one is a reference to the other.

68. Throughout the Class Period, the Producer Defendants utilized Wistisen to facilitate the conspiracy and the exchange of confidential, proprietary, and competitively sensitive non-public information, regarding, among other things, prices, capacity, demand, sales volume, supply and other key production and pricing metrics in furtherance of the conspiracy. Throughout the Class Period, the Producer Defendants utilized Wistisen to implement, monitor, and/or enforce the conspiracy and the exchange of confidential, proprietary, and competitively sensitive non-public information.

69. [redacted]:

- [redacted];
- [redacted];
- [redacted];
- [redacted]; [redacted]
- [redacted].

70. [redacted].

3. **Agents and Co-conspirators**

71. Various other persons, firms, and corporations not named as defendants herein have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

72. Whenever reference is made to any act of a corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents,

employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

73. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers, acquisitions, asset purchase agreements, or other business combinations.

## III. JURISDICTION, VENUE, AND COMMERCE

74. This action arises under Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26.

75. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337.

76. Venue is proper in this District under 15 U.S.C. §§ 15(a), 22, and 28 U.S.C. § 1391(b), (c), and (d) because, during the Class Period, Defendants resided, transacted business, were found, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

77. During the Class Period, Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States and its territories.

78. During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, interstate railways, interstate highways, and the United States Mail, to effectuate their illegal scheme.

79. Defendants' conduct also had a substantial effect on the intrastate commerce of each State in the United States and the District of Columbia.

80. This Court has personal jurisdiction over each Defendant because each Defendant transacted business, maintained substantial contacts, and is located and/or committed unlawful conduct in this District. Defendants' unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District and each State and Territory of the United States and the District of Columbia.

## IV. FACTUAL ALLEGATIONS

### A. The Market for Granulated Sugar in the United States

81. The U.S. sugar production process starts from beet and cane fields. About 56% of the sugar production is beet sugar and 44% is cane sugar. After processing, beet sugar and cane sugar are reasonably interchangeable.

82. "Granulated Sugar," also known as "white," or "table" sugar, is made by extracting juice from the sugar cane or sugar beet, processing the juice to remove impurities and to concentrate it into a thick syrup, boiling it until sugar crystals form, separating the sugar crystals from the syrup in a centrifuge, drying the sugar crystals with hot air, and grinding them to uniform size.[5]

[5] "Refined Sugar" as that term is used herein, refers to sugar that is extracted from sugar cane or sugar beets and processed to yield food grade sugar. Granulated Sugar is one form of Refined Sugar, along with brown sugar, powdered sugar, and liquid sugar.

83. Granulated Sugar is considered the gold standard of sweeteners with a clean, pleasant sweetness and no secondary taste or aftertaste. Granulated Sugar is the most common sweetener used in home food preparation, and cookbooks and consumers tend to dislike any sugar substitute that does not match its sweetness profile. Eighty percent of all sugar sold in the United States is Granulated Sugar.

84. The sugar processing industry generated an estimated $13.5 billion in revenues in 2024.

85. Defendants, either directly or via their marketing affiliates, market and sell Granulated Sugar to customers, including food and beverage manufacturers, retailers, and food service companies. Defendants also sell Granulated Sugar to distributors who resell or further refine it into various other types of sugar products.

86. Granulated Sugar is a staple food commonly used by commercial, industrial, and institutional users such as bakeries, restaurants, confectionaries, and food manufacturers, as well as consumers as an ingredient in baking, cooking, and sweetening foods and drinks. Commercial, industrial, and institutional users (*i.e.*, the proposed class of Commercial Indirect Purchasers) purchase the Producer Defendants' Granulated Sugar through direct purchaser intermediaries such as wholesalers or food service distributors, (*i.e.*, the proposed class of Direct Purchasers), which in turn purchase Granulated Sugar directly from the Defendants. Consumer Indirect Purchasers generally purchase such sugar at retail for end use.

87. Granulated Sugar, regardless of whether it is made from sugar cane or sugar beets, is a commodity product with little or no differentiation based on the producer.

Typically, competition for commodity products is based on price as opposed to other attributes such as product quality or customer service; as a result, a commodity such as Granulated Sugar is susceptible to cartel behavior.

88. Due to the lack of product differentiation, the Producer Defendants are forced to compete on price, such that the pricing decisions of each Granulated Sugar producer affect the market price for Granulated Sugar.

**B. The Defendants Have Market Power**

89. During the Class Period, the Producer Defendants collectively controlled approximately [redacted] of the Granulated Sugar market in the United States ("Relevant Market"). The Producer Defendants recognize their dominant position. For instance, in an email string discussing United's acquisition of Imperial, ASR/Domino noted the view that there is "1 less competitor and now 3 companies account for 75% of the market."

90. The 2024 estimated share of each Producer Defendant by capacity is shown in Figure 1 below:

| Marketing Entity | Refining Entity | Capacity (cwt) | % Share |
|---|---|---|---|
| **Domino Foods, Inc.** | **American Sugar Refining, Inc.** | | |
| | Chalmette, LA | 20,500,000 | |
| | Baltimore, MD | 16,500,000 | |
| | Crockett. CA | 17,000,000 | |
| | Yonkers, NY | 12,250,000 | |
| | **Florida Crystals Corp.** - South Bay, FL | 6,600,000 | |
| | **Total** | **72,850,000** | **30%** |
| **United Sugar Cooperative** | **American Crystal Sugar Co.** | 40,000,000 | |
| | **U.S. Sugar Corp.** – Clewiston, FL | 18,000,000 | |
| | **U.S. Sugar Savannah Refinery** - Savannah, GA | 18,600,000 | |
| | **Minn-Dak Farmers Co-op** – Wahpeton, ND | 9,600,000 | |
| | **Wyoming Sugar Co.** - Worland, WY | 1,100,000 | |
| | **Total** | **87,300,000** | **36%** |
| **National Sugar Marketing LLC** | **Amalgamated Sugar Co.** | | |
| | Snake River Sugar Co. | 23,500,000 | |
| | **Southern Minnesota Beet Sugar Cooperative** | | |
| | Renville, MN | 10,100,000 | |
| | Brawley, CA | 3,350,000 | |
| | **Total** | **36,950,000** | **15%** |
| **Cargill, Inc.** | **Louisiana Sugar Refining LLC** - Gramercy, LA | **20,000,000** | **8%** |
| **Michigan Sugar Co.** | **Michigan Sugar Co.** | **14,500,000** | **6%** |
| **Western Sugar Cooperative** | **Western Sugar Cooperative** | **12,000,000** | **5%** |
| **Grand Total** | | **243,600,000** | |

Figure 1.

Producer Defendants account for 92% of domestic production capacity.

91. The following chart indicates the Producer Defendants' collective market share is approximately [redacted]

[redacted]

Figure 2

92. The domestic market for Granulated Sugar experienced significant consolidation in recent years, helping to facilitate cartel conduct. For instance, in 2019, United sought to acquire competitor Imperial Sugar from Louis Dreyfus. Subsequently, U.S. Sugar, one of the four member-owners of United, entered into an asset purchase agreement whereby a newly formed subsidiary, U.S. Sugar Savannah, would acquire Imperial, and United would market and sell all Granulated Sugar produced by Imperial.

93. In 2021, the U.S. Department of Justice ("DOJ") sued to block the proposed merger, arguing that the acquisition would leave the overwhelming majority of sales across

the Southeast in the hands of only two producers and would create higher prices for businesses and consumers in the Southeastern United States. The district court was not persuaded by the DOJ's limitation of the relevant geographic market to the Southeast. The merger was finalized on November 30, 2022.

### C. Defendants Unlawfully Raised, Fixed, Maintained, or Stabilized Prices of Granulated Sugar in the United States.

#### 1. Defendants Unlawfully Shared Confidential Price and Sales Information Through Commodity.

> "Genuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals . . . ."
>
> —*American Column & Lumber Co. v. United States*, 257 U.S. 377, 410 (1921)

94. Defendants engaged in a systematic and deliberate scheme to exchange competitively sensitive, non-public information to suppress competition and maintain artificially high prices for Granulated Sugar in the United States. Through a network of coordinated exchanges facilitated primarily by Commodity, the Producer Defendants—United and its member owners, ASR/Domino and its owner Florida Crystals, Michigan Sugar, NSM and its member owners, and Western—shared and received current pricing, sold positions, crop size and yields, and forward-looking price strategies. These exchanges were not publicly accessible and were not anonymized. Instead, they used either specific company names or apparent references to specific Producer Defendants based on geography or other identifying factors, thus serving only the agreed conspiratorial purposes of the Producer Defendants. There is no economically rational reason for the Producer

Defendants to share such commercially sensitive information with their competitors in the absence of an agreement.

95. During the Class Period, the Defendants conspired to fix, raise, maintain, and stabilize the price of Granulated Sugar sold in the United States. Their information sharing scheme is a plus factor that supports the existence of Defendants' *per se* unlawful price-fixing conspiracy in violation of Section 1 of the Sherman Act.

96. Additionally, Defendants' information sharing scheme is, in and of itself, an independent violation of Section 1 of the Sherman Act, analyzed under the Rule of Reason.

97. The conspiratorial exchanges between the Defendants were neither incidental nor benign. For example, on multiple occasions, senior executives at Producer Defendants explicitly sought to signal pricing intentions to their competitors. Internal communications reveal efforts to share updates on market "tightness," forward-looking price increases, and inventory conditions through Commodity, ensuring alignment among the Producer Defendants. These exchanges were instrumental in setting supra-competitive prices.

98. The exchange of pricing, crop and yield, and sold-position information by the Producer Defendants was intended to ensure—and did ensure—higher prices for Granulated Sugar than would have existed in a competitive market unaffected by the Defendants' anticompetitive agreement.

**2. Mechanism of Information Exchange.**

99. Commodity acted as a clearinghouse by collecting detailed, sensitive non-public information from the Producer Defendants, and rapidly redistributing it by

agreement to other Producer Defendants within the cartel. The information exchanged, which included current and forward-looking information, allowed the Defendants to avoid price competition and coordinate their pricing strategies in real-time. For example, knowing a producer's production information, such as tons per acre combined with acres harvested and the percentage of sugar content, allows competitors to understand how much sugar a beet company has to sell in total. Likewise, sold positions provide critical insights into each competitor's pricing flexibility by allowing competitors to calculate how much sugar the competitor has left to sell. By knowing their rivals' volume, supply, and capacity information, the Producer Defendants could confidently maintain, adjust, or raise prices without fear of being undercut by their ostensible rivals.

100. [redacted]

101. The role of Commodity in facilitating this scheme was crucial. It served as a conduit and tool for the Producer Defendants to effectuate the conspiracy. Unlike legitimate industry analysts, Commodity lacks a public presence, does not market its services to the public, and does not publish anonymized market research based on the data it receives. This exclusive and secretive arrangement underscores the Producer Defendants' intent to limit access to critical market information and maintain their price-fixing conspiracy.

102. [redacted]:

- [redacted]
- [redacted]
- [redacted]

103. [redacted]:

- [redacted]
- [redacted]
- [redacted]
- [redacted]

104. [redacted]

105. [redacted]

106. [redacted]

107. The Producer Defendants understand the competitive sensitivity of the information each of them provides to Commodity. Likewise, Commodity understands that the competitively sensitive information shared by the Producer Defendants would not ordinarily or rationally be disclosed to rivals in a competitive market. The purpose of their information sharing was to enable ASR/Domino, United, Michigan Sugar, NSM, and Western to fix, maintain, stabilize, or coordinate prices of Granulated Sugar in the United States.

108. The Producer Defendants had policies not to publish their own competitively sensitive information. For instance, United, like the other Producer Defendants, does not publish its current Granulated Sugar prices or sold position. Indeed, United's sold position is confidential, and its employees are prohibited from sharing that information outside the company. Nevertheless, United intentionally and regularly shared its sold position with Mr.

Wistisen, who United knew would in turn share it with ASR/Domino and other competitors.

109. For example, Dirk Francis Swart, Executive Vice-President of Sales at United States Sugar, testified that United shared information with Mr. Wistisen because "we know he's going to share information and we want the information that gets shared to be accurate."[6]

110. Likewise, ASR/Domino's ethics policy in its written code of conduct prohibits employees from directly talking about company pricing with competitors. Nevertheless, ASR/Domino employees shared non-public, confidential, commercially sensitive pricing, sold position, and other information with Mr. Wistisen knowing that he would provide the information to other competitors.

111. ***Effect on the Market.*** The consequences of the Defendants' coordinated efforts were profound. By maintaining a shared understanding of one another's pricing and market strategies, the Producer Defendants effectively eliminated meaningful competition. The USDA's restrictive production allotments and import limitations further amplified the anticompetitive effects, as Defendants could manipulate supply to exploit limited market alternatives. Granulated Sugar prices rose significantly during the Class Period, with no corresponding increase in production costs or supply constraints.

112. Due to the USDA's production allotments and limitations on imports and tariffs, the Producer Defendants know that as they sell out of Granulated Sugar, they can

[6] *United States v. U.S. Sugar Corp. et al.*, No. 21-cv-1644-MN (D. Del. April 18, 2022), ECF No. 226, at 180.

charge higher prices because there will be little to no additional competitive product from foreign sources available in the domestic market to force them to maintain or reduce price. Thus, knowing one another's sold position allows the Producer Defendants to calculate when and how much they can raise, fix, maintain, or stabilize prices due to the amount of supply. Likewise, knowing their competitors' production information, such as planting schedules, harvests, and yields allows the Producer Defendants to accurately forecast total crop volume and market supply, allowing them to raise, fix, maintain or stabilize prices based on the amount of supply.

113. Commodity provided the reciprocal information to the Producer Defendants rapidly, often within hours of having received it. The Producer Defendants then used the market intelligence they received from Commodity and other sources when deciding how much to charge for Granulated Sugar, enabling them to extract supra-competitive prices, which they did from the Plaintiffs.

114. Using the non-anonymized competitively sensitive, non-public information exchanged contemporaneously through Commodity, the Producer Defendants had discrete information about competitors' supply and planned pricing going into the contracting season and ensured that they would not undercut each other's prices and cause prices to decrease as they would in a competitive market.

115. Furthermore, with a collective [redacted] share of the market, the Producer Defendants account for the vast majority of Granulated Sugar production, sales, and capacity. As a result, they are able to exert power over pricing, and smaller market

participants are not an effective competitive constraint on Producer Defendants' dominance.

116. Defendants' anticompetitive scheme had real-world implications for the purchasers of Granulated Sugar. For instance, the Sourcing Business Leader for the Meals and Baking Operation System at General Mills explained that as a large customer of sugar it would negatively affect General Mills if sugar suppliers were sharing their sold information or future pricing with one another: "if [sugar suppliers] knew what other [suppliers] were potentially going to offer, how much they would offer or how aggressive someone else would be, [it] could potentially dictate what type [of] pricing they would submit to us."

117. ***Evidence of Coordinated Conduct.*** Commodity published its reports with price, crop size, yield, and sold positions specifically naming the Producer Defendants or referencing them by region according to the location of their respective beet sugar processing plants and cane sugar refineries as shown in the chart below:

| Regional Reference or Nickname | Company with Production Facilities |
|---|---|
| Baltimore | **ASR/Domino** (large Domino cane sugar refinery) |
| Crystal | **American Crystal** (United member owner) |
| Florida | **Florida Crystals** (owner of ASR)<br>**United** (U.S. Sugar) |

| Regional Reference or Nickname | Company with Production Facilities |
|---|---|
| Fort Morgan | **Western** (beet sugar facility in Fort Morgan, CO) |
| Gulf | **ASR/Domino** (Louisiana)<br>**Cargill** (Louisiana) |
| Lovell | **Western** (beet sugar facility in Lovell, Wyoming) |
| Michigan | **Michigan Sugar** (beet sugar processing plants) |
| Mini-Cassia | **Amalgamated** (beet sugar processing plant in Mini-Cassia, West Paul, ID) |
| Nampa | **Amalgamated** (beet sugar facility in Nampa, ID) |
| Northeast | **ASR/Domino** (Domino cane sugar refineries in Baltimore and Yonkers (until Dec. 2022)) |
| RRV (Red River Valley) | **United** (American Crystal and Minn-Dak beet sugar processing plants) |
| Scottsbluff | **Western** (beet processing facility in Scottsbluff, NE) |
| So-Minn | **Southern Minnesota Beet Sugar Cooperative** (NSM member owner) |
| Southeast (may include Florida refineries) | **United** (U.S. Sugar Savannah/Imperial)<br>**Florida Crystals** (owner of ASR)<br>**United** (U.S. Sugar) |

| Regional Reference or Nickname | Company with Production Facilities |
|---|---|
| Twin Falls | **Amalgamated** (beet sugar processing plant in Twin Falls, ID) |
| West Coast - Beet | **NSM** (So-Minn beet sugar processing plants in California) |
| West Coast -Cane | **ASR/Domino** (C&H cane sugar refinery in California) |

118. [redacted]

**April 2018**

119. [redacted]

[redacted]

**July 2018**

120. [redacted]

**November 2018**

121. [redacted]

[redacted]

122. [redacted]

123. [redacted]

124. In the subsequent months, Mr. Wistisen kept in close contact with other Defendants and co-conspirators, regularly checking in with various producers by phone and email.

**April 2019**

125. Wistisen's communication with the Producer Defendants and exchange of non-public, non-anonymized information continued throughout 2019.

126. [redacted]

127. [redacted]

**May 2019**

128. [redacted]

129. [redacted]

130. [redacted]

**June 2019**

131. [redacted]

**September 2019**

132. Communications on September 16, 2019, show how Mr. Wistisen shared information among the Producer Defendants in quick succession. On that date, Mr. Wistisen emailed Alan Henderson, ASR/Domino's Vice President of Industrial Sales, asking where he would put refined prices and coverage. A few hours later, Mr. Henderson wrote back with cane pricing for Fiscal Year 2020. He reported ASR/Domino's Northeast prices at $38.50 bulk basis, Gulf prices at $36.50 bulk basis, and West prices at $39.00 bulk basis.

133. [redacted] He later wrote back to ASR/Domino's Mr. Henderson and reported the production information he had learned from his "source" about the harvests and forecasted tons per acre (tpa) at American Crystal and its sister United member owners: "The harvest issues would be at Minn-Dak and So-Minn, terribly wet!" He continued, "Crystal is also too wet on the majority of beets, but northern beets, which have been dry, are doing better on moisture. They haven't changed their projected tpa or sugar forecasts. My source said they don't need any more moisture until spring!" Mr. Wistisen further remarked on the cane price increase updates he received from ASR/Domino's Mr. Henderson and his other Producer Defendant sources: "The price updates I did receive today didn't have nearly the level of cane price increases you reported … but I bet they're headed that way …"

134. [redacted]

135. [redacted]

[redacted]

**October 2019**

136. [redacted]

137. [redacted]

[redacted]

138. [redacted]

**December 2019**

139. [redacted]

140. [redacted]

[redacted]

**January 2020**

141. In 2020, Producer Defendants continued to exchange competitively sensitive information about pricing and supply through Commodity. On January 8, 2020, Robert Sproull, Senior VP of Sales Marketing and Product Development at ASR/Domino, emailed Mr. Henderson that "it's really important we signal to the market that there's still going to be tightness," and "[w]e need to signal to the market that we're going to maintain price, especially for the Oct-Dec quarter. And there's not much to lose here. Pure price discovery."

142. In keeping with the Producer Defendants' goal to "maintain price," Mr. Wistisen's coordination of the information exchanged among them continued. [redacted]

143. [redacted]

144. [redacted]

**February 2020**

145. [redacted]

[redacted]

[redacted]

146. [redacted]

[redacted]

[redacted]

147. [redacted]

**April 2020**

148. [redacted]

149. [redacted]

**June 2020**

150. [redacted]

[redacted]

**August 2020**

151. On August 17, 2020, Mr. Wistisen emailed Mr. Henderson of ASR/Domino, providing him with beet crop updates including that Michigan increased its tpa from 29 to 30, So-Minn increased to 29.6 tpa, Western increased to 31.6 tpa in one region and 31.8 tpa in another, and asked: "Where would you put cane prices and coverage?" The next day, August 18, Mr. Henderson responded:

> [...]
> Quick Update:
> Pricing:
> Northeast - $39.00 to $40.00 BULK FOB
> South - $37.50 to $37.75 Bulk FOB - fighting Cargill mainly
> West - $39.50 to $40.00 Bulk FOB - values staying strong…
> Cane gulf still fighting for share - but some talk of Cargill moving prices up to $37.50 gross fob.
> Coverage:
> Beets - 70 to 75%
> Cane - 50 to 55%
> [...]

152. Mr. Wistisen then provided specific sold positions for Michigan and Western: "My goodness, what a difference a month makes. Michigan 85+% booked, Western 75-%."

**September 2020**

153. The next month, Mr. Wistisen reported to ASR/Domino regarding its competitors' production information: "Crystal bumped up yields slightly to 28.7, par with five-year average. Sugars are lagging by about 0.5 … So-Minn increased yield forecast to record 31 tpa, sugars running 15.95%, dry weather forecast, so could see 'decent' end-of-season sugars, very pleased with factory performance, so far. Michigan holding forecasts unchanged, sugars nearing 16%, factories running well, stockpiling on Oct. 19th."

154. Mr. Wistisen added with regard to pricing that Michigan was at "$38.5+, selective selling, 90+%, Western $36.75, mostly out of the market, 90+%, United also 90+% (including cane) not sure on price, last indication was early Sep, were still in market and mostly firm at $36.50 and $38." To the extent Wistisen's email suggests these Producer Defendants' beets were "well sold," that supports that these Defendants would maintain or increase their prices as their inventory declined.

155. Mr. Wistisen often provided information on pricing and sold position to the Producer Defendants, rapidly after receiving it himself. On September 21, 2020, Mr. Wistisen separately asked, within minutes, Mr. Henderson of ASR/Domino and Eric Speece of United, if there was "[a]nything new of interest on the pricing front?" They each responded with their company's respective pricing and sold positions. Mr. Speece shared, "We are firm at $36.50 (no change) and now $38.50 on cane (an increase of $0.50/cwt) and yes you heard correctly we are 90+% sold." In response, Mr. Wistisen thanked United "for keeping the communication lines open!"

156. [redacted]

157. On September 22, 2020, Mr. Henderson responded to Mr. Wistisen at Commodity with detailed pricing, sold position, and volume information for ASR/Domino and other Granulated Sugar producers:

> Pricing (Cane)
>
> North and mid-Atlantic - $40.50 to 41.00 FOB - prices were lower past few weeks but have firmed up to these levels. No discounting at this time.
>
> Gulf - $38.50 fob
>
> West - $40.50 to $41.00 fob firm
>
> Note - higher levels for the Oct./Dec. 20 period as most cane and beet companies are well sold and/or filling past force majeure volume.
>
> I'm hearing most cane guys 70 to 75% booked with the exception of Cargill at 90%??
>
> Beet prices below seem accurate and coverage at 90% I believe is about right.

158. On September 22, 2020, ***less than three hours*** after receiving Mr. Henderson's response, Mr. Wistisen provided United and ASR/Domino with their competitor's pricing and other competitively sensitive information in emails less than a minute apart. Mr. Wistisen wrote to ASR/Domino that "U.S. Sugar recently increased to $38.50, so looks like the range is $38.50 to $41, nice increase over last month. Beet not much change from earlier indications, prices are $36.50 to $38.75, very little sugar available at the low price, industry coverage 87%, all but NSM over 90+% booked." To

United, Mr. Wistisen wrote, "ASR saying back up to $40.50 to $41. So now I have cane range at $38.50 to $41." As to sold position, he reported that ASR was at 70% with the other southern refiners up 10-15% from average. "Beet: not hearing anything that would change earlier indications. Overall I'd estimate coverage is 87%, all but NSM 90+% Waiting for confirm from Michigan, but Midwest ranging from $36.50 to 38.75, very little available at low price (so I hear)."

159. Then in early September 2020 as supplies became more limited for future contracts, prices crept back up. Wistisen represented to ASR/Domino that Michigan was up to $38.5+ with 90% sold, Western was at $36.75, also 90% sold, United at 90% sold was last selling at $36.50 for beet and $38 for cane.

160. Defendants' communications with Wistisen further evidenced their parallel pricing. For example, Defendants held similar prices "firm" in parallel, which is another way of saying they would not be discounting to take market share. For instance, on September 21, 2020, United was "firm at $36.50 (no change) and now $38.50 on cane."

161. [redacted]

162. [redacted]

**October 2020**

163. [redacted]

164. [redacted]

165. [redacted]

166. [redacted]

**November 2020**

167. In yet another example, Mr. Wistisen emailed both Eric Speece at United and Alan Henderson at ASR/Domino within approximately 40 minutes of each other in mid-November 2020 asking them, "where would [they] put . . . prices?" Both responded later that day with pricing information.

168. On November 16, 2020, Mr. Wistisen wrote to Mr. Henderson, asking: "Curious what you're hearing on domestic raw and refined pricing? I haven't heard back from United yet. Did they pullback from spot market? Where would you put prices and cane coverage?" Mr. Henderson responded later that same day: "Prices have firmed up again based on higher # 16 values, beets close to sold out and less imports, tier 2 sugar available at this time. Near-by values back up to $46.00 FOB all locations. For calendar 2021: East/West - $42.00 fob[;] Gulf -$39.50 fob[;] Cane Coverage - 85-90%[.]"

169. For his part, Mr. Speece forwarded Mr. Wistisen's email to Dirk Swart, Executive Vice President of Sales at United, and asked what he should relay regarding United's sales. Mr. Swart responded, "I'd like him to hear $36.50/$38.00 and probably moving higher based on the strength of the booked position."

170. On November 17, 2020, Mr. Wistisen responded further to Mr. Henderson by sharing information received from United: "So strange, I can't wrap my head around United's approach. They came up very short on production, and market has firmed, but they're still at $36.50 RRV and $38.50 Southeast?!?! But did say they'll probably be taking prices higher given strong sold position . . . Waiting to hear back from a number of contacts." Mr. Wistisen also relayed the results of a conversation with Michigan Sugar: "Michigan final numbers came in ever-so-slightly below indications 10 days ago. They were tight on harvest labor, but got through it ok. Didn't comment on factory labor situation."

**January 2021**

171. The extensive sharing of non-public, forward-looking information continued into 2021. On January 19, 2021, Mr. Wistisen wrote to United, providing several paragraphs of information on developments in the sugar industry. Near the end, he asked: "Has United put out a price range on FY22?" On January 20, Mr. Speece at United responded: "We have not yet set pricing for 2022, but we will soon." [redacted] Mr. Wistisen then wrote back to Mr. Speece at United: "Very little so far on FY22, one processor saying they might start around 35.00 net Midwest…" He went on to discuss his thoughts on FY22 pricing. Mr. Speece then forwarded the email to his colleagues, Dirk Swart, Executive Vice President of Sales, and Steven Hanson, Director of Marketing, to discuss the information received from Mr. Wistisen and its effect on United's pricing. He expressed concern that $35 was too low and suggested that United "[m]ay want to communicate pricing earlier than the colloquium to send a msg. I'll plan on call him tomorrow as it is always easier than black and white. Let me know if there are any key messages you would like me to relay on." Mr. Speece emphasized the necessity of signaling to competitors through Mr. Wistisen that starting prices for negotiations should be higher, rather than waiting to discuss it with them in person at the International Sugar Colloquium.

172. [redacted]

**February 2021**

173. [redacted]

174. On February 15, 2021, Mr. Wistisen wrote to Mr. Speece at United: "Any action in FY22? Has United put a number on it yet? No word back from other processors/refiners, I'll send along indications." Mr. Speece quickly responded: "We are still at the $36.50 and $38.50 with zero problems selling at those values. I do not anticipate any changes to our prices, but we have not formally decided. No action on 2022 just some small inquiries." Mr. Wistisen asked: "Just to clarify: United has not issued FY22 list prices, and at this point doesn't expect FY22 prices to change much from remainder FY21?" On February 16, 2021, Mr. Speece answered: "Give me a ring and we can discuss."

175. The next day, February 17, 2021, [redacted] Mr. Wistisen also sent Mr. Speece an email with FY22 pricing: "NSM in the market at $34.50 net, but no action Western $35.00 net, and willing to wheel and deal if buyer ready to book, little interest ASR expecting cane refiners to drop prices by a dollar for FY22 to match up to No.16 compared to FY21." Mr. Wistisen then wrote to ASR/Domino regarding United's plan to "hold steady" on pricing: "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50[.]"

**March 2021**

176. [redacted]

[redacted]

177. [redacted]

**April 2021**

178. [redacted]

179. The same day, Mr. Wistisen wrote to Mr. Henderson, of ASR/Domino, disseminating current and future pricing information received from Michigan Sugar and other co-conspirators while asking for pricing and demand information in return: "Where would you put price ranges and demand? I have spot $36.50 firm Midwest, $39.00 firm Michigan (but watching Baltimore progress, could creep higher), and east and west coasts now at $44.00. And forward I have quoting at $35.50-36 Midwest, 37.50-38 Gulf, $42.00 Coasts." In response to the inquiry, Henderson confirmed the accuracy of Wistisen's information: "I believe your pricing numbers below are very accurate," and provided additional pricing details: "Prices in FY21 are very firm with both coast at $43.50/$44.00 bulk FOB basis. We heard RRV folks are tight and holding at $36.50 fob. For FY22, RRV

at $35.50 big volume, $36.00 smaller volume fob. For us, closer to $39.00 gulf, $38.50 Florida and $41.50 both coasts. Close to 30% coverage for FY22."

**May 2021**

180. On May 11, 2021, Mr. Wistisen wrote to Mr. Henderson of ASR/Domino: "Are those higher spot prices, $43.50-44.00 holding up?" On May 12, 2021, Mr. Henderson responded affirmatively, noting price resilience at Domino's Baltimore refinery following a fire: "All is good in Baltimore. Melt rates close to 90% of pre-fire levels. With that being said near-by prices are selling at $44.00 fob bulk basis. The $31.50 #16 is also pushing white pricing up."

181. On May 17, 2021, Wistisen emailed Mr. Henderson again, requesting pricing and inventory information: "Have you bumped up FY22 prices yet on explosive gains in No. 16 prices… Where would you put refiner FY22 coverage?"

182. Later that same day, Henderson responded with ASR/Domino's FY21 pricing: "FY21 prices – now at $45.00 fob bulk basis east and west coast. Down in Florida and gulf $44.00 fob bulk basis. FY22 prices – $42.00 fob bulk basis, $40.50 fob bulk basis Florida and the gulf. FY22 coverage – approximately 35 to 40%."

183. [redacted] He then wrote to ASR/Domino and relayed information obtained from United and NSM, including specific price updates. Based on this information, he advised ASR/Domino to "expect to raise prices": "Just talked with United: prices unchanged, spot and forward Hello!? But their head honcho is on vacation, bad timing Only about 40% covered. But expect big action over the next month, 20+% add to bookings, and at that time

expect to raise prices, and not by just a dollar." He reported that Western was still at $36 spot and forward, 45-50% booked and NSM at "$36 Renville and $38 west, 45-55?% booked."

184. [redacted]

185. [redacted]

186. On May 26, 2021, ASR/Domino's Henderson circulated an internal email, relaying competitors' pricing information from his conversation with Wistisen.

**June 2021**

187. On June 17, 2021, Mr. Wistisen emailed Alan Henderson of ASR/Domino an update on crops and asked, "What are you seeing on the price and demand side of things?" Mr. Wistisen then explained what he knew and the information he anticipated receiving from United, Western, and Michigan Sugar:

> I'm just getting going on pricing, but have heard a bit:
>
> NSM: 35-36 net RRV, 37 net West. Claiming to be close to sold out at Brawley, 70% Renville, but only 40% booked Amalgamated.
>
> United reportedly (I'll talk with them tomorrow) holding $36.50 gross, bigs are booking and getting discounts of about a buck or less, that's less than last season.
> Western supposedly (I'll talk with them tomorrow) increased prices to $36.50 net, not getting many takers.

188. In short, Mr. Wistisen informed ASR/Domino that NSM had slightly lowered prices $35-36 in the Midwest and $37 on the West coast net with discounts, while United was holding at $36.50 but offering discounts of up to $1 to large accounts. He also reported that Western increased its prices to $36.50 after discounts.

189. The next day, Mr. Henderson responded to Mr. Wistisen, including with price increase information from ASR/Domino's competitors, "Word on the street [was] United moving up a $1.00 cwt since bookings now over 60%." He went on to share future prices for the 4th quarter of 2021:

> Cane prices firming up as #16 values rise.
>
> Oct.- Dec. 21
>
> East/West coasts ·- $44.00 gross fob bulk basis
>
> Gulf - $42.00 gross fob bulk basis

Jan.- Dec. 22

East/West - $42.00 gross bulk basis

Gulf - $39.75 gross fob bulk basis.

190. [redacted]

191. [redacted]

**July 2021**

192. Prices continued to creep up. In July 2021, Mr. Wistisen told ASR that United was holding beet at $36.50 firm but increased cane to $39.50 firm. By stating the prices were firm, Wistisen indicated United was not offering discounts off this price. He also reported that Western and Michigan were temporarily out of the market, indicating they had already contracted a significant portion of their supply. Henderson at ASR updated Wistisen by telling him that ASR was now at $40.50 in the gulf and $43 fob on the coasts.

193. [redacted] He later reported to ASR/Domino's Henderson new inventory details for both Michigan Sugar and Western and plans to obtain pricing and booking confirmation from United: "Michigan and

Western 80+% [booked], and rumors suggest United is also now around 80% booked and recently increased prices (I hope to have confirmation soon)." In the same email, Mr. Wistisen asked ASR/Domino for information as well: "What's happening on the cane side of the fence? Sounds like you're now $48 spot, and Imperial $49. Where would you put forward pricing and coverage?"

194. That same day, Mr. Henderson responded by updating Mr. Wistisen on ASR/Domino's pricing details: "Our pricing for remainder of FY21 is $48.00 bulk basis all locations. With raws remaining high in the Oct./Dec. 21 period we are $46.00 fob bulk basis east/west and $44.00 gulf. For FY22 close to 65% booked and moving prices up. I haven't officially seen a United price increase but heard it's out there (+$2.00)." Additionally, on the same day, Henderson forwarded Wistisen's message to coworkers, saying, "FYI below………United price increase. Rich is thinking $2.00 increase but no official word yet. Let's see if we can hunt something down."

195. [redacted] Mr. Wistisen wrote to ASR/Domino providing pricing and booking information from several Producer Defendants and asking for information in return: "I don't understand it, but this is the word from United: 80-85% sold, will be at 90 very soon. Beet holding at $36.50 firm, and cane increased to $39.50 firm. Hearing both Western and Michigan temporarily out of the market. Any changes in ASR forward prices? I have you at $39.75 gulf and $42 coasts." Henderson immediately responded, informing Wistisen on ASR's pricing: "We are now $40.50 gulf, $43, fob east and west. Coast." Mr. Wistisen responded again, informing

Henderson: "Well at least one group, your group, has their finger on the pulse of this market. The United info I provided was direct from them this morning. They held a big huddle yesterday (sounded like all sales reps/VP were present), and those numbers were the result."

196. [redacted]

197. [redacted]

**November 2021**

198. [redacted]

199. [redacted]

[redacted]

200. [redacted]

201. [redacted]

**March 2022**

202. [redacted]

203. [redacted]

[redacted]

204. [redacted]

**April 2022**

205. Soon after the 2022 ISC meetings ended, refined sugar prices rose by 17% from the prices for which sugar was sold a year before.

206. [redacted]

207. [redacted]

208. [redacted]

209. The Producer Defendants, eager for up-to-date, competitively sensitive information from one another, also used Ron Sterk, a long-time editor for Sosland Publishing, to exchange competitively sensitive information. Mr. Sterk had close proximity to the Producer Defendants due to his job at Sosland Publishing reporting on the sugar industry.

210. For instance, on August 12, 2020, ASR/Domino's Adam Whittaker wrote to his colleague Alan Henderson regarding pricing information for United and NSM and harvest information for Michigan Sugar and Western's Fort Morgan, Colorado facility, that he obtained directly from Mr. Sterk in exchange for ASR/Domino's competitively sensitive information: "Talked to Ron. Cargill is well sold thru 21, current # is $37 net/$37.75 gross. Imperial is sold out thru Dec. 20. NSM taking their price up to $34-$34.50 (rumor had they were down to $33 FOB to CSM in GA) United still holding out at $37.50-$38 FOB Clewiston. I told him we were still $40-$41 on East/West Coast and the SE and Gulf were $39 fob. Also told him we were busy, a lot of spot opportunities coming our way thru Sept ad that we have a good book on thru Oct/Dec but still have capacity to sell. RRV/Michigan started harvest this week. CO to start early as well."

211. Likewise, on February 17, 2021, Adam Whittaker of ASR/Domino wrote to his colleague Alan Henderson regarding reports from United that he received directly from Mr. Sterk and detailed the competitively sensitive information he shared in exchange: "Just off the phone with Ron. United telling him they're at $36.50 for 2022 but very little activity for now…Ron also asking about raw prices, told him FL is well sold, price action indicates cost of moving LA sugar to coastal refineries coupled with decrease of MEL with 70% being raws. LA ok to store raw sugar than sell it to coastal refineries, deficit areas need to demand the sugar from surplus areas to get it moving."

212. [redacted]

### 3. Defendants Communicated Directly and Worked Together to Maintain High Prices

213. [redacted]

214. [redacted]

[redacted]

215. [redacted]

216. [redacted]

217. On March 25, 2021, in response to the news that "Imperial's sugar will be marketed by United," Adam Whittaker, Director of National Accounts at ASR/Domino, remarked: "It's going to be more important than ever to stay close to United. To the point where we might want to start thinking about ways to work with them (*i.e.*, asking them for quotes [REDACTED]), on down the road. This is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry . . . ."

218. [redacted]

### 4. Defendants Relied Upon the Exchanged Competitively Sensitive Information.

219. [redacted]

220. Knowing a competitor's sold position was used to justify higher prices and to bid on business throughout the contract season. For example, when Alan Henderson of ASR/Domino learned that Imperial was sold out for the rest of the year, he responded to his colleagues that "Imperial being sold out gives us justification for a premium in Oct/Dec vs. CY2021 business."

221. United not only received information from Mr. Wistisen that it used in pricing decisions and to send messages about pricing to competitors, but also affirmatively used him to signal competitors. In one example, United's Executive Vice President, Dirk Swart, told United's Eric Speece that he wanted Mr. Wistisen to "hear" that United's

current beet sugar price was $36.50 and cane sugar price was $38, but United was contemplating increasing its prices given its sold position. They discussed what they wanted to "indicate" to Mr. Wistisen before deciding to continue the conversation by phone. Similarly, United's Mr. Speece thought a competitor was selling at too low a price, so he told his colleagues that United "may want to communicate pricing earlier than the colloquium to send a msg [message]."

222. Mr. Swart of United testified that the "better information about what [his] competitor's actual prices were, [United] could better avoid these destructive situations" of customers using pricing information to negotiate better prices.

223. ASR/Domino decided not to get "aggressive" on pricing because ASR/Domino "would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing." ASR/Domino also wanted to "signal to the market" that there would be tightness and ASR/Domino would "maintain price."

224. There is no plausible, non-conspiratorial justification for the Producer Defendants to use Commodity and/or other means to share highly confidential and proprietary detailed information about their current and future prices, future supply, and sold positions. In a competitive market, such proprietary, competitively sensitive information would be a closely guarded secret. Accordingly, sharing such proprietary, competitively sensitive information would not be in Defendants' economic self-interest in the absence of an agreement.

225. Defendants knew and intended that their private exchanges of competitively sensitive information about prices, production, and sold positions would allow them to

artificially raise, fix, maintain, or stabilize Granulated Sugar prices above the levels that would have existed absent the anticompetitive conduct alleged herein.

226. In one instance, United pulled offers and raised prices in part to "send[] a message" to its competitors "that we were not interested in allowing the market to slip lower." United's CEO Matthew Wineinger testified that he was "confident" that "word got back" to United's competitors.

**5. Defendants Agreed to a Common Formula to Fix Prices.**

227. In furtherance of their agreement to manipulate and fix the prices of Granulated Sugar, the Producer Defendants developed and agreed to standardized pricing formulas. For example, one of their formulas relied on publicly observed benchmarks, such as futures prices, to coordinate their pricing strategies and maintain artificially high price levels. This approach allowed Defendants to obscure their collusion under the guise of market-driven practices while avoiding competitive pressures.

228. The Producer Defendants routinely referenced Number 16 futures prices to set their FOB pricing. [redacted]

229. In February 2021, Mr. Wistisen told Mr. Henderson that on the pricing side, sugar prices could increase thanks, *inter alia*, to the "history of excellent selling

restraint/patience from ASR, [and] high no. 16 prices…." This communication highlights how shared adherence to such benchmarks reinforced collusion rather than competition.

230. Similarly, in July 2021, Mr. Henderson referenced United's impending $2 price increase for beet sugar, emphasizing that it "makes sense if they follow the #16 market and do the math." Henderson later acknowledged that ASR/Domino was actively "pricing off #16 market," and that United mirrored this strategy, raising its Gulf FOB price to precisely match ASR's price of $40.50. United's executives admitted that this increase followed a "big huddle" among their marketing team, a clear signal of coordinated decision-making.

231. Even as Imperial Sugar operated outside the domestic production framework before its acquisition by U.S. Sugar, it relied on similar pricing formulas tied to Number 16 prices. Notably, Imperial declared that "acting as a price-taker would put the whole business at risk," reinforcing its disinterest in genuine price competition. Such statements reveal a collective industry mindset aimed at maintaining profit margins through coordinated pricing rather than market-based competition.

232. By agreeing to common pricing formulas based on Number 16 futures prices, the Producer Defendants created an environment where price-fixing was not only feasible but virtually guaranteed. This deliberate coordination eliminated the unpredictability inherent in competitive markets, ensuring stable yet inflated prices that directly harmed competition generally and consumers specifically. Such conduct underscores a blatant disregard for antitrust principles, further illustrating the Defendants' conspiratorial objectives that amount to a *per se* violation of the Sherman Act.

### 6. As a Result of Defendants' Misconduct, the Producer Defendants' Sugar Prices Increased Dramatically During the Class Period

233. Granulated Sugar prices increased significantly during the Class Period as a result of Defendants' agreement and conduct. [redacted]

[redacted]

Figure 3

[redacted]

Figure 4

234. [redacted] This increased synchronization of Defendants' pricing is consistent with the alleged coordination and provides economic evidence consistent with a change in competitive behavior during the Class Period.

[redacted]

Figure 5.

235. As shown in Figure 6 below, nominal retail prices of Granulated Sugar rose 69% from January 2019 through October 2024:




Figure 6.

236. This increase was contrary to pricing patterns prior to the Class Period and is not explained by market forces, such as inflation (CPI)[7], as shown in Figure 7 below:




Figure 7.

237. Granulated Sugar prices increased dramatically during the Class Period without a decline in the supply of Granulated Sugar. U.S. beet and cane sugar production increased from 8,999,000 short tons in 2018/2019 to an estimated 9,368,000 short tons in 2023/2024.

[7] Consumer Price Index ("CPI") is a price index of a basket of goods and services paid by urban consumers. Percent changes in the price index measure the inflation rate between any two time periods. CPI is a commonly recognized measure of inflation in the United States.

238. In the past 20 years, the price of Granulated Sugar doubled on an indexed basis. There is no economic rationale for the rate of price increases during the Class Period.

**D. Additional Plus Factors Support the Existence of a Conspiracy**

239. In addition to the direct evidence of extensive information sharing by the Producer Defendants commencing with the engagement of Commodity and Mr. Wistisen, as well as the dramatic price increases imposed by each of the Defendants during the Class Period, there are other "plus factors" that support an inference of collusion. Plus factors are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," that thus support an inference of a conspiracy.[8] The exchange of private, competitively sensitive information among competitors, as described above, is a plus factor that strongly supports an inference of collusion.

240. Here, in addition to the information sharing, plus factors that further support an inference of collusion include: (a) sugar industry consolidation and concentration, (b) high barriers to entry, (c) inelastic demand, (d) high vertical integration, (e) opportunities to collude, (f) the fungible, commodity nature of Granulated Sugar, and (g) a history of antitrust violations by sugar manufacturers, including a number of the Producer Defendants and/or their predecessors.

---

[8] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011).

### 1. The Market is Highly Concentrated, and the Defendants Are the Dominant Firms

241. Prior to U.S. Sugar's acquisition of Imperial in November 2022, the top three marketers of sugar in the United States accounted for 65% of the market. As discussed above, the Producer Defendants currently maintain [redacted] of the Granulated Sugar market in the United States.

242. The sugar industry became even more concentrated following U.S Sugar's acquisition of Imperial in November 2022, resulting in a substantial increase in dominance by ASR/Domino and United.

### 2. Barriers to Entry Are High

243. There are high barriers to becoming a manufacturer of Granulated Sugar. The start-up capital necessary to compete with today's Granulated Sugar manufacturers would be, at least, in the millions. Granulated Sugar manufacturers have large economies of scale, utilizing large and expensive production facilities. Furthermore, Granulated Sugar manufacturers must be vertically integrated with growers of sugar beets or sugar cane to qualify for USDA loans and production allotments that enable growers to process raw sugar into Granulated Sugar without competition from imports. United States Department of Agriculture ("USDA") production allotments linked to USDA loan programs and limitations on imports and tariffs limit foreign competitors entering the U.S. market that could otherwise serve as a competitive restraint on Producer Defendants.

### 3. Demand for Sugar is Inelastic

244. Economic theory recognizes that industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices.

245. Demand for Granulated Sugar is inelastic, so a decrease in supply in the face of stable or rising demand will increase prices. Defendants recognize that Granulated Sugar demand is inelastic. The Producer Defendants knew that they could demand higher prices when less Granulated Sugar was available to sell. As a result, they routinely exchanged information about their sold position to maintain higher prices because they knew that there were no meaningful substitutes for Granulated Sugar.

### 4. Defendants Are Vertically Integrated

246. The Granulated Sugar industry is almost entirely vertically integrated. In the Granulated Sugar industry, "vertical integration" means the Granulated Sugar producer owns or controls each aspect of growing sugar cane or sugar beets, processing these crops into raw sugar using their own processing facilities, refining the raw sugar into Granulated Sugar in their own refining facilities, and selling their Granulated Sugar to direct purchasers. A consolidated market with vertically integrated participants is a structural characteristic that makes an industry conducive to collusion.

247. The President and CEO of Imperial Sugar prior to its acquisition by U.S. Sugar testified that it was difficult for Imperial to compete with the other Granulated Sugar producers because it was not vertically integrated.

### 5. Defendants Had Numerous Opportunities to Collude

248. Industries with high levels of communication among their executives are more conducive to price-fixing and other means of collusion. Opportunities to collude facilitate price-fixing by providing cartelists with legitimate-appearing opportunities to meet, build trust, and develop, adjust, and implement agreements about prices. Accordingly, meetings and communications among competitors, along with other factors, support the existence and operation of a price-fixing agreement.

249. Defendants had opportunities to collude through annual meetings of industry seminars and several trade organizations. These meetings and organizations include (1) the International Sweetener Colloquium ("ISC"); (2) annual Jenkins Sugar Group ("JSG") Commodities seminars; (3) the Sugar Association, Inc., ("Sugar Association"); (4) the American Sugar Alliance; (5) the U.S. Beet Sugar Association; and (6) the Beet Sugar Development Foundation.

250. Co-hosted by the Sweetener Users Association and the International Dairy Foods Association ("IDFA"), ISC is a multi-day meeting held annually in late February or early March. According to the IDFA, the ISC is "the industry[']s premier gathering for leaders of the global sweetener industry" that provides a "unique opportunity for key players from all sectors to discuss the most pressing issues facing the global sweetener industry" and "to network with your fellow industry executives."

251. Consistent with that purpose, the ISC includes multiple sessions addressing issues affecting the Granulated Sugar market, followed by additional opportunities for face-to-face interaction such as networking breaks, networking receptions, after-hours

parties, and golf tournaments. These events were often sponsored by one or more Producer Defendants.

252. Throughout the relevant period, except for 2021 due to COVID-19, ISC meetings were held in person. Each year the Producer Defendants sent multiple representatives to attend the ISC in person. Plaintiffs have identified several individuals who were regular attendees to the ISC meetings who engaged in reciprocal information exchanges through Wistisen, including Alan Henderson (ASR/Domino), Eric Speece (United Sugar), Steven Hanson (United Sugar), Dirk Swart (United Sugar), and Pedro Figueroa (Michigan Sugar). ISC provided additional opportunities for these individuals to meet in person and discuss pricing and market conditions, exchange competitively sensitive information, and coordinate conduct.

253. The 2019 ISC was held in-person in Aventura, Florida, from February 24 through February 27. Attendees participated in presentations on factors that would impact future sugar prices in the upcoming year. Shortly thereafter, sugar prices experienced a notable increase.

254. The 2020 ISC was held in person in La Quinta, California, from February 23 through February 26. The event brought together more than 480 attendees, including representatives from Producer Defendants United Sugar, ASR/Domino, Michigan Sugar, Western, and NSM.

255. On March 3, 2020, less than a week after the Colloquium, ASR/Dominos' Alan Henderson, who attended the meeting, sent Rob Sproull of ASR/Domino an email with the subline line "Colloquium Recap" sharing a "summary of points from the ISC."

Specifically, the email contains "competitive numbers" for fiscal year 2021 for certain competitors, with Henderson providing non-public competitive information including: "Michigan firm at $38.50 for 2021"; "United took prices up to $36.50 FOB RRV pre colloquium to the trade and heard it from specific customers"; "Clewiston - $37.50 FOB bulk"; "NSM – still offering sugar in FY20. Values close to 43.00/44.00 fob factory, 46.00/47.00 fob west coast transfer stations"; and "Imperial – 38.00/38.50 for CY 2021 on bulk EFG." On information and belief, Henderson received this competitor pricing information from conversations he had at the ISC.

256. After being held virtually in 2021, the ISC returned to an in-person format in 2022. The 2022 ISC was held in Tucson, Arizona, from February 27 through March 2. Podcasters from commodities firm McKeany-Flavell, podcasting live from the 2022 ISC on March 2, 2022, reported the beet industry would likely be sold out by May or June, that users and suppliers were getting together to discuss issues, and that there were "price increases everywhere[.]"

257. Colloquium meetings, upon information and belief, were also inflection points where information on future sugar contract prices was gathered to be incorporated in ICE No. 16 sugar futures. Those futures in turn were used to develop actual prices during 2022 and 2023. Soon after the 2022 ISC ended, sugar prices rose by 25%.

258. [redacted]

[redacted]

259. As noted, supra, similar parallel pricing increases occurred following the 2023 ISC in La Quinta, California, and again in 2024 following the ISC in Aventura, Florida.

260. IDFA has produced computer worksheets pursuant to subpoena, each with an undated worksheet tab related to registration and listing hundreds of people believed to be participants in IDFA's various ISC programs. These lists include personnel from Producer Defendants, including some who, as discussed supra, were in contact with Mr. Wistisen.

261. IDFA productions and public attendee lists show the Producer Defendants sent numerous executives as representatives to the ISC. Upon information and belief, United's representatives from various years included, among others: Celestino Ruiz (CEO), Dirk Swart ( Interim CEO and Executive VP of Industrial Sales), Matthew Wineinger (President & CEO), Eric Speece (Director, Strategic Accounts), David Susla (VP Consumer Sales & Marketing), Peter Smith (VP Sales – Strategic Accounts), Jeana Hines (VP, Sales – Industrial), Brian Smith (VP, Sales), Kevin Heazlitt (Economic Analysis Manager), and Steven Hanson (VP, Business Development). Representatives from the member owner entities of United Sugar included, amongst others: Thomas Rathke (U.S. Sugar Savannah VP, Specialty Products), Don Gilbert (U.S. Sugar Savannah Director, Commodities & Logistics), Mike Gorrell (U.S. Sugar Savannah Senior VP), Patrick Henneberry (U.S. Sugar Savannah Senior VP, Commodities Management),

Gustavo Rodriguez Gonzalez (U.S. Sugar Savannah Trader), and David Prout (U.S. Sugar Savannah VP, Trading).

262. ASR/Domino similarly had multiple executives attend ISC throughout the relevant period, and upon information and belief included amongst others: Alan Henderson (VP, Industrial Sales), Rob Sproull (Senior VP, Sales, Marketing & Product Development), Chad Cliff (Director of National Accounts), Adam Whittaker (Director of National Accounts), Toby Cohen (VP, Market Analysis), and Brian Dahlman (National Accounts Manager).

263. Michigan Sugar executives that attended ISC during the relevant period include, among others, Neil Juhnke (President & CEO) and John Whaley (VP Sales & Marketing).

264. Numerous executives from NSM entities also attended ISC over the relevant period, including among others: Mike Garner (Amalgamated Chairman), John McCreedy (Amalgamated President & CEO), Jake Hancock (Amalgamated VP, Commercial Strategy), Rodney Perry (Western Sugar President & CEO), Pat Laubacher (Amalgamated Senior VP), Jason Bridges (Western Sugar Senior VP & CFO), Chris Simons (NSM President & CEO), Bill Smith (NSM President & CEO), Ty Smith (NSM VP, Sales), and Cannon Holtgrieve (NSM Director, National Accounts & Retail Sales).

265. [redacted]

[redacted]

266. [redacted]

267. In addition to attending industry meetings, Producer Defendants had additional opportunities for coordination through their participation in various sugar-related trade associations.

268. The Sugar Association is one example. All Producer Defendants are members of the Sugar Association, and executives of Producer Defendants have held board positions. Specifically, the Board of the Sugar Association included Jose "Pepe" Fanjul Jr. (ASR/Domino and Florida Crystals), Mike Greear (Wyoming Sugar Company), Matt Hoffman (Sugar Cane Growers Cooperative of Florida, parent company of ASR), Neil Juhnke (Michigan Sugar), Peter O'Malley (ASR/Domino), Parks Shackelford (Florida Crystals, parent company of ASR), Rob Sproull (ASR/Domino), and Kurt Wickstrom (Minn-Dak).

269. Besides the annual membership meeting and Board of Directors meetings the Sugar Association also regularly hosted informal receptions and dinners attended by its members and directors. [redacted]

[redacted]

270. Further, the crossover of employees among the Defendants provided additional opportunities to collude or exchange competitively sensitive information. For example, ASR/Domino's Director of National Accounts, Adam Whittaker, ASR/Domino's National Accounts Manager, Brian Dahlman, and United's Director of Strategic Accounts, Eric Speece, were former employees of Cargill. Mr. Whittaker worked at Cargill for over a decade before joining ASR/Domino, while Mr. Speece worked at Cargill for about eleven years prior to joining United. Mr. Whittaker's and Mr. Speece's employment at Cargill overlapped for almost a five-year period. Mr. Whittaker, Mr. Speece, and Mr. Dahlman were all involved in the exchange of competitively sensitive information as described in the email exchanges detailed herein.

**6. Granulated Sugar is a Commodity**

271. As detailed above, Granulated Sugar is a fungible commodity. Coordination is easier with a commodity product because firms wishing to form a cartel can more easily monitor and detect defections from a price-fixing agreement where observed differences in prices, other than those arising because of differences in product grade, for example, are more likely to reflect cheating on the conspiracy than some kind of custom arrangement.

272. Futures contracts for domestic raw cane sugar and "White Sugar" (symbol "W") are traded on the Intercontinental Exchange ("ICE") alongside other commodity products such as wheat, crude oil, and gold. Typically, when a product is characterized as a commodity, competition is based principally on price as opposed to other attributes such

as product quality or customer service. The commodity nature of Granulated Sugar helps to facilitate cartel behavior.

273. Due to the lack of product differentiation, the Producer Defendants are forced to compete on price such that the pricing decisions of each Granulated Sugar producer affect the market price for Granulated Sugar.

274. In sum, the Granulated Sugar industry has characteristics that ensure the exchanges by Defendants of competitively sensitive, non-public, material internal information are highly anticompetitive. The exchanges allowed the Producer Defendants to raise, fix, maintain, or stabilize Granulated Sugar prices during the Class Period. As a result, Defendants' unlawful conduct caused Plaintiffs and members of the Classes to pay artificial prices for Granulated Sugar during the Class Period. These prices exceeded the amounts they would have paid if the prices for Granulated Sugar had been determined in a competitive market. Plaintiffs and members of the Classes suffered antitrust injury because of Defendants' conduct.

#### 7. There is a History of Anticompetitive Conduct in the Sugar Industry

275. The sugar industry in the United States has long been plagued by anticompetitive practices, with violations of antitrust laws dating back nearly a century. This historical pattern of misconduct serves as a backdrop to the present conspiracy, highlighting the industry's susceptibility to collusion and the Defendants' deliberate perpetuation of these unlawful practices.

276. **1930s: The Sugar Institute Case.** For example, in the 1930s, the United States Supreme Court addressed the antitrust violations of the Sugar Institute, a trade association for sugar manufacturers.[9] The Court upheld findings that the Sugar Institute engaged in collusion by mandating advance price announcements and strict adherence to those announced prices and terms. These practices stifled competition and allowed manufacturers to control the market, setting a precedent for subsequent antitrust enforcement in the sugar industry.

277. **1948: American Crystal Sugar and Uniform Pricing Agreements.** The anticompetitive tendencies of the sugar industry resurfaced in 1948 when the Supreme Court examined the activities of American Crystal Sugar, now part of Defendant United.[10] The case centered on agreements among California sugar refiners to pay uniform prices for sugar beets. The Court condemned this arrangement, noting its far-reaching monopolistic effects. By eliminating price competition among refiners, the agreements deprived sugar beet growers of any competitive opportunity, increased market control over sugar sales, and entrenched a monopolistic structure. The Court's decision underscored the inherent dangers of collusion in the sugar industry and its devastating effect on competition.

278. **1970s: Broker-Facilitated Price Fixing.** In the 1970s, the DOJ uncovered another collusive scheme involving sugar refiners, including California & Hawaiian Sugar Company (later acquired by Defendant ASR/Domino) and American Crystal Sugar

---

[9] *United States v. Sugar Institute*, 297 U.S. 553, 582 (1936).

[10] *Mandeville Island Farms, Inc. v. American Crystal Sugar Co*., 334 U.S. 219, 221 (1948).

Corporation (part of Defendant United). The sugar refiners were accused of using "brokers to act as go-betweens in carrying price information and exchanging assurances on price actions between and among refiners" to facilitate price-fixing.[11]

279. This led to a 1978 consent decree prohibiting such conduct, including direct communications about future prices and the use of intermediaries to facilitate price discussions. Despite these prohibitions, the practices described in the decree bear striking similarities to the conduct alleged in this case.

280. **Private Litigation and Settlements.** The DOJ's actions in the 1970s sparked multiple private class action lawsuits on both coasts of the United States, where courts certified classes of affected consumers. These cases ultimately settled, further illustrating the pervasiveness of anticompetitive practices in the sugar industry and the widespread harm inflicted on consumers.[12]

281. The history of antitrust violations in the sugar industry reveals a consistent pattern: sugar producers and refiners have repeatedly used information exchanges and pricing agreements to suppress competition. The Defendants' conduct in the present case is a continuation of this troubling legacy, exploiting structural vulnerabilities in the industry to agree upon and maintain artificially high prices for Granulated Sugar.

---

[11] *United States v. Great Western Sugar Co., et al.*, Case No. 74-2674-SW at ¶ 1415 (N.D. Cal. Dec. 19, 1974) (complaint brought by the United States in 1974 against Great Western Sugar Company, American Crystal Sugar Company (now part of United), Amalgamated Sugar Company, and other sugar refiners).

[12] *See In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322 (E.D. Pa. 1976); *In re Sugar Indus. Antitrust Litig.*, MDL No. 2201, 1976 WL 1374 (N.D. Cal. May 12, 1976), *mandamus denied*, 559 F.2d 481 (9th Cir. 1977).

### E. Defendants' Information Exchange Is an Independent Violation of Section 1 of the Sherman Act

282. Competition is harmed when, as here, competitors with market power in a concentrated market exchange confidential, strategic information about current and forward-looking plans for prices and supply. Price, capacity, supply, and costs are crucial aspects of competition. Information exchanges advance competitors' ability to collude. It is long-held Supreme Court precedent that exchanges of competitive information among competitors may independently violate Section 1, even without an express agreement to fix prices.

283. Here, Defendants' information exchange existed for the purpose of increasing prices of Granulated Sugar above competitive levels and aiding the Producer Defendants in abusing their market power to suppress price competition.

284. Defendants' information exchange took place in secret and involved the exchange of confidential, current, and forward-looking information.

285. Further, as alleged above, Defendants' information exchange occurred in a market with characteristics that make it particularly likely that such an exchange will have anticompetitive effects, including a market with inelastic demand, relatively few sellers, and a fungible product, for which competition is price-based.

286. As a result, as alleged above, prices for Granulated Sugar rose significantly during the Relevant Period.

287. There is no legitimate procompetitive justification for Defendants' conduct.

288. Defendants, through their use of Commodity and Wistisen to exchange non-public current and forward price, sales, and production information, have caused direct anticompetitive effects across the nation in the form of higher prices to U.S. consumers, commercial indirect purchasers, and direct purchasers, such as Plaintiffs.

### F. The USDA Sugar Program Does Not Render the Conspiracy Less Plausible

289. Defendants' anticompetitive scheme was not constrained by the USDA sugar program. This government program, established under the Agriculture and Food Act of 1981 (the 1981 Farm Bill), is said to stabilize sugar prices domestically. Over the years, Congress has reauthorized the program, most recently in 2025, with loan rates for raw cane and refined beet sugar increasing by over 20%.

290. While the USDA sugar program sets certain parameters for the domestic sugar market, it neither dictates final pricing nor shields producers from domestic competition. Instead, it provides mechanisms like price support loans, marketing allotments, and import quotas to maintain baseline sugar prices in the United States. However, these measures do not preclude the existence—or effect—of price-fixing conspiracies like the one alleged here.

291. The price support loans offered by the USDA allow sugar processors to borrow against their inventory at predetermined rates. If market prices fall below these levels, processors can forfeit their sugar as loan repayment. Yet, during the Class Period, there were no forfeitures, indicating that market prices consistently exceeded the USDA's effective support levels.

292. The Farm Service Agency (FSA) produces quarterly reports projecting whether the U.S. sugar stocks reported in the World Agricultural Supply and Demand Estimates report are likely to lead to forfeitures. The FSA's projections have concluded that forfeitures are unlikely for every quarter since March 2019. This is supported by the FSA's national level database of loan forfeitures for all commodities, which lists no forfeitures for beet sugar, cane sugar, or in-process sugars since at least 2019.

293. The lack of sugar loan forfeitures since 2019 suggests that market prices have been above the effective support level since 2019. As a result, the loan program did not serve as a binding constraint on sugar prices, leaving ample room for Defendants to manipulate the market upward.

294. The USDA also administers annual marketing allotments to cap the amount of sugar that processors can sell domestically for human consumption. While this mechanism seeks to prevent overproduction from depressing prices, it explicitly excludes limits on agricultural production or processing.

295. During the Class Period, the allotments were consistently below domestic demand, indicating that they did not act as a binding limitation on sales or pricing. This environment allowed the Defendants to coordinate price increases under the guise of supply constraints.

296. The USDA enforces tariff-rate quotas (TRQs) on imported sugar under the World Trade Organization's Uruguay Round Agreement. While these quotas protect domestic producers by limiting the amount of foreign sugar entering the market duty-free, they set minimum, not maximum, levels for imports. Throughout the Class Period, TRQs

were close to these minimum levels, providing limited external competitive pressure to counteract the Producer Defendants' collusive pricing strategies.

297. The USDA sugar program does not actively regulate market prices for Granulated Sugar. Instead, it provides a framework that Defendants exploited to execute their conspiracy. By using information about supply limitations and production allotments, the Defendants created artificial scarcity and coordinated pricing in a manner that was neither compelled by nor consistent with the goals of the USDA program.

298. While the USDA sugar program establishes a supportive baseline for domestic producers, it does not authorize, facilitate, or necessitate price-fixing. The conspiracy alleged in this case operated independently of the USDA's regulatory framework, leveraging market dynamics to harm competition, overcharge consumers, and violate antitrust laws.

### G. Defendants' Anticompetitive Conduct Proximately Caused Plaintiffs and Members of the Classes to Suffer Antitrust Injury and Damages

299. Because of the Defendants' anticompetitive conduct: (1) competition in the Granulated Sugar market has been reduced or eliminated, (2) prices for Granulated Sugar have been maintained at supra-competitive levels, and (3) United States purchasers of Granulated Sugar have been deprived of the benefit of price competition.

300. As a result of the Defendants' anticompetitive conduct, Plaintiffs and Class members paid more for Granulated Sugar than they otherwise would have paid and thus suffered antitrust injury and damages. The overcharges paid by Plaintiffs and members of

the Classes for Granulated Sugar constitute antitrust injury and harm to competition under the federal antitrust laws.

## V. LIMITATIONS AND TOLLING

301. By equitable estoppel, Defendants' concealment of their unlawful conspiracy has tolled any applicable statutes of limitations for Plaintiffs and Class Members with respect to any claims and rights of action that Plaintiffs and Class Members have alleged in this Complaint.

302. Plaintiffs and Class Members were not placed on actual or constructive notice of the conspiracy alleged herein until, at the earliest, the DOJ's Findings of Fact in support of its petition to stop the merger of United and Imperial was made public. The full scope of the Defendants' unlawful conduct could not have been discovered until the appellate exhibit volumes from the DOJ matter were made public on or about November 1, 2022.

303. In addition, throughout the Class Period, the Defendants actively, effectively, affirmatively, and fraudulently concealed their unlawful conspiracy from Plaintiffs and members of the Classes, and the conspiracy was inherently self-concealing.

304. Defendants promised to obey the law and act with integrity. For example, ASR Group's Code of Ethics and Business Conduct states in part, "ASR Group has always been dedicated to conducting business in a lawful and ethical manner in all of its operations." It further states that it seeks success "only . . . while upholding the highest standards of ethical conduct and all of the laws, domestic and foreign, that apply to our work." Regarding antitrust and competition laws, the Code states that ASR Group is

"prohibited" from engaging in "agreements with competitors to fix or control prices," and that it "may not engage in direct or indirect discussions or contacts with competitors regarding . . . [p]rices to be charged by ASR Group or others or regarding other terms and conditions of sales[;] [t]erritories or markets in which products will be sold[;] . . . [and] [b]usiness, marketing or strategic plans."

305. United's Code of Business Conduct and Ethics states that "[o]beying the law, both in letter and in spirit, is the foundation on which our ethical standards are built. All our employees, officers, directors, agents, and other representatives must respect and obey the laws of the cities, states, and countries in which we operate." It further states that "[w]e seek to outperform our competition fairly and honestly," and that there is an "obligation to protect [United's] assets [including United's] confidential information[.] Unauthorized use or distribution of United Sugars' confidential information is prohibited."

306. Michigan Sugar's commitment to "Sustainability and Corporate Social Responsibility" states that the company "live[s] by our values – Excellence, Pride, Integrity, Compassion, and Trust. This is the foundation of a business environment that sets respect and dignity for coworkers, suppliers, customers, and partners as an absolute expectation."

307. NSM's Commitment to Food Safety and Quality statement from January 3, 2023, states the "primary mission of National Sugar Marketing ("NSM") is to provide our customers quality products at competitive pricing on a national platform." The statement, signed by the Presidents and CEOs of NSM, Amalgamated, and Southern Minnesota Beet

Sugar COOP, continues by saying "[w]e continue to demonstrate ethical responsibility to our customers, our members partners, the community, and the environment."

308. Western Sugar Cooperative's Code of Ethics and Business Conduct Guidelines from September 2022 states "[a]ll employees, officers and directors of Western Sugar are obligated to comply at all times and unconditionally with the requirements of all applicable laws and professional rules applicable to their area of activity in Western Sugar." In its Antitrust Policy from the same year, Western also states it "values the importance of free market competition and is committed to conducting business fairly and transparently. [Western] will fully comply with all antitrust laws applicable to its operations."

309. These promises to obey the law and behave with integrity prevented Plaintiffs and members of the Classes from discovering Defendants' conduct earlier.

## VI. CLAIMS FOR RELIEF

### COUNT I:
### PRICE FIXING
### Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)
### On Behalf of All Plaintiffs and Class Members

310. Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

311. Defendants formed an unlawful contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3 to raise, fix, maintain, or stabilize Granulated Sugar prices. Since at least 2019, Defendants agreed with each other to exchange competitively sensitive non-public

information regarding prices, output, and costs in order to raise, fix, maintain or stabilize the prices of Granulated Sugar. The agreement was intended to and did unreasonably restrain trade and suppress competition with the purpose and effect of artificially raising, fixing, maintaining, or stabilizing prices in the Granulated Sugar market in the United States.

312. Pursuant to the agreement, the Defendants agreed to and did share pricing and other information that distorted and suppressed competition in the relevant market knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Granulated Sugar sold to Plaintiffs and members of the Classes.

313. This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is facially anticompetitive with no valid non-pretextual procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

314. Plaintiffs and the Class Members are threatened with future injury to their business and property by reason of Defendants' continuing violations of Sections 1 and 3 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

315. Plaintiffs and the Class Members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.[13]

**COUNT II:**
**UNLAWFUL INFORMATION EXCHANGE**
**Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)**
**On Behalf of All Plaintiffs and Class Members**

316. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

317. For purposes of this Count, which is based upon a claim subject to a Rule of Reason analysis, the relevant geographic market is the United States, and the relevant product market is Granulated Sugar. The Producer Defendants now have a combined [redacted] of the Granulated Sugar market and thus possess market power within it.

318. Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2019, and continuing through the present, Defendants agreed with each other to exchange competitively sensitive, non-public information regarding prices, output, supplies, and costs to raise, fix, maintain, or stabilize prices for Granulated Sugar in the United States to or at supra-competitive levels. The agreement was intended to and did unreasonably restrain trade and suppress competition, and it had the likely and actual effect of raising, fixing, maintaining, or stabilizing prices in the Granulated Sugar market in the

[13] Direct Purchaser Plaintiffs also seek monetary damages pursuant to the Sherman Act, and the Commercial and Consumer Indirect Purchaser Plaintiffs also seek monetary damages and other relief available to them under state law, which will be alleged in their respective Short-Form Complaints, by Order of the Court. *See* ECF No. 315.

United States to or at supra-competitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

319. Pursuant to the agreement, Defendants agreed to and did share pricing and other internal, material competitive information that distorted and suppressed competition in the relevant market while knowing and intending that the information would be used to artificially raise, fix, maintain, or stabilize prices of Granulated Sugar sold in the United States to Plaintiffs and Class Members to or at supra-competitive levels.

320. This conduct is unlawful under either a quick look or a full-fledged Rule of Reason analysis because the agreement is facially anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, the Producer Defendants' objectives could have been reasonably achieved through less restrictive means.

321. The contract, combination, or conspiracy alleged herein has had the following effects, among others:

- Price competition in the sale of Granulated Sugar has been restrained, suppressed, and/or eliminated in the United States;
- Prices for Granulated Sugar sold by the Producer Defendants have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States; and
- Plaintiffs and the Class Members have been deprived of the benefits of free and open competition.

322. Plaintiffs and Class Members have been injured and will continue to be injured in their businesses or property by paying more for Granulated Sugar purchased indirectly from the Producer Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

323. Plaintiffs and Class Members are threatened with future injury to their business and property by reason of Defendants' continuing violations of Sections 1 and 3 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

324. Plaintiffs and the Class Members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.[14]

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, respectfully request judgment against Defendants, as follows:

A. That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed in violations of Sections 1 and 3 of the Sherman Act;

B. That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and

---

[14] Direct Purchaser Plaintiffs also seek monetary damages pursuant to the Sherman Act, and the Commercial and Consumer Indirect Purchaser Plaintiffs also seek monetary damages and other relief available to them under state law, which will be alleged in their respective Short-Form Complaints, by Order of the Court. *See* ECF No. 315.

restrained from in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

C. That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of a company's information;

D. That Plaintiffs and the Classes recover their costs of suit, including reasonable attorneys' fees, expenses, and costs as provided by law; and

E. That Plaintiffs and the Classes be awarded such other and further relief as the case may require and the Court may deem just and proper.

Dated: September 14, 2026

Respectfully Submitted,

*/s/ Daniel E. Gustafson*
**GUSTAFSON GLUEK PLLC**
DANIEL E. GUSTAFSON (#0202241)
DANIEL C. HEDLUND (#0258337)
JOSHUA J. RISSMAN (#0391500)
ABOU B. AMARA, JR. (#0401146)
GABRIELLE M. KOLB (#0504386)
MELANIE A. MILLER (#0506523)
Canadian Pacific Plaza
120 So. Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
jrissman@gustafsongluek.com
aamara@gustafsongluek.com
gkolb@gustafsongluek.com
mmiller@gustafsongluek.com

*/s/ Michael L. Roberts*
**ROBERTS LAW FIRM US, PC**
MICHAEL L. ROBERTS
ERICH P. SCHORK
SARAH E. DELOACH
1920 McKinney Ave, Suite 700
Dallas, TX 75201
Telephone: (501) 821-5575
Fax: (501) 821-4474
mikeroberts@robertslawfirm.us
erichschork@robertslawfirm.us
sarahdeloach@robertslawfirm.us

***Appointed Interim Plaintiffs' Steering Committee Members and Co-Leads for the Direct Purchaser Plaintiffs Subgroup***

*/s/ Heidi M. Silton*
**LOCKRIDGE GRINDAL NAUEN PLLP**
HEIDI M. SILTON (#025759X)
JESSICA N. SERVAIS (#0326744)
JOSEPH C. BOURNE (#0389922)
MICHAEL J.K.M. KINANE (#0504621)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: 612/339-6900
hmsilton@locklaw.com
jnservais@locklaw.com
jcbourne@locklaw.com
mjkmkinane@locklaw.com

*/s/ Kimberly A. Justice*
**JUSTICE JAGHER LONDON & MILLEN LLC**
KIMBERLY A. JUSTICE
JONATHAN M. JAGHER
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610/234-6486
kjustice@jjlmlaw.com
jjagher@jjlmlaw.com

**JUSTICE JAGHER LONDON & MILLEN LLC**
MATTHEW W. RUAN (#033909X)
DOUGLAS A. MILLEN
ROBERT J. WOZNIAK
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@jjlmlaw.com
dmillen@jjlmlaw.com
rwozniak@jjlmlaw.com

***Appointed Interim Plaintiffs' Steering Committee Member and Co-Lead Counsel for the Commercial Indirect Purchaser Plaintiffs Subgroup***

*/s/ Stacey P. Slaughter*
**ROBINS KAPLAN LLP**
STACEY P. SLAUGHTER (#0296971)
CAITLIN E. KEIPER (#0504799)
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: 612-349-8500
Facsimile: 612-339-4181
sslaughter@robinskaplan.com
ckeiper@robinskaplan.com

**ROBINS KAPLAN LLP**
ELLEN G. JALKUT
1325 Avenue of the Americas, Suite 2601
New York, NY 10019
Telephone: 212-980-7400
Facsimile: 212-980-7499
ejalkut@robinskaplan.com

*/s/ Elizabeth A. Fegan*
**FEGAN SCOTT LLP**
ELIZABETH A. FEGAN
DERRICK LOVING
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone: (844) 399-5171
Fax: (312) 264-0100
beth@feganscott.com
derrick@feganscott.com

**FEGAN SCOTT LLP**
JONATHAN LINDENFELD
305 Broadway, 7th Floor
New York, NY 10007
Jonathan@feganscott.com
Telephone: (844) 399-5171
Fax: (312) 264-0100

*/s/ Peter A. Barile III*
**LOWEY DANNENBERG, P.C.**
VINCENT BRIGANTI
PETER ST. PHILLIP, JR.
PETER A. BARILE III
SITSO BEDIAKO (#0389073)
NICOLE A. VENO
VINCENT R. CAPPUCCI, JR.
RADHIKA GUPTA
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Fax: (914) 997-0035
vbriganti@lowey.com
pstphillip@lowey.com
pbarile@lowey.com
sbediako@lowey.com
nveno@lowey.com
vcappucci@lowey.com
rgupta@lowey.com

***Appointed Interim Plaintiffs' Steering Committee Members and Co-Lead Counsel for the Consumer Indirect Purchaser Plaintiffs Subgroup***