**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| IN RE: GRANULATED SUGAR ANTITRUST LITIGATION | MDL No. 24-03110 (JWB/ECW) |
| **THIS DOCUMENT RELATES TO:** *Mondelēz Global LLC et al. v. ASR Group International, Inc. et al.,* No. 0:26-cv-03528 | |

**SUPPLEMENTAL DECLARATION OF**
**PROFESSOR EMERITA NANCY J. MOORE**

I, Professor Emerita Nancy J. Moore, hereby declare and state:

## I. Scope

1. I incorporate my September 4, 2026, Declaration herein, and use the defined terms as defined in the Declaration. ECF No. 769 ("Moore Decl.").

2. I submit this Supplemental Declaration in support of the Food Manufacturer Plaintiffs' reply in support of their Motion. *See* ECF Nos. 760–772. My Supplemental Declaration provides responsive opinions to the Declaration of Bruce A. Green (ECF No. 844 ("Green Decl.")) and to questions of lawyers' professional responsibility raised by ASR/Domino's and Paul Weiss's oppositions and their supporting papers filed on September 23, 2026 (ECF Nos. 842–845, 848–849). Due to the voluminous filings by ASR/Domino and Paul Weiss and short window in which to respond, I touch on certain key points but note that I have not provided all points of agreement or disagreement with

the September 23, 2026, filings. I reserve the right to later render opinions responding to Paul Weiss's and ASR/Domino's September 23, 2026, filings, particularly if requested by the Court.

## II. Expert Qualifications

3. I incorporate the Expert Qualifications Section of my Declaration herein.

4. In addition to the documents listed in Exhibit Q to my Declaration, I also reviewed the following documents: Paul Weiss's Opposition and supporting papers (ECF Nos. 842–845 ("PW Opp.")); ASR/Domino's Opposition and supporting papers (ECF Nos. 848–849 ("ASR/Domino Opp.")); and any additional legal authority cited herein.

## III. Summary of Opinions

5. As discussed below and based on my Declaration, and the facts set forth in Paul Weiss's and ASR/Domino's Oppositions and their supporting papers (ECF Nos. 842–845, 848–849), it is my opinion that:

a. The Food Manufacturer Plaintiffs' evidence describes information that falls within the categories recognized by the ABA and district courts as "significantly harmful" pursuant to Rule 1.18.

b. Paul Weiss's Opposition and supporting papers (ECF Nos. 842–845) establish that the firm did not satisfy the elements of Rule 1.18(d)(2). Specifically, the new information revealed by Paul Weiss's opposition demonstrates that the screen was "untimely" and that Paul Weiss does not offer enough information to assess its adequacy. The new information also confirms that Paul Weiss did not provide the requisite prompt notice of the screen to the Food Manufacturer Plaintiffs, as required by that Rule.

c. Paul Weiss's representation of ASR/Domino in the Sugar MDL and its membership on the Defendants' Steering Committee are directly adverse to Kraft Heinz pursuant to Minnesota Rule of Professional Conduct 1.7.

d. I incorporate the opinions in my Declaration, herein, none of which I would change based on my review of Paul Weiss's and ASR/Domino's oppositions and supporting papers.

## IV. <u>**Clarification of ¶¶ 40–41 of the Declaration**</u>

6. In paragraph 40 of my Declaration, I opined:

> Rule 1.18(c) provides that "[i]f a lawyer is disqualified from representation under this paragraph, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in paragraph (d)." Comment [7] to Rule 1.18 explains that "[u]nder paragraph (c), the prohibition in this rule is imputed to other lawyers as provided in Rule 1.10," except for situations covered by paragraph (d). Under Rule 1.10(a), when a lawyer is personally disqualified, all lawyers associated with them in a law firm are similarly prohibited from the representation, unless there is an available exception. Thus, the personal disqualification of the remaining lawyers is imputed to the Paul Weiss lawyers representing ASR/Domino.

7. Paul Weiss and Professor Green incorrectly argue that Rule 1.10, including Rule 1.10(c), does not apply to former prospective client conflicts. PW Opp. at 18 n.6; Green Decl. ¶ 43 n.10. This position is contrary to the express language of Comment [7] to Rule 1.18, which provides that "the prohibition in this rule is imputed to other lawyers as provided in Rule 1.10," but that the methods to avoid imputation (i.e., informed consent or screening) are provided within Rule 1.18(d). Thus, my argument under Rule 1.10(c) is not an attempt to revise the Rule (*see* PW Opp. at 18 n.6) but is an interpretation of the Rule, prompted by the direction of Comment [7].

8. Although Professor Green concludes (without addressing the reference to Rule 1.10 in Rule 1.18 Comment [7]) that Rule 1.10(c) does not apply to former prospective client conflicts (*see* Green Decl. ¶ 43 n.10), he apparently concedes that the content of that Rule applies through the express language of Rule 1.18(c), i.e., if there is even one current Paul Weiss lawyer who has "significantly harmful information," then that lawyer's conflict is imputed to the current Paul Weiss lawyers representing ASR/Domino unless an exception under Rule 1.18(d) applies. *Id.* ¶ 43.[1] That is precisely what Rule 1.10(c) provides. My only purpose in referring to Rule 1.10(c) (as opposed to relying solely on the language of Rule 1.18(c)) is to highlight that there must be an express inquiry into whether the Supporting Consultation Attorneys (defined below) have "significantly harmful information."

9. Neither Paul Weiss nor Professor Green dispute that there are two Paul Weiss attorneys—one current employee, one former employee as of May 2026[2] (McCabe Decl. ¶ 7)—who were involved in the 2024 consultation (hereinafter, the "Supporting Consultation Attorneys"), in addition to the three departed partners who participated in the

[1] Of course, this is precisely what Rule 1.18(c) provides: "A lawyer [who has learned information from a prospective client during a consultation] shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d)." Professor Green cannot reasonably argue that if the remaining Supporting Consultation Attorney learned such information, this attorney is not personally disqualified, and the disqualification is imputed to other Paul Weiss lawyers unless there is an exception under Rule 1.18(d).

[2] The conflicts issues were identified by the Food Manufacturer Plaintiffs to Paul Weiss no later than February 6, 2026. Petkoski Decl. ¶ 14.

entirety of the 2024 consultation, including the October 2024 in-person consultation. PW Opp. at 5–8; Green Decl. ¶¶ 14–17.

10. Regardless of whether one uses the language of Rule 1.18(c) itself (whether there is a current Paul Weiss lawyer who received "significantly harmful information") or the language of Rule 1.10(c) (whether, after the departures of the three Paul Weiss partners, there is "any lawyer remaining in the firm [who] has [confidential information] . . . that is material to the matter"),[3] the further inquiry I undertook in my initial declaration was to opine on two questions: (1) during the 2024 consultation, did Paul Weiss obtain "significantly harmful information;" and, if so, (2) did any of the Supporting Consultation Attorneys learn such information. I turn now to respond to certain arguments that relate to these two questions.

## V. Professor Green Makes Unsupported Assumptions Concerning Whether Paul Weiss Obtained Significantly Harmful Information from the Food Manufacturer Plaintiffs

11. Paul Weiss and Professor Green assume that because the Supporting Consultation Attorneys did not attend the in-person consultation in October 2024, they did not obtain significantly harmful information from the Food Manufacturer Plaintiffs. PW Opp. at 16–18; Green Decl. ¶¶ 34–38, 43–44. Professor Green fails to consider whether the Food Manufacturer Plaintiffs' information relating to their "strategic thinking concerning[] the merits of the case, potential defenses, and litigation and settlement strategy" that was

[3] In my initial declaration, I assumed that "material confidential information" means "significantly harmful information" when applied to former prospective clients. *See* Moore Decl. ¶ 41.

shared at the October 2024 consultation was passed to the Supporting Consultation Attorneys via written meeting notes and/or oral conversations with the three partners who attended the consultation in person. *See* Dillingham Decl. ¶ 13.

12. Tellingly, Paul Weiss's opposition (i) did not supply evidence that the Supporting Consultation Attorneys lacked confidential information relating to the 2024 consultation; (ii) did not argue it would be appropriate for the Supporting Consultation Attorneys to represent ASR/Domino in the Sugar MDL; and (iii) did not include any declarations from the Supporting Consultation Attorneys denying that they obtained the confidential information described in Ms. Dillingham's declaration from the Food Manufacturer Plaintiffs in the pitch via the three departed partners, either orally or in writing.[4] Without such declarations, I believe it is improper for Professor Green, who did not attend the October 2024 consultation, to speculate that the Supporting Consultation Attorneys and the firm are not in possession of significantly harmful information learned from the Food Manufacturer Plaintiffs in that meeting, as well as at earlier stages of the consultation. As a result, given the lack of compliance with Rule 1.18(d), it is improper for the Paul Weiss ASR/Domino attorneys (Mr. Petkoski and others) to continue to represent ASR/Domino.

---

[4] Indeed, even in Ms. McCabe's declaration, she does not claim that she has obtained a declaration from either of the Supporting Consultation Attorneys that they did not *learn* confidential information about the in-person consultation from the three departed partners: all she says is that "[b]oth never shared or discussed any alleged confidential information from the Former Prospective Clients with any lawyers representing ASR/Domino." McCabe Decl. ¶ 7.

## VI. The Evidentiary Record Shows Two Types of Significantly Harmful Information Were Provided to Paul Weiss

13. Professor Green opines that "Paul, Weiss should not be disqualified based on its alleged receipt of disqualifying information from Plaintiffs as former prospective clients." *See* Green Decl. ¶¶ 26–38. He bases his conclusion on: (1) characterizing a declaration given under penalty of perjury by a member of the bar (Ms. Emily Dillingham) as allegations insufficient to support a finding of "significantly harmful" information (*id.* ¶¶ 2, 17, 19, 34–38) (while at the same time asking the Court to credit the sworn declarations and representations of the party that hired him as a basis for denying the relief sought in the Motion) (*id.* ¶ 44 ("Paul, Weiss's representations should be accepted.")); and (2) speculating that the pricing information the Food Manufacturer Plaintiffs disclosed at Paul Weiss's request was not itself "significantly harmful information." I disagree with Professor Green's opinion and stand by my contrary opinion in my Declaration. *See* Moore Decl. ¶¶ 31–38.

14. As discussed in my Declaration, information disclosed by the prospective client that is typically viewed as "significantly harmful" under Rule 1.18 includes "views on various settlement issues including price and timing;" "personal accounts of each relevant event [and the prospective client's] strategic thinking concerning how to manage the situation;" and "a presentation by a corporation seeking to bring an action of 'the underlying facts and legal theories about its proposed lawsuit.'" ABA Formal Opinion 20-492 (2020) at 6 (quoting N.Y.C. Bar Ass'n Comm. on Prof'l Ethics, Formal Op. 2013-1 (2013), at 5); *see also* Moore Decl. ¶¶ 34–38. Further:

> Information may be "significantly harmful" if it is sensitive or privileged information that the lawyer would not have received in the ordinary course of due diligence; or if it is information that has long-term significance or continuing relevance to the matter; such as motives, litigation strategies or potential weakness. "Significantly harmful" may also be the premature possession of information that could have a substantial impact on settlement proposals and trial strategy; the personal thoughts and impression about the facts of the case; or information that is extensive, critical or of significant use.

ABA Formal Opinion 20-492 (2020) at 7 (quoting *Kuntz v. Disciplinary Bd. of Supreme Court of North Dakota*, 869 N.W.2d 117, 125 (N.D. 2015)). Professor Green's Declaration adopts this "premature possession" standard, Green Decl. ¶ 29 n.5, and Paul Weiss relies on *In re OneJet, Inc.*, 614 B.R. 522 (Bankr. W.D. Pa. 2020), describing "significantly harmful information" to include "intimate knowledge of the prospective client's views and impressions of the litigation that could not have been obtained elsewhere, including a party's assessment of its own claims and risk tolerance, its settlement authority, and its strategic vision to manage any litigation." PW Opp. at 15 (internal quotations omitted).

15. Ms. Dillingham's sworn declaration stated that the Food Manufacturer Plaintiffs provided information relating to their "strategic thinking concerning[] the merits of the case, potential defenses, and litigation and settlement strategy" at the October 2024 consultation. *See* Dillingham Decl. ¶ 13. The parties agree that these categories of information are "significantly harmful information." *See supra* at ¶ 14. Also, as part of the 2024 consultation, Kellanova provided pricing data to Paul Weiss, which I understand is "key evidence" used "to support establishing a parallel pricing pattern amongst the potential defendants." Mot. at 8 n.6. This category of information is of the type that Professor Green acknowledges can be significantly harmful information because it is

"premature possession of information that could have a substantial impact on settlement proposals[.]" Green Decl. ¶ 29 n.5. Both of these categories of information that the Food Manufacturer Plaintiffs provided as part of the 2024 consultation satisfy the standard of "significantly harmful" information described herein, including under the standards identified by Paul Weiss and Professor Green.

16. Despite the parties' agreement on the standard, Professor Green appears to avoid a finding that "significantly harmful information" was obtained by Paul Weiss by discrediting the sworn declaration of a member of the bar (Ms. Dillingham) as solely allegations, and speculating—without the support of any evidence from the Paul Weiss perspective of what was discussed during the 2024 consultation (such as by declarations from the three departed partners and the two Supporting Consultation Attorneys)—that there was no communication between the three departed pitching partners and the two Supporting Consultation Attorneys about the October 2024 in-person consultation or related work product. Green Decl. ¶¶ 34–38. In his view, "there is no evidence that any lawyer remaining at the Firm possessed" the confidential information after the three partners left the firm in 2025. *Id.* ¶ 43. He also claims that because the pricing information would be revealed in discovery, it is unlikely to be significantly harmful. *Id.* ¶ 37.

17. Professor Green's treatment of Ms. Dillingham's declaration is contrary to Minnesota law. In *Niemi v. Girl Scouts of Minnesota & Wisconsin Lakes & Pines*, a Minnesota appellate court held that a former client's affidavit filed in support of a disqualification motion that described the confidential information she provided to her former counsel in general terms—"performance, supervisory style, employment history,

experience, strengths and weaknesses, and job qualifications"—was sufficient to establish that the confidential information had been in fact communicated. 768 N.W.2d 385, 389 (Minn. App. 2009). The court agreed that the plaintiff was "not required to produce evidence that confidential factual information actually was communicated because it is reasonable to infer that she made the communications that she says she made" in the affidavit. *Id*. at 390.[5] So too here, Ms. Dillingham's sworn declaration should be credited, not treated as "allegations." Also, as described above, the firm offered no declarations from either the three departed partners or the Supporting Consultation Attorneys (including from the associate still employed by the firm) denying Ms. Dillingham's sworn assertions and stating that they lacked confidential information relating to the 2024 consultation, including both information from the October 2024 in-person consultation and the pricing data.

18. With respect to the pricing data, Professor Green cites no authority to support his conclusion that the pricing data "cannot be inferred" as "significantly harmful" (Green Decl. ¶ 37), despite his own declaration acknowledging that "premature possession of information that could have a substantial impact on settlement proposals and trial strategy" qualifies as significantly harmful information. *See supra* at ¶ 14. Instead, he concludes it

---

[5] *Niemi* involved disqualification under Rule 1.9, not Rule 1.18; however, the court found it necessary to determine whether the plaintiff had "made the communications that she [said] she made" in order to determine whether the two matters in that case were substantially related under Rule 1.9. The point is that the court did not require the plaintiff to detail the specific facts she disclosed, but rather it was enough to establish, via her uncontested affidavit, that she disclosed factual information in the categories she identified.

cannot be significantly harmful because the data was already in ASR/Domino's possession and it otherwise would be produced in discovery. Green Decl. ¶ 37. First, the pricing data included information from purchases from other sugar suppliers, not just from ASR/Domino. Dillingham Decl., Ex. K. Second, even if ASR/Domino were to receive that information in discovery, that information remained unscreened on Paul Weiss's system for about five months where there was a risk that it could have been prematurely accessed by the Paul Weiss ASR/Domino team, including in their work with economic experts and in responding to the Food Manufacturer Plaintiffs' November 2025 letter. Petkoski Decl. ¶ 11; Davis Decl. ¶ 28.

19. Even if the Paul Weiss ASR/Domino team has not accessed the pricing data, it is the type of information (premature possession) that the parties both agree could be "significantly harmful" and would thus trigger Paul Weiss's obligation to comply with Rule 1.18(d) so that it would avoid the imputation of the conflict. In other words, if it is established that the Supporting Consultation Attorneys learned confidential information from the Food Manufacturer Plaintiffs "that could be significantly harmful," then in order to avoid imputation, Paul Weiss was obligated to comply with the requirements of Rule 1.18(d), and the Food Manufacturer Plaintiffs are not required to establish that the ASR/Domino team has accessed (or will access) this information.

20. I thus reject Professor Green's opinion that there is insufficient evidence that "significantly harmful information" was provided by the Food Manufacturer Plaintiffs to Paul Weiss as part of the 2024 consultation.

## VII. <u>The Record Shows Paul Weiss Failed to Satisfy the Conjunctive Elements of Rule 1.18(d)(2)</u>

21. Professor Green does not dispute that Rule 1.18(d)(2) requires reasonable measures, *and* a timely screen, *and* prompt written notice. *See* Green Decl. ¶ 24 n.1. Failure of one of these elements defeats the exception. However, I disagree with Professor Green's interpretation and application of the Rule. Professor Green opines that disqualification should not be required for "technical" non-compliance with the conjunctive elements of Rule 1.18(d)(2) because there was a screen in place to secure certain consultation materials and forbid discussion between certain firm attorneys. Green Decl. ¶¶ 39–47. The requirements in Rule 1.18(d)(2) are not "technical" requirements. They are ethical obligations of the firm. Paul Weiss's casual treatment of its divergence from its ethical requirements, and the firm's advocacy for the Court to reach a result that places no responsibility on the firm to fulfill its obligations to both sets of "clients" (the Food Manufacturer Plaintiffs, as former prospective clients, and ASR/Domino, a current client) could undermine "the public's confidence in the legal system." Moore Decl. ¶ 69; *LaSalle Nat'l Bank v. County of Lake*, 703 F.2d 252, 259 (7th Cir. 1983) (Despite lateral attorney submitting affidavit in support of opposition to motion to disqualify disclaiming disclosure of confidential information "to any person associated with the firm . . . on any matter relevant to this litigation," the Seventh Circuit affirmed disqualification of firm where firm failed to institute a screen of lateral attorney until six months after the attorney joined the firm due in part because "the relevant information is singularly within the ken of the party defending against the motion" and implicated "the reputation of the bar as a whole[.]").

22. Based on further information provided in Paul Weiss's and ASR/Domino's oppositions and supporting papers, I maintain my opinion that none of the three conjunctive elements of Rule 1.18(d)(2) at issue was complied with.

23. With respect to reasonable measures, I do not dispute that a lawyer consulting a prospective client needs to obtain information "to determine whether the lawyer may properly accept the representation," Green Decl. ¶ 33, but Professor Green identifies no efforts Paul Weiss took to limit the firm's exposure to the Food Manufacturer Plaintiffs' confidential information. The firm provides no evidence that it confined the consultation to conflicts and scope; declined client data pre-engagement; cautioned the prospective client not to share strategy until engagement; or documented those steps. None of this evidence appears in the record. Professor Green also raises a concern that consultations or "beauty contests" where confidential information is disclosed could be used to "conflict out" participating firms like Paul Weiss here. Green Decl. ¶ 47. However, Rule 1.18(d)(2) places the burden on the lawyer participating in a "beauty contest" to take "reasonable measures to avoid exposure to more disqualifying information than was reasonably necessary to determine whether to represent the prospective client," if the lawyer wants to protect herself and her firm from imputation. A sophisticated firm, such as Paul Weiss, could have limited the flow of confidential information to protect against the risk of a Rule 1.18 prospective client conflict, but it did not. It may not rely on in-house counsel for the Food Manufacturer Plaintiffs to limit the flow of significantly harmful information, given that counsel may have disclosed this information in order to obtain and assess Paul Weiss's proposed approach to the prospective representation.

24. Paul Weiss's opposition likewise tacitly concedes that its screen was untimely (and Professor Green declines to address this element in detail (Green Decl. ¶ 46 ("there is no need to debate whether Paul, Weiss's screen was 'timely' within the meaning of Rule 1.18(d)(2)(i)")). The Paul Weiss Opposition does not provide a date when the screen was implemented but generally explains that it was instituted sometime after counsel for the Food Manufacturer Plaintiffs raised their conflicts concerns in February 2026. McCabe Decl. ¶¶ 13–14. Thus, the screen was likely implemented about five months after Paul Weiss recruited and hired Mr. Petkoski as a lateral partner in September 2025 and "immediately" began representing ASR/Domino. Petkoski Decl. ¶¶ 9–10; Davis Decl. ¶ 22.

25. It is my opinion that in September 2025, when Mr. Petkoski began his work with the firm and the firm accepted the representation of ASR/Domino in the Sugar MDL, Paul Weiss "reasonably should [have] know[n]" there was a need for screening. Moore Decl. ¶ 48 (quoting Comment [10] to Rule 1.0); *see also LaSalle Nat'l Bank*, 703 F.2d at 259 n.3 ("[O]ur analysis frequently requires identification of problems at the time attorneys are hired. In some cases, this may be difficult or even impossible. Nevertheless, we believe that *timely* screening arrangements are essential to the avoidance of firm disqualification."). In Formal Opinion 09-455, the ABA provided guidance with respect to the lateralling lawyer and prospective new firm's duties to "detect and resolve conflicts of interest." "[B]efore a moving lawyer joins a new firm, the Model Rules and the common law require the lawyer and the firm to detect and resolve conflicts of interest to protect their

clients and former clients, even if only one party to the move undertakes the actual conflicts analysis." *Id.* at 3.

26. More than one year prior to Mr. Petkoski joining the firm as a lateral partner, Petkoski Decl. ¶ 9, a former Paul Weiss partner had run and cleared conflicts for this same MDL, for the purpose of determining whether Paul Weiss could consult with the Food Manufacturer Plaintiffs, including current Paul Weiss client Kraft Heinz, all of which intended to be adverse to ASR/Domino. Dillingham Decl. ¶¶ 3–14. As a result, the law firm either did or reasonably should have entered relevant information about the 2024 prospective client consultation into its conflicts checking software.[6] There is no evidence in the record that Paul Weiss undertook a conflicts check with respect to the potential representation of ASR/Domino in the same MDL (which was the subject of the firm's earlier May 2024 conflicts check) either (1) prior to when Mr. Petkoski joined the firm; (2) at the time Mr. Petkoski joined the firm; or (3) at the time the firm began its representation of ASR/Domino in September 2025. Presumably, any of these conflict checks would have uncovered the 2024 consultation and Paul Weiss's then six-year representation of Kraft Heinz, and at that point, Paul Weiss would have had a duty to address and resolve the Rule 1.18 conflict and with respect to Kraft Heinz, the Rule 1.7 conflict, including by providing

---

[6] Paul Weiss had represented Kraft Heinz for six years at the time of Mr. Petkoski's lateral hire. PW Opp. at 11; Fox Decl., Ex. H. It is difficult to understand how the firm could have failed to detect either the Rule 1.18 prospective client conflict involving Kraft Heinz as one of former potential plaintiffs or the Rule 1.7 directly adverse conflict involving Kraft Heinz, which Paul Weiss concedes prohibits it from representing ASR/Domino in at least its direct dealings with Kraft Heinz in both its individual action and in the MDL. *See* PW Opp. at 28-29.

notice to all Food Manufacturer Plaintiffs of the conflicts affecting each of them. If Paul Weiss and Mr. Petkoski had complied with their duties in a timely fashion, the alleged prejudice emphasized by Professor Green (Green Decl. ¶ 41) could have been mitigated by Paul Weiss, which had duties to both ASR/Domino and the Food Manufacturer Plaintiffs.

27. Paul Weiss relies on two cases to support its assertion that its screen was timely, *Vaccine Center, LLC v. Glaxosmithkline LLC*, No. 2:12-cv-01849, 2013 WL 1787176 (D. Nev. Apr. 25, 2013) and *Beckenstein Enterprises-Prestige Park, LLC v. Lichtenstein*, No. X06CV030183486S, 2004 WL 1966863 (Conn. Super. Ct. Aug. 11, 2004). PW Opp. at 21. Both are distinguishable because: (1) there was no evidence in either case that the lawyer reasonably should have known of the conflict prior to the time that the conflict was raised by opposing counsel; and (2) there is no evidence that the screen was promptly implemented when Paul Weiss learned (through Mr. Petkoski's conflicts check in December 2025) that Kraft Heinz (one of the plaintiffs suing ASR/Domino) was a current client of the law firm. Petkoski Decl. ¶¶ 11, 13, 14; McCabe Decl. ¶ 12. This second distinguishing factor suggests that Paul Weiss "reasonably should have known" that a screen was required no later than December 2025.

28. Based on this record, I disagree that Paul Weiss has provided enough information about its screen for either the Food Manufacturer Plaintiffs or the Court to determine its adequacy. Paul Weiss's Deputy General Counsel Elizabeth McCabe's declaration does not supply information necessary to assess adequacy such as the date of the screen; the screening mechanisms, the identity of the relevant persons (including the identity of the entirety of the ASR/Domino Paul Weiss team and the Supporting

Consultation Attorneys); how the information was "electronically secured;" whose email accounts contained the pricing data and whether those inboxes were retained, who has had access to them, and when access was restricted. *See generally* McCabe Decl. ¶ 14.

29. Finally, Rule 1.18(d)(2)(ii) requires that "written notice [of screening under (d)(2)(i)] is promptly given to the prospective client." *See also* Green Decl. ¶ 32. Despite citing this specific provision of the Rule in his declaration, Professor Green incorrectly opines that Rule 1.18(d) "do[es] not require that details be shared with the opposing party regarding screening measures and the circumstances leading up to the adoption of such measures." Green Decl. ¶ 45 n.12. This opinion ignores Comment [8] to Rule 1.18, which provides that written notice includes "a description of the screened lawyer's prior representation and of the screening procedures employed." I have seen no evidence of Paul Weiss's compliance with these minimum requirements. *See* Moore Decl. ¶¶ 53–55. Any writings after February 2026 did not include the sufficient detail required by Rule 1.18. *See* Fox Decl., Ex. D (Paul Weiss letter stating that the Supporting Consultation Attorneys were "screened from all matters" involving ASR/Domino and that the consultation materials "are not accessible to and have not been accessed by" the ASR/Domino Paul Weiss team); Fox Decl., Ex. G (Paul Weiss letter stating generally that the firm "implemented appropriate screening measures" without providing any description of those measures).

30. It is also undisputed that no written notice of the conflict was provided by Paul Weiss to the Food Manufacturer Plaintiffs. Instead, it is agreed the conflict was raised orally by counsel for the Food Manufacturer Plaintiffs in February 2026, although Mr. Petkoski had conducted a conflicts check in early December 2025 (McCabe Decl. ¶ 12)

and therefore knew for more than one month before the February 2026 call that Kraft Heinz (a current Paul Weiss client) was an adverse party to the firm's representation of ASR/Domino. Petkoski Decl. ¶¶ 11–14; McCabe Decl. ¶¶ 12–14; Fox Decl. ¶¶ 12–14. (There is also no record evidence that Paul Weiss alerted at least its current client Kraft Heinz of the conflict due to its representation of ASR/Domino in the same matter.)

31. To avoid the "written notice . . . given to the prospective client" requirement, Paul Weiss argues that actual notice suffices under Rule 1.18. PW Opp. at 20–21. This opinion is not adopted by Professor Green, presumably because it has no basis in the Rules or in law. *See* Minn. R. Prof'l Conduct 1.18(d)(2)(ii) ("written notice is promptly given to the prospective client"); Minn. R. Prof'l Conduct 1.0(o) (defining "written" to "denote[] a tangible or electronic record of a communication or representation, including handwriting, typewriting, printing, photostating, photography, audio or videorecording, and electronic communications"); *Benevida Foods, LLC v. Advance Mag. Publishers Inc.*, No. 15-cv-2729, 2016 WL 3453342, at *14 (concluding no notice was provided where the prospective client denied receiving written notice from the law firm); *Gohlke by Luciano v. Trinitas Regional Medical Center*, No. A-2815-22, 2023 WL 7383051, at *5 (N.J. Super. Ct. App. Div. Nov. 8, 2023) (concluding that lack of written notice "alone" required disqualification, and rejecting "actual or constructive notice" argument where the relevant Rule (1.10), like Rule 1.18, required "written notice" to be given "promptly" to the affected client).

32. For the reasons set forth above, the September 23, 2026, oppositions have not changed my opinion that the disqualification of the personally disqualified Paul Weiss lawyers is imputed to the Paul Weiss lawyers representing ASR/Domino, and that Paul

Weiss has not avoided, and cannot avoid, imputation through timely and effective screening measures.

## VIII. Paul Weiss's Representation of ASR/Domino Is Directly Adverse to Kraft Heinz, a Current Client of Paul Weiss, in Violation of Minnesota Rule 1.7(a)(1)

33. Rule 1.7(a)(1) provides that a conflict of interest exists if "the representation of one client will be directly adverse to another client." Paul Weiss does not dispute that Kraft Heinz was a current client of Paul Weiss at the time it began representing ASR/Domino and that it remains a current client of the law firm. *See* PW Opp. at 4, 11. Whether Kraft Heinz's Delaware Chancery Court litigation matter is unrelated is irrelevant. *See* Rule 1.7 cmt. 6 ("Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent. Thus, absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, ***even when the matters are wholly unrelated***.") (Emphasis added).

34. I disagree with Professor Green's opinion that any adversity to Kraft Heinz in the MDL where ASR/Domino's counsel at Paul Weiss is a member of the Steering Committee is merely indirect. Green Decl. ¶¶ 48–53. There is no dispute that as a leader on Defendants' Steering Committee, Paul Weiss partner Mr. Petkoski is responsible for coordinating and conducting discovery on "behalf of Defendants in all actions [including against Kraft Heinz];" examining witnesses and introducing evidence at hearings on behalf of Defendants; and exploring, developing, and pursuing "all settlement options pertaining to any claim, case, or portion thereof in the litigation." *See* ECF No. 193 at 6-8. This is "head-to-head opposition" and "litigating against a party that is a client in another matter"

that constitutes direct adversity. *See* Green Decl. ¶ 49; Moore Decl. ¶¶ 56–64. Despite Paul Weiss's emphasis on the engagement of Maslon as conflicts counsel for ASR/Domino to purportedly eliminate Kraft Heinz's direct adversity concerns by having the firm avoid dealings with Kraft Heinz, *see* PW Opp. at 28–30, ASR/Domino's Chief Litigation Counsel's declaration strongly suggests that Paul Weiss will ultimately steer the defense and that Paul Weiss's continued involvement in all claims is required to avoid inadequate representation. Davis Decl. ¶¶ 25–34. She attests that Paul Weiss will "develop the record and [defense] strategy"; work with economists to analyze discovery "and [to] develop economics-based defenses to the substantive claims[;]" and prepare argument for the motion to dismiss, including of the Direct Action Plaintiffs' complaints, which logically includes the amended complaint filed by the Food Manufacturer Plaintiffs jointly. Davis Decl. ¶¶ 26–27, 31; ECF No. 745. She also describes Paul Weiss's representation of ASR/Domino as involving "unparalleled" understanding and claims the firm's "institutional knowledge" of ASR/Domino, the sugar industry, the relevant factual issues, and ASR/Domino's legal positions "cannot be replicated." Davis Decl. ¶ 29.[7]

35. I touch on certain authorities cited by Professor Green to provide additional context. In my opinion, Professor Green's cited authority is either distinguishable or

[7] I do not discount that Mr. Petkoski and certain members of his team possess extensive knowledge, but this is knowledge they obtained over four years at a prior firm, A&O Shearman, Petkoski Decl. ¶¶ 3–9, and as described above, the conflict could have and should have been addressed in September 2025 before the matter was transferred to Paul Weiss. *See supra* at ¶¶ 25–26.

undermines his opinion and supports the opinions set forth in my Declaration and my Supplemental Declaration.

a. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 965 F. Supp. 2d 104 (D.D.C. 2013):[8] as a preliminary note, D.C.'s version of Rule 1.7 is significantly different from Minnesota's Rule 1.7. D.C. Rule 1.7 "prohibits a firm from representing a client that takes a position in a matter that is adverse to the position taken by another current firm client in the same matter." *Rail Freight*, 965 F. Supp. 2d at 110 (describing D.C. Rule 1.7(b)(1)). In contrast, Minnesota Rule 1.7 forbids representation when "the representation of one client will be directly adverse to another client." Thus, Minnesota's Rule 1.7 does not require that the direct adversity be in the "same matter," i.e., the basis under which the *Rail Freight* court concluded that there was no conflict in that case. *See Rail Freight*, 965 F. Supp. 2d at 107–18 (concluding that the separate but related action and the class action were "distinct matters" and not the "same matter" under D.C. Rule 1.7). In other words, Minnesota follows the Model Rules, while D.C. takes a different, minority approach. Further, in *Rail Freight*, the moving party, Oxbow, was an unnamed class member of an MDL that had filed its own, separate complaint, but the related action had not yet been consolidated into the class action MDL. The defendant (Union Pacific ("UP")) was being represented by Latham & Watkins LLP ("Latham") in the class action but by separate

[8] Paul Weiss also cites *Milwaukee Electric Tool Corp. v. Hilti, Inc.*, No. 14-CV-1288, 2015 WL 1898393 (E.D. Wis. Apr. 27, 2015), which is distinguishable. *Milwaukee Electric Tool* concerned a series of related cases without evidence that the allegedly conflicted firm would participate in motions adverse to its client or oppose a client's motion. ASR/Domino's counsel here indicated that Paul Weiss will be involved in expert analysis and motion practice relating to Kraft Heinz. *See* Davis Decl. ¶¶ 26–31.

counsel in Oxbow's related action. (Latham did not represent any party in the related action.) Oxbow had filed a limited discovery motion in the class action, but that motion was defended by other counsel, and the court accepted Latham's assertion that it had not assisted other counsel in defending the motion. In denying Oxbow's motion to disqualify, the court stressed that Oxbow's discovery motion "presented a discrete dispute in a complicated antitrust action, and Latham's uncontested representation is that it did not assist UP in opposing Oxbow's motion." *Id.* at 117. Here, Kraft Heinz's individual matter (its Amended Complaint with certain of the other Food Manufacturer Plaintiffs) has been consolidated into the MDL and Paul Weiss has an appearance on file in that matter (and in the MDL). This matter is more akin to *Arrowpac Inc. v. Sea Star Line LLC*, Nos. 3:12-cv-1180-J-32JBT et al., 2013 WL 5460027 (M.D. Fla. Apr. 30, 2013), acknowledged by Professor Green as contrary authority to *Rail Freight*, Green Decl. ¶ 52 n.16, because Paul Weiss is representing ASR/Domino adverse to the other plaintiffs in Kraft Heinz's individual action and, as ASR/Domino's own Chief Litigation Counsel Ms. Davis has acknowledged, *see* Davis Decl. ¶¶ 25–31, Paul Weiss will be directly involved in the Sugar MDL, taking positions for ASR/Domino in the MDL adverse to other plaintiffs, including all of the Food Manufacturer Plaintiffs, that could be dispositive of Kraft Heinz's individual antitrust claims, and will be moving to dismiss the individual complaint filed by Kraft Heinz and certain of the other Food Manufacturer Plaintiffs.

b. *Sumitomo Corp. v. J. P. Morgan & Co.*, No. 99 CIV. 4004 (JSM), 2000 WL 145747 (S.D.N.Y. Feb. 8, 2000): like *Rail Freight*, *Sumitomo* is distinguishable on the facts. There, Paul Weiss was not "attempting to establish wrongdoing by Chase or

seeking a judgment that will directly impact Chase." *Id.* at *5. In the Sugar MDL, and through its impending motion to dismiss Direct Action Plaintiffs' complaints, Paul Weiss will be taking actions contrary to all Food Manufacturer Plaintiffs, including Kraft Heinz. Paul Weiss's representation in the Sugar MDL and with respect to the Food Manufacturer Plaintiffs' joint complaint is more akin to *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225 (2d Cir. 1977) referenced in *Sumitomo*. In *Fund of Funds*, the Second Circuit disqualified separate counsel that a conflicted firm (Morgan Lewis) had assisted in developing an action against the firm's current client (while Morgan Lewis was representing a different client suing separate defendants in a related action), holding that a lawyer "cannot delegate his fiduciary duties to another in an effort to avoid its strictures" and that the arrangement would allow Morgan Lewis "to do indirectly what [it] cannot do directly," *id.* at 234, notwithstanding that it never appeared in the action and repeatedly disclaimed any role in "making a case" against its client, *id.* at 229–32. Like Morgan Lewis, Paul Weiss will remain the architect of the litigation against its own client—developing the factual record, the expert analyses, and the legal strategy that will be deployed against Kraft Heinz's claim—while conflicts counsel Maslon will undoubtedly use the work product developed by Paul Weiss and sign the briefs and motions addressed directly to Kraft Heinz. *See* Davis Decl. ¶¶ 26–31.

c. <u>ABA Formal Opinion 05-435</u>: the ABA Standing Committee on Ethics and Professional Responsibility concludes that a lawyer representing an insurer in action A would be prohibited under Rule 1.7 from representing a plaintiff in action B against a defendant whose defense is being provided by the same insurer, where that insurer

is also a named party in the litigation or the lawyer would be required to undertake discovery of the insurer. ABA Formal Opinion 05-435 (2004) at 1–3. Here, it is undisputed that both Kraft Heinz and ASR/Domino are participants in the MDL and parties in the individual case. This is direct adversity.

d. Professor Green also cites a law review article, Stephen Gillers, "*Directly Adverse" Means Directly Adverse: How Courts Have Misread Rule 1.7(a)(1) and Why It Matters*, 98 Denv. L. Rev. 59, 72–74 (2020). Professor Gillers agrees that direct adversity exists in factual situations akin to *Fund of Funds* (which he characterized as an "easy" case of direct adversity because of "[t]he assistance Morgan Lewis gave [conflicts counsel] in the prosecution of the claim against its own client") and where a client will "confront its own law firm in court, on motions, or in discovery." *Id.* at 72–74. Professor Green fails to grapple with the statements in Ms. Davis's declaration suggesting that a *Fund of Funds* situation is present due to Paul Weiss's position as a member of the Defendants' Steering Committee and as counsel for ASR/Domino against the other Food Manufacturer Plaintiffs in the same joint case, which will require the acts of direct adversity identified by Professor Gillers.

36. Professor Green ends this section of his declaration by suggesting that Kraft Heinz can terminate its seven-year relationship with Paul Weiss in the Delaware matter given its concern that Paul Weiss will be acting against it in the MDL and in Kraft Heinz's separate action with the other Food Manufacturer Plaintiffs. Green Decl. ¶ 53. But this would raise the same prejudice concerns as those articulated by ASR/Domino. In my view,

any “hardship” should not be borne by Kraft Heinz, as it is the law firm’s obligation, not the obligation of its clients, to resolve the firm’s conflicts.

37. In summary, I have not changed my opinion that Paul Weiss’s representation of ASR/Domino is directly adverse to Kraft Heinz, a current client of the law firm.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 28, 2026, in Brookline, Massachusetts.

Nancy J. Moore

Nancy J. Moore