WINTHROP & WEINSTINE

September 29, 2026

Thomas H. Boyd
Direct Dial: (612) 604-6505
Main Fax: (612) 604-6800
tboyd@winthrop.com

**VIA ECF**
The Honorable Elizabeth Cowan Wright
Warren E. Burger Federal Building and U.S. Courthouse
316 North Robert Street, Suite 100
St. Paul, MN 55101

**Re:** ***In re: Granulated Sugar Antitrust Litigation***
MDL No. 24-03110 (JWB/ECW)
This Document Relates To: *Mondelēz Global LLC et al. v. ASR Group International, Inc. et al.*, No. 0:26-cv-03528

Dear Judge Wright:

Pursuant to our call to your chambers this morning and the permission granted to file this letter, we write to provide an additional pertinent and significant authority that came to our attention after we filed Paul, Weiss's opposition to the pending motion to disqualify in these matters: *Board of Regents of the University of Nebraska v. BASF Corporation*, No. 4:04-CV-3356, 2006 WL 2385363 (D. Neb. Aug. 17, 2004). A copy of this decision is enclosed for your convenience.

The *BASF Corporation* decision from U.S. Magistrate Judge David L. Piester applied Eighth Circuit precedent and ethical rules similar to the Minnesota Rules of Professional Conduct. The decision, pages *8 and *10-12, is relevant to the Minnesota Rule 1.7 arguments raised in the *Mondelez* Plaintiffs' motion to disqualify Paul, Weiss. In keeping with Fed. R. App. P. 28(j), this letter does not provide argument about this authority, but Paul, Weiss reserves the right to present argument about this authority during the upcoming hearing on September 30, 2026.

If you have any questions regarding this matter, please do not hesitate to contact us.

Very truly yours,

WINTHROP & WEINSTINE, P.A.

Thomas H. Boyd

Thomas H. Boyd

Enclosure (1)
44247766v1

2006 WL 2385363
Only the Westlaw citation is currently available.
United States District Court, D. Nebraska.

BOARD OF REGENTS OF the UNIVERSITY OF NEBRASKA, Plaintiff,
v.
BASF CORPORATION, Defendant,
and
Monsanto Company, Intervening Plaintiff.

No. 4:04CV3356.
|
Aug. 17, 2006.

**Attorneys and Law Firms**

Andre R. Barry, James M. Bausch, Cline, Williams Law Firm, Lincoln, NE, for Plaintiff.

Danene J. Tushar, Sherman P. Willis, Wayne J. Mark, Fraser, Stryker Law Firm, Omaha, NE, Steven G. Spears, Howrey Law Firm, Houston, TX, for Intervening Plaintiff.

Charanjit Brahma, Gregg F. Locascio, Kirkland, Ellis Law Firm, Washington, DC, Robert W. Mullin, David S. Houghton, Lieben, Whitted Law Firm, Omaha, NE, for Defendant.

John P. Passarelli, Kutak, Rock Law Firm, Omaha, NE, for Intervening Defendant.

MEMORANDUM AND ORDER

DAVID L. PIESTER, Magistrate Judge.

***1** Intervening plaintiff Monsanto Company ("Monsanto") has moved to disqualify defendant BASF Corporation's ("BASF") counsel in this action, Gregg F. LoCascio, Charanjit Brahma, and the firm of Kirkland & Ellis LLP ("K & E"). Monsanto claims that K & E has a conflict of interest which disqualifies them from ethically representing BASF in this case.

Monsanto claims that it has been a client of K & E since 2000, in that it is a defendant represented by K & E in pending litigation in Mississippi. Monsanto contends that its interests in this case are directly adverse to those of BASF and that Monsanto did not give K & E informed consent to represent BASF in this litigation. It concludes that K & E's continued representation of BASF in this case is prohibited by both the Nebraska Rules of Professional Conduct and the Nebraska Code of Professional Responsibility and thus by the local rules of this court.

BASF counters with arguments that K & E has represented BASF for years, that it did not learn of Monsanto's claim to an exclusive license of the technology at the center of this case until after it had commenced its representation of BASF, and that it did obtain Monsanto's informed consent to continue representing BASF in this case. It further contends that the Mississippi litigation is unrelated to this case and Monsanto's motion is part of a broader strategy to extract business concessions from BASF. It argues that the alleged conflict, if it exists, was created by Monsanto and was "thrust upon" K & E, and further, that disqualification would deny BASF its counsel of choice to its significant prejudice. Filing 86.[1]

FACTS

Monsanto was sued in state court in Mississippi by Delta and Pine Land Company ("DPL") by complaint filed January 18, 2000. Filing 82, Exhibit 2. That litigation is a breach of contract suit which concerns, *inter alia,* alleged failures of Monsanto to take commercially reasonable efforts to obtain antitrust clearance to effect a merger with the plaintiff ("a commercial breeder, producer and marketer of cotton and soybean planting seed"), termination of their merger agreement, and resulting losses in value of the plaintiff's stock. Filing 82, Exhibit 2. Monsanto filed its answer in that case on January 31, 2000. The answer bears the signature of local counsel from Mississippi and K & E. Filing 82, Exhibit 3. There is no evidence that K & E represented Monsanto at any earlier time.

In representing Monsanto in the course of the DPL case for the last five years, K & E has been paid "millions of dollars in legal fees," has viewed "millions of pages of Monsanto's confidential records and information regarding recombinant DNA gene technology, including technology relating to herbicide resistance and other issues associated with Monsanto's biotechnology business strategy," and has "worked very closely with numerous top level executives, scientists, and lawyers at Monsanto in ...

discussing ... Monsanto's biotechnology and acquisition strategies.” Affidavit of David F. Snively, Deputy General Counsel of Monsanto, Filing 82, Exhibit 3.

***2** This case was filed November 17, 2004. It seeks a declaratory judgment that BASF has “no right, title, or interest” in a non-exclusive license “to make, have made, use or sell any invention including know-how and resulting patents in the field of crops resistant to dicamba and all genetic material related to deriving dicamba resistance” to which the plaintiff has rights under a contract with defendant's predecessor in interest, Sandoz Agro, Inc. Complaint, Filing 1.

K & E attorneys Brahma and LoCascio sought and received admission pro hac vice to represent the defendant on December 23, 2004. Filings 8–11.

On January 12, 2005 Monsanto and plaintiff (variously referred to in the documents as “Board,” “University,” or “Nebraska”) entered into a license agreement in which plaintiff granted Monsanto an exclusive license to the Dicamba-resistant technology at issue in this case. Affidavit of Dennis R. Hoerner, Senior Counsel–Intellectual Property for Monsanto, Filing 82, Exhibit 4; Complaint in Intervention, Filing 76, para. 13–15.

There is no evidence that either plaintiff or Monsanto publicly disclosed the existence, parties, or terms of this agreement until March 23, 2005 in a news release issued by the Institute of Agriculture and Natural Resources, University of Nebraska–Lincoln. Filing 86–3, Exhibit C, Attachment 1. Nor before that date had counsel for plaintiff disclosed the agreement to counsel for BASF. *Id.* The news release did not disclose the date the agreement had been executed. *Id.*

A motion to dismiss was filed on behalf of BASF by attorneys Brahma and LoCascio and K & E and local counsel Houghton on January 21, 2005. Filing 20. The motion to dismiss was denied on March 7, 2005. Filing 27.

Attorney Brahma at K & E discovered the news release “in late March, 2005.” Filing 86, Exhibit C. On Monday, March 25, 2005 he informed fellow K & E attorney Assaf that he had discovered on the internet a news release announcing the University–Monsanto licensing agreement. K & E obtained authorization from BASF to contact Monsanto in advance of BASF's April 6 answer deadline in this case. Assaf, through fellow K & E attorney LoCascio, sought from Emily Nicklin, a partner in K & E's Chicago office, the name of someone at Monsanto to contact. LoCascio sent an email to Nicklin advising her of the news release and included a copy. On March 28 Nicklin forwarded LoCascio's email to David Snively at Monsanto. See Filing 86, Exhibit B. LoCascio's email to Nicklin contained the following:

> As background, our client BASF was sued by the Univ of Nebraska in a DJ action seeking a determination that BASF has no rights in this technology. BASF acquired a non-exclusive license to these same rights in 1997 via an acquisition from Sandoz Agro. BASF & K & E had prepared a counterclaim to be filed [M]onday seeking an injunction against the University preventing them from licensing the rights in a manner inconsistent with BASF's license. Earlier this week, the university apparently went ahead anyway and gave Monsanto an exclusive license to these same rights.

***3** Filing 86, Exhibit E.

On April 5, 2005 K & E attorney Assaf telephoned Snively at Monsanto and was put in telephone contact with Dennis Hoerner, Senior Counsel—Intellectual Property. Assaf informed Hoerner of K & E's representation of BASF. The remaining content of that conversation is in dispute. According to Hoerner's affidavit, Assaf said that K & E “would be” representing BASF in this case,

> even though [K & E] represented Monsanto in other litigation and understood that Monsanto had a license from the University to the Dicamba-resistant plant technology at issue in the declaratory judgment suit. I was not overly concerned about the University's claim for declaratory judgment against BASF because regardless of whether Monsanto held an exclusive or non-exclusive license to the technology, it would still have the freedom to operate in the area of Dicamba-resistant plant technology. Neither during our conversation, nor in his letter of April 7, 2005 that followed, did counsel for BASF inform me that BASF had filed a Counterclaim against the University seeking title to technology that was a part of the License Agreement between Monsanto and the University.

Filing 82, Exhibit 4, p. 2.

Assaf's recollection, however, is quite different. Assaf recalls that he informed Hoerner that (1) K & E had been representing BASF in this dispute since November, 2004; (2) BASF had a pre-existing non-exclusive license to the dicamba-related technology, and any “alleged ‘exclusive’ license grant from the Board to Monsanto was ineffective”; (3) it was the

view of BASF and K & E that the Board had no right to license what it did not own, that the Board did not own the subject technology, and that Monsanto may have been taken advantage of by the Board; (4) K & E would continue to aggressively litigate on behalf of BASF; and (5) K & E would be filing an answer and counterclaims against the Board "to vindicate BASF's rights." Filing 86, Exhibit B. He states that Mr. Hoerner consented to K & E's continued representation of BASF, requiring only that BASF have other counsel take any depositions from Monsanto. He also states that Mr. Hoerner never mentioned Monsanto's "exclusive" license rights, and never expressed any lack of authority to consent to K & E's continued representation. *Id.*

BASF's Answer and Counterclaims were filed in this case on April 6, 2006. Filing 30. The counterclaims' prayer for relief seeks a declaration that the rights under the contract between plaintiff and Sandoz Agro, Inc. were properly transferred and are valid, and enjoining the plaintiff from "taking any action contrary to BASF's ownership or license rights under the Contract." *Id.*

Assaf wrote a letter to Hoerner on April 7, 2005 to "follow[ ] up on our discussion earlier this week regarding the BASF/University of Nebraska dispute." It continued, "As we discussed, while Nebraska has entered into a license with Monsanto, there is no conflict. While we all agree there is no conflict, there may be 'indirect adversity' issues." Filing 82, Exhibit 5. Monsanto did not respond to Assaf's letter and has never signed any writing explicitly waiving any conflict of interest posed by the firm's representation of BASF in this case and Monsanto in the DPL case. Monsanto's "consent" did not result from its usual practice in evaluating potential conflict situations. Snively Affidavit, Filing 82, Exhibit 4.

***4** "Monsanto"[2] first learned of BASF's claim to title in the biotechnology at issue in this case in late August or early September, 2005 when "Monsanto" contacted counsel for plaintiff and received copies of the pleadings, including BASF's Answer and Counterclaims. Affidavit of Dennis Hoerner, Filing 82, Exhibit 4.

After BASF filed its Answer and Counterclaims in this case, an initial scheduling order was entered and the parties began discovery. A planning conference was held and a final scheduling order was entered setting a trial in February, 2006. Filing 37. A motion to compel discovery was filed by BASF in November, 2005, however, which stalled the progression of the case. As well, on January 25, 2006 Monsanto filed its motion to intervene. Also during that general time period all three of the present parties engaged in negotiations attempting to resolve the entire dispute. See Filing 65.

The court resolved the motion to compel on January 26, 2006, filing 56, but the response deadlines on the motion to intervene were extended because of the parties' negotiations. Filing 66. When that effort failed, the parties completed the filing of evidence and briefs on the motion to intervene, which was finally submitted on April 24, 2006. Filings 72–73.

In the midst of the parties' settlement discussions, on April 5, 2006 (ironically exactly one year after the phone conversation between Hoerner and Assaf), David Snively wrote a letter to James H. Schink, the General Counsel of K & E, objecting to K & E's continued representation of BASF in this case and requesting that K & E withdraw. Filing 82, Exhibit 3, Attachment A.

Schink responded by letter to Snively on April 10, 2006 outlining the reasons he believed K & E's withdrawal was not ethically required under the circumstances. Filing 86–3, Exhibit H.

In response to Schink's letter, Snively again wrote to him on May 4, 2006 advising that Monsanto's alleged "consent" to K & E's continued representation of BASF was not "informed," and that Monsanto would take "all necessary and appropriate action to protect its interest." Filing 82, Exhibit 3, Attachment B.

By order entered May 11, 2006 (filing 74) the court granted Monsanto's motion to intervene. Monsanto filed its complaint in intervention on May 18, 2006, filing 76, followed on June 9, 2006 with the present motion to disqualify counsel. Filing 80.

Since the inception of the case, K & E's lawyers have expended huge amounts of time and resources in their investigation of BASF's and the plaintiff's claims and defenses and preparation of pleadings, evidence, and briefs. Assaf Declaration, Filing 86, Exhibit 2. Likewise since the inception of the DPL litigation, different K & E lawyers have expended huge amounts of time and resources representing Monsanto. Monsanto intends to retain K & E as its lawyer in the DPL case. Snively Affidavit, Filing 82, Exhibit 4.

DISCUSSION

It is within the trial court's discretion to disqualify counsel in particular fact situations in order to preserve the integrity of the court and the proceedings and to avoid confusion among jurors or an appearance of partiality in the case at hand. However, that discretion must be carefully exercised, as such motions can be asserted for a variety of tactical reasons, and the disqualification of counsel deprives the client of counsel of its choice.

> ***5** The decision to grant or deny a motion to disqualify an attorney rests in the discretion of the trial court, and we will reverse this determination only upon a showing of abuse of that discretion. *A. J., by L.B. v. Kierst,* 56 F.3d 849, 859 (8th Cir.1995). Because of the potential for abuse by opposing counsel, "disqualification motions should be subjected to 'particularly strict judicial scrutiny.' " *Optyl Eyewear Fashion Int'l Corp. v. Style Cos.,* 760 F.2d 1045, 1050 (9th Cir.1985) (quoting *Rice v. Baron,* 456 F.Supp. 1361, 1370 (S.D.N.Y.1978)). When reviewing a decision of a district court on a motion for disqualification of an attorney, we apply the same rules governing the professional conduct of attorneys that the district court has adopted. See *Blair v. Armontrout,* 916 F.2d 1310, 1333 (8th Cir.), cert. denied, 502 U.S. 825 (1991).

*Harker v. Comm'r of Internal Revenue,* 82 F.3d 806, 808 (8th Cir.1996). See also, *Grahams Service Inc. v. Teamsters Local 975,* 700 F.2d 420, 423 (8th Cir.1982); *Rocchigiani v. World Boxing Counsel,* 82 F.Supp.2d 182, 186–9 (S.D.N.Y.2000), and cases cited therein.

This court has specifically not incorporated any particular code or ethical rules of professional conduct. Instead, the applicable local rule establishes as a general rule that an attorney admitted to practice must not engage in "conduct unbecoming of a member of the bar." NEGenR 1.7(b)(2)(B). The rule permits the court to consult others' rules or codes of professional conduct if it would be helpful in resolving issues before it. *Id.* In this case I have utilized the American Bar Association Annotated Model Rules of Professional Conduct, because K & E is a "national law firm," and because the model rules inform the court on generally applicable standards in concurrent representation issues. The question, however, is to be determined based on federal law. *State of Arkansas v. Dean Foods Products Co., Inc.,* 605 F.2d 380, 383 (8th Cir.1979), overruled on other grounds, *In Re Multi–Piece Rim Products Liability Litigation,* 612 F.2d 377 (8th Cir.1980).

The American Bar Association's Annotated Model Rules of Professional Conduct, Fifth Edition (2003) address these subjects as follows:

> RULE 1.7 CONFLICT OF INTEREST: CURRENT CLIENTS
>
> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> > (1) the representation of one client will be directly adverse to another client; or
> >
> > (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
>
> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
>
> > (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
> >
> > ***6** (2) the representation is not prohibited by law;
> >
> > (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
> >
> > (4) each affected client gives informed consent, confirmed in writing.

The "General Principles" in the Comment to this rule include the following:

> [2] Resolution of a conflict of interest problem under this Rule requires the lawyer to: 1) clearly identify the client or clients; 2) determine whether a conflict of interest exists; 3) decide whether the representation may be undertaken despite the existence of a conflict, i.e., whether the conflict is consentable; and 4) if so, consult with the clients affected under paragraph (a) and obtain their informed consent, confirmed in writing. The clients affected under paragraph (a) include both of the clients referred to in paragraph (a)(1) and the one or more clients whose representation might be materially limited under paragraph (a)(2).

[5] Unforeseeable developments, such as changes in corporate and other organizational affiliations or the addition or realignment of parties in litigation, might create conflicts in the midst of a representation, as when a company sued by the lawyer on behalf of one client is bought by another client represented by the lawyer in an unrelated matter. Depending on the circumstances, the lawyer may have the option to withdraw from one of the representations in order to avoid the conflict. The lawyer must seek court approval where necessary and take steps to minimize harm to the clients. See Rule 1.16. The lawyer must continue to protect the confidences of the client from whose representation the lawyer has withdrawn. See Rule 1.9(c).

[6] Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent. Thus, absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated. The client as to whom the representation is directly adverse is likely to feel betrayed, and the resulting damage to the client-lawyer relationship is likely to impair the lawyer's ability to represent the client effectively. In addition, the client on whose behalf the adverse representation is undertaken reasonably may fear that the lawyer will pursue that client's case less effectively out of deference to the other client, i.e., that the representation may be materially limited by the lawyer's interest in retaining the current client. Similarly, a directly adverse conflict may arise when a lawyer is required to cross-examine a client who appears as a witness in a lawsuit involving another client, as when the testimony will be damaging to the client who is represented in the lawsuit. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only economically adverse, such as representation of competing economic enterprises in unrelated litigation, does not ordinarily constitute a conflict of interest and thus may not require consent of the respective clients.

***7** [18] Informed consent requires that each affected client be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client. See Rule 1.0(e) (informed consent). The information required depends on the nature of the conflict and the nature of the risks involved.

Regarding "Informed Consent," the Comments to Rule 1.7 state:

> One condition necessary for curing an otherwise impermissible conflict is that the client give informed consent, after full disclosure of the nature and implications of the lawyer's conflict. Informed consent denotes the client's agreement to the lawyer's proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of —and reasonably available alternatives to—the proposed course of conduct.

Further comments to Rule 1.7 include:

> Rule 1.7(b)(4) requires a lawyer to obtain written confirmation of a client's consent to the lawyer's conflict of interest. This is a new requirement, imposed by the 2002 amendments to the Model Rules. Note that "written confirmation" is not the same as "written consent"; Rule 1.0(b) defines "written confirmation" to include a letter from the lawyer to the client confirming the client's oral consent.

Applicable definitions in Rule 1.0 are as follows:

> (e) "Informed consent" denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct.

Rule 1.0 defines "Confirmed in writing" as follows:

> (b) "Confirmed in writing," when used in reference to the informed consent of a person, denotes informed consent that is given in writing by the person or a writing that a lawyer promptly transmits to the person confirming an oral informed consent. See paragraph (e) for the definition of "informed consent." If it is not feasible to obtain or transmit the writing at the time the person gives informed consent, then the lawyer must obtain or transmit it within a reasonable time thereafter.

The Comments to Rule 1.0 say:

> [6] Many of the Rules of Professional Conduct require the lawyer to obtain the informed consent of a client or other person.... The communication necessary to obtain such consent will vary according to the Rule involved and the circumstances giving rise to the need to obtain informed consent. The lawyer must make reasonable efforts to ensure that the client or other person possesses information reasonably adequate to make an informed decision. Ordinarily, this will require communication that

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

includes a disclosure of the facts and circumstances giving rise to the situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct, and a discussion of the client's or other person's options and alternatives. In some circumstances it may be appropriate for a lawyer to advise a client or other person to seek the advice of other counsel. A lawyer need not inform a client or other person of facts or implications already known to the client or other person; nevertheless, a lawyer who does not personally inform the client or other person assumes the risk that the client or other person is inadequately informed and the consent is invalid. In determining whether the information and explanation provided are reasonably adequate, relevant factors include whether the client or other person is experienced in legal matters generally and in making decisions of the type involved, and whether the client or other person is independently represented by other counsel in giving the consent. Normally, such persons need less information and explanation than others, and generally a client or other person who is independently represented by other counsel in giving the consent should be assumed to have given informed consent.

***8** [7] Obtaining informed consent will usually require an affirmative response by the client or other person. In general, a lawyer may not assume consent from a client's or other person's silence. Consent may be inferred, however, from the conduct of a client or other person who has reasonably adequate information about the matter. A number of Rules require that a person's consent be confirmed in writing. See Rules 1.7(b) and 1.9(a). For a definition of "writing" and "confirmed in writing," see paragraphs (n) and (b). Other Rules require that a client's consent be obtained in a writing signed by the client. See, e.g., Rules 1.8(a) and (g). For a definition of "signed," see paragraph (n).

Finally, a conflict of interest for one lawyer in a firm is generally imputed to all the lawyers in the same firm. Rule 1.10 states:

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

Ordinarily the party seeking to disqualify counsel must bear the initial burden of coming forward with evidence to justify disqualification. *Weeks v. Indep. School Dist. No. I–89 of Okla. County,* 230 F.3d 1201, 1212 (10th Cir.2000). Ultimately, however, the attorney sought to be disqualified must demonstrate that disqualification is not required under the circumstances. *In re BellSouth Corp.,* 334 F.3d 941, 961 (11th Cir.2003); *A.J. by L.B. v. Kierst,* 56 F.3d 849, 859 (8th Cir.1995); *Regent Insurance Co. v. Insurance Company of North America,* 804 F.Supp. 1387, 1390 (D.Kan.1992); *Pacific Employers Ins. Co. v. P.B. Hoidale Co., Inc.,* 789 F.Supp. 1112, 1113 (D.Kan.1992).

There are several critical issues to resolve in determining this motion. Among them are: First, is the DPL case related to this one? Second, if so, did Monsanto give K & E its "informed consent" to K & E's continued representation of BASF in this case? Third, if not, has Monsanto waived its right to complain by failing to promptly assert its rights? Fourth, if not, was the conflict "thrust upon" K & E by the actions of Monsanto? Fifth, if not, may K & E nevertheless continue to represent BASF in this case despite the conflict?

*Related Cases.*

Monsanto has produced no evidence that the two cases are in fact related. Mr. Snively's affidavit says in broad, conclusory terms that they are related. He states that K & E lawyers have been privy to "millions of pages of Monsanto's confidential records and information regarding recombinant DNA gene technology, including technology relating to herbicide resistance and other issues associated with Monsanto's biotechnology business strategy," and have "worked very closely with numerous top level executives, scientists, and lawyers at Monsanto in ... discussing ... Monsanto's biotechnology and acquisition strategies." Affidavit of David F. Snively, Deputy General Counsel of Monsanto, Filing 82, Exhibit 3. However, Monsanto has produced no evidence describing any specific items of such information, documents, biotechnology or acquisition strategies which have been shared with K & E, and no evidence that any such information relates to BASF's claims in this litigation. In addition, the pleadings from the Mississippi case do not demonstrate that any of the issues in that case trace the issues in this case. I cannot simply accept his conclusions without evidence. The record does establish that there is now a conflict of interest for K & E, but not that the two matters are related. Compare *Wycoff v. Nix,* 869 F.2d 1111, 1117 (8th Cir.1989)[3]

(Concurrent representation of a defendant and a prison guard who was a possible witness).

***9** Recognizing that my conclusion in this matter may not be the last word, however, I address the other issues.

*Monsanto's Consent.*

I conclude that Monsanto's consent was not "informed" so as to excuse K & E's continued representation of BASF. First, the evidence establishes that the discussion between Mr. Asaff and Mr. Hoerner was anything but thorough. While Mr. Asaff states now that he discussed a number of possible conflicts, he does not now state what possibilities were discussed, nor possible ramifications of them. It appears from his declaration that the closest he came to such a discussion was informing Mr. Hoerner that "an alleged 'exclusive' license grant from the Board to Monsanto was ineffective." He does not state that he told Hoerner BASF's position was directly in conflict with Monsanto's interest in the subject technology. Further, his "confirming" letter did even less.[4] Mr. Hoerner's affidavit is to the effect that he did not give the matter much critical attention; indeed, he did not even initiate the normal internal review procedures for evaluating possible conflict situations. I find that puzzling, given the enormity of the stakes in this litigation; it begs the question of whether that attitude was the product of his own lack of attention, or being misled by Mr. Asaff, or something else. In any event, the evidence before the court is insufficient to demonstrate that Monsanto was "aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on [its] interests," nor that it agreed "to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."[5] I conclude that K & E has not shown that it engaged in the type of disclosure demanded by its fiduciary obligation to Monsanto, and as a result, Monsanto has not given K & E its informed consent to continue representing BASF in this case.

*Monsanto's Waiver*

K & E argues that Monsanto has waived the conflict by not taking action earlier. The argument has merit. Mr. Hoerner, although put "on notice" of the potential conflict, apparently took no action himself to investigate the matter until four or five months later when he or someone else at Monsanto decided to pursue it with plaintiff's counsel. Nor did he initiate any internal inquiry about the possibility of formally waiving the conflict. His affidavit says that he "was not overly concerned about the University's claim for declaratory judgment against BASF because regardless of whether Monsanto held an exclusive or non-exclusive license to the technology, it would still have the freedom to operate in the area of Dicamba-resistant plant technology."[6] K & E faults Monsanto for not protesting its representation of BASF long before it filed its motion to disqualify counsel, and points to the phone call and letter from Mr. Snively to Mr. Schink one year after Mr. Asaff's telephone notice to Mr. Hoerner.

***10** Monsanto argues that it took prompt action to seek a global resolution of the dispute, involving all three parties, prior to seeking intervention in this case and moving for K & E's disqualification, and that it promptly filed the motion as soon as practicable after its complaint in intervention. It argues it should not be penalized for attempting to resolve the matter informally as part of the parties' settlement discussions.

The Eighth Circuit has required that motions to disqualify opposing counsel be made in a timely fashion. *Central Milk Producers Co-op. v. Sentry Food Stores, Inc.,* 573 F.2d 988, 991–992 (8th Cir.1978) (delay of two years after discovery of factual basis for motion held to be waiver).[7] See also *Greenwalt v. Wal–Mart Stores, Inc.,* 253 Neb. 32, 38 (1997)(Party waived conflict by failing to file interlocutory petition for peremptory writ of mandamus or any other interlocutory review of the district court's denial of WalMart's motion to disqualify Greenwalt's counsel).

Although Monsanto's delay was not dictated by the circumstances, that is, there is no reason shown why it could not have with diligence investigated the matter in the days immediately following the first call from Mr. Asaff to Mr. Hoerner, some of that delay can be attributed to K & E's failure to provide Mr. Hoerner a complete, accurate picture of the situation. In addition, the delay was not inordinate under the totality of the circumstances. I do not fault Monsanto for its delay.

*Monsanto's "Thrust"*

K & E argues that it was Monsanto that created the conflict in the first place, by its contracting with plaintiff in January, 2005, and in any event, the direct conflict did not arise until Monsanto became a party to this case, thus "thrusting" the conflict on K & E. Although Monsanto argues that this doctrine does not apply in this circumstance, I disagree. At

the time K & E commenced its representation of BASF in this dispute[8]—sometime near the date of the filing of the complaint herein on November 17, 2004—it had represented BASF for a number of years. Prior to the DPL litigation, K & E had not represented Monsanto. When this case was filed, there was no notion that any other party was involved, much less a current client that would be taking a position adverse to BASF. The conflict arose with the contract between the plaintiff and Monsanto in January, 2005. From K & E's perspective it was an "unforeseeable development" as that term is used in Model Rule 1.7 .[9]

Principle 5 following that rule requires K & E to take steps to minimize harm to the clients. In this case wholly different litigation teams from K & E are representing BASF in this case and Monsanto in the DPL litigation; none of the lawyers involved has represented the other client. Assaf Declaration, Filing 86, Exhibit B. Monsanto has argued that K & E lawyers have been privy to "millions of pages of Monsanto's confidential records and information regarding recombinant DNA gene technology, including technology relating to herbicide resistance and other issues associated with Monsanto's biotechnology business strategy," and have "worked very closely with numerous top level executives, scientists, and lawyers at Monsanto in ... discussing ... Monsanto's biotechnology and acquisition strategies." Affidavit of David F. Snively, Deputy General Counsel of Monsanto, Filing 82, Exhibit 3. However, it has produced no evidence describing any specific items of such information, documents, biotechnology or acquisition strategies which have been shared with K & E, and no evidence that any such information relates to BASF's claims in this litigation, and no evidence that any such information has been shared between the two teams of lawyers at K & E. More importantly, even if such information has been shared, there is in this record no showing of any resulting prejudice to Monsanto in either this case or the Mississippi case. Should the motion to disqualify be denied, K & E would still be required to keep inviolate the confidential information and trade secrets of Monsanto; in this regard it may be that the proverbial "Chinese wall" would be necessary to keep such information—both Monsanto's and BASF's—from the lawyers for the other client.[10]

*K & E's Continued Representation.*

***11** I am for a number of reasons persuaded that the court should not disqualify K & E from continuing its representation of BASF. In *Gould v. Mitsui Mining,* 738 F.Supp. 1126 (N.D.Ohio 1990) the court faced a similar, though not identical, issue. It considered the following factors: prejudice to the moving party; receipt of confidential information as a result of the other representation; the cost of retaining new counsel, in terms of both time and money; the delay to the litigation caused by requiring the first-represented client to obtain new counsel; the complexity of the issues in the case and the time it would take new counsel to acquaint themselves with the facts and issues; and the fact that the conflict was created by merger after the case was commenced, not by any affirmative act of counsel. *Id.* at 1126–27. See also, *University of Rochester v. G.D. Searle & Co., Inc.,* 2000WL1922271 (W.D. N. Y.2000). All of these factors favor allowing K & E to remain as BASF's counsel in this case.

First, the record before me does not show any prejudice to Monsanto from allowing K & E to continue representing BASF in this case. As noted above, its conclusory statements do not constitute evidence, rather, they leave the matter to possibility and conjecture.

Second, the record does not demonstrate that any of Monsanto's confidential information has been given to K & E's lawyers working on this case. Given the continued obligation of K & E to keep its clients' confidences, I think it possible for K & E to protect those confidences as to both Monsanto in the Mississippi litigation and BASF in this case.

Third, I believe that requiring K & E's withdrawal at this point would not only deprive BASF of its chosen counsel, but would also cause it to incur enormous amounts of time and money in finding and educating new counsel to continue in this case. I would be inclined to this result, nevertheless, had I found it necessary to preserve the integrity of the proceedings and eliminate any "taint" caused by the concurrent representation. The record before the court does not demonstrate the necessity to do so in these circumstances. See, *Rocchigiani* 82 F.Supp.2d at 186–187; *Hickman v. Burlington Bio–Medical Corp.,* 371 F.Supp.2d 225, 229 (E.D. N. Y.2005).

In addition, were I to disqualify K & E and require new counsel, this case would be delayed substantially to permit new counsel to get "up to speed" with the other parties and adequately prepared to go forward. This is complex litigation. The court will be called upon to resolve issues of great factual and scientific intricacy against a backdrop of a marketplace of competitive pressure to develop new products. The case has already been on file for over a year and a half, and the

pleadings are just now reaching closing.[11] It is important that the case not be delayed unnecessarily.

Finally, the conflict now facing K & E was not of its own making. At the time it undertook to represent BASF in this case, Monsanto was not involved. The first occasion for K & E to learn of Monsanto's possible interest was approximately March 25, 2005, after it had undertaken the representation of BASF in this case. Since there has been no showing that the two cases are related, I see no substantial harm and no taint to the proceedings in this court by allowing K & E to remain as counsel for BASF.

***12** In sum, Monsanto has failed to meet its burden of demonstrating that the two cases are substantially related, but even if it had, the factors considered lead to the conclusion that K & E should not be disqualified.

IT THEREFORE HEREBY IS ORDERED:

1. Monsanto's motion to strike, filing 92, is denied as moot.

2. Monsanto's motion to disqualify counsel, filing 80, is denied.

3. BASF's motion for hearing, filing 98, is denied.

4. BASF's motion for a stay of discovery, filing 89, is granted in part, and except as may be otherwise agreed among counsel, discovery in this case is stayed until the pending motion to intervene, filing 99, has been resolved. Within thirty days following the court's order deciding the pending motion to intervene, counsel shall again "meet and confer" pursuant to *Fed.R.Civ.P.* 26(f) and provide to the court their views on an appropriate schedule for progression of this case to trial. In the event a conference with the court is desired, request therefor may be made by telephoning chambers.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2385363

Footnotes

1 Monsanto has moved to strike the declaration of Thomas D. Morgan, filed in opposition to its motion to disqualify. The declaration is largely conclusions based upon K & E's version of facts, some of which are disputed. I have not considered the declaration.

2 No person at Monsanto is identified as having "first learned" this information or having contacted plaintiff's counsel.

3 " 'When an attorney attempts to represent his client free of compromising loyalties, and at the same time preserve the confidences communicated by a present or former client in the same or a substantially related matter, a conflict arises.' *U.S. v. Agosto,* 675 F.2d 965, 971 (8th Cir.1982), cert. denied, 459 U.S. 834 (1982)."

4 His characterizing of the "possible" conflict as "indirect adversity" is misleading; even giving K & E the benefit of its argument that it did not know—exactly—the particulars of the technology claimed to be the subject of both contracts, and even though it did not know—exactly—the terms of Monsanto's contract, how BASF's position, taken with the contemporaneous filing of its counterclaim, that it holds a "non-exclusive" license was only a "potential" conflict with Monsanto's claim to an "exclusive" license eludes me. Moreover, the letter does not even allude to—much less recount with particularity—what Mr. Asaff now says was Mr. Hoerner's only "condition" on K & E's continued representation of BASF, that separate counsel depose any Monsanto witnesses.

5 That BASF has consented to the conflicting representation may be inferred from the fact that K & E continues to represent it; however, K & E has produced no evidence to that effect.

6 According to Hoerner's affidavit, Monsanto's contract with the plaintiff provides that if Monsanto's license is ultimately found to be non-exclusive, Monsanto would pay plaintiff royalties at a reduced rate. Filing 82, Exhibit 4.

7 "A motion to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion. This court will not allow a litigant to delay filing a motion to disqualify in order to use the motion later as a tool to deprive his opponent of counsel of his choice after substantial preparation of a case has been completed. Here appellants not only waited more than two years after they knew Futterman had been hired to formally raise the issue, but

they specifically approved the arrangement followed by Pressman and Hartunian with respect to screening Futterman from the case. It is not claimed that this arrangement has been violated. In view of these circumstances we find that appellants have waived their right to object to the hiring of Futterman. See *Redd v. Shell Oil Co.,* 518 F.2d 311, 315 (10th Cir.1975); *United States Fidelity & Guaranty Co. v. Bolding,* 447 F.2d 462, 464 n. 1 (10th Cir.1971); *Milone v. English,* 306 F.2d 814, 818 (D.C.Cir.1962); *Marco v. Dulles,* 169 F.Supp. 622, 632 (S.D.N.Y.), appeal dismissed, 268 F.2d 192 (2nd Cir.1959). Cf. ABA Comm. of Professional Ethics, Opinions, No. 342 (1975) (allows waiver by government of prohibition of ex-government attorney representing another party against the government in a matter substantially related to work conducted while a government employee); ABA Code of Professional Responsibility DR–5–105(C) (allows representation of multiple clients if full disclosure and consent by clients). But see *W.E. Bassett Co. v. H .C. Cook Co.,* 201 F.Supp. 821 (D.Conn.), aff'd, 302 F.2d 268 (2nd Cir.1962)."

8 The evidence is that K & E has represented BASF for a long period of time, but the DPL litigation is the first time it has represented Monsanto.

9 I reject Monsanto's argument that the rule applies only in corporate acquisition situations.

10 The court is not required to impose specific safeguards, and will not do so. That is the obligation of K & E.

11 If the pending motion to intervene by Syngenta Crop Protection, Inc., filing 99, be granted, the pleadings will remain open for some additional time.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.